ENTERED &
SCANNED
SEP 26 2005
IMAGE *12*

## COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| **STATE OF OHIO,** | : | **Case No. B-9309022** |
| | : | |
| **Plaintiff,** | : | **Judge Mark Schweikert** |
| | : | |
| -vs- | : | **DECISION DENYING** |
| | : | **DEFENDANT'S MOTION** |
| **JAMES DERRICK O'NEAL,** | : | **TO VACATE OR SET ASIDE** |
| | : | **HIS DEATH SENTENCE** |
| | : | |
| **Defendant.** | : | |

This matter is before the court on Defendant James Derrick O'Neal's First Successive Petition to Vacate or Set Aside his death sentence. Defendant argues that he is mentally retarded, and thus not subject to the death penalty pursuant to the Supreme Court's decision in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242 (2002). In *Atkins* the United States Supreme Court held that the Eighth Amendment to the United States Constitution, barring "cruel and unusual punishments," prohibits the execution of a person who is mentally retarded. *Id*. The Court has reviewed the entire record in this matter, including any and all evidence relating to Defendant's mental status that was produced at pretrial, trial, at the mitigation hearing, submitted with his petition herein, the testimony of witnesses at the evidentiary hearing on this petition and the reports of experts submitted in evidence by both parties. The Court has also considered the memoranda and the arguments of counsel. Based on the above the court makes the following findings.

## Case History

James O'Neal was indicted on December 16, 1993. The jury found the Defendant guilty of two counts of aggravated murder in counts 1 and 2 as well as the aggravated burglary charge in count 4. Following a penalty hearing, the jury recommended the death penalty on both aggravated murder counts. On December 11, 1995 this court sentenced Defendant to death. The Ohio Supreme Court affirmed the judgment and denied Defendant's petition for writ of certiorari on May 21, 2001. This court denied Defendant's initial post conviction petition on February 17, 1998. The First District Court of Appeals affirmed the decision. The Ohio Supreme Court denied jurisdiction on March 8, 2000. Defendant's petition for a writ of habeas corpus is presently stayed in federal court pending exhaustion of state remedies.

On November 15, 2002, Defendant filed his First Successive Petition to Vacate or Set Aside Sentence based upon the *Atkins* decision. *Atkins*, 536 U.S. 304 (2002). On April 7, 2004 this court issued Findings of Fact, Conclusions of Law, and an Entry Dismissing Defendant's Successive Petition filed pursuant to *Atkins v. Virginia*. The First District Court of Appeals subsequently issued an Entry Dismissing Defendant's Appeal by Agreement and remanded the case to this court for an evidentiary hearing. On May 17, 2005 this court held a hearing on Defendant's petition.

## Atkins and Lott

As mentioned above, in *Atkins* the United States Supreme Court held that it is a violation of the Eighth Amendment's bar to cruel and unusual punishment to sentence a mentally retarded offender to death. *Id.* at 321. The *Atkins* Court proscribed the execution of the mentally retarded, however it did not establish clear procedures for

2



ENTERED &
SCANNED
SEP 2 6 2005
IMAGE /3

determining whether an individual is "mentally retarded" for purposes of escaping execution. Instead, it left it to the states to "develop appropriate ways to enforce the constitutional restrictions" on executing the mentally retarded. *Id.* at 317.

In *State v. Lott*, the Ohio Supreme Court prescribed the standards and procedural guidelines for determining whether convicted petitioners facing the death penalty are mentally retarded. *State v. Lott*, 97 Ohio St.3d 303, 779 N.E.2d 1011 (2002). The *Lott* Court determined that, "[c]linical definitions of mental retardation, cited with approval in *Atkins*, provide a standard for evaluating an individual's claim of mental retardation." *Id.* at 305. "These definitions require (1) significantly subaverage intellectual functioning, (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self direction, and (3) onset before the age of 18." *Id.* "There is a rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70." *Id.*

In the case sub judice, the question of whether Defendant is mentally retarded should be decided by the court and does not represent a jury question. *Id.* at 306. "In considering an *Atkins* claim, the trial court shall conduct its own de novo review of the evidence in determining whether the defendant is mentally retarded." *Id.* "The trial court should rely on professional evaluations of [Defendant's] mental status, and consider expert testimony, appointing experts if necessary in deciding [the] matter." *Id.* "The trial court shall make written findings and set forth its rationale for finding the defendant mentally retarded or not mentally retarded." *Id.* "[Defendant] bears the burden of establishing that he is mentally retarded by a preponderance of the evidence." *Id.* at 307.

