# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-050840<br>TRIAL NO. B-9309022 |
| Respondent-Appellee, | : | |
| vs. | | *D E C I S I O N.* |
| | : | |
| JAMES DERRICK O'NEAL, | | |
| | : | |
| Petitioner-Appellant. | | |
| | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: December 1, 2006

*John J. Gideon* and *Michael W. Krumholtz*, for Petitioner-Appellant,

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings*, Assistant Prosecuting Attorney, for Respondent-Appellee.

**MARK P. PAINTER, Judge.**

{¶1} Petitioner-appellant James Derrick O'Neal presents a single assignment of error challenging the Hamilton County Common Pleas Court's judgment denying his postconviction petition seeking relief from his death sentence because he is mentally retarded. We affirm the court's judgment.

{¶2} O'Neal was convicted in 1992 of aggravated murder and sentenced to death. In 2002, the United States Supreme Court ruled in *Atkins v. Virginia*[1] that executing a mentally retarded person violates the proscription against cruel and unusual punishment contained in the Eighth Amendment to the United States Constitution. In December of that year, the Ohio Supreme Court in *State v. Lott*[2] established procedures and substantive standards for adjudicating a capital defendant's *Atkins* claim. O'Neal subsequently presented an *Atkins* claim in a postconviction petition. Following a hearing, the common pleas court denied the petition. This appeal followed.

### *I. O'Neal's Mental-Retardation Hearing*

{¶3} At the hearing on O'Neal's *Atkins* claim, the parties stipulated to the admission of psychologists' reports, O'Neal's school and mental-health records, and the record from his murder trial. O'Neal presented expert opinion testimony by a clinical psychologist. The state offered no testimony at the hearing, but submitted the matter upon its exhibits. O'Neal's expert concluded that O'Neal was mentally retarded, while the state's experts concluded that he was not. Based on the evidence adduced at the hearing, the trial court concluded that O'Neal had failed to prove his claim.

---

[1] (2002), 536 U.S. 304, 122 S.Ct. 2242.
[2] 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011.

### *A. The Trial*

{¶4}   Dr. David Chiappone, a clinical psychologist appointed to evaluate O'Neal for his 1995 trial, diagnosed O'Neal as functioning in the borderline range of intelligence, with polysubstance abuses and a mixed personality disorder. He testified to that effect at the trial. He arrived at this conclusion after testing and interviewing O'Neal, interviewing O'Neal's friends and family, and reviewing his school, work, and criminal histories.

{¶5}   Dr. Chiappone found that O'Neal's school records showed that he had then functioned in the borderline to mildly mentally retarded range. The report of a school psychologist who had evaluated O'Neal in 1968, when O'Neal was 14 years old and in the sixth grade, reflected a full-scale IQ score of 64 and well-below-grade-level academic achievement. The psychologist recommended that O'Neal be placed in a "slow learner" program, but he was not. And he left high school before completing the tenth grade.

{¶6}   From 1972 to 1975, he served in the Marines, where he attained the rank of lance corporal. But he was dishonorably discharged when he was absent without leave because, he asserted, the military had declined to allow him to attend his father's funeral.

{¶7}   After his discharge, O'Neal supported himself by selling drugs. In 1988, he was imprisoned for trafficking. After his release a year later, O'Neal held a variety of menial jobs, including work in the kitchen of a country club restaurant. His supervisor there testified that although O'Neal had struggled with tardiness and absenteeism, he had been a good worker.

{¶8}   O'Neal had several children from various relationships. After his release from prison, he sought and obtained custody of two of his children. In 1992, he married the victim, and he and his two children made a home with his wife and her three children.

{¶9}   On the IQ test administered by Dr. Chiappone in 1994, O'Neal received a full-scale score of 71. Dr. Chiappone acknowledged that O'Neal had "a low IQ." But he

3

asserted that O'Neal's work history showed that "his fundamental skills [were] a bit higher than his attained intellect." From this, Dr. Chiappone concluded that O'Neal was not mentally retarded.

{¶10} Dr. Robert G. Tureen, a clinical psychologist specializing in neuropsychology, also testified at O'Neal's trial. Dr. Chiappone had consulted with Dr. Tureen when Dr. Chiappone's evaluation suggested that O'Neal suffered from a brain disorder or brain damage. Dr. Tureen interviewed and tested O'Neal and reviewed the IQ test administered by Dr. Chiappone. He confirmed Dr. Chiappone's suspicion of a brain disorder, and he testified at trial to his conclusion that O'Neal was borderline to mildly mentally retarded.

