IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

JAMES DERRICK O'NEAL,

    Petitioner,

    vs.

MARGARET BAGLEY, Warden

    Respondent.

: 

:     Case No. 1:02-cv-357

:     District Judge Michael R. Barrett
    Magistrate Judge Michael R. Merz

:     <u>Death Penalty Case</u>

---

**MOTION OF PETITIONER JAMES O'NEAL
FOR LEAVE TO AMEND HIS PETITION
FOR A WRIT OF HABEAS CORPUS**

---

Petitioner James Derrick O'Neal, through the undersigned counsel, moves the Court pursuant to 28 U.S.C. §2242, Rule 15 of the Federal Rules of Civil Procedure, and Rule 11 of the Rules Governing Section 2254 Cases, for leave to amend his petition for a writ of habeas corpus to include an eighteenth ground for relief claiming that his execution would violate the Eighth Amendment to the United States Constitution because he is mentally retarded. The grounds for this motion are contained in the following supporting memorandum.

    Respectfully submitted,

       s/John J. Gideon
    JOHN J. GIDEON (0008151)
    (Trial Counsel)
    250 East Stanton Avenue
    Columbus, Ohio 43214-1268
    Phone: (614) 844-3954
    Email: johngideon@sbcglobal.net

        s/Michael W. Krumholtz
MICHAEL W. KRUMHOLTZ (0009099)
(Co-Counsel)
Bieser, Greer & Landis LLP
6 North Main Street, Suite 400
Dayton, Ohio 45402-1908
Phone: (937) 223-3277
Facsimile: (937) 223-6339
Email: mwk@bgllaw.com

COUNSEL FOR PETITIONER

**MEMORANDUM IN SUPPORT**

**I. Procedural Posture**

On June 21, 2002, Petitioner O'Neal, having exhausted all available state court remedies with respect to the claims he intended to raise in this Court, filed his petition for a writ of habeas corpus containing seventeen claims (Doc. No. 7).

Pursuant to this Court's scheduling order of June 7, 2002 (Doc. No. 11) Respondent Bagley filed her return of writ with an appendix containing a copy of the state court record on September 9, 2002 (Doc. Nos. 14-20).

On November 12, 2002, the date originally scheduled for Petitioner to file his traverse, Petitioner filed a motion requesting leave, pursuant to the decision in <u>Atkins v. Virginia</u>, 536 U.S. 304 (June 20, 2002), to amend his petition to add an eighteenth claim that his death sentence should be vacated on the ground that he is mentally retarded (Doc. No. 21). On that same date Petitioner moved the Court to stay these habeas corpus proceedings to permit him to exhaust his state court remedies with respect to this new claim (Doc. No. 22).

The Court granted Petitioner's motion to amend his petition by order of November 13, 2002. Following the filing of Respondent's memorandum opposing the staying of these

proceedings (Doc. No. 23), the Court ordered these proceedings stayed on December 11, 2002 pending exhaustion of state court proceedings (Doc. No. 24).

On November 15, 2002 Petitioner filed with the Court of Common Pleas, Hamilton County, his first successive petition to vacate or set aside his sentence based on <u>Atkins v. Virginia</u>. Petitioner's petition in <u>State of Ohio v. James Derrick O'Neal</u>, Case No. B-9309022, was denied by the Court of Common Pleas (the Hon. Mark R. Schweikert presiding) on April 7, 2004 without the benefit of an evidentiary hearing. Petitioner appealed the court's denial of his petition to the Court of Appeals of Hamilton County. By way of agreed entry filed on August 13, 2004, Petitioner withdrew his appeal and he was granted an evidentiary hearing before the Court of Common Pleas on the issue of whether he is mentally retarded as defined by <u>Atkins</u>. The Court of Common Pleas then appointed experts on behalf of both Petitioner and Respondent to examine Petitioner.

The Court of Common Pleas held the evidentiary hearing on May 17, 2005. The parties filed post-hearing briefs. On September 26, 2005 the trial court denied Petitioner's petition to vacate or set aside his sentence, concluding that Petitioner did not meet the legal standard set forth in <u>Atkins</u> to be deemed "mentally retarded."

