

1    TO BE SENT DIRECTLY TO THE      OHIO

2    COURT OF COMMON PLEAS

3    HAMILTON COUNTY, OHIO

**FILED**
**Criminal Division**

**DEC 2 2005**

4    - - -

5    STATE OF OHIO,    :

HAMILTON COUNTY
GREGORY HARTMANN
CLERK OF COURTS

6    Plaintiff,    :

7    Vs.    :    Case No. B-9309022

C-050840

8    JAMES DERRICK O'NEAL    :

9    Defendant.    :

10    - - -

11

12    COMPLETE TRANSCRIPT OF PROCEEDINGS

**FILED**
**COURT OF APPEALS**

13    - - -

14    DEC - 2 2005

15    Judith A. Mullen, Esq.
Phillip R. Cummings, Esq.

GREGORY HARTMANN
CLERK OF COURTS
HAMILTON COUNTY

16    On behalf of the Plaintif

17    John J. Gideon, Esq.
Michael W. Krumholtz, Esq.

18

19    On behalf of the Plaintiff.

20    - - -

21    BE IT REMEMBERED that upon the

22    motion of this cause, on May 17th, 2005, before

23    the Honorable MARK R. SCHWEIKERT, Judge of the

24    said Court of Common Pleas, the following

25    proceedings were had.

HAMILTON COUNTY
CLERK OF COURTS

BOUND DOCUMENT
CANNOT BE SCANNED



1
```
                        STATE OF OHIO
                          VERSUS
                  JAMES DERRICK O'NEAL
                   Case No. B-9309022
                   Case No.  C-050840
```

4
```
                     I N D E X
```

5
**DEFENDANT'S WITNESSES**

6
**Dr. Robert G. Tureen**

7
```
Direct Examination ...............Page 06, Line 14
Cross-examination ................Page 36, Line 16
Redirect Examination .............Page 48, Line 08
```

9
```
                   E X H I B I T S
```

11
**STATE'S EXHIBITS**

12
Exhibit No. 1, Dr. Nelson's report

13
```
Marked for identification ....... By counsel
Received into evidence ..........Page 50, Line 10
```

Exhibit No. 2, CV, Dr. W. Michael Nelson, III

```
Marked for identification .......By counsel
Received into evidence ..........Page 50, Line 10
```

17
Exhibit No. 3, O'Neal medical Chart

18
```
Marked for identification .......By counsel
Received into evidence ..........Page 50, Line 10
```

19
Exhibit No. 4, ODRC Mental Health file, O'Neal

20
```
Marked for identification .......By counsel
Received into evidence ..........Page 50, line 10
```

22
Exhibit No. 5, O'Neal Ohio Supreme Court decision

23
```
Marked for identification .......By counsel
Received into evidence ..........Page 50, Line 10
```

<u>Defendant's Exhibits</u>:


Exhibit A, O'Neal school records

Marked for identification ....... By counsel
Received into evidence .......... Page 50, Line 12

Exhibit B, July 27, 1994 report

Marked for identification ....... By counsel
Received into evidence .......... Page 50, Line 12

Exhibit C, Tureen Report

Marked for identification ....... By counsel
Received into evidence .......... Page 50, Line 12


- - -


        ALL OF THE EXHIBITS IN THE ABOVE CAUSE
        ARE IN THE CUSTODY OF THE EXHIBIT CLERK.

1      MORNING SESSION, MAY 17, 2005

2           P-r-o-c-e-e-d-i-n-g-s

3      THE COURT:  Let's go on record on

4  this.  This is State of Ohio v. James

5  Derrick O'Neal.  The defendant is not

6  present yet.  He is on his way.

7      Maybe we should wait until he gets

8  here.  We will do that.

9      MS. MULLEN:  Your Honor, when the

10  defendant arrives, I would like to read

11  into the record the agreed stipulations

12  between the parties.

13      THE COURT:  That's kind of where I

14  was going.

15      MS. MULLEN:  I'm sorry.

16      THE COURT:  I thought we had better

17  wait until he gets here.

