1   limitations in two or more adaptive skills as

2   expressed in conceptual, social, and practical

3   adaptive skills, which occurred before he was age

4   18?

5          A.    Yes, I do.

6          Q.    What is your opinion?

7          A.    That he still suffers from the same

8   level of conceptual inability, if you will, and

9   social limitations as he did prior -- in the past.

10         Q.    And what particular adaptive skills

11  does Mr. O'Neal suffer from a significant

12  limitation of?

13         A.    First of all, there is a significant

14  limitation in academic skills.  I would say

15  reading, math skills, but more importantly is the

16  limitation as a result of what I initially

17  referred to as mild cerebral brain dysfunction,

18  which I believe is the cause of the low level of

19  intellectual function.

20              Now, that particular type of

21  disturbance that he demonstrated on our earlier

22  testing limits his ability to consider alternative

23  modes of dealing with situations which are

24  stressful or which he finds in some way

25  threatening.

Q.    And I don't have *Atkins* in front of me, I'm going from memory.  Feel free to review *Atkins* if you have it in your possession.  The reference in *Atkins* to adaptive skills relates to the following:  Communication, self care, home living, social, community use, self direction, health and safety, functional academics, leisure, work.  What you have just described, does that fall into that category of functional academics?

A.    The functional academics and social adaptive.

Q.    How does that fall into the category of social adaptive?

A.    This is an individual who is going to become rigid, perseverative, not able to think of alternative ways of dealing with situations which occur particularly under stress.

Q.    Does it impact the issue of whether or not Mr. O'Neal is mentally retarded if he meets two of the ten types of limitations of adaptive behavior?

A.    My understanding is that it does.

Q.    You have provided us with your opinion concerning whether or not James O'Neal is mentally retarded.  Are there gradations of mental

1    retardation, Doctor?

2        A.    Yes, there are.

3        Q.    Based upon your education, training

4    and experience and your interviewing and your

5    testing of Mr. O'Neal and your review of his

6    scholastic records, do you have an opinion to a

7    reasonable certainty as a psychologist as to the

8    level of gradation of Mr. O'Neal's retardation?

9        A.    Yes, I do.

10       Q.    What is that opinion?

11       A.    He is mildly mentally retard.

12       Q.    Dr. Tureen, what the meant by the

13   term "borderline" in speaking about mental

14   retardation or a mental retardation evaluation?

15       A.    On our intellectual measures, such as

16   the Weschsler scale or the Reynolds scale, there

17   is an area of intellectual functioning that is

18   below average but doesn't quite fall into the

19   mentally retarded range.

20       Q.    Have you reviewed any prison records

21   pertaining to Mr. O'Neal from the Mansfield

22   Correctional Institute?

23       A.    Yes.

24       Q.    In reviewing those records, have you

25   seen any indication that Mr. O'Neal has any

1    difficulty in following the rules of confinement

2    in that institution?

3          A.    No, I don't believe so.

4          Q.    Does that in any way undercut the

5    opinions that you have just given us concerning

6    his mental retardation?

7          A.    Not at all.

8          Q.    Why do you say that?

9          A.    We are not talking about somebody who

10   is brain dead.  We are talking about limitations.

11   There is some learning that can take place, but

12   it's at a certain level.  For instance, he was a

13   dishwasher.  That doesn't take a high level of

14   skill.  There are people with Mr. O'Neal's level

15   of functioning, who work under supervised

16   situations, and can function well under

17   structured, supervised situations, which is the

18   situation in prison.

19         Q.    Let me refer to your 2005 report.

20   The last sheet or one of the last sheets in the

21   report is entitled "WAIS-III Summary Report."  Do

22   you see where I'm referring, Doctor?

23         A.    Yes.

24         Q.    Can you explain how that particular

25   page should be read to the Court?

1    A.    The most important number there or

2    three numbers there are the verbal performance in

3    full scale IQs, which are described as

4    "borderline, extremely low, and extremely low."

