States Supreme Court denied his petition for writ of certiorari. James Derrick O'Neal v. Ohio, 532 U.S. 1037, 121 S.Ct. 1997, 149 L.Ed.2d 1001 (2001).

Petitioner filed his original petition for postconviction relief with this Court on July 2, 1997. The Court denied the petition on February 17, 1998. Petitioner filed an appeal from the denial of his original postconviction petition to the Court of Appeals for Hamilton County, First Appellate District, which affirmed the denial of his postconviction petition on March 26, 1999. State v. O'Neal, Hamilton App. No. C-980247, 1999 Ohio App. LEXIS 1207 (1999) (unreported). The Ohio Supreme Court denied leave to appeal the Court of Appeals judgment affirming the denial of the original petition for postconviction relief on March 8, 2000. State v. O'Neal, 88 Ohio St.3d 1441, 724 N.E.2d 1154 (2000).

Petitioner filed a timely application for reopening of the direct appeal in the Court of Appeals of Hamilton County, First Appellate District on March 12, 1998. On July 9, 1998 the Court of Appeals denied the application for reopening. State v. O'Neal, Hamilton App. No. C-960392 (July 9, 1998)(unreported). The Ohio Supreme Court affirmed the Court of Appeals' denial of Petitioner's application for the reopening of his direct appeal on March 8, 2000. State v. O'Neal, 88 Ohio St.3d 179, 724 N.E.2d 423 (2000).

On May 21, 2002 Petitioner O'Neal filed a petition for a writ of habeas corpus in the United States District Court for the Southern District of Ohio, Western Division. James Derrick O'Neal v. Margaret Bagley, Warden, Case No. C-1-2-357.

On June 20, 2002 the United States Supreme Court decided Atkins v. Virginia, 536 U.S. 304, holding that the Eighth Amendment to the United States Constitution, barring "cruel and unusual punishments," prohibits the execution of a person who is mentally retarded. Because this decision reversed existing Supreme Court precedent and created a new federal claim that

Petitioner had not presented to the state courts as required by federal habeas corpus exhaustion doctrine, the Federal District Court stayed federal habeas corpus proceedings pending Petitioner's exhaustion of state court remedies.

On November 15, 2002 Petitioner filed a successive petition for postconviction relief asking this Court to vacate his sentence of death on the ground that he is mentally retarded and not subject to the death penalty as held in Atkins v. Virginia.

Issue Presented

The federal constitutional claim that Petitioner James O'Neal raised in his petition for postconviction relief -- and the issue to be decided by this Court -- is whether Petitioner is mentally retarded and therefore not subject to the death penalty under the Eighth Amendment to the United States Constitution as determined by the test set out in Atkins v. Virginia.

The Standard of Mental Retardation

Atkins v. Virginia holds that "Construing and applying the Eighth Amendment in the light of our 'evolving standards of decency,' we therefore conclude that such punishment is excessive and that the Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." 536 U.S. at 321.

In reaching this conclusion the Court in Atkins succinctly summarizes the reasoning for reversing its contrary decision in Penry v. Lynaugh, 492 U.S. 302 (1989):

> Those mentally retarded persons who meet the law's requirements for criminal responsibility should be tried and punished when they commit crimes. **Because of their disabilities in areas of reasoning, judgment, and control of their impulses, however, they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct. Moreover, their impairments can jeopardize the reliability and fairness of capital proceedings against mentally retarded defendants.**

3

Id. at 306-307 (emphasis added). The Court in <u>Atkins</u> addresses the question of whether executing the mentally retarded serves the penological purposes of the death penalty:

