1  good adaptive skills in other domains and many no

2  longer have the level of impairment required for

3  diagnosis of mental retardation."

4          A.    I agree with that.

5              THE COURT:  Excuse me.  Where were

6          you reading from?

7              MS. MULLEN:  The *DSM-IV*, which is the

8          Diagnostic and Statistical Manual of Mental

9          Disorders.

10             THE COURT:  Thank you.

11 BY MS. MULLEN:

12         Q.    And as you have discussed before, the

13 adaptive functioning has to do with how a person

14 deals in the outer world?

15         A.    Yes.

16         Q.    You're aware that Mr. O'Neal went to

17 high school, are you not?

18         A.    I am aware of that.

19         Q.    He went to Taft High School?

20         A.    Yes.

21         Q.    Are you aware that he wasn't in any

22 special class?

23         A.    He was recommended for special

24 classes.  If you look at his academic performance

25 he should have been.

```
 1          Q.    But he was not, right?

 2          A.    He was not.  That doesn't mean that

 3     he shouldn't have been.

 4          Q.    Are you aware that he, for example,

 5     he owned and drove an automobile?

 6          A.    Yes.

 7          Q.    Are you aware of that?

 8          A.    Well, I don't know that.  I'm aware

 9     that he owned an automobile.  I know that he drove

10     an automobile, that he could drive.

11          Q.    Are you aware that he was in the

12     military?

13          A.    Yes.

14          Q.    That he was a lance corporal in the

15     military?

16          A.    I have not seen that particular

17     discharge.  I have only read it.

18          Q.    In the reports?

19          A.    In the reports.

20          Q.    You're aware that he was married and

21     raised a family?

22          A.    He was married and tried to raise a

23     family.

24          Q.    Okay.  Were you aware that he had

25     custody of his children?
```

1          A.    Yes.

2          Q.    He sought and received custody of his

3    children?

4          A.    Yes.

5          Q.    Were you aware that he worked for a

6    living?

7          A.    At times he did, yes.

8          Q.    He was a valued employee?

9          A.    At times he was.

10         Q.    Do you know that his mother testified

11   at his trial that he was a normal child?

12         A.    In terms of what?  Walking?

13         Q.    She said he was a normal child, a

14   child who was normal.  Are you aware of that, sir?

15         A.    I don't recall her particular

16   statement at trial.

17         Q.    As you said before, as far as we

18   know, he's adjusted to prison life?

19         A.    Yes.

20         Q.    Are you aware that his intellectual

21   functioning was evaluated in prison, and there was

22   no deficit noted?

23         A.    I have seen the statement.  I have

24   not seen the evidence that they talk about.  I

25   also saw statements that he is "a bit dull."  I

1    have not seen any data.

2         Q.    But it's in the report?

3         A.    But how is that determined?

4         Q.    I don't know, but apparently the

5    prison system thought that he had no deficit.  Are

6    you aware of that?

7         A.    I'm aware of that, but I don't know

8    how that pertains to the issue of retardation.

9         Q.    But aren't these all evidence of

10   adaptive functioning?

11        A.    How much adaptive functioning

12   -- excuse me.  I'm not sure that much adaptive

13   functioning is required on death row.

14        Q.    How about he went to the high school,

15   isn't that an indication of adaptive functioning?

16        A.    But he did extremely poor.

17        Q.    How about he was in the military?

18        A.    He went AWOL.  He did not find an

19   alternative solution to dealing with the

20   situation.

21        Q.    None of these things change your mind

22   about his adaptive functioning?

23        A.    I never said he could -- if you read

24   my report, I said there were two areas in which he

25   could not adapt, and there are eight in which he

1    could.  Yes, he has areas which he capable of

2    adapting.

3          Q.    You're aware, I am sure, that Dr.

4    Nelson found that Mr. O'Neal was not mentally

5    retarded?

6          A.    He claimed that he was not.

7          Q.    Even after reviewing your report?

8          A.    Yes.

9          Q.    Of course Dr. Chiappone had the same

10   opinion, correct?

11         A.    Yes.

12         Q.    Now, you talked about his lack of

13   social adaptivity?

14         A.    Adaptability.

15         Q.    He has a personality disorder, does

16   he not?

