

ENTERED
MAR 1 7 2006

# IN THE COURT OF APPEALS
## FIRST APPELLATE DISTRICT OF OHIO
## HAMILTON COUNTY, OHIO

**STATE OF OHIO**                        **APPEAL NO.  050840**

                                         **TRIAL NO. B-939022**

vs                                       **ENTRY GRANTING EXTENSION OF TIME TO FILE BRIEF**

**JAMES DERRICK O'NEAL**

This cause came on to be considered upon the motion of the appellant filed herein to extend time to file his/her brief.

The Court upon consideration thereof finds that the motion is well taken and is granted.

Wherefore, it is the Order of this Court that the appellant shall have until March 22, 2006 to file brief.

**D67606640**

To The Clerk: 2

Enter upon the Journal of the Court on ___MAR 1 7 2006___ per order of the Court.

By: _____

Presiding Judge

Case 1:02-cv-00357-MRB-MRM   Document 40-13   Filed 06/22/2007   Page 2 of 25

NOTICE OF APPEALABLE JUDGMENT  SENT BY ORDINARY MAIL ON  3/20/2006  CMSR5157

-----------------------------------------------------------------------------

| CASE NO. | JUDGE | PLAINTIFF | DEFENDANT | SENT NOTICE TO |
|----------|-------|-----------|-----------|----------------|
| C 0500840 | 902 | STATE OF OHIO | JAMES DERRICK ONEAL | JOHN JOSEPH GIDEON<br>250 EAST STANTON AVE<br>COLUMBUS OH  43214-1268 |
| C 0500840 | 902 | STATE OF OHIO | JAMES DERRICK ONEAL | HAMILTON COUNTY PROSECUTOR<br>230 E NINTH ST,  ROOM 7000<br>CINCINNATI OH  45202 |



FILED
COURT OF APPEALS

MAR 2 0 2006

GREGORY HARTMANN
CLERK OF COURTS
HAMILTON COUNTY



D67614439



D67698760

IN THE COURT OF APPEALS OF OHIO
FIRST APPELLATE DISTRICT
HAMILTON COUNTY

STATE OF OHIO,

    Respondent-Appellee,

v.

JAMES DERRICK O'NEAL,

    Petitioner-Appellant.

APPEAL NO. C-050840

TRIAL NO. B-939022

<u>DEATH PENALTY CASE</u>

On Appeal From The Court Of Common Pleas Of Hamilton County

---

BRIEF OF PETITIONER-APPELLANT

---

**FILED**
**COURT OF APPEALS**

MAR 2 9 2006

GREGORY HARTMANN
CLERK OF COURTS
HAMILTON COUNTY

JOHN J. GIDEON  (0008151)
250 East Stanton Avenue
Columbus, Ohio 43214-1268
(614) 844-3954

MICHAEL W. KRUMHOLTZ (0009099)
Bieser, Greer & Landis, LLP
6 North Main Street, Suite 400
Dayton, Ohio 45402-1908
(937) 223-3277

COUNSEL FOR PETITIONER-
    APPELLANT

JOSEPH T. DETERS (0012084P)
Prosecuting Attorney
PHILIP R. CUMMINGS (0041497P)
Assistant Prosecuting Attorney
230 East Ninth Street, Suite 7000
Cincinnati, Ohio  45202
(513) 946-3006

COUNSEL FOR RESPONDENT-
    APPELLEE

GREGORY HARTMANN
CLERK OF COURTS
HAM. CNTY. OH

2006 MAR 24 P 1:31

FILED

# TABLE OF CONTENTS

PAGE(S)

STATEMENT OF THE CASE..................................................................................1

    A.  Procedural Posture ...............................................................................1

    B.  Statement of Facts ..............................................................................2

ASSIGNMENT OF ERROR AND ARGUMENT ........................................................16

**Assignment of Error**

The decision of the trial court concluding that Appellant is not mentally retarded as defined in Atkins v. Virginia is not based on competent, credible, reliable evidence and violates Appellant's right to be free from cruel and unusual punishment under the Eighth Amendment and his right to due process of law under the Fourteenth Amendments to the United States Constitution. [Decision Denying Defendant's Motion To Vacate Or Set Aside His Death Sentence at page 11] ...............................................................................................................16

**Authorities**

State v. Lott, 97 Ohio St.3d 303, 2002-Ohio-6625 (2002) ...............................16,19

State v. Anderson, 1st Dist. No. C-040541, 2005-Ohio-4301 (Aug. 19, 2005).....16

State v. Were, 1st Dist. No. C-030485, 2005-Ohio-376 (Feb. 4, 2005) ................16

Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).........17

Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) .........17

**First Issue Presented for Review**

Whether the trial court's conclusion -- that the "standard error of measurement" in IQ testing requires Appellant to "present the court with IQ scores of 64 or below" to raise the presumption that his IQ is 70 or below and to meet his burden of establishing that he *suffers from significant subaverage intellectual functioning* -- is contrary to law ......................................................................................................20

**Authorities**

O'Neal Apx. Vol. XI
Page 104

State v. Lott, 97 Ohio St.3d 303, 2002-Ohio-6625 (2002) ....................................21

Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).........23

American Association of Mental Retardation (AAMR), Definition
of Mental Retardation, What is Intelligence?,
http://www.aamr.org/Policies/faq_mental_retardation.shtml...............................24

**Second Issue Presented for Review**

Whether the trial court's conclusion -- that Appellant is able to
adequately perform some adaptive behavioral skills -- is sufficient
to outweigh the preponderance of the evidence that Appellant has
significant limitations in at least two adaptive behavior skills,
namely academic skills and social skills................................................................24

**Authorities**

State v. Lott, 97 Ohio St.3d 303, 2002-Ohio-6625 (2002) ....................................25

Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)....25,28

American Association of Mental Retardation (AAMR), Definition
of Mental Retardation, What is Intelligence?,
http://www.aamr.org/Policies/faq_mental_retardation.shtml...............................25

Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) .........28

**Third Issue Presented for Review**

Whether the trial court's reliance on the February, 1968 assessment
of Appellant by Cincinnati Public School psychologist Ruth
Kauffman when Appellant was 14 years old -- in which Appellant
obtained a full scale IQ test score of 64 and in which the
psychologist recommended Appellant for the Junior High Slow
Learning Program due to "below normal intellectual functioning" -
- for the conclusion that Appellant's mental retardation did not
become manifest before age 18 is against the weight of the
evidence and contrary to law .................................................................................29

**Authorities**

Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).........31

State v. Lott, 97 Ohio St.3d 303, 2002-Ohio-6625 (2002) ....................................31

CONCLUSION..............................................................................................................33

CERTIFICATE OF SERVICE ....................................................................................34

APPENDIX....................................................................................................................35

State of Ohio v. James Derrick O'Neal, Decision Denying Defendant's
Motion To Vacate Or Set Aside His Death Sentence, September 26, 2005 ...................A-1

iv

## STATEMENT OF THE CASE

A.    Procedural Posture

This is an appeal from the judgment of the Court of Common Pleas of Hamilton County denying Petitioner-Appellant James Derrick O'Neal's first successive petition to vacate or set aside his death sentence based on his claim that he is mentally retarded and not subject to the death penalty under the Supreme Court's decision in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

Appellant was convicted of aggravated murder and sentenced to death by the Court of Common Pleas on December 11, 1995. His conviction and death sentence were affirmed on both direct appeal and collateral review through the Ohio Supreme Court.

On May 21, 2002 Appellant filed a petition for a writ of habeas corpus in the United States District Court for the Southern District of Ohio, Western Division. James Derrick O'Neal v. Margaret Bagley, Warden, Case No. C-1-02-357. The United States Supreme Court, on June 20, 2002, decided Atkins v. Virginia wherein the Court held that the Eighth Amendment to the United States Constitution, barring "cruel and unusual punishments," prohibits the execution of a person who is mentally retarded. Because Atkins reversed existing Supreme Court precedent and created a new federal claim that O'Neal could not have presented to the Ohio state courts at trial or on direct or collateral appeal, the federal court stayed the habeas corpus proceedings to allow Appellant to exhaust his state court remedies as required by the exhaustion doctrine.

On November 15, 2002 Appellant filed with the Court of Common Pleas, Hamilton County, his first successive petition to vacate or set aside his sentence based on Atkins. Appellant's petition was denied by the court below on April 7, 2004 without the benefit of an

1

evidentiary hearing. Appellant appealed the court's denial of his petition to this Court. By way of agreed entry filed on August 13, 2004, Appellant withdrew his appeal and he was granted an evidentiary hearing before the court below on the issue of whether he is mentally retarded as defined by Atkins. The court below appointed experts to examine Appellant on behalf of both Appellant and Appellee.

The Court of Common Pleas held the evidentiary hearing on May 17, 2005. The parties filed post-hearing briefs. On September 26, 2005 the court denied Appellant's petition to vacate or set aside his sentence, finding that Appellant did not meet the legal standard set forth in Atkins to be deemed "mentally retarded."

Because the decision of the Court of Common Pleas concluding that Appellant is not mentally retarded is not based on competent, credible, reliable evidence and violates Appellant's right to be free from cruel and unusual punishment under the Eighth Amendment Appellant appeals the trial court's September 26, 2005 judgment.

B.    Statement of Facts

The three-part constitutional standard for evaluating a claim of mental retardation, as stated in Atkins and recognized in State v. Lott, 97 Ohio St.3d 303, 2002-Ohio-6625 (2002), is: (1) significantly subaverage intellectual functioning, (2) significant limitations in two or more adaptive skills, and (3) onset before age 18. The facts as to each part of this standard are as follows.

