- "We hold that there is a rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70."
- "The trial court shall decide whether the petitioner is mentally retarded by using the preponderance-of-the-evidence standard."
- "The three-part test defining mental retardation, as cited in *Atkins*, provides that trial court with the constitutional standard for reviewing the evidence. In considering an *Atkins* claim, the trial court shall conduct its own *de novo* review of the evidence in determining whether the defendant is mentally retarded. The trial court should rely on professional evaluations of [the petitioner's] mental status, and consider expert testimony, appointing experts if necessary, in deciding this matter. The trial court shall make written findings and set forth its rationale for finding the defendant mentally retarded or not mentally retarded. We believe that these matters should be decided by the court and do not represent a jury question. In this regard, a trial court's ruling on mental retardation should be conducted in a manner comparable to a ruling on competency (i.e., the judge, not the jury, decides the issue)."
- "[The petitioner] bears the burden of establishing that he is mentally retarded by a preponderance of the evidence."

## First Issue Presented for Review

Whether the trial court's conclusion -- that the "standard error of measurement" in IQ testing requires Appellant to "present the court with IQ scores of 64 or below" to raise the presumption that his IQ is 70 or below and to meet his burden of establishing that he suffers from significant subaverage intellectual functioning -- is contrary to law.

The trial court concluded that Appellant does not suffer from significantly subaverage intellectual functioning. Decision Denying Defendant's Motion To Vacate Or Set Aside His Death Sentence at page 9. The court states:

Defendant contends that the presumption that he is not mentally retarded is rebutted by his two tests that point to **a sub-70 IQ**. This court agrees. However, Defendant also bears the burden of proving by a preponderance of the evidence that he suffers from significantly subaverage intellectual functioning. *Id.* at 307.

The Ohio Supreme Court determined that **a score of 70 or above** raised a rebuttable presumption that a defendant is not mentally retarded, but it did not ignore the aforementioned five point standard of error completely. *Id.* at 304. **As such, to meet his burden, Defendant must present the court with IQ scores of**

20

**64 or below,** Based on the standard margin of error, Defendant's IQ test score of 67 means that his true score could place him anywhere between the 62 and 72 range. Furthermore, his February 9, 1968 IQ score of 64 is not a recent one, and at best provides the court with equal evidence as to whether Defendant suffers from significantly subaverage intellectual functioning. Therefore, Defendant has failed to prove the first prong of the test enumerated in *Lott* by a preponderance of the evidence. (emphasis added)

Id.

As a preliminary matter, the trial court was in error in stating that <u>Lott</u> held that "a score of 70 or above" is the cutoff point for raising a presumption that a defendant is not mentally retarded. The <u>Lott</u> court held that a rebuttable presumption that a defendant is not mentally retarded exists "if his or her IQ is <u>above</u> <u>70</u>." Id. at ¶12. The trial court's entire decision is infected with the misapprehension that a score of 70 places a defendant in the category of not being mentally retarded.

It is important to keep in perspective the totality of the evidence that supports the conclusion that Appellant does suffer from significantly subaverage intellectual functioning. Appellant acknowledges that he obtained a full scale score of 71 on the WAIS-R administered by Dr. Chiappone in 1994. But Appellant got a full scale score of 64 on the WISC administered in 1968 by school psychologist Ruth Kaufman, a score of 63 on the Cognitive Status Exam administered by Dr. Tureen in 1994, a full scale score of 67 on the WAIS-III administered by Dr. Tureen in 2004, and a composite index score of 63 on the Reynolds Intellectual Scales test administered by Dr. Tureen in 2004.

In addition to the IQ scores themselves, all of the experts agree that Appellant's level of intellectual functioning is "significantly subaverage."

O'Neal Apx. Vol. XI
Page 127

Cincinnati Public Schools School Psychologist Ruth Kaufman concluded that Appellant should be in the "Junior High Slow Learning Program." She further stated that "Below normal intellectual functioning due to organic dysfunction seemed to be the primary problem."

Dr. Chiappone testified that he administered a number of tests to Appellant and that Appellant "scored in the what are called the border range of mental retardation." [sic] [H]e functions at the second or third percentile of the general population." Trial Tr. at 981.

Dr. Nelson, who did not visit, interview, or test Appellant, or even testify at the evidentiary hearing in support of his report, says on page 3 of his report (Hearing Exhibit 1, March 21, 2005 Dr. Nelson Report): "It appears that Mr. O'Neal is functioning in the Mild MR to Borderline range of intelligence." [sic]

Dr. Tureen, who visited with, interviewed, and tested Appellant both in 1994 before trial and in 2004 before preparing his latest report -- and who testified at the mitigation phase of the trial and at the evidentiary hearing -- says at pages 9 to 10 of his report (Hearing Exhibit C, January 18, 2005 Dr. Tureen Report): "In conclusion, it is this examiner's opinion that there is evidence to support a diagnosis of mild mental retardation effecting James Derrick O'Neal, as outlined in the AAMR criteria for mental retardation. Furthermore, the level of intellectual functioning is as least in part related to cerebral dysfunction from an early age. It is my opinion that Mr. O'Neal clearly meets the criteria for I.Q. level, which has been consistently established in the retarded range, since grade school and he meets the criteria of the initiation of the retardation as before the age of eighteen."

