## CERTIFICATE OF SERVICE

    I hereby certify that I have sent a copy of the foregoing Brief of Plaintiff-Appellee, by United States mail, addressed to John J. Gideon (0008151), 250 East Stanton Avenue, Columbus, Ohio 43214-1268, and Michael W. Krumholtz (0009099), 6 North Main Street, Suite 400, Dayton, Ohio 45402-1908, counsel of record, this 13 day of July, 2006.

                                          Philip R. Cummings, 0041497P
                                          Assistant Prosecuting Attorney

## COURT OF APPEALS

Judges:
Rupert A. Doan
Lee H. Hildebrandt, Jr.
Robert H. Gorman
Mark Philip Painter
J. Howard Sundermann, Jr.
Sylvia S. Hendon

FIRST APPELLATE DISTRICT OF OHIO
William Howard Taft Law Center
12th Floor, 230 East Ninth Street
Cincinnati, Ohio 45202-2138

Mark E. Combs
Court Administrator

Molly Leonard
Assistant Administrator

August 2, 2006

**FILED**
**COURT OF APPEALS**

AUG - 2 2006

GREGORY HARTMANN
CLERK OF COURTS
HAMILTON COUNTY

(513) 946-3500
Fax: (513) 946-3412

John Gideon
250 East Stanton Avenue
Columbus, OH 432140000

C050840

D69441987

Re: **State of Ohio vs. James Derrick O'Neal**

Counselor:

On 10/3/2006 the above case is set for hearing on the merits at **9:00 a.m.** in **Courtroom B of the Court of Appeals, 12th Floor, William Howard Taft Law Center, 230 East Ninth Street, Cincinnati, Ohio 45202.**

Counsel is advised that the setting for this case has **priority over all trial settings later established.** Counsel should attempt to alleviate any conflicts. But, if an irreconcilable conflict develops, counsel shall notify, in writing, this court and all opposing counsel at least forty-five (45) days prior to the hearing.

If counsel wishes to submit this cause to the court without oral argument, counsel should, after conferring with opposing counsel, submit a written request for submission on the briefs. The request must be submitted at least three days before the hearing date. Counsel is reminded that the court reserves the right to deny or permit the request.

On the scheduled hearing date, all counsel shall report to the Court's Marshall in the main lobby immediately outside the courtrooms at **8:50 a.m.**

**SO ORDERED**

## COURT OF APPEALS

Judges:
Rupert A. Doan
Lee H. Hildebrandt, Jr.
Robert H. Gorman
Mark Philip Painter
J. Howard Sundermann, Jr.
Sylvia S. Hendon

**FIRST APPELLATE DISTRICT OF OHIO**
William Howard Taft Law Center
12th Floor, 230 East Ninth Street
Cincinnati, Ohio 45202-2138

Mark E. Combs
Court Administrator

Molly Leonard
Assistant Administrator

August 2, 2006

(513) 946-3500
Fax: (513) 946-3412

Michael Krumholtz
6 North Main Street
Ste. 400
Dayton, OH 45402-1908

C050840

Re:  **State of Ohio vs. James Derrick O'Neal**

Counselor:

On 10/3/2006 the above case is set for hearing on the merits at **9:00 a.m.** in **Courtroom B** of the **Court of Appeals, 12th Floor, William Howard Taft Law Center, 230 East Ninth Street, Cincinnati, Ohio 45202.**

Counsel is advised that the setting for this case has **priority over all trial settings later established.** Counsel should attempt to alleviate any conflicts. But, if an irreconcilable conflict develops, counsel shall notify, in writing, this court and all opposing counsel at least forty-five (45) days prior to the hearing.

If counsel wishes to submit this cause to the court without oral argument, counsel should, after conferring with opposing counsel, submit a written request for submission on the briefs. The request must be submitted at least three days before the hearing date. Counsel is reminded that the court reserves the right to deny or permit the request.

