Table 4
Evidence That WAIS–R Scores Imply a Huge Variation in WISC IQ Gains by Age

| Age in years | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pattern implied[a] | 12.20 | 10.42 | 8.64 | 6.86 | 5.08 | 3.30 | 1.52 | -0.26 | -2.04 | -3.82 | -5.60 | -7.38 |
| Actual pattern[b] | — | — | 1.97 | 2.02 | 2.02 | 2.05 | 2.06 | 1.99 | 2.03 | 2.07 | 2.13 | |
| Number | — | — | 55 | 114 | 128 | 132 | 156 | 114 | 112 | 92 | 75 | |

Note.  Dashes indicate that no data were available. WAIS–R = Wechsler Adult Intelligence Scale—Revised; WISC = Wechsler Intelligence Scale for Children.
[a]"Pattern implied" shows the trend from WISC IQ gains to losses, over ages 5–16, that would have to exist to match WAIS–R losses at ages 16–17 (IQ level 55–70).
[b]"Actual pattern" shows the actual trend of WISC IQ gains by age, which evidences no tendency for gains to diminish from ages 7–15 (all IQ levels). The source of these data (Flynn, 1984a, Table 2), which have been analyzed and adapted for comparison, gives gains over a 24.5-year period, so they are reduced to cover a period of 6 years.

184                                                      FLYNN

according to the general rule. Anyone tested today should, of course, take the WAIS–III rather than the WAIS–R. The Psychological Corporation has made a determined effort to collect fuller low-IQ samples, so that the WAIS–III does not duplicate the WAIS–R's problems (Wechsler, 1997). To prevent any misunderstanding, *it should be noted that there is nothing wrong with using the WAIS–III* to assess whether someone is mentally retarded. It is not the test content but the test norms that pose problems. And these pose a problem only if the IQ scores they generate are taken at face value rather than adjusting them.

The numbers in the WAIS–R to WAIS–III data are scant. As for the rate of obsolescence since the WAIS–III was normed in 1995, we cannot be certain of the *rate until the WAIS–IV appears. It is to be hoped that the Psychological Corporation will offer a careful analysis of trends, one based on, say, 500 subjects.* In the meantime, we should use a rate of 0.3 points per year.

## Aristotle's Opinion

The *prefatory quotation from Aristotle is not intended as an appeal to authority but to encapsulate his wise advice: Do not ignore decent data just because it would be preferable to have perfect data.* Given the problems involved in selecting representative standardization samples and given the changes in scoring conventions at low-IQ levels, the emergence of the general rule is impressive. The rate of 0.3 points per year holds true, both at the mean and low-IQ levels, where the data are best—namely, the WISC data. Why are the WAIS data less perfect? It is because they represent adult data, and it is much more difficult to select representative samples of adults. With schoolchildren, as long as you locate a good sample of schools and test everyone, you are home free, whereas adults are not gathered together in one institution and can be located only if you visit all of their workplaces or homes. It is likely that adult samples can be accurate only to within a few points. It is particularly difficult to set adult norms at a level three standard deviations below the mean, where, typically, only 2 or 3 members of a standardization sample provide scores.

Confronting the total body of data, one can conclude either that the rate of gain is like the epicycles of ancient astronomy, with heavenly bodies moving forward to one point, then reversing themselves, then moving forward again; or that a coherent pattern shines through. The options that confront us are sobering: Adjust scores for obsolescence or accept scores likely to be misleading. Despite the difficulties with the WAIS data, I believe the choice is clear. This is an appeal to prudence but no worse because of that.

Table 1 supplies all of the information needed to adjust scores. It specifies when all Wechsler–Binet tests were normed, including the old WISC of 1947–1948 (as distinct from when they were published: usually a year or two later). It recommends deducting 0.3 IQ points per year from the scores of defendants for every year that passed between the date when the test was normed and the date when the test was taken. In addition, an extra 2.34 points should be deducted from WAIS–III scores on the grounds that that test gave inflated IQs even in the year in which it was normed.

### John Doe and Mary Smith

It may be helpful to refer to an actual case (with alterations only to avoid identification of the parties) to illustrate what these recommendations mean in practice. John Doe was convicted of murder and sentenced to death contingent on a determination of whether he is mentally retarded. He was born in 1967. During his developmental years, he was assessed only once: in 1975, at the age of 8, by Mary Smith, a school psychologist.

Fortunately, we have her report, which states that she gave him the WISC (normed 1947–1948) and not the WISC–R (1972). This may seem odd given that the new (at that time) WISC–R was published in 1974. However, IQ tests are costly, and schools tend to exhaust their old supply before purchasing the latest edition of a test. Sometimes, knowledge of when a test was published will tell you what version was used in a case where it is not specified. For example, if it was administered in 1973, it had to be the WISC rather than the WISC–R; if administered in 1990, it had to be the WISC–R rather than the WISC–III; and so forth. Note that the reverse is not true: The date a test is administered will not tell you whether the latest version was used.

Mary Smith was taught to assess adaptive functioning independently of IQ scores. In fact, school psychologists sometimes find it difficult to compartmentalize the two. You may find telltale signs in the report. In this case, Mary noted John's poor performance in reading and arithmetic despite extra tutoring, but then rejected a diagnosis of MR on the basis of a WISC IQ score of 75. Today, we know something that she could not have known. Fully 27.5 years had passed between the norming of the WISC and the day the defendant took it (1975 minus 1947.5). Therefore, its norms were 8.25 IQ points out of date (27.5 × 0.3 points per year). So John's score of 75 should have been lowered to 67, easily in the MR range. John is likely to be executed simply because his school's budget did not extend to purchasing the new WISC–R. On its newer norms, he would have scored 68 (only 3 years had passed) and probably would have been classified as mentally retarded.

Given the paucity of assessment during his developmental years, the defendant was interviewed by both a defense and a prosecution psychologist. Inevitably, the former noted hesitancy and conceptual vagueness typical of MR, and the latter found him far too alert and fluent to be mentally retarded. Therefore, much hinges on the IQ scores. The defense psychologist administered the WAIS–III, recorded an IQ of 70, and cited this as confirmation of the assessment of MR. One week later, the prosecution psychologist administered the WAIS–III and scored his IQ at 72, which left him in no doubt that an assessment of MR was inappropriate.

