

**The Supreme Court of Ohio**

Clerk's Office
65 South Front Street, 8th Floor
Columbus, Ohio 43215-3431
614.387.9000
614.387.9530

Marcia J. Mengel
Clerk of Court

Search Results: Case Number 2007-0080

# The Supreme Court of Ohio
## CASE INFORMATION

### GENERAL INFORMATION

**Case: 2007-0080** Death Penalty Postconviction Case

**Filed:** 01/16/07

**Status:** Case Is Disposed

### State of Ohio v. James Derrick O'Neal

### PARTIES and ATTORNEYS

| |
|---|
| O'Neal, James Derrick (Appellant)<br>    Represented by:<br>        Gideon, John (8151) , Counsel of Record<br>        Krumholtz, Michael (9099) |
| State of Ohio (Appellee)<br>    Represented by:<br>        Cummings, Philip (41497) , Counsel of Record<br>        Deters, Joseph (12084) |

### PRIOR JURISDICTION

| Jurisdiction Information | Prior Decision Date | Case Number(s) |
|---|---|---|
| Hamilton County, 1st District | 12/01/2006 | C050840 |

### DOCKET ITEMS

- Most documents that were filed in Supreme Court cases after December 1, 2006, are scanned. They are available for viewing via the online dockets, generally within one business day from their date of filing.
- Supreme Court orders that were issued after January 1, 2007, are also available via the online docket as PDFs. Although original orders issued by the Court bear the signature of the Chief Justice, the signature usually will not appear in the online versions. In all other respects, the online versions will be identical to the original signed orders on file with the Clerk's Office.
- A symbol in an online docket denotes a scanned filing or an electronic version of a Supreme Court order. Clicking

O'Neal Apx. Vol. XII
Page 1

the icon opens an image of the filing or order.

| Date Filed | Description |
|---|---|
| 01/16/07 View | Notice of appeal of James Derrick O'Neal<br>*Filed by:* O'Neal, James |
| 01/16/07 View | Memorandum in support of jurisdiction<br>*Filed by:* O'Neal, James |
| 01/16/07 View | Affidavit of indigency<br>*Filed by:* O'Neal, James |
| 01/16/07 View | Case information statement<br>*Filed by:* O'Neal, James |
| 01/17/07 | Copy of notice of appeal sent to clerk of court of appeals |
| 02/13/07 View | Memorandum in response<br>*Filed by:* State of Ohio |
| 05/02/07 View | **DECISION: Jurisdiction declined and appeal dismissed** |
| 05/16/07 | Copy of entry sent to clerk |

Back

© 2004-2007 Enabling Technologies, Inc.

Question or Comments?

ECMS Online 1.2.9

O'Neal Apx. Vol. XII
Page 2

http://www.sconet.state.oh.us/clerk_of_court/ecms/resultsbycasenumber.asp?type=3&year=2007&number...   6/9/2007

ORIGINAL

IN THE SUPREME COURT OF OHIO

ON COMPUTER - II

STATE OF OHIO,

      Plaintiff-Appellee,

    v.

JAMES DERRICK O'NEAL,

      Defendant-Appellant.

CASE NO. ____07 - 0080_____

On Appeal From the Court of
Appeals of Hamilton County,
First Appellate District

Court of Appeals Case
No. C-050840

---

NOTICE OF APPEAL OF APPELLANT JAMES DERRICK O'NEAL

---

JOHN J. GIDEON (0008151)
250 East Stanton Avenue
Columbus, Ohio 43214-1268
Phone: (614) 844-3954
Email: johngideon@sbcglobal.net

MICHAEL W. KRUMHOLTZ (0009099)
Bieser, Greer & Landis LLP
6 North Main Street, Suite 400
Dayton, Ohio 45402-1908
Phone: (937) 223-3277
Facsimile: (937) 223-6339
Email: mwk@bgllaw.com

COUNSEL FOR APPELLANT

JOSEPH T. DETERS (0012084)
Hamilton County Prosecuting Attorney
PHILIP R. CUMMINGS (0041497)
Assistant Prosecuting Attorney
230 East Ninth Street, Suite 7000
Cincinnati, Ohio 45202-2174
Phone: (513) 946-3021
Email: Phil.Cummings@hcpros.org

COUNSEL FOR APPELLEE

FILED

JAN 16 2007

MARCIA J. MENGEL, CLERK
SUPREME COURT

## NOTICE OF APPEAL OF APPELLANT JAMES DERRICK O'NEAL

Appellant James Derrick O'Neal hereby gives notice of appeal to the Supreme Court of Ohio from the judgment of the Hamilton County Court of Appeals, First Appellate District, in State of Ohio v. James Derrick O'Neal, Case No. C-050840, entered in the Court of Appeals on December 1, 2006. A copy of the judgment entry is appended to this notice of appeal.

This is an appeal from a decision of a court of appeals in a capital case affirming the judgment of a court of common pleas concluding that a capital defendant is not mentally retarded. This case involves affirmance of the death penalty, raises substantial constitutional questions concerning the standards applicable to a claim of mental retardation, and is of public or great general interest.

Respectfully submitted,

JOHN J. GIDEON (0008151)
(Trial Counsel)
250 East Stanton Avenue
Columbus, Ohio 43214-1268
Phone: (614) 844-3954
Email: johngideon@sbcglobal.net

MICHAEL W. KRUMHOLTZ (0009099)
(Co-Counsel)
Bieser, Greer & Landis LLP
6 North Main Street, Suite 400
Dayton, Ohio 45402-1908
Phone: (937) 223-3277
Facsimile: (937) 223-6339
Email: mwk@bgllaw.com

COUNSEL FOR APPELLANT

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Notice of Appeal of Appellant James Derrick

O'Neal was served on Joseph T. Deters, Prosecuting Attorney, and Philip R. Cummings,

Assistant Prosecuting Attorney, 230 East Ninth Street, Suite 7000, Cincinnati, Ohio 45202-2174,

by regular U.S. mail, postage prepaid, on this __16th__ day of January, 2007.


JOHN J. GIDEON (0008151)
Counsel for Appellant

o'neal.noticeofappeal-osc-Jan'07

# IN THE COURT OF APPEALS
## FIRST APPELLATE DISTRICT OF OHIO
## HAMILTON COUNTY, OHIO

STATE OF OHIO,                      :          APPEAL NO. C-050840
                                               TRIAL NO. B-9309022
      Respondent-Appellee,     :
  vs.                                        *DECISION.*
                                    :
JAMES DERRICK O'NEAL,               :

      Petitioner-Appellant.    :

                                    :

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: December 1, 2006

*John J. Gideon* and *Michael W. Krumholtz*, for Petitioner-Appellant,

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings*, Assistant Prosecuting Attorney, for Respondent-Appellee.

OHIO FIRST DISTRICT COURT OF APPEALS

**MARK P. PAINTER, Judge.**

{¶1}   Petitioner-appellant James Derrick O'Neal presents a single assignment of error challenging the Hamilton County Common Pleas Court's judgment denying his postconviction petition seeking relief from his death sentence because he is mentally retarded. We affirm the court's judgment.

{¶2}   O'Neal was convicted in 1992 of aggravated murder and sentenced to death.   In 2002, the United States Supreme Court ruled in *Atkins v. Virginia*[1] that executing a mentally retarded person violates the proscription against cruel and unusual punishment contained in the Eighth Amendment to the United States Constitution.   In December of that year, the Ohio Supreme Court in *State v. Lott*[2] established procedures and substantive standards for adjudicating a capital defendant's *Atkins* claim.   O'Neal subsequently presented an *Atkins* claim in a postconviction petition.   Following a hearing, the common pleas court denied the petition.   This appeal followed.

### I. O'Neal's Mental-Retardation Hearing

{¶3}   At the hearing on O'Neal's *Atkins* claim, the parties stipulated to the admission of psychologists' reports, O'Neal's school and mental-health records, and the record from his murder trial.   O'Neal presented expert opinion testimony by a clinical psychologist.   The state offered no testimony at the hearing, but submitted the matter upon its exhibits.   O'Neal's expert concluded that O'Neal was mentally retarded, while the state's experts concluded that he was not.   Based on the evidence adduced at the hearing, the trial court concluded that O'Neal had failed to prove his claim.

---

[1] (2002), 536 U.S. 304, 122 S.Ct. 2242.
[2] 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011.

OHIO FIRST DISTRICT COURT OF APPEALS

## A.  *The Trial*

{¶4}    Dr. David Chiappone, a clinical psychologist appointed to evaluate O'Neal for his 1995 trial, diagnosed O'Neal as functioning in the borderline range of intelligence, with polysubstance abuses and a mixed personality disorder.  He testified to that effect at the trial.  He arrived at this conclusion after testing and interviewing O'Neal, interviewing O'Neal's friends and family, and reviewing his school, work, and criminal histories.

{¶5}    Dr. Chiappone found that O'Neal's school records showed that he had then functioned in the borderline to mildly mentally retarded range.  The report of a school psychologist who had evaluated O'Neal in 1968, when O'Neal was 14 years old and in the sixth grade, reflected a full-scale IQ score of 64 and well-below-grade-level academic achievement.  The psychologist recommended that O'Neal be placed in a "slow learner" program, but he was not.  And he left high school before completing the tenth grade.

{¶6}    From 1972 to 1975, he served in the Marines, where he attained the rank of lance corporal.  But he was dishonorably discharged when he was absent without leave because, he asserted, the military had declined to allow him to attend his father's funeral.

{¶7}    After his discharge, O'Neal supported himself by selling drugs.  In 1988, he was imprisoned for trafficking.  After his release a year later, O'Neal held a variety of menial jobs, including work in the kitchen of a country club restaurant.  His supervisor there testified that although O'Neal had struggled with tardiness and absenteeism, he had been a good worker.

{¶8}    O'Neal had several children from various relationships.  After his release from prison, he sought and obtained custody of two of his children.  In 1992, he married the victim, and he and his two children made a home with his wife and her three children.

{¶9}    On the IQ test administered by Dr. Chiappone in 1994, O'Neal received a full-scale score of 71.  Dr. Chiappone acknowledged that O'Neal had "a low IQ."  But he

3

OHIO FIRST DISTRICT COURT OF APPEALS

asserted that O'Neal's work history showed that "his fundamental skills [were] a bit higher than his attained intellect." From this, Dr. Chiappone concluded that O'Neal was not mentally retarded.

{¶10} Dr. Robert G. Tureen, a clinical psychologist specializing in neuropsychology, also testified at O'Neal's trial. Dr. Chiappone had consulted with Dr. Tureen when Dr. Chiappone's evaluation suggested that O'Neal suffered from a brain disorder or brain damage. Dr. Tureen interviewed and tested O'Neal and reviewed the IQ test administered by Dr. Chiappone. He confirmed Dr. Chiappone's suspicion of a brain disorder, and he testified at trial to his conclusion that O'Neal was borderline to mildly mentally retarded.

### B. The Hearing

{¶11} Dr. Tureen evaluated O'Neal again in 2004 for his *Atkins* claim. He issued a report and appeared as the sole witness at O'Neal's *Atkins* hearing. The state countered with Dr. Chiappone's 1994 trial testimony and the March 2005 report of Dr. W. Michael Nelson III.

### 1. The Mental-Retardation Criteria

{¶12} The Ohio Supreme Court in *State v. Lott* provided three criteria for evaluating a capital defendant's claim that he is, in the words of the United States Supreme Court in *Atkins*, "so impaired as to fall within the range of mentally retarded offenders [against] who[se] [execution] there [has emerged] a national consensus."[3] The defendant must demonstrate by a preponderance of the evidence (1) that he suffers from "significantly subaverage intellectual functioning," (2) that he has experienced "significant limitations in two or more adaptive skills, such as communication, self-care, and self-

---

[3] *Atkins v. Virginia*, 536 U.S. at 317.

4

OHIO FIRST DISTRICT COURT OF APPEALS

direction," and (3) that these manifestations of mental retardation appeared before the age of 18.[4]

{¶13}  The court in *Lott* cautioned that an IQ test score is merely one measure of intellectual functioning that "alone [is] not sufficient to make a final determination on [the mental-retardation] issue."[5]  Nevertheless, the court declared that a full-scale IQ score above 70 gives rise to "a rebuttable presumption that a defendant [is] not mentally retarded."[6]

{¶14}  The court in *Lott* formulated its mental-retardation criteria based upon the clinical definitions of mental retardation provided in 1992 by the American Association of Mental Retardation ("AAMR") and in 2002 by the American Psychiatric Association ("APA") and cited with approval by the Supreme Court in *Atkins*.[7]  Both definitions provided these diagnostic criteria for mental retardation: substantial limitations in present functioning, manifested before the age of 18, and characterized by significantly subaverage intellectual functioning coexisting with significant limitations in two of the adaptive skills of communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, health and safety, functional academics, leisure, and work.[8]  In 2002, the AAMR amended its definition to require a finding of significant deficiencies in one of three categories of adaptive skills:  "conceptual," which includes communication and functional academics skills; "social," which includes social/interpersonal and leisure skills; and "practical," which includes work, self-care, health, and safety skills.[9]

---

[4] *State v. Lott*, supra, at ¶12.
[5] See id.
[6] Id.
[7] *Atkins v. Virginia*, 536 U.S. at 308, fn. 3; *State v. Lott*, supra, at ¶12.
[8] American Association of Mental Retardation, Mental Retardation: Definition, Classification, and Systems of Supports 5 (9 Ed.1992); Diagnostic and Statistical Manual of Mental Disorders 41 (4 Ed.2000).
[9] American Association of Mental Retardation, Mental Retardation: Definition, Classification, and Systems of Supports 1 (10 Ed.2002).

OHIO FIRST DISTRICT COURT OF APPEALS

### 2. Dr. Tureen's Report and Testimony

{¶15}  In his report, Dr. Tureen noted that the AAMR recognizes that a "standard error of measurement * * * exists in any psychometric test measure, where an obtained score actually represents [the midpoint in] a range of statistical probability" of plus or minus five.  He also noted the AAMR's admonition against relying strictly on IQ-test scores to measure intellectual functioning.

{¶16}  With the AAMR and *Lott* standards in mind, Dr. Tureen reviewed O'Neal's school records and the IQ test administered by Dr. Chiappone in 1994.  He administered two IQ tests, on which O'Neal scored 67 and 63.  He also conducted a three-hour interview with O'Neill.  Applying the legal standard for mental retardation provided in *Atkins* and *Lott* and the psychological standards provided in 2000 by the APA and in 2002 by the AAMR, Dr. Tureen diagnosed O'Neal with "mild mental retardation."

{¶17}  From O'Neal's school records, Dr. Tureen found that his mental retardation had manifested before the age of 18.  O'Neal's 1968 full-scale IQ score of 64 consisted of a verbal score of 79 and a performance score of 55.  And he scored in the lowest percentiles on other "intellectual measures," such as the Stanford Achievement Test and the Scholastic Aptitude Test.  Dr. Tureen found that the vast difference between the verbal and performance portions of O'Neal's IQ scores indicated a severe learning disability and raised the possibility of a cerebral brain dysfunction that interfered with his intellectual ability and academic achievement.  Dr. Tureen acknowledged that O'Neal had not been placed in special-education classes.  But he noted that the school psychologist had recommended them, and that O'Neal's academic performance showed the need for them.  Dr. Tureen concluded that O'Neal's scores on these intellectual measures provided evidence of "the existence of low intellectual ability."

OHIO FIRST DISTRICT COURT OF APPEALS

{¶18}   Dr. Tureen stated that the consistency between O'Neal's performance on his earlier intellectual assessments and his performance on his 1994 and 2004 IQ tests verified the persistence into adulthood of his intellectual deficiencies and his brain dysfunction.   With respect to O'Neal's current adaptive functioning, Dr. Tureen asserted that information relevant to his functioning during his ten years under the structured conditions on death row would not be useful.   Dr. Tureen instead looked to his 1994 report, his and Dr. Chiappone's trial testimony, and O'Neal's history of drug and alcohol abuse.   He found no impairments in eight of the AAMR adaptive-skills areas, at least when alcohol or drugs were not involved.   He acknowledged that O'Neal had owned and had driven a car, had served in the military, had married and had supported a family, had sought and had gained custody of two children, had held jobs, and had adjusted to prison life.   But he found that O'Neal's limited intellectual abilities impaired his functional academics and, in "emotionally charged" situations, compromised his social adaptability skills.

### 3. Dr. Nelson's Report

{¶19}   For the report that he provided at the state's behest, Dr. Nelson looked at the IQ-test data, the evaluations conducted by Drs. Tureen and Chiappone, the trial record, and O'Neal's medical, school, work, and prison records.   Dr. Nelson concluded that O'Neal did not meet the definition of mental retardation.

{¶20}   Dr. Nelson acknowledged that O'Neal's IQ scores were subject to a standard error of measurement of plus or minus five, and that mental retardation might thus be diagnosed in an individual with an IQ score of 70 to 75  and significant deficits in adaptive behavior.   Conversely, he asserted, mental retardation could not be diagnosed in an individual with an IQ score of less than 70 if he had no significant deficits in his adaptive functioning.   Dr. Nelson found that, to the extent of his intellectual deficits and

7

OHIO FIRST DISTRICT COURT OF APPEALS

his deficits in the conceptual adaptive skills of reading and money concepts, O'Neal functioned in the mild-mental-retardation to borderline range. But he insisted that O'Neal exhibited no deficits in his practical adaptive skills, and that the deficits in his social skills, which arose in situations involving emotional intensity, were more a function of his psychological problems. Dr. Nelson concluded that, because O'Neal functioned at least in the borderline range in his social and practical adaptive skills, he was not mentally retarded.

## II. The Common Pleas Court's Decision

{¶21} The determination of whether a capital defendant is, by the *Lott* court's definition, mentally retarded presents a factual issue for the trial court.[10] Based upon the evidence adduced at the hearing, the court below concluded that O'Neal had failed to sustain his burden of proving by a preponderance of the evidence that he is mentally retarded. The court noted that O'Neal's 71 IQ score raised the presumption that he was not mentally retarded. And the court found that he had failed to rebut the presumption.

{¶22} In its decision, the court found that O'Neal had failed to prove by a preponderance of the evidence that he suffered from significantly subaverage intellectual functioning. With respect to the over-70 presumption, the court noted the plus-or-minus-five standard error of measurement recognized in *Lott* and acknowledged by Drs. Chiappone, Tureen, and Nelson. The court construed the standard error of measurement to require O'Neal to "present the court with IQ scores of 64 or below" to rebut the *Lott* presumption. It then discounted O'Neal's 1968 full-scale IQ score of 64 because it was "not a recent [score], and at best provide[d] the court with equal evidence [to his 1994 and 2004 scores] as to whether [he] suffer[ed] from significantly subaverage intellectual functioning."

---

[10] Id. at ¶9.

OHIO FIRST DISTRICT COURT OF APPEALS

{¶23} We are at a loss to explain how the court arrived at its "64 or below" requirement. Nothing in the *Atkins* or *Lott* decisions or in the psychologists' reports or testimony warranted such a requirement. We, therefore, hold that the court erred as a matter of law in imposing it.

{¶24} Nevertheless, Dr. Nelson's report provided the court with evidence upon which it might have concluded that O'Neal had failed to prove significantly subaverage intellectual functioning. More significantly, the record is replete with evidence to support the court's finding that O'Neal had failed to prove the conjunctive criterion of coexistent limitations in two or more adaptive skills, so we believe the court's misapprehension of the IQ numbers was harmless.

### III. We Affirm

{¶25} An appellate court will not reverse a trial court's determination of the issue of mental retardation if the determination was supported by reliable, credible evidence.[11] O'Neal's over-70 IQ score raised the presumption that he was not mentally retarded. We conclude that reliable, credible evidence supported the trial court's determination that O'Neal had failed to overcome the presumption. We, therefore, overrule the assignment of error and affirm the judgment of the court below.

Judgment affirmed.

GORMAN, P.J., and SUNDERMANN, J., concur.

*Please Note:*
    The court has recorded its own entry on the date of the release of this decision.

---

[11] *State v. Were* (Feb. 4, 2005), 1st Dist. No. C-030485, 2005-Ohio-376.

9

ORIGINAL

IN THE SUPREME COURT OF OHIO

ON COMPUTER - JJ

STATE OF OHIO,

    Plaintiff-Appellee,

07 - 0080

    v.

CASE NO. _____

On Appeal From the Court of
Appeals of Hamilton County,
First Appellate District

JAMES DERRICK O'NEAL,

    Defendant-Appellant.

Court of Appeals Case
No. C-050840

---

## MEMORANDUM IN SUPPORT OF JURISDICTION
## OF APPELLANT JAMES DERRICK O'NEAL

---

JOHN J. GIDEON (0008151)
250 East Stanton Avenue
Columbus, Ohio 43214-1268
Phone: (614) 844-3954
Email: johngideon@sbcglobal.net

MICHAEL W. KRUMHOLTZ (0009099)
Bieser, Greer & Landis LLP
6 North Main Street, Suite 400
Dayton, Ohio 45402-1908
Phone: (937) 223-3277
Facsimile: (937) 223-6339
Email: mwk@bgllaw.com

COUNSEL FOR APPELLANT

JOSEPH T. DETERS (0012084)
Hamilton County Prosecuting Attorney
PHILIP R. CUMMINGS (0041497)
Assistant Prosecuting Attorney
230 East Ninth Street, Suite 7000
Cincinnati, Ohio 45202-2174
Phone: (513) 946-3021
Email: Phil.Cummings@hcpros.org

COUNSEL FOR APPELLEE

FILED

JAN 16 2007

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

## TABLE OF CONTENTS

PAGE(S)

EXPLANATION OF WHY THIS CASE IS A CASE THAT INVOLVES
SUBSTANTIAL CONSTITUTIONAL QUESTIONS AND IS A CASE OF
PUBLIC AND GREAT GENERAL INTEREST ..............................................................1

STATEMENT OF THE CASE AND FACTS ...............................................................3

ARGUMENT IN SUPPORT OF PROPOSITIONS OF LAW....................................18

    **Proposition of Law No. I:**

    A defendant who scores an average of 65.6 on five IQ tests administered
    beginning when he is 14-years-old in 1968 and ending in 2004 when he is 50
    years old -- and whose IQ scores are re-normed to average 62.432 to adjust
    for rising IQ levels called the "Flynn Effect" -- proves by a preponderance of
    the evidence that his IQ is 70 or below and that he has significantly
    subaverage intellectual functioning pursuant to <u>Atkins v. Virginia</u> and <u>State
    v. Lott</u> ...................................................................................................18

    **Proposition of Law No. II:**

    A defendant who is determined by his school psychologist when he is 14 years
    old to have a full scale IQ of 64 and whom the school psychologist
    recommends for the Junior High School Slow Learning Program due to
    "below normal intellectual functioning" has shown by a preponderance of
    the evidence that his mental retardation had its onset before age 18 pursuant
    to <u>Atkins v. Virginia</u> and <u>State v. Lott</u> ........................................................26

    **Proposition of Law No. III:**

    A trial court deciding whether a defendant is mentally retarded under the
    standards of <u>Atkins v. Virginia</u> and <u>State v. Lott</u> -- and in particular whether
    a defendant has significant limitations in two or more adaptive behavior
    skills -- may not choose to rely on evidence from an expert appointed by the
    court who has not met, interviewed, evaluated, or administered IQ tests to
    the defendant and who does not testify at the evidentiary hearing over
    evidence from an expert appointed by the court who has met, interviewed,
    evaluated, and administered IQ tests to the defendant and who does testify
    and is subject to cross-examination at the evidentiary hearing...................30

CONCLUSION.................................................................................................35

CERTIFICATE OF SERVICE ........................................................................36

APPENDIX.....................................................................................................38

    Decision and Judgment Entry,
      State of Ohio v. James Derrick O'Neal,
    Hamilton County Court of Appeals
    Case No. C-050840 (December 1, 2006).................................................. A-1

<u>EXPLANATION OF WHY THIS CASE INVOLVES</u>
<u>SUBSTANTIAL CONSTITUTIONAL QUESTIONS AND</u>
<u>IS A CASE OF PUBLIC AND GREAT GENERAL INTEREST</u>

This appeal presents this Court with a case in which both a state trial court and a court of appeals went fundamentally awry in their attempts to apply the new constitutional rule adopted in <u>Atkins v. Virginia</u> (2002), 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335, where the United States Supreme Court held that a mentally retarded defendant is not subject to the death penalty, and in their efforts to apply that new constitutional rule under the procedures and standards adopted by this Court in <u>State v. Lott</u> (December 11, 2002), 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, to implement <u>Atkins</u>.

The trial court -- rather than simply observing the <u>Atkins</u> constitutional rule and applying the procedures and standards prescribed in <u>Lott</u> -- construed both the law and the facts most strongly against Appellant.

It is not an exaggeration to say that the trial court reformulated the "over-70" IQ standard to require a defendant to prove IQ test scores of 64 or below to meet the standard of "significantly subaverage intellectual functioning." Nor is it hyperbole to state that the trial court reformulated the "onset-by-age-18" standard to require a defendant to prove that he had significant limitations in two or more adaptive behavior skills. Nor is it a stretch to say that the trial court recast the test of "significant limitations in two or more adaptive behavior skills" to require a defendant to prove that he is profoundly mentally retarded and without any skills and strengths whatsoever.

Not only did the trial court misunderstand and misapply the applicable legal standards, but the trial court also strained to conclude that Appellant met none of these inventive standards by its rejecting the findings and conclusions and opinions of an expert (Dr. Robert Tureen) who

1

actually met with Appellant, interviewed him, evaluated him, gave him written tests, and testified under oath and was subject to cross-examination at the evidentiary hearing before the trial court in favor of an expert (Dr. Michael Nelson) who never met Appellant, never interviewed him, never evaluated him, never gave him written tests and never testified under oath or was subjected to cross-examination at the evidentiary hearing.

The Court of Appeals, except for its rejecting the trial court's reformulation of the "over-70" IQ standard to require an IQ test score of 64, failed to correct the pervasive and fundamental errors in the trial court's decision.

This Court should grant this case a hearing on the merits to correct the lower courts' misunderstanding and misapplication of the constitutional standards in Atkins and Lott.

2

## STATEMENT OF THE CASE AND FACTS

A.  History of the Case

This is an appeal from the judgment of the Court of Appeals of Hamilton County, First Appellate District affirming the judgment of the Court of Common Pleas of Hamilton County denying Petitioner-Appellant James Derrick O'Neal's first successive petition to vacate or set aside his death sentence based on his claim that he is mentally retarded and not subject to the death penalty under the Supreme Court's decision in Atkins v. Virginia (2002), 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335.

Appellant was convicted of aggravated murder and sentenced to death by the Court of Common Pleas on December 11, 1995 (the Hon. Ralph E. Winkler presiding). His conviction and death sentence were affirmed on both direct appeal and collateral review through the Ohio Supreme Court.

On May 21, 2002 Appellant filed a petition for a writ of habeas corpus in the United States District Court for the Southern District of Ohio, Western Division. James Derrick O'Neal v. Margaret Bagley, Warden, Case No. 1:02-cv-357. The United States Supreme Court, on June 20, 2002, decided Atkins v. Virginia wherein the Court held that the Eighth Amendment to the United States Constitution, barring "cruel and unusual punishments," prohibits the execution of a person who is mentally retarded. Because Atkins reversed existing Supreme Court precedent and created a new federal claim that O'Neal could not have presented to the Ohio state courts at trial or on direct or collateral appeal, the federal court stayed the habeas corpus proceedings to allow Appellant to exhaust his state court remedies as required by the exhaustion doctrine.

On November 15, 2002 Appellant filed with the Court of Common Pleas, Hamilton County, his first successive petition to vacate or set aside his sentence based on <u>Atkins</u>. Appellant's petition was denied by the court below (the Hon. Mark R. Schweikert presiding) on April 7, 2004 without the benefit of an evidentiary hearing. Appellant appealed the court's denial of his petition to the Court of Appeals of Hamilton County. By way of agreed entry filed on August 13, 2004, Appellant withdrew his appeal and he was granted an evidentiary hearing before the Court of Common Pleas on the issue of whether he is mentally retarded as defined by <u>Atkins</u>. The Court of Common Pleas appointed experts on behalf of both Appellant and Appellee to examine Appellant.

The Court of Common Pleas held the evidentiary hearing on May 17, 2005. The parties filed post-hearing briefs. On September 26, 2005 the court denied Appellant's petition to vacate or set aside his sentence, finding that Appellant did not meet the legal standard set forth in <u>Atkins</u> to be deemed "mentally retarded."

Appellant filed a timely appeal to the Court of Appeals. Appellant and Appellee filed briefs. Appellant filed notice of supplemental authorities. Following oral argument, the Court of Appeals issued a decision and judgment entry on December 1, 2006 affirming the judgment of the Court of Common Pleas.

B.  Facts Relevant to Propositions of Law

The three-part constitutional standard for evaluating a claim of mental retardation, as stated in <u>Atkins</u> and recognized in <u>State v. Lott</u> (December 11, 2002), 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, is: (1) significantly subaverage intellectual functioning, (2) significant limitations in two or more adaptive skills, and (3) onset before age 18. The facts as to each part of this standard are as follows.

4

<u>Onset Before Age 18</u>

The third part of the constitutional test of mental retardation, as restated by this Court in

<u>Lott</u>, is "onset before the age of 18."

Appellant did not begin to claim that he was mentally retarded only after the decision in

<u>Atkins</u> was issued. Nor was the preparation for the penalty phase of his trial the first time that

Appellant was diagnosed as mentally retarded.

The report of Cincinnati Public Schools School Psychologist Ruth Kaufman from

February, 1968 when Appellant was 14 years old and in the 6th grade (Hearing Exhibit A) shows

that Appellant obtained a full scale IQ of 64 on the Wechsler Intelligence Scale for Children

(WISC). Ms. Kaufman, in her assessment of Appellant's performance on the WISC and other

tests, noted Appellant's strengths and weaknesses, and observed that Appellant's performance

tests showed that he was "moderately retarded." Ms. Kaufman concluded that Appellant should

be in the "Junior High Slow Learning Program." She further stated that "Below normal

intellectual functioning due to organic dysfunction seemed to be the primary problem."

Dr. Michael Nelson, who submitted a written report to the Court (Hearing Exhibit 1) but

did not interview or test Appellant and who did not testify at the hearing, wrote in his report at

page 3 that the full scale IQ test results placed Appellant overall in the "Mild range of Mental

Retardation." And Dr. Nelson added that "He manifested a significant deficit in his performance

capabilities where he functioned in the moderate to mild range of mental retardation."

Dr. Robert Tureen, who interviewed and tested Appellant June, 1994 before his trial and

who interviewed and tested Appellant again in December, 2004 after being appointed by the trial

court, and who testified at the evidentiary hearing on May 17, 2005, provided a more thorough

analysis of the significance of the school psychological evaluation. Dr. Tureen said this (at page 4 of his report):

> On the Wechsler Intelligence Scale for Children, he obtained a **Fullscale I.Q. of 64** (Verbal I.Q. 79, Performance I.Q. 55). **That large a discrepancy on the Wechsler scales between Verbal and Performance Scores does raise at least the possibility of some level of brain disturbance or dysfunction, that might be interfering with intellectual ability.** The school psychologist summary evaluation recommended that James be placed in the junior high school slow learner program. She further was of the opinion that "Below normal intellectual functioning, due to organic dysfunction seemed to be the primary problem." She also indicated that emotional problems might be interfering with his school achievement. The importance of this is **the early establishment of not only measured I.Q. levels, but also the presumption of impaired brain function (cerebral dysfunction). *** It is my opinion that the above data establishes the existence of low intellectual ability, at least in terms of his academic performance, as well as assessed intellectual measures before the age of eighteen, with suggested evidence of cerebral brain dysfunction, resulting in poor academic achievement and low intellectual status.** (emphasis added)

Noting Appellant's low achievement test scores, Dr. Nelson agreed that "Mr. O'Neal had long-standing achievement/academic skill deficits."

While the school psychological testing and evaluation was focused on Appellant's intellectual and academic skills and abilities and does not contain a discrete analysis of Appellant's adaptive behavioral skills, the performance scores on the Wechsler test and other tests led Ms. Kaufman to conclude more broadly that "When tasks required that he work toward an unknown goal or concentrate on visual cues, he gave an extremely defective performance. Spatial reasoning was also very poor for his age. Moreover, his knowledge of vocabulary and recall of information indicated defective functioning."

<u>Significantly Subaverage Intellectual Functioning</u>

6

The second part of the constitutional test of mental retardation, as restated in <u>Lott</u>, is "significantly subaverage intellectual functioning."

Before the death penalty trial began before the trial court in October, 1995 Appellant was examined and evaluated by two psychologists, Dr. David Chiappone and Dr. Robert Tureen. Dr. Tureen, in his January 18, 2005 report to the trial court, summarizes the assessment by Dr. Chiappone which led to Dr. Chiappone's requesting that Dr. Tureen, a neuropsychologist, examine Appellant:

> In 1994, during his incarceration at the Hamilton County Justice Center, **David Chiappone, Ph.D. administered the Wechsler Adult Intelligence Scale-R.** This is a scale that is related in characteristics to the Wechsler Intelligence Scale for Children, but is normed on the adult population and is in fact the fourth revision of the adult Wechsler Scales. On March 31, 1994, the following I.Q. scores were obtained: Verbal I.Q. 72, Performance I.Q. 71 and **Full Scale I.Q. 71,** all representing **a ranking a the 3rd percentile,** compared to the general population, meaning that 97% of the population does as well or better than James performed on the test. **The 95% confidence interval for the Full Scale I.Q. is 67 to 77, which are reasonable limits of the range within which James's "true" Full Scale I.Q. lies. Thus, there is a reasonable probability that James' true score lies below the established score of 70, representing mental retardation,** but also a reasonable probability that his true score lies above that particular level. What was more important at the time, was the **continued presence of evidence of brain dysfunction.** This was essentially why Dr. Chiappone requested my involvement in the case, since on his initial testing, he was finding signs suggesting brain disorder and this is my specialty area. Additional testing, using specific measures that are sensitive to the presence of brain dysfunction I administered in 1994 substantiated **a consistent picture of a brain dysfunction, present on several measures, indicating impairment in abstraction and problem solving and difficulty on measures of spatial analysis and synthesis,** which was suggested by the poor performance I.Q. reported in 1968. On the other hand, his general language, his auditory comprehension and general verbal expression and his ability to follow instructions were all intact, within **his level of intellectual functioning, that is, of an individual with an I.Q. in the borderline to mildly**

7

> **retarded range**, as measured on the Wechsler Adult Intelligence
> Scale-R (WAIS-R). (emphasis added)

Hearing Exhibit C, January 18, 2005 Dr. Tureen Report at pages 5-6.

The courts below have fixated on the isolated fact that Appellant obtained a full scale score of 71 on the WAIS-R administered by Dr. Chiappone in 1994 and have virtually ignored the fact that Appellant got a full scale score of 64 on the WISC administered in 1968, and a score of 63 on the Cognitive Status Exam administered by Dr. Tureen in 1994, and a full scale score of 67 on the WAIS-III administered by Dr. Tureen in 2004, and a composite index score of 63 on the Reynolds Intellectual Scales test administered by Dr. Tureen in 2004.

As Dr. Tureen carefully and thoughtfully explained in his hearing testimony at Hrg. Tr. 36-37, these tests have errors of measurement. As explained cogently by the AAMR:

> Although not perfect, intelligence is represented by Intelligence
> Quotient (IQ) scores obtained from standardized tests given by a
> trained professional. In regard to the intellectual criterion for the
> diagnosis of mental retardation, **mental retardation is generally
> thought to be present if an individual has an IQ test score of
> approximately 70 or below**. An obtained IQ score must always be
> considered in light of its **standard error of measurement**,
> appropriateness, and **consistency** with administration guidelines.
> <u>Since the standard error of measurement for most IQ tests is
> approximately 5, the ceiling may go up to 75</u>. This represents a
> score approximately 2 standard deviations below the mean,
> considering the standard error of measurement.

American Association of Mental Retardation (AAMR), Definition of Mental Retardation, What is Intelligence?, http://www.aamr.org/Policies/faq_mental_retardation.shtml (emphasis added).

At the time of Appellant's trial in October, 1995 the prevailing rule on the imposition of the death penalty on mentally retarded persons was that contained in <u>Penry v. Lynaugh</u> (1989), 492 U.S. 302. <u>Penry</u> held that it was not a violation of the Eighth Amendment's ban on cruel and unusual punishment to execute a mentally retarded person. Thus, the penalty phase mitigation

testimony regarding Appellant's mental retardation was presented, not as a bar to the imposition of the death penalty, but merely as evidence in mitigation. The constitutional standards for determining if an offender is mentally retarded -- as set out in <u>Atkins</u> -- did not exist and were not referred to during the questioning of either Dr. Chiappone or Dr. Tureen. The examinations of Dr. Chiappone and Dr. Tureen, which are part of the trial record, are noticeably devoid of any reference to the definitions of mental retardation of the American Association of Mental Retardation or the American Psychiatric Association. Even more noticeable is the absence of any questioning, and consequently the absence of any testimony, about the actual scores that Appellant achieved on the various I.Q. and other tests administered in 1994 or to Appellant's abilities with respect to specific adaptive behavior skills.

Thus, when during his testimony Dr. Chiappone said that "He's not retarded," -- referring of course to Appellant -- this statement was not made with explicit reference to the AAMR or APA definitions of mental retardation. Nor, obviously, could this statement have referred to the constitutional standard of mental retardation later set out in <u>Atkins</u>.

But virtually all of the rest of Dr. Chiappone's 1995 penalty phase mitigation testimony supports the conclusion that Appellant meets the constitutional definition of mental retardation.

Dr. Chiappone testified that he administered a number of tests to Appellant and that Appellant "scored in the what are called the border range of mental retardation. [sic] He's not retarded, but he functions at the second or third percentile of the general population." Trial Tr. at 981. He testified that Appellant had difficulty performing some simple tests that the Doctor administered. "And so at that point I thought there was what we call organicity above and beyond limited intellect. And at that point I recommended we have a neuropsychologist who specializes in dysfunctions of the brain to do further testing to make sure we didn't miss

anything." Trial Tr. at 982. Dr. Chiappone testified that Appellant suffered from "borderline mental retardation based on the IQ test and substantiated by his educational data." Trial Tr. at 987. Finally, Dr. Chiappone stated that Appellant had a "[l]ack of coping skills" which, along with other factors, "made it more difficult for him to effectively problem solve." Trial Tr. at 996.

As noted above, after he evaluated and tested Appellant, Dr. Chiappone referred Appellant to Dr. Robert Tureen, a clinical neuropsychologist at the Mayfield Neurological Institute in Cincinnati. Dr Tureen also testified in the mitigation phase of the trial. Trial Tr. at 997.

Dr. Tureen did further testing of Appellant which showed a "longstanding type of disturbance" which he called "minimal cerebral dysfunction." Trial Tr. at 1001. Dr. Tureen testified that Appellant had a very poor academic performance throughout his limited academic career and that "early psychological testing that was done in '68 stated there was evidence of organicity or brain damage." Trial Tr. at 1002.

As to Appellant's level of intellectual functioning, Dr. Tureen described it as being "in the borderline to mildly retarded range." Trial Tr. at 1002. Dr. Tureen concluded that Appellant is "an individual who's going to have some limitations on how well they're [sic] going to be able to function. *** By cognitive thinking general problems involving memory, spatial and statistical skills, language usage, as well as motor skills. [sic] And on that particular exam he performed well into the impaired range. You take that performance and put it together with the IQ level and you see an individual who is going to have some sort of difficulties in adjusting in the world." Trial Tr. at 1003. He added that persons like Appellant would have "some real limitations of what they're going to be able to do in life and what they're going to be able to accomplish." Trial

Tr. at 1005. Finally, Dr. Tureen testified on cross-examination that Appellant "was functioning in the mildly mentally retarded to borderline range." Trial Tr. at 1009.

Dr. Nelson, on page 3 of his report (Hearing Exhibit 1, March 21, 2005 Dr. Nelson Report) summarizes Dr. Chiappone's and Dr. Tureen's penalty phase mitigation testimony as follows: "It appears that Mr. O'Neal is functioning in the Mild MR to Borderline range of intelligence." Thus, Respondent's expert, Dr. Nelson, does not disagree with the diagnosis of mental retardation.

It is important to emphasize here that the WAIS-R was not the only test administered to Appellant in 1994. Other tests were administered and Appellant's performance on all of these tests demonstrates, as Dr. Tureen testified at the evidentiary hearing below, a consistent pattern of significantly subaverage intellectual functioning. If Atkins had been the rule at the time of Appellant's trial, his attorneys would have questioned Dr. Tureen with respect to the specific results of all of these tests.

Hearing Exhibit B, Dr. Tureen's July 27, 1994 report, contains this most important summary of all of the 1994 test results:

> TEST RESULTS AND INTERPRETATION: James was administered the **Wechsler Adult Intelligence Scale - R (WAIS-R) by Dr. Chippone [sic] yielding Verbal Performance and Full scale I.Q.'s in the borderline range to mildly mentally retarded range (3rd percentile in comparison with others of his age).** The only subscale score which was significantly out of line and significantly higher than his overall average subscale scores was on the Digit Symbol subtest which reflects relatively good psychomotor speed and visual motor coordination. The general intellectual level is compatible with the academic levels reported and described above.
>
> **On the Cognitive Status Exam (Barrett), a screening exam for cognitive, sensory, and motor functions, James obtained a score of 63 out of a possible 104 points, scores below 75 are in**

11

the impaired range. <u>Generally speaking, individuals who have</u>
<u>WAIS-R I.Q. levels in the borderline to retarded range coupled</u>
<u>with cognitive status exam scores significant [sic] below 65, as</u>
<u>is the case here, are generally seen as having difficulties</u>
<u>functioning in the environment in even relatively routine ways</u>
<u>on a day to day basis as he result of impairment in brain</u>
<u>function</u>. If this impairment is longstanding, that is congenital as
opposed to something more recently acquired, then the functioning
is likely to be marginal at best. Because of difficulty adapting and
adjusting, such individuals are likely to find themselves struggling
in the general adaptation.

James's performance on the Wisconsin Card Sort and Porteus
Mazes reflects evidence of difficulty in abstraction and problem
solving. On the **Wisconsin Card Sort** in particular, there is very
**high perseverative response rate**. What this reflects is an
inability to learn effectively from feedback information regarding
one's performance and a tendency to continually repeat the same
types of behavior pattern even though there may be information
provided that the behavior pattern is incorrect. In otherwords [sic],
**he does not learn well from information being provided by the**
**environment, particularly in novel situations**. On the **Porteus**
**Mazes**, James again demonstrates **considerable difficulty in**
**planning ahead and attempting to anticipate a course of action**.
His performance level actually reaches around year 7, but even
here he is struggling to perform within the acceptable limits.

Further evidence of impaired functioning is reflected on any spatial
analytic task. On copying simple configurations such as a Greek
cross, there is marked constructional dyspraxia, that is an inability
to accurately reproduce the appropriate juxtaposition of the various
spatial features of the figure. His attempt to copy the complex Rey
figure resulted in even more evidence of the difficulty he has with
spatial analytical skills resulting in a markedly distorted copy of
the figure. When he was asked to recall the figure immediately
after the copy phase, he was only able to produce one or two lines
of this rather intricate figure and even those were drawn
incorrectly.

Finally, on the **Hooper Visual Organization Test (VOT),** a task
which does not involve a motor component, but strictly involves
the conceptual organization of spatial elements into recognizable
wholes, **performance is in the severely impaired range.**

Brief measures of language assessment indicate that object, number, letter, and word recognition are unimpaired within the level of the patient's intellect. His auditory comprehension and expression are unimpaired. He is able to follow instructions without difficulty. His reading level is functional for routine day to day activities.

GENERAL CONCLUSIONS: This is a 39 year old male with **borderline to mildly retarded level of intellectual functioning** as reflected in previously administered psychometric measures. Current testing reflects evidence of impaired higher cortical functions such as novel reasoning, abstracting, and planning, and spatial analytical skills, while motor functions remain relatively intact.

Given the early academic records, these findings most likely reflect **a longstanding condition**.

Hearing Exhibit B, July 27, 1994 Dr. Tureen Report, at pages 2-3.

In December of 2004 Dr. Tureen again interviewed Appellant and again administered tests. The details of the results of these tests are contained in his January 18, 2005 report:

On the **WAIS-III**, James obtained a Verbal I.Q. of 71, Performance I.Q. of 69, and **Full Scale I.Q. of 67.** The descriptions currently used rate the Performance and Full Scale I.Q. as "extremely low" and Verbal I.Q. as "borderline."

Hearing Exhibit C, January 18, 2005 Dr. Tureen Report at page 6 (emphasis added).

Dr. Tureen also had Appellant take the **Reynolds Intellectual Scales** test:

I also chose to administer the Reynolds Intellectual Scales, which is a relatively new test, but has both the advantage and disadvantage of not involving any psychomotor measures. *** The following indices are essentially I.Q. scores:
Verbal Index = 68, 2nd percentile, 95th confidence interval 63-77 (i.e. range where true score lies)
Non-Verbal Index = 67, 1st percentile, 95th confidence interval 62-75
**Composite Index = 63**, 1st percentile rank, 95th confidence interval 59-70

Id., at page 7 (emphasis added).

13