Considering the scores that Appellant has achieved on ALL the IQ tests he has been administered from when he was 14 years old to the present, the preponderance of the evidence is that Appellant's IQ is below 70. Taken together with Appellant's academic performance as well as his performance on achievement tests, the evidence establishes that Appellant has consistently suffered from significantly subaverage intellectual functioning.

<u>Significant Limitations in Two or More Adaptive Behavior Skills</u>

The third part of the constitutional test of mental retardation, as stated by this Court in <u>Lott</u>, is "significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction."

The thrust of the State's questions and argument at the evidentiary hearing was, essentially, that Appellant does not meet the definition of mental retardation because he was able to go to school, drive a car, get married, have children, be a Marine, and hold various jobs (ignoring how poorly Appellant generally fared in almost all of these areas).

The definition of mental retardation -- be it the definition of the American Association of Mental Retardation, the definition of the American Psychiatric Association, the constitutional definition set out by the United States Supreme Court in <u>Atkins</u>, or the definition adopted by this Court in <u>Lott</u> -- does <u>not</u> require that to qualify as "mentally retarded" an offender must be profoundly mentally retarded. The execution of a person who is mildly mentally retarded is unconstitutional under <u>Atkins</u>. Indeed, the AAMR definition of "mental retardation" expressly contemplates that:

**"Within an individual, limitations often coexist with strengths."**

American Association of Mental Retardation (AAMR), Definition of Mental Retardation, What is Intelligence?, http://www.aamr.org/Policies/faq_mental_retardation.shtml (emphasis added).

The State's questions and arguments during the evidentiary hearing seemed to suggest that to be "mentally retarded" as defined by Atkins an offender must be profoundly mentally retarded and have significant limitations in ALL adaptive behavior skills. That obviously is not the law. The law is the three-part test. The question is not whether Appellant has some strengths -- he obviously does. The question is whether Appellant meets the three-part test, the third part pertaining to significant limitations in two or more adaptive skills.

Dr. Chiappone testified that Appellant had a "[l]ack of coping skills" which, along with other factors, "made it more difficult for him to effectively problem solve." Trial Tr. at 996.

Dr. Nelson, who did not visit, interview, or test Appellant, or even testify at the evidentiary hearing in support of his report, nevertheless agrees that: "It is clear that Mr. O'Neal has difficulties in dealing with stressful situations in an effective manner and does not think through the consequences of his behavior very well." Hearing Exhibit 1, March 21, 2005 Dr. Nelson Report, at page 5. While Dr. Nelson goes on to say that this same problem is experienced by "individuals who function at higher levels of intelligence," he does not deny that Appellant's limitation in this area is evidence of a problem with his social skills or that this limitation is caused by mental retardation. Moreover, Dr. Nelson concedes that: "Mr. O'Neal does seem to exhibit significant deficits in several conceptual areas (i.e., reading, money concepts). Id. (emphasis added). Finally, Dr. Nelson says expressly that: "I would agree that Mr. O'Neal certainly has evidenced difficulties in his adaptive functioning in situations involving emotional intensity." Id. While Dr. Nelson attributes these difficulties to "psychiatric difficulties," he fails

to provide any basis for concluding that these difficulties are not caused by Appellant's mental retardation. Importantly, Dr. Nelson was not available to have his assertion cross-examined.

Dr. Tureen testified at Appellant's October, 1995 trial that Appellant is "an individual who's going to have some limitations on how well they're [sic] going to be able to function. *** By cognitive thinking general problems involving memory, spatial and statistical skills, language usage, as well as motor skills. [sic] And on that particular exam he performed well into the impaired range. You take that performance and put it together with the IQ level and you see an individual who is going to have some sort of difficulties in adjusting in the world." Trial Tr. at 1003. He added that persons like Appellant would have "some real limitations of what they're going to be able to do in life and what they're going to be able to accomplish." Trial Tr. at 1005. Finally, Dr. Tureen testified on cross-examination that Appellant "was functioning in the mildly mentally retarded to borderline range." Trial Tr. at 1009.

At the evidentiary hearing on May 17, 2005 Dr. Tureen testified specifically in terms of the constitutional standard of mental retardation and the requirement of the third prong of the test that requires significant limitations in two or more adaptive skills. In particular, Dr. Tureen testified that Appellant has significant limitations in conceptual as well as social skills:

> Q. Based on your education, training, and experience and your interviewing and testing of Mr. O'Neal, as well as your review of his scholastic records, do you have an opinion, Dr. Tureen, to a reasonable certainty as a psychologist as to **whether or not Mr. O'Neal currently suffers from a disability characterized by significant limitations in two or more adaptive skills** as expressed in conceptual, social, and practical adaptive skills, which occurred before he was age 18?
>
> A. Yes, I do.
>
> Q. What is your opinion?

16

A.  That he still suffers from the same level of **conceptual inability**, if you will, and **social limitations** as he did prior -- in the past.

Q.  And what **particular adaptive skills** does Mr. O'Neal suffer from a significant limitation of?

A.  First of all, there is **a significant limitation in academic skills. I would say reading, math**, but more importantly is the limitation as a result of what I initially referred to as mild cerebral dysfunction, which I believe is the cause of the **low level of intellectual function.**

Now, that particular type of disturbance that he demonstrated on our earlier testing limits his ability to consider alternative modes of dealing with situations which are stressful or which he finds in some way threatening.

Q.  And I don't have *Atkins* in front of me, I'm going from memory. Feel free to review *Atkins* if you have it in your possession. The reference in *Atkins* to adaptive skills relates to the following: Communication, self care, home living, social, community use, self direction, health and safety, functional academics, leisure, work. What you have just described, does that fall into that category of functional academics?

A.  The functional academics and social adaptive.

Q.  How does that fall into the category of **social adaptive**?

A.  **This is an individual who is going to become rigid, perseverative, not able to think of alternative ways of dealing with situations which occur particularly under stress.**

Q.  Does it impact the issue of whether or not Mr. O'Neal is mentally retarded if he meets two of the ten types of limitations in adaptive behavior?

A.  My understanding is that it does.

Q.  You have provided us with your opinion concerning whether or not James O'Neal is mentally retarded. Are there **gradations of mental retardation, Doctor?**

A.   Yes, there are.

Q.   Based on your education, training and experience and your interviewing and your testing of Mr. O'Neal and your review of his scholastic records, do you have an opinion to a reasonable certainty as a psychologist as to the **level of gradation of Mr. O'Neal's retardation?**

A.   Yes, I do.

Q.   What is that opinion?

A.   **He is mildly mentally retarded**.

Hearing Transcript at pages 30-33 (emphasis added).

<u>ARGUMENT IN SUPPORT OF PROPOSITIONS OF LAW</u>

**<u>Proposition of Law No. I</u>:**

**A defendant who scores an average of 65.6 on five IQ tests administered beginning when he is 14-years-old in 1968 and ending in 2004 when he is 50 years old -- and whose IQ scores are re-normed to average 62.432 to adjust for rising IQ levels called the "Flynn Effect" -- proves by a preponderance of the evidence that his IQ is 70 or below and that he has significantly subaverage intellectual functioning pursuant to <u>Atkins v. Virginia</u> and <u>State v. Lott</u>.**

The trial court concluded that Appellant does not suffer from significantly subaverage intellectual functioning. Decision Denying Defendant's Motion To Vacate Or Set Aside His Death Sentence at page 9. The court stated:

Defendant contends that the presumption that he is not mentally retarded is rebutted by his two tests that point to **a sub-70 IQ**. This court agrees. However, Defendant also bears the burden of proving by a preponderance of the evidence that he suffers from significantly subaverage intellectual functioning. *Id.* at 307.

The Ohio Supreme Court determined that **a score of 70 or above** raised a rebuttable presumption that a defendant is not mentally retarded, but it did not ignore the aforementioned five point standard of error completely. *Id.* at 304. **As**

18

**such, to meet his burden, Defendant must present the court with IQ scores of 64 or below.** Based on the standard margin of error, Defendant's [2004] IQ test score of 67 means that his true score could place him anywhere between the 62 and 72 range. Furthermore, his February 9, 1968 IQ score of 64 is not a recent one, and at best provides the court with equal evidence as to whether Defendant suffers from significantly subaverage intellectual functioning. Therefore, Defendant has failed to prove the first prong of the test enumerated in *Lott* by a preponderance of the evidence. (emphasis added)

Id.

As a preliminary matter, the trial court was clearly in error in stating that Lott held that "a score of 70 or above" is the cutoff point for raising a presumption that a defendant is not mentally retarded. Lott held that a rebuttable presumption that a defendant is not mentally retarded exists "if his or her IQ is above 70." Id. at ¶12. The trial court's entire decision is infected with the misapprehension that a score of 70 places a defendant in the category of not being mentally retarded.

It is important to keep in perspective the totality of the evidence that supports the conclusion that Appellant does suffer from significantly subaverage intellectual functioning. Appellant acknowledges that he obtained a full scale score of 71 on the WAIS-R administered by Dr. Chiappone in 1994. But Appellant got a full scale score of 64 on the WISC administered in 1968 by school psychologist Ruth Kaufman, a score of 63 on the Cognitive Status Exam administered by Dr. Tureen in 1994, a full scale score of 67 on the WAIS-III administered by Dr. Tureen in 2004, and a composite index score of 63 on the Reynolds Intellectual Scales test administered by Dr. Tureen in 2004.

In addition to the IQ scores themselves, all of the experts agree that Appellant's level of intellectual functioning is "significantly subaverage."

19

Cincinnati Public Schools School Psychologist Ruth Kaufman concluded that Appellant should be in the "Junior High Slow Learning Program." She further stated that "Below normal intellectual functioning due to organic dysfunction seemed to be the primary problem."

Dr. Chiappone testified that he administered a number of tests to Appellant and that Appellant "scored in the what are called the border range of mental retardation." [sic] [H]e functions at the second or third percentile of the general population." Trial Tr. at 981.

Dr. Nelson, who did not visit, interview, or test Appellant, or even testify at the evidentiary hearing in support of his report, says on page 3 of his report (Hearing Exhibit 1, March 21, 2005 Dr. Nelson Report): "It appears that Mr. O'Neal is functioning in the Mild MR to Borderline range of intelligence." [sic]

Dr. Tureen, who visited with, interviewed, and tested Appellant both in 1994 before trial and in 2004 before preparing his latest report -- and who testified at the mitigation phase of the trial and at the evidentiary hearing in the court below -- says at pages 9 to 10 of his report (Hearing Exhibit C, January 18, 2005 Dr. Tureen Report): "In conclusion, it is this examiner's opinion that there is evidence to support a diagnosis of mild mental retardation effecting James Derrick O'Neal, as outlined in the AAMR criteria for mental retardation. Furthermore, the level of intellectual functioning is as least in part related to cerebral dysfunction from an early age. It is my opinion that Mr. O'Neal clearly meets the criteria for I.Q. level, which has been consistently established in the retarded range, since grade school and he meets the criteria of the initiation of the retardation as before the age of eighteen."

The trial court apparently was not satisfied that Appellant has consistently averaged well below 70 on his IQ tests. The trial court was apparently troubled by the fact that psychology is not an exact science, that there is a "standard error of measurement." While the United States

Supreme Court in <u>Atkins</u> placed the "cutoff IQ score for the intellectual functioning prong of the mental retardation standard "between 70 or 75 or lower," and this Court in <u>Lott</u> placed the cutoff IQ score at which a defendant is presumptively deemed not to be mentally retarded at "above 70," the trial court decided to amend the standard, to create a new standard in which a "Defendant must present the court with IQ scores of 64 or below."

As Dr. Tureen carefully and thoughtfully explained on cross-examination in his hearing testimony, these tests have long been recognized to have standard errors of measurement:

> Q. Is it correct to generalize that the IQ score that you come up there [sic] can vary either five degrees over or five degrees under?
>
> A. They can, yes.
>
> Q. So an IQ score of 71 could be 76 or 66?
>
> A. It's possible, sure. Again, I think **the important point that I have been trying to make here is the consistency of the pattern from a very early age on IQ measures.**
>
> Q. The point that I'm trying to make is it could be anywhere in that range, so we can't say for sure the exact number. Would that be correct?
>
> A. That would be correct except that traditionally that [sic] we take the number, and if you read reports of -- as in this report -- if you read reports that that what the IQ is, you state it's 67, not that it's in a range from X to Y.

Hrg. Tr. at pages 37-38 (emphasis added). And as explained cogently by the AAMR:

> Although not perfect, intelligence is represented by Intelligence Quotient (IQ) scores obtained from standardized tests given by a trained professional. In regard to the intellectual criterion for the diagnosis of mental retardation, **mental retardation is generally thought to be present if an individual has an IQ test score of <u>approximately</u> 70 or below.** An obtained IQ score must always be considered in light of its **standard error of measurement**, appropriateness, and **consistency** with administration guidelines.

21

> **Since the standard error of measurement for most IQ tests is approximately 5, the ceiling may go up to 75.** This represents a score approximately 2 standard deviations below the mean, considering the standard error of measurement.

American Association of Mental Retardation (AAMR), Definition of Mental Retardation, What is Intelligence?, http://www.aamr.org/Policies/faq_mental_retardation.shtml (emphasis added).

The Court of Appeals rejected the trial court's taking upon itself the task of reformulating for the United States Supreme Court and this Court the constitutional standard for determining whether a defendant has significantly subaverage intellectual functioning. The Court of Appeals ruled:

> We are at a loss to explain how the court arrived at its "64 or below" requirement. Nothing in the *Atkins* or *Lott* decisions or in the psychologists' reports or testimony warranted such a requirement. We, therefore, hold that the court erred as a matter of law in imposing it.

State of Ohio v. James Derrick O'Neal, Hamilton County Court of Appeals Case No. C050840, Decision and Judgment Entry (December 1, 2006), at Appendix A-9, ¶23.

Despite the fact that the trial court had reformulated not only the constitutional significantly-subaverage-intellectual-functioning test but also (as will be explained below) the significant-limitations-in-two-or-more-adaptive-skills test and the onset-before-age-18 test and had, as well, construed all of the evidence most strongly against Appellant even though the defense expert, Dr. Tureen, actually met Appellant, interviewed Appellant, evaluated Appellant, administered tests to Appellant, and testified in both the penalty phase mitigation hearing in 1995 and the trial court's 2005 evidentiary hearing while the prosecution expert, Dr. Nelson, never met, interviewed, evaluated, or administered any tests to Appellant and failed to appear to testify or be cross-examined at the evidentiary hearing, the Court of Appeals found:

22

> Nevertheless, Dr. Nelson's report provided the court with evidence upon which it might have concluded that O'Neal had failed to prove significantly subaverage intellectual functioning.

Id. at ¶24. The Court of Appeals failed to state what, specifically, might have been in Dr. Nelson's report that "might" have supported the trial court's finding that Appellant did not prove by a preponderance that he has significantly subaverage intellectual functioning. But the Court of Appeals did say, in its concluding paragraph, that:

> O'Neal's over-70 score raised the presumption that he was not mentally retarded.

Id. at ¶25.

The Court of Appeals failed to provide any reasoning why the trial court might have been justified in relying on the one IQ test score out of five, the IQ score from one of two IQ tests administered in 1994, in which Appellant scored above 70 and in fact scored 71. The Court of Appeals' failure to provide any reasoning for this is even more baffling when one remembers that the trial court itself did not rely on the 1994 IQ test score of 71 but rather relied on the 2004 WAIS-III test administered by Dr. Tureen on which Appellant scored 67:

> The Ohio Supreme Court determined that a score of 70 or above raised a rebuttable presumption that a defendant is not mentally retarded, but it did not ignore the aforementioned five point standard of error completely. *Id.* at 304. As such, to meet his burden, Defendant must present the court with IQ scores of 64 or below. **Based on the standard margin of error, Defendant's [2004] IQ test score of 67 means that his true score could place him anywhere between the 62 and 72 range.** Furthermore, his February 9, 1968 IQ score of 64 is not a recent one, and at best provides the court with equal evidence as to whether Defendant suffers from significantly subaverage intellectual functioning. Therefore, Defendant has failed to prove the first prong of the test enumerated in *Lott* by a preponderance of the evidence. (emphasis added)

Decision Denying Defendant's Motion To Vacate Or Set Aside His Death Sentence at page 9.

Thus, the trial court was under the misapprehension that a score of 70 or above created a

rebuttable presumption that Appellant did not suffer from significantly subaverage intellectual functioning. And so, the trial court thought, because of the 5-point standard margin of error Appellant (and all other defendants) must prove that he has an IQ of 69 or below by presenting an IQ score that takes into account the 5-point margin of error. In short, the trial court lowered the constitutional test of significantly subaverage intellectual functioning to an IQ test score of 64! The trial court deduced that Appellant's 2004 IQ test score of 67 -- due to the standard margin of error -- meant that Appellant's IQ was as high as 72.

The question, then, is whether the Court of Appeals' reliance on the 1994 IQ score of 71 is any more reasonable than the trial court's reliance on the more recent 2004 IQ score of 67 (with its margin of error plus or minus 5 points). The Court of Appeals failed to provide any reasoning for picking out the highest one of Appellant's five IQ test scores rather than <u>averaging</u> the five test scores as recommended by Dr. Tureen in his testimony at the evidentiary hearing where he emphasizes the "consistency of the pattern" of Appellant's IQ test scores "from a very early age." Indeed, if one averages the scores from Appellant's five IQ tests -- 64, 71, 63, 67, and 63 -- one obtains an **average score of 65.6**, well below a score of 70.

<u>Lott</u> holds that there is "a rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70." One would think, conversely, that a defendant who shows that his IQ is 70 or below has shown by a preponderance of the evidence that he is mentally retarded, or at least suffers from significantly subaverage intellectual functioning. The Court of Appeals' was in error to rule otherwise. This Court should reverse the judgment of the Court of Appeals.

But there is yet another reason why this Court should find that Appellant proved that he suffers from significantly subaverage intellectual functioning. On August 7, 2006, almost two

24

months before oral argument, Appellant filed notice of supplemental authorities. The supplemental authorities cited by Appellant all pertained to the "Flynn Effect."

Appellant cited Walker v. True (4th Cir. 2005), 399 F.3d 315, *after remand*, 401 F.3d 574 (Luttig, J.), in which the United States Court of Appeals for the Fourth Circuit vacated and remanded the case to the district court to consider the "Flynn Effect," which, as stated by the Fourth Circuit, "posits that IQ scores rise over time and that IQ tests that are not 're-normed' to adjust for rising IQ levels will overstate a testee's IQ." 399 F.3d at 323.

Appellant also cited the Tenth District Ohio Court of Appeals' decision in State v. Burke (Dec. 30, 2005), 2005-Ohio-7020, where the court, in considering the "Flynn Effect" and precedents from other jurisdictions on the relevance of the "Flynn effect," ruled in ¶51: "We conclude that a trial court must consider evidence presented by the Flynn effect, but, consistent with its prerogative to determine the persuasiveness of the evidence, the trial court is not bound to, but may, conclude the Flynn effect is a factor in a defendant's IQ score."

Finally, Appellant cited -- and attached a copy to the notice of supplemental authorities -- the paper published in the May, 2006 issue of the American Psychological Association's journal, *Psychology, Public Policy, and Law*: Flynn, James R., "Tethering the Elephant: Capital Cases, IQ, and the Flynn Effect," *Psychology, Public Policy, and Law*, 2006 May Vol. 12(2), 170-189, with the latest update on the "Flynn Effect" by its originator.

Applying the "Flynn Effect" adjustments to "re-norm" Appellant's IQ test scores produces the following results:

| Test (year normed) | Date Test Administered | Given Score | Score Adjusted for 'Flynn Effect' (0.3 points per year) |
|---|---|---|---|
| Cincinnati Public Schools: | February, 1968 | 64 | (20 years X 0.3 = -6) 58 |

25

| | | | |
|---|---|---|---|
| WISC (1947-1948) | | | |
| Dr. Chiappone: WAIS-R (1978) | March, 1994 | 71 | (16 years X 0.3 = -4.8) **66.2** |
| Dr. Tureen: Barrett Cognitive Status Exam (unk) | June, 1994 | 63 | N/A |
| Dr. Tureen: WAIS-III (1995) | December, 2004 | 67 | (9 years X 0.3 = -2.7) 64.3 (and deduct extra 2.34 points because WAIS-III scores inflated when normed = -2.34) **61.96** |
| Dr. Tureen: Reynolds Intellectual Scales (unk) | December, 2004 | 63 | N/A |

The average of Appellant's IQ scores re-normed to adjust for rising IQ levels per the "Flynn Effect" is **62.432**. This average is even stronger proof that Appellant suffers from significant subaverage intellectual functioning, contrary to both the trial court's and the Court of Appeals' decisions.

### Proposition of Law No. II:

**A defendant who is determined by his school psychologist when he is 14 years old to have a full scale IQ of 64 and whom the school psychologist recommends for the Junior High School Slow Learning Program due to "below normal intellectual functioning" has shown by a preponderance of the evidence that his mental retardation had its onset before age 18 pursuant to Atkins v. Virginia and State v. Lott.**

The trial court concluded that Appellant did not prove by a preponderance of the evidence that his mental retardation became manifest before he became 18. Decision Denying Defendant's Motion To Vacate Or Set Aside His Death Sentence at page 10. The court states:

26

**Defendant's February 9, 1968 IQ score of 64 demonstrates that he was functioning at a subaverage intellectual level at age 14.** However, Dr. Ruth Kaufman's 1968 Wechsler Intelligence Test for Children also indicated "superior" performance on tasks requiring judgment in social situations, and "effective functioning" in his knowledge of vocabulary and recall of information. *Id.* (See Dr. Nelson III Report, p.3, 3/21/05). **Subaverage intellectual functioning is only one prong of the three prong conjunctive test enumerated in *Lott*.** *Lott*, 97 Ohio St.3d 305 (2002). Dr. Kaufman's statement indicates that despite Defendant's sub-70 IQ, he was not suffering from significant limitations in two or more adaptive skills. This demonstrates that all three prongs of the three prong conjunctive test were not met in 1968. **Thus, Defendant has not met his burden of proving by a preponderance of the evidence that he was mentally retarded before age 18.** *Id.* at 307.

The trial court thus construed the <u>third prong</u> of the constitutional standard of mental retardation -- the American Association of Mental Retardation saying that mental retardation "manifests before age 18" and the American Psychiatric Association saying that "onset must occur before age 18 years" -- to subsume <u>both of the other prongs</u> of the constitutional standard. In other words, the trial court held that in order for a defendant to prove that his mental retardation "manifested" itself or that his mental retardation "onset" before he turned 18 years of age he must prove, by a preponderance of the evidence that he had significantly subaverage intellectual functioning and significant limitations in the adaptive behavior as expressed in two or more conceptual, social, and practical skills before the age of 18.

There are at least three reasons why the court's reasoning fails.

First, although the trial court concedes that school psychologist Ruth Kaufman's assessment showed that Appellant "was functioning at a subaverage intellectual level at age 14," the court resorts to a rather stinted and selective reading of Dr. Kaufman's report in order to conclude that Appellant did not prove that "he was mentally retarded before age 18." If the trial court was willing to accept Dr. Kaufman's conclusion that Appellant had "below normal intellectual functioning" why didn't the trial court also accept Dr. Kaufman's conclusion that

27

Appellant was "moderately retarded"? Why did the trial court gloss over the last paragraph on the first page of Dr. Kaufman's report where she says: "When tasks required that he work toward an unknown goal or concentrate on visual cues, he gave an extremely defective performance. Spatial reasoning was also very poor for his age. Moreover, his knowledge of vocabulary and recall of information indicated defective reasoning"? And why did the trial court ignore the last sentence in Dr. Kaufman's report where she says: "Emotional problems also interfere with James' school achievement and should be investigated"? It is apparent that Dr. Kaufman, as a good professional, recognized that a mentally retarded person can have strengths as well as limitations. And her assessment clearly identifies a number of conceptual and social skills. The trial court's conclusion is therefore not supported by the record.

Second, assuming, for the sake of argument, that Dr. Kaufman's report did not indicate significant limitations in two or more adaptive skills, it would be the height of unfairness and unreasonableness to expect that a school psychologist -- whose role is primarily to place students in the most appropriate academic program and to identify emotional problems that might "interfere with academic achievement" -- would make a comprehensive and thorough analysis of whether a particular 14 year old student satisfies all the prongs of the definition of mental retardation. There is no evidence that Dr. Kaufman was or is a forensic psychologist or that she had any reason to determine whether Appellant was mentally retarded in constitutional terms.

Third, and perhaps most importantly, the trial court's holding -- that Appellant had to prove by a preponderance of the evidence that he met all three prongs of the constitutional standard before age 18 rather than just the "onset" or "manifestation" of mental retardation before age 18 -- is yet another creative reformulation of the constitutional standard enunciated in Atkins and in Lott.

"Onset" is generally defined as "a start" or "a beginning." "Manifestation" is defined as "an indication of the existence, reality, or presence of something." The definitions of the two words "onset" and "manifestation" show that the third prong of the constitutional standard of mental retardation only means that there must be a start, a beginning, or an indication of the existence of mental retardation. "Onset" and "manifestation" do not connote full-blown, conclusive evidence meeting in detail of all aspects of the definition of "mental retardation."

To hold that a defendant, to be deemed mentally retarded, must prove by a preponderance of the evidence in existence before he turned 18 that he then suffered from both significantly subaverage intellectual functioning and significant limitations in two or more adaptive skills is a burden that very few mentally retarded people could meet. Dr. Kaufman's report actually satisfies the trial court's unduly expansive definition of the "onset before the age of 18" prong. But it is not realistic to generally expect school psychologists to do a comprehensive, thorough forensic analysis of every student who might be a candidate for mental retardation. Neither is it realistic to expect school psychologists to establish whether or not the student meets the criteria of mental retardation that might possibly someday exempt that student from the death penalty or might qualify that student someday for certain medical or government benefits.

The trial court's conclusion, therefore, that Appellant failed to prove "onset before the age of 18" is not supported by competent, credible, reliable evidence and is contrary to law.

Despite the fact that Appellant raised this precise issue and presented this same argument in the Court of Appeals, the decision and judgment entry of the court below is absolutely silent about the trial court's ruling on this prong of the constitutional standard for mental retardation. State of Ohio v. James Derrick O'Neal, Hamilton County Court of Appeals Case No. C050840, Decision and Judgment Entry (December 1, 2006), at Appendix A-8 to A-9, ¶¶21-25.

The Court of Appeals' failure to address and to correct the trial court's erroneous reformulation of another prong of the constitutional test for mental retardation and it's failure to affirm the trial court's conclusion that Appellant did not prove onset before age 18 was error. This Court should reverse the judgment of the Court of Appeals.

**Proposition of Law No. III**:

**A trial court deciding whether a defendant is mentally retarded under the standards of Atkins v. Virginia and State v. Lott -- and in particular whether a defendant has significant limitations in two or more adaptive behavior skills -- may not choose to rely on evidence from an expert appointed by the court who has not met, interviewed, evaluated, or administered IQ tests to the defendant and who does not testify at the evidentiary hearing over evidence from an expert appointed by the court who has met, interviewed, evaluated, and administered IQ tests to the defendant and who does testify and is subject to cross-examination at the evidentiary hearing.**

The trial court concluded that Appellant does not suffer from significant limitations in two or more adaptive behavior skills. Decision Denying Defendant's Motion To Vacate Or Set Aside His Death Sentence at page 10. The court stated:

> Defendant argues that he suffers from significant limitations in two or more adaptive skills. Dr. Tureen was the only psychiatric expert to offer any support to Defendant's position. Conversely, the respective opinions of two of the three experts available to the court clearly indicate that Defendant does not have significant limitations in two or more adaptive skills.
>
> ***
>
> Defendant was capable of positive communication, self-care and self-direction. Defendant provided for his family, and fought for custody of his children. He consistently held jobs, and earned high endorsements from his supervisors. **These are not the actions of a man who is incapable of adapting to society's needs.**

Id. (emphasis added)

The trial court's conclusion that Appellant is not mentally retarded because he is not limited in ALL adaptive skills, but only in a few, is incorrect as a matter of law.

The definition of mental retardation -- be it the definition of the American Association of Mental Retardation, the definition of the American Psychiatric Association, the constitutional definition set out by the United States Supreme Court in <u>Atkins</u>, or the definition adopted by the this Court in <u>Lott</u> -- does <u>not</u> require that to qualify as "mentally retarded" an offender must be profoundly mentally retarded. The execution of a person who is mildly mentally retarded is unconstitutional under <u>Atkins</u>. Indeed, the expanded AAMR definition of "mental retardation" expressly contemplates that:

**"Within an individual, limitations often coexist with strengths."**

American Association of Mental Retardation (AAMR), Definition of Mental Retardation, What is Intelligence?, http://www.aamr.org/Policies/faq_mental_retardation.shtml (emphasis added).

The thrust of the State's questions and argument at the evidentiary hearing was, essentially, that Appellant does not meet the definition of mental retardation because he was able to go to school, drive a car, get married, have children, be a Marine, and hold various jobs (ignoring how poorly Appellant generally fared in almost all of these areas). The State's questions and arguments during the evidentiary hearing suggested that to be "mentally retarded" as defined by <u>Atkins</u> an offender must be profoundly mentally retarded and have significant limitations in <u>ALL</u> adaptive behavior skills. That obviously is not the law. Appellant is aware of no precedent that holds that a person who is able to do these things, but who has significant limitations in two or more adaptive skills, is not mentally retarded.

The law is the three-part test. The question is not whether Appellant has some strengths -- he obviously does. The question is whether Appellant meets the three-part test, the third part pertaining to significant limitations in two or more adaptive skills.

The trial court concluded that while Dr. Tureen's evidence supported Appellant's assertion that he does have significant limitations in at least two adaptive skills, Dr. Tureen is outnumbered two-to-one by Dr. Chiappone and Dr. Nelson. The problem with this conclusion is that it ignores what Dr. Chiappone testified to at the mitigation phase of the trial and it ignores what Dr. Nelson says in his report.

Dr. Chiappone testified that Appellant had a "[l]ack of coping skills" which, along with other factors, "made it more difficult for him to effectively problem solve." Trial Tr. at 996.

Dr. Nelson, who did not visit, interview, or test Appellant, or even testify at the evidentiary hearing in support of his report, nevertheless agrees that: "It is clear that Mr. O'Neal has difficulties in dealing with stressful situations in an effective manner and does not think through the consequences of his behavior very well." Hearing Exhibit 1, March 21, 2005 Dr. Nelson Report, at page 5. While Dr. Nelson goes on to say that this same problem is experienced by "individuals who function at higher levels of intelligence," he does not deny that Appellant's limitation in this area is evidence of a problem with his social skills or that this limitation is caused by mental retardation. Moreover, Dr. Nelson concedes that: "Mr. O'Neal does seem to exhibit significant deficits in several conceptual areas (i.e., reading, money concepts). Id. (emphasis added). Finally, Dr. Nelson says expressly that: "I would agree that Mr. O'Neal certainly has evidenced difficulties in his adaptive functioning in situations involving emotional intensity." Id. While Dr. Nelson attributes these difficulties to "psychiatric difficulties," he fails to provide any basis for concluding that these difficulties are not caused by Appellant's mental retardation. Importantly, Dr. Nelson was not available to have his assertions cross-examined.

Dr. Tureen testified at Appellant's October, 1995 penalty phase mitigation hearing that Appellant is "an individual who's going to have some limitations on how well they're [sic] going

32

to be able to function. *** By cognitive thinking general problems involving memory, spatial and statistical skills, language usage, as well as motor skills. [sic] And on that particular exam he performed well into the impaired range. You take that performance and put it together with the IQ level and you see an individual who is going to have some sort of difficulties in adjusting in the world." Trial Tr. at 1003. He added that persons like Appellant would have "some real limitations of what they're going to be able to do in life and what they're going to be able to accomplish." Trial Tr. at 1005. Finally, Dr. Tureen testified on cross-examination that Appellant "was functioning in the mildly mentally retarded to borderline range." Trial Tr. at 1009.

At the evidentiary hearing on May 17, 2005, Dr. Tureen testified specifically in terms of the constitutional standard of mental retardation and the requirement of the third prong of the test that requires significant limitations in two or more adaptive behavior skills. In particular, Dr. Tureen testified that Appellant has significant limitations in both academic/conceptual skills as well as social skills. Hrg. Tr. at 30-33.

Assuming, for the sake of argument, that Dr. Chiappone's and Dr. Nelson's evidence did not support the conclusion that Appellant suffers from significant limitations in two or more adaptive skills, the trial court was incorrect in failing to substantially discount the evidence provided by both doctors.

Dr. Chiappone did offer testimony during the mitigation phase of Appellant's trial that Appellant was not mentally retarded. However, Dr. Chiappone testified to present general mitigation testimony, and did not testify as to whether or not Appellant was mentally retarded. At the time of Appellant's trial the law was that of Penry v. Lynaugh that it was not unconstitutional to impose a sentence of death on a mentally retarded person. Atkins v. Virginia

33

was not the law then and Appellant's possible mental retardation was not at issue. Neither Dr. Chiappone nor Dr. Tureen were examined at Appellant's trial with explicit reference to the definition of mental retardation  by the American Association of Mental Retardation or the American Psychiatric Association or with specific reference to the long list of adaptive behavior skills. Therefore, it was unreasonable for the trial court not to discount the reliability and the credibility of the evidence provided by Dr. Chiappone from 1994 and 1995.

It was also unreasonable for the trial court not to severely -- if not totally -- discount the reliability, credibility, and competence of the evidence provided by Dr. Nelson. Remember that Dr. Nelson failed to meet, interview, or test Appellant, or even testify at the evidentiary hearing in support of his report. He was not called to testify by the State and his opinions were not subject to cross-examination as were those of Dr. Tureen. Moreover, the American Psychological Association's "Specialty Guidelines for Forensic Psychologists" Part VI(H) states:

> Forensic psychologists avoid giving written or oral evidence about the psychological characteristics of particular individuals when they have not had an opportunity to conduct an examination of the individual adequate to the scope of the statements, opinions, or conclusions to be issued. Forensic psychologists make every reasonable effort to conduct such examinations. **When it is not possible or feasible to do so, they make clear the impact of such limitations on the reliability and validity of their professional products, evidence, or testimony**.

Here, Dr. Nelson did not suggest that his failure to meet, interview, or test Appellant limited the reliability and validity of his opinions and the trial court failed to take these limitations into account. Therefore, the trial court's conclusion that Appellant did not meet his burden of proving that he is suffering significant limitations in two adaptive behavioral skills -- academic and social skills -- is not supported by competent, credible, and reliable evidence and is contrary to law.

The Court of Appeals' decision does not cure the trial court's error. On this issue the Court of Appeals merely gives us this conclusory, unspecific, and unsupported rationale:

34

> Nevertheless, Dr. Nelson's report provided the court with evidence upon which it might have concluded that O'Neal had failed to prove significantly subaverage intellectual functioning. More significantly, **the record is replete with evidence to support the court's finding that O'Neal had failed to prove the conjunctive criterion of coexistent limitations in two or more adaptive skills,** so we believe the court's misapprehension of the IQ numbers was harmless.

State of Ohio v. James Derrick O'Neal, Hamilton County Court of Appeals Case No. C050840, Decision and Judgment Entry (December 1, 2006), at Appendix A-9, ¶24 (emphasis added).

The Court of Appeals totally fails to provide any reasoning -- as it was asked to do by Appellant's assignment of error -- for concluding that evidence provided by an expert who has never met or evaluated or tested a death penalty defendant is more reliable and more credible than the evidence provided by an expert who was called in by the original examining psychologist, and who met, actually talked with, evaluated, and tested the defendant as required by professional standards, and who actually testified at the evidentiary hearing and whose opinions were subject to cross-examination.

The Court of Appeals' judgment affirming the judgment of the trial court as being supported by reliable, credible evidence is erroneous and contrary to the standards set forth in Atkins v. Virginia and State v. Lott. This Court should reverse the judgment of the Court of Appeals.

## CONCLUSION

For all the foregoing reasons the judgment of the Court of Appeals of Hamilton County affirming the trial court's judgment denying Appellant's petition to vacate or set aside his sentence on the ground that Appellant is not mentally retarded is not supported by reliable and

credible evidence and is contrary to the legal standards set forth in <u>Atkins v. Virginia</u> and in <u>State v. Lott</u>.

This Court should grant leave to appeal to hear this case on the merits and should reverse the judgment of the Court of Appeals.

Respectfully submitted,

JOHN J. GIDEON (0008151)
(Trial Counsel)
250 East Stanton Avenue
Columbus, Ohio 43214-1268
Phone: (614) 844-3954
Email: johngideon@sbcglobal.net

MICHAEL W. KRUMHOLTZ (0009099)
(Co-Counsel)
Bieser, Greer & Landis LLP
6 North Main Street, Suite 400
Dayton, Ohio 45402-1908
Phone: (937) 223-3277
Facsimile: (937) 223-6339
Email: mwk@bgllaw.com

COUNSEL FOR APPELLANT

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Memorandum In Support Of Jurisdiction Of Appellant James Derrick O'Neal was served on Joseph T. Deters, Prosecuting Attorney, and Philip R. Cummings, Assistant Prosecuting Attorney, 230 East Ninth Street, Suite 7000, Cincinnati, Ohio 45202-2174, by regular U.S. Mail, postage prepaid, on this *16th* day of January, 2007.

O'Neal Apx. Vol. XII
Page 53

JOHN J. GIDEON (0008151)
Counsel for Appellant

o'neal.memoranduminsupportofjurisdiction-Atkinsappeal-osc-Jan'07

37

APPENDIX

PAGE

Decision and Judgment Entry,
  State of Ohio v. James Derrick O'Neal,
  Hamilton County Court of Appeals
  Case No. C-050840 (December 1, 2006) ................................................................................. A-1

# IN THE COURT OF APPEALS
## FIRST APPELLATE DISTRICT OF OHIO
### HAMILTON COUNTY, OHIO

STATE OF OHIO,                                    :          APPEAL NO. C-050840
                                                             TRIAL NO. B-9309022
      Respondent-Appellee,               :
  vs.                                                        *DECISION.*

JAMES DERRICK O'NEAL,                             :

      Petitioner-Appellant.              :

                                  :

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: December 1, 2006

*John J. Gideon* and *Michael W. Krumholtz,* for Petitioner-Appellant,

*Joseph T. Deters,* Hamilton County Prosecuting Attorney, and *Philip R. Cummings,*
Assistant Prosecuting Attorney, for Respondent-Appellee.

## OHIO FIRST DISTRICT COURT OF APPEALS

**MARK P. PAINTER, Judge.**

{¶1}    Petitioner-appellant James Derrick O'Neal presents a single assignment of error challenging the Hamilton County Common Pleas Court's judgment denying his postconviction petition seeking relief from his death sentence because he is mentally retarded. We affirm the court's judgment.

{¶2}    O'Neal was convicted in 1992 of aggravated murder and sentenced to death. In 2002, the United States Supreme Court ruled in *Atkins v. Virginia*[1] that executing a mentally retarded person violates the proscription against cruel and unusual punishment contained in the Eighth Amendment to the United States Constitution. In December of that year, the Ohio Supreme Court in *State v. Lott*[2] established procedures and substantive standards for adjudicating a capital defendant's *Atkins* claim. O'Neal subsequently presented an *Atkins* claim in a postconviction petition. Following a hearing, the common pleas court denied the petition. This appeal followed.

### I. O'Neal's Mental-Retardation Hearing

{¶3}    At the hearing on O'Neal's *Atkins* claim, the parties stipulated to the admission of psychologists' reports, O'Neal's school and mental-health records, and the record from his murder trial. O'Neal presented expert opinion testimony by a clinical psychologist. The state offered no testimony at the hearing, but submitted the matter upon its exhibits. O'Neal's expert concluded that O'Neal was mentally retarded, while the state's experts concluded that he was not. Based on the evidence adduced at the hearing, the trial court concluded that O'Neal had failed to prove his claim.

---

[1] (2002), 536 U.S. 304, 122 S.Ct. 2242.
[2] 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011.

A-2

OHIO FIRST DISTRICT COURT OF APPEALS

### A. The Trial

{¶4}   Dr. David Chiappone, a clinical psychologist appointed to evaluate O'Neal for his 1995 trial, diagnosed O'Neal as functioning in the borderline range of intelligence, with polysubstance abuses and a mixed personality disorder.  He testified to that effect at the trial.  He arrived at this conclusion after testing and interviewing O'Neal, interviewing O'Neal's friends and family, and reviewing his school, work, and criminal histories.

{¶5}   Dr. Chiappone found that O'Neal's school records showed that he had then functioned in the borderline to mildly mentally retarded range.  The report of a school psychologist who had evaluated O'Neal in 1968, when O'Neal was 14 years old and in the sixth grade, reflected a full-scale IQ score of 64 and well-below-grade-level academic achievement.  The psychologist recommended that O'Neal be placed in a "slow learner" program, but he was not.  And he left high school before completing the tenth grade.

{¶6}   From 1972 to 1975, he served in the Marines, where he attained the rank of lance corporal.  But he was dishonorably discharged when he was absent without leave because, he asserted, the military had declined to allow him to attend his father's funeral.

{¶7}   After his discharge, O'Neal supported himself by selling drugs.  In 1988, he was imprisoned for trafficking.  After his release a year later, O'Neal held a variety of menial jobs, including work in the kitchen of a country club restaurant.  His supervisor there testified that although O'Neal had struggled with tardiness and absenteeism, he had been a good worker.

{¶8}   O'Neal had several children from various relationships.  After his release from prison, he sought and obtained custody of two of his children.  In 1992, he married the victim, and he and his two children made a home with his wife and her three children.

{¶9}   On the IQ test administered by Dr. Chiappone in 1994, O'Neal received a full-scale score of 71.  Dr. Chiappone acknowledged that O'Neal had "a low IQ."  But he

A-3

## OHIO FIRST DISTRICT COURT OF APPEALS

asserted that O'Neal's work history showed that "his fundamental skills [were] a bit higher than his attained intellect." From this, Dr. Chiappone concluded that O'Neal was not mentally retarded.

{¶10} Dr. Robert G. Tureen, a clinical psychologist specializing in neuropsychology, also testified at O'Neal's trial. Dr. Chiappone had consulted with Dr. Tureen when Dr. Chiappone's evaluation suggested that O'Neal suffered from a brain disorder or brain damage. Dr. Tureen interviewed and tested O'Neal and reviewed the IQ test administered by Dr. Chiappone. He confirmed Dr. Chiappone's suspicion of a brain disorder, and he testified at trial to his conclusion that O'Neal was borderline to mildly mentally retarded.

### B. The Hearing

{¶11} Dr. Tureen evaluated O'Neal again in 2004 for his *Atkins* claim. He issued a report and appeared as the sole witness at O'Neal's *Atkins* hearing. The state countered with Dr. Chiappone's 1994 trial testimony and the March 2005 report of Dr. W. Michael Nelson III.

### 1. The Mental-Retardation Criteria

{¶12} The Ohio Supreme Court in *State v. Lott* provided three criteria for evaluating a capital defendant's claim that he is, in the words of the United States Supreme Court in *Atkins*, "so impaired as to fall within the range of mentally retarded offenders [against] who[se] [execution] there [has emerged] a national consensus."[3] The defendant must demonstrate by a preponderance of the evidence (1) that he suffers from "significantly subaverage intellectual functioning," (2) that he has experienced "significant limitations in two or more adaptive skills, such as communication, self-care, and self-

---

[3] *Atkins v. Virginia*, 536 U.S. at 317.

OHIO FIRST DISTRICT COURT OF APPEALS

direction," and (3) that these manifestations of mental retardation appeared before the age of 18.[4]

{¶13}   The court in *Lott* cautioned that an IQ test score is merely one measure of intellectual functioning that "alone [is] not sufficient to make a final determination on [the mental-retardation] issue."[5]   Nevertheless, the court declared that a full-scale IQ score above 70 gives rise to "a rebuttable presumption that a defendant [is] not mentally retarded."[6]

{¶14}   The court in *Lott* formulated its mental-retardation criteria based upon the clinical definitions of mental retardation provided in 1992 by the American Association of Mental Retardation ("AAMR") and in 2002 by the American Psychiatric Association ("APA") and cited with approval by the Supreme Court in *Atkins*.[7]   Both definitions provided these diagnostic criteria for mental retardation: substantial limitations in present functioning, manifested before the age of 18, and characterized by significantly subaverage intellectual functioning coexisting with significant limitations in two of the adaptive skills of communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, health and safety, functional academics, leisure, and work.[8]   In 2002, the AAMR amended its definition to require a finding of significant deficiencies in one of three categories of adaptive skills:  "conceptual," which includes communication and functional academics skills; "social," which includes social/interpersonal and leisure skills; and "practical," which includes work, self-care, health, and safety skills.[9]

---

[4] *State v. Lott*, supra, at ¶12.
[5] See id.
[6] Id.
[7] *Atkins v. Virginia*, 536 U.S. at 308, fn. 3; *State v. Lott*, supra, at ¶12.
[8] American Association of Mental Retardation, Mental Retardation: Definition, Classification, and Systems of Supports 5 (9 Ed.1992); Diagnostic and Statistical Manual of Mental Disorders 41 (4 Ed.2000).
[9] American Association of Mental Retardation, Mental Retardation: Definition, Classification, and Systems of Supports 1 (10 Ed.2002).

A-5