In the case at hand, Defendant has failed to meet his burden. Based on the entire record, including the testimony of experts, professional evaluations of Defendant's



ENTERED &
SCANNED
SEP 2 6 2005
IMAGE 14

mental status, and Defendant's history, it is the decision of this court that Defendant is not mentally retarded. Therefore, his motion to vacate or set aside his death sentence is denied.

### Findings of Fact

Three expert psychologists, including Dr. Michael Nelson III, Dr. Chiappone, and Dr. Robert Tureen provided this court with their respective expert opinions. To determine Defendant's level of intellectual functioning, all three psychologists evaluated his IQ scores. Additionally, the three experts used information obtained from interviews with Defendant and Defendant's history to determine whether he has significant limitations in adaptive skills. Two of the three experts concluded that Defendant is not mentally retarded. Dr. Tureen was the only expert to lend any support to Defendant's position.

On February 9, 1968 Defendant took a Wechsler Intelligence Test for Children administered by Dr. Ruth Kaufman, school psychologist for Cincinnati Public Schools. Defendant's score indicated a full scale IQ of 64. (See Dr. Nelson III Report, p.3, 3/21/05). However, the same test indicated "superior" performance on tasks requiring judgment in social situations, and "effective functioning" in his knowledge of vocabulary and recall of information. *Id.* This court finds Dr. Kaufman's assessment of Defendant's IQ and social functioning credible.

This court further finds that Dr. Chiappone's assessment of Defendant's IQ and his level of social adaptability are also credible. Defendant's score on a 1994 Wechsler Adult Intelligence Scale-R indicated an IQ of 71. *Id.* Dr. Chiappone concluded that Defendant was not mentally retarded. *Id.* At trial on November 6, 1995 Dr. Chiappone



ENTERED &
SCANNED
SEP 2 6 2005
IMAGE 15

testified that, "Defendant's fundamental skills were a bit higher than his attained intellect." (Tp 981-982). He also testified that Defendant understood the proceedings, knew "the difference between what's right and what's wrong" and was "capable of formulating a plan," such as "killing someone." *Id.* at 993.

In 2004, Defendant obtained a score indicating an IQ of 67 on the Wechsler Adult Intelligence Scale administered by Dr. Tureen. (See Dr. Nelson III Report, p. 4, 3/21/05). He also received a score indicating an IQ of 63 on the Reynold's Intellectual Scales Test. *Id.* However, Dr. Tureen concluded that "[Defendant's] general language, his auditory comprehension and general verbal expression and his ability to follow instructions were all intact, within his level of intellectual functioning, that is, of an individual with an IQ in the *"borderline to mildly retarded range."* (See Dr. Tureen's Report, pp. 5-6, 1/18/05) (Emphasis added). Conversely, Dr. Tureen testified on 5/17/05 to his belief that Defendant meets the requirements necessary to be labeled mentally retarded because he has "low IQ scores in the mentally retarded range". (Tp. 29).

There is an apparent unexplained deviation between Dr. Tureen's testimony that Defendants IQ scores were conclusively "in the mentally retarded range" at the hearing of 5/17/05 and his conclusion that Defendant was functioning at the "borderline to mildly retarded range" articulated in his1/18/05 report to the court.

It is apparent to this court that the psychiatric community has adopted the Wechsler Intelligence Scale as the standard for determining intelligence. Even Dr. Tureen (the only Dr. in this case who chose to administer the Reynold's Test) conceded that the Wechsler Test is the "Gold Standard" of intelligence assessment. (See Dr. Tureen's Report, 1/18/05). While the Wechsler Test is the standard, it is not flawless.



ENTERED &
SCANNED
SEP 26 2005
IMAGE *16*

According to Dr. Nelson, there is a measurement error of approximately 5 points in assessing IQ, although this may vary from instrument to instrument. (See Dr. Nelson III Report, p. 1, 3/21/05). In Dr. Tureen's report of 1/18/05 he acknowledged the standard margin of error: "Thus there is a reasonable probability that [Defendant's] true score lies below the established score of 70, representing mental retardation, but also a reasonable probability that his true score lies above that particular level." (See Dr. Tureen's Report, p. 5, 1/18/05). The standard margin of error for IQ tests seems to be an accepted principal in the scientific community. As such, this court finds that there is a standard margin of error of at least five points for IQ tests. For example, a Wechsler IQ of 70 is considered to represent an IQ between 65 and 75. Defendant's IQ score of 71 in 1994 could place him anywhere between 66 and 76 on the scale of intelligence. His score of 67 in 2004 could place him anywhere from 62 to 72 on the IQ scale. The five point standard of error makes it difficult to determine whether Defendant is functioning at or above the 70 level. In *Lott* the Ohio Supreme Court faced the same difficulty. *Lott*, 97 Ohio St.3d 303 (2002).

The *Lott* Court found that Lott had an IQ of 72. It also acknowledged the existence of a standard margin of error of five points for IQ test scores. *Id.* at 304. Even if this court decided to interpret Defendant's IQ scores to indicate that he has sub-average intellectual functioning (which it does not), Defendant would still have to prove by a preponderance of the evidence that he has significant limitations in two or more adaptive skills such as communication, self-care, and self direction . *Lott*, 97 Ohio St.3d 303, 305 (2002).

ENTERED & SCANNED
SEP 26 2005
IMAGE 17

6

This court finds credible Dr. Nelson's, conclusion that Defendant does not meet the definition of mental retardation that involves significantly subaverage intellectual functioning, concurrent deficits or **impairments in present adaptive functioning**, and the onset before age 18 years. (See Dr. Nelson III Report, p. 6, 3/21/05) (Emphasis added). He determined that "[Defendant's] social skills abilities can become compromised at times, although this is more related to his drug usage and characterological/personality deficits than to any intellectual/cognitive deficits." *Id.*

Dr. Chiappone testified that Defendant's level of adaptive functioning was "much higher" than his obtained level of intelligence would suggest. (Tp 981, 992). "He actually functions on a much higher level than his attained IQ." (Tp 992, 1004). Additionally, Dr. Chiappone testified that Defendant "is not retarded"...[because] "I think his fundamental skills are a bit higher than his attained intellect." (Tp 981-982). This court finds that Defendant's level of adaptive functioning is considerably higher than his attained intellect.

In his January 18, 2005 report Dr. Tureen stated that "[Defendant's] limited intellectual ability affects his adaptability." (See Dr. Tureen Report, p. 9, 1/18/05). He stated, "[e]vidence has been provided to indicate that there is impairment in the area of social adaptability." *Id.* However, he also concluded that Defendant was functioning in the "mild to borderline mental retardation" range. *Id.* at 6. Thus, Dr. Tureen's report indicates that despite Defendant's impairment in social adaptability, he was unable to determine with certainty whether Defendant was mentally retarded. Even though Dr. Tureen did not take a clear position on whether Defendant was mentally retarded, he did conclude that he suffered from impairment in social adaptability. This court finds his

7



conclusion that Defendant suffered from impairment in social adaptability credible. However, this court finds the respective opinions of Dr. Chiappone, and Dr. Nelson credible as well.

Additionally, as the State enumerates, Defendant's history lends further support to the position that he has sufficient adaptive skills, and therefore is not mentally retarded. Defendant's mother described him as a "normal kid" (Tp 918). Defendant fought for and obtained custody of his children. (Tp 921-925). He served in the Marines from 1972 to 1975, rising to the rank of Lance Corporal. (See Dr. Nelson III Report, p. 5, 3/21/05). Defendant worked at Aerotek for four consecutive years. (Tp 923). He began working at Kenwood Country Club on 4/1/93 as a dishwasher/ floor cleaner. (Tp 959). Defendant's supervisor noted that Defendant "had a very strong work ethic and when he was there he did a fabulous job for us" (Tp. 959). Defendant's supervisor also testified that he "observed [Defendant] at least on three occasions that are clear, that he kind of stepped in the middle as a peace maker and separated a couple guys that were going at it" (Tp 961).

After returning home from prison after some drug problems, Defendant dedicated himself to turning his life around. His childhood friend testified that Defendant made a 360 degree turn after he was released from prison. (Tp 934). He further testified he no longer was "hustling and selling drugs and running the streets." *Id.*

## Conclusions of Law

As stated above, in *State v. Lott* the Ohio Supreme Court prescribed a three part test for determining whether convicted petitioners facing the death penalty are mentally retarded. *Lott*, 97 Ohio St.3d 303 (2002). The test includes: "(1) significantly subaverage intellectual functioning, (2) significant limitations in two or more adaptive



ENTERED &
SCANNED
SEP 26 2005
IMAGE 19

skills, such as communication, self-care, and self direction, and (3) onset before the age of 18." *Id.*

### (1) Defendant Does Not Suffer From Significantly Subaverage

### Intellectual Functioning.

According to all three experts who provided opinions for the court, a sub-70 IQ points to significantly subaverage intellectual functioning. Pursuant to the Ohio Supreme Court's decision in *Lott*, Defendant's IQ score of 71 in 1994 triggered a rebuttable presumption that he is not mentally retarded. *Id.* Defendant contends that the presumption that he is not mentally retarded is rebutted by his two tests that point to a sub-70 IQ. This court agrees. However, Defendant also bears the burden of proving by a preponderance of the evidence that he suffers from significantly subaverage intellectual functioning. *Id.* at 307.

The Ohio Supreme Court determined that a score of 70 or above raised a rebuttable presumption that a defendant is not mentally retarded, but it did not ignore the aforementioned five point standard of error completely. *Id.* at 304. As such, to meet his burden, Defendant must present the court with IQ scores of 64 or below. Based on the standard margin of error, Defendant's IQ test score of 67 means his true score could place him anywhere between the 62 and 72 range. Furthermore, his February 9, 1968 IQ score of 64 is not a recent one, and at best provides the court with equal evidence as to whether Defendant suffers from significantly sub-average intellectual functioning. Therefore, Defendant has failed to prove the first prong of the test enumerated in *Lott* by a preponderance of the evidence. *Id.* at 307. This conclusion could end the court's



ENTERED &
SCANNED
SEP 26 2005
IMAGE 20

analysis as the test enumerated in *Lott* is conjunctive. However, for purposes of clarity an analysis of the other two prongs will follow.

### (2) Defendant Does Not Suffer From Significant Limitations In Two or More Adaptive Skills.

Defendant argues that he suffers from significant limitations in two or more adaptive skills. Dr. Tureen was the only psychiatric expert to offer any support to Defendant's position. Conversely, the respective opinions of two of the three experts available to the court clearly indicate that Defendant does not have significant limitations in two or more adaptive skills. As such, Defendant has not proven by a preponderance of the evidence that he suffers from limitations in two or more adaptive skills and he has failed to meet his burden of proving the second prong of the three prong test by a preponderance of the evidence. *Id.* Moreover, Defendant's history lends further support to this court's conclusion.

Defendant was capable of positive communication, self-care and self-direction. Defendant provided for his family, and fought for custody of his children. He consistently held jobs, and earned high endorsements from his superiors. These are not the actions of a man who is incapable of adapting to society's standards. As such, and pursuant to the expert testimony provided to the court, Defendant has not proven by a preponderance of the evidence that he suffers from significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction. *Id.*

### (3) Defendant Has Failed To Prove Beyond A Preponderance Of The Evidence That He Was Mentally Retarded Prior To Age 18.

10



ENTERED &
SCANNED

SEP 26 2005

IMAGE 21

Defendant's February 9, 1968 IQ score of 64 demonstrates that he was functioning at a subaverage intellectual level at age 14. However, Dr. Ruth Kaufman's 1968 Wechsler Intelligence Test for Children also indicated "superior" performance on tasks requiring judgment in social situations, and "effective functioning" in his knowledge of vocabulary and recall of information. *Id.* (See Dr. Nelson III Report, p.3, 3/21/05). Subaverage intellectual functioning is only one prong of the three prong conjunctive test enumerated in *Lott*. *Lott*, 97 Ohio St.3d 305 (2002). Dr. Kaufman's statement indicates that despite Defendant's sub-70 IQ, he was not suffering from significant limitations in two or more adaptive skills. This demonstrates that all three prongs of the three prong conjunctive test were not met in 1968. Thus, Defendant has not met his burden of proving by a preponderance of the evidence that he was mentally retarded before age 18. *Id.* at 307.

## Conclusion

Defendant has failed to prove each prong of the conjunctive three prong test prescribed by the *Lott* Court by a preponderance of the evidence. *Id.* Therefore, Defendant is not mentally retarded, and his Petition to Vacate or Set Aside his death sentence is denied.

So Ordered.

**ENTER**

SEP 2 0 2005

MARK R SCHWEIKERT

Judge Mark R. Schweikert

COURT OF COMMON PLEAS
ENTER

HON. MARK R. SCHWEIKERT

THE CLERK SHALL SERVE NOTICE TO PARTIES PURSUANT TO CIVIL RULE 58 WHICH SHALL BE TAXED AS COSTS HEREIN.

ENTERED & SCANNED
SEP 26 2005
IMAGE 22