### B. The Hearing

{¶11} Dr. Tureen evaluated O'Neal again in 2004 for his *Atkins* claim. He issued a report and appeared as the sole witness at O'Neal's *Atkins* hearing. The state countered with Dr. Chiappone's 1994 trial testimony and the March 2005 report of Dr. W. Michael Nelson III.

### 1. The Mental-Retardation Criteria

{¶12} The Ohio Supreme Court in *State v. Lott* provided three criteria for evaluating a capital defendant's claim that he is, in the words of the United States Supreme Court in *Atkins*, "so impaired as to fall within the range of mentally retarded offenders [against] who[se] [execution] there [has emerged] a national consensus."[3] The defendant must demonstrate by a preponderance of the evidence (1) that he suffers from "significantly subaverage intellectual functioning," (2) that he has experienced "significant limitations in two or more adaptive skills, such as communication, self-care, and self-

---

[3] *Atkins v. Virginia*, 536 U.S. at 317.

4

direction," and (3) that these manifestations of mental retardation appeared before the age of 18.[4]

{¶13}  The court in *Lott* cautioned that an IQ test score is merely one measure of intellectual functioning that "alone [is] not sufficient to make a final determination on [the mental-retardation] issue."[5]  Nevertheless, the court declared that a full-scale IQ score above 70 gives rise to "a rebuttable presumption that a defendant [is] not mentally retarded."[6]

{¶14}  The court in *Lott* formulated its mental-retardation criteria based upon the clinical definitions of mental retardation provided in 1992 by the American Association of Mental Retardation ("AAMR") and in 2002 by the American Psychiatric Association ("APA") and cited with approval by the Supreme Court in *Atkins*.[7]  Both definitions provided these diagnostic criteria for mental retardation: substantial limitations in present functioning, manifested before the age of 18, and characterized by significantly subaverage intellectual functioning coexisting with significant limitations in two of the adaptive skills of communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, health and safety, functional academics, leisure, and work.[8]  In 2002, the AAMR amended its definition to require a finding of significant deficiencies in one of three categories of adaptive skills:  "conceptual," which includes communication and functional academics skills; "social," which includes social/interpersonal and leisure skills; and "practical," which includes work, self-care, health, and safety skills.[9]

---

[4] *State v. Lott*, supra, at ¶12.
[5] See id.
[6] Id.
[7] *Atkins v. Virginia*, 536 U.S. at 308, fn. 3; *State v. Lott*, supra, at ¶12.
[8] American Association of Mental Retardation, Mental Retardation: Definition, Classification, and Systems of Supports 5 (9 Ed.1992); Diagnostic and Statistical Manual of Mental Disorders 41 (4 Ed.2000).
[9] American Association of Mental Retardation, Mental Retardation: Definition, Classification, and Systems of Supports 1 (10 Ed.2002).

### *2. Dr. Tureen's Report and Testimony*

{¶15} In his report, Dr. Tureen noted that the AAMR recognizes that a "standard error of measurement * * * exists in any psychometric test measure, where an obtained score actually represents [the midpoint in] a range of statistical probability" of plus or minus five. He also noted the AAMR's admonition against relying strictly on IQ-test scores to measure intellectual functioning.

{¶16} With the AAMR and *Lott* standards in mind, Dr. Tureen reviewed O'Neal's school records and the IQ test administered by Dr. Chiappone in 1994. He administered two IQ tests, on which O'Neal scored 67 and 63. He also conducted a three-hour interview with O'Neill. Applying the legal standard for mental retardation provided in *Atkins* and *Lott* and the psychological standards provided in 2000 by the APA and in 2002 by the AAMR, Dr. Tureen diagnosed O'Neal with "mild mental retardation."

{¶17} From O'Neal's school records, Dr. Tureen found that his mental retardation had manifested before the age of 18. O'Neal's 1968 full-scale IQ score of 64 consisted of a verbal score of 79 and a performance score of 55. And he scored in the lowest percentiles on other "intellectual measures," such as the Stanford Achievement Test and the Scholastic Aptitude Test. Dr. Tureen found that the vast difference between the verbal and performance portions of O'Neal's IQ scores indicated a severe learning disability and raised the possibility of a cerebral brain dysfunction that interfered with his intellectual ability and academic achievement. Dr. Tureen acknowledged that O'Neal had not been placed in special-education classes. But he noted that the school psychologist had recommended them, and that O'Neal's academic performance showed the need for them. Dr. Tureen concluded that O'Neal's scores on these intellectual measures provided evidence of "the existence of low intellectual ability."

{¶18}  Dr. Tureen stated that the consistency between O'Neal's performance on his earlier intellectual assessments and his performance on his 1994 and 2004 IQ tests verified the persistence into adulthood of his intellectual deficiencies and his brain dysfunction.  With respect to O'Neal's current adaptive functioning, Dr. Tureen asserted that information relevant to his functioning during his ten years under the structured conditions on death row would not be useful.  Dr. Tureen instead looked to his 1994 report, his and Dr. Chiappone's trial testimony, and O'Neal's history of drug and alcohol abuse.  He found no impairments in eight of the AAMR adaptive-skills areas, at least when alcohol or drugs were not involved.  He acknowledged that O'Neal had owned and had driven a car, had served in the military, had married and had supported a family, had sought and had gained custody of two children, had held jobs, and had adjusted to prison life.  But he found that O'Neal's limited intellectual abilities impaired his functional academics and, in "emotionally charged" situations, compromised his social adaptability skills.

### 3.  Dr. Nelson's Report

{¶19}  For the report that he provided at the state's behest, Dr. Nelson looked at the IQ-test data, the evaluations conducted by Drs. Tureen and Chiappone, the trial record, and O'Neal's medical, school, work, and prison records.  Dr. Nelson concluded that O'Neal did not meet the definition of mental retardation.

{¶20} Dr. Nelson acknowledged that O'Neal's IQ scores were subject to a standard error of measurement of plus or minus five, and that mental retardation might thus be diagnosed in an individual with an IQ score of 70 to 75  and significant deficits in adaptive behavior.  Conversely, he asserted, mental retardation could not be diagnosed in an individual with an IQ score of less than 70 if he had no significant deficits in his adaptive functioning.  Dr. Nelson found that, to the extent of his intellectual deficits and

7

his deficits in the conceptual adaptive skills of reading and money concepts, O'Neal functioned in the mild-mental-retardation to borderline range. But he insisted that O'Neal exhibited no deficits in his practical adaptive skills, and that the deficits in his social skills, which arose in situations involving emotional intensity, were more a function of his psychological problems. Dr. Nelson concluded that, because O'Neal functioned at least in the borderline range in his social and practical adaptive skills, he was not mentally retarded.

## *II. The Common Pleas Court's Decision*

{¶21} The determination of whether a capital defendant is, by the *Lott* court's definition, mentally retarded presents a factual issue for the trial court.[10] Based upon the evidence adduced at the hearing, the court below concluded that O'Neal had failed to sustain his burden of proving by a preponderance of the evidence that he is mentally retarded. The court noted that O'Neal's 71 IQ score raised the presumption that he was not mentally retarded. And the court found that he had failed to rebut the presumption.

{¶22} In its decision, the court found that O'Neal had failed to prove by a preponderance of the evidence that he suffered from significantly subaverage intellectual functioning. With respect to the over-70 presumption, the court noted the plus-or-minus-five standard error of measurement recognized in *Lott* and acknowledged by Drs. Chiappone, Tureen, and Nelson. The court construed the standard error of measurement to require O'Neal to "present the court with IQ scores of 64 or below" to rebut the *Lott* presumption. It then discounted O'Neal's 1968 full-scale IQ score of 64 because it was "not a recent [score], and at best provide[d] the court with equal evidence [to his 1994 and 2004 scores] as to whether [he] suffer[ed] from significantly subaverage intellectual functioning."

---

[10] Id. at ¶9.

8

**OHIO FIRST DISTRICT COURT OF APPEALS**

{¶23} We are at a loss to explain how the court arrived at its "64 or below" requirement. Nothing in the *Atkins* or *Lott* decisions or in the psychologists' reports or testimony warranted such a requirement. We, therefore, hold that the court erred as a matter of law in imposing it.

{¶24} Nevertheless, Dr. Nelson's report provided the court with evidence upon which it might have concluded that O'Neal had failed to prove significantly subaverage intellectual functioning. More significantly, the record is replete with evidence to support the court's finding that O'Neal had failed to prove the conjunctive criterion of coexistent limitations in two or more adaptive skills, so we believe the court's misapprehension of the IQ numbers was harmless.

### *III. We Affirm*

{¶25} An appellate court will not reverse a trial court's determination of the issue of mental retardation if the determination was supported by reliable, credible evidence.[11] O'Neal's over-70 IQ score raised the presumption that he was not mentally retarded. We conclude that reliable, credible evidence supported the trial court's determination that O'Neal had failed to overcome the presumption. We, therefore, overrule the assignment of error and affirm the judgment of the court below.

Judgment affirmed.

**GORMAN, P.J.,** and **SUNDERMANN, J.,** concur.

*Please Note:*

The court has recorded its own entry on the date of the release of this decision.

---

[11] *State v. Were* (Feb. 4, 2005), 1st Dist. No. C-030485, 2005-Ohio-376.