Petitioner filed a timely appeal to the Court of Appeals. Petitioner and the State filed briefs. Petitioner filed notice of supplemental authorities. Following oral argument, the Court of Appeals issued a decision and judgment entry on December 1, 2006 in <u>State of Ohio v. James Derrick O'Neal</u>, Case No. C-050840, affirming the judgment of the Court of Common Pleas.

Petitioner sought leave to appeal in the Supreme Court of Ohio. On May 2, 2007 the Supreme Court of Ohio, in <u>State of Ohio v. James Derrick O'Neal</u>, Case No. 2007-80, declined

to accept jurisdiction on the ground that the appeal did not involve a substantial constitutional question.

Following Petitioner's filing of a status report on May 4, 2007 (Doc. No. 36), this Court ordered the stay of these habeas corpus proceedings vacated and established a case schedule which begins with Petitioner's filing of this motion for leave to amend his petition (Doc. No. 37).

**II. Why Leave to Amend the Petition for Writ of Habeas Corpus Should Be Granted**

28 U.S.C. § 2242 provides that a habeas petition "may be amended or supplemented as provided in the rules of procedure applicable to civil actions." The rule for amendment in a civil case is Rule 15 (a) of the Federal Rules of Civil Procedure which provides that after a responsive pleading is filed "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." The Court of Appeals for the Sixth Circuit has held that "the thrust of Rule 15 is to reinforce the principle that cases 'should be tried on their merits rather than the technicalities of pleadings.'" Moore v. City of Paducha, 790 F. 2d 557, 559 (6th Cir. 1986)(citation omitted.)

In Foman v. Davis, 371 U.S. 178, 181-182 (1962), the United States Supreme Court interpreted the phrase "freely given" as used in Fed. R. Civ. P. 15(a) and determined that the phrase is a limitation on a court's discretion to deny leave to amend: "the Federal Rules rejected the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept[ed] the principle that the purpose of pleading is to facilitate a proper decision on the merits." The Supreme Court also stated that courts should allow amendment absent undue delay or bad faith on the part of the moving party, or undue prejudice to the opposing party. Foman, 371 U.S. at 182.

This motion is not made out of either bad faith or an interest in unnecessarily delaying these proceedings. Prior to the Supreme Court's decision in <u>Atkins v. Virginia</u>, Petitioner's claim was not cognizable in federal habeas corpus proceedings; thus, Petitioner's previous, original motion for leave to amend his petition to add this claim (Doc. No. 21) was made within a reasonable time after the Supreme Court's decision in <u>Atkins v. Virginia</u> and after a reasonable investigation of the claim.

Petitioner returned to state court and filed his successive postconviction petition raising his <u>Atkins</u> claim on November 15, 2002, promptly after this Court granted Petitioner's earlier, original motion to amend his petition even before this Court ruled that this case should be stayed on December 11, 2002 (Doc. No. 24).

Although Petitioner did not prevail on his <u>Atkins</u> claim in the state courts, the fact that the state trial court ultimately appointed experts to examine Petitioner and held an evidentiary hearing and required the parties to file post-hearing briefs before issuing its 11-page decision shows that the claim is a substantial one.

### III. Petitioner's Eighteenth Ground for Relief

**<u>Ground Eighteen</u>:**

> **The imposition of a sentence of death on Petitioner violates his right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution because he is mentally retarded under the standards -- reasonably applied -- announced in <u>Atkins v. Virginia</u> and in light of the facts -- reasonably determined -- presented to the state courts that show that Petitioner suffers from significantly subaverage intellectual functioning which had its onset before he attained the age of 18 and which leaves Petitioner with significant limitations in two or more adaptive behavior skills.**

The three-part constitutional standard for evaluating a claim of mental retardation, as recognized and enunciated by <u>Atkins v. Virginia</u> and as applied by <u>State v. Lott</u> (December 11,

5

2002), 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, is: (1) significantly subaverage intellectual functioning, (2) significant limitations in two or more adaptive skills, and (3) onset before age 18. The facts as to each part of this standard are as follows.

Onset Before Age 18

The third part of the constitutional test of mental retardation, as restated by the Ohio Supreme Court in Lott, is "onset before the age of 18."

Petitioner did not begin to claim that he was mentally retarded only after the decision in Atkins was issued. Nor was the preparation for the penalty phase of his trial the first time that Petitioner was diagnosed as mentally retarded.

The report of Cincinnati Public Schools School Psychologist Ruth Kaufman from February, 1968 when Petitioner was 14 years old and in the 6th grade (Hearing Exhibit A) shows that Petitioner obtained a full scale IQ of 64 on the Wechsler Intelligence Scale for Children (WISC). Ms. Kaufman, in her assessment of Petitioner's performance on the WISC and other tests, noted Petitioner's strengths and weaknesses, and observed that Petitioner's performance tests showed that he was "moderately retarded." Ms. Kaufman concluded that Petitioner should be in the "Junior High Slow Learning Program." She further stated that "Below normal intellectual functioning due to organic dysfunction seemed to be the primary problem."

Dr. Michael Nelson, who submitted a written report to the Court of Common Pleas (Hearing Exhibit 1) but did not interview or test Petitioner and who did not testify at the hearing, wrote in his report at page 3 that the full scale IQ test results placed Petitioner overall in the "Mild range of Mental Retardation." And Dr. Nelson added that "He manifested a significant deficit in his performance capabilities where he functioned in the moderate to mild range of mental retardation."

Dr. Robert Tureen, who interviewed and tested Petitioner in June, 1994 before his trial and who interviewed and tested Petitioner again in December, 2004 after being appointed by the trial court, and who testified at the evidentiary hearing on May 17, 2005, provided a more thorough analysis of the significance of the school psychological evaluation. Dr. Tureen said this (at page 4 of his report):

> On the Wechsler Intelligence Scale for Children, he obtained a **Fullscale I.Q. of 64** (Verbal I.Q. 79, Performance I.Q. 55). **That large a discrepancy on the Wechsler scales between Verbal and Performance Scores does raise at least the possibility of some level of brain disturbance or dysfunction, that might be interfering with intellectual ability.** The school psychologist summary evaluation recommended that James be placed in the junior high school slow learner program. She further was of the opinion that "Below normal intellectual functioning, due to organic dysfunction seemed to be the primary problem." She also indicated that emotional problems might be interfering with his school achievement. The importance of this is **the early establishment of not only measured I.Q. levels, but also the presumption of impaired brain function (cerebral dysfunction)**. *** **It is my opinion that the above data establishes the existence of low intellectual ability, at least in terms of his academic performance, as well as assessed intellectual measures before the age of eighteen, with suggested evidence of cerebral brain dysfunction, resulting in poor academic achievement and low intellectual status.** (emphasis added)

Noting Petitioner's low achievement test scores, Dr. Nelson agreed that "Mr. O'Neal had long-standing achievement/academic skill deficits."

While the school psychological testing and evaluation was focused on Petitioner's intellectual and academic skills and abilities and does not contain a discrete analysis of Petitioner's adaptive behavioral skills, the performance scores on the Wechsler test and other tests led Ms. Kaufman to conclude more broadly that "When tasks required that he work toward an unknown goal or concentrate on visual cues, he gave an extremely defective performance.

7

Spatial reasoning was also very poor for his age. Moreover, his knowledge of vocabulary and recall of information indicated defective functioning."

<u>Significantly Subaverage Intellectual Functioning</u>

The second part of the constitutional test of mental retardation, as restated in <u>Lott</u>, is "significantly subaverage intellectual functioning."

Before the death penalty trial began in October, 1995 Petitioner was examined and evaluated by two psychologists, Dr. David Chiappone and Dr. Robert Tureen. Dr. Tureen, in his January 18, 2005 report to the trial court, summarizes the assessment by Dr. Chiappone which led to Dr. Chiappone's requesting that Dr. Tureen, a neuropsychologist, examine Petitioner:

> In 1994, during his incarceration at the Hamilton County Justice Center, **David Chiappone, Ph.D. administered the Wechsler Adult Intelligence Scale-R.** This is a scale that is related in characteristics to the Wechsler Intelligence Scale for Children, but is normed on the adult population and is in fact the fourth revision of the adult Wechsler Scales. On March 31, 1994, the following I.Q. scores were obtained: Verbal I.Q. 72, Performance I.Q. 71 and **Full Scale I.Q. 71**, all representing **a ranking a the 3rd percentile**, compared to the general population, meaning that 97% of the population does as well or better than James performed on the test. **The 95% confidence interval for the Full Scale I.Q. is 67 to 77, which are reasonable limits of the range within which James's "true" Full Scale I.Q. lies. Thus, there is a reasonable probability that James' true score lies below the established score of 70, representing mental retardation,** but also a reasonable probability that his true score lies above that particular level. What was more important at the time, was the **continued presence of evidence of brain dysfunction.** This was essentially why Dr. Chiappone requested my involvement in the case, since on his initial testing, he was finding signs suggesting brain disorder and this is my specialty area. Additional testing, using specific measures that are sensitive to the presence of brain dysfunction I administered in 1994 substantiated **a consistent picture of a brain dysfunction, present on several measures, indicating impairment in abstraction and problem solving and difficulty on measures of spatial analysis and synthesis**, which was suggested by the poor performance I.Q. reported in 1968. On the other hand, his general language, his auditory comprehension and

> general verbal expression and his ability to follow instructions were all intact, within **his level of intellectual functioning, that is, of an individual with an I.Q. in the borderline to mildly retarded range**, as measured on the Wechsler Adult Intelligence Scale-R (WAIS-R). (emphasis added)

Hearing Exhibit C, January 18, 2005 Dr. Tureen Report at pages 5-6.

The state courts fixated on the isolated fact that Petitioner obtained a full scale score of 71 on the WAIS-R administered by Dr. Chiappone in 1994 and virtually ignored the fact that Petitioner got a full scale score of 64 on the WISC administered in 1968, and a score of 63 on the Cognitive Status Exam administered by Dr. Tureen in 1994, and a full scale score of 67 on the WAIS-III administered by Dr. Tureen in 2004, and a composite index score of 63 on the Reynolds Intellectual Scales test administered by Dr. Tureen in 2004.

As Dr. Tureen carefully and thoughtfully explained in his hearing testimony at Hrg. Tr. 36-37, these tests have errors of measurement. As explained cogently by the AAMR:

> Although not perfect, intelligence is represented by Intelligence Quotient (IQ) scores obtained from standardized tests given by a trained professional. In regard to the intellectual criterion for the diagnosis of mental retardation, **mental retardation is generally thought to be present if an individual has an IQ test score of approximately 70 or below**. An obtained IQ score must always be considered in light of its **standard error of measurement**, appropriateness, and **consistency** with administration guidelines. **Since the standard error of measurement for most IQ tests is approximately 5, the ceiling may go up to 75**. This represents a score approximately 2 standard deviations below the mean, considering the standard error of measurement.

See, American Association of Mental Retardation (AAMR), Definition of Mental Retardation, What is Intelligence?, http://www.aamr.org/Policies/faq_mental_retardation.shtml (emphasis added). At the time of Petitioner's trial in October, 1995 the prevailing rule on the imposition of the death penalty on mentally retarded persons was that contained in Penry v. Lynaugh (1989), 492 U.S. 302. Penry held that it was not a violation of the Eighth Amendment's ban on cruel and

9

unusual punishment to execute a mentally retarded person. Thus, the penalty phase mitigation testimony regarding Petitioner's mental retardation was presented, not as a bar to the imposition of the death penalty, but merely as evidence in mitigation. The constitutional standards for determining if an offender is mentally retarded -- as set out in Atkins -- did not exist and were not referred to during the questioning of either Dr. Chiappone or Dr. Tureen. The examinations of Dr. Chiappone and Dr. Tureen, which are part of the trial record, are noticeably devoid of any reference to the definitions of mental retardation of the American Association of Mental Retardation or the American Psychiatric Association. Even more noticeable is the absence of any questioning, and consequently the absence of any testimony, about the actual scores that Petitioner achieved on the various I.Q. and other tests administered in 1994 or to Petitioner's abilities with respect to specific adaptive behavior skills.

Thus, when during his testimony Dr. Chiappone said that "He's not retarded," -- referring of course to Petitioner -- this statement was not made with explicit reference to the AAMR or APA definitions of mental retardation. Nor, obviously, could this statement have referred to the constitutional standard of mental retardation later set out in Atkins.

But virtually all of the rest of Dr. Chiappone's 1995 penalty phase mitigation testimony supports the conclusion that Petitioner meets the constitutional definition of mental retardation.

Dr. Chiappone testified that he administered a number of tests to Petitioner and that Petitioner "scored in the what are called the border range of mental retardation. [sic] He's not retarded, but he functions at the second or third percentile of the general population." Trial Tr. at 981. He testified that Petitioner had difficulty performing some simple tests that the Doctor administered. "And so at that point I thought there was what we call organicity above and beyond limited intellect. And at that point I recommended we have a neuropsychologist who

specializes in dysfunctions of the brain to do further testing to make sure we didn't miss anything." Trial Tr. at 982. Dr. Chiappone testified that Petitioner suffered from "borderline mental retardation based on the IQ test and substantiated by his educational data." Trial Tr. at 987. Finally, Dr. Chiappone stated that Petitioner had a "[l]ack of coping skills" which, along with other factors, "made it more difficult for him to effectively problem solve." Trial Tr. at 996.

As noted above, after he evaluated and tested Petitioner, Dr. Chiappone referred Petitioner to Dr. Robert Tureen, a clinical neuropsychologist at the Mayfield Neurological Institute in Cincinnati. Dr Tureen also testified in the mitigation phase of the trial. Trial Tr. at 997.

Dr. Tureen did further testing of Petitioner which showed a "longstanding type of disturbance" which he called "minimal cerebral dysfunction." Trial Tr. at 1001. Dr. Tureen testified that Petitioner had a very poor academic performance throughout his limited academic career and that "early psychological testing that was done in '68 stated there was evidence of organicity or brain damage." Trial Tr. at 1002.

As to Petitioner's level of intellectual functioning, Dr. Tureen described it as being "in the borderline to mildly retarded range." Trial Tr. at 1002. Dr. Tureen concluded that Petitioner is "an individual who's going to have some limitations on how well they're [sic] going to be able to function. *** By cognitive thinking general problems involving memory, spatial and statistical skills, language usage, as well as motor skills. [sic] And on that particular exam he performed well into the impaired range. You take that performance and put it together with the IQ level and you see an individual who is going to have some sort of difficulties in adjusting in the world." Trial Tr. at 1003. He added that persons like Petitioner would have "some real limitations of what they're going to be able to do in life and what they're going to be able to accomplish." Trial

Tr. at 1005. Finally, Dr. Tureen testified on cross-examination that Petitioner "was functioning in the mildly mentally retarded to borderline range." Trial Tr. at 1009.

Dr. Nelson, on page 3 of his report (Hearing Exhibit 1, March 21, 2005 Dr. Nelson Report) summarizes Dr. Chiappone's and Dr. Tureen's penalty phase mitigation testimony as follows: "It appears that Mr. O'Neal is functioning in the Mild MR to Borderline range of intelligence." Thus, Respondent's expert, Dr. Nelson, does not disagree with the diagnosis of mental retardation.

It is important to emphasize here that the WAIS-R was not the only test administered to Petitioner in 1994. Other tests were administered and Petitioner's performance on all of these tests demonstrates, as Dr. Tureen testified at the evidentiary hearing before the state trial court, a consistent pattern of significantly subaverage intellectual functioning. If Atkins had been the rule at the time of Petitioner's trial, his attorneys would have questioned Dr. Tureen with respect to the specific results of all of these tests.

Hearing Exhibit B, Dr. Tureen's July 27, 1994 report, contains this most important summary of all of the 1994 test results:

> TEST RESULTS AND INTERPRETATION: James was administered the **Wechsler Adult Intelligence Scale - R (WAIS-R) by Dr. Chippone [sic] yielding Verbal Performance and Full scale I.Q.'s in the borderline range to mildly mentally retarded range (3rd percentile in comparison with others of his age).** The only subscale score which was significantly out of line and significantly higher than his overall average subscale scores was on the Digit Symbol subtest which reflects relatively good psychomotor speed and visual motor coordination. The general intellectual level is compatible with the academic levels reported and described above.
>
> **On the Cognitive Status Exam (Barrett), a screening exam for cognitive, sensory, and motor functions, James obtained a score of 63 out of a possible 104 points, scores below 75 are in the impaired range. Generally speaking, individuals who have**

12

**<u>WAIS-R I.Q. levels in the borderline to retarded range coupled with cognitive status exam scores significant [sic] below 65, as is the case here, are generally seen as having difficulties functioning in the environment in even relatively routine ways on a day to day basis as he result of impairment in brain function</u>**. If this impairment is longstanding, that is congenital as opposed to something more recently acquired, then the functioning is likely to be marginal at best. Because of difficulty adapting and adjusting, such individuals are likely to find themselves struggling in the general adaptation.

James's performance on the Wisconsin Card Sort and Porteus Mazes reflects evidence of difficulty in abstraction and problem solving. On the **Wisconsin Card Sort** in particular, there is very **high perseverative response rate**. What this reflects is an inability to learn effectively from feedback information regarding one's performance and a tendency to continually repeat the same types of behavior pattern even though there may be information provided that the behavior pattern is incorrect. In otherwords [sic], **he does not learn well from information being provided by the environment, particularly in novel situations**. On the **Porteus Mazes**, James again demonstrates **considerable difficulty in planning ahead and attempting to anticipate a course of action**. His performance level actually reaches around year 7, but even here he is struggling to perform within the acceptable limits.

Further evidence of impaired functioning is reflected on any spatial analytic task. On copying simple configurations such as a Greek cross, there is marked constructional dyspraxia, that is an inability to accurately reproduce the appropriate juxtaposition of the various spatial features of the figure. His attempt to copy the complex Rey figure resulted in even more evidence of the difficulty he has with spatial analytical skills resulting in a markedly distorted copy of the figure. When he was asked to recall the figure immediately after the copy phase, he was only able to produce one or two lines of this rather intricate figure and even those were drawn incorrectly.

Finally, on the **Hooper Visual Organization Test (VOT),** a task which does not involve a motor component, but strictly involves the conceptual organization of spatial elements into recognizable wholes, **performance is in the severely impaired range.**

Brief measures of language assessment indicate that object, number, letter, and word recognition are unimpaired within the level of the patient's intellect. His auditory comprehension and

> expression are unimpaired. He is able to follow instructions without difficulty. His reading level is functional for routine day to day activities.
>
> GENERAL CONCLUSIONS: This is a 39 year old male with **borderline to mildly retarded level of intellectual functioning** as reflected in previously administered psychometric measures. Current testing reflects evidence of impaired higher cortical functions such as novel reasoning, abstracting, and planning, and spatial analytical skills, while motor functions remain relatively intact.
>
> Given the early academic records, these findings most likely reflect **a longstanding condition**.

Hearing Exhibit B, July 27, 1994 Dr. Tureen Report, at pages 2-3.

In December of 2004 Dr. Tureen again interviewed Petitioner and again administered tests. The details of the results of these tests are contained in his January 18, 2005 report:

> On the **WAIS-III**, James obtained a Verbal I.Q. of 71, Performance I.Q. of 69, and **Full Scale I.Q. of 67.** The descriptions currently used rate the Performance and Full Scale I.Q. as "extremely low" and Verbal I.Q. as "borderline."

Hearing Exhibit C, January 18, 2005 Dr. Tureen Report at page 6 (emphasis added).

Dr. Tureen also had Petitioner take the **Reynolds Intellectual Scales** test:

> I also chose to administer the Reynolds Intellectual Scales, which is a relatively new test, but has both the advantage and disadvantage of not involving any psychomotor measures. *** The following indices are essentially I.Q. scores:
> Verbal Index = 68, 2nd percentile, 95th confidence interval 63-77 (i.e. range where true score lies)
> Non-Verbal Index = 67, 1st percentile, 95th confidence interval 62-75
> **Composite Index = 63**, 1st percentile rank, 95th confidence interval 59-70

Id., at page 7 (emphasis added).

Considering the scores that Petitioner achieved on ALL the IQ tests that have been administered from when he was 14 years old to the present, the weight of the evidence --

reasonably determined -- is that Petitioner's IQ is below 70. Taken together with Petitioner's academic performance as well as his performance on achievement tests, the evidence establishes that Petitioner has consistently suffered from significantly subaverage intellectual functioning.

<u>Significant Limitations in Two or More Adaptive Behavior Skills</u>

The third part of the constitutional test of mental retardation, as stated by the Ohio Supreme Court in <u>Lott</u>, is "significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction."

The thrust of the government's questions and argument at the evidentiary hearing was, essentially, that Petitioner does not meet the definition of mental retardation because he was able to go to school, drive a car, get married, have children, be a Marine, and hold various jobs (ignoring how poorly Petitioner generally fared in almost all of these areas).

The definition of mental retardation -- be it the definition of the American Association of Mental Retardation, the definition of the American Psychiatric Association, the constitutional definition set out by the United States Supreme Court in <u>Atkins</u>, or the definition adopted in <u>Lott</u> -- does <u>not</u> require that to qualify as "mentally retarded" an offender must be profoundly mentally retarded. The execution of a person who is mildly mentally retarded is unconstitutional under <u>Atkins</u>. Indeed, the AAMR definition of "mental retardation" expressly contemplates that:

**"Within an individual, limitations often coexist with strengths."**

American Association of Mental Retardation (AAMR), Definition of Mental Retardation, What is Intelligence?, http://www.aamr.org/Policies/faq_mental_retardation.shtml (emphasis added).

The government's questions and arguments during the evidentiary hearing seemed to suggest that to be "mentally retarded" as defined by <u>Atkins</u> an offender must be profoundly mentally retarded and have significant limitations in <u>ALL</u> adaptive behavior skills. That

15

obviously is not the law. The law is the three-part test. The question is not whether Petitioner has some strengths -- he obviously does. The question is whether Petitioner meets the three-part test, the third part pertaining to significant limitations in two or more adaptive skills.

Dr. Chiappone testified that Petitioner had a "[l]ack of coping skills" which, along with other factors, "made it more difficult for him to effectively problem solve." Trial Tr. at 996.

Dr. Nelson, who did not visit, interview, or test Petitioner, or even testify at the evidentiary hearing in support of his report, nevertheless agrees that: "It is clear that Mr. O'Neal has difficulties in dealing with stressful situations in an effective manner and does not think through the consequences of his behavior very well." Hearing Exhibit 1, March 21, 2005 Dr. Nelson Report, at page 5. While Dr. Nelson goes on to say that this same problem is experienced by "individuals who function at higher levels of intelligence," he does not deny that Petitioner's limitation in this area is evidence of a problem with his social skills or that this limitation is caused by mental retardation. Moreover, Dr. Nelson concedes that: "Mr. O'Neal does seem to exhibit significant deficits in several conceptual areas (i.e., reading, money concepts). Id. (emphasis added). Finally, Dr. Nelson says expressly that: "I would agree that Mr. O'Neal certainly has evidenced difficulties in his adaptive functioning in situations involving emotional intensity." Id. While Dr. Nelson attributes these difficulties to "psychiatric difficulties," he fails to provide any basis for concluding that these difficulties are not caused by Petitioner's mental retardation. Importantly, Dr. Nelson was not available to have his assertions cross-examined.

Dr. Tureen testified at Petitioner's October, 1995 trial (in the mitigation phase, before Atkins) that Petitioner is "an individual who's going to have some limitations on how well they're [sic] going to be able to function. *** By cognitive thinking general problems involving memory, spatial and statistical skills, language usage, as well as motor skills. [sic] And on that

particular exam he performed well into the impaired range. You take that performance and put it together with the IQ level and you see an individual who is going to have some sort of difficulties in adjusting in the world." Trial Tr. at 1003. He added that persons like Petitioner would have "some real limitations of what they're going to be able to do in life and what they're going to be able to accomplish." Trial Tr. at 1005. Finally, Dr. Tureen testified on cross-examination that Petitioner "was functioning in the mildly mentally retarded to borderline range." Trial Tr. at 1009.

At the evidentiary hearing on May 17, 2005 Dr. Tureen testified specifically in terms of the constitutional standard of mental retardation and the requirement of the third prong of the test that requires significant limitations in two or more adaptive skills. In particular, Dr. Tureen testified that Petitioner has significant limitations in <u>conceptual</u> as well as <u>social</u> skills:

> Q. Based on your education, training, and experience and your interviewing and testing of Mr. O'Neal, as well as your review of his scholastic records, do you have an opinion, Dr. Tureen, to a reasonable certainty as a psychologist as to **whether or not Mr. O'Neal currently suffers from a disability characterized by significant limitations in two or more adaptive skills** as expressed in conceptual, social, and practical adaptive skills, which occurred before he was age 18?
>
> A. Yes, I do.
>
> Q. What is your opinion?
>
> A. That he still suffers from the same level of **conceptual inability**, if you will, and **social limitations** as he did prior -- in the past.
>
> Q. And what **particular adaptive skills** does Mr. O'Neal suffer from a significant limitation of?
>
> A. First of all, there is **a significant limitation in academic skills. I would say reading, math**, but more importantly is the limitation as a result of what I initially referred to as mild

    cerebral dysfunction, which I believe is the cause of the **low level of intellectual function.**

    Now, that particular type of disturbance that he demonstrated on our earlier testing limits his ability to consider alternative modes of dealing with situations which are stressful or which he finds in some way threatening.

Q. And I don't have *Atkins* in front of me, I'm going from memory. Feel free to review *Atkins* if you have it in your possession. The reference in *Atkins* to adaptive skills relates to the following: Communication, self care, home living, social, community use, self direction, health and safety, functional academics, leisure, work. What you have just described, does that fall into that category of functional academics?

A. The functional academics and social adaptive.

Q. How does that fall into the category of **social adaptive**?

A. **This is an individual who is going to become rigid, perseverative, not able to think of alternative ways of dealing with situations which occur particularly under stress.**

Q. Does it impact the issue of whether or not Mr. O'Neal is mentally retarded if he meets two of the ten types of limitations in adaptive behavior?

A. My understanding is that it does.

Q. You have provided us with your opinion concerning whether or not James O'Neal is mentally retarded. Are there **gradations of mental retardation**, Doctor?

A. Yes, there are.

Q. Based on your education, training and experience and your interviewing and your testing of Mr. O'Neal and your review of his scholastic records, do you have an opinion to a reasonable certainty as a psychologist as to the **level of gradation of Mr. O'Neal's retardation?**

A. Yes, I do.

Q. What is that opinion?

    A.  **He is mildly mentally retarded**.

Hearing Transcript at pages 30-33 (emphasis added).

The facts and law underlying this eighteenth ground for relief were presented to every level of the state courts and state court remedies have been exhausted.

The sentence of death imposed on Petitioner James O'Neal should be vacated under the Eighth Amendment to the United States Constitution and under the constitutional standards established by Atkins v. Virginia.

### IV. Position of Opposing Counsel

In accordance with S.D. Ohio Civ. R. 7.3(b) the undersigned counsel for Petitioner contacted counsel for Respondent, Stephen A. Maher, by telephone to solicit Respondent's consent to the amendment of the petition requested in this motion. Counsel for Respondent indicated to counsel for Petitioner that Respondent does not oppose the motion to amend the petition.

### V. Conclusion

For all the foregoing reasons Petitioner James O'Neal requests leave of this Court to amend his petition for a writ of habeas corpus by adding, as his eighteenth ground for relief, the ground for relief stated above in part III of this motion.

                    Respectfully submitted,

                      s/John J. Gideon
                    JOHN J. GIDEON (0008151)
                    (Trial Counsel)
                    250 East Stanton Avenue
                    Columbus, Ohio 43214-1268
                    Phone: (614) 844-3954
                    Email: johngideon@sbcglobal.net

        s/Michael W. Krumholtz
MICHAEL W. KRUMHOLTZ (0009099)
(Co-Counsel)
Bieser, Greer & Landis LLP
6 North Main Street, Suite 400
Dayton, Ohio 45402-1908
Phone: (937) 223-3277
Facsimile: (937) 223-6339
Email: mwk@bgllaw.com

COUNSEL FOR PETITIONER

## CERTIFICATE OF SERVICE

I hereby certify that on May 31, 2007 I electronically filed the foregoing Motion Of Petitioner James O'Neal For Leave To Amend His Petition For A Writ Of Habeas Corpus with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Stephen E. Maher and Matthew C. Hellman, Assistant Attorneys General, Capital Crimes Section, 30 East Broad Street-23rd Floor, Columbus, Ohio 43215-3428.

        s/ John J. Gideon
JOHN J. GIDEON (0008151)
(Trial Counsel)
250 East Stanton Avenue
Columbus, Ohio 43214-1268
Phone: (614) 844-3954
Email: johngideon@sbcglobal.net

COUNSEL FOR PETITIONER