18      MS. MULLEN:  Yes.

19      (Pause in proceedings.)

20      THE COURT:  Okay.  Let's call State

21  of Ohio v. James O'Neal, Case Number

22  B9309022.  Let the record reflect that the

23  defendant is present in court with his

24  counsel.

25      This matter is on today for a hearing

1  regarding the defendant's post-conviction

2  petition requesting a determination under

3  the Supreme Court case of *Atkins v.*

4  *Virginia*, that he is a mentally retarded

5  offender not subject to the death penalty.

6      The Court has previously ordered, at

7  the request of the parties, psychological

8  evaluations, and those reports have been

9  received.  I have not reviewed these

10  reports.  I did that on purpose because I

11  wasn't sure whether these were technically

12  the defense's evaluation, whether you were

13  going to offer them or not, and so although

14  I have them, but I haven't reviewed them.

15      Correct me if I am wrong, but I

16  believe that the defense has the burden in

17  this situation, so you would proceed first.

18      MR. KRUMHOLTZ:  We have the

19  obligation in going forward.

20      Your Honor, we could call Dr. Tureen.

21      I think Ms. Mullen will be discussing

22  some stipulations that the Court may want

23  to have read for the record.

24      MS. MULLEN:  The parties have agreed

25  to stipulate to the admissibility of all of

1    the doctors' reports, to Dr. Nelson's CV,

2    to Mr. O'Neal's medical chart, Mr. O'Neal's

3    mental health file, to the entire trial

4    record and transcripts, and to Mr. O'Neal's

5    school records.

6         MR. KRUMHOLTZ:  That's correct.

7         THE COURT:  What was final one?

8         MS. MULLEN:  The school records.

9         THE COURT:  And the defense accepts

10    all of those stipulations.

11         MR. KRUMHOLTZ:  That's right, your

12    Honor.  And with those stipulations, we

13    would call Dr. Tureen.

14         ROBERT TUREEN, Ph.D.

15    being first duly sworn, was examined and testified

16    as follows:

17         THE COURT:  Good morning, doctor.

18         THE WITNESS:  Good morning.

19         DIRECT EXAMINATION

20    BY MR. KRUMHOLTZ:

21         Q.    Sir, please give us your full name.

22         A.    Robert Tureen.

23         Q.    What is your current professional

24    address?

25         A.    Mayfield Clinic, 506 Oak Street,

1    Cincinnati.

2         Q.    How are you currently employed?

3         A.    I'm an associate of the Mayfield

4    Clinic?

5         Q.    What is the Mayfield Clinic, Dr.

6    Tureen.

7         A.    It's a group of private

8    practitioners, including 15 neurosurgeons and

9    myself.

10        Q.    What is your professional area?

11        A.    I'm a clinical psychologist with a

12   specialist in neuropsychology.

13        Q.    Are you licensed as a psychologist in

14   the State of Ohio?

15        A.    Yes.

16        Q.    How long have you been licensed in

17   this state, sir?

18        A.    Since '73 or '74, whenever the

19   licensure went through.

20        Q.    Doctor, is there such a thing as

21   board certification for psychologists?

22        A.    Yes.

23        Q.    Please explain what board

24   certification is in the case of a psychologist.

25        A.    There are several specialty areas in

1    which people are board certified in psychology by

2    the American Board of Professional Psychologists.

3    And this is a recognition via testing and

4    accomplishment of our peers that you have reached

5    a certain state of expertise in your area.  I'm a

6    diplomate with the American Board of Clinical

7    Neuropsychologists, and that was granted in 1986.

8              Q.   When you say you're a diplomate,

9    does that mean you have attained board

10   certification?

11             A.   Yes, it does.

12             Q.   How long have you been with the

13   Mayfield Clinic?

14             A.   Seven years

15             Q.   How long have you been in the private

16   practice of psychology, doctor?

17             A.   Well, I would consider my tenure with

18   the Mayfield Clinic being in private practice of

19   psychology.

20             Q.   If you would, please describe for us

21   your undergraduate educational background in

22   college.

23             A.   I received my bachelor degree from

24   the University of Michigan, and I majored in

25   psychology there.  Then I obtained my master's

1  degree from Akron State, which is now Akron State

2  University, and then went onto Wayne State

3  University in Detroit to obtain my Ph.D.  I did a

4  clinical internship at LaFayette Clinic in

5  Detroit, which no longer exists.  I did a two-year

6  postdoctoral fellowship at the University of

7  Oklahoma Medical Center.

8          Q.    Dr. Tureen, what is neuropsychology?

9          A.    That is a branch of psychology which

10  specializes in evaluating and treating the

11  behavioral reactions of changes in the brain

12  function or disordered brain function.

13          Q.    If you would, please describe for the

14  Court the nature of your practice of psychology as

15  it exists today.

16          A.    As it exist today, I'm doing almost

17  exclusive evaluation of individuals who are either

18  known to have impaired brain function or thought

19  to have impaired brain function.

20          Q.    Have you had any experience in your

21  practice of psychology in evaluating people to

22  determine whether or not they are mentally

23  retarded?

24          A.    Yes, that's pretty much run through

25  the practice over the years.

Q.    If you would generally, please describe your experience in evaluating people on this issue of mental retardation for the Court.

A.    The basic approach is to use a battery of tests to establish a level of intellectual functioning.  We further try to understand where that mental retardation might be stemming from.  For instance, is it coming from longstanding brain damage?  A learning disorder that may be the result of brain damage?  And we may or may not look at school records.  I don't work with children that much -- I don't work with children at all.  Excuse me.  I work with adults, so it's hard to get hold of school records frequently.  But if you can, that's also helpful in establishing when the retardation in and of itself occurred.  Then you look at the functional activity, how the person functions on a day-to-day basis.

Q.    Doctor, setting aside this particular gentleman, James O'Neal, setting him aside, what kind of experience -- how many cases have you been involved in evaluating people as to whether or not they are mentally retarded?

A.    We are talking hundreds.  I can't

give you a specific number.  And by terms of mentally retardation, we are talking about the problems beginning early on before the age of 18 and not acquired as an adult.

Q.    Have you ever been qualified as expert witness in giving testimony in the Hamilton County Court of Common Pleas?

A.    Yes, I have.

Q.    Can you give us an estimate as to the number of times in which you have qualified as an expert in giving testimony in Hamilton County Common Pleas Court?

A.    Probably a dozen times.

Q.    Let me discuss some work with you that you have performed in this particular case involving Mr. O'Neal.  First, of all as it relates to your testimony today, when you were first contacted and asked to conduct an evaluation in this matter pertaining to the question of whether or not James O'Neal is mentally retarded?

A.    It was I think around August of 2004.

Q.    Prior to that initial contact on this issue of mental retardation, had you had any involvement with James O'Neal?

A.    Yes, I did.

1      Q.     If you would, describe for the Court

2  what that involvement consisted of?

3      A.     Back in 1994 at the time of the

4  initial trial, I was called in by another

5  psychologist who was involved in the evaluation of

6  Mr. O'Neal.  The basis for being called is that

7  that psychologist was concerned that there was

8  evidence in his evaluation to suggest that there

9  was some brain disorder, brain damage, if you

10  will, exhibited by Mr. O'Neal.  And therefore, as

11  an expert in that area, I was asked to come in and

12  evaluate Mr. O'Neal.

13      Q.     In your work involving Mr. O'Neal

14  back at that time, 1994, did you conduct any type

15  of interview with Mr. O'Neal?

16      A.     Yes, I did.

17      Q.     Did you conduct any testing of Mr.

18  O'Neal back at that time?

19      A.     Yes, I specifically used a battery of

20  tests to look at the possibility of symptoms of

21  brain damage or brain dysfunction.  He had already

22  had some testing by Dr. Chiappone, who had seen

23  him previously.

24      Q.     With regard to the testing that you

25  did relating to Mr. O'Neal in 1994, please

indicate for the Court what testing that you did and what the results of those tests were. And if it helps to refer to your earlier report, please feel free to do that, Doctor.

A.    I administered him a test with a screening battery of various types of mental function, including memory and language and what we refer to as spacial relations.

There are also two measures of which are particularly important, which reference what we call executive functioning. That is the ability to take information in, process that information, plan, decide, and effectively carry out a plan of action to achieve a goal. Even more importantly, to be able to shift one's way of thinking or a person's focus when there is a change in the environment. The environment is changing. Our brain is constantly making adjustments to the environment and evaluating feedback information.

That was particularly important in this instance, because Mr. O'Neal showed an incredible amount of rigidity in thinking. He became very perseverative. And what I gave him stuck in his head. No matter whatever the

1    information may be, that this is not an

2    appropriate response as we are testing him, he was

3    unable to make the change.  He was unable to test

4    out alternative hypotheses that we were using in

5    the field.

6         Q.    Was there any other testing that you

7    performed on Mr. O'Neal back at that time?

8         A.    Yes, that was the Wisconsin Card

9    Sort.  That was the test that I used to evaluate

10   that particular aspect; the Porteus Mazes.

11        I also did some -- administered the

12   Rey Figure -- that's R-e-y -- which is a spacial

13   planning process, which is very sensitive to the

14   existence of brain disturbance.

15        The Hooper Visual Organization Test,

16   again, is a measure which assesses the ability to

17   visually organize spacial stimuli and to recognize

18   objects, and the inability to do that reflects

19   some disturbance in the basic brain processing and

20   basic abilities as we would normally assess them.

21        Where his strengths were was mostly

22   in his verbal expression in language.

23        Q.    Now, have we covered, Doctor, not

24   only the tests you administered back in '94, but

25   the results of those tests from your standpoint as

a psychologist?

A.    Well, I concluded that he was in the borderline to mildly retarded level of retarded function as reflected by previously psychometric measures, that the current testing reflecting he had evidence of impaired higher cortical functions.  That means brain function, such as the ability to reason abstractly, problem solve, and plan while other functions remain well intact such as language.

Q.    You mentioned testing you performed on Mr. O'Neal back in 1994, did you personally take Mr. O'Neal through an IQ test back at any time in '94?

A.    At that time, no.

Q.    Did you review the results of IQ test that had been administered to O'Neal back at that time?

A.    I did.

Q.    Who performed that IQ test?

A.    Dr. Chiappone.

Q.    Let me take you from 1994 to 2004. Regarding your work in 2004 in connection with the issue of whether or not Mr. O'Neal is mentally retarded, can you describe in general terms for

the Court the work that you have performed?

A.    Yes.  Besides again interviewing Mr. O'Neal -- and this is on December 4th of 2004 -- I chose to administer two IQ measures.  Now, the Weschsler, W-e-s-c-h-s-l-e-r, Adult Intelligent Scale 3 is the upgraded version of test that Dr. Chiappone used in 1994.

Typically, when a new test is brought out, or a new version of a test is brought out, it has been cleaned up.  Items which were not important before and which did not show to be discriminatory are dropped.  New forms are established.  It's considered to be a more accurate measure at this point, so I administered that test.

I also wanted a backup measure just to see, you know, to be, if you will, twice assured of what I was getting, so I administered the Reynolds Intelligence Test.  That is not near as popular a test.  It's a relatively new test, but it also assesses some of the same types of abilities, but it does so in a different manner.

Q.    Doctor, in addition to this testing, have you reviewed any records pertaining to Mr. O'Neal in connection with your evaluation on the

1  issue of whether or not he is mentally retarded?

2       A.    Yes, I have.

3       Q.    In general, can you tell what records

4  you have reviewed?

5       A.    Probably the most important one was

6  the psychological evaluation or educational

7  evaluation performed back when he was in grade six

8  at age 14.  I don't have the date on that.

9       Q.    Let me stop you for a second and

10  approach if I may.  Let me hand you what's been

11  marked as Defendant's Exhibit A.  I will give you

12  a chance to look at that.

13       A.    Yes.

14       Q.    Do you recognize that, sir?

15       A.    Yes, that's a copy of the school

16  records from the Cincinnati Public Schools'

17  psychology service.

18       Q.    Are those records that you have

19  reviewed in connection with your evaluation of

20  whether or not James O'Neal is mentally retarded?

21       A.    Yes.

22       Q.    Are those records significant in any

23  way in assisting you with making that

24  determination?

25       A.    Yes.  This occurred when he was, as I

said before, when he was in Grade 6 at age 14.
The date I believe was 1968.  He was administered
the Weschsler Adult Intelligence Scale for
Children, which is, if you will, a downward
version of the Wechsler Scale for adults.  This is
again the standard and popular measure.

          At that time, he obtained a full
scale IQ of 64, which is well into the retarded
range.  What was more important to me was the
difference between his verbal skills and what we
call nonverbal skills on the Weschsler Adult
Intelligence Scale.  There is almost a 25 point
split.  And that's the type of problems that you
see in children who have not just severe learning
disabilities but problems in brain function.  And,
in fact, the psychologist at the time indicated
that the "below intellectual functioning is due to
organic dysfunction, organic impaired brain
function."

          Q.    You mentioned that one of the things
that you did in your more recent work in 2004 in
evaluating Mr. O'Neal on mental retardation was
conduct an interview of Mr. O'Neal.  When did that
take place?

          A.    December 4, 2004.

1        Q.    Where was the interview conducted?

2        A.    In the Hamilton County Justice

3    Center.

4        Q.    On that occasion, how long were you

5    with James O'Neal?

6        A.    Approximately three hours.

7        Q.    In connection with the work that you

8    did in 2004 evaluating the issue of whether or not

9    James O'Neal is mentally retarded, did you review

10    the testing that you had performed back in 1994?

11        A.    Yes, I did.

12        Q.    And back at the time of your 1994

13    work involving Mr. O'Neal, did you prepare a

14    written report at that time?

15        A.    Yes.

16        Q.    Let me show you what's been marked as

17    Exhibit B, Dr. Tureen, and I'll ask you if you

18    have seen that before?

19        A.    Yes.

20        Q.    Please tell us what that is.

21        A.    It's a copy of my evaluation which

22    was sent to Mr. John Keller, who was the defense

23    lawyer at the time -- one of defense lawyers at

24    the time.

25        Q.    Have you had an opportunity to review

that report in connection with your more recent 2004/2005 work pertaining to Mr. O'Neal?

A.    Yes.  In fact, I was earlier talking about this.

Q.    Now, back when you interviewed Mr. O'Neal in 2004, what was the reason that you conducted that interview?

A.    Well, the reason was to actually redo the psychometric testing or IQ testing and see where he was today.

Q.    Was that interview significant to you in the ultimate formulation of your opinion concerning this issue of whether or not Mr. O'Neal is mentally retarded?

A.    Yes.  And if I can give the reason, is that it's a consistent habit of intellectual performance, which has been established as far back as grade six.

Q.    As a psychologist, would you ever make a determination that someone was mentally retarded without having conducted an interview of that person.

A.    It's my policy not to make a diagnosis of any individual without personal contact.

Q.    Let me show you, Doctor, what has been marked as Exhibit C.  Can you tell what that is?

A.    This is a copy of the report that I sent to the Court as a result of my contact with Mr. O'Neal on December 4th.

Q.    What's the date of the report, sir?

A.    January 18, 2005.

Q.    And would having the report in your hand at this point assist you in giving your testimony?

A.    Yes.

Q.    In relation to this issue of mental retardation of James O'Neal, have you reviewed any legal authority?

A.    Yes, I have.

Q.    What have you looked at?

A.    Primarily *Atkins versus Virginia*, a Supreme Court decision handout written by Judge Stevens.  There was also an amicus brief that was written for the State of Ohio.  There is the statement from the American Mental Retardation Association, which outlines the definitions of mental retardation, which is accepted by *Atkins* and which was supported in the amicus brief.

There is also -- there was a report of *Lott versus State of Ohio.*

        Q.    I'm sorry?

        A.    *Lott versus Ohio.*

        Q.    Are you aware, Doctor, of any criteria that are utilized in making a determination that a person is mentally retarded?

        A.    The major criteria that I'm aware of is that which is established by the American Mental Retardation Association.

        Q.    If you would, please identify what those criteria are.

        A.    I'm going take this from my report, which is taken from *The Manual of the American Mental Retardation*, which is entitled, "Mental Retardation Definition Classification System of Support."

            Their particular statements are as follows:

            "The disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills and originated before the age of 18."

        Q.    You referenced just a moment ago the

1    American Association for Mental Retardation.  What

2    is that, sir?

3         A.    It's a nationally known organization

4    of -- it's an advocacy organization.  It's a

5    support organization, which has been around

6    since the 1920s and has established many

7    guidelines for working with mental retardation and

8    is nationally recognized.

9         Q.    Dr. Tureen, in your experience as a

10    psychologist, have you dealt with the use of these

11    criteria before your work in the case of James

12    O'Neal?

13         A.    Yes.

14         Q.    When you, as a psychologist, speak of

15    adaptive behavior, what does that refer to?

16         A.    -- talking about the ability to

17    adjust to the real world in which we live

18    basically; does one have the skills that are

19    necessary to function academically, to function in

20    the work-related world, to function in the legal

21    world, to function in the social world, to

22    function interpersonally in a manner that is

23    successful and not detrimental to them or to

24    society.

25         Q.    You described two tests that you

performed in 2004 with Mr. O'Neal, if I recall

correctly, the Weschsler and also the Reynolds

test?

     A.    Yes.

     Q.    If you would, take us through how

the particular tests administered?  How are they

given to a subject?

     A.    They are administered directly; in

this instance by myself.  It's a face-to-face

administration.  That in of itself takes probably

close to two hours for the two tests.

     Q.    When you do those tests -- I know

there are two -- what do those tests measure?

     A.    They measure essentially -- let me

back up.  They are broken down into components.

The components are compiled into a full scale or

composite score.  What has been demonstrated that

in terms of adaptive functioning, generally

speaking, that full scale or composite score is

the most significant.

         In other words, if you look at the

Weschsler Adult Intelligence Scale, there are 14

subscales, scales that have to do with:  How could

a person do arithmetic?  What is their vocabulary?

How well can they do some abstract spacial

analysis?

Those are all put together to come up with a final score.  That's the final score which is used as the best assessment of where an individual is in terms of their general adaptive capacity.

Q.    How does that comport with the term "full scale IQ"?

A.    That is the same thing on the Weschsler scale.  Other scales call them composite IQs.

Q.    Let me take you first to the Weschsler and then to the Reynolds.  If you would, please tell us or describe what the results of those tests were from 2004 for James O'Neal?

A.    The full scale IQ on the Weschsler was 67.

Q.    Did you say "67"?

A.    Sixty-seven.  Now, the qualitative descriptions are a little bit different.  You will find that the newer IQ measures do not like to use the term "mental retardation."  The older ones do.

Technically, they describe him as being that score.  "That score" being extremely low.  What it is, is that the first percentile of

the general population -- that means 99

individuals who take the test -- do better than

Mr. O'Neal did.  Okay.

        The verbal scale was an IQ of 71,

which is at the third percentile.  Again, you can

get an idea that 97 percent of the people do

better.

        And the performance scale was 69,

which is a measure of more perceptual motor,

hand/eye coordination and visualization skills.

And an important point in looking at these three

numbers from any statistical basis is the numbers

of 67, 69, and 71 are not significantly different.

They all represent very low levels of intellectual

functioning.

    Q.    Let me jump from the Weschsler to the

Reynolds testing.  What were the results of that

testing that you conducted in 2004?

    A.    The Reynolds breaks down a little bit

differently, but still the composite IQ in this

case was 63, which again is at the first

percentile in this particular case, so we are

getting again a measure of functioning at

basically the lowest level you can in terms of

percentile ranges.  That means 99 percent of

1    people function better than this particular

2    individual.

3            The nonverbal index was 67, and the

4    verbal index was 68 -- again, scores which are not

5    significantly different from each other, all low

6    into what we call the extremely low -- or using

7    the old term "retarded" -- range.

8        Q.    Who actually scored the Weschsler and

9    Reynolds test that were done of Mr. O'Neal in

10   2004.

11       A.    I did.

12       Q.    In arriving at the scores that you

13   have described for us, did you attempt to do

14   anything to put Mr. O'Neal's IQ in a particular

15   range?

16       A.    No, I handle this the same as I do

17   any other scoring task.  I have the manuals in

18   front of me.  There are always some answers which

19   may be questionable to try and resolve those

20   questions one way or the other.

21       Q.    Can a subject of these tests, the

22   Weschsler and the Reynolds, do something to

23   intentionally try to score badly or have a low

24   score on the testing?

25       A.    You mean can they?

Q.     Yes.

A.     Yes, they can.

Q.     And as someone who is administering the tests, is there anything that you do to watch for that or guard against that?

A.     Well, you get a sense of the effort. But there is a more important measure here of whether or not he tried to do worse, and that's the consistency of performance since age 14. There is no variation here.

Q.     With regard to the Weschsler Adult Intelligence Scale, the test that you performed on James O'Neal in 2004, is that a test that is well recognized in the psychological community?

A.     Yes.  I think I referred to it as the gold standard of intelligence measure for adults.

Q.     Dr. Tureen, based upon your education, training, and experience as a psychologist and your interviewing and testing with James O'Neal as well as your review of his school records, have you formed an opinion to a reasonable certainty as a psychologist as to whether or not James O'Neal is mentally retarded and meets the criteria for mental retardation that we have previously talked about?

1    A.    Yes, I have.

2    Q.    What is your opinion, sir?

3    A.    That Mr. O'Neal meets the criteria

4  for mental retardation.

5    Q.    What is the basis of that opinion?

6    A.    Three bases:

7    One is low IQ scores in the mentally

8  retarded range;

9    Two is the fact that this has

10  occurred before the age of 18, as documented by

11  school records;

12    And three is evidence of impaired

13  brain function that is going to impact his ability

14  to function continually efficiently in social

15  situations, particularly social situations which

16  are stressful.

17    So he is academically impaired.  He

18  is socially -- there is a social impairment under

19  specific situations of high stress, and this has

20  occurred before the age of 18.

21    Q.    Let me, if I may, break this down to

22  the different prongs or different pieces of the

23  criteria for mental retardation.

24    Based upon your education, training,

25  and experience, and your interview and testing

1    with James O'Neal, as well as your review of his

2    scholastic records, do you have an opinion to a

3    reasonable certainty as a psychologist as to

4    whether or not he suffers from a disability

5    characterized by significantly subaverage

6    intellectual functioning which originated before

7    he was 18 years old?

8              A.    Yes.

9              Q.    What is your opinion?

10             A.    That, in fact, he suffers from a

11   disability originating before the age of 18.  It's

12   not only based upon the fact that he was tested at

13   age 14 and demonstrated sublevels of intellectual

14   function, but if you look at the academic records,

15   his performance levels across those records that

16   were available, again, were at the first and

17   second percentile compared to the general

18   population.

19             Q.    Based upon your education, training,

20   and experience and your interviewing and testing

21   of Mr. O'Neal, as well as your review of his

22   scholastic records, do you have an opinion, Dr.

23   Tureen, to reasonable certainty as a psychologist

24   as to whether or not Mr. O'Neal currently suffers

25   from a disability characterized by significant