5    The extremely low is in the retarded range.  Okay.

6    As I said, it's kind of a political correctness

7    that people don't like to use the term mental

8    retardation as much as they did in the past,

9    extremely low becomes the synonym for mental

10   retardation.

11        The important point that I tried to

12   make earlier is, if you look at those three

13   scores, they are not statistically significantly

14   different.

15        The true performance -- if you look

16   at the point where it says "95 percent confidence

17   interval," the true score lies in between those

18   intervals.  It could just as well be 64 or 72.

19   Q.    In relation to your work in this

20   case, have you had opportunity, Dr. Tureen, to

21   review a written report prepared by Dr. Nelson?

22   A.    Yes, I did.

23   Q.    Is there anything in Dr. Nelson's

24   report that has caused you to change any of the

25   opinions that you have expressed for the Court

1    today?

2        A.    NO.   In fact, I think for the most

3    part, except for the final conclusion, he and I

4    are agreeing based upon the information that we

5    have.

6        Q.    Have you reviewed your testimony

7    given at Mr. O'Neal's trial back in 1995 in

8    preparation for your testimony today?

9        A.    Yes.

10       Q.    Are the opinions that you have

11   expressed today are consistent with the testimony

12   that you gave at that time?

13       A.    I believe they are.

14           MR. KRUMHOLTZ:  Nothing further, your

15   Honor.   Thank you.

16           THE COURT:  Cross-examination?

17           MS. MULLEN:  Thank you, Judge.

18           CROSS-EXAMINATION

19   BY MS. MULLEN:

20       Q.    Hello, Dr. Tureen.

21       A.    Hello.

22       Q.    According to your discussion of

23   summary report in regards to the 95 percent

24   confidence interval, that means IQ testing is not

25   exact.  Would that be correct?

1        A.    IQ testing is based on -- I can't say

2  yes or no.  If I may explain.

3        Q.    Okay.  Sure.

4        A.    It's a statistical process.  And when

5  you use statistics, you get a range.  You get what

6  is known as standard error of measurement.  And

7  for the full scale IQ -- I don't remember the

8  exact standard error of measurement, but it's

9  somewhere between two and three.  So, if you look

10  at the full scale IQ of 67, that real number is

11  something like 65, or it's like 68, somewhere in

12  that range.

13        Q.    So on your verbal scale where it says

14  "67 to 77," is that the confidence?

15        A.    That's a different confidence level.

16  That's not the standard error of measurement.

17        Q.    Is it correct to generalize that the

18  IQ score that you come up there can vary either

19  five degrees over or five degrees under?

20        A.    They can, yes.

21        Q.    So an IQ score of 71 could be 76 or

22  66?

23        A.    It's possible, sure.  Again, I think

24  the important point that I have been trying to

25  make here is the consistency of the pattern from a

very early age on IQ measures.

Q.    The point that I'm trying to make is it could be anywhere in that range, so we can't say for sure the exact number.  Would that be correct?

A.    That would be correct except that traditionality that we take the number, and if you read reports of -- as in this report -- if you read reports that state what the IQ is, you state it's 67, not that it's in a range from X to Y.

Q.    But it's understood that there is a range?

A.    There is always a range, yes, statistically.

Q.    So in regards to back Dr. Chiappone's administering the Weschsler back in 1994, he came up with 71?

A.    Yes.

Q.    That could be 76, or it could be -- whatever five from 71 is -- 66, right?

A.    It could be.

Q.    So is it correct to say that we don't know his exact score?

A.    No, we don't, but we are also dealing with the best guess, and that number is the best

1   guess.  Okay.  It's a statistical guess, but it's

2   still the best guess.

3        Q.    Do you agree that even with an IQ

4   below 70, there would be no diagnosis of mental

5   retardation without some significant impairment in

6   adaptive functioning?

7        A.    Yes.

8        Q.    So you almost need to look at the

9   adaptive functioning in order to come to a

10  conclusion.  Would that be correct?

11       A.    Yes.

12       Q.    Do you agree with the *DSM-IV* -- I'm

13  sure that you're familiar with that -- that mental

14  retardation is not necessarily a lifetime

15  disorder?

16       A.    It depends.  You're going to have to

17  define that for me, or they are going to have to

18  define it for me.

19       Q.    Well, I only know what they say in

20  just a couple sentences on Page 44.  "Mental

21  retardation is not necessarily a lifelong

22  disorder.  Individuals who had mild mental

23  retardation early in their lives, manifested by

24  failure in academic learning tasks, may, with the

25  appropriate training and opportunities, develop

1   good adaptive skills in other domains and many no

2   longer have the level of impairment required for

3   diagnosis of mental retardation."

4          A.    I agree with that.

5                THE COURT:   Excuse me.   Where were

6          you reading from?

7                MS. MULLEN:   The *DSM-IV*, which is the

8          Diagnostic and Statistical Manual of Mental

9          Disorders.

10               THE COURT:   Thank you.

11  BY MS. MULLEN:

12         Q.    And as you have discussed before, the

13  adaptive functioning has to do with how a person

14  deals in the outer world?

15         A.    Yes.

16         Q.    You're aware that Mr. O'Neal went to

17  high school, are you not?

18         A.    I am aware of that.

19         Q.    He went to Taft High School?

20         A.    Yes.

21         Q.    Are you aware that he wasn't in any

22  special class?

23         A.    He was recommended for special

24  classes.  If you look at his academic performance

25  he should have been.

1        Q.    But he was not, right?

2        A.    He was not.  That doesn't mean that

3   he shouldn't have been.

4        Q.    Are you aware that he, for example,

5   he owned and drove an automobile?

6        A.    Yes.

7        Q.    Are you aware of that?

8        A.    Well, I don't know that.  I'm aware

9   that he owned an automobile.  I know that he drove

10  an automobile, that he could drive.

11       Q.    Are you aware that he was in the

12  military?

13       A.    Yes.

14       Q.    That he was a lance corporal in the

15  military?

16       A.    I have not seen that particular

17  discharge.  I have only read it.

18       Q.    In the reports?

19       A.    In the reports.

20       Q.    You're aware that he was married and

21  raised a family?

22       A.    He was married and tried to raise a

23  family.

24       Q.    Okay.  Were you aware that he had

25  custody of his children?

1        A.    Yes.

2        Q.    He sought and received custody of his

3 children?

4        A.    Yes.

5        Q.    Were you aware that he worked for a

6 living?

7        A.    At times he did, yes.

8        Q.    He was a valued employee?

9        A.    At times he was.

10       Q.    Do you know that his mother testified

11 at his trial that he was a normal child?

12       A.    In terms of what? Walking?

13       Q.    She said he was a normal child, a

14 child who was normal. Are you aware of that, sir?

15       A.    I don't recall her particular

16 statement at trial.

17       Q.    As you said before, as far as we

18 know, he's adjusted to prison life?

19       A.    Yes.

20       Q.    Are you aware that his intellectual

21 functioning was evaluated in prison, and there was

22 no deficit noted?

23       A.    I have seen the statement. I have

24 not seen the evidence that they talk about. I

25 also saw statements that he is "a bit dull." I

have not seen any data.

Q.    But it's in the report?

A.    But how is that determined?

Q.    I don't know, but apparently the prison system thought that he had no deficit.  Are you aware of that?

A.    I'm aware of that, but I don't know how that pertains to the issue of retardation.

Q.    But aren't these all evidence of adaptive functioning?

A.    How much adaptive functioning -- excuse me.  I'm not sure that much adaptive functioning is required on death row.

Q.    How about he went to the high school, isn't that an indication of adaptive functioning?

A.    But he did extremely poor.

Q.    How about he was in the military?

A.    He went AWOL.  He did not find an alternative solution to dealing with the situation.

Q.    None of these things change your mind about his adaptive functioning?

A.    I never said he could -- if you read my report, I said there were two areas in which he could not adapt, and there are eight in which he

1    could.  Yes, he has areas which he capable of

2    adapting.

3         Q.    You're aware, I am sure, that Dr.

4    Nelson found that Mr. O'Neal was not mentally

5    retarded?

6         A.    He claimed that he was not.

7         Q.    Even after reviewing your report?

8         A.    Yes.

9         Q.    Of course Dr. Chiappone had the same

10   opinion, correct?

11        A.    Yes.

12        Q.    Now, you talked about his lack of

13   social adaptivity?

14        A.    Adaptability.

15        Q.    He has a personality disorder, does

16   he not?

17        A.    Which is?

18        Q.    Antisocial personality disorder?

19        A.    Based upon --

20        Q.    Borderline personality disorder.

21        A.    Based upon what?

22        Q.    It's in the reports.  I mean, I only

23   know the reports, like you do.

24        A.    Okay.  He had an antisocial

25   personality disorder because of his drug use and

1    his run-ins with the law.  I do not recall any

2    basis or seeing a basis for diagnosing a

3    borderline personality.

4          Q.    He has been diagnosed

5    psychiatrically, correct, as having a borderline

6    personality?

7          A.    I am not aware.

8          Q.    You're not aware of that, sir?

9          A.    I'm not aware of who diagnosed that

10    or what is the basis.

11          Q.    But you're aware of that?

12          A.    I know that Dr. Nelson said that he

13    had a borderline -- mixed borderline -- mixed

14    personality disorder, including borderline

15    personality and antisocial disorder.  I don't know

16    where he got it.

17          Q.    Well, also it's in the trial

18    transcript I think, too, from the psychologist who

19    testified.

20          A.    Dr. Chiappone?

21          Q.    I'm not sure.  I don't remember.  But

22    anyway, here's the point that I'm getting to,

23    wouldn't that account for his lack of social

24    skills or lack of social adaptability?

25          A.    I think that's a great point, but I

1  think just as reasonably the fact that you have an

2  individual who has brain dysfunction, which

3  results in low intellectual functioning, which

4  results in compromised ability to adapt to certain

5  types of situations is as reasonable an

6  explanation, and as far as I'm concerned, I have

7  demonstrated the brain dysfunction, okay, as a

8  neuropsychologist, that can account for the level

9  of functioning that the disorder in functioning

10 that we saw, and you can attach that on top of it,

11 if you will, but still the underlying cause of the

12 mental retardation in the inability to adapt in

13 the two areas that I talked about in my opinion

14 are the result of his brain dysfunction.

15      Q.    Well, are you taking into

16 consideration the entire social aspect?

17      A.    You can put that on top of it, if you

18 want to, but I'm still saying that the issue that

19 we have been talking about, which is, is he

20 mentally retarded?  And there are areas of failure

21 to adapt which coincide with that mental

22 retardation, and I have talked about that a number

23 of times.  Those are the two that I think that

24 lead to my conclusion, plus the fact that this

25 occurred before the age of 18, that he is mentally

retarded.

Q.    Well, I'm asking you to consider if someone has an antisocial personality, wouldn't that lead to the same problem, and isn't that a separate thing of mental retardation?

A.    Yes, and that would not necessarily lead to the same problem.

Q.    Isn't that the basis of why so many people are in prison, is that they have that antisocial personality?  They can't get along with people.  And isn't that what Mr. O'Neal manifests?

A.    Yes, and there are also -- I'm going to go back to my talking about the kind of test results that he demonstrated, which shows a man, which is his brain, which locks in, if you will, because of a disturbance in the way the brain functions and cannot conceptualize different ways of handling certain types of situations that even somebody who has a borderline personality, or who is an antisocial personality can, in fact, do.  He gets locked into it.  He become perseverant.  He is going to do same thing over and over.  He gets a thought in his head, and it's almost like obsessive compulsive disorder.  Once he starts on a track and it's an emotionally charged track, he

1    is limited.  That is what I believe -- I think --

2    is the cause of the mental retardation.

3              MS. MULLEN:  I don't think that I

4         have anything else.  Thank you.

5              THE COURT:  Redirect?

6              MR. KRUMHOLTZ:  I just have one

7         question.

8              REDIRECT EXAMINATION

9    BY MR. KRUMHOLTZ:

10        Q.    Dr. Tureen, Ms. Mullen asked you

11   about Dr. O'Neal's report.  Is there anything to

12   indicate that -- I said "Dr. O'Neal -- Freudian

13   slip.

14        A.    Dr. Nelson.

15        Q.    Is there anything in Dr. Nelson's

16   report that indicates that Dr. Nelson examined Mr.

17   O'Neal?

18        A.    No.  My understanding is Dr. Nelson

19   based his conclusions upon the review of

20   documentation.

21             MR. KRUMHOLTZ:  I have nothing

22        further.

23             Your Honor, we would offer for

24        admission -- they are covered by the

25        stipulation, the three exhibits that we

1    have presented with the doctor.

2        THE COURT:  Any objection to the

3    exhibits?

4        MS. MULLEN:  No, Judge.

5        THE COURT:  Doctor, you can step

6    down.

7        (Witness excused.)

8        THE COURT:  Does the defense have any

9    further witnesses?

10       MR. KRUMHOLTZ:  We do not, your

11   Honor.

12       THE COURT:  The State have any

13   witnesses you want to call?

14       MS. MULLEN:  No, your Honor.  We

15   would just offer the exhibits that we have

16   marked.  Shall I recite what they are.

17       THE COURT:  You want to recite those?

18       MS. MULLEN:  State's Exhibit 1 is Dr.

19   Nelson's report.

20       State's Exhibit 2 is Dr. Nelson's CV.

21       State's Exhibit 3 is Mr. O'Neal's

22   medical chart.

23       State's Exhibit Number 4 is Mr.

24   O'Neal's mental health file.

25       State's Exhibit 5 is the Ohio Supreme

1    Court decision, *State of Ohio v. O'Neal*,

2    that being, *87 Ohio St. 3d 402*.  That's

3    all.

4         THE COURT:  Any objection to the

5    State's exhibits?

6         MR. KRUMHOLTZ:  No objection.

7         THE COURT:  Okay.  We'll admit the

8    defense exhibits without objection and the

9    State's Exhibits without objection.

10         (State's Exhibits 1, 2, 3, 4 and 5

11    were admitted;

12         Defendant Exhibits 1, 2 and 3

13    were admitted.)

14         THE COURT:  Does the defense wish to

15    offer argument, or are you going to submit

16    some kind of brief?  How do you want to

17    proceed?

18         MR. KRUMHOLTZ:  It's really the

19    Court's preference.  I am happy to argue a

20    few minute, if you would prefer, or if you

21    prefer briefing, we can do it in that

22    fashion.

23         THE COURT:  Does the State have a

24    preference?

25         MR. CUMMINGS:  We are prepared to

1    argue if the Court prefers.

2         THE COURT:  Why don't we give brief

3    arguments.  I don't have the benefit of me

4    having reviewed all of exhibits at this

5    time, and so I'll certainly allow you, if

6    you want, to submit some kind of a brief.

7         I would suggest the defense would

8    file something, and the State would respond

9    to it, and you would have the final word.

10        I'll allow you to give a short

11    argument at this time.  I am thinking it

12    would be helpful for me to consider your

13    briefs after I have read everything.

14        MR. KRUMHOLTZ:  That's fine.  We will

15    take advantage of that offer from the

16    Court.

17        Briefly, the template for this, as

18    you know, is *Atkins versus Virginia*,

19    decided in June of 2002.

20        One of exhibits that you have

21    received in the case is *State versus*

22    *O'Neal*, the decision regarding this

23    particular case, but please, as you sift

24    through that particular information and the

25    case decision, look at the date, which

1    predates *Atkins versus Virginia.*

2         What does *Atkins* tell us?  *Atkins*

3    tells us that there is a certain measure

4    which a trial judge in your position can

5    make that will determine whether someone is

6    or is not mentally retarded.  If they are

7    mentally retarded, the Eighth Amendment

8    precludes their execution.

9         What does Atkins look at?  If you

10   will look, Daryl Renard Atkins had a full

11   scale IQ of 59, and the Court mentions the

12   term "full scale IQ".

13        Dr. Tureen today and in his report

14   tells you the full scale IQ for James

15   Derrick O'Neal is 67.

16        Look also at the case of the *State*

17   *versus Lott*, which is Ohio's adaptation, if

18   you will, of the Atkins' test, and the

19   Ohio's determination from the Ohio Supreme

20   Court as to how the state court will

21   survive or enforce, if you will, *Atkins.*

22        What the Court said was that an IQ of

23   over 70 is presumed to be not mentally

24   retarded.  They chose some line drawing.

25   They chose a line in the sand.  They said,

if the IQ is over 70, a person is not
mentally retarded.

We have a full scale IQ taken in
2004, the WAIS-III, the current "gold
standard" test, that indicates that man has
an IQ of 67.

And Ms. Mullen is absolutely correct.
There are ranges, and the Court knows that.

Dr. Tureen emphasized, and very
importantly, the consistency of testing
done when Mr. O'Neal was in grade school,
done by Dr. Chiappone and done now by Dr.
Tureen. So you have that IQ.

The IQ itself is not conclusive on
the issue of mental retardation. The other
issues becomes important under the Atkins
standard. Are there significant
limitations in adaptive function?

As I recall, there are ten areas of
adaptive functioning. One of those is
functional academics. Dr. Tureen's report
and testimony highlighted Mr. O'Neal has a
significant limitation in his functional
academics.

The second area of significant

limitation and adaptive functioning for
this person is that the fact in social
situations that emotionally he is rigid in
his thinking to the point that he has no
social alternative.  That, according to Dr.
Tureen was a significant limitation that
puts him into the category of mentally
retarded.

So we ask the Court in looking at the
evidence to pinpoint those issues of
functional academics and those issues of
the social functioning because it requires
in *Atkins* two or more of these areas, and
it requires a significant detriment in
intellectual ability.  That's where the 67
IQ comes into play.

Thank you.

MR. CUMMINGS:  Your Honor, if I may,
we have an exhibit that I would like to
pull out here.

Your Honor, at this juncture, I think
it's important to point out that the
defense has the burden of proof by a
preponderance of the evidence.

*State v. Lott* made that clear.  It's

1    also clear a score of an IQ test of above

2    70 is a rebuttable presumption that

3    somebody is not mentally retarded.

4        Now, in this case, as has been

5    discussed, there's been multiple IQ test

6    given to Mr. O'Neal, and he scored a

7    variety of different scores in the range of

8    I think 64 to 71 or 72.  And taking into

9    account the standard deviations, I think

10   you can see where he could be as high as

11   76.

12       And the point of that is that the IQ

13   tests themselves are not determinative in

14   this case.  In fact, that's the point that

15   Dr. Nelson makes in his report, that the IQ

16   test itself doesn't really make this

17   Court's decision an easy one.  It's a

18   range, and it's a nondeterminative issue

19   here.

20       So really to resolve this issue in

21   Mr. O'Neal's case, I think it's necessary

22   to look at the adaptive evidence of his

23   life history.  I think that's where it is

24   clearly evident that he is not mentally

25   retarded.

Why do we say that?  For a variety of
reasons.  I think when you go over the
exhibits and the trial records, that would
become clear.  We would like to highlight
for you the ones we think are most
important.

First of all, I believe on Page 18 of
the Supreme Court's opinion on mental
retardation was not an issue in the
mitigation phase, yet the Court went out of
it's way to note in it's decision that Mr.
O'Neal is not mentally retarded.

Second, you have the report of Dr.
Nelson, where he says Mr. O'Neal is not
mentally retarded precisely because of his
excellent adaptive behavior he has
exhibited over his life.

We have the mitigation testimony of
Dr. David Chiappone, which is in the fifth
volume of the trial transcript.  He said
the IQ range is definitely in the
borderline range because Mr. O'Neal
functions at a much higher level than his
IQ would indicate.  He is not mentally
retarded.

Look at Mr. O'Neal's life history.
He served in the military.  He served the
last two years or three years as a lance
corporal.  He went AWOL to attend his
father's funeral, but that still indicates
a man who served his country for 36 months.
Attending your father's funeral is not an
indicator of mental retardation.

This is a man who, once he got out of
prison, decided he was going to turn his
life around.

He told his family that he was going
to seek and he did ultimately attain
custody of his children.  He made a
conscious effort to find steady employment,
and he did so.

Why is this important?  Because one
of the adaptive behaviors you must look at
is, does he have the ability to self
direct?  Does he have the ability to focus
and make decisions?  He clearly does.  He
turned his life around.  That's in the
mitigation hearing.  You will see that and
review that.  That was so striking the Ohio
Supreme Court noted that as well in its

1    decision.  This was man who had self

2    direction enough to pull himself together

3    and decide he was going to seek steady

4    employment and get custody of his children,

5    and he did so.

6         He did get the custody of his

7    children.  His employment history had hills

8    and valleys, but it's important to note

9    that his employer said he was a fabulous

10    employee at the Kenwood Country Club, and

11    he would hire him back in a minute.  He had

12    a fantastic work ethic.

13         And when it goes to his social

14    adaptability, it's important to note what

15    the employer said about him.

16         He actually acted as peacemaker in

17    the kitchen, which is a volatile, stressful

18    environment.  Often the kitchen workers

19    would have disputes, and he acted as

20    peacemaker.

21         He actually had high level of social

22    adaptability, and he exhibited them so well

23    the employer said he would hire this man

24    back in a minute.  His good work ethic

25    earned him employee of the month at

1    Aerotek, the last place he worked.

2        His Department of Corrections'

3    records will be in the exhibits with this

4    Court, and it is important to note that the

5    Department of Corrections noted no mental

6    deficit.  This is not a close case.  This

7    is a man, when he chooses to do so, has

8    tremendous ability to adapt, and for that

9    reason Dr. Chiappone says he functions at

10   much a higher level than his attained IQ.

11   That's what Dr. Nelson felt as well.

12       That's why the State is confident

13   after the Court reviews all the testimony

14   and trial exhibits of this case and the

15   reports that it will find the defense has

16   not met their burden here by a

17   preponderance of the evidence.

18       Thank you.

19       THE COURT:  Okay.  You will have an

20   opportunity to brief this.  I don't know

21   that you need to say anything further at

22   this time.  I'll ask you to agree on a

23   schedule to submit those briefs, and then I

24   will try to give you a determination in a

25   timely fashion.

1        Any reason why we shouldn't order the

2    defendant returned to the institution at

3    this time.

4        MR. KRUMHOLTZ:  No reason, your

5    Honor.

6        THE COURT:  We will do that.  We'll

7    order that the Hamilton County Sheriff

8    return the defendant to -- where has he

9    been at?

10        MR. GIDEON:  Mansfield.

11        THE COURT:  Mansfield.  And I look

12    forward to your briefs.  Court will stand

13    in recess.

<u>CERTIFICATE</u>

I, DEBORAH A. KAHLES, RPR, the undersigned, an Official Court Reporter for the Hamilton County Court of Common Pleas, do hereby certify that at the time and place stated herein, I recorded in stenotype and thereafter transcribed the within transcript of proceedings and that the foregoing Transcript of Proceedings is a true, complete, and accurate transcript of my said stenotype notes.

IN WITNESS WHEREOF, I hereunto set my hand this 19th day of May, 2005.

_____
DEBORAH A. KAHLES, RPR
Official Court Reporters
Court of Common Pleas
Hamilton County, Ohio