> [O]ur death penalty jurisprudence provides two reasons consistent with the legislative consensus that the mentally retarded should be categorically excluded from execution. **First, there is a serious question as to whether either justification that we have recognized as a basis for the death penalty applies to mentally retarded offenders.**
>
> With respect to **retribution** -- the interest in seeing that the offender gets his "just deserts" -- the severity of the appropriate punishment necessarily depends on the culpability of the offender. Since <u>Gregg</u>, our jurisprudence has consistently confined the imposition of the death penalty to a narrow category of the most serious crimes. \*\*\* Thus, **pursuant to our narrowing jurisprudence, which seeks to ensure that only the most deserving of execution are put to death, an exclusion for the mentally retarded is appropriate.**
>
> With respect to **deterence**...[t]he theory of deterence in capital sentencing is predicated upon the notion that the increased severity of the punishment will inhibit criminal actors from carrying out murderous conduct. Yet it is the same **cognitive and behavioral impairments that make these defendants less morally culpable** -- for example, the **diminished ability to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses -- that also make it less likely that they can process the information of the possibility of the execution as a penalty, and, as a result, control their conduct based upon that information.**
>
> The reduced capacity of mentally retarded offenders provides a second justification for a categorical rule making such offenders ineligible for the death penalty. \*\*\* **Mentally retarded defendants may be less able to give meaningful assistance to their counsel and are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes.**

Id. at 318-321 (emphasis added).

On the question of "determining which offenders are in fact retarded" the Court in <u>Atkins</u>

4

observed that the forensic psychologist who testified on behalf of Atkins in the penalty phase of his trial, Dr. Evan Nelson, had evaluated Atkins and concluded that he was "mildly mentally retarded." 536 U.S. at 308. The phrase "mildly mentally retarded" is followed by footnote 3 in which the Court quotes the definitions of "mental retardation" of both the American Association of Mental Retardation (AAMR):

> "*Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18." (emphasis in original)

and of the American Psychiatric Association (APA):

> "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system."

536 U.S. at 308.

The Court in Atkins adopts a constitutional test for mental retardation. The Atkins Court embraces the definition of mental retardation from the AAMR and the American Psychiatric Association:

> As discussed above, **clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self direction that became**

5

> manifest before age 18. Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition **they have diminished capacities to understand and process information, to communicate, to engage in logical reasoning, to control impulses, and to understand the reactions of others.**

Id. at 318 (emphasis added). The Atkins Court, in footnote 5, observes that "Dr. Nelson administered the Wechsler Adult Intelligence Scales test (WAIS-III), the standard instrument in the United States for assessing intellectual functioning." The Court goes on to describe how the WAIS-III is scored and notes that Atkins' full scale IQ was 59. The Court does not decide what the "cutoff" should be, but observes:

> It is estimated that **between 1 and 3 percent of the population has an IQ between 70 or 75 or lower, which is typically considered the cutoff IQ score for the intellectual functioning prong** of the mental retardation definition.

536 U.S. at 309 fn. 5 (emphasis added).

Finally, rather than establish a precise test of mental retardation and rather than prescribe a definite process for determining who is mentally retarded, the Supreme Court in Atkins expressly left those issues to the States:

> Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus. As was our approach in Ford v. Wainwright, 477 U.S. 399 (1986), with regard to insanity, "we leave to the State(s) the task of developing appropriate ways to enforce the constitutional restrictions upon [their] execution of sentences." Id., at 405, 416-417.

536 U.S. at 317.

Following closely on the decision in Atkins the Ohio Supreme Court addressed in State v. Lott (December 11, 2002), 97 Ohio St.3d 303, 2002-Ohio-6625, the procedures to be followed

6

and the substantive standard to be applied in determining a claim of mental retardation. In its *per curiam* decision in Lott, the Court held the following:

- "Whether Lott is mentally retarded is a disputed factual dispute, which we believe is best resolved by the trial court."
- "We hold that there is a rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70."
- "The trial court shall decide whether the petitioner is mentally retarded by using the preponderance-of-the-evidence standard."
- "The three-part test defining mental retardation, as cited in *Atkins*, provides that trial court with the constitutional standard for reviewing the evidence. In considering an *Atkins* claim, the trial court shall conduct its own *de novo* review of the evidence in determining whether the defendant is mentally retarded. The trial court should rely on professional evaluations of [the petitioner's] mental status, and consider expert testimony, appointing experts if necessary, in deciding this matter. The trial court shall make written findings and set forth its rationale for finding the defendant mentally retarded or not mentally retarded. We believe that these matters should be decided by the court and do not represent a jury question. In this regard, a trial court's ruling on mental retardation should be conducted in a manner comparable to a ruling on competency (i.e., the judge, not the jury, decides the issue).
- "[The petitioner] bears the burden of establishing that he is mentally retarded by a preponderance of the evidence."

Conclusion

Petitioner James O'Neal has established by a preponderance of the evidence that he is mentally retarded. The evidence shows that Petitioner has demonstrated that he has significantly subaverage intellectual functioning with an IQ consistently under 70, that he has significant limitations in adaptive behavior as expressed in two or more conceptual, social and practical adaptive skills, and that his disability manifested itself before he was 18 years of age. Therefore, the imposition of the death penalty on Petitioner is in violation of the Eighth Amendment and should be vacated.

The Evidence

The three-part constitutional standard for evaluating a claim of mental retardation, as stated in Atkins and recognized in Lott, is: (1) significantly subaverage intellectual functioning, (2) significant limitations in two or more adaptive skills, and (3) onset before age 18. The evidence showing that Petitioner meets each part of this standard will be addressed in turn. Petitioner will begin with the third part of the test.

### Onset Before Age 18

The third part of the constitutional test of mental retardation, as restated by the Ohio Supreme Court in Lott, is "onset before the age of 18."

Petitioner did not begin to claim that he was mentally retarded only after the decision in Atkins was issued. Nor was the preparation for the penalty phase of his trial the first time that Petitioner was diagnosed as mentally retarded.

The report of Cincinnati Public Schools School Psychologist Ruth Kaufman from February, 1968 when Petitioner was 14 years old and in the 6th grade (Hearing Exhibit A) shows that Petitioner obtained a full scale IQ of 64 on the Wechsler Intelligence Scale for Children (WISC). Ms. Kaufman, in her assessment of Petitioner's performance on the WISC and other tests, noted Petitioner's strengths and weaknesses, and observed that Petitioner's performance tests showed that he was "moderately retarded." Ms. Kaufman concluded that Petitioner should be in the "Junior High Slow Learning Program." She further stated that "Below normal intellectual functioning due to organic dysfunction seemed to be the primary problem."

Dr. Michael Nelson, who submitted a written report to the Court (Hearing Exhibit 1) but did not interview or test Petitioner and who did not testify at the hearing, wrote in his report at page 3 that the full scale IQ test results placed Petitioner overall in the "Mild range of Mental

8

Retardation." And Dr. Nelson added that "He manifested a significant deficit in his performance capabilities where he functioned in the moderate to mild range of mental retardation."

Dr. Robert Tureen, who interviewed and tested Petitioner in June, 1994 before his trial and who interviewed and tested Petitioner again in December, 2004 after being appointed by this Court, and who testified at the evidentiary hearing on May 17th, provided a more thorough analysis of the significance of the school psychological evaluation. Dr. Tureen said this (at page 4 of his report):

> On the Wechsler Intelligence Scale for Children, he obtained a **Fullscale I.Q. of 64** (Verbal I.Q. 79, Performance I.Q. 55). **That large a discrepancy on the Wechsler scales between Verbal and Performance Scores does raise at least the possibility of some level of brain disturbance or dysfunction, that might be interfering with intellectual ability.** The school psychologist summary evaluation recommended that James be placed in the junior high school slow learner program. She further was of the opinion that "Below normal intellectual functioning, due to organic dysfunction seemed to be the primary problem." She also indicated that emotional problems might be interfering with his school achievement. The importance of this is **the early establishment of not only measured I.Q. levels, but also the presumption of impaired brain function (cerebral dysfunction). *** It is my opinion that the above data establishes the existence of low intellectual ability, at least in terms of his academic performance, as well as assessed intellectual measures before the age of eighteen, with suggested evidence of cerebral brain dysfunction, resulting in poor academic achievement and low intellectual status.** (emphasis added)

Noting Petitioner's low achievement test scores, Dr. Nelson agreed that "Mr. O'Neal had long-standing achievement/academic skill deficits."

While the school psychological testing and evaluation was focused on Petitioner's intellectual and academic skills and abilities and does not contain a discrete analysis of Petitioner's adaptive behavioral skills, the performance scores on the Wechsler test and other

9

tests led Ms. Kaufman to conclude more broadly that "When tasks required that he work toward an unknown goal or concentrate on visual cues, he gave an extremely defective performance. Spatial reasoning was also very poor for his age. Moreover, his knowledge of vocabulary and recall of information indicated defective functioning."

Thus, the preponderance of the evidence shows that the onset of Petitioner's mental retardation began well before he was 18 years of age.

Significantly Subaverage Intellectual Functioning

The second part of the constitutional test of mental retardation, as restated in Lott, is "significantly subaverage intellectual functioning."

Before trial began before this Court in October, 1995 Petitioner was examined and evaluated by two psychologists, Dr. David Chiappone and Dr. Robert Tureen. Dr. Tureen, in his January 18, 2005 report to this Court, summarizes the assessment by Dr. Chiappone which led to Dr. Chiappone requesting that Dr. Tureen, a neuropsychologist, examine Petitioner:

> In 1994, during his incarceration at the Hamilton County Justice Center, **David Chiappone, Ph.D. administered the Wechsler Adult Intelligence Scale-R.** This is a scale that is related in characteristics to the Wechsler Intelligence Scale for Children, but is normed on the adult population and is in fact the fourth revision of the adult Wechsler Scales. On March 31, 1994, the following I.Q. scores were obtained: Verbal I.Q. 72, Performance I.Q. 71 and **Full Scale I.Q. 71**, all representing **a ranking a the 3rd percentile**, compared to the general population, meaning that 97% of the population does as well or better than James performed on the test. **The 95% confidence interval for the Full Scale I.Q. is 67 to 77, which are reasonable limits of the range within which James's "true" Full Scale I.Q. lies. Thus, there is a reasonable probability that James' true score lies below the established score of 70, representing mental retardation,** but also a reasonable probability that his true score lies above that particular level. What was more important at the time, was the **continued presence of evidence of brain dysfunction.** This was essentially why Dr. Chiappone requested my involvement in the case, since on

10

> his initial testing, he was finding signs suggesting brain disorder and this is my specialty area. Additional testing, using specific measures that are sensitive to the presence of brain dysfunction I administered in 1994 substantiated **a consistent picture of a brain dysfunction, present on several measures, indicating impairment in abstraction and problem solving and difficulty on measures of spatial analysis and synthesis**, which was suggested by the poor performance I.Q. reported in 1968. On the other hand, his general language, his auditory comprehension and general verbal expression and his ability to follow instructions were all intact, within **his level of intellectual functioning, that is, of an individual with an I.Q. in the borderline to mildly retarded range**, as measured on the Wechsler Adult Intelligence Scale-R (WAIS-R). (emphasis added)

Hearing Exhibit C, January 18, 2005 Dr. Tureen Report at pages 5-6.

Respondent, of course, would like to focus on the isolated fact that Petitioner obtained a full scale score of 71 on the WAIS-R administered by Dr. Chiappone and ignore the fact that Petitioner got a full scale score of 64 on the WISC administered in 1968, or the score of 63 on the Cognitive Status Exam administered by Dr. Tureen in 1994, or a full scale score of 67 on the WAIS-III administered by Dr. Tureen in 2004, or a composite index score of 63 on the Reynolds Intellectual Scales test administered by Dr. Tureen in 2004.

As Dr. Tureen carefully and thoughtfully explained in his hearing testimony, these tests have errors of measurement. As explained by the AAMR:

> Although not perfect, intelligence is represented by Intelligence Quotient (IQ) scores obtained from standardized tests given by a trained professional. In regard to the intellectual criterion for the diagnosis of mental retardation, **mental retardation is generally thought to be present if an individual has an IQ test score of approximately 70 or below**. An obtained IQ score must always be considered in light of its **standard error of measurement**, appropriateness, and **consistency** with administration guidelines. <u>Since the standard error of measurement for most IQ tests is approximately 5, the ceiling may go up to 75</u>. This represents a score approximately 2 standard deviations below the mean, considering the standard error of measurement.

11

O'Neal Apx. Vol. X
Page 30

American Association of Mental Retardation (AAMR), Definition of Mental Retardation, What is Intelligence?, http://www.aamr.org/Policies/faq_mental_retardation.shtml (emphasis added). Thus, given the standard error of measurement, as well as the fact that Petitioner has consistently scored at "approximately" 70 or below on tests throughout his life, including the most recent 2004 test, it cannot be reasonably argued that Petitioner's IQ is above 70.

At the time of Petitioner's trial in October, 1995 the prevailing rule on the imposition of the death penalty on mentally retarded persons was that contained in Penry v. Lynaugh, 492 U.S. 302 (1989). Penry held that it was not a violation of the Eighth Amendment's ban on cruel and unusual punishment to execute a mentally retarded person. Thus, the testimony regarding Petitioner's mental retardation was presented, not as a bar to the imposition of the death penalty, but merely as evidence in mitigation. The constitutional standards for determining if an offender is mentally retarded -- as set out in Atkins -- did not exist and were not referred to during the questioning of either Dr. Chiappone or Dr. Tureen at trial. In fact, the examinations of Dr. Chiappone and Dr. Tureen, which are part of the trial record, are noticeably devoid of any reference to the definitions of mental retardation of the American Association of Mental Retardation or the American Psychiatric Association. Even more noticeable is the absence of any questioning, and consequently the absence of any testimony, about the actual scores that Petitioner achieved on the various I.Q. and other tests administered in 1994 or to Petitioner's abilities with respect to specific adaptive behavior skills.

Thus, when during his testimony Dr. Chiappone said that "He's not retarded," -- referring of course to Petitioner -- this statement was not made with explicit reference to the AAMR or

APA definitions of mental retardation. Nor, obviously, could this statement have referred to the constitutional standard of mental retardation later set out in Atkins.

But it should be noted that virtually all of the rest of Dr. Chiappone's 1995 penalty phase mitigation testimony supports the conclusion that Petitioner meets the constitutional definition of mental retardation.

Dr. Chiappone testified that he administered a number of tests to Petitioner and that Petitioner "scored in the what are called the border range of mental retardation. [sic] He's not retarded, but he functions at the second or third percentile of the general population." Trial Tr. at 981. He testified that Petitioner had difficulty performing some simple tests that the Doctor administered. "And so at that point I thought there was what we call organicity above and beyond limited intellect. And at that point I recommended we have a neuropsychologist who specializes in dysfunctions of the brain to do further testing to make sure we didn't miss anything." Trial Tr. at 982. Dr. Chiappone testified that Petitioner suffered from "borderline mental retardation based on the IQ test and substantiated by his educational data." Trial Tr. at 987. Finally, Dr. Chiappone stated that Petitioner had a "[l]ack of coping skills" which, along with other factors, "made it more difficult for him to effectively problem solve." Trial Tr. at 996.

This testimony establishes, essentially, that Petitioner suffered significantly subaverage intellectual functioning, as well as significant limitations in his adaptive behavior skills, which we will discuss below.

As noted above, after he evaluated and tested Petitioner, Dr. Chiappone referred Petitioner to Dr. Robert Tureen, a clinical neuropsychologist at the Mayfield Neurological Institute in Cincinnati. Dr Tureen also testified in the mitigation phase of the trial. Trial Tr. at 997.

Dr. Tureen did further testing of Petitioner which showed a "longstanding type of disturbance" which he called "minimal cerebral dysfunction." Trial Tr. at 1001. Dr. Tureen testified that Petitioner had a very poor academic performance throughout his limited academic career and that "early psychological testing that was done in '68 stated there was evidence of organicity or brain damage." Trial Tr. at 1002.

As to Petitioner's level of intellectual functioning, Dr. Tureen described it as being "in the borderline to mildly retarded range." Trial Tr. at 1002. Dr. Tureen concluded that Petitioner is "an individual who's going to have some limitations on how well they're [sic] going to be able to function. *** By cognitive thinking general problems involving memory, spatial and statistical skills, language usage, as well as motor skills. [sic] And on that particular exam he performed well into the impaired range. You take that performance and put it together with the IQ level and you see an individual who is going to have some sort of difficulties in adjusting in the world." Trial Tr. at 1003. He added that persons like Petitioner would have "some real limitations of what they're going to be able to do in life and what they're going to be able to accomplish." Trial Tr. at 1005. Finally, Dr. Tureen testified on cross-examination that Petitioner "was functioning in the mildly mentally retarded to borderline range." Trial Tr. at 1009.

Dr. Nelson, on page 3 of his report (Hearing Exhibit 1, March 21, 2005 Dr. Nelson Report) summarizes Dr. Chiappone's and Dr. Tureen's penalty phase mitigation testimony as follows: "It appears that Mr. O'Neal is functioning in the Mild MR to Borderline range of intelligence." Thus, Respondent's expert, Dr. Nelson, does not disagree with the diagnosis of mental retardation.

It is important to emphasize here that the WAIS-R was not the only test administered to Petitioner in 1994. Other tests were administered and Petitioner's performance on all of these

14

tests demonstrates, as Dr. Tureen testified at the evidentiary hearing, a consistent pattern of significantly subaverage intellectual functioning. If <u>Atkins</u> had been the rule at the time of Petitioner's trial, surely his attorneys would have sought Dr. Tureen's testimony with respect to the specific results of all of these tests.

Hearing Exhibit B, Dr. Tureen's July 27, 1994 report, contains this most important summary of all of the 1994 test results:

> <u>TEST RESULTS AND INTERPRETATION</u>: **James was administered the Wechsler Adult Intelligence Scale - R (WAIS-R) by Dr. Chippone [sic] yielding Verbal Performance and Full scale I.Q.'s in the borderline range to mildly mentally retarded range (3rd percentile in comparison with others of his age).** The only subscale score which was significantly out of line and significantly higher than his overall average subscale scores was on the Digit Symbol subtest which reflects relatively good psychomotor speed and visual motor coordination. The general intellectual level is compatible with the academic levels reported and described above.
>
> **On the Cognitive Status Exam (Barrett), a screening exam for cognitive, sensory, and motor functions, James obtained a score of 63 out of a possible 104 points, scores below 75 are in the impaired range.** <u>Generally speaking, individuals who have WAIS-R I.Q. levels in the borderline to retarded range coupled with cognitive status exam scores significant [sic] below 65, as is the case here, are generally seen as having difficulties functioning in the environment in even relatively routine ways on a day to day basis as he result of impairment in brain function</u>. If this impairment is longstanding, that is congenital as opposed to something more recently acquired, then the functioning is likely to be marginal at best. Because of difficulty adapting and adjusting, such individuals are likely to find themselves struggling in the general adaptation.
>
> James's performance on the Wisconsin Card Sort and Porteus Mazes reflects evidence of difficulty in abstraction and problem solving. On the **Wisconsin Card Sort** in particular, there is very **high perseverative response rate**. What this reflects is an inability to learn effectively from feedback information regarding one's performance and a tendency to continually repeat the same

types of behavior pattern even though there may be information provided that the behavior pattern is incorrect. In otherwords [sic], **he does not learn well from information being provided by the environment, particularly in novel situations.** On the **Porteus Mazes**, James again demonstrates **considerable difficulty in planning ahead and attempting to anticipate a course of action.** His performance level actually reaches around year 7, but even here he is struggling to perform within the acceptable limits.

Further evidence of impaired functioning is reflected on any spatial analytic task. On copying simple configurations such as a Greek cross, there is marked constructional dyspraxia, that is an inability to accurately reproduce the appropriate juxtaposition of the various spatial features of the figure. His attempt to copy the complex Rey figure resulted in even more evidence of the difficulty he has with spatial analytical skills resulting in a markedly distorted copy of the figure. When he was asked to recall the figure immediately after the copy phase, he was only able to produce one or two lines of this rather intricate figure and even those were drawn incorrectly.

Finally, on the **Hooper Visual Organization Test (VOT)**, a task which does not involve a motor component, but strictly involves the conceptual organization of spatial elements into recognizable wholes, **performance is in the severely impaired range.**

Brief measures of language assessment indicate that object, number, letter, and word recognition are unimpaired within the level of the patient's intellect. His auditory comprehension and expression are unimpaired. He is able to follow instructions without difficulty. His reading level is functional for routine day to day activities.

GENERAL CONCLUSIONS: This is a 39 year old male with **borderline to mildly retarded level of intellectual functioning** as reflected in previously administered psychometric measures. Current testing reflects evidence of impaired higher cortical functions such as novel reasoning, abstracting, and planning, and spatial analytical skills, while motor functions remain relatively intact.

Given the early academic records, these findings most likely reflect **a longstanding condition.**

Hearing Exhibit B, July 27, 1994 Dr. Tureen Report, at pages 2-3.

16

In December of 2004 Dr. Tureen again interviewed Petitioner and again administered tests. The details of the results of these tests are contained in his January 18, 2005 report:

> On the **WAIS-III**, James obtained a Verbal I.Q. of 71, Performance I.Q. of 69, and **Full Scale I.Q. of 67.** The descriptions currently used rate the Performance and Full Scale I.Q. as "extremely low" and Verbal I.Q. as "borderline."

Hearing Exhibit C, January 18, 2005 Dr. Tureen Report at page 6 (emphasis added).

Dr. Tureen also had Petitioner take the **Reynolds Intellectual Scales** test:

> I also chose to administer the Reynolds Intellectual Scales, which is a relatively new test, but has both the advantage and disadvantage of not involving any psychomotor measures. *** The following indices are essentially I.Q. scores:
> Verbal Index = 68, 2nd percentile, 95th confidence interval 63-77 (i.e. range where true score lies)
> Non-Verbal Index = 67, 1st percentile, 95th confidence interval 62-75
> **Composite Index = 63**, 1st percentile rank, 95th confidence interval 59-70

Id., at page 7 (emphasis added).

Considering the scores that Petitioner has achieved on all the IQ tests he has been administered from when he was 14 years old to the present, the preponderance of the evidence is that Petitioner's IQ is below 70. Taken together with Petitioner's academic performance as well as his performance on achievement tests, the evidence establishes that Petitioner has consistently suffered from significantly subaverage intellectual functioning.

### Significant Limitation in Two or More Adaptive Skills

The third part of the constitutional test of mental retardation, as stated by the Ohio Supreme Court in Lott, is "significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction."

17

The thrust of Respondent's questions and argument at the evidentiary hearing was, essentially, that Petitioner does not meet the definition of mental retardation because he was able to go to school, drive a car, get married, have children, be a Marine, and hold various jobs (ignoring how poorly Petitioner generally fared in almost all of these areas).

It is important to point out that the definition of mental retardation -- be it the definition of the American Association of Mental Retardation, the definition of the American Psychiatric Association, the constitutional definition set out by the United States Supreme Court in Atkins, or the definition adopted by the Ohio Supreme Court in Lott -- does not require that to qualify as "mentally retarded" an offender must be profoundly mentally retarded. The execution of a person who is mildly mentally retarded is unconstitutional under Atkins. Indeed, the AAMR definition of "mental retardation" expressly contemplates that:

> **"Within an individual, limitations often coexist with strengths."**

American Association of Mental Retardation (AAMR), Definition of Mental Retardation, What is Intelligence?, http://www.aamr.org/Policies/faq_mental_retardation.shtml (emphasis added).

Respondent's questions and arguments seem to suggest that to be "mentally retarded" as defined by Atkins an offender must be profoundly mentally retarded and have significant limitations in ALL adaptive behavior skills. That obviously is not the law. The law is the three-part test. The question is not whether Petitioner has some strengths -- he obviously does. The question is whether Petitioner meets the three-part test, the third part pertaining to significant limitations in two or more adaptive skills.

Recall that Dr. Chiappone testified that Petitioner had a "[l]ack of coping skills" which, along with other factors, "made it more difficult for him to effectively problem solve." Trial Tr. at 996.

18

Dr. Nelson, who did not visit, interview, or test Petitioner, or even testify at the evidentiary hearing in support of his report, nevertheless agrees that: "It is clear that Mr. O'Neal has difficulties in dealing with stressful situations in an effective manner and does not think through the consequences of his behavior very well." Hearing Exhibit 1, March 21, 2005 Dr. Nelson Report, at page 5. While Dr. Nelson goes on to say that this same problem is experienced by "individuals who function at higher levels of intelligence," he does not deny that Petitioner's limitation in this area is evidence of a problem with his social skills or that this limitation is caused by mental retardation. Moreover, Dr. Nelson concedes that: "Mr. O'Neal does seem to exhibit significant deficits in <u>several</u> conceptual areas (i.e., reading, money concepts). Id. (emphasis added). Finally, Dr. Nelson says expressly that: "I would agree that Mr. O'Neal certainly has evidenced difficulties in his adaptive functioning in situations involving emotional intensity." Id. While Dr. Nelson attributes these difficulties to "psychiatric difficulties," he fails to provide any basis for concluding that these difficulties are not caused by Petitioner's mental retardation. Importantly, Dr. Nelson was not available to have his assertion cross-examined.

Dr. Turcen testified at Petitioner's October, 1995 trial that Petitioner is "an individual who's going to have some limitations on how well they're [sic] going to be able to function. *** By cognitive thinking general problems involving memory, spatial and statistical skills, language usage, as well as motor skills. [sic] And on that particular exam he performed well into the impaired range. You take that performance and put it together with the IQ level and you see an individual who is going to have some sort of difficulties in adjusting in the world." Trial Tr. at 1003. He added that persons like Petitioner would have "some real limitations of what they're going to be able to do in life and what they're going to be able to accomplish." Trial Tr. at 1005.

19

Finally, Dr. Tureen testified on cross-examination that Petitioner "was functioning in the mildly mentally retarded to borderline range." Trial Tr. at 1009.

At the evidentiary hearing on May 17th Dr. Tureen testified specifically in terms of the constitutional standard of mental retardation and the requirement of the third prong of the test that requires significant limitations in two or more adaptive skills. In particular, Dr. Tureen testified that Petitioner has significant limitations in conceptual as well as social skills:

> Q. Based on your education, training, and experience and your interviewing and testing of Mr. O'Neal, as well as your review of his scholastic records, do you have an opinion, Dr. Tureen, to a reasonable certainty as a psychologist as to **whether or not Mr. O'Neal currently suffers from a disability characterized by significant limitations in two or more adaptive skills** as expressed in conceptual, social, and practical adaptive skills, which occurred before he was age 18?
>
> A. Yes, I do.
>
> Q. What is your opinion?
>
> A. That he still suffers from the same level of **conceptual inability**, if you will, and **social limitations** as he did prior -- in the past.
>
> Q. And what **particular adaptive skills** does Mr. O'Neal suffer from a significant limitation of?
>
> A. First of all, there is **a significant limitation in academic skills. I would say reading, math**, but more importantly is the limitation as a result of what I initially referred to as mild cerebral dysfunction, which I believe is the cause of the **low level of intellectual function.**
>
> Now, that particular type of disturbance that he demonstrated on our earlier testing limits his ability to consider alternative modes of dealing with situations which are stressful or which he finds in some way threatening.

Q. And I don't have *Atkins* in front of me, I'm going from memory. Feel free to review *Atkins* if you have it in your possession. The reference in *Atkins* to adaptive skills relates to the following: Communication, self care, home living, social, community use, self direction, health and safety, functional academics, leisure, work. What you have just described, does that fall into that category of functional academics?

A. The functional academics and social adaptive.

Q. How does that fall into the category of **social adaptive**?

A. **This is an individual who is going to become rigid, perseverative, not able to think of alternative ways of dealing with situations which occur particularly under stress.**

Q. Does it impact the issue of whether or not Mr. O'Neal is mentally retarded if he meets two of the ten types of limitations in adaptive behavior?

A. My understanding is that it does.

Q. You have provided us with your opinion concerning whether or not James O'Neal is mentally retarded. Are there **gradations of mental retardation**, Doctor?

A. Yes, there are.

Q. Based on your education, training and experience and your interviewing and your testing of Mr. O'Neal and your review of his scholastic records, do you have an opinion to a reasonable certainty as a psychologist as to the **level of gradation of Mr. O'Neal's retardation?**

A. Yes, I do.

Q. What is that opinion?

A. **He is mildly mentally retarded.**

21