17         A.    Which is?

18         Q.    Antisocial personality disorder?

19         A.    Based upon --

20         Q.    Borderline personality disorder.

21         A.    Based upon what?

22         Q.    It's in the reports.  I mean, I only

23   know the reports, like you do.

24         A.    Okay.  He had an antisocial

25   personality disorder because of his drug use and

1    his run-ins with the law.  I do not recall any

2    basis or seeing a basis for diagnosing a

3    borderline personality.

4         Q.    He has been diagnosed

5    psychiatrically, correct, as having a borderline

6    personality?

7         A.    I am not aware.

8         Q.    You're not aware of that, sir?

9         A.    I'm not aware of who diagnosed that

10   or what is the basis.

11        Q.    But you're aware of that?

12        A.    I know that Dr. Nelson said that he

13   had a borderline -- mixed borderline -- mixed

14   personality disorder, including borderline

15   personality and antisocial disorder.  I don't know

16   where he got it.

17        Q.    Well, also it's in the trial

18   transcript I think, too, from the psychologist who

19   testified.

20        A.    Dr. Chiappone?

21        Q.    I'm not sure.  I don't remember.  But

22   anyway, here's the point that I'm getting to,

23   wouldn't that account for his lack of social

24   skills or lack of social adaptability?

25        A.    I think that's a great point, but I

1    think just as reasonably the fact that you have an

2    individual who has brain dysfunction, which

3    results in low intellectual functioning, which

4    results in compromised ability to adapt to certain

5    types of situations is as reasonable an

6    explanation, and as far as I'm concerned, I have

7    demonstrated the brain dysfunction, okay, as a

8    neuropsychologist, that can account for the level

9    of functioning that the disorder in functioning

10   that we saw, and you can attach that on top of it,

11   if you will, but still the underlying cause of the

12   mental retardation in the inability to adapt in

13   the two areas that I talked about in my opinion

14   are the result of his brain dysfunction.

15        Q.    Well, are you taking into

16   consideration the entire social aspect?

17        A.    You can put that on top of it, if you

18   want to, but I'm still saying that the issue that

19   we have been talking about, which is, is he

20   mentally retarded?  And there are areas of failure

21   to adapt which coincide with that mental

22   retardation, and I have talked about that a number

23   of times.  Those are the two that I think that

24   lead to my conclusion, plus the fact that this

25   occurred before the age of 18, that he is mentally

1    retarded.

2        Q.    Well, I'm asking you to consider if

3    someone has an antisocial personality, wouldn't

4    that lead to the same problem, and isn't that a

5    separate thing of mental retardation?

6        A.    Yes, and that would not necessarily

7    lead to the same problem.

8        Q.    Isn't that the basis of why so many

9    people are in prison, is that they have that

10   antisocial personality?  They can't get along with

11   people.  And isn't that what Mr. O'Neal manifests?

12       A.    Yes, and there are also -- I'm going

13   to go back to my talking about the kind of test

14   results that he demonstrated, which shows a man,

15   which is his brain, which locks in, if you will,

16   because of a disturbance in the way the brain

17   functions and cannot conceptualize different ways

18   of handling certain types of situations that even

19   somebody who has a borderline personality, or who

20   is an antisocial personality can, in fact, do.  He

21   gets locked into it.  He become perseverant.  He

22   is going to do same thing over and over.  He gets

23   a thought in his head, and it's almost like

24   obsessive compulsive disorder.  Once he starts on

25   a track and it's an emotionally charged track, he

1    is limited.  That is what I believe -- I think --

2    is the cause of the mental retardation.

3              MS. MULLEN:  I don't think that I

4         have anything else.  Thank you.

5              THE COURT:  Redirect?

6              MR. KRUMHOLTZ:  I just have one

7         question.

8              REDIRECT EXAMINATION

9    BY MR. KRUMHOLTZ:

10        Q.    Dr. Tureen, Ms. Mullen asked you

11   about Dr. O'Neal's report.  Is there anything to

12   indicate that -- I said "Dr. O'Neal -- Freudian

13   slip.

14        A.    Dr. Nelson.

15        Q.    Is there anything in Dr. Nelson's

16   report that indicates that Dr. Nelson examined Mr.

17   O'Neal?

18        A.    No.  My understanding is Dr. Nelson

19   based his conclusions upon the review of

20   documentation.

21             MR. KRUMHOLTZ:  I have nothing

22        further.

23             Your Honor, we would offer for

24        admission -- they are covered by the

25        stipulation, the three exhibits that we

1    have presented with the doctor.

2          THE COURT:  Any objection to the

3    exhibits?

4          MS. MULLEN:  No, Judge.

5          THE COURT:  Doctor, you can step

6    down.

7          (Witness excused.)

8          THE COURT:  Does the defense have any

9    further witnesses?

10         MR. KRUMHOLTZ:  We do not, your

11   Honor.

12         THE COURT:  The State have any

13   witnesses you want to call?

14         MS. MULLEN:  No, your Honor.  We

15   would just offer the exhibits that we have

16   marked.  Shall I recite what they are.

17         THE COURT:  You want to recite those?

18         MS. MULLEN:  State's Exhibit 1 is Dr.

19   Nelson's report.

20         State's Exhibit 2 is Dr. Nelson's CV.

21         State's Exhibit 3 is Mr. O'Neal's

22   medical chart.

23         State's Exhibit Number 4 is Mr.

24   O'Neal's mental health file.

25         State's Exhibit 5 is the Ohio Supreme

1   Court decision, *State of Ohio v. O'Neal*,

2   that being, *87 Ohio St. 3d 402*.  That's

3   all.

4        THE COURT:  Any objection to the

5   State's exhibits?

6        MR. KRUMHOLTZ:  No objection.

7        THE COURT:  Okay.  We'll admit the

8   defense exhibits without objection and the

9   State's Exhibits without objection.

10       (State's Exhibits 1, 2, 3, 4 and 5

11   were admitted;

12       Defendant Exhibits 1, 2 and 3

13   were admitted.)

14       THE COURT:  Does the defense wish to

15   offer argument, or are you going to submit

16   some kind of brief?  How do you want to

17   proceed?

18       MR. KRUMHOLTZ:  It's really the

19   Court's preference.  I am happy to argue a

20   few minute, if you would prefer, or if you

21   prefer briefing, we can do it in that

22   fashion.

23       THE COURT:  Does the State have a

24   preference?

25       MR. CUMMINGS:  We are prepared to

1    argue if the Court prefers.

2        THE COURT:  Why don't we give brief

3    arguments.  I don't have the benefit of me

4    having reviewed all of exhibits at this

5    time, and so I'll certainly allow you, if

6    you want, to submit some kind of a brief.

7        I would suggest the defense would

8    file something, and the State would respond

9    to it, and you would have the final word.

10       I'll allow you to give a short

11    argument at this time.  I am thinking it

12    would be helpful for me to consider your

13    briefs after I have read everything.

14       MR. KRUMHOLTZ:  That's fine.  We will

15    take advantage of that offer from the

16    Court.

17       Briefly, the template for this, as

18    you know, is *Atkins versus Virginia*,

19    decided in June of 2002.

20       One of exhibits that you have

21    received in the case is *State versus*

22    *O'Neal*, the decision regarding this

23    particular case, but please, as you sift

24    through that particular information and the

25    case decision, look at the date, which

1  predates *Atkins versus Virginia*.

2      What does *Atkins* tell us?  *Atkins*

3  tells us that there is a certain measure

4  which a trial judge in your position can

5  make that will determine whether someone is

6  or is not mentally retarded.  If they are

7  mentally retarded, the Eighth Amendment

8  precludes their execution.

9      What does Atkins look at?  If you

10  will look, Daryl Renard Atkins had a full

11  scale IQ of 59, and the Court mentions the

12  term "full scale IQ".

13      Dr. Tureen today and in his report

14  tells you the full scale IQ for James

15  Derrick O'Neal is 67.

16      Look also at the case of the *State*

17  *versus Lott*, which is Ohio's adaptation, if

18  you will, of the Atkins' test, and the

19  Ohio's determination from the Ohio Supreme

20  Court as to how the state court will

21  survive or enforce, if you will, *Atkins*.

22      What the Court said was that an IQ of

23  over 70 is presumed to be not mentally

24  retarded.  They chose some line drawing.

25  They chose a line in the sand.  They said,

1  if the IQ is over 70, a person is not

2  mentally retarded.

3       We have a full scale IQ taken in

4  2004, the WAIS-III, the current "gold

5  standard" test, that indicates that man has

6  an IQ of 67.

7       And Ms. Mullen is absolutely correct.

8  There are ranges, and the Court knows that.

9       Dr. Tureen emphasized, and very

10 importantly, the consistency of testing

11 done when Mr. O'Neal was in grade school,

12 done by Dr. Chiappone and done now by Dr.

13 Tureen.  So you have that IQ.

14      The IQ itself is not conclusive on

15 the issue of mental retardation.  The other

16 issues becomes important under the Atkins

17 standard.  Are there significant

18 limitations in adaptive function?

19      As I recall, there are ten areas of

20 adaptive functioning.  One of those is

21 functional academics.  Dr. Tureen's report

22 and testimony highlighted Mr. O'Neal has a

23 significant limitation in his functional

24 academics.

25      The second area of significant

1      limitation and adaptive functioning for

2      this person is that the fact in social

3      situations that emotionally he is rigid in

4      his thinking to the point that he has no

5      social alternative.  That, according to Dr.

6      Tureen was a significant limitation that

7      puts him into the category of mentally

8      retarded.

9           So we ask the Court in looking at the

10     evidence to pinpoint those issues of

11     functional academics and those issues of

12     the social functioning because it requires

13     in *Atkins* two or more of these areas, and

14     it requires a significant detriment in

15     intellectual ability.  That's where the 67

16     IQ comes into play.

17           Thank you.

18           MR. CUMMINGS:  Your Honor, if I may,

19     we have an exhibit that I would like to

20     pull out here.

21           Your Honor, at this juncture, I think

22     it's important to point out that the

23     defense has the burden of proof by a

24     preponderance of the evidence.

25           *State v. Lott* made that clear.  It's

1    also clear a score of an IQ test of above

2    70 is a rebuttable presumption that

3    somebody is not mentally retarded.

4        Now, in this case, as has been

5    discussed, there's been multiple IQ test

6    given to Mr. O'Neal, and he scored a

7    variety of different scores in the range of

8    I think 64 to 71 or 72.  And taking into

9    account the standard deviations, I think

10   you can see where he could be as high as

11   76.

12       And the point of that is that the IQ

13   tests themselves are not determinative in

14   this case.  In fact, that's the point that

15   Dr. Nelson makes in his report, that the IQ

16   test itself doesn't really make this

17   Court's decision an easy one.  It's a

18   range, and it's a nondeterminative issue

19   here.

20       So really to resolve this issue in

21   Mr. O'Neal's case, I think it's necessary

22   to look at the adaptive evidence of his

23   life history.  I think that's where it is

24   clearly evident that he is not mentally

25   retarded.

1       Why do we say that?  For a variety of

2   reasons.  I think when you go over the

3   exhibits and the trial records, that would

4   become clear.  We would like to highlight

5   for you the ones we think are most

6   important.

7       First of all, I believe on Page 18 of

8   the Supreme Court's opinion on mental

9   retardation was not an issue in the

10  mitigation phase, yet the Court went out of

11  it's way to note in it's decision that Mr.

12  O'Neal is not mentally retarded.

13      Second, you have the report of Dr.

14  Nelson, where he says Mr. O'Neal is not

15  mentally retarded precisely because of his

16  excellent adaptive behavior he has

17  exhibited over his life.

18      We have the mitigation testimony of

19  Dr. David Chiappone, which is in the fifth

20  volume of the trial transcript.  He said

21  the IQ range is definitely in the

22  borderline range because Mr. O'Neal

23  functions at a much higher level than his

24  IQ would indicate.  He is not mentally

25  retarded.

1      Look at Mr. O'Neal's life history.

2  He served in the military.  He served the

3  last two years or three years as a lance

4  corporal.  He went AWOL to attend his

5  father's funeral, but that still indicates

6  a man who served his country for 36 months.

7  Attending your father's funeral is not an

8  indicator of mental retardation.

9      This is a man who, once he got out of

10  prison, decided he was going to turn his

11  life around.

12      He told his family that he was going

13  to seek and he did ultimately attain

14  custody of his children.  He made a

15  conscious effort to find steady employment,

16  and he did so.

17      Why is this important?  Because one

18  of the adaptive behaviors you must look at

19  is, does he have the ability to self

20  direct?  Does he have the ability to focus

21  and make decisions?  He clearly does.  He

22  turned his life around.  That's in the

23  mitigation hearing.  You will see that and

24  review that.  That was so striking the Ohio

25  Supreme Court noted that as well in its

1    decision.  This was man who had self

2    direction enough to pull himself together

3    and decide he was going to seek steady

4    employment and get custody of his children,

5    and he did so.

6        He did get the custody of his

7    children.  His employment history had hills

8    and valleys, but it's important to note

9    that his employer said he was a fabulous

10   employee at the Kenwood Country Club, and

11   he would hire him back in a minute.  He had

12   a fantastic work ethic.

13       And when it goes to his social

14   adaptability, it's important to note what

15   the employer said about him.

16       He actually acted as peacemaker in

17   the kitchen, which is a volatile, stressful

18   environment.  Often the kitchen workers

19   would have disputes, and he acted as

20   peacemaker.

21       He actually had high level of social

22   adaptability, and he exhibited them so well

23   the employer said he would hire this man

24   back in a minute.  His good work ethic

25   earned him employee of the month at

1   Aerotek, the last place he worked.

2   His Department of Corrections'

3   records will be in the exhibits with this

4   Court, and it is important to note that the

5   Department of Corrections noted no mental

6   deficit. This is not a close case. This

7   is a man, when he chooses to do so, has

8   tremendous ability to adapt, and for that

9   reason Dr. Chiappone says he functions at

10  much a higher level than his attained IQ.

11  That's what Dr. Nelson felt as well.

12  That's why the State is confident

13  after the Court reviews all the testimony

14  and trial exhibits of this case and the

15  reports that it will find the defense has

16  not met their burden here by a

17  preponderance of the evidence.

18  Thank you.

19  THE COURT: Okay. You will have an

20  opportunity to brief this. I don't know

21  that you need to say anything further at

22  this time. I'll ask you to agree on a

23  schedule to submit those briefs, and then I

24  will try to give you a determination in a

25  timely fashion.

1    Any reason why we shouldn't order the

2    defendant returned to the institution at

3    this time.

4    MR. KRUMHOLTZ:  No reason, your

5    Honor.

6    THE COURT:  We will do that.  We'll

7    order that the Hamilton County Sheriff

8    return the defendant to -- where has he

9    been at?

10    MR. GIDEON:  Mansfield.

11    THE COURT:  Mansfield.  And I look

12    forward to your briefs.  Court will stand

13    in recess.

<u>CERTIFICATE</u>

I, DEBORAH A. KAHLES, RPR, the undersigned, an Official Court Reporter for the Hamilton County Court of Common Pleas, do hereby certify that at the time and place stated herein, I recorded in stenotype and thereafter transcribed the within transcript of proceedings and that the foregoing Transcript of Proceedings is a true, complete, and accurate transcript of my said stenotype notes.

IN WITNESS WHEREOF, I hereunto set my hand this 19th day of May, 2005.

_____
DEBORAH A. KAHLES, RPR
Official Court Reporters
Court of Common Pleas
Hamilton County, Ohio



D66398089

# Court of Appeals First Appellate District of Ohio.

STATE OF OHIO

Plaintiff APPELLEE

C 050840

vs.

No. B-939022

JAMES DERRICK O'NEAL

Defendant APPELLANT

### TRANSCRIPT OF THE DOCKET AND JOURNAL ENTRIES

C-940652  1-125
C-960392  126-200
C-980247 201-221
C-040286  222-252

1 of 2

FILED
2005 DEC 12 A 9: 44
GREGORY HARTMANN
CLERK OF COURTS
HAM. CNTY. OH

HAMILTON COUNTY
CLERK OF COURTS

BOUND DOCUMENT
CANNOT BE SCANNED

# Court of Appeals First Appellate District of Ohio.

STATE OF OHIO
_____

                              Plaintiff APPELLEE

                                              C 050840
              vs.
                              No. B-939022

JAMES DERRICK O'NEAL
_____

                              Defendant APPELLANT

TRANSCRIPT OF THE DOCKET AND JOURNAL ENTRIES

2 of 2

```
TODAY'S DATE 12/12/2005              HAMILTON COUNTY CLERK OF COURTS
                                     COMMON PLEAS DIVISION                  PAGE    1
         CASE B 9309022              Criminal Appearance Report             CMSR5155
--------------------------------------------------------------------------------

                             A P P E A R A N C E   D O C K E T

 Attorney - Plaintiff
 Attorney - Defendant   JOHN JOSEPH GIDEON                          8151
 Cur Judge -            RALPH WINKLER                               31

 STATE OF OHIO vs  JAMES DERRICK ONEAL

   Total Deposits              $ 00
      Total Costs           $238 90


 STATE OF OHIO
         vs
 JAMES DERRICK ONEAL
      UNKNOWN .                            Municipal #  ,,,
 CINC                         OH


    Race  B  Age  39  Sex  M

 Filed 12/16/1993  0005 - WARRANT ON INDICTMENT
 Count 1  Disposition 3DOC DEPARTMENT OF CORRECTIONS        Date 12/11/1995
 Count 2  Disposition 3DOC DEPARTMENT OF CORRECTIONS        Date 12/11/1995
 Count 3  Disposition 3DOC DEPARTMENT OF CORRECTIONS        Date 12/11/1995
 Count 4  Disposition 3DOC DEPARTMENT OF CORRECTIONS        Date 12/11/1995

 IMAGE       DATE       DESCRIPTION                            AMOUNT
--------------------------------------------------------------------------------
             12/16/1993  INDICTMENT REPORTED AND FILED
                         INDICTMENT FOR
                         AGGRAVATED MURDER 2903 01 R C
                         (CAPITAL) W/SPEC, ATTEMPT (AGGRAVATED
                         MURDER) 2923 02 R C  W/SPEC,
                         AGGRAVATED BURGLARY 2911 11 R C  W/SPEC
             12/16/1993  PRECIPE FOR WARRANT FILED AND WARRANT
                         ISSUED
    68       12/20/1993  ENTRY APPOINTING COUNSEL
                         DALE SCHMIDT
             12/21/1993  SIMON L  LEIS JR , SHERIFF  I HAVE IN
                         CUSTODY AND HAVE SERVED COPY OF
                         INDICTMENT ON
                         SAID DEFENDANT BY PAUL COSGROVE DEPUTY
     9       12/22/1993  PLEA OF NOT GUILTY ENTERED AT
                         ARRAIGNMENT
                         $1,000,000
     9       12/22/1993  COUNSEL ASSIGNED
                         DALE SCHMIDT & JOHN KELLER
    14       12/22/1993  APPOINTMENT OF TRIAL COUNSEL IN A
                         CAPITAL CASE DALE G SCHMIDT & JOHN T
                         KELLER
   113       12/22/1993  APPLIC  REQUESTING PERMISSION TO
                         BROADCAST,TELEVISE,PHOTO , RECORD
                         COURTROOM PROCEEDINGS
                         CINTI  ENQUIRER
   114       12/22/1993  APPLIC  REQUESTING PERMISSION TO
                         BROADCAST,TELEVISE,PHOTO , RECORD
                         COURTROOM PROCEEDINGS
                         CINTI POST
   236       12/22/1993  ENTRY OF CONTINUANCE
                         1/7/94
             12/27/1993  NOTICE TO SUPREME COURT OF OHIO OF
                         FILING OF INDICTMENT CHARGING
                         AGGRAVATED MURDER W/SPEC (S) OF
                         AGGRAVATING CIRCUMSTANCES 2929 021A
                         R C
             12/28/1993  DEMAND FOR DISCOVERY
             12/28/1993  REQUEST FOR BILL OF PARTICULARS
   165        1/07/1994  ENTRY OF CONTINUANCE
                         1/14/94
              1/10/1994  MOTION
                         TO EMPLOY EXPERTS AND AUTHORIZE
                         PAYMENTS OF FEES OF SAME
```