### Onset Before Age 18

The third part of the constitutional test of mental retardation, as restated by the Ohio Supreme Court in Lott, is "onset before the age of 18."

Appellant did not begin to claim that he was mentally retarded only after the decision in Atkins was issued. Nor was the preparation for the penalty phase of his trial the first time that Appellant was diagnosed as mentally retarded.

The report of Cincinnati Public Schools School Psychologist Ruth Kaufman from February, 1968 when Appellant was 14 years old and in the 6th grade (Hearing Exhibit A) shows that Appellant obtained a full scale IQ of 64 on the Wechsler Intelligence Scale for Children (WISC). Ms. Kaufman, in her assessment of Appellant's performance on the WISC and other tests, noted Appellant's strengths and weaknesses, and observed that Appellant's performance tests showed that he was "moderately retarded." Ms. Kaufman concluded that Appellant should be in the "Junior High Slow Learning Program." She further stated that "Below normal intellectual functioning due to organic dysfunction seemed to be the primary problem."

Dr. Michael Nelson, who submitted a written report to the Court (Hearing Exhibit 1) but did not interview or test Appellant and who did not testify at the hearing, wrote in his report at page 3 that the full scale IQ test results placed Appellant overall in the "Mild range of Mental Retardation." And Dr. Nelson added that "He manifested a significant deficit in his performance capabilities where he functioned in the moderate to mild range of mental retardation."

Dr. Robert Tureen, who interviewed and tested Appellant June, 1994 before his trial and who interviewed and tested Appellant again in December, 2004 after being appointed by the trial court, and who testified at the evidentiary hearing on May 17, 2005, provided a more thorough analysis of the significance of the school psychological evaluation. Dr. Tureen said this (at page 4 of his report):

> On the Wechsler Intelligence Scale for Children, he obtained a **Fullscale I.Q. of 64** (Verbal I.Q. 79, Performance I.Q. 55). **That large a discrepancy on the Wechsler scales between Verbal and**

3

> **Performance Scores does raise at least the possibility of some level of brain disturbance or dysfunction, that might be interfering with intellectual ability.** The school psychologist summary evaluation recommended that James be placed in the junior high school slow learner program. She further was of the opinion that "Below normal intellectual functioning, due to organic dysfunction seemed to be the primary problem." She also indicated that emotional problems might be interfering with his school achievement. The importance of this is **the early establishment of not only measured I.Q. levels, but also the presumption of impaired brain function (cerebral dysfunction). \*\*\* It is my opinion that the above data establishes the existence of low intellectual ability, at least in terms of his academic performance, as well as assessed intellectual measures before the age of eighteen, with suggested evidence of cerebral brain dysfunction, resulting in poor academic achievement and low intellectual status.** (emphasis added)

Noting Appellant's low achievement test scores, Dr. Nelson agreed that "Mr. O'Neal had long-standing achievement/academic skill deficits."

While *the school psychological testing and evaluation was focused on Appellant's intellectual and academic skills and abilities and does not contain a discrete analysis of Appellant's adaptive behavioral skills*, the performance scores on the Wechsler test and other tests led Ms. Kaufman to conclude more broadly that "When tasks required that he work toward an unknown goal or concentrate on visual cues, he gave an extremely defective performance. Spatial reasoning was also very poor for his age. Moreover, his knowledge of vocabulary and recall of information indicated defective functioning."

<u>Significantly Subaverage Intellectual Functioning</u>

The second part of the constitutional test of mental retardation, as restated in <u>Lott</u>, is "significantly subaverage intellectual functioning."

Before the death penalty trial began before the trial court in October, 1995 Appellant was examined and evaluated by two psychologists, Dr. David Chiappone and Dr. Robert Tureen. Dr.

4

Tureen, in his January 18, 2005 report to the trial court, summarizes the assessment by Dr.

Chiappone which led to Dr. Chiappone's requesting that Dr. Tureen, a neuropsychologist,

examine Appellant:

> In 1994, during his incarceration at the Hamilton County Justice Center, **David Chiappone, Ph.D. administered the Wechsler Adult Intelligence Scale-R.** This is a scale that is related in characteristics to the Wechsler Intelligence Scale for Children, but is normed on the adult population and is in fact the fourth revision of the adult Wechsler Scales. On March 31, 1994, the following I.Q. scores were obtained: Verbal I.Q. 72, Performance I.Q. 71 and **Full Scale I.Q. 71,** all representing **a ranking a the 3rd percentile,** compared to the general population, meaning that 97% of the population does as well or better than James performed on the test. **The 95% confidence interval for the Full Scale I.Q. is 67 to 77, which are reasonable limits of the range within which James's "true" Full Scale I.Q. lies. Thus, there is a reasonable probability that James' true score lies below the established score of 70, representing mental retardation,** but also a reasonable probability that his true score lies above that particular level. What was more important at the time, was the **continued presence of evidence of brain dysfunction.** This was essentially why Dr. Chiappone requested my involvement in the case, since on his initial testing, he was finding signs suggesting brain disorder and this is my specialty area. Additional testing, using specific measures that are sensitive to the presence of brain dysfunction I administered in 1994 substantiated **a consistent picture of a brain dysfunction, present on several measures, indicating impairment in abstraction and problem solving and difficulty on measures of spatial analysis and synthesis,** which was suggested by the poor performance I.Q. reported in 1968. On the other hand, his general language, his auditory comprehension and general verbal expression and his ability to follow instructions were all intact, within **his level of intellectual functioning, that is, of an individual with an I.Q. in the borderline to mildly retarded range,** as measured on the Wechsler Adult Intelligence Scale-R (WAIS-R). (emphasis added)

Hearing Exhibit C, January 18, 2005 Dr. Tureen Report at pages 5-6.

Respondent has focused on the isolated fact that Appellant obtained a full scale score of

71 on the WAIS-R administered by Dr. Chiappone and has ignored the fact that Appellant got a

full scale score of 64 on the WISC administered in 1968, or the score of 63 on the Cognitive

Status Exam administered by Dr. Tureen in 1994, or a full scale score of 67 on the WAIS-III

administered by Dr. Tureen in 2004, or a composite index score of 63 on the Reynolds

Intellectual Scales test administered by Dr. Tureen in 2004.

As Dr. Tureen carefully and thoughtfully explained in his hearing testimony at Hrg. Tr.

36-37, these tests have errors of measurement. As explained cogently by the AAMR:

> Although not perfect, intelligence is represented by Intelligence
> Quotient (IQ) scores obtained from standardized tests given by a
> trained professional. In regard to the intellectual criterion for the
> diagnosis of mental retardation, **mental retardation is generally
> thought to be present if an individual has an IQ test score of
> approximately 70 or below**. An obtained IQ score must always be
> considered in light of its **standard error of measurement**,
> appropriateness, and **consistency** with administration guidelines.
> <u>**Since the standard error of measurement for most IQ tests is
> approximately 5, the ceiling may go up to 75**</u>. This represents a
> score approximately 2 standard deviations below the mean,
> considering the standard error of measurement.

American Association of Mental Retardation (AAMR), Definition of Mental Retardation, What

is Intelligence?, http://www.aamr.org/Policies/faq_mental_retardation.shtml (emphasis added).

At the time of Appellant's trial in October, 1995 the prevailing rule on the imposition of

the death penalty on mentally retarded persons was that contained in <u>Penry v. Lynaugh</u>, 492 U.S.

302 (1989). <u>Penry</u> held that it was not a violation of the Eighth Amendment's ban on cruel and

unusual punishment to execute a mentally retarded person. Thus, the testimony regarding

Appellant's mental retardation was presented, not as a bar to the imposition of the death penalty,

but merely as evidence in mitigation. The constitutional standards for determining if an offender

is mentally retarded -- as set out in <u>Atkins</u> -- did not exist and were not referred to during the

questioning of either Dr. Chiappone or Dr. Tureen at trial. The examinations of Dr. Chiappone

6

and Dr. Tureen, which are part of the trial record, are *noticeably devoid of any reference to the* definitions of mental retardation of the American Association of Mental Retardation or the American Psychiatric Association. Even more noticeable is the absence of any questioning, and consequently the absence of any testimony, about the actual scores that Appellant achieved on the various I.Q. and other tests administered in 1994 or to Appellant's abilities with respect to specific adaptive behavior skills.

Thus, when during his testimony Dr. Chiappone said that "He's not retarded," -- referring of course to Appellant -- this statement was not made with explicit reference to the AAMR or APA definitions of mental retardation. Nor, obviously, could this statement have referred to the constitutional standard of mental retardation later set out in <u>Atkins</u>.

But virtually all of the rest of Dr. Chiappone's *1995 penalty phase mitigation testimony* supports the conclusion that Appellant meets the constitutional definition of mental retardation.

Dr. Chiappone testified that he administered a number of tests to Appellant and that Appellant "scored in the what are called the border range of mental retardation. [sic] He's not retarded, but he functions at the second or third percentile of the general population." Trial Tr. at 981. He testified that Appellant had difficulty *performing some simple tests* that the Doctor administered. "And so at that point I thought there was what we call organicity above and beyond limited intellect. And at that point I recommended we have a neuropsychologist who specializes in dysfunctions of the brain to do further testing to make sure we didn't miss anything." Trial Tr. at 982. Dr. Chiappone testified that Appellant suffered from "borderline mental retardation based on the IQ test and *substantiated by his* educational data." Trial Tr. at 987. Finally, Dr. Chiappone stated that Appellant had a "[l]ack of coping skills" which, along with other factors, "made it more difficult for him to effectively problem solve." Trial Tr. at 996.

7

As noted above, after he evaluated and tested Appellant, Dr. Chiappone referred Appellant to Dr. Robert Tureen, a clinical neuropsychologist at the Mayfield Neurological Institute in Cincinnati. Dr Tureen also testified in the mitigation phase of the trial. Trial Tr. at 997.

Dr. Tureen did further testing of Appellant which showed a "longstanding type of disturbance" which he called "minimal cerebral dysfunction." Trial Tr. at 1001. Dr. Tureen testified that Appellant had a very poor academic performance throughout his limited academic career and that "early psychological testing that was done in '68 stated there was evidence of organicity or brain damage." Trial Tr. at 1002.

As to Appellant's level of intellectual functioning, Dr. Tureen described it as being "in the borderline to mildly retarded range." Trial Tr. at 1002. Dr. Tureen concluded that Appellant is "an individual who's going to have some limitations on how well they're [sic] going to be able to function. *** By cognitive thinking general problems involving memory, spatial and statistical skills, language usage, as well as motor skills. [sic] And on that particular exam he performed well into the impaired range. You take that performance and put it together with the IQ level and you see an individual who is going to have some sort of difficulties in adjusting in the world." Trial Tr. at 1003. He added that persons like Appellant would have "some real limitations of what they're going to be able to do in life and what they're going to be able to accomplish." Trial Tr. at 1005. Finally, Dr. Tureen testified on cross-examination that Appellant "was functioning in the mildly mentally retarded to borderline range." Trial Tr. at 1009.

Dr. Nelson, on page 3 of his report (Hearing Exhibit 1, March 21, 2005 Dr. Nelson Report) summarizes Dr. Chiappone's and Dr. Tureen's penalty phase mitigation testimony as follows: "It appears that Mr. O'Neal is functioning in the Mild MR to Borderline range of

8

intelligence." Thus, Respondent's expert, Dr. Nelson, does not disagree with the diagnosis of mental retardation.

It is important to emphasize here that the WAIS-R was not the only test administered to Appellant in 1994. Other tests were administered and Appellant's performance on all of these tests demonstrates, as Dr. Tureen testified at the evidentiary hearing, a consistent pattern of significantly subaverage intellectual functioning. If <u>Atkins</u> had been the rule at the time of Appellant's trial, his attorneys would have questioned Dr. Tureen with respect to the specific results of all of these tests.

Hearing Exhibit B, Dr. Tureen's July 27, 1994 report, contains this most important summary of all of the 1994 test results:

> <u>TEST RESULTS AND INTERPRETATION:</u> James was administered the **Wechsler Adult Intelligence Scale - R (WAIS-R) by Dr. Chippone [sic] yielding Verbal Performance and Full scale I.Q.'s in the borderline range to mildly mentally retarded range (3rd percentile in comparison with others of his age).** The only subscale score which was significantly out of line and significantly higher than his overall average subscale scores was on the Digit Symbol subtest which reflects relatively good psychomotor speed and visual motor coordination. The general intellectual level is compatible with the academic levels reported and described above.
>
> **On the Cognitive Status Exam (Barrett), a screening exam for cognitive, sensory, and motor functions, James obtained a score of 63 out of a possible 104 points, scores below 75 are in the impaired range. <u>Generally speaking, individuals who have WAIS-R I.Q. levels in the borderline to retarded range coupled with cognitive status exam scores significant [sic] below 65, as is the case here, are generally seen as having difficulties functioning in the environment in even relatively routine ways on a day to day basis as he result of impairment in brain function</u>.** If this impairment is longstanding, that is congenital as opposed to something more recently acquired, then the functioning is likely to be marginal at best. Because of difficulty adapting and

9

adjusting, such individuals are likely to find themselves struggling in the general adaptation.

James's performance on the Wisconsin Card Sort and Porteus Mazes reflects evidence of difficulty in abstraction and problem solving. On the **Wisconsin Card Sort** in particular, there is very **high perseverative response rate**. What this reflects is an inability to learn effectively from feedback information regarding one's performance and a tendency to continually repeat the same types of behavior pattern even though there may be information provided that the behavior pattern is incorrect. In otherwords [sic], **he does not learn well from information being provided by the environment, particularly in novel situations**. On the **Porteus Mazes**, James again demonstrates **considerable difficulty in planning ahead and attempting to anticipate a course of action**. His performance level actually reaches around year 7, but even here he is struggling to perform within the acceptable limits.

Further evidence of impaired functioning is reflected on any spatial analytic task. On copying simple configurations such as a Greek cross, there is marked constructional dyspraxia, that is an inability to accurately reproduce the appropriate juxtaposition of the various spatial features of the figure. His attempt to copy the complex Rey figure resulted in even more evidence of the difficulty he has with spatial analytical skills resulting in a markedly distorted copy of the figure. When he was asked to recall the figure immediately after the copy phase, he was only able to produce one or two lines of this rather intricate figure and even those were drawn incorrectly.

Finally, on the **Hooper Visual Organization Test (VOT)**, a task which does not involve a motor component, but strictly involves the conceptual organization of spatial elements into recognizable wholes, **performance is in the severely impaired range**.

Brief measures of language assessment indicate that object, number, letter, and word recognition are unimpaired within the level of the patient's intellect. His auditory comprehension and expression are unimpaired. He is able to follow instructions without difficulty. His reading level is functional for routine day to day activities.

GENERAL CONCLUSIONS: This is a 39 year old male with **borderline to mildly retarded level of intellectual functioning** as reflected in previously administered psychometric measures.

10

> Current testing reflects evidence of impaired higher cortical functions such as novel reasoning, abstracting, and planning, and spatial analytical skills, while motor functions remain relatively intact.
>
> Given the early academic records, these findings most likely reflect **a longstanding condition**.

Hearing Exhibit B, July 27, 1994 Dr. Tureen Report, at pages 2-3.

In December of 2004 Dr. Tureen again interviewed Appellant and again administered tests. The details of the results of these tests are contained in his January 18, 2005 report:

> On the **WAIS-III**, James obtained a Verbal I.Q. of 71, Performance I.Q. of 69, and **Full Scale I.Q. of 67.** The descriptions currently used rate the Performance and Full Scale I.Q. as "extremely low" and Verbal I.Q. as "borderline."

Hearing Exhibit C, January 18, 2005 Dr. Tureen Report at page 6 (emphasis added).

Dr. Tureen also had Appellant take the **Reynolds Intellectual Scales** test:

> I also chose to administer the Reynolds Intellectual Scales, which is a relatively new test, but has both the advantage and disadvantage of not involving any psychomotor measures. *** The following indices are essentially I.Q. scores:
> Verbal Index = 68, 2nd percentile, 95th confidence interval 63-77 (i.e. range where true score lies)
> Non-Verbal Index = 67, 1st percentile, 95th confidence interval 62-75
> **Composite Index = 63**, 1st percentile rank, 95th confidence interval 59-70

Id., at page 7 (emphasis added).

Considering the scores that Appellant has achieved on all the IQ tests he has been administered from when he was 14 years old to the present, the preponderance of the evidence is that Appellant's IQ is below 70. Taken together with Appellant's academic performance as well as his performance on achievement tests, the evidence establishes that Appellant has consistently suffered from significantly subaverage intellectual functioning.

11

<u>Significant Limitations in Two or More Adaptive Skills</u>

The third part of the constitutional test of mental retardation, as stated by the Ohio Supreme Court in <u>Lott,</u> is "significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction."

The thrust of Respondent's questions and argument at the evidentiary hearing was, essentially, that Appellant does not meet the definition of mental retardation because he was able to go to school, drive a car, get married, have children, be a Marine, and hold various jobs (ignoring how poorly Appellant generally fared in almost all of these areas).

The definition of mental retardation -- be it the definition of the American Association of Mental Retardation, the definition of the American Psychiatric Association, the constitutional definition set out by the United States Supreme Court in <u>Atkins,</u> or the definition adopted by the Ohio Supreme Court in <u>Lott</u> -- does <u>not</u> require that to qualify as "mentally retarded" an offender must be profoundly mentally retarded. The execution of a person who is mildly mentally retarded is unconstitutional under <u>Atkins.</u> Indeed, the AAMR definition of "mental retardation" expressly contemplates that:

**"Within an individual, limitations often coexist with strengths."**

American Association of Mental Retardation (AAMR), Definition of Mental Retardation, What is Intelligence?, http://www.aamr.org/Policies/faq_mental_retardation.shtml (emphasis added).

Appellee's questions and arguments during the evidentiary hearing seemed to suggest that to be "mentally retarded" as defined by <u>Atkins</u> an offender must be profoundly mentally retarded and have significant limitations in <u>ALL</u> adaptive behavior skills. That obviously is not the law. The law is the three-part test. The question is not whether Appellant has some strengths -- he

12

obviously does. The question is whether Appellant *meets the three-part test, the third part* pertaining to significant limitations in two or more adaptive skills.

Dr. Chiappone testified that Appellant had a "[l]ack of coping skills" which, along with other factors, "made it more difficult for him to effectively problem solve." Trial Tr. at 996.

Dr. Nelson, who did not visit, interview, or test Appellant, or even testify at the evidentiary hearing in support of *his report, nevertheless agrees that:* "It is clear that Mr. O'Neal has difficulties in dealing with stressful situations in an effective manner and does not think through the consequences of his behavior very well." Hearing Exhibit 1, March 21, 2005 Dr. Nelson Report, at page 5. While Dr. Nelson goes on to say that this same problem is experienced by "individuals who function at higher levels of intelligence," he does not deny that Appellant's limitation in this area is evidence *of a problem with his social skills* or that this limitation is caused by mental retardation. Moreover, Dr. Nelson concedes that: "Mr. O'Neal does seem to ·exhibit significant deficits in <u>several</u> conceptual areas (i.e., reading, money concepts). <u>Id</u>. (emphasis added). Finally, Dr. Nelson says expressly that: "I would agree that Mr. O'Neal certainly has evidenced difficulties in his adaptive functioning in situations involving emotional intensity." <u>Id</u>. While *Dr. Nelson attributes these difficulties to "psychiatric difficulties,"* he fails to provide any basis for concluding that these difficulties are not caused by Appellant's mental retardation. Importantly, Dr. Nelson was not available to have his assertion cross-examined.

Dr. Tureen testified at Appellant's October, 1995 trial that Appellant is "an individual who's going to have some limitations on how well they're [sic] going to be able to function. *** *By cognitive thinking general problems involving memory, spatial and statistical skills, language* usage, as well as motor skills. [sic] And on that particular exam he performed well into the impaired range. You take that performance and put it together with the IQ level and you see an

13

individual who is going to have some sort of difficulties in adjusting in the world." Trial Tr. at
1003. He added that persons like Appellant would have "some real limitations of what they're
going to be able to do in life and what they're going to be able to accomplish." Trial Tr. at 1005.
Finally, Dr. Tureen testified on cross-examination that Appellant "was functioning in the mildly
mentally retarded to borderline range." Trial Tr. at 1009.

At the evidentiary hearing on May 17, 2005 Dr. Tureen testified specifically in terms of
the constitutional standard of mental retardation and the requirement of the third prong of the test
that requires significant limitations in two or more adaptive skills. In particular, Dr. Tureen
testified that Appellant has significant limitations in conceptual as well as social skills:

> Q. Based on your education, training, and experience and your
> interviewing and testing of Mr. O'Neal, as well as your review
> of his scholastic records, do you have an opinion, Dr. Tureen,
> to a reasonable certainty as a psychologist as to **whether or
> not Mr. O'Neal currently suffers from a disability
> characterized by significant limitations in two or more
> adaptive skills** as expressed in conceptual, social, and
> practical adaptive skills, which occurred before he was age
> 18?

> A. Yes, I do.

> Q. What is your opinion?

> A. That he still suffers from the same level of **conceptual
> inability**, if you will, and **social limitations** as he did prior --
> in the past.

> Q. And what **particular adaptive skills** does Mr. O'Neal suffer
> from a significant limitation of?

> A. First of all, there is **a significant limitation in academic
> skills. I would say reading, math**, but more importantly is the
> limitation as a result of what I initially referred to as mild
> cerebral dysfunction, which I believe is the cause of the **low
> level of intellectual function.**

14

Now, that particular type of disturbance that he demonstrated on our earlier testing limits his ability to consider alternative modes of dealing with situations which are stressful or which he finds in some way threatening.

Q.   And I don't have *Atkins* in front of me, I'm going from memory. Feel free to review *Atkins* if you have it in your possession. The reference in *Atkins* to adaptive skills relates to the following: Communication, self care, home living, social, community use, self direction, health and safety, functional academics, leisure, work. What you have just described, does that fall into that category of functional academics?

A.   The functional academics and social adaptive.

Q.   How does that fall into the category of **social adaptive**?

A.   **This is an individual who is going to become rigid, perseverative, not able to think of alternative ways of dealing with situations which occur particularly under stress.**

Q.   Does it impact the issue of whether or not Mr. O'Neal is mentally retarded if he meets two of the ten types of limitations in adaptive behavior?

A.   My understanding is that it does.

Q.   You have provided us with your opinion concerning whether or not James O'Neal is mentally retarded. Are there **gradations of mental retardation**, Doctor?

A.   Yes, there are.

Q.   Based on your education, training and experience and your interviewing and your testing of Mr. O'Neal and your review of his scholastic records, do you have an opinion to a reasonable certainty as a psychologist as to the **level of gradation of Mr. O'Neal's retardation**?

A.   Yes, I do.

Q.   What is that opinion?

A.   **He is mildly mentally retarded.**

15

Hearing Transcript at pages 30-33 (emphasis added).

## ASSIGNMENT OF ERROR AND ARGUMENT

### Assignment of Error

The decision of the trial court concluding that Appellant is not mentally retarded as defined in Atkins v. Virginia *is not* based on competent, credible, reliable evidence and violates Appellant's right to be free from cruel and unusual punishment under the Eighth Amendment and his right to due process of law under the Fourteenth Amendments to the United States Constitution.

### Standard of Review on Appeal

State v. Lott, 97 Ohio St.3d 303, 2002-Ohio-6625 (2002), holds that a trial court's ruling on mental retardation should be conducted in a manner comparable to a ruling on competency -- that is, the issue is to be determined by the judge and not a jury. And the petitioner has the burden of proving that he is mentally retarded by a preponderance of the evidence. Id. at ¶21.

In State v. Anderson, 1st Dist. No. C-040541, 2005-Ohio-4301 (August 19, 2005), this Court expressly overruled prior decisions that might have suggested that the standard of review of a decision on a postconviction petition is "abuse of discretion." The Court held: "An appellate challenge to a trial court's disposition of a postconviction petition presents a mixed question of law and fact. The appellate court must accept the common pleas court's findings of fact if the findings are supported by some competent, credible evidence; the court then reviews *de novo* the lower court's conclusions of law." Id. at ¶, n. 3.

In State v. Were, 1st Dist. No. C-030485, 2005-Ohio-376 (February 4, 2005), this court held that "An appellate court will not reverse a trial court's finding on mental retardation

provided that there was credible and reliable evidence supporting the trial court's conclusion." Id. at ¶78.

Standard of Mental Retardation

Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), holds that "Construing and applying the Eighth Amendment in the light of our 'evolving standards of decency,' we therefore conclude that such punishment is excessive and that the Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." 536 U.S. at 321.

In reaching this conclusion the Court in Atkins succinctly summarizes the reasoning for reversing its contrary decision in Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989):

> Those mentally retarded persons who meet the law's requirements for criminal responsibility should be tried and punished when they commit crimes. **Because of their disabilities in areas of reasoning, judgment, and control of their impulses, however, they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct. Moreover, their impairments can jeopardize the reliability and fairness of capital proceedings against mentally retarded defendants.**
>
> Id. at 306-307 (emphasis added). **put to death, an exclusion for the mentally retarded is appropriate.**

On the question of "determining which offenders are in fact retarded" the Court in Atkins observed that the forensic psychologist who testified on behalf of Atkins in the penalty phase of his trial, Dr. Evan Nelson, had evaluated Atkins and concluded that he was "mildly mentally retarded." 536 U.S. at 308. The phrase "mildly mentally retarded" is followed by footnote 3 in

17

which the Court quotes the definitions of "mental retardation" of both the American Association

of Mental Retardation (AAMR):

> "*Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18." (emphasis in original)

and of the American Psychiatric Association (APA):

> "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental retardation has many different etiologies and may be seen as a final common pathway of various pathological processes *that affect the functioning of the central nervous system.*"

536 U.S. at 308.

The Court in <u>Atkins</u> adopts a constitutional test for mental retardation. The <u>Atkins</u> Court

embraces the definition of mental retardation from the AAMR and the American Psychiatric

Association:

> As discussed above, **clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self direction that became manifest before age 18.** Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition **they have diminished capacities to understand and process information, to communicate, to engage in logical reasoning, to control impulses, and to understand the reactions of others.**

Id. at 318 (emphasis added). The Atkins Court, in footnote 5, observes that "Dr. Nelson administered the Wechsler Adult Intelligence Scales test (WAIS-III), the standard instrument in the United States for assessing intellectual functioning." The Court goes on to describe how the WAIS-III is scored and notes that Atkins' full scale IQ was 59. The Court does not decide what the "cutoff" should be, but observes:

> It is estimated that **between 1 and 3 percent of the population has an IQ between 70 or 75 or lower, which is typically considered the cutoff IQ score for the intellectual functioning prong** of the mental retardation definition.

536 U.S. at 309 fn. 5 (emphasis added).

Finally, rather than establish a precise test of mental retardation and rather than prescribe a definite process for determining who is mentally retarded, the Supreme Court in Atkins expressly left those issues to the States:

> Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus. As was our approach in Ford v. Wainwright, 477 U.S. 399 (1986), with regard to insanity, "we leave to the State(s) the task of developing appropriate ways to enforce the constitutional restrictions upon [their] execution of sentences." Id., at 405, 416-417.

536 U.S. at 317.

Following closely on the decision in Atkins the Ohio Supreme Court addressed in State v. Lott, 97 Ohio St.3d 303, 2002-Ohio-6625 (December 11, 2002), the procedures to be followed and the substantive standard to be applied in determining a claim of mental retardation. In its *per curiam* decision in Lott, the Court held the following:

- "Whether Lott is mentally retarded is a disputed factual dispute, which we believe is best resolved by the trial court."

19