The trial court apparently was not satisfied that Appellant has consistently scored well below 70 on his IQ tests. The trial court was apparently troubled by the fact that psychology is not an exact science, that there is a "standard error of measurement." While the United States

22

Supreme Court in <u>Atkins</u> placed the "cutoff IQ score for the intellectual functioning prong of the mental retardation standard "between 70 or 75 or lower," and the Ohio Supreme Court in <u>Lott</u> placed the cutoff IQ score at which a defendant is presumptively deemed not to be mentally retarded at "above 70," the trial court decided to amend the standard, to create a new standard in which a "Defendant must present the court with IQ scores of 64 or below."

As Dr. Tureen carefully and thoughtfully explained on cross-examination in his hearing testimony, these tests have long been recognized to have standard errors of measurement:

> Q.  Is it correct to generalize that the IQ score that you come up there [sic] can vary either five degrees over or five degrees under?
>
> A.  They can, yes.
>
> Q.  So an IQ score of 71 could be 76 or 66?
>
> A.  It's possible, sure. Again, I think the important point that I have been trying to make here is the consistency of the pattern from a very early age on IQ measures.
>
> Q.  The point that I'm trying to make is it could be anywhere in that range, so we can't say for sure the exact number. Would that be correct?
>
> A.  That would be correct except that traditionally that [sic] we take the number, and if you read reports of -- as in this report -- if you read reports that that what the IQ is, you state it's 67, not that it's in a range from X to Y.

Hrg. Tr. at pages 37-38.  And as explained cogently by the AAMR:

> Although not perfect, intelligence is represented by Intelligence Quotient (IQ) scores obtained from standardized tests given by a trained professional. In regard to the intellectual criterion for the diagnosis of mental retardation, **mental retardation is generally thought to be present if an individual has an IQ test score of <u>approximately</u> 70 or below**. An obtained IQ score must always be considered in light of its **standard error of measurement**, appropriateness, and **consistency** with administration guidelines.

23

> **Since the standard error of measurement for most IQ tests is approximately 5, the ceiling may go up to 75**. This represents a score approximately 2 standard deviations below the mean, considering the standard error of measurement.

American Association of Mental Retardation (AAMR), Definition of Mental Retardation, What is Intelligence?, http://www.aamr.org/Policies/faq_mental_retardation.shtml (emphasis added).

In sum, the consistent pattern, over a long period of years, of Appellant's IQ score being well under 70 is sufficient to show, by a preponderance of the evidence, that Appellant does suffer from significantly subaverage intellectual functioning. The trial court's conclusion that Appellant could only meet his burden by presenting the trial court with "IQ scores of 64 or below" is contrary to the constitutional standard established in _Atkins_ and as explained and applied in _Lott_. The conclusion that Appellant does not suffer from significantly subaverage intellectual functioning should be reversed as contrary to law and not based on competent, credible, reliable evidence.

### Second Issue Presented for Review

> Whether the trial court's conclusion -- that Appellant is able to adequately perform some adaptive behavioral skills -- is sufficient to outweigh the preponderance of the evidence that Appellant has significant limitations in at least two adaptive behavior skills, namely academic skills and social skills.

The trial court concluded that Appellant does not suffer from significant limitations in two or more adaptive behavior skills. Decision Denying Defendant's Motion To Vacate Or Set Aside His Death Sentence at page 10. The court states:

> Defendant argues that he suffers from significant limitations in two or more adaptive skills. Dr. Tureen was the only psychiatric expert to offer any support to Defendant's position. Conversely, the respective opinions of two of the three experts available to the court clearly indicate that Defendant does not have significant limitations in two or more adaptive skills.

24

\*\*\*

> Defendant was capable of positive communication, self-care and self-direction. Defendant provided for his family, and fought for custody of his children. He consistently held jobs, and earned high endorsements from his supervisors. **These are not the actions of a man who is incapable of adapting to society's needs.**

Id. (emphasis added)

The trial court's conclusion that, because Appellant is not limited in all adaptive skills but only in a few, he is not mentally retarded, is incorrect as a matter of law.

The definition of mental retardation -- be it the definition of the American Association of Mental Retardation, the definition of the American Psychiatric Association, the constitutional definition set out by the United States Supreme Court in Atkins, or the definition adopted by the Ohio Supreme Court in Lott -- does not require that to qualify as "mentally retarded" an offender must be profoundly mentally retarded. The execution of a person who is mildly mentally retarded is unconstitutional under Atkins. Indeed, the expanded AAMR definition of "mental retardation" expressly contemplates that:

> **"Within an individual, limitations often coexist with strengths."**

American Association of Mental Retardation (AAMR), Definition of Mental Retardation, What is Intelligence?, http://www.aamr.org/Policies/faq_mental_retardation.shtml (emphasis added).

The thrust of the government's questions and argument at the evidentiary hearing was, essentially, that Appellant does not meet the definition of mental retardation because he was able to go to school, drive a car, get married, have children, be a Marine, and hold various jobs (ignoring how poorly Appellant generally fared in almost all of these areas). Respondent's questions and arguments during the evidentiary hearing suggest that to be "mentally retarded" as defined by Atkins an offender must be profoundly mentally retarded and have significant

25

limitations in <u>ALL</u> adaptive behavior skills. That obviously is not the law. Appellant is aware of no precedent that holds that a person who is able to do these things, but who has significant limitations in two or more adaptive skills, is not mentally retarded.

The law is the three-part test. The question is not whether Appellant has some strengths -- he obviously does. The question is whether Appellant meets the three-part test, the third part pertaining to significant limitations in two or more adaptive skills.

The trial court concluded that while Dr. Tureen's evidence supported Appellant's assertion that he does have significant limitations in at least two adaptive skills, Dr. Tureen is outnumbered two-to-one by Dr. Chiappone and Dr. Nelson. The problem with this conclusion is that it ignores what Dr. Chiappone testified to at the mitigation phase of the trial and it ignores what Dr. Nelson says in his report.

Dr. Chiappone testified that Appellant had a "[l]ack of coping skills" which, along with other factors, "made it more difficult for him to effectively problem solve." Trial Tr. at 996.

Dr. Nelson, who did not visit, interview, or test Appellant, or even testify at the evidentiary hearing in support of his report, nevertheless agrees that: "It is clear that Mr. O'Neal has difficulties in dealing with stressful situations in an effective manner and does not think through the consequences of his behavior very well." Hearing Exhibit 1, March 21, 2005 Dr. Nelson Report, at page 5. While Dr. Nelson goes on to say that this same problem is experienced by "individuals who function at higher levels of intelligence," he does not deny that Appellant's limitation in this area is evidence of a problem with his social skills or that this limitation is caused by mental retardation. Moreover, Dr. Nelson concedes that: "Mr. O'Neal does seem to exhibit significant deficits in <u>several</u> conceptual areas (i.e., reading, money concepts). <u>Id</u>. (emphasis added). Finally, Dr. Nelson says expressly that: "I would agree that Mr. O'Neal

26

certainly has evidenced difficulties in his adaptive functioning in situations involving emotional intensity." Id. While Dr. Nelson attributes these difficulties to "psychiatric difficulties," he fails to provide any basis for concluding that these difficulties are not caused by Appellant's mental retardation. Importantly, Dr. Nelson was not available to have his assertion cross-examined.

Dr. Tureen testified at Appellant's October, 1995 trial that Appellant is "an individual who's going to have some limitations on how well they're [sic] going to be able to function. ∗∗∗ By cognitive thinking general problems involving memory, spatial and statistical skills, language usage, as well as motor skills. [sic] And on that particular exam he performed well into the impaired range. You take that performance and put it together with the IQ level and you see an individual who is going to have some sort of difficulties in adjusting in the world." Trial Tr. at 1003. He added that persons like Appellant would have "some real limitations of what they're going to be able to do in life and what they're going to be able to accomplish." Trial Tr. at 1005. Finally, Dr. Tureen testified on cross-examination that Appellant "was functioning in the mildly mentally retarded to borderline range." Trial Tr. at 1009.

At the evidentiary hearing on May 17, 2005 Dr. Tureen testified specifically in terms of the constitutional standard of mental retardation and the requirement of the third prong of the test that requires significant limitations in two or more adaptive skills. In particular, Dr. Tureen testified that Appellant has significant limitations in both academic/conceptual skills as well as social skills. Hrg. Tr. at 30-33.

Assuming, for the sake of argument, that Dr. Chiappone's and Dr. Nelson's evidence did not support the conclusion that Appellant suffers from significant limitations in two or more adaptive skills, the trial court was incorrect in failing to substantially discount the evidence provided by both doctors.

27

Dr. Chiappone did offer testimony during the mitigation phase of Appellant's trial that Appellant was not mentally retarded. But Dr. Chiappone testified to present general mitigation testimony, not to testify as to whether or not Appellant was mentally retarded. At the time of Appellant's trial the law was that of <u>Penry v. Lynaugh</u> that it was not unconstitutional to impose a sentence of death on a mentally retarded person. <u>Atkins v. Virginia</u> was not the law then and Appellant's possible mental retardation was not at issue. Neither Dr. Chiappone nor Dr. Tureen were examined at Appellant's trial with explicit reference to the definition of mental retardation by the American Association of Mental Retardation or the American Psychiatric Association or with specific reference to the long list of adaptive behavior skills. Therefore, it was unreasonable for the trial court not to discount the reliability and the credibility of the evidence provided by Dr. Chiappone from 1994 and 1995.

It was also unreasonable for the trial court not to severely -- if not totally -- discount the reliability, credibility, and competence of the evidence provided by Dr. Nelson. Remember that Dr. Nelson failed to meet, interview, or test Appellant, or even testify at the evidentiary hearing in support of his report. He was not called to testify by the government and his opinions were not subject to cross-examination as were those of Dr. Tureen. Moreover, the American Psychological Association's "Specialty Guidelines for Forensic Psychologists" Part VI(H) states:

> Forensic psychologists avoid giving written or oral evidence about the psychological characteristics of particular individuals when they have not had an opportunity to conduct an examination of the individual adequate *to the scope of* the statements, opinions, or conclusions to be issued. Forensic psychologists make every reasonable effort to conduct such examinations. **When it is not possible or feasible to do so, they make clear the impact of such limitations on the reliability and validity of their professional products, evidence, or testimony.**

Here, Dr. Nelson did not suggest that his failure to meet, interview, or test Appellant limited the reliability and validity of his opinions and the trial court failed to take these limitations into

account. Therefore, the trial court's conclusion that Appellant did not meet his burden of proving that he is suffering significant limitations in two adaptive behavioral skills -- academic and social skills -- is not supported by competent, credible, and reliable evidence and is contrary to law.

### Third Issue Presented for Review

>    Whether the trial court's reliance on the February, 1968 assessment of Appellant by Cincinnati Public School psychologist Ruth Kauffman when Appellant was 14 years old -- in which Appellant obtained a full scale IQ test score of 64 and in which the psychologist recommended Appellant for the Junior High Slow Learning Program due to "below normal intellectual functioning" -- for the conclusion that Appellant's mental retardation did not become manifest before age 18 is against the weight of the evidence and contrary to law.

The trial court concluded that Appellant did not proved by a preponderance of the evidence that his mental retardation became manifest before he became 18. Decision Denying Defendant's Motion To Vacate Or Set Aside His Death Sentence at page 10. The court states:

> **Defendant's February 9, 1968 IQ score of 64 demonstrates that he was functioning at a subaverage intellectual level at age 14.** However, Dr. Ruth Kaufman's 1968 Wechsler Intelligence Test for Children also indicated "superior" performance on tasks requiring judgment in social situations, and "effective functioning" in his knowledge of vocabulary and recall of information. *Id.* (See Dr. Nelson III Report, p.3, 3/21/05). **Subaverage intellectual functioning is only one prong of the three prong conjunctive test enumerated in *Lott*.** *Lott*, 97 Ohio St.3d 305 (2002). Dr. Kaufman's statement indicates that despite Defendant's sub-70 IQ, he was not suffering from significant limitations in two or more adaptive skills. This demonstrates that all three prongs of the three prong conjunctive test were not met in 1968. **Thus, Defendant has not met his burden of proving by a preponderance of the evidence that he was mentally retarded before age 18.** *Id.* at 307.

The trial court thus construes the <u>third prong</u> of the constitutional standard of mental retardation -- the American Association of Mental Retardation saying that mental retardation "manifests

before age 18" and the American Psychiatric Association saying that "onset must occur before age 18 years" -- to subsume both of the other prongs of the constitutional standard. In other words, the trial court holds that in order for a defendant to prove that his mental retardation "manifested" itself or that his mental retardation "onset" before he turned 18 years of age he must prove, by a preponderance of the evidence that he had significantly subaverage intellectual functioning and significant limitations in the adaptive behavior as expressed in two or more conceptual, social, and practical skills before the age of 18.

There are at least three reasons why the court's reasoning fails.

First, although the trial court concedes that school psychologist Ruth Kaufman's assessment showed that Appellant "was functioning at a subaverage intellectual level at age 14," the court resorts to a rather stinted and selective reading of Dr. Kaufman's report in order to conclude that Appellant did not prove that "he was mentally retarded before age 18." If the trial court is willing to accept Dr. Kaufman's conclusion that Appellant had "below normal intellectual functioning" why doesn't the trial court also accept Dr. Kaufman's conclusion that Appellant was "moderately retarded"? Why does the trial court gloss over the last paragraph on the first page of Dr. Kaufman's report where she says: "When tasks required that he work toward an unknown goal or concentrate on visual cues, he gave an extremely defective performance. Spatial reasoning was also very poor for his age. Moreover, his knowledge of vocabulary and recall of information indicated defective reasoning." And why does the trial court ignore the last sentence in Dr. Kaufman's report where she says: "Emotional problems also interfere with James' school achievement and should be investigated"? It is apparent that Dr. Kaufman, as a good professional, recognized that a mentally retarded person can have strengths as well as limitations.

30

And her assessment clearly identifies a number of conceptual and social skills. The trial court's conclusion is therefore not supported by the record.

Second, assuming, for the sake of argument, that Dr. Kaufman's report did not indicate significant limitations in two or more adaptive skills, it would be the height of unfairness and unreasonableness to expect that a school psychologist -- whose role is primarily to place students in the most appropriate academic program and to identify emotional problems that might "interfere with academic achievement" -- would make a comprehensive and thorough analysis of whether a particular 14 year old student satisfies all the prongs of the definition of mental retardation. There is no evidence that Dr. Kaufman was or is a forensic psychologist or that she had any reason to determine whether Appellant was mentally retarded in constitutional terms.

Third, and perhaps most importantly, the trial court's holding -- that Appellant had to prove by a preponderance of the evidence that he met all three prongs of the constitutional standard before age 18 rather than just the "onset" or "manifestation" of mental retardation before age 18 -- appears to be yet another creative reformulation of the constitutional standard enunciated in <u>Atkins</u> and in <u>Lott</u>.

"Onset" is generally defined as "a start" or "a beginning." "Manifestation" is defined as "an indication of the existence, reality, or presence of something." The definitions of the two words "onset" and "manifestation" show that the third prong of the constitutional standard of mental retardation only means that there be a start or a beginning or an indication of the existence of something. "Onset" and "manifestation" do not connote full-blown, conclusive evidence meeting in detail of all aspects of the definition of "mental retardation."

To hold that a defendant, to be deemed mentally retarded, must prove by a preponderance of the evidence in existence before he turned 18 that he then suffered from both significantly

31

subaverage intellectual functioning and significant limitations in two or more adaptive skills is a burden that very few mentally retarded people could meet. Dr. Kaufman's report actually satisfies the trial court's unduly expansive definition of the "onset before the age of 18" prong. But it is not realistic to generally expect school psychologists to do a comprehensive, thorough forensic analysis of every student who might be a candidate for mental retardation to establish whether or not the student meets the criteria of mental retardation that might possibly someday exempt that student from the death penalty or might qualify that student someday for certain medical or government benefits.

The trial court's conclusion, therefore, that Appellant failed to prove "onset before the age of 18" is not supported by competent, credible, reliable evidence and is contrary to law.

CONCLUSION

For all of the foregoing reasons the September 26, 2005 judgment of the trial court denying Appellant's petition to vacate or set aside his death sentence based on his claim that he is mentally retarded and not subject to the death penalty under the Supreme Court's decision in Atkins v. Virginia should be reversed on the ground that it is not based on competent, credible, or reliable evidence and violates Appellant's right to be free from cruel and unusual punishment under the Eighth Amendment and his right to due process of law under the Fourteenth Amendment to the United States Constitution.

This Court should hold that Appellant is mentally retarded and set aside and vacate his sentence of death.

Respectfully submitted,

JOHN J. GIDEON (0008151)
250 East Stanton Avenue
Columbus, Ohio 43214-1268
(614) 844-3954

and

MICHAEL W. KRUMHOLTZ (0009099)
Bieser, Greer & Landis, LLP
6 North Main Street, Suite 400
Dayton, Ohio 45402-1908
(937) 223-3277

COUNSEL FOR APPELLANT

33

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Brief of Petitioner-Appellant was served on

Joseph T. Deters, Prosecuting Attorney, and Philip R. Cummings, Assistant Prosecuting

Attorney, 230 East Ninth Street, Suite 7000, Cincinnati, Ohio 45202, by regular U.S. Mail,

postage prepaid, on this ___24th___ day of March, 2006.


JOHN J. GIDEON (0008151)
Counsel for Appellant

34

## APPENDIX

PAGE

Findings of Fact, Conclusions of Law, and Entry Dismissing Petition
  to Vacate .............................................................................................................. A-1

35

ENTERED &
SCANNED
SEP 26 2005
IMAGE 12

**COURT OF COMMON PLEAS**
**HAMILTON COUNTY, OHIO**

STATE OF OHIO,     : Case No. B-9309022

   Plaintiff,    : Judge Mark Schweikert

-vs-        : **DECISION DENYING**
          : **DEFENDANT'S MOTION**
JAMES DERRICK O'NEAL,  : **TO VACATE OR SET ASIDE**
          : **HIS DEATH SENTENCE**
          :
   Defendant.    :

   This matter is before the court on Defendant James Derrick O'Neal's First Successive Petition to Vacate or Set Aside his death sentence. Defendant argues that he is mentally retarded, and thus not subject to the death penalty pursuant to the Supreme Court's decision in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242 (2002). In *Atkins* the United States Supreme Court held that the Eighth Amendment to the United States Constitution, barring "cruel and unusual punishments," prohibits the execution of a person who is mentally retarded. *Id.* The Court has reviewed the entire record in this matter, including any and all evidence relating to Defendant's mental status that was produced at pretrial, trial, at the mitigation hearing, submitted with his petition herein, the testimony of witnesses at the evidentiary hearing on this petition and the reports of experts submitted in evidence by both parties. The Court has also considered the memoranda and the arguments of counsel. Based on the above the court makes the following findings.

**A-1**

## Case History

James O'Neal was indicted on December 16, 1993. The jury found the Defendant guilty of two counts of aggravated murder in counts 1 and 2 as well as the aggravated burglary charge in count 4. Following a penalty hearing, the jury recommended the death penalty on both aggravated murder counts. On December 11, 1995 this court sentenced Defendant to death. The Ohio Supreme Court affirmed the judgment and denied Defendant's petition for writ of certiorari on May 21, 2001. This court denied Defendant's initial post conviction petition on February 17, 1998. The First District Court of Appeals affirmed the decision. The Ohio Supreme Court denied jurisdiction on March 8, 2000. Defendant's petition for a writ of habeas corpus is presently stayed in federal court pending exhaustion of state remedies.

On November 15, 2002, Defendant filed his First Successive Petition to Vacate or Set Aside Sentence based upon the *Atkins* decision. *Atkins*, 536 U.S. 304 (2002). On April 7, 2004 this court issued Findings of Fact, Conclusions of Law, and an Entry Dismissing Defendant's Successive Petition filed pursuant to *Atkins v. Virginia*. The First District Court of Appeals subsequently issued an Entry Dismissing Defendant's Appeal by Agreement and remanded the case to this court for an evidentiary hearing. On May 17, 2005 this court held a hearing on Defendant's petition.

## Atkins and Lott

As mentioned above, in *Atkins* the United States Supreme Court held that it is a violation of the Eighth Amendment's bar to cruel and unusual punishment to sentence a mentally retarded offender to death. *Id.* at 321. The *Atkins* Court proscribed the execution of the mentally retarded, however it did not establish clear procedures for



ENTERED &
SCANNED
SEP 26 2005
IMAGE

O'Neal Apx. Vol. XI
Page 143

determining whether an individual is "mentally retarded" for purposes of escaping execution. Instead, it left it to the states to "develop appropriate ways to enforce the constitutional restrictions" on executing the mentally retarded. *Id.* at 317.

In *State v. Lott*, the Ohio Supreme Court prescribed the standards and procedural guidelines for determining whether convicted petitioners facing the death penalty are mentally retarded. *State v. Lott*, 97 Ohio St.3d 303, 779 N.E.2d 1011 (2002). The *Lott* Court determined that, "[c]linical definitions of mental retardation, cited with approval in *Atkins*, provide a standard for evaluating an individual's claim of mental retardation." *Id.* at 305. "These definitions require (1) significantly subaverage intellectual functioning, (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self direction, and (3) onset before the age of 18." *Id.* "There is a rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70." *Id.*

In the case sub judice, the question of whether Defendant is mentally retarded should be decided by the court and does not represent a jury question. *Id.* at 306. "In considering an *Atkins* claim, the trial court shall conduct its own de novo review of the evidence in determining whether the defendant is mentally retarded." *Id.* "The trial court should rely on professional evaluations of [Defendant's] mental status, and consider expert testimony, appointing experts if necessary in deciding [the] matter." *Id.* "The trial court shall make written findings and set forth its rationale for finding the defendant mentally retarded or not mentally retarded." *Id.* "[Defendant] bears the burden of establishing that he is mentally retarded by a preponderance of the evidence." *Id.* at 307.

In the case at hand, Defendant has failed to meet his burden. Based on the entire record, including the testimony of experts, professional evaluations of Defendant's

ENTERED & SCANNED

SEP 26 2005

IMAGE 14

Vol. XI
Page 144

3

A-3

mental status, and Defendant's history, it is the decision of this court that Defendant is not mentally retarded. Therefore, his motion to vacate or set aside his death sentence is denied.

### Findings of Fact

Three expert psychologists, including Dr. Michael Nelson III, Dr. Chiappone, and Dr. Robert Tureen provided this court with their respective expert opinions. To determine Defendant's level of intellectual functioning, all three psychologists evaluated his IQ scores. Additionally, the three experts used information obtained from interviews with Defendant and Defendant's history to determine whether he has significant limitations in adaptive skills. Two of the three experts concluded that Defendant is not mentally retarded. Dr. Tureen was the only expert to lend any support to Defendant's position.

On February 9, 1968 Defendant took a *Wechsler Intelligence Test for Children* administered by Dr. Ruth Kaufman, school psychologist for *Cincinnati Public Schools.* Defendant's score indicated a full scale IQ of 64. (See Dr. Nelson III Report, p.3, 3/21/05). However, the same test indicated "superior" performance on tasks requiring judgment in social situations, and "effective functioning" in his knowledge of vocabulary and recall of information. *Id.* This court finds Dr. Kaufman's assessment of Defendant's IQ and social functioning credible.

This court further finds that Dr. Chiappone's assessment of Defendant's IQ and his level of social adaptability are also credible. Defendant's score on a 1994 Wechsler Adult Intelligence Scale-R indicated an IQ of 71. *Id.* Dr. Chiappone concluded that Defendant was not mentally retarded. *Id.* At trial on November 6, 1995 Dr. Chiappone


ENTERED &
SCANNED

SEP 2 0 2005

IMAGE *15*

... Vol. XI
Page 145

testified that, "Defendant's fundamental skills were a bit higher than his attained intellect." (Tp 981-982). He also testified that Defendant understood the proceedings, knew "the difference between what's right and what's wrong" and was "capable of formulating a plan," such as "killing someone." *Id.* at 993.

In 2004, Defendant obtained a score indicating an IQ of 67 on the Wechsler Adult Intelligence Scale administered by Dr. Tureen. (See Dr. Nelson III Report, p. 4, 3/21/05). He also received a score indicating an IQ of 63 on the Reynold's Intellectual Scales Test. *Id.* However, Dr. Tureen concluded that "[Defendant's] general language, his auditory comprehension and general verbal expression and his ability to follow instructions were all intact, within his level of intellectual functioning, that is, of an individual with an IQ in the *"borderline to mildly retarded range."* (See Dr. Tureen's Report, pp. 5-6, 1/18/05) (Emphasis added). Conversely, Dr. Tureen testified on 5/17/05 to his belief that *Defendant meets the requirements necessary to be labeled mentally retarded because he has* "low IQ scores in the mentally retarded range". (Tp. 29).

There is an apparent unexplained deviation between Dr. Tureen's testimony that Defendants IQ scores were conclusively "in the mentally retarded range" at the hearing of 5/17/05 and his conclusion that Defendant was functioning at the "borderline to mildly retarded range" articulated in his 1/18/05 report to the court.

It is apparent to this court that the psychiatric community has adopted the Wechsler Intelligence Scale as the standard for determining intelligence. Even Dr. Tureen (the only Dr. in this case who chose to administer the Reynold's Test) conceded that the Wechsler Test is the "Gold Standard" of intelligence assessment. (See Dr. Tureen's Report, 1/18/05). While the Wechsler Test is the standard, it is not flawless.

ENTERED &
SCANNED
SEP 26 2005
IMAGE 16

According to Dr. Nelson, there is a measurement error of approximately 5 points in assessing IQ, although this may vary from instrument to instrument. (See Dr. Nelson III Report, p. 1, 3/21/05). In Dr. Tureen's report of 1/18/05 he acknowledged the standard margin of error: "Thus there is a reasonable probability that [Defendant's] true score lies below the established score of 70, representing mental retardation, but also a reasonable probability that his true score lies above that particular level." (See Dr. Tureen's Report, p. 5, 1/18/05). The standard margin of error for IQ tests seems to be an accepted principal in the scientific community. As such, this court finds that there is a standard margin of error of at least five points for IQ tests. For example, a Wechsler IQ of 70 is considered to represent an IQ between 65 and 75. Defendant's IQ score of 71 in 1994 could place him anywhere between 66 and 76 on the scale of intelligence. His score of 67 in 2004 could place him anywhere from 62 to 72 on the IQ scale. The five point standard of error makes it difficult to determine whether Defendant is functioning at or above the 70 level. In *Lott* the Ohio Supreme Court faced the same difficulty. *Lott*, 97 Ohio St.3d 303 (2002).

The *Lott* Court found that Lott had an IQ of 72. It also acknowledged the existence of a standard margin of error of five points for IQ test scores. *Id.* at 304. Even if this court decided to interpret Defendant's IQ scores to indicate that he has sub-average intellectual functioning (which it does not), Defendant would still have to prove by a preponderance of the evidence that he has significant limitations in two or more adaptive skills such as communication, self-care, and self direction. *Lott*, 97 Ohio St.3d 303, 305 (2002).

ENTERED & SCANNED

SEP 2 6 2005

IMAGE

O'Neal Apx. Vol. XI
Page 147

This court finds credible Dr. Nelson's, conclusion that Defendant does not meet the definition of mental retardation that involves significantly subaverage intellectual functioning, concurrent deficits or impairments in present adaptive functioning, and the onset before age 18 years. (See Dr. Nelson III Report, p. 6, 3/21/05) (Emphasis added). He determined that "[Defendant's] social skills abilities can become compromised at times, although this is more related to his drug usage and characterological/personality deficits than to any intellectual/cognitive deficits." *Id.*

Dr. Chiappone testified that Defendant's level of adaptive functioning was "much higher" than his obtained level of intelligence would suggest. (Tp 981, 992). "He actually functions on a much higher level than his attained IQ." (Tp 992, 1004). Additionally, Dr. Chiappone testified that Defendant "is not retarded"…[because] "I think his fundamental skills are a bit higher than his attained intellect." (Tp 981-982). This court finds that Defendant's level of adaptive functioning is considerably higher than his attained intellect.

In his January 18, 2005 report Dr. Tureen stated that "[Defendant's] limited intellectual ability affects his adaptability." (See Dr. Tureen Report, p. 9, 1/18/05). He stated, "[e]vidence has been provided to indicate that there is impairment in the area of social adaptability." *Id.* However, he also concluded that Defendant was functioning in the "mild to borderline mental retardation" range. *Id.* at 6. Thus, Dr. Tureen's report indicates that despite Defendant's impairment in social adaptability, he was unable to determine with certainty whether Defendant was mentally retarded. Even though Dr. Tureen did not take a clear position on whether Defendant was mentally retarded, he did conclude that he suffered from impairment in social adaptability. This court finds his

ENTERED &
SCANNED
SEP 28 2005
IMAGE 12

conclusion that Defendant suffered from impairment in social adaptability credible. However, this court finds the respective opinions of Dr. Chiappone, and Dr. Nelson credible as well.

Additionally, as the State enumerates, Defendant's history lends further support to the position that he has sufficient adaptive skills, and therefore is not mentally retarded. Defendant's mother described him as a "normal kid" (Tp 918). Defendant fought for and obtained custody of his children. (Tp 921-925). He served in the Marines from 1972 to 1975, rising to the rank of Lance Corporal. (See Dr. Nelson III Report, p. 5, 3/21/05). Defendant worked at Aerotek for four consecutive years. (Tp 923). He began working at Kenwood Country Club on 4/1/93 as a dishwasher/ floor cleaner. (Tp 959). Defendant's supervisor noted that Defendant "had a very strong work ethic and when he was there he did a fabulous job for us" (Tp. 959). Defendant's supervisor also testified that he "observed [Defendant] at least on three occasions that are clear, that he kind of stepped in the middle as a peace maker and separated a couple guys that were going at it" (Tp 961).

After returning home from prison after some drug problems, Defendant dedicated himself to turning his life around. His childhood friend testified that Defendant made a 360 degree turn after he was released from prison. (Tp 934). He further testified he no longer was "hustling and selling drugs and running the streets." *Id.*

### Conclusions of Law

As stated above, in *State v. Lott* the Ohio Supreme Court prescribed a three part test for determining whether convicted petitioners facing the death penalty are mentally retarded. *Lott*, 97 Ohio St.3d 303 (2002). The test includes: "(1) significantly subaverage intellectual functioning, (2) significant limitations in two or more adaptive

ENTERED &
SCANNED

SEP 26 2005

IMAGE 19

Appeal Appx Vol. XI
Page 149

skills, such as communication, self-care, and self direction, and (3) onset before the age of 18." *Id.*

### (1) Defendant Does Not Suffer From Significantly Subaverage

### Intellectual Functioning.

According to all three experts who provided opinions for the court, a sub-70 IQ points to significantly subaverage intellectual functioning. Pursuant to the Ohio Supreme Court's decision in *Lott*, Defendant's IQ score of 71 in 1994 triggered a rebuttable presumption that he is not mentally retarded. *Id.* Defendant contends that the presumption that he is not mentally retarded is rebutted by his two tests that point to a sub-70 IQ. This court agrees. However, Defendant also bears the burden of proving by a preponderance of the evidence that he suffers from significantly subaverage intellectual functioning. *Id.* at 307.

The Ohio Supreme Court determined that a score of 70 or above raised a rebuttable presumption that a defendant is not mentally retarded, but it did not ignore the aforementioned five point standard of error completely. *Id.* at 304. As such, to meet his burden, Defendant must present the court with IQ scores of 64 or below. Based on the standard margin of error, Defendant's IQ test score of 67 means his true score could place him anywhere between the 62 and 72 range. Furthermore, his February 9, 1968 IQ score of 64 is not a recent one, and at best provides the court with equal evidence as to whether Defendant suffers from significantly sub-average intellectual functioning. Therefore, Defendant has failed to prove the first prong of the test enumerated in *Lott* by a preponderance of the evidence. *Id.* at 307. This conclusion could end the court's



ENTERED &
SCANNED

SEP 26 2005

IMAGE