On the scheduled hearing date, all counsel shall report to the Court's Marshall in the main lobby immediately outside the courtrooms at **8:50 a.m.**

**SO ORDERED**

## COURT OF APPEALS

Judges:
Rupert A. Doan
Lee H. Hildebrandt, Jr.
Robert H. Gorman
Mark Philip Painter
J. Howard Sundermann, Jr.
Sylvia S. Hendon

**FIRST APPELLATE DISTRICT OF OHIO**
William Howard Taft Law Center
12th Floor, 230 East Ninth Street
Cincinnati, Ohio 45202-2138

Mark E. Combs
Court Administrator

Molly Leonard
Assistant Administrator

August 2, 2006

(513) 946-3500
Fax: (513) 946-3412

Philip Cummings
230 E. Ninth Street
Ste. 4000
Cincinnati, OH 452020000

C050840

Re:   State of Ohio vs. James Derrick O'Neal

Counselor:

On **10/3/2006** the above case is set for hearing on the merits at **9:00 a.m.** in **Courtroom B** of the **Court of Appeals, 12th Floor, William Howard Taft Law Center, 230 East Ninth Street, Cincinnati, Ohio 45202.**

Counsel is advised that the setting for this case has **priority over all trial settings later established.** Counsel should attempt to alleviate any conflicts. But, if an irreconcilable conflict develops, counsel shall notify, in writing, this court and all opposing counsel at least forty-five (45) days prior to the hearing.

If counsel wishes to submit this cause to the court without oral argument, counsel should, after conferring with opposing counsel, submit a written request for submission on the briefs. The request must be submitted at least three days before the hearing date. Counsel is reminded that the court reserves the right to deny or permit the request.

On the scheduled hearing date, all counsel shall report to the Court's Marshall in the main lobby immediately outside the courtrooms at **8:50 a.m.**

**SO ORDERED**

IN THE COURT OF APPEALS OF OHIO
FIRST APPELLATE DISTRICT
HAMILTON COUNTY

STATE OF OHIO,

    Respondent-Appellee,             APPEAL NO. C-050840

v.                                         TRIAL NO. B-939022

JAMES DERRICK O'NEAL,         DEATH PENALTY CASE

    Petitioner-Appellant.

---

APPELLANT JAMES O'NEAL'S NOTICE OF SUPPLEMENTAL AUTHORITIES

---

Appellant James O'Neal, pursuant to Rule 21(H) of the Ohio Rules of Appellate Procedure, hereby notifies the Court and opposing counsel of supplemental authorities in further support of the First Issue Presented For Review in his brief.

FILED
COURT OF APPEALS
AUG - 7 2006
GREGORY HARTMANN
CLERK OF COURTS
HAMILTON COUNTY

FILED 2006 AUG -7 P 2:26 GREGORY HARTMANN CLERK OF COURTS HAM. CNTY. OH

Respectfully submitted,

JOHN J. GIDEON (0008151)
250 East Stanton Avenue
Columbus, Ohio 43214-1268
(614) 844-3954

and

MICHAEL W. KRUMHOLTZ (0009099)
Bieser, Greer & Landis, LLP
6 North Main Street, Suite 400
Dayton, Ohio 45402-1908
(937) 223-3277

COUNSEL FOR APPELLANT

O'Neal Apx. Vol. XI
Page 185

1

## SUPPLEMENTAL AUTHORITIES

The May, 2006 issue of the American Psychological Association's journal, *Psychology, Public Policy, and Law,* contains an article, a copy of which is attached hereto: Flynn, James R., "Tethering the Elephant: Capital Cases, IQ, and the Flynn Effect," *Psychology, Public Policy, and Law,* 2006 May Vol. 12(2), 170-189.

In Walker v. True, 399 F.3d 315 (4th Cir. 2005), *after remand,* 401 F.3d 574 (4th Cir. 2005)(Luttig, J.), the United States Court of Appeals for the Fourth Circuit vacated and remanded the case to the district court to consider the "Flynn Effect," which, as stated by the Fourth Circuit, "posits that IQ scores rise over time and that IQ tests that are not 're-normed' to adjust for rising IQ levels will overstate a testee's IQ." 399 F.3d at 323.

The Tenth District Ohio Court of Appeals, in State v. Burke, 2005-Ohio-7020 (Dec. 30, 2005), in considering the "Flynn Effect" and precedents from other jurisdictions on the relevance of the "Flynn effect," ruled in ¶51: "We conclude that a trial court must consider evidence presented by the Flynn effect, but, consistent with its prerogative to determine the persuasiveness of the evidence, the trial court is not bound to, but may, conclude the Flynn effect is a factor in a defendant's IQ score."

Finally, attached is a chart entitled "James Derrick O'Neal: History of IQ Tests" applying the newly quantified adjustments to IQ test scores as specified in Dr. Flynn's article in the current issue of *Psychology, Public Policy, and Law,* cited above.

Respectfully submitted,

*/s/ John J. Gideon*
JOHN J. GIDEON (0008151)
250 East Stanton Avenue
Columbus, Ohio 43214-1268

(614) 844-3954

and

*Michael W. Krumholtz /JJG*
MICHAEL W. KRUMHOLTZ (0009099)
Bieser, Greer & Landis, LLP
6 North Main Street, Suite 400
Dayton, Ohio 45402-1908
(937) 223-3277

COUNSEL FOR APPELLANT

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Appellant James O'Neal's Notice of Supplemental Authority was served on Joseph T. Deters, Prosecuting Attorney, and Philip R. Cummings, Assistant Prosecuting Attorney, 230 East Ninth Street, Suite 7000, Cincinnati, Ohio 45202, by regular U.S. Mail, postage prepaid, on this ___4th___ day of August, 2006.

JOHN J. GIDEON (0008151)
Counsel for Appellant

Psychology, Public Policy, and Law
2006, Vol. 12, No. 2, 170–189

Copyright 2006 by the American Psychological Association
1076-8971/06/$12.00   DOI: 10.1037/1076-8971.12.2.170

# TETHERING THE ELEPHANT
## Capital Cases, IQ, and the Flynn Effect

James R. Flynn
University of Otago

Capital offenders cannot be executed if they are mentally retarded. Therefore, the IQ scores of offenders are important, and the U.S. 4th Circuit Court of Appeals has held that the Flynn effect is relevant to interpreting their IQ scores. The Flynn effect (IQ gains over time) means that different IQ tests will give different scores purely as a result of when the tests were normed. Because execution must not be a random result of what test defendants take, a formula is provided to convert IQ scores to a common metric: the norms current at the time the test was taken. The formula also includes a correction based on evidence that the Wechsler Adult Intelligence Scale—Third Edition inflates IQs because of sampling error. Given the inevitability that opposing experts will offer conflicting diagnoses, IQ scores merit special attention in capital cases.

*Keywords:* death penalty, mental retardation, IQ gains

> These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual.... The Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed. (Justice Stewart, in *Furman v. Georgia*, 1972)

> It is the mark of an educated man ... that in every subject he looks for only so much precision as its nature permits. (Aristotle, *Nichomachean Ethics*, 1, 3, 1094b, 24–26)

In *Furman v. Georgia* (1972), on behalf of the U.S. Supreme Court, Justice Stewart argued that the death penalty must be imposed with consistency and with due regard to the culpability of those who suffer its consequences. Thirty years later, in *Atkins v. Virginia* (2002), the Court held that the Eighth Amendment to the U.S. Constitution forbids the death penalty for those with mental retardation (MR). Subsequently, in *Walker v. True* (2005), the Fourth Circuit Court of Appeals held that in applying this standard, the "Flynn effect" had to be taken into account if it could be shown that it had affected the defendant's IQ score.

Because this effect bears my name, I have been approached by legal counsels in over a dozen postconviction cases and have sworn 11 affidavits in five states: Most cases were assessments of the IQ scores of defendants on death row; one was in support of a submission to the Florida Supreme Court advocating the relevance of the Flynn effect; another was a declaration requested by counsel for Walker (*Walker v. True*, 2005) when his case was returned to the court of appeals for decision.

---

Correspondence concerning this article should be addressed to James R. Flynn, Department of Political Studies, University of Otago, P.O. Box 56, Dunedin, New Zealand. E-mail: jim.flynn@stonebow.otago.ac.nz

O'Neal Apx. Vol. XI
Page 188

Similar submissions by others have been welcomed by the courts. In California, the court in *People v. Superior Court* (2005) said that the Flynn effect must be considered in determining a defendant's IQ and noted that its relevance appeared to be generally accepted in the clinical field. Over the last year or so, two federal courts of appeal and eight courts in six states have discussed its relevance (*Black v. State*, 2005; *Bowling v. Commonwealth*, 2005; *Ex parte Murphy*, 2006; *In re Hicks*, 2004; *Myers v. State*, 2005; *People v. Superior Court*, 2005; *State v. Burke*, 2005; *State v. Murphy*, 2005; *Walker v. True*, 2005; *Walton v. Johnson*, 2005). In the most recent of these (*Ex parte Murphy*, 2006), despite a defendant with an IQ of 81 on the Wechsler Adult Intelligence Scale—Revised (WAIS–R), the appellate court granted a stay of execution directing the trial court to resolve the issue of MR. How a defendant with a measured IQ of 81 might be classified as mentally retarded will become apparent.

Although I have no great desire to discourage attorneys from paying for my expert opinion, it seems propitious to make public some of the considerations and data that must be assimilated if the Flynn effect is to clarify rather than confuse. Hereafter I shall refer to it by its descriptive name: IQ gains over time.

### Relevance of IQ Gains Over Time

Most states that apply the death penalty have adopted a criterion for MR as both poor adaptive functioning and an IQ score of at least two standard deviations below the population mean, namely, an IQ of 70 or below. They have also recognized the possibility of measurement error in any particular test administration. This allows for the fact that a person's performance may vary from day to day because of his or her mood, general health, and so forth. Where there is only one test score on record, the effective criterion can be as high as 75.

Arguably, the court-administered criterion is more stringent than that set by the American Association on Mental Retardation (AAMR). First, the AAMR (2002, p. 58) recommends a score of approximately 70 to 75 irrespective of measurement error. This means that when there is a single testing, caution dictates a criterion of 75 to 80. Second, the AAMR (2002, p. 58) castigates states such as Connecticut for adopting fixed IQ scores as cutoff points for MR and stresses that IQ scores can be overridden by poor adaptive behavior and clinical judgment. The implication is that defendants who are classified as mentally retarded on behavioral criteria should not in addition have to produce a case based on IQ. However, defense attorneys find that the clinical judgments of prosecution and defense psychologists are almost always at variance and feel constrained to make a case in terms of IQ in order to be taken seriously. Both the courts and the AAMR specify that MR should be apparent during the defendant's developmental period, that is, prior to the age of 18.

The question of poor adaptive functioning usually turns on such sources of information as interviews and examinations of the offender by school or clinical psychologists, medical histories, failure to qualify for a driver's license or hold anything but an unskilled job, and testimony by family and friends as to degree of suggestibility. An IQ score at least two standard deviations below the mean carries weight because it isolates the bottom 2.27% of the defendant's age group. In practice, cases tend to fall into one of three categories:

172                                       FLYNN

1. During the defendant's school years, there was at least one clear diagnosis of MR consequent on inability to cope and a series of IQ scores at 70 or below.

2. The defendant was evaluated at school and was not diagnosed as mentally retarded. However, there is reason to believe that the diagnosis was affected by the fact that IQ scores were assumed to show that the defendant was less than two standard deviations below the mean when, in fact, they signaled the opposite.

3. The defendant never received a formal diagnosis prior to age 18, and therefore, prison diagnosis as an adult becomes crucial. Once again, IQ scores play a dual role: They must be interpreted properly to determine whether the IQ criterion of two standard deviations below the mean is met; and they must be interpreted properly so that clinical judgment of adaptive behavior is not influenced, perhaps subconsciously, by an inflated estimate of the defendant's standing relative to his or her peers.

The second and third categories pose the question of how a school psychologist or a court-appointed psychologist could be mistaken about whether an IQ score was two standard deviations below that of the average person. The answer is that all a score of 70 tells us is that someone was two standard deviations below the average person in a standardization sample, namely, the sample drawn to set the norms for the test that the person took. If the sample included only Americans with no more than a grade-school education, its norms would be too low. Someone who took that test and received a score of 85, a score one standard deviation below the average of those who set its norms, might actually be two standard deviations below the average American and might deserve a score of 70.

Imagine that there are IQ gains over time that run at a rate of 0.3 IQ points per year and therefore, over 50 years, total 15 points. That means that even if a sample were perfectly representative of Americans in 1950, it is no longer representative circa 2000. Indeed, in that context, its norms would be far too low. Assume that a schoolchild aged 10 in 2000 is two standard deviations below contemporary 10-year-olds and therefore deserves an IQ of 70. If you give that child a test 50 years out of date, he or she will get a score of 85 and appear to be only one standard deviation below average. Naturally, judges want to know whether defendants were actually two standard deviations below their peers at the time they were tested and not how they rank against a group selected at some random date in the past. Therefore, the question of IQ gains over time cannot be ignored. Presumably, judges will also wish to know whether some IQ tests produce suspect scores in the sense that they rank people against a group that was unrepresentative even at the time it was selected. After all, as shown above, substandard samples are simply deceptive. They engender test scores that indicate that someone is less than two standard deviations below the population mean when, in fact, their performance ranks them at that level or below.

### Recognition of the Relevance of IQ Gains

With the publication of the first systematic study of IQ gains in America (Flynn, 1984b), scholars began to adjust test results in the light of those gains. An early example was the famous Milwaukee Project. Garber (1988) had administered a variety of IQ tests to children who had been exposed to an enriched environment to estimate whether the intervention had reduced the risk of their