In fact, the two scores both indicate MR. The WAIS–III gives a bonus of 2.34 points. This in itself lowers the two scores to 67.66 and 69.66. The fact that its norms were 10 years out of date when it was administered has to count for something. Allowing 3 points reduces the two scores to 64.66 and 66.66, clearly in the retardate range. The second score is 2 points higher, but because the second testing was only 1 week after the first, the subject probably gained those points from practice effects.

I have not mentioned measurement error, that is, the fact that a single testing

186                                   FLYNN

of a person may give an IQ score accurate only between ±5 points. That is because this defendant has three scores, all of which (when properly interpreted) put him at 67 or below—and that means the possibility of measurement error is much reduced. But imagine that this defendant had only one score, which when properly interpreted was 71. The odds that his true IQ justified a classification of MR would be almost 50%. A score of 76 would be needed to be confident that a diagnosis of MR was inappropriate.

## Playing Games With Time

No prosecutor should be allowed to argue that because IQ scores are rising, a person tested 20 years ago (and who scored 70 against the norms of that time) would probably do better today and score 76. No defense attorney should be allowed a similar gambit: to argue that a person who today scores 71 (against current norms) would probably score 65 against the norms of 20 years hence.

The United States Supreme Court (*Atkins v. Virginia,* 2002) rightly undermined such arguments by setting as a criterion of MR that a person should be two or more standard deviations below the mean—if we add the corollary that the mean refers to the average performance of Americans at the time the person was tested. The prosecution should not make the unwarranted assumption that the defendant will gain ground on his or her cohort in terms of IQ as the defendant ages: Otherwise, a performance 20 years after the defendant's initial test will still put him or her two standard deviations below the mean and at an IQ of 70. The defense should not make the unwarranted assumption that the defendant will lose ground on his or her cohort as the defendant ages: Otherwise he or she will still score less than two standard deviations below the mean and at an IQ of 71. Such arguments could become valid only if the AAMR reached a firm conclusion about the significance of IQ gains over time and altered its criterion of MR. As noted above, that decision should be left to them rather than lawyers.

These arguments can be discredited by extension. Why stop at 20 years? Why not appeal to a posited future in which scores have risen so high that no one qualifies as mentally retarded? Why not appeal to a distant day whose norms are so tough that everyone now living would qualify as mentally retarded? The current state of our *knowledge* dictates three propositions: Defendants must be assessed against the criterion of MR that exists at present; their test scores *must* be interpreted in terms of the norms of the year in which they are tested; and their performance must be one that has actually occurred, not an event in a nonexistent future.

I also wish to call attention to another argument put forward by prosecutors, namely, that the Flynn effect is a "group phenomenon" and cannot be applied to individuals. As the reader now knows, this is just a senseless mantra. When the group making the IQ gains is composed of Americans, those gains render test norms obsolete and inflate the IQ of every individual being scored against obsolete norms.

## Common Ground

The purpose of this article is not to undermine confidence in IQ scores. Quite the contrary. America's adversarial system of justice makes it almost inevitable

that when prosecution and defense experts interview defendants, they will reach opposite conclusions about whether MR is present. IQ scores provide a less subjective weight to put into the scales. But IQ scores are not like a loaf of bread that simply is what it is. They are messages whose meaning is not intrinsically ambiguous but does require interpretation. Once the mode of interpretation is applied, adjusted IQ scores usually tell a coherent story.

There is nothing odd about this. Thermometers send us messages about temperature. But in order to interpret them, we have to know whether the norms are Fahrenheit or Centigrade. And compare the formulae for conversion:

$$\text{Temperature: } (C \times 9/5) + 32 = F, \tag{1}$$

$$\text{Intelligence: Test Score} - (I \times 0.3) = IQ, \tag{2}$$

where I is the interval between when the test was normed and when the subject sat; and the test is a Wechsler–Binet test administered in America. In addition, if the Wechsler test happens to be the WAIS–III, an extra 2.34 points should be deducted from the test score. Certainly, the IQ formula is simpler than the temperature formula.

I am not a jurist but a moral philosopher with expertise in the theory and measurement of intelligence. However, as the prefatory quotation from Justice Stewart makes clear, law must be consistent with at least the most basic rules of morality, so that grievous penalties are not imposed "wantonly." To paraphrase his words, the U.S. Constitution cannot tolerate a death penalty that is the random result of whatever IQ test a school psychologist happened to have in stock. The legitimacy of capital punishment is a matter of debate. Where psychologists should set the criterion for MR will always have to be reexamined in the light of new evidence. But no jurist, moral thinker, psychologist, or person of ordinary decency will believe that the Supreme Court intended to let loose an elephant in a crowd.

## References

American Association on Mental Retardation. (2002). *Mental retardation: Definition, classification, and systems of support* (10th ed.). Washington, DC: Author.

Atkins v. Virginia, 536 U.S. 304, 122 S. CT 2242 (2002).

Black v. State, No. M2004-01345-CCA-R3-PD, 2005 Tenn. Crim. App. LEXIS 1129 (Tenn. 2005).

Bowling v. Commonwealth, 163 S.W.3d 361 (Ky. 2005).

Breslau, N., Dickens, W. T., Flynn, J. R., Peterson, E. L., & Lucia, V. C. (in press). Low birthweight and social disadvantage: Tracking their relationship with children's IQ during the period of school attendance. *Intelligence*.

*Ex parte* Murphy, No. WR-38,198-03, 2006 Tex. Crim. App. (Tex. Jan. 18, 2006).

Flynn, J. R. (1984a). IQ gains and the Binet decrements. *Journal of Educational Measurement, 21*, 283–290.

Flynn, J. R. (1984b). The mean IQ of Americans: Massive gains 1932 to 1978. *Psychological Bulletin, 95*, 29–51.

Flynn, J. R. (1985). Wechsler intelligence tests: Do we really have a criterion of mental retardation? *American Journal of Mental Deficiency, 90*, 236–244.

188                                           FLYNN

Flynn, J. R. (1998). WAIS–III and WISC–III: IQ gains in the United States from 1972 to 1995; how to compensate for obsolete norms. *Perceptual and Motor Skills, 86,* 1231–1239.

Flynn, J. R. (2006). Efeito Flynn: Repensando a inteligência e seus efeitos [The Flynn Effect: Rethinking intelligence and what affects it]. In C. Flores-Mendoza & R. Colom (Eds.), *Introdução à Psicologia das Diferenças Individuais* (pp. 387–411). Porto Alegre, Brazil: ArtMed. (English translation available from James R. Flynn: jim.flynn@stonebow.otago.ac.nz)

Flynn, J. R., & Weiss, L. G. (2006). *American IQ gains from 1932 to 2002: The significance of the WISC subtests.* Manuscript submitted for publication.

Frumkin, I. B. (2003). *Mental retardation: A primer to cope with expert testimony* (p. 3). Retrieved January 6, 2006, from http://www.nlada.org/DMS/Documents/1066919805.15/Mental%20Retardation.pdf

Furman v. Georgia, 408 U.S. 238 (1972).

Garber, H. L. (1988). *The Milwaukee Project: Preventing mental retardation in children at risk.* Washington DC: American Association on Mental Retardation.

*In re* Hicks, 375 F.3d 1237 (11th Cir. 2004).

Kanaya, T., Scullin, M. H., & Ceci, S. J. (2003). The Flynn effect and U.S. policies: The impact of rising IQ scores on American society via mental retardation diagnoses. *American Psychologist, 58,* 778–790.

Lynn, R., & Vanhanen, T. (2002). *IQ and the wealth of nations.* Westport, CT: Praeger.

Myers v. State, 278 P.1106 (Okla. 2005).

Neisser, U. (Ed.). (1998). *The rising curve: Long-term gains in IQ and related measures.* Washington, DC: American Psychological Association.

People v. Superior Court (Vidal), 129 Cal. App. 4th 434, 28 Cal Rptr. 3d 529 (5th Ct. App. 2005), *vacated and later proceedings at* People v. S.C., 2005 Cal. LEXIS 13290 (Cal. Nov. 17, 2005).

Psychological Corporation. (2003). *The WISC–IV technical manual.* San Antonio, TX: Author.

Roid, G. H. (2003). *Stanford–Binet Intelligence Scales, fifth edition: Technical manual.* Itasca, IL: Riverside.

Sparrow, S. (2006). [Table 8.2: Correlations between the Vineland–II and Vineland ABS domains and adaptive behavior composite]. Unpublished raw data.

Spitz, H. H. (1989). Variations in Wechsler Interscale IQ disparities at different levels of IQ. *Intelligence, 13,* 157–167.

State v. Burke, 2005 Ohio 7020 (2005).

State v. Murphy, 2005 Ohio 423 (2005).

Thorndike, R. L., Hagen, E. P., & Sattler, J. M. (1986). *The Stanford–Binet Intelligence Scale, fourth edition: Technical manual.* Chicago: Riverside.

Trowbridge, B. (2003). *US Supreme Court finds execution of the mentally retarded "cruel and unusual"; you have to pass a test before you can be put to death?* (pp. 7–8). Retrieved January 6, 2006, from http://www.trowbridgefoundation.org/docs/execution.htm

Walker v. True, 399 F.3d 315 (4th Cir. 2005), *after remand,* 401 F.3d 574 (4th Cir. 2005).

Walton v. Johnson, 407 F.3d 285, 295–97 (4th Cir., 2005).

Wechsler, D. (1955). *Wechsler Adult Intelligence Scale: Manual.* New York: Psychological Corporation.

Wechsler, D. (1974). *Wechsler Intelligence Scale for Children–Revised: Manual.* New York: Psychological Corporation.

Wechsler, D. (1981). *Wechsler Adult Intelligence Scale—Revised: Manual.* New York: Psychological Corporation.

CAPITAL CASES, IQ, AND THE FLYNN EFFECT                    189

Wechsler, D. (1997). *Wechsler Adult Intelligence Scale—Third Edition: Manual*. San Antonio, TX: Psychological Corporation.

Zimmerman, I. R., & Woo-Sam, J. M. (1997). Review of the criterion-related validity of the WISC–III: The first five years. *Perceptual and Motor Skills, 85*, 531–535.

Received August 1, 2005
Revision received March 20, 2006
Accepted March 24, 2006 ■

## James Derrick O'Neal: History of IQ Tests

| Test (year normed) | Date Test Administered | Given Score | Score Adjusted for 'Flynn Effect' (0.3 points per year) |
|---|---|---|---|
| Cincinnati Public Schools: WISC (1947-1948) | February, 1968 | 64 | (20 years X 0.3 = -6) **58** |
| Dr. Chiappone: WAIS-R (1978) | March, 1994 | 71 | (16 years X 0.3 = -4.8) **66.2** |
| Dr. Tureen: Barrett Cognitive Status Exam (unk) | June, 1994 | 63 | N/A |
| Dr. Tureen: WAIS-III (1995) | December, 2004 | 67 | (9 years X 0.3 = -2.7) 64.3 (and deduct extra 2.34 points because WAIS-III scores inflated when normed = -2.34) **61.96** |
| Dr. Tureen: Reynolds Intellectual Scales (unk) | December, 2004 | 63 | N/A |



FILED
COURT OF APPEALS

DEC 0 1 2006

GREGORY HARTMANN
CLERK OF COURTS
HAMILTON COUNTY

# IN THE COURT OF APPEALS
## FIRST APPELLATE DISTRICT OF OHIO
## HAMILTON COUNTY, OHIO

D71084062

STATE OF OHIO,                              :          APPEAL NO. C-050840
                                                       TRIAL NO. B-9309022
     Respondent-Appellee,            :
  vs.                                               *DECISION.*

JAMES DERRICK O'NEAL,                       :          **PRESENTED TO THE CLERK
                                                       OF COURTS FOR FILING**
     Petitioner-Appellant.           :
                                                       DEC **0 1** 2006
                                            :
                                                       **COURT OF APPEALS**


Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  December 1, 2006


*John J. Gideon* and *Michael W. Krumholtz,* for Petitioner-Appellant,

*Joseph T. Deters,* Hamilton County Prosecuting Attorney, and *Philip R. Cummings,* Assistant Prosecuting Attorney, for Respondent-Appellee.

FILED

2006 DEC -1 A 5

GREGORY HART...
CLERK OF COUR...
HAM. CNTY. C...

**MARK P. PAINTER, Judge.**

{¶1}    Petitioner-appellant James Derrick O'Neal presents a single assignment of error challenging the Hamilton County Common Pleas Court's judgment denying his postconviction petition seeking relief from his death sentence because he is mentally retarded. We affirm the court's judgment.

{¶2}    O'Neal was convicted in 1992 of aggravated murder and sentenced to death. In 2002, the United States Supreme Court ruled in *Atkins v. Virginia*[1] that executing a mentally retarded person violates the proscription against cruel and unusual punishment contained in the Eighth Amendment to the United States Constitution. In December of that year, the Ohio Supreme Court in *State v. Lott*[2] established procedures and substantive standards for adjudicating a capital defendant's *Atkins* claim. O'Neal subsequently presented an *Atkins* claim in a postconviction petition. Following a hearing, the common pleas court denied the petition. This appeal followed.

### I. O'Neal's Mental-Retardation Hearing

{¶3}    At the hearing on O'Neal's *Atkins* claim, the parties stipulated to the admission of psychologists' reports, O'Neal's school and mental-health records, and the record from his murder trial. O'Neal presented expert opinion testimony by a clinical psychologist. The state offered no testimony at the hearing, but submitted the matter upon its exhibits. O'Neal's expert concluded that O'Neal was mentally retarded, while the state's experts concluded that he was not. Based on the evidence adduced at the hearing, the trial court concluded that O'Neal had failed to prove his claim.

---

[1] (2002), 536 U.S. 304, 122 S.Ct. 2242.
[2] 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011.

OHIO FIRST DISTRICT COURT OF APPEALS

### A. The Trial

{¶4}    Dr. David Chiappone, a clinical psychologist appointed to evaluate O'Neal for his 1995 trial, diagnosed O'Neal as functioning in the borderline range of intelligence, with polysubstance abuses and a mixed personality disorder. He testified to that effect at the trial. He arrived at this conclusion after testing and interviewing O'Neal, interviewing O'Neal's friends and family, and reviewing his school, work, and criminal histories.

{¶5}    Dr. Chiappone found that O'Neal's school records showed that he had then functioned in the borderline to mildly mentally retarded range. The report of a school psychologist who had evaluated O'Neal in 1968, when O'Neal was 14 years old and in the sixth grade, reflected a full-scale IQ score of 64 and well-below-grade-level academic achievement. The psychologist recommended that O'Neal be placed in a "slow learner" program, but he was not. And he left high school before completing the tenth grade.

{¶6}    From 1972 to 1975, he served in the Marines, where he attained the rank of lance corporal. But he was dishonorably discharged when he was absent without leave because, he asserted, the military had declined to allow him to attend his father's funeral.

{¶7}    After his discharge, O'Neal supported himself by selling drugs. In 1988, he was imprisoned for trafficking. After his release a year later, O'Neal held a variety of menial jobs, including work in the kitchen of a country club restaurant. His supervisor there testified that although O'Neal had struggled with tardiness and absenteeism, he had been a good worker.

{¶8}    O'Neal had several children from various relationships. After his release from prison, he sought and obtained custody of two of his children. In 1992, he married the victim, and he and his two children made a home with his wife and her three children.

{¶9}    On the IQ test administered by Dr. Chiappone in 1994, O'Neal received a full-scale score of 71. Dr. Chiappone acknowledged that O'Neal had "a low IQ." But he

## OHIO FIRST DISTRICT COURT OF APPEALS

asserted that O'Neal's work history showed that "his fundamental skills [were] a bit higher than his attained intellect." From this, Dr. Chiappone concluded that O'Neal was not mentally retarded.

{¶10} Dr. Robert G. Tureen, a clinical psychologist specializing in neuropsychology, also testified at O'Neal's trial. Dr. Chiappone had consulted with Dr. Tureen when Dr. Chiappone's evaluation suggested that O'Neal suffered from a brain disorder or brain damage. Dr. Tureen interviewed and tested O'Neal and reviewed the IQ test administered by Dr. Chiappone. He confirmed Dr. Chiappone's suspicion of a brain disorder, and he testified at trial to his conclusion that O'Neal was borderline to mildly mentally retarded.

### B. The Hearing

{¶11} Dr. Tureen evaluated O'Neal again in 2004 for his *Atkins* claim. He issued a report and appeared as the sole witness at O'Neal's *Atkins* hearing. The state countered with Dr. Chiappone's 1994 trial testimony and the March 2005 report of Dr. W. Michael Nelson III.

### 1. The Mental-Retardation Criteria

{¶12} The Ohio Supreme Court in *State v. Lott* provided three criteria for evaluating a capital defendant's claim that he is, in the words of the United States Supreme Court in *Atkins,* "so impaired as to fall within the range of mentally retarded offenders [against] who[se] [execution] there [has emerged] a national consensus."[3] The defendant must demonstrate by a preponderance of the evidence (1) that he suffers from "significantly subaverage intellectual functioning," (2) that he has experienced "significant limitations in two or more adaptive skills, such as communication, self-care, and self-

---

[3] *Atkins v. Virginia*, 536 U.S. at 317.

OHIO FIRST DISTRICT COURT OF APPEALS

direction," and (3) that these manifestations of mental retardation appeared before the age of 18.[4]

{¶13}  The court in *Lott* cautioned that an IQ test score is merely one measure of intellectual functioning that "alone [is] not sufficient to make a final determination on [the mental-retardation] issue."[5]  Nevertheless, the court declared that a full-scale IQ score above 70 gives rise to "a rebuttable presumption that a defendant [is] not mentally retarded."[6]

{¶14}  The court in *Lott* formulated its mental-retardation criteria based upon the clinical definitions of mental retardation provided in 1992 by the American Association of Mental Retardation ("AAMR") and in 2002 by the American Psychiatric Association ("APA") and cited with approval by the Supreme Court in *Atkins*.[7]  Both definitions provided these diagnostic criteria for mental retardation: substantial limitations in present functioning, manifested before the age of 18, and characterized by significantly subaverage intellectual functioning coexisting with significant limitations in two of the adaptive skills of communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, health and safety, functional academics, leisure, and work.[8]  In 2002, the AAMR amended its definition to require a finding of significant deficiencies in one of three categories of adaptive skills:  "conceptual," which includes communication and functional academics skills; "social," which includes social/interpersonal and leisure skills; and "practical," which includes work, self-care, health, and safety skills.[9]

---

[4] *State v. Lott*, supra, at ¶12.
[5] See id.
[6] Id.
[7] *Atkins v. Virginia*, 536 U.S. at 308, fn. 3; *State v. Lott*, supra, at ¶12.
[8] American Association of Mental Retardation, Mental Retardation: Definition, Classification, and Systems of Supports 5 (9 Ed.1992); Diagnostic and Statistical Manual of Mental Disorders 41 (4 Ed.2000).
[9] American Association of Mental Retardation, Mental Retardation: Definition, Classification, and Systems of Supports 1 (10 Ed.2002).

**OHIO FIRST DISTRICT COURT OF APPEALS**

### 2. Dr. Tureen's Report and Testimony

{¶15}  In his report, Dr. Tureen noted that the AAMR recognizes that a "standard error of measurement * * * exists in any psychometric test measure, where an obtained score actually represents [the midpoint in] a range of statistical probability" of plus or minus five.  He also noted the AAMR's admonition against relying strictly on IQ-test scores to measure intellectual functioning.

{¶16}  With the AAMR and *Lott* standards in mind, Dr. Tureen reviewed O'Neal's school records and the IQ test administered by Dr. Chiappone in 1994.  He administered two IQ tests, on which O'Neal scored 67 and 63.  He also conducted a three-hour interview with O'Neill.  Applying the legal standard for mental retardation provided in *Atkins* and *Lott* and the psychological standards provided in 2000 by the APA and in 2002 by the AAMR, Dr. Tureen diagnosed O'Neal with "mild mental retardation."

{¶17}  From O'Neal's school records, Dr. Tureen found that his mental retardation had manifested before the age of 18.  O'Neal's 1968 full-scale IQ score of 64 consisted of a verbal score of 79 and a performance score of 55.  And he scored in the lowest percentiles on other "intellectual measures," such as the Stanford Achievement Test and the Scholastic Aptitude Test.  Dr. Tureen found that the vast difference between the verbal and performance portions of O'Neal's IQ scores indicated a severe learning disability and raised the possibility of a cerebral brain dysfunction that interfered with his intellectual ability and academic achievement.  Dr. Tureen acknowledged that O'Neal had not been placed in special-education classes.  But he noted that the school psychologist had recommended them, and that O'Neal's academic performance showed the need for them.  Dr. Tureen concluded that O'Neal's scores on these intellectual measures provided evidence of "the existence of low intellectual ability."

**OHIO FIRST DISTRICT COURT OF APPEALS**

{¶18} Dr. Tureen stated that the consistency between O'Neal's performance on his earlier intellectual assessments and his performance on his 1994 and 2004 IQ tests verified the persistence into adulthood of his intellectual deficiencies and his brain dysfunction. With respect to O'Neal's current adaptive functioning, Dr. Tureen asserted that information relevant to his functioning during his ten years under the structured conditions on death row would not be useful. Dr. Tureen instead looked to his 1994 report, his and Dr. Chiappone's trial testimony, and O'Neal's history of drug and alcohol abuse. He found no impairments in eight of the AAMR adaptive-skills areas, at least when alcohol or drugs were not involved. He acknowledged that O'Neal had owned and had driven a car, had served in the military, had married and had supported a family, had sought and had gained custody of two children, had held jobs, and had adjusted to prison life. But he found that O'Neal's limited intellectual abilities impaired his functional academics and, in "emotionally charged" situations, compromised his social adaptability skills.

### 3. Dr. Nelson's Report

{¶19} For the report that he provided at the state's behest, Dr. Nelson looked at the IQ-test data, the evaluations conducted by Drs. Tureen and Chiappone, the trial record, and O'Neal's medical, school, work, and prison records. Dr. Nelson concluded that O'Neal did not meet the definition of mental retardation.

{¶20} Dr. Nelson acknowledged that O'Neal's IQ scores were subject to a standard error of measurement of plus or minus five, and that mental retardation might thus be diagnosed in an individual with an IQ score of 70 to 75 and significant deficits in adaptive behavior. Conversely, he asserted, mental retardation could not be diagnosed in an individual with an IQ score of less than 70 if he had no significant deficits in his adaptive functioning. Dr. Nelson found that, to the extent of his intellectual deficits and

his deficits in the conceptual adaptive skills of reading and money concepts, O'Neal functioned in the mild-mental-retardation to borderline range. But he insisted that O'Neal exhibited no deficits in his practical adaptive skills, and that the deficits in his social skills, which arose in situations involving emotional intensity, were more a function of his psychological problems. Dr. Nelson concluded that, because O'Neal functioned at least in the borderline range in his social and practical adaptive skills, he was not mentally retarded.

## II. The Common Pleas Court's Decision

{¶21} The determination of whether a capital defendant is, by the *Lott* court's definition, mentally retarded presents a factual issue for the trial court.[10] Based upon the evidence adduced at the hearing, the court below concluded that O'Neal had failed to sustain his burden of proving by a preponderance of the evidence that he is mentally retarded. The court noted that O'Neal's 71 IQ score raised the presumption that he was not mentally retarded. And the court found that he had failed to rebut the presumption.

{¶22} In its decision, the court found that O'Neal had failed to prove by a preponderance of the evidence that he suffered from significantly subaverage intellectual functioning. With respect to the over-70 presumption, the court noted the plus-or-minus-five standard error of measurement recognized in *Lott* and acknowledged by Drs. Chiappone, Tureen, and Nelson. The court construed the standard error of measurement to require O'Neal to "present the court with IQ scores of 64 or below" to rebut the *Lott* presumption. It then discounted O'Neal's 1968 full-scale IQ score of 64 because it was "not a recent [score], and at best provide[d] the court with equal evidence [to his 1994 and 2004 scores] as to whether [he] suffer[ed] from significantly subaverage intellectual functioning."

---

[10] *Id.* at ¶9.

OHIO FIRST COURT OF APPEALS

{¶23}   We are at a loss to explain how the court arrived at its "64 or below" requirement.  Nothing in the *Atkins* or *Lott* decisions or in the psychologists' reports or testimony warranted such a requirement.  We, therefore, hold that the court erred as a matter of law in imposing it.

{¶24}   Nevertheless, Dr. Nelson's report provided the court with evidence upon which it might have concluded that O'Neal had failed to prove significantly subaverage intellectual functioning.  More significantly, the record is replete with evidence to support the court's finding that O'Neal had failed to prove the conjunctive criterion of coexistent limitations in two or more adaptive skills, so we believe the court's misapprehension of the IQ numbers was harmless.

### III. We Affirm

{¶25}   An appellate court will not reverse a trial court's determination of the issue of mental retardation if the determination was supported by reliable, credible evidence.[11]  O'Neal's over-70 IQ score raised the presumption that he was not mentally retarded.   We conclude that reliable, credible evidence supported the trial court's determination that O'Neal had failed to overcome the presumption.  We, therefore, overrule the assignment of error and affirm the judgment of the court below.

Judgment affirmed.

GORMAN, P.J., and SUNDERMANN, J., concur.


*Please Note:*

The court has recorded its own entry on the date of the release of this decision.

---

[11] *State v. Were* (Feb. 4, 2005), 1st Dist. No. C-030485, 2005-Ohio-376.

# IN THE COURT OF APPEALS
## FIRST APPELLATE DISTRICT OF OHIO
## HAMILTON COUNTY, OHIO



STATE OF OHIO,                           :          APPEAL NO. C-050840
                                                    TRIAL NO. B-9309022
    Respondent-Appellee,         :

vs.                                                 *JUDGMENT ENTRY.*

JAMES DERRICK O'NEAL,                    :

    Petitioner-Appellant.        :



This cause was heard upon the appeal, the record, the briefs, and arguments.

The judgment of the trial court is affirmed for the reasons set forth in the Decision filed this date.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty and orders that costs are taxed under App. R. 24.

The court further orders that 1) a copy of this Judgment with a copy of the Decision attached constitutes the mandate, and 2) the mandate be sent to the trial court for execution under App. R. 27.

**To The Clerk:**

**Enter upon the Journal of the Court on December 1, 2006 per Order of the Court.**

By: _____
              **Presiding Judge**

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO,                              :

      Respondent-Appellee,        :

vs.

JAMES DERRICK O'NEAL,              :

      Petitioner-Appellant.        :

                                    :

APPEAL NO. C-050840
TRIAL NO. B-9309022

*D E C I S I O N.*

**PRESENTED TO THE CLERK
OF COURTS FOR FILING**

DEC 0 1 2006

**COURT OF APPEALS**

Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  December 1, 2006

*John J. Gideon* and *Michael W. Krumholtz*, for Petitioner-Appellant,

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings*, Assistant Prosecuting Attorney, for Respondent-Appellee.

**MARK P. PAINTER, Judge.**

{¶1}    Petitioner-appellant James Derrick O'Neal presents a single assignment of error challenging the Hamilton County Common Pleas Court's judgment denying his postconviction petition seeking relief from his death sentence because he is mentally retarded. We affirm the court's judgment.

{¶2}    O'Neal was convicted in 1992 of aggravated murder and sentenced to death. In 2002, the United States Supreme Court ruled in *Atkins v. Virginia*[1] that executing a mentally retarded person violates the proscription against cruel and unusual punishment contained in the Eighth Amendment to the United States Constitution. In December of that year, the Ohio Supreme Court in *State v. Lott*[2] established procedures and substantive standards for adjudicating a capital defendant's *Atkins* claim. O'Neal subsequently presented an *Atkins* claim in a postconviction petition. Following a hearing, the common pleas court denied the petition. This appeal followed.

## I. O'Neal's Mental-Retardation Hearing

{¶3}    At the hearing on O'Neal's *Atkins* claim, the parties stipulated to the admission of psychologists' reports, O'Neal's school and mental-health records, and the record from his murder trial. O'Neal presented expert opinion testimony by a clinical psychologist. The state offered no testimony at the hearing, but submitted the matter upon its exhibits. O'Neal's expert concluded that O'Neal was mentally retarded, while the state's experts concluded that he was not. Based on the evidence adduced at the hearing, the trial court concluded that O'Neal had failed to prove his claim.

---

[1] (2002), 536 U.S. 304, 122 S.Ct. 2242.
[2] 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011.

### A. The Trial

{¶4}    Dr. David Chiappone, a clinical psychologist appointed to evaluate O'Neal for his 1995 trial, diagnosed O'Neal as functioning in the borderline range of intelligence, with polysubstance abuses and a mixed personality disorder. He testified to that effect at the trial. He arrived at this conclusion after testing and interviewing O'Neal, interviewing O'Neal's friends and family, and reviewing his school, work, and criminal histories.

{¶5}    Dr. Chiappone found that O'Neal's school records showed that he had then functioned in the borderline to mildly mentally retarded range. The report of a school psychologist who had evaluated O'Neal in 1968, when O'Neal was 14 years old and in the sixth grade, reflected a full-scale IQ score of 64 and well-below-grade-level academic achievement. The psychologist recommended that O'Neal be placed in a "slow learner" program, but he was not. And he left high school before completing the tenth grade.

{¶6}    From 1972 to 1975, he served in the Marines, where he attained the rank of lance corporal. But he was dishonorably discharged when he was absent without leave because, he asserted, the military had declined to allow him to attend his father's funeral.

{¶7}    After his discharge, O'Neal supported himself by selling drugs. In 1988, he was imprisoned for trafficking. After his release a year later, O'Neal held a variety of menial jobs, including work in the kitchen of a country club restaurant. His supervisor there testified that although O'Neal had struggled with tardiness and absenteeism, he had been a good worker.

{¶8}    O'Neal had several children from various relationships. After his release from prison, he sought and obtained custody of two of his children. In 1992, he married the victim, and he and his two children made a home with his wife and her three children.

{¶9}    On the IQ test administered by Dr. Chiappone in 1994, O'Neal received a full-scale score of 71. Dr. Chiappone acknowledged that O'Neal had "a low IQ." But he

asserted that O'Neal's work history showed that "his fundamental skills [were] a bit higher than his attained intellect." From this, Dr. Chiappone concluded that O'Neal was not mentally retarded.

{¶10} Dr. Robert G. Tureen, a clinical psychologist specializing in neuropsychology, also testified at O'Neal's trial. Dr. Chiappone had consulted with Dr. Tureen when Dr. Chiappone's evaluation suggested that O'Neal suffered from a brain disorder or brain damage. Dr. Tureen interviewed and tested O'Neal and reviewed the IQ test administered by Dr. Chiappone. He confirmed Dr. Chiappone's suspicion of a brain disorder, and he testified at trial to his conclusion that O'Neal was borderline to mildly mentally retarded.

### B. The Hearing

{¶11} Dr. Tureen evaluated O'Neal again in 2004 for his *Atkins* claim. He issued a report and appeared as the sole witness at O'Neal's *Atkins* hearing. The state countered with Dr. Chiappone's 1994 trial testimony and the March 2005 report of Dr. W. Michael Nelson III.

### 1. The Mental-Retardation Criteria

{¶12} The Ohio Supreme Court in *State v. Lott* provided three criteria for evaluating a capital defendant's claim that he is, in the words of the United States Supreme Court in *Atkins*, "so impaired as to fall within the range of mentally retarded offenders [against] who[se] [execution] there [has emerged] a national consensus."[3] The defendant must demonstrate by a preponderance of the evidence (1) that he suffers from "significantly subaverage intellectual functioning," (2) that he has experienced "significant limitations in two or more adaptive skills, such as communication, self-care, and self-

---

[3] *Atkins v. Virginia*, 536 U.S. at 317.

direction," and (3) that these manifestations of mental retardation appeared before the age of 18.[4]

{¶13}  The court in *Lott* cautioned that an IQ test score is merely one measure of intellectual functioning that "alone [is] not sufficient to make a final determination on [the mental-retardation] issue."[5]  Nevertheless, the court declared that a full-scale IQ score above 70 gives rise to "a rebuttable presumption that a defendant [is] not mentally retarded."[6]

{¶14}  The court in *Lott* formulated its mental-retardation criteria based upon the clinical definitions of mental retardation provided in 1992 by the American Association of Mental Retardation ("AAMR") and in 2002 by the American Psychiatric Association ("APA") and cited with approval by the Supreme Court in *Atkins*.[7]  Both definitions provided these diagnostic criteria for mental retardation: substantial limitations in present functioning, manifested before the age of 18, and characterized by significantly subaverage intellectual functioning coexisting with significant limitations in two of the adaptive skills of communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, health and safety, functional academics, leisure, and work.[8]  In 2002, the AAMR amended its definition to require a finding of significant deficiencies in one of three categories of adaptive skills:  "conceptual," which includes communication and functional academics skills; "social," which includes social/interpersonal and leisure skills; and "practical," which includes work, self-care, health, and safety skills.[9]

---

[4] *State v. Lott*, supra, at ¶12.
[5] See id.
[6] Id.
[7] *Atkins v. Virginia*, 536 U.S. at 308, fn. 3; *State v. Lott*, supra, at ¶12.
[8] American Association of Mental Retardation, Mental Retardation: Definition, Classification, and Systems of Supports 5 (9 Ed.1992); Diagnostic and Statistical Manual of Mental Disorders 41 (4 Ed.2000).
[9] American Association of Mental Retardation, Mental Retardation: Definition, Classification, and Systems of Supports 1 (10 Ed.2002).

**OHIO FIRST DISTRICT COURT OF APPEALS**

### 2. *Dr. Tureen's Report and Testimony*

{¶15}   In his report, Dr. Tureen noted that the AAMR recognizes that a "standard error of measurement * * * exists in any psychometric test measure, where an obtained score actually represents [the midpoint in] a range of statistical probability" of plus or minus five.   He also noted the AAMR's admonition against relying strictly on IQ-test scores to measure intellectual functioning.

{¶16}   With the AAMR and *Lott* standards in mind, Dr. Tureen reviewed O'Neal's school records and the IQ test administered by Dr. Chiappone in 1994.   He administered two IQ tests, on which O'Neal scored 67 and 63.   He also conducted a three-hour interview with O'Neill.   Applying the legal standard for mental retardation provided in *Atkins* and *Lott* and the psychological standards provided in 2000 by the APA and in 2002 by the AAMR, Dr. Tureen diagnosed O'Neal with "mild mental retardation."

{¶17}   From O'Neal's school records, Dr. Tureen found that his mental retardation had manifested before the age of 18.   O'Neal's 1968 full-scale IQ score of 64 consisted of a verbal score of 79 and a performance score of 55.   And he scored in the lowest percentiles on other "intellectual measures," such as the Stanford Achievement Test and the Scholastic Aptitude Test.   Dr. Tureen found that the vast difference between the verbal and performance portions of O'Neal's IQ scores indicated a severe learning disability and raised the possibility of a cerebral brain dysfunction that interfered with his intellectual ability and academic achievement.   Dr. Tureen acknowledged that O'Neal had not been placed in special-education classes.   But he noted that the school psychologist had recommended them, and that O'Neal's academic performance showed the need for them.   Dr. Tureen concluded that O'Neal's scores on these intellectual measures provided evidence of "the existence of low intellectual ability."

**OHIO FIRST DISTRICT COURT OF APPEALS**

{¶18}  Dr. Tureen stated that the consistency between O'Neal's performance on his earlier intellectual assessments and his performance on his 1994 and 2004 IQ tests verified the persistence into adulthood of his intellectual deficiencies and his brain dysfunction.  With respect to O'Neal's current adaptive functioning, Dr. Tureen asserted that information relevant to his functioning during his ten years under the structured conditions on death row would not be useful.  Dr. Tureen instead looked to his 1994 report, his and Dr. Chiappone's trial testimony, and O'Neal's history of drug and alcohol abuse.  *He found no impairments in eight of the AAMR adaptive-skills areas,* at least when alcohol or drugs were not involved.  He acknowledged that O'Neal had owned and had driven a car, had served in the military, had married and had supported a family, had sought and had gained custody of two children, had held jobs, and had adjusted to prison life.  But he found that O'Neal's limited intellectual abilities impaired his functional academics and, in "emotionally charged" situations, compromised his social adaptability skills.

### 3. Dr. Nelson's Report

{¶19}  For the report that he provided at the state's behest, Dr. Nelson looked at the IQ-test data, the evaluations conducted by Drs. Tureen and Chiappone, the trial record, and O'Neal's medical, school, work, and prison records.  Dr. Nelson concluded that *O'Neal did not meet the definition of mental retardation.*

{¶20}  Dr. Nelson acknowledged that O'Neal's IQ scores were subject to a standard error of measurement of plus or minus five, and that mental retardation might thus be diagnosed in an individual with an IQ score of 70 to 75  and significant deficits in adaptive behavior.  Conversely, he asserted, mental retardation could not be diagnosed in an individual with an IQ score of less than 70 if he had no significant deficits in his adaptive functioning.  Dr. Nelson found that, to the extent of his intellectual deficits and

his deficits in the conceptual adaptive skills of reading and money concepts, O'Neal functioned in the mild-mental-retardation to borderline range. But he insisted that O'Neal exhibited no deficits in his practical adaptive skills, and that the deficits in his social skills, which arose in situations involving emotional intensity, were more a function of his psychological problems. Dr. Nelson concluded that, because O'Neal functioned at least in the borderline range in his social and practical adaptive skills, he was not mentally retarded.

### II. The Common Pleas Court's Decision

{¶21}    The determination of whether a capital defendant is, by the *Lott* court's definition, mentally retarded presents a factual issue for the trial court.[10]  Based upon the evidence adduced at the hearing, the court below concluded that O'Neal had failed to sustain his burden of proving by a preponderance of the evidence that he is mentally retarded.  The court noted that O'Neal's 71 IQ score raised the presumption that he was not mentally retarded.  And the court found that he had failed to rebut the presumption.

{¶22}    In its decision, the court found that O'Neal had failed to prove by a preponderance of the evidence that he suffered from significantly subaverage intellectual functioning.  With respect to the over-70 presumption, the court noted the plus-or-minus-five standard error of measurement recognized in *Lott* and acknowledged by Drs. Chiappone, Tureen, and Nelson.  The court construed the standard error of measurement to require O'Neal to "present the court with IQ scores of 64 or below" to rebut the *Lott* presumption.  It then discounted O'Neal's 1968 full-scale IQ score of 64 because it was "not a recent [score], and at best provide[d] the court with equal evidence [to his 1994 and 2004 scores] as to whether [he] suffer[ed] from significantly subaverage intellectual functioning."

---

[10] Id. at ¶9.

**OHIO FIRST DISTRICT COURT OF APPEALS**

{¶23} We are at a loss to explain how the court arrived at its "64 or below" requirement. Nothing in the *Atkins* or *Lott* decisions or in the psychologists' reports or testimony warranted such a requirement. We, therefore, hold that the court erred as a matter of law in imposing it.

{¶24} Nevertheless, Dr. Nelson's report provided the court with evidence upon which it might have concluded that O'Neal had failed to prove significantly subaverage intellectual functioning. More significantly, the record is replete with evidence to support the court's finding that O'Neal had failed to prove the conjunctive criterion of coexistent limitations in two or more adaptive skills, so we believe the court's misapprehension of the IQ numbers was harmless.

### III. We Affirm

{¶25} An appellate court will not reverse a trial court's determination of the issue of mental retardation if the determination was supported by reliable, credible evidence.[11] O'Neal's over-70 IQ score raised the presumption that he was not mentally retarded. We conclude that reliable, credible evidence supported the trial court's determination that O'Neal had failed to overcome the presumption. We, therefore, overrule the assignment of error and affirm the judgment of the court below.

Judgment affirmed.

**GORMAN, P.J.,** and **SUNDERMANN, J.,** concur.

*Please Note:*

The court has recorded its own entry on the date of the release of this decision.

---

[11] *State v. Were* (Feb. 4, 2005), 1st Dist. No. C-030485, 2005-Ohio-376.

O'Neal Apx. Vol. XI
Page 227

---------------------------------------------------------------------------------------------

| CASE NO. | JUDGE | PLAINTIFF | DEFENDANT | SENT NOTICE TO |
|----------|-------|-----------|-----------|----------------|
| C 0500840 | 902 | STATE OF OHIO | JAMES DERRICK ONEAL | JOHN JOSEPH GIDEON<br>250 EAST STANTON AVE<br>COLUMBUS OH  43214-1268 |
| C 0500840 | 902 | STATE OF OHIO | JAMES DERRICK ONEAL | HAMILTON COUNTY PROSECUTOR<br>230 E NINTH ST,  ROOM 7000<br>CINCINNATI OH  45202 |

**FILED**
**COURT OF APPEALS**

DEC - 4 2006

GREGORY HARTMANN
CLERK OF COURTS
HAMILTON COUNTY



D71079232