IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

JAMES DERRICK O'NEAL,

      Petitioner,

    vs.

MARGARET BAGLEY, Warden

      Respondent.

:

:    Case No. 1:02-cv-357

:    District Judge Michael R. Barrett
:    Chief Magistrate Judge Michael R. Merz

:

    <u>Death Penalty Case</u>

_____

**TRAVERSE OF PETITIONER
JAMES DERRICK O'NEAL**

_____

JOHN J. GIDEON (0008151)
(Trial Attorney)
250 East Stanton Avenue
Columbus, Ohio 43214-1268
Phone: (614) 844-3954
Email: johngideon@sbcglobal.net

and

MICHAEL W. KRUMHOLTZ (0009099)
(Co-Counsel)
Bieser, Greer & Landis LLP
6 North Main Street, Suite 400
Dayton, Ohio 45402-1908
Phone: (937) 223-3277
Facsimile: (937) 223-6339
Email: mwk@bgllaw.com

COUNSEL FOR PETITIONER

MARC DANN
Attorney General

STEPHEN E. MAHER (0032279)
Assistant Attorney General
Capital Crimes Unit
30 East Broad Street, 23rd Floor
Columbus, Ohio 43215-3428
Phone: (614) 728-7055
Facsimile: (614) 728-8600

COUNSEL FOR RESPONDENT

## TABLE OF CONTENTS

Page

I.    PROCEDURAL HISTORY OF THE CASE...................................................................1

II.   FACTS OF THE CASE ...............................................................................24

III.  PROCEDURAL DEFAULT ANALYSIS ........................................................49

IV.   STANDARD OF REVIEW OF HABEAS CORPUS PETITION......................................64

V.    ARGUMENT IN SUPPORT OF
      CONSTITUTIONAL GROUNDS FOR RELIEF..................................................79

      Ground One:

          Petitioner's right to fair warning and due process under the
          Fourteenth Amendment was denied by the change in the rule of
          law with respect to a spouse's privilege to enter the marital
          residence by the Court of Appeals in its pretrial decision in O'Neal
          I and by the Ohio Supreme Court in the application of its decision
          in State v. Lilly...................................................................79

      Ground Two:

          Petitioner's right to due process under the Fourteenth Amendment
          was denied by his convictions on counts, specifications, and
          charges of aggravated burglary on insufficient evidence ......................................85

      Ground Three:

          The imposition of a sentence of death on Petitioner based on an
          aggravating circumstance identical to the element that makes the
          murder an aggravated offense--aggravated burglary resulting from
          the alleged trespass of the marital residence--violated Petitioner's
          Eighth Amendment right to be free from cruel and unusual
          punishment because it fails to draw a rational distinction between
          those eligible and those not eligible for the death penalty....................................91

      Ground Four:

          Petitioner's right to due process under the Fourteenth Amendment
          and his right to be free from cruel and unusual punishment under
          the Eighth Amendment was violated by the government's argument
          in  penalty  phase  closing  argument  that  the  nature  and

i

circumstances of the offense--a statutory mitigating factor under Ohio's death penalty scheme--should be considered an aggravating circumstance ........................................................................................................95

Ground Five:

Petitioner's right to due process under the Fourteenth Amendment and his right to be free from cruel and unusual punishment under the Eighth Amendment were violated by the submission to the jury in the penalty phase of the trial of multiple charges of aggravated murder and multiple and duplicative aggravating circumstances when only one victim was involved......................................................................97

Ground Six:

Petitioner's right to due process under the Fourteenth Amendment and his right to be free from cruel and unusual punishment under the Eighth Amendment were violated by the penalty phase jury instructions which told the jury that the aggravating circumstance which the jury was to weigh against mitigating evidence included two mutually exclusive alternatives--that he was either the "principal offender" or that he acted with "prior calculation and design." ..................................................................................................99

Ground Seven:

Petitioner was denied his Sixth Amendment right to the effective assistance of counsel by the failure of trial counsel to introduce a complete copy of the lease listing Petitioner as husband and occupant of the home and by their failure to introduce evidence that the locks to the home had not been changed................................................101

Ground Eight:

Petitioner was denied his Sixth Amendment right to the effective assistance of counsel by the failure of trial counsel to object to the omission from the culpability phase jury instructions on trespass the phrase "in the absence of a restraining order or an order granting one party exclusive possession of the marital residence" and the failure to object to reference in the instructions to the marital residence as the "wife's residence" and the use of the word "estranged" without defining the term for the jury ...............................................106

Ground Nine:

Petitioner's right to confrontation under the Sixth Amendment and to due process under the Fourteenth Amendment were violated by the admission of multiple hearsay statements allegedly made by the victim ...........................................................................................................115

Ground Ten:

Petitioner's right to be free from cruel and unusual punishment under the Eighth Amendment was violated by the imposition of punishment disproportionate to the punishment normally inflicted on defendants for domestic homicides and for similar offenses committed in the same jurisdiction .....................................................118

Ground Eleven:

Petitioner's right to due process and to equal protection of the law under the Fourteenth Amendment was violated by the use of peremptory challenges to exclude members of his race from the jury contrary to the standards established in Batson v. Kentucky ......................120

Ground Twelve:

Petitioner's right to due process under the Fourteenth Amendment was violated by the admission of statements obtained from Petitioner by the police by means of deceiving Petitioner into believing his wife was still alive, making his waiver of his right to remain silent not voluntary, knowing, and intelligent .........................................122

Ground Thirteen:

Petitioner's right to due process under the Fourteenth Amendment and his right to be free from cruel and unusual punishment under the Eighth Amendment were violated by the trial court's refusal to give an instruction in the culpability phase of the trial of the lesser included offense of murder ...............................................................................123

Ground Fourteen:

Petitioner's Sixth Amendment right to a fair and impartial jury and his Eighth Amendment right to be free from cruel and unusual punishment were violated by the selection of a jury predisposed to impose a sentence of death, contrary to the standards in Witherspoon v. Illinois.........................................................................................124

Ground Fifteen:

Petitioner's right to be free from cruel and unusual punishment under the Eighth Amendment was violated by the imposition of sentences of death under the Ohio death penalty scheme which is devoid of penological justification, has a racially disproportionate impact, fails to rationally narrow the class of death eligible defendants, permits the imposition of death when aggravating circumstances only just outweigh mitigating factors, denies the consideration of mercy, allows the arbitrary selection of those to receive the death penalty, and fails to provide guidance on the weighing of aggravating circumstances and mitigating factors.........................125

Ground Sixteen:

Petitioner's right to be free from cruel and unusual punishment under the Eighth Amendment was violated by the instruction to the jury in the penalty phase of the trial that it could not be governed by considerations of sympathy..........................................................................129

Ground Seventeen:

Petitioner's right to due process under the Fourteenth Amendment and his right to be free from cruel and unusual punishment under the Eighth Amendment were violated by the cumulative effect of all the errors committed during the culpability and penalty phases of the trial and on appeal....................................................................130

Ground Eighteen:

The imposition of a sentence of death on Petitioner violates his right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution because he is mentally retarded under the standards -- reasonably applied -- announced in Atkins v. Virginia and in light of the facts -- reasonably determined -- presented to the state courts that show that Petitioner suffers from significantly subaverage intellectual functioning which had its onset before he attained the age of 18 and which leaves Petitioner with significant limitations in two or more adaptive behavior skills ..........................................................131

VI.  CONCLUSION ...............................................................................147

VII.  CERTIFICATE OF SERVICE.........................................................148

iv

## I. <u>PROCEDURAL HISTORY OF THE CASE</u>

Petitioner James Derrick O'Neal (hereafter "Petitioner") was indicted by the grand jury of Hamilton County on December 16, 1993 in a four-count indictment in Case No. B939022.

The first count of the indictment charged Petitioner with aggravated murder for causing the death of his wife, Carol Ann Lee O'Neal, while committing aggravated burglary of their home at 4938 Plainville Road on December 11, 1993. The first count of the indictment was accompanied by two death penalty specifications, the first charging that the offense was part of a course of conduct involving an attempt to kill two or more persons and the second charging that the offense was committed while Petitioner was committing aggravated burglary. The first count was also accompanied by a firearm specification.

The second count charged Petitioner with aggravated murder for causing the death of Carol O'Neal with prior calculation and design. The second count was also accompanied by the same two death penalty specifications as the first count and by a firearm specification.

The third count of the indictment charged Petitioner with the attempted aggravated murder of Ricardo Lee--Carol O'Neal's son by a prior marriage--and was accompanied by a firearm specification. The fourth count of the indictment charged Petitioner with the aggravated burglary of 4938 Plainville Road and was also accompanied by a firearm specification.

On December 22, 1993 Dale G. Schmidt and John T. Keller were appointed as trial counsel to represent Petitioner. Petitioner was arraigned on December 22, 1993 and entered a plea of not guilty.

On April 29, 1994 Petitioner's counsel moved to dismiss all charges of aggravated burglary contained in the indictment. The motion was based on the contention that Petitioner

1

could not have committed a trespass of the premises where the alleged offenses took place, 4938 Plainville Road, for several reasons. First, Petitioner had been residing there with his wife, Carol O'Neal, and their children up until December 7, 1993 when an altercation between the two occurred and Petitioner left the premises. Second, the premises were the dwelling of Petitioner's spouse, Carol O'Neal. And third, at the time of the offenses no court order restricted Petitioner's entry into the marital residence.

On May 5, 1994 the government responded to the motion to dismiss, arguing that a pretrial motion to dismiss was improper and that an individual could commit a trespass in entering his spouse's dwelling.

On August 15, 1994 the trial court, the Honorable Ralph Winkler presiding, held an oral hearing on Petitioner's motion to dismiss the aggravated burglary charges. At this hearing Petitioner's counsel submitted Defendant's Exhibit 1 as a joint exhibit. Defendant's Exhibit 1 was a copy of a certified abstract of marriage of James Derrick O'Neal to Carol Ann Lee in Hamilton County on November 14, 1992. Trial counsel John Keller represented to the court that Carol O'Neal and Petitioner were residing together at 4938 Plainville Road with their children, and that an altercation occurred on December 7, 1993, as a result of which Carol O'Neal filed a complaint with the Hamilton County Municipal Court seeking a temporary protective order. A copy of Carol O'Neal's complaint was attached to the motion to dismiss the aggravated burglary charges as Exhibit C. Exhibit D to the motion was a copy of an entry granting a temporary protective order. The entry was signed on December 12, 1993, the day after Petitioner kicked in the front door to their house and shot his wife Carol. Mr. Keller argued that under the circumstances there could not have been a trespass and therefore there could have been no aggravated burglary. (Apx. Vol. I, pages 8-14: 8/15/94 Pretrial Hrg., T.p. 2-8.)

2

Assistant Prosecuting Attorney Seth Tieger argued that the motion should be overruled as premature because no evidence had been presented. He represented to the court that on December 7, 1993 Carol O'Neal "was in the process of changing the locks" and of packing up Petitioner's clothes and thus Petitioner had no possessory interest in the premises. He represented that Petitioner "didn't have a key...[b]ecause if he did, he would have just opened up the door." (Apx. Vol. I, pages 14-15: 8/15/94 Pretrial Hrg., T.p. 8-9.) Mr. Tieger argued that using violence to enter a residence constitutes a trespass. After hearing additional oral argument from the prosecution and defense, the trial court announced that the motion to dismiss the aggravated burglary charges would be granted and all charges pertaining to aggravated burglary would be dismissed. (Apx. Vol. I, pages 19-21: 8/15/94 Hrg., T.p.13-15.)

On August 16, 1994 the trial court filed its entry dismissing the charges of aggravated burglary and granting a stay for purposes of appeal.

The government filed an appeal on August 16, 1994 in Case No. C-940652. The issue raised by the government was whether Petitioner could be convicted of any of the aggravated burglary charges and specifications contained in the indictment. Petitioner was represented in this appeal by Attorneys Elizabeth E. Agar, Dale G. Schmidt, and John T. Keller.

On April 26, 1995 the Court of Appeals of Hamilton County reversed the judgment of the trial court and remanded the case to allow the government to put on evidence to show that there was a decision by both parties to establish separate residences. State v. O'Neal, 103 Ohio App. 3d 151, 155, 658 N.E. 2d 1102 (1995). ("O'Neal I") In the decision the court stated as fact that Carol O'Neal had changed the locks. ( Id. at 153, 155.)

Petitioner sought leave to appeal the judgment of the Court of Appeals to the Ohio Supreme Court in Case No. 95-1001. Petitioner raised two propositions of law:

3

I.    Trespass is an essential element of aggravated burglary, and where defendant enters the marital residence, prior to the issuance of any court order restricting him from doing so, he does not commit a trespass, and thus cannot be convicted of aggravated burglary.

II.   Where the facts, as agreed to by both State and Defense, cannot legally support a conviction, the court does not err in dismissing counts or specifications of the indictment prior to trial.

Leave to appeal was denied on July 19, 1995.  State v. O'Neal, 73 Ohio St. 3d 1411, 651 N.E. 2d 1309 (1995).

The culpability phase of the trial began on October 24, 1995 with the voir dire of prospective jurors.  The government was represented at trial by Assistant Prosecuting Attorneys Jerome Kunkel and Gus Leon. Petitioner was represented by Attorneys Dale Schmidt and John Keller.

Following opening statements and preceding the government's case, the parties stipulated three joint exhibits: (a) Joint Exhibit 1 was a certified abstract of marriage showing that Petitioner and Carol Ann Lee were married by Judge Wayne F. Wilke on November 14, 1992; (b) Joint Exhibit 2 consisted of a copy of a motion for a temporary protective order filed in Case No. 93CRB40795 in the Hamilton County Municipal Court, a citizen referral form on domestic violence completed by Cincinnati Police Officer Michael Mercer, and an entry granting the motion for temporary protective order dated December 12, 1993, the day after Carol O'Neal's death; and (c) Joint Exhibit 3 which consisted of two pages, one page being the first page of a Housing Assistance Payments Contract and the other page being an October 19, 1993 Notification of Change to Lease and Housing Assistance Payments Contract.

The government called sixteen witnesses in the first phase of the trial: (i) Michael Mercer, a Cincinnati Police Officer, who testified about the altercation reported to him on

4

December 7, 1993 between Petitioner and Carol O'Neal; (ii) Patricia Carr, a long-time friend and co-worker of Carol O'Neal's, who testified about events leading up to December 11, 1993; (iii) Jamie Wright, a co-worker of Carol O'Neal's, who testified about a phone call Carol reportedly received from Petitioner on December 11, 1993 which she testified she listened to on a speaker phone; (iv) Timothy Schopmeyer, the pizza delivery man who witnessed Petitioner's entry into 4938 Plainville Road the night of December 11, 1993; (v) Sanchez Lee, Carol O'Neal's son, concerning the shooting; (vi) LaShawnda Lee, Carol O'Neal's daughter, concerning the shooting; (vii) Clarence Cody, Carol's O'Neal's son, concerning the shooting; (viii) Ricardo Lee, Carol O'Neal's oldest son, concerning the shooting of Carol and the supposed attempted shooting and striking of Ricardo; (ix) Andre Griffin, a friend  who was visiting Ricardo, as to the shooting of Carol and supposed attempted shooting and striking of Ricardo; (x) Lawrence Batchelor, the district police officer who was first to respond to 4938 Plainville Road after the shooting; (xi) Mark Schoonover, the canine officer, who tracked Petitioner; (xii) Kevin York, the police officer who assisted the canine officer in the arrest of Petitioner and transported him and the weapon to police headquarters; (xiii) William Hillard, a police criminalist, about the crime scene; (xiv) John Gerber, the forensic pathologist with the Coroner's Office who performed the autopsy; (xv) William Schrand, the firearms examiner, who testified concerning the condition of the weapon and the markings on the discharged casings and projectiles; and (xvi) Charles Beaver, the police detective who interrogated Petitioner on December 11, 1993, who testified from his notes concerning the oral statement Petitioner gave to him that night.

Petitioner's counsel moved under Criminal Rule 29 for dismissal of the aggravated burglary charges. (Trial Tr., T.p.752-5.) The trial court overruled the motion. Petitioner's counsel moved for general dismissal under Rule 29, which the court also overruled.

5

Upon the admission of Petitioner's employment records from Kenwood Country Club the defense rested.  (Trial Tr., T.p. 760.)

During the interlude following the close of the government's case and preceding closing arguments the trial court and counsel addressed a number of issues concerning jury instructions. (Trial Tr.,T.p. 748-751.) Petitioner's counsel indicated that they would be submitting a request for an instruction on the lesser included offense of murder. This request was filed with the court. The court acknowledged a motion by Petitioner's counsel for instructions on burglary and trespass, which is not listed as being filed on the docket in this case. There were other discussions concerning the instructions on trespass, murder, purposefulness, and prior calculation and design.

On the morning of Tuesday, October 31, 1995, the trial court gave its instructions to the jury.  (Trial Tr., T.p. 815-858.)  At the conclusion of the jury instructions the court excused the jury to deliberate and invited objections from counsel. Id. at 858. Petitioner's counsel renewed its Rule 29 motion for judgment of acquittal and objected to the instructions based on its prior requests and objections.  The court overruled the motion and objections.

During its deliberations in the afternoon of October 31, 1995 the jury sent the court a note requesting a definition of the term "estranged" as used by the court in its instruction on trespass at Trial Tr., T.p. 826.  (Trial Tr., T.p. 861.)  The court declined to define "estranged" for the jury. (Id.)

Shortly after noon on November 2, 1995 the jury returned its verdicts. The jury found Petitioner guilty of the aggravated murder of Carol O'Neal as charged in the first count of the indictment, but not guilty of the first death penalty specification charging that the offense was part of a course of conduct involving an attempt to kill two or more persons, guilty of the second

6

death penalty specification charging that the offense was committed while Petitioner was committing aggravated burglary, and guilty of the firearm specification. (Trial Tr.,T.p. 896-7.) The jury also found Petitioner guilty of aggravated murder as charged in the second count of the indictment, not guilty of the first death penalty specification to count two, guilty of the second death penalty specification, and guilty of the firearm specification. (Id. at 897-8.)  The jury found Petitioner not guilty of the attempted aggravated murder of Ricardo Lee as charged in the third count of the indictment. (Id.) Finally, the jury found Petitioner guilty of aggravated burglary as charged in the fourth count of the indictment and of the firearm specification contained in the fourth count.  (Id. at 898-9.)  The jury was polled and confirmed the verdicts.

The penalty phase of the trial began on Monday, November 6, 1995. Counsel for Petitioner called six witnesses in the mitigation phase: (i) Dorothy O'Neal, Petitioner's mother, testified about Petitioner's family history, his schooling, his military service, his work history, and his drug conviction; (ii) Steven Dumas, Petitioner's long-time childhood friend, testified about Petitioner's prior conviction and his reformation in prison, his work history and family life; (iii) Cortez, Petitioner's son, testified about Petitioner as a father, family life, and the conflicts with Carol's children; (iv) Jamie Powers, the former head chef at Kenwood Country Club, testified about Petitioner's work ethic and family difficulties; (v) David Chiappone, Ph.D., a clinical psychologist, testified about Petitioner's family, social, educational, and marital history, about his having an IQ in the 2nd or 3rd lowest percentile, about his being in the borderline to mildly retarded range of intelligence, of his difficulty in thinking rationally or problem-solving in emotionally-charged, personal situations; and (vi) Robert Turner, Ph. D., a neuropsychologist, who testified that Petitioner suffered from minimal cerebral dysfunction, that he was borderline

to mildly retarded, that the limitations on his functioning caused him to act out without anticipating consequences of his behavior, and that he had adjusted well to incarceration.

Petitioner read a statement expressing remorse for what he had done, apologizing to Carol's children and family, thanking his family for their support, and stating once again that he did not mean to kill his wife Carol.  (Trial Tr., T.p. 1011.)

The court instructed the jury.  (Trial Tr.,T.p. 1053-1065.)

In the afternoon of November 8, 1995 the jury returned its verdicts.  (Trial Tr., T.p. 1068-1069.)  The jury found that the aggravating circumstances outweighed the mitigating factors on both counts one and two and recommended a sentence of death. The jury was polled and confirmed its verdicts.

On December 11, 1995 the trial court imposed sentence on Petitioner.  The court ordered Petitioner to be sentenced to death on counts one and two, to serve a sentence of 10 to 25 years with 10 years actual incarceration on the fourth count, and to serve a term of three years actual incarceration on each of the firearm specifications, to be served concurrently with each other.

On December 22, 1995 the trial court filed its sentencing opinion.

The trial court appointed Elizabeth Agar and Dale Schmidt for purpose of the appeal. They raised fifteen assignments of error on behalf of Petitioner in a brief filed on January 6, 1997:

I. The trial court erred to the prejudice of defendant in denying the defendant's motions for judgment of acquittal or for a new trial, and in accepting and journalizing guilty verdicts on all counts and specifications charging an aggravated burglary.

II. The trial court erred to defendant's prejudice when it permitted the use of peremptory challenges on three separate occasions to strike members of defendant's race from the jury panel, and overruled defense motions to strike the panel or for mistrial.

8

III.    Admission of multiple hearsay statements allegedly made by the victim denies defendant the right to confront the witnesses against him, and to due process of law, where the admitted statements do not fall into any recognized hearsay exception.

IV.    The trial court erred to defendant's prejudice when it refused to grant his request for an instruction on the lesser included offense of murder.

V.    The trial court erred to defendant's prejudice in overruling his motion to suppress statements made after his arrest.

VI.    The trial court erred to defendant's prejudice when it permitted the state to argue that the nature and circumstances of the offense were aggravating rather than mitigating factors, and that the jury should base its decision on emotion rather than evidence.

VII.    The trial court erred to defendant's prejudice in presenting multiple counts and multiple specifications to the jury, and in entering verdicts and sentences on more than one count of aggravated murder.

VIII.    Submission of irrelevant and duplicative specifications to the jury during the penalty phase of the trial violated defendant's right to be free from cruel and unusual punishment as guaranteed by the Eighth Amendment to the United States Constitution and by parallel state constitutional provisions.

IX.    Systematic exclusion of prospective jurors opposed to the death penalty violated defendant's right to a fair and impartial jury which reflects the community from which it is drawn, as guaranteed by the state and federal constitutions.

X.    The trial court erred to defendant's prejudice by refusing to permit the jury to consider mercy when determining the proper sentence for these offenses.

XI.    Imposition of the death penalty without proof beyond a reasonable doubt of all statutory aggravating circumstances violated defendant's rights under the Eighth Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and corresponding provisions of the Ohio Constitution.

XII.    Use of the same operative fact to first elevate ordinary murder to aggravated murder and then to capital, death eligible, aggravated murder violates defendant's protection against cruel and unusual punishment as secured to him by the Eighth Amendment, and the right to due process and equal protection of law under the Fourteenth Amendment and corresponding provisions of the Ohio Constitution.

XIII.    Imposition of the sentence of death on defendant violates his rights under the Eighth Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the Federal Constitution, and his right to due course of law and punishment not cruel and unusual under the Ohio Constitution.

XIV.    The trial court erred to defendant's prejudice in accepting the jury's recommendation and sentencing him to death.

XV.    Individual and collective errors mandate reversal of defendant's conviction and sentence.

While the direct appeal was pending in the Court of Appeals, Petitioner, through postconviction counsel John Gideon, filed a petition for postconviction relief on July 2, 1997 in the Court of Common Pleas. In the petition Petitioner raised two grounds for relief:

I.    Ineffective assistance of counsel on issue of trespass.

II.    Ineffective assistance of counsel on jury instructions.

The first ground for relief claimed that trial counsel rendered constitutionally ineffective assistance of counsel in failing to introduce into evidence at trial a complete copy of the lease of the premises at 4938 Plainville Road which listed Petitioner as Carol O'Neal's husband and an occupant of the premises, and which would have provided documentary support for Appellant's claim of right to enter and to occupy the premises. Petitioner's claim of right to enter and to occupy the premises was prejudiced by counsels' further failure to introduce evidence through landlord Kenneth Taylor corroborating that the locks had not been changed and that Petitioner still had a key and could have entered the premises.

10

The second ground for relief claimed that trial counsel also rendered constitutionally ineffective assistance of counsel in failing to file and to preserve in the record a request for a jury instruction that "in the absence of a restraining order or an order granting one party exclusive possession" Petitioner had a right to enter the premises and to file and preserve in the record an objection to the court's use of the phrase "wife's residence" rather than "marital residence."

On September 3, 1997 Petitioner filed an amendment to the petition, supplementing his second ground for relief. Petitioner claimed that trial counsel were ineffective in failing to object to the trial court's use of the term "estranged" in the instructions on trespass and that the source of the request for inclusion of that term was not apparent on the face of the record because the government's request which included the term was not filed and made a part of the record.

On September 16, 1997 the government moved to dismiss the petition.

Meanwhile, the Court of Appeals, on December 12, 1997, issued a decision in the direct appeal in Case No. C-960392 overruling the assignments of error and affirming the judgment of the trial court. State v. O'Neal, Hamilton App. No. C-960392, 1997 Ohio App. LEXIS 5510 (December 12, 1997)(unreported) ("O'Neal II"). Appellate counsel filed a notice of appeal to the Ohio Supreme Court in Case No. 98-147.

On February 17, 1998 the trial court issued Findings of Fact, Conclusions of Law, and Entry Dismissing Petition to Vacate in dismissing the petition for postconviction relief. The court found that Carol O'Neal, as lessee and tenant, had the right to exclude Petitioner; that the claim that the locks had not been changed was not supported by evidentiary documents, even though prosecution witness Patricia Carr testified that Carol O'Neal wasn't able to change the locks; and the claim that counsel were ineffective for failing to preserve objections to jury instructions was barred by *res judicata*.

11

Petitioner filed a notice of appeal from the dismissal of his petition for postconviction relief to the Court of Appeals on March 18, 1998 in Case No. C-980247.

On March 12, 1998 Petitioner filed, through postconviction counsel, a timely application for reopening in the Court of Appeals in Case No. C-960392.  The application for reopening stated six assignments of error not raised by appellate counsel and not considered on the merits by the Court of Appeals:

I.      The trial court erred to the prejudice of Appellant in including in its instruction on trespass the term "estranged" and in failing to define the term for the jury after the jury requested a definition of the term.

II.     Trial counsel rendered ineffective assistance of counsel by failing to object to the trial court's inclusion of the term "estranged" in the instruction on trespass and by failing to object to the trial court's refusal to define the meaning of the term "estranged" after the jury requested a definition of the term.

III.    The trial court erred to the prejudice of Appellant by omitting from the instruction on trespass the phrase "in the absence of a restraining order or an order granting one party exclusive possession of the marital residence" which was contained in the holding of the Court of Appeals in the State's appeal of the dismissal of the aggravated burglary charges.

IV.    Trial counsel rendered ineffective assistance of counsel by failing to object to the omission from the trial court's instruction on trespass the phrase "in the absence of a restraining order or an order granting one party exclusive possession of the marital residence" which was contained in the holding of the Court of Appeals in the State's appeal of the dismissal of the aggravated burglary charges.

V.     The trial court erred to Appellant's prejudice in its instruction on trespass in repeatedly referring to the marital residence as the "wife's residence," creating an impermissible presumption that the residence was the "wife's residence."

VI.    Trial counsel rendered ineffective assistance of counsel by failing to object to the instruction on trespass including the reference to the marital residence as the "wife's residence."

The government filed a memorandum in opposition to the application for reopening on March 30, 1998.

On April 21, 1998 Petitioner, through appellate counsel Elizabeth E. Agar and Roxann H. Dieffenbach, filed a brief in the Ohio Supreme Court in direct appeal Case No. 98-147 raising seventeen propositions of law:

I.    A person does not lose all possessory interest in the marital residence, nor the right to legally enter that residence, because he has temporarily left the residence as a result of a marital argument.

II.    Trespass is an essential element of aggravated burglary, and where defendant enters the marital residence, prior to the issuance of any court order restricting him from doing so, he does not commit a trespass or a burglary.

III.    The state's use of peremptories to excuse three Afro-American jurors, without articulating inadequate [sic] non-discriminatory reason [sic] for their dismissal, combined with the acknowledged fact that defendant is a member of a cognizable racial group, violates defendant's right to equal protection under the United States and Ohio Constitutions.

IV.    Admission of multiple hearsay statements allegedly made by the victim denies defendant the right to confront the witnesses against him, and to due process of law, where the admitted statements do not fall into any recognized hearsay exception.

V.    When the jury, on the basis of the evidence presented, could reasonably find for the state on all elements of aggravated murder except prior calculation and design, or commission of an underlying felony, the trial court must charge on the lesser included offense of murder if a timely request for such a charge is made.

VI.    Admission in evidence of statements elicited from defendant while in custody, which are obtained by deception, and are thus not the product of a knowing and intelligent waiver, violates the Fifth and

13

Sixth Amendments to the United States Constitution and parallel constitutional and statutory provisions in the state of Ohio.

VII.    Ohio's death penalty statute mandates that the nature and circumstances of the offense can only be considered as mitigating factors; thus, their consideration as aggravating factors, as well as appeals to emotion, violates this statute and defendant's right to be free from arbitrary infliction of the death penalty as guaranteed by the Eighth Amendment to the United States Constitution, and parallel state provisions.

VIII.   Although multiple charges of aggravated murder may be submitted to the jury during the guilt phase of trial, where there is only one death charge there can be only one conviction, and presentation to the jury of multiple counts, with multiple specifications, followed by imposition of multiple death sentences, violates defendant's right to be free from cruel and unusual punishment under the state and federal Constitutions.

IX.    The alternative provisions of O.R.C. § 2929.04(A)(7) are mutually exclusive and, where one is presented to the jury as an aggravating circumstance, inclusion of the other undermines the required reliability of the jury's determination, in violation of the Eighth Amendment to the United States Constitution and by parallel state constitutional provisions.

X.    The Sixth Amendment to the United States Constitution, and the parallel provision in Ohio's Constitution, require that juries be a cross-section of the jurisdiction where a defendant is tried, and systematic exclusion of prospective jurors opposed to the death penalty violated defendant's right to a fair and impartial jury which reflects the community from which it is drawn, as guaranteed by the state and federal Constitutions.

XI.     An instruction to the jury at the penalty phase of trial that it could not be governed by considerations of sympathy, improperly restricts consideration of legitimate mitigating factors, in violation of the prohibition against cruel and unusual punishment embodied in the state and federal Constitutions.

XII.    Imposition of the death penalty without proof beyond a reasonable doubt of all statutory aggravating circumstances violated defendant's rights under the Eighth Amendment and the Due Process and Equal Protection Clauses of the Fourteenth

14

Amendment, and corresponding provisions of the Ohio Constitution.

XIII.   Use of the same operative fact to first elevate ordinary murder to aggravated murder and then to capital, death eligible, aggravated murder violates defendant's protection against cruel and unusual punishment as secured to him by the Eighth Amendment, and the right to due process and equal protection of law under the Fourteenth Amendment and corresponding provisions of the Ohio Constitution.

XIV.   Imposition of the sentence of death on defendant violates his rights under the Eighth Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the federal Constitution, and his right to due course of law and punishment not cruel and unusual under the Ohio Constitution.

XV.    Defendant's sentence violates the Eighth and Fourteenth Amendments to the Constitution of the United States, and parallel state provisions, because it is disproportionately severe in relation to the crime committed, and to sentences visited upon others for the same crime in the same and other jurisdictions.

XVI.   Defendant's death sentence must be set aside because it is disproportionately severe when compared to other cases in Hamilton County and in the state of Ohio in which capital sentencing decisions were made.

XVII.  The combined effect of errors in evidentiary rulings, and rulings on pretrial motions denied defendant a fair and impartial disposition of his case, and made imposition of the death penalty arbitrary, all in violation of defendant's rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitutions [sic], and parallel state provisions.

Meanwhile, on July 1, 1998 Petitioner, through postconviction counsel, filed a brief in the Court of Appeals of Hamilton County in Case No. C-980247, the appeal from the dismissal of his petition for postconviction relief. In his brief Petitioner raised the following two assignments of error:

I.      The trial court erred in concluding that Appellant failed to raise a substantive ground for relief based on ineffective assistance of counsel when Appellant presented evidence outside the record that

15

Appellant's trial counsel failed to introduce a complete copy of the lease of the marital residence listing Appellant as an occupant and thereby deprived the jury of key factual, documentary support for his claim of right to enter the marital residence, and further erred in concluding that Appellant was not prejudiced by factually unsupported representations to the jury by the prosecution and the defense that Appellant's name was not on the lease and that he did not have a key to the marital residence.

II.     The trial court erred in concluding that Appellant's claim of ineffective assistance of counsel with respect to jury instructions was barred by res judicata.

On July 9, 1998 the Court of Appeals filed an entry denying Petitioner's application for reopening. State v. O'Neal, Hamilton App. No. C-960392 (July 9, 1998)(unreported). The Court of Appeals simply concluded that Petitioner did not demonstrate a genuine issue that appellate counsel performed in a deficient manner by not raising the assignments of error stated in the application for reopening or that the alleged deficiencies prejudiced the outcome of the appeal.

Petitioner filed a notice of appeal from that judgment to the Ohio Supreme Court on August 21, 1998 in Case No. 98-1735. On October 12, 1998 Petitioner filed his merit brief in that case raising the following three propositions of law as to assignments of error not raised on appeal by appellate counsel:

I.     Trial counsel are deficient in failing to object to a trial court's error in including in the jury instruction on trespass the undefined term "estranged," a term not included in the standard established as the law of the case by the court of appeals, where a question from the jury shows that the definition of the term is crucial to the jury's finding on the issue of trespass, undermining confidence in the verdict.

II.     Trial counsel are deficient in failing to object to a trial court's error in omitting from the jury instruction on trespass the phrase "in the absence of a restraining order or an order granting one party exclusive possession of the marital residence," and confidence in the verdict is undermined, when the phrase is included in the standard

16

established as the law of the case by the court of appeals and the jury is not instructed not to rely on a restraining order entered following the death of the victim.

III.    Trial counsel are deficient in failing to object to a trial court's error in referring, in jury instructions on trespass, to the marital residence as the "wife's residence," predisposing the jury to finding that marital residence is the "wife's residence" and that the defendant committed trespass, undermining confidence in the verdict.

On March 26, 1999 the Court of Appeals of Hamilton County filed a decision affirming the trial court's dismissal of Petitioner's petition for postconviction relief. State v. O'Neal, Hamilton App. No. C-980247, 1999 Ohio App. LEXIS 1207 (March 26, 1999). The Court of Appeals concluded that Petitioner did not show that he was prejudiced by his trial counsels' failure to introduce a complete copy of the lease containing Petitioner's name or their failure to produce evidence--corroborating prosecution evidence--that the locks to the marital residence had not been changed and that Petitioner still had a key to the marital residence. The Court of Appeals found that the issue of whether the locks had been changed or Petitioner still had a key "had little relevance." The Court of Appeals also concluded that Petitioner's claim of ineffective assistance of counsel with respect to the jury instructions on trespass was barred by *res judicata* on the ground that the claim could be determined based on evidence in the record.

On April 16, 1999 Petitioner, through direct appeal counsel, filed in the Ohio Supreme Court a list of additional authorities. On April 28, 1999 the Ohio Supreme Court struck the additional authorities. State v. O'Neal, 85 Ohio St. 3d 1465, 709 N.E.2d 171 (April 28, 1999).

Petitioner filed a notice of appeal from the Court of Appeals judgment affirming the dismissal of Petitioner's petition for postconviction relief to the Ohio Supreme Court on May 10,

17

1999 in Case No. 99-906.   On that same date Petitioner filed a memorandum raising the

following two propositions of law:

> I.       The failure of trial counsel to introduce a complete copy of a lease listing the defendant as husband and occupant, the failure to introduce evidence and argue that the locks on the marital residence had not been changed, and the failure to introduce evidence that the defendant still owned a key to the marital residence are of such significance to the trier of facts's determination of whether a spouse commits a trespass of the marital residence that such deficiencies raise a substantive ground for relief based on ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution**.**

> II.      Where a claim of a violation of a defendant's Sixth Amendment right to the effective assistance of counsel with respect to a request for jury instructions cannot be determined without resort to evidence outside the record the application of the rule of *res judicata* to preclude review of the claim is a violation of due process as guaranteed in the Fourteenth Amendment to the United States Constitution.

While the application for reopening appeal and postconviction appeal were pending in the

Ohio Supreme Court, that court, on January 5, 2000 issued its decision in the direct appeal.   In

State v. O'Neal, 87 Ohio St. 3d 402, 721 N.E.2d 73 (January 5, 2000), the court affirmed the

judgment of the Court of Appeals affirming the convictions and sentences including the sentence

of death.   Justice Pfeifer dissented, concluding that the case "probably should have been

prosecuted as a non-capital case" and that the aggravating circumstances did not outweigh the

mitigating factors.  Id. at 421-422.

On January 18, 2000 Petitioner, through postconviction counsel, filed a motion for

reconsideration in the Ohio Supreme Court pursuant to Rule XI, Section 2 of the Rules of the

Ohio Supreme Court.   Petitioner asked the court to reconsider its judgment on propositions of

law one, two, and twelve. Petitioner specifically argued that the Court of Appeals, in its pretrial decision (*O'Neal I*), abolished the spousal privilege to enter the marital residence and created a new rule of law requiring a court to determine whether both spouses have decided to establish separate residences, and thereby violated Petitioner's right to fair notice and due process as enunciated in <u>Bouie v. City of Columbia</u>, 378 U.S. 347, 84 S. Ct. 1697, 12 L. Ed. 2d 894 (1964). Petitioner also argued that the Ohio Supreme Court's application to Petitioner's direct appeal of the new rule it adopted in its October 20, 1999 decision in <u>State v. Lilly</u>, 87 Ohio St. 3d 97, 717 N.E.2d 322 (1999), stating the test of whether a spouse can commit a trespass or burglary of the marital residence to be a question of custody and control, was also contrary to <u>Bouie</u>.

The government filed a memorandum in opposition to the Petitioner's motion for reconsideration, contending that the motion "is a re-argument of the issues already raised and rejected" and that the Ohio Supreme Court's decision in <u>State v. Lilly</u> was controlling.

On March 8, 2000 the Ohio Supreme Court rendered decisions on both Petitioner's appeal from the denial of his application for reopening and the affirmance of the dismissal of his petition for postconviction relief. In <u>State v. O'Neal</u>, 88 Ohio St. 3d 179, 724 N.E.2d 423 (March 8, 2000), the Ohio Supreme Court affirmed the Court of Appeals denial of Petitioner's application for reopening for the reasons contained in the Court of Appeals decision. In <u>State v. O'Neal</u>, 88 Ohio St. 3d 1441, 724 N.E.2d 1154 (March 8, 2000), the court denied leave to appeal the Court of Appeals affirmance of the dismissal of the petition for postconviction relief.

On May 16, 2000 Petitioner, through postconviction counsel John Gideon, filed a petition for writ of certiorari in the United States Supreme Court in Case No. 99-9611. He raised two questions:

19

I.       Did the Ohio appellate courts' change in the rule of law with respect to a spouse's right to enter the marital residence, after the acts for which Petitioner was charged with capital murder, deny Petitioner fair warning and due process under the Fourteenth Amendment contrary to *Bouie v. City of Columbia*, 378 U.S. 347 (1964)?

II.     Did the imposition of a sentence of death on Petitioner based on an aggravating circumstance identical to the element that makes the murder an aggravated offense--aggravated burglary resulting from the trespass of the marital residence--violate the Eighth Amendment because it fails to draw a rational distinction between those eligible for the death penalty and those not eligible for the death penalty contrary to *Lowenfield v. Phelps*, 484 U.S. 939 (1988)?

On May 21, 2001, following the issuance of the United States Supreme Court decision in Rogers v. Tennessee, 532 U.S. 451, 121 S.Ct. 1693, 149 L.Ed. 2d 697 (May 14, 2001), the court denied Petitioner's petition for writ of certiorari. James Derrick O'Neal v. Ohio, 532 U.S. 1037, 121 S. Ct. 1997, 149 L. Ed. 2d 1001 (May 21, 2001).

On June 21, 2002, Petitioner O'Neal, having exhausted all available state court remedies with respect to the claims he intended to raise in this Court, filed his petition for a writ of habeas corpus containing seventeen claims (Doc. No. 7).

Pursuant to this Court's scheduling order of June 7, 2002 (Doc. No. 11) Respondent Bagley filed her return of writ with an appendix containing a copy of the state court record on September 9, 2002 (Doc. Nos. 14-20).

On November 12, 2002, the date originally scheduled for Petitioner to file his traverse, Petitioner filed a motion requesting leave, pursuant to the decision in Atkins v. Virginia, 536 U.S. 304 (June 20, 2002), to amend his petition to add an eighteenth claim that his death sentence should be vacated on the ground that he is mentally retarded (Doc. No. 21). On that same date Petitioner moved the Court to stay these habeas corpus proceedings to permit him to exhaust his state court remedies with respect to this new claim (Doc. No. 22).

20

The Court granted Petitioner's motion to amend his petition by order of November 13, 2002. Following the filing of Respondent's memorandum opposing the staying of these proceedings (Doc. No. 23), the Court ordered these proceedings stayed on December 11, 2002 pending exhaustion of state court proceedings (Doc. No. 24).

On November 15, 2002 Petitioner filed with the Court of Common Pleas, Hamilton County, his first successive petition to vacate or set aside his sentence based on <u>Atkins v. Virginia</u>. Petitioner claimed that he is mentally retarded and not subject to the death penalty. Petitioner's petition in <u>State of Ohio v. James Derrick O'Neal</u>, Case No. B-9309022, was denied by the Court of Common Pleas (the Hon. Mark R. Schweikert presiding) on April 7, 2004 without the benefit of an evidentiary hearing. Petitioner appealed the court's denial of his petition to the Court of Appeals of Hamilton County. By way of agreed entry filed on August 13, 2004, Petitioner withdrew his appeal and he was granted an evidentiary hearing before the Court of Common Pleas on the issue of whether he is mentally retarded as defined by <u>Atkins</u>. The Court of Common Pleas then appointed experts on behalf of both Petitioner and Respondent to examine Petitioner.

The Court of Common Pleas held the evidentiary hearing on May 17, 2005. The parties filed post-hearing briefs. On September 26, 2005 the trial court denied Petitioner's petition to vacate or set aside his sentence, concluding that Petitioner did not meet the legal standard set forth in <u>Atkins</u> to be deemed "mentally retarded."

Petitioner filed a timely appeal to the Court of Appeals. Petitioner and the State filed briefs. Petitioner raised this assignment of error and issues presented for review:

> The decision of the trial court concluding that Appellant is not mentally retarded as defined in <u>Atkins v. Virginia</u> is not based on competent, credible, reliable evidence and violates Appellant's right to be free from cruel and unusual

21

punishment under the Eighth Amendment and his right to due process of law under the Fourteenth Amendments to the United States Constitution.

First Issue Presented for Review

Whether the trial court's conclusion -- that the "standard error of measurement" in IQ testing requires Appellant to "present the court with IQ scores of 64 or below" to raise the presumption that his IQ is 70 or below and to meet his burden of establishing that he suffers from significant subaverage intellectual functioning -- is contrary to law.

Second Issue Presented for Review

Whether the trial court's conclusion -- that Appellant is able to adequately perform some adaptive behavioral skills -- is sufficient to outweigh the preponderance of the evidence that Appellant has significant limitations in at least two adaptive behavior skills, namely academic skills and social skills.

Third Issue Presented for Review

Whether the trial court's reliance on the February, 1968 assessment of Appellant by Cincinnati Public School psychologist Ruth Kauffman when Appellant was 14 years old -- in which Appellant obtained a full scale IQ test score of 64 and in which the psychologist recommended Appellant for the Junior High Slow Learning Program due to "below normal intellectual functioning" -- for the conclusion that Appellant's mental retardation did not become manifest before age 18 is against the weight of the evidence and contrary to law.

 Petitioner filed notice of supplemental authorities. Following oral argument, the Court of Appeals issued a decision and judgment entry on December 1, 2006 in State of Ohio v. James Derrick O'Neal, Case No. C-050840, affirming the judgment of the Court of Common Pleas.

Petitioner sought leave to appeal in the Supreme Court of Ohio. He raised three propositions of law:

I.    A defendant who scores an average of 65.6 on five IQ tests administered beginning when he is 14-years-old in 1968 and ending in 2004 when he is 50 years old -- and whose IQ scores are re-normed to average 62.432 to adjust for rising IQ levels called the "Flynn Effect" -- proves by a preponderance of the evidence that his IQ is 70 or below and that he has significantly subaverage intellectual functioning pursuant to Atkins v. Virginia and State v. Lott.

22

II.     A defendant who is determined by his school psychologist when he is 14 years old to have a full scale IQ of 64 and whom the school psychologist recommends for the Junior High School Slow Learning Program due to "below normal intellectual functioning" has shown by a preponderance of the evidence that his mental retardation had its onset before age 18 pursuant to <u>Atkins v. Virginia</u> and <u>State v. Lott</u>.

III.    A trial court deciding whether a defendant is mentally retarded under the standards of <u>Atkins v. Virginia</u> and <u>State v. Lott</u> -- and in particular whether a defendant has significant limitations in two or more adaptive behavior skills -- may not choose to rely on evidence from an expert appointed by the court who has not met, interviewed, evaluated, or administered IQ tests to the defendant and who does not testify at the evidentiary hearing over evidence from an expert appointed by the court who has met, interviewed, evaluated, and administered IQ tests to the defendant and who does testify and is subject to cross-examination at the evidentiary hearing.

On May 2, 2007 the Supreme Court of Ohio, in <u>State of Ohio v. James Derrick O'Neal</u>, Case No. 2007-80, declined to accept jurisdiction on the ground that the appeal did not involve a substantial constitutional question.

Following Petitioner's filing of a status report on May 4, 2007 (Doc. No. 36), this Court on May 7, 2007 ordered the stay of these habeas corpus proceedings vacated and established a case schedule to begin with Petitioner's filing of a motion for leave to amend his petition (Doc. No. 37).

On May 31, 2007 Petitioner filed a motion for leave to amend his petition for a writ of habeas corpus by adding an eighteenth ground for relief: that the imposition on him of a sentence of death violated his right to be free from cruel and unusual punishment under the Eighth Amendment as applied in <u>Atkins</u>. (Doc. No. 38). This Court granted the motion on June 1, 2007.

Respondent filed an amendment to her return of writ on June 29, 2007 addressing Petitioner's eighteenth ground for relief. (Doc. No. 42). Respondent also filed with the

23

amendment to the return of writ a supplemental appendix including the state court record of Petitioner's second/successive postconviction proceedings in the state courts. (Doc. No. 40).

Pursuant to this Court's May 7, 2007 scheduling order (Doc. No. 36) Petitioner on June 28, 2007 filed a motion for discovery. (Doc. No. 41). Following Respondent's response to Petitioner's motion for discovery (Doc. No. 43), this Court issued an order granting the motion in part and denying it in part (Doc. No. 44).

This traverse is Petitioner's response to Respondent's return of writ (Doc. No. 14) and to her amendment to her return of writ (Doc. No. 42).

## II.  FACTS OF THE CASE

Petitioner James Derrick O'Neal and his wife Carol were married on November 14, 1992 and eventually resided together with the minor children from their previous marriages at 4938 Plainville Road in Cincinnati.

On December 7, 1993 Petitioner and Carol had an altercation, as a result of which Carol threw Petitioner and his children out of the house. Carol called the police and told a Cincinnati police officer that the altercation was about food stamps and that Petitioner had struck her.  Carol filed a domestic violence complaint in the Hamilton County Municipal Court and requested a temporary protective order.

Petitioner, who had been living "on the streets" or with relatives since December 7th, and whose clothes and other belongings--as well as those of his young sons--were still at 4938 Plainville Road, returned to the residence on Plainville Road in the evening of December 11, 1993, kicked in the front door, and shot Carol once in the chest.  Carol later died during surgery.

As Justice Pfeifer said in his dissent on direct appeal, "At its core, this is a murder case and it probably should have been prosecuted as a noncapital case." State v. O'Neal, 87 Ohio St. 3d 402, 421, 721 N.E. 2d 73 (2000). But it wasn't prosecuted as a noncapital case.

The prosecution seized on the fact that Petitioner kicked in the front door of their home to charge him with aggravated burglary and thereby raise murder to aggravated murder. And the prosecution used the same aggravated burglary charge as an aggravating circumstance to make the offense a capital offense and Petitioner eligible for the death penalty.

On April 29, 1994 Petitioner's trial counsel filed a pretrial motion to dismiss all of the aggravated burglary charges contained in the indictment. T.d. 9792; Petition Exhibit C. The motion contended that Petitioner could not have committed a trespass of the premises where the alleged offenses took place, 4938 Plainville Road. The grounds for the motion were that Petitioner had been residing there with his wife, Carol, and their children until December 7, 1993, that the premises was the home of Petitioner and his wife Carol and their children, and that at the time of the offenses no court order restricted Petitioner's entry into the marital residence. The motion cited decisions from the Vinton County and Franklin County Courts of Appeals holding that a spouse has a privilege to enter a dwelling of the other spouse and could not be criminally liable for trespass, an element of burglary.

The motion argued, *inter alia*, that as Carol O'Neal's spouse and in the absence of a court order Appellant had a right to enter the marital dwelling. The motion did not discuss Appellant's right to enter the premises of 4938 Plainville Road under a lease agreement. Nor did the motion address the issue of the changing of locks at 4938 Plainville Road.

At the August 15, 1994 oral hearing on the motion to dismiss, Assistant Prosecuting Attorney Seth Tieger stated that on December 7, 1993 Carol O'Neal "was in the process of

25

changing the locks." Apx. Vol. I, pages 14-15: 8/15/94 Hrg., T.p. 8-9.  He went on to speculate

that Appellant "didn't have a key...[b]ecause if he did, he would have just opened up the door."

Id. Defense counsel John Keller addressed the suggestion "that it's alleged that Carol Ann O'Neal

had tried to change the locks." Id. at 11: Apx. Vol. I, page 17. Mr. Keller proposed a hypothetical

in which his own wife "has changed the locks." Id. at 11-12: Apx. Vol. I, pages 17-18. He argued

that under that circumstance his kicking in his front door wouldn't be a trespass.  He went on to

conclude: "But simply to take a key or to change the lock doesn't suggest or vindicate a

possessory interest in the property."  Id.

The trial court agreed and dismissed all of the aggravated burglary charges and

specifications, including the entire first count charging felony aggravated murder, the aggravated

burglary death penalty specification to the second count, and the fourth count charging

aggravated burglary.  The trial court stayed its order pending appeal by the government.

The Court of Appeals of Hamilton County reversed the trial court.  The Court of Appeals

rejected the rule that a spouse has a privilege to enter the marital residence and created a rule that

in the absence of a restraining order the question of whether one spouse has sole possessory

interest in the house depends on whether both parties made a decision to live in separate places.

The Court of Appeals remanded the case for trial to allow the government to put on evidence to

show that there was a decision by both parties to establish separate residences.

In its decision reversing and remanding the judgment of the trial court dismissing all

charges of aggravated burglary, the Court of Appeals found, based on information in the record

"not presented in the form of evidentiary material," that Carol O'Neal had, in fact, changed the

locks. State v. O'Neal (1995), 103 Ohio App. 3d 151, 153 and 155, 658 N.E.2d 1102. It is

unclear what information in the record the Court of Appeals was relying on for this finding, or

26

how the suggestion that Carol O'Neal was "in the process of changing the locks" was translated into an accomplished fact.

Petitioner sought leave to appeal the judgment of the Court of Appeals to the Supreme Court of Ohio. Leave to appeal was denied.

The case went to trial before the Court of Common Pleas. Trial began on October 24, 1995.

In his opening statement for the State, Mr. Kunkel stated that the evidence would show that Carol O'Neal "took his key....[she] put him out."  Trial Tr.,T.p. 323.

Prior to the beginning of the State's case, the parties stipulated into evidence several joint exhibits. One of these joint exhibits was supposedly a copy of the lease agreement for 4938 Plainville Road. Joint Exhibit 3, Petition Exhibit D, consists of the first page of a Housing Assistance Payments Contract for 4938 Plainville Road, and a one-page October 19, 1993 Notification of Change to Lease and Housing Assistance Payments Contract which states that Petitioner's two sons, Jermaine and Cortez, were to be added to the lease.

In the direct examination of prosecution witness Patricia Carr, Carol O'Neal's long-time friend and co-worker, Prosecutor Kunkel asked her what was Carol O'Neal's plan for getting Appellant out of the house. Ms. Carr testified: "She had packed up his things. **She was going to get the locks changed, but she wasn't able to in time before all this had happened**." Trial Tr.,T.p. 375 (emphasis added). Mr. Kunkel asked Ms. Carr again what was Carol O'Neal's plan. Ms. Carr again testified: "**She was going to get the locks changed** and hopefully she was going to try to get a restraining order to get him out of there to keep him away from her."  Trial Tr.,T.p. 376 (emphasis added).  Carol O'Neal was going to get the locks changed and was going to try to get a restraining order.  She had not accomplished either goal as of December 11, 1993.

27

Mr. Leon argued, in closing argument for the State, that Petitioner didn't have a key to 4938 Plainville Road. Trial Tr.,T.p. 771. The prosecution did not introduce any evidence as to what Appellant had in his possession when he was arrested on the night of December 11, 1993, including whether or not he had a key. Nor did the prosecution introduce evidence that Carol O'Neal took Petitioner's key.

Mr. Keller, in closing argument on behalf of Petitioner, argued that the lease agreement for 4938 Plainville Road included Appellant's two children as residents, which established that Petitioner was residing there. Trial Tr.,T.p. 775. Mr. Keller did not argue that Petitioner's name was on the lease agreement or rebut the prosecution argument that Petitioner did not own or possess a key to 4938 Plainville Road.

Mr. Schmidt argued on behalf of Petitioner that "he didn't have a key," although no evidence was adduced as to whether Petitioner owned or possessed a key. Trial Tr.,T.p. 779.

Mr. Kunkel argued in his final guilt/innocence phase closing argument on behalf of the State: "There's **the lease**. You have the front page of the lease and addendum for the lease. When you get back there, you look at these. And **nowhere on either of these documents is his name**. **Nowhere**. His wife rented that house." Trial Tr.,T.p. 802 (emphasis added). He went on to say: "he has **no key** to get in. He's moved." Id. (emphasis added).

Kenneth Taylor, the owner and landlord of the premises at 4938 Plainville Road, was twice subpoenaed to testify. A subpoena was issued for Mr. Taylor on April 6, 1994 and was served on him on April 8, 1994. T.d. 9896. Another subpoena was issued for him on July 20, 1994 and served on him on July 25, 1994. T.d. 9734.A subpoena was not issued for him on August 24, 1995 or on September 25, 1995 when the other subpoenas were issued.

Kenneth Taylor, if called to testify, could have provided a complete copy of the lease agreement and other documents for the premises at 4938 Plainville Road. Postconviction Petition Exhibit E is the affidavit of Kenneth Taylor identifying and authenticating a complete copy of the six-page lease of 4938 Plainville Road.  The lease, attached as an exhibit to the affidavit, contains the name of Petitioner James O'Neal, along with that of Carol O'Neal and her children, on page 3 of the lease under Part G, Occupancy, which lists those who "shall personally use and occupy the premises." Also attached to the affidavit is a complete copy of the Housing Assistance Payments Contract.  Kenneth Taylor also identifies and authenticates the October 19, 1993 Notification of Change to Lease and Housing Assistance Payments Contract.

The trial court and counsel conferred concerning jury instructions after the prosecution's exhibits were admitted. Trial Tr.,T.p. 748-751. The following colloquy ensued:

| | |
|---|---|
| MR. KELLER: | At this point we're anticipating no other evidence.  And then I would like - - we've had some discussions, but I submitted on behalf of Mr. O'Neal a motion for some additional special instructions for the jury and I've given a copy to the Court. I just want those made a part of the record. |
| THE COURT: | Well, you only gave me one on burglary. |
| MR. KELLER: | We'll give you the other one on murder. |
| THE COURT: | Well, I've already addressed the one on agg burglary, and what I've taken is in the instructions for count number four regarding the aggravated burglary, when I give them the standard definition of trespass, I then include the submitted instructions that the State gave, |

> followed by yours.  Now, have you
> seen what I've done?

Trial Tr.,T.p. 748. The foregoing passage reflects that the trial court composed the instructions on aggravated burglary from the standard definition on trespass as well as instructions proposed by the prosecution and by the defense. The record does not show which parts of the instructions on burglary and trespass were proposed by the prosecution and which were proposed by the defense.

Appellant's counsel filed a motion for the court to instruct the jury on the lesser offense of murder on counts one and two of the indictment. T.d. 9506; Trial Tr.,T.p. 748.

The court acknowledged receipt from defense counsel of a motion for instructions on burglary. Id. Mr. Schmidt stated that counsel submitted a charge on burglary and trespassing. Id. at 750. The docket does not reflect the filing of such a motion. Postconviction Petition Exhibit F is a copy of what defense counsel apparently submitted to the Court but failed to file.

In its discussion of the proposed jury instructions, the trial court informed the parties that "I've dropped out the wording 'in the absence of court order' and started right after that and put in exactly what you gave me." Trial Tr.,T.p. 748-9. In its instructions to the jury the court defined "trespass" as:

> Trespass means any entrance, knowingly made, in a structure, residence, or dwelling of another is unlawful if it is without authority, consent or privilege to do so. [sic]  Trial Tr.,T.p. 826.

The court went on to instruct the jury that a husband can be convicted of an aggravated burglary of his wife's residence under certain conditions.  The court specified those conditions:

> Those conditions are that both parties understand that they are now living separate and apart.  In order to decide this issue, you must review all the facts

30

and circumstances in evidence that relate to this question.

When a husband and wife are **estranged** and both parties understand that they are living separate and apart, a husband may not use force to enter the wife's residence. If he does so, that is a trespass. Trial Tr.,T.p. 826-7. (emphasis added)

In its decision reversing the dismissal of the aggravated burglary charges and remanding to the trial court for trial on the issue, the Court of Appeals stated its holding as follows:

We hold that **in the absence of a restraining order or an order granting one party exclusive possession** of the **marital residence**, the question of whether one spouse has the sole possessory interest in the house depends on whether the evidence shows that both parties had made the decision to live in separate places. Both parties must have understood that the possessory interest of one was being relinquished, even if it was relinquished begrudgingly or reluctantly. In the absence of such a showing, there can be no finding of trespass and, hence, no aggravated burglary. (emphasis added) Petition Exhibit B at page four.

The holding did not include the term "estranged" or any term synonymous with that term.

The proposed defense instruction on trespass not filed and made a part of the record (see Postconviction Petition Exhibit F) contained the language "...in the absence of...[a] restraining order or an order granting one party exclusive possession of the marital residence." The instructions given by the trial court omitted the language referring to the absence of a restraining order or an order granting one party exclusive possession, and referred twice to the "wife's residence" rather than to the "marital residence." Trial Tr.,T.p. 826-7. The trial court, in fact, interrupted Mr. Keller's closing argument when he suggested that the court would instruct on the absence of a restraining order. Trial Tr.,T.p.777.

31

Joint Exhibit 1 included a copy of a restraining order, although granted on December 12, 1993, the day after the death of Carol O'Neal.

At the conclusion of the trial court's first phase instructions, the court excused the jury for deliberations and invited objections to the instructions from counsel. Trial Tr.,T.p. 858.

Petitioner's counsel made no specific objections, but made a general objection based on prior requests and arguments. Id. at 859. Petitioner's counsel did not object to the court's omission of reference to the absence of a restraining order or an order granting one party exclusive possession nor to the court's reference to the "wife's residence" rather than to the "marital residence," nor to the use of the term "estranged." Id.

The docket does not list the prosecution request for instructions entitled "Aggravated Burglary Count Special Instruction Requested by State," Postconviction Petition Exhibit H.

These two requests for instructions, those of the defense and those of the prosecution, show that it was the prosecution and not the defense that requested the instruction using the term "estranged." See Postconviction Petition Exhibit H, second paragraph. The instruction with the term "estranged" was taken verbatim from the prosecution's request for instructions.

After the jury began its deliberations it sent out a note:

THE COURT:      The record should reflect that we're
                here because the jury sent out a note,
                and you can show that to Gina.

                The note reads:  **We need the legal
                definition in Ohio of what
                "estranged" means.** Signed Lee
                Baumgartner, Foreman.

                         ***

                The Court has discussed the matter
                with counsel and concluded that

32

we're unable to give any further instructions to the jury, at least in this area.

And the Court, with approval of counsel, plans to send a note to the jurors worded something like this: Ladies and gentlemen of the jury, in response to your request for a legal definition the word "estranged," [sic] this is to notify you the Court has previously given you all the applicable instructions regarding this case and is unable to give you any further instructions at this time. Please rely on you collective memories and understanding in making your deliberations.

Trial Tr.,T.p. 861-862 (emphasis added). The prosecution and the defense approved this response to the jury question. Id.

On November 2, 1995 the jury returned its verdicts. The jury found Petitioner guilty of the aggravated murder of Carol O'Neal as charged in the first count of the indictment, but not guilty of the first death penalty specification charging that the offense was part of a course of conduct involving an attempt to kill two or more persons, guilty of the second death penalty specification charging that the offense was committed while Petitioner was committing aggravated burglary, and guilty of the firearm specification. The jury also found Petitioner guilty of aggravated murder as charged in the second count of the indictment (prior calculation and design), not guilty of the first death penalty specification to count two, guilty of the second death penalty specification, and guilty of the firearm specification. The jury found Petitioner not guilty of the attempted aggravated murder of Ricardo Lee as charged in the third count of the

33

indictment. Finally, the jury found Petitioner guilty of aggravated burglary as charged in the fourth count of the indictment and of the firearm specification contained in the fourth count.

Following the penalty phase of the trial the jury found that the aggravating circumstances outweighed the mitigating factors on both the first and second counts and recommended a sentence of death.

On December 11, 1995 the trial court imposed sentences of death on Petitioner on the first and second counts.

Petitioner filed a petition for postconviction relief in the trial court on July 2, 1997 raising claims of ineffective assistance of counsel.

On December 12, 1997 the Court of Appeals issued a decision on the direct appeal affirming the judgment of the trial court.

On February 17, 1998 the trial court dismissed the postconviction petition. Petitioner appealed to the Court of Appeals of Hamilton County.

On March 12, 1998 Petitioner filed a timely application for reopening of the direct appeal in the Court of Appeals raising a number of claims of ineffective assistance of appellate counsel on direct appeal.  The Court of Appeals denied the application for reopening.

On March 26, 1999 the Court of Appeals of Hamilton County issued a decision affirming the trial court's dismissal of Petitioner's petition for postconviction relief.

The Supreme Court of Ohio issued its opinion on direct appeal on January 5, 2000 affirming the convictions and sentences of death. In considering the question of whether Petitioner could be found to have trespassed in the marital residence and whether he therefore could have committed an aggravated burglary, the Ohio Supreme Court did not apply the rule which the jury had been instructed to apply but instead applied the rule it had recently adopted in

34

its October 20, 1999 decision in <u>State v. Lilly</u>, 87 Ohio St. 3d 97, 717 N.E.2d 322 (1999). In

<u>Lilly</u> the court rejected those Court of Appeals' decisions which had ruled that a spouse has a

privilege to enter the marital dwelling or the dwelling of the other spouse. In <u>Lilly</u> the court ruled

that the test of whether a spouse commits a trespass or burglary of the marital residence is a

question of custody and control.

The Ohio Supreme Court found that Carol O'Neal had custody and control of the home

based on the erroneous findings that Petitioner's name was not on the lease and that after the

altercation on December 7, 1993 Petitioner had moved out and began living somewhere else.

When Petitioner was arrested he gave his address as 4938 Plainville Road. His belongings and

those of his sons were still at that house. There was no restraining order at the time of the

incident, and there is no evidence that the locks had been changed. Petitioner was not living

somewhere else, but was living "on the streets."

Petitioner moved for reconsideration. The Supreme Court of Ohio denied reconsideration

on February 16, 2000.

On March 8, 2000 the Supreme Court of Ohio denied Petitioner leave to appeal the Court

of Appeals decision on Petitioner's postconviction petition.

On that same date the Supreme Court of Ohio affirmed the Court of Appeals denial of

Petitioner's application for reopening.

Petitioner filed a petition for writ of certiorari in the United States Supreme Court. The

petition raised the issue of whether Petitioner's right to fair warning and due process had been

violated by the application to Petitioner's trial of the new rule adopted by the Court of Appeals in

its pretrial decision and by the application to Petitioner's direct appeal of the new rule adopted by

the Ohio Supreme Court in <u>Lilly</u>. The petition for writ of certiorari was denied on May 21, 2001.

***

Subsequent to the filing of Petitioner's federal habeas corpus petition the United States Supreme Court decided Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), in which it was held that a mentally retarded defendant is not subject to the death penalty.

The three-part constitutional standard for evaluating a claim of mental retardation, as stated in Atkins and recognized in State v. Lott, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011 (December 11, 2002), is: (1) significantly subaverage intellectual functioning, (2) significant limitations in two or more adaptive skills, and (3) onset before age 18. The facts as to each part of this standard are as follows.

<u>Onset Before Age 18</u>

The third part of the constitutional test of mental retardation, as restated by Lott, is "onset before the age of 18."

Petitioner did not begin to claim that he was mentally retarded only after the decision in Atkins was issued. Nor was the preparation for the penalty phase of his trial the first time that Petitioner was diagnosed as mentally retarded.

The report of Cincinnati Public Schools School Psychologist Ruth Kaufman from February, 1968 when Petitioner was 14 years old and in the 6th grade (Hearing Exhibit A) shows that Petitioner obtained a full scale IQ of 64 on the Wechsler Intelligence Scale for Children (WISC). Ms. Kaufman, in her assessment of Petitioner's performance on the WISC and other tests, noted Petitioner's strengths and weaknesses, and observed that Petitioner's performance tests showed that he was "moderately retarded." Ms. Kaufman  concluded that Petitioner should

36

be in the "Junior High Slow Learning Program." She further stated that "Below normal intellectual functioning due to organic dysfunction seemed to be the primary problem."

Dr. Michael Nelson, who submitted a written report to the Court (Hearing Exhibit 1) but did not interview or test Petitioner and who did not testify at the hearing, wrote in his report at page 3 that the full scale IQ test results placed Petitioner overall in the "Mild range of Mental Retardation." And Dr. Nelson added that "He manifested a significant deficit in his performance capabilities where he functioned in the moderate to mild range of mental retardation."

Dr. Robert Tureen, who interviewed and tested Petitioner in June, 1994 before his trial and who interviewed and tested Petitioner again in December, 2004 after being appointed by the trial court, and who testified at the evidentiary hearing on May 17, 2005, provided a more thorough analysis of the significance of the school psychological evaluation. Dr. Tureen said this (at page 4 of his report):

> On the Wechsler Intelligence Scale for Children, he obtained a **Fullscale I.Q. of 64** (Verbal I.Q. 79, Performance I.Q. 55). **That large a discrepancy on the Wechsler scales between Verbal and Performance Scores does raise at least the possibility of some level of brain disturbance or dysfunction, that might be interfering with intellectual ability.** The school psychologist summary evaluation recommended that James be placed in the junior high school slow learner program. She further was of the opinion that "Below normal intellectual functioning, due to organic dysfunction seemed to be the primary problem." She also indicated that emotional problems might be interfering with his school achievement. The importance of this is **the early establishment of not only measured I.Q. levels, but also the presumption of impaired brain function (cerebral dysfunction). *** It is my opinion that the above data establishes the existence of low intellectual ability, at least in terms of his academic performance, as well as assessed intellectual measures before the age of eighteen, with suggested evidence of cerebral brain dysfunction, resulting in poor academic achievement and low intellectual status.** (emphasis added)

37

Noting Petitioner's low achievement test scores, Dr. Nelson agreed that "Mr. O'Neal had long-standing achievement/academic skill deficits."

While the school psychological testing and evaluation was focused on Petitioner's intellectual and academic skills and abilities and does not contain a discrete analysis of Petitioner's adaptive behavioral skills, the performance scores on the Wechsler test and other tests led Ms. Kaufman to conclude more broadly that "When tasks required that he work toward an unknown goal or concentrate on visual cues, he gave an extremely defective performance. Spatial reasoning was also very poor for his age. Moreover, his knowledge of vocabulary and recall of information indicated defective functioning."

<u>Significantly Subaverage Intellectual Functioning</u>

The second part of the constitutional test of mental retardation, as restated in <u>Lott</u>, is "significantly subaverage intellectual functioning."

Before the death penalty trial began before the trial court in October, 1995 Petitioner was examined and evaluated by two psychologists, Dr. David Chiappone and Dr. Robert Tureen. Dr. Tureen, in his January 18, 2005 report to the trial court, summarizes the assessment by Dr. Chiappone which led to Dr. Chiappone's requesting that Dr. Tureen, a neuropsychologist, examine Petitioner:

> In 1994, during his incarceration at the Hamilton County Justice Center, **David Chiappone, Ph.D. administered the Wechsler Adult Intelligence Scale-R.** This is a scale that is related in characteristics to the Wechsler Intelligence Scale for Children, but is normed on the adult population and is in fact the fourth revision of the adult Wechsler Scales. On March 31, 1994, the following I.Q. scores were obtained: Verbal I.Q. 72, Performance I.Q. 71 and **Full Scale I.Q. 71**, all representing **a ranking a the 3rd percentile**, compared to the general population, meaning that 97% of the population does as well or better than James performed on the test. **The 95% confidence interval for the Full Scale I.Q. is**

> **67 to 77, which are reasonable limits of the range within which James's "true" Full Scale I.Q. lies. Thus, there is a reasonable probability that James' true score lies below the established score of 70, representing mental retardation,** but also a reasonable probability that his true score lies above that particular level. What was more important at the time, was the **continued presence of evidence of brain dysfunction.** This was essentially why Dr. Chiappone requested my involvement in the case, since on his initial testing, he was finding signs suggesting brain disorder and this is my specialty area. Additional testing, using specific measures that are sensitive to the presence of brain dysfunction I administered in 1994 substantiated **a consistent picture of a brain dysfunction, present on several measures, indicating impairment in abstraction and problem solving and difficulty on measures of spatial analysis and synthesis**, which was suggested by the poor performance I.Q. reported in 1968. On the other hand, his general language, his auditory comprehension and general verbal expression and his ability to follow instructions were all intact, within **his level of intellectual functioning, that is, of an individual with an I.Q. in the borderline to mildly retarded range**, as measured on the Wechsler Adult Intelligence Scale-R (WAIS-R). (emphasis added)

Hearing Exhibit C, January 18, 2005 Dr. Tureen Report at pages 5-6.

The state courts fixated on the isolated fact that Petitioner obtained a full scale score of 71 on the WAIS-R administered by Dr. Chiappone in 1994 and virtually ignored the fact that Petitioner got a full scale score of 64 on the WISC administered in 1968, and a score of 63 on the Cognitive Status Exam administered by Dr. Tureen in 1994, and a full scale score of 67 on the WAIS-III administered by Dr. Tureen in 2004, and a composite index score of 63 on the Reynolds Intellectual Scales test administered by Dr. Tureen in 2004.

As Dr. Tureen carefully and thoughtfully explained in his hearing testimony at Hrg. Tr. 36-37, these tests have errors of measurement. As explained cogently by the AAMR:

> Although not perfect, intelligence is represented by Intelligence Quotient (IQ) scores obtained from standardized tests given by a trained professional. In regard to the intellectual criterion for the diagnosis of mental retardation, **mental retardation is generally**

39

> **thought to be present if an individual has an IQ test score of approximately 70 or below**. An obtained IQ score must always be considered in light of its **standard error of measurement**, appropriateness, and **consistency** with administration guidelines. **Since the standard error of measurement for most IQ tests is approximately 5, the ceiling may go up to 75**. This represents a score approximately 2 standard deviations below the mean, considering the standard error of measurement.

American Association of Mental Retardation (AAMR), Definition of Mental Retardation, What is Intelligence?, http://www.aamr.org/Policies/faq_mental_retardation.shtml (emphasis added).

At the time of Petitioner's trial in October, 1995 the prevailing rule on the imposition of the death penalty on mentally retarded persons was that contained in Penry v. Lynaugh (1989), 492 U.S. 302. Penry held that it was not a violation of the Eighth Amendment's ban on cruel and unusual punishment to execute a mentally retarded person. Thus, the penalty phase mitigation testimony regarding Petitioner's mental retardation was presented, not as a bar to the imposition of the death penalty, but merely as evidence in mitigation. The constitutional standards for determining if an offender is mentally retarded -- as set out in Atkins -- did not exist and were not referred to during the questioning of either Dr. Chiappone or Dr. Tureen. The examinations of Dr. Chiappone and Dr. Tureen, which are part of the trial record, are noticeably devoid of any reference to the definitions of mental retardation of the American Association of Mental Retardation or the American Psychiatric Association. Even more noticeable is the absence of any questioning, and consequently the absence of any testimony, about the actual scores that Appellant achieved on the various I.Q. and other tests administered in 1994 or to Petitioner's abilities with respect to specific adaptive behavior skills.

Thus, when during his testimony Dr. Chiappone said that "He's not retarded," -- referring of course to Petitioner -- this statement was not made with explicit reference to the AAMR or

APA definitions of mental retardation. Nor, obviously, could this statement have referred to the constitutional standard of mental retardation later set out in <u>Atkins</u>.

But virtually all of the rest of Dr. Chiappone's 1995 penalty phase mitigation testimony supports the conclusion that Appellant meets the constitutional definition of mental retardation.

Dr. Chiappone testified that he administered a number of tests to Petitioner and that Petitioner "scored in the what are called the border range of mental retardation. [sic] He's not retarded, but he functions at the second or third percentile of the general population." Trial Tr. at 981. He testified that Petitioner had difficulty performing some simple tests that the Doctor administered. "And so at that point I thought there was what we call organicity above and beyond limited intellect. And at that point I recommended we have a neuropsychologist who specializes in dysfunctions of the brain to do further testing to make sure we didn't miss anything." Trial Tr. at 982. Dr. Chiappone testified that Petitioner suffered from "borderline mental retardation based on the IQ test and substantiated by his educational data." Trial Tr. at 987. Finally, Dr. Chiappone stated that Petitioner had a "[l]ack of coping skills" which, along with other factors, "made it more difficult for him to effectively problem solve." Trial Tr. at 996.

As noted above, after he evaluated and tested Petitioner, Dr. Chiappone referred Petitioner to Dr. Robert Tureen, a clinical neuropsychologist at the Mayfield Neurological Institute in Cincinnati. Dr Tureen also testified in the mitigation phase of the trial. Trial Tr. at 997.

Dr. Tureen did further testing of Petitioner which showed a "longstanding type of disturbance" which he called "minimal cerebral dysfunction." Trial Tr. at 1001. Dr. Tureen testified that Petitioner had a very poor academic performance throughout his limited academic

career and that "early psychological testing that was done in '68 stated there was evidence of organicity or brain damage." Trial Tr. at 1002.

As to Petitioner's level of intellectual functioning, Dr. Tureen described it as being "in the borderline to mildly retarded range." Trial Tr. at 1002. Dr. Tureen concluded that Petitioner is "an individual who's going to have some limitations on how well they're [sic] going to be able to function. *** By cognitive thinking general problems involving memory, spatial and statistical skills, language usage, as well as motor skills. [sic] And on that particular exam he performed well into the impaired range. You take that performance and put it together with the IQ level and you see an individual who is going to have some sort of difficulties in adjusting in the world." Trial Tr. at 1003. He added that persons like Petitioner would have "some real limitations of what they're going to be able to do in life and what they're going to be able to accomplish." Trial Tr. at 1005. Finally, Dr. Tureen testified on cross-examination that Petitioner "was functioning in the mildly mentally retarded to borderline range." Trial Tr. at 1009.

Dr. Nelson, on page 3 of his report (Hearing Exhibit 1, March 21, 2005 Dr. Nelson Report) summarizes Dr. Chiappone's and Dr. Tureen's penalty phase mitigation testimony as follows: "It appears that Mr. O'Neal is functioning in the Mild MR to Borderline range of intelligence." Thus, Respondent's expert, Dr. Nelson, does not disagree with the diagnosis of mental retardation.

It is important to emphasize here that the WAIS-R was not the only test administered to Petitioner in 1994. Other tests were administered and Appellant's performance on all of these tests demonstrates, as Dr. Tureen testified at the evidentiary hearing below, a consistent pattern of significantly subaverage intellectual functioning. If Atkins had been the rule at the time of

42

Petitioner's trial, his attorneys would have questioned Dr. Tureen with respect to the specific results of all of these tests.

Hearing Exhibit B, Dr. Tureen's July 27, 1994 report, contains this most important summary of all of the 1994 test results:

> TEST RESULTS AND INTERPRETATION: James was administered the **Wechsler Adult Intelligence Scale - R (WAIS-R) by Dr. Chippone [sic] yielding Verbal Performance and Full scale I.Q.'s in the borderline range to mildly mentally retarded range (3rd percentile in comparison with others of his age).** The only subscale score which was significantly out of line and significantly higher than his overall average subscale scores was on the Digit Symbol subtest which reflects relatively good psychomotor speed and visual motor coordination. The general intellectual level is compatible with the academic levels reported and described above.
>
> **On the Cognitive Status Exam (Barrett), a screening exam for cognitive, sensory, and motor functions, James obtained a score of 63 out of a possible 104 points, scores below 75 are in the impaired range. Generally speaking, individuals who have WAIS-R I.Q. levels in the borderline to retarded range coupled with cognitive status exam scores significant [sic] below 65, as is the case here, are generally seen as having difficulties functioning in the environment in even relatively routine ways on a day to day basis as he result of impairment in brain function**. If this impairment is longstanding, that is congenital as opposed to something more recently acquired, then the functioning is likely to be marginal at best. Because of difficulty adapting and adjusting, such individuals are likely to find themselves struggling in the general adaptation.
>
> James's performance on the Wisconsin Card Sort and Porteus Mazes reflects evidence of difficulty in abstraction and problem solving. On the **Wisconsin Card Sort** in particular, there is very **high perseverative response rate**. What this reflects is an inability to learn effectively from feedback information regarding one's performance and a tendency to continually repeat the same types of behavior pattern even though there may be information provided that the behavior pattern is incorrect. In otherwords [sic], **he does not learn well from information being provided by the environment, particularly in novel situations**. On the **Porteus**

43

**Mazes**, James again demonstrates **considerable difficulty in planning ahead and attempting to anticipate a course of action**. His performance level actually reaches around year 7, but even here he is struggling to perform within the acceptable limits.

Further evidence of impaired functioning is reflected on any spatial analytic task. On copying simple configurations such as a Greek cross, there is marked constructional dyspraxia, that is an inability to accurately reproduce the appropriate juxtaposition of the various spatial features of the figure. His attempt to copy the complex Rey figure resulted in even more evidence of the difficulty he has with spatial analytical skills resulting in a markedly distorted copy of the figure. When he was asked to recall the figure immediately after the copy phase, he was only able to produce one or two lines of this rather intricate figure and even those were drawn incorrectly.

Finally, on the **Hooper Visual Organization Test (VOT),** a task which does not involve a motor component, but strictly involves the conceptual organization of spatial elements into recognizable wholes, **performance is in the severely impaired range.**

Brief measures of language assessment indicate that object, number, letter, and word recognition are unimpaired within the level of the patient's intellect. His auditory comprehension and expression are unimpaired. He is able to follow instructions without difficulty. His reading level is functional for routine day to day activities.

GENERAL CONCLUSIONS: This is a 39 year old male with **borderline to mildly retarded level of intellectual functioning** as reflected in previously administered psychometric measures. Current testing reflects evidence of impaired higher cortical functions such as novel reasoning, abstracting, and planning, and spatial analytical skills, while motor functions remain relatively intact.

Given the early academic records, these findings most likely reflect **a longstanding condition**.

Hearing Exhibit B, July 27, 1994 Dr. Tureen Report, at pages 2-3.

    In December of 2004 Dr. Tureen again interviewed Petitioner and again administered

tests. The details of the results of these tests are contained in his January 18, 2005 report:

44

> On the **WAIS-III**, James obtained a Verbal I.Q. of 71, Performance I.Q. of 69, and **Full Scale I.Q. of 67.** The descriptions currently used rate the Performance and Full Scale I.Q. as "extremely low" and Verbal I.Q. as "borderline."

Hearing Exhibit C, January 18, 2005 Dr. Tureen Report at page 6 (emphasis added).

Dr. Tureen also had Petitioner take the **Reynolds Intellectual Scales** test:

> I also chose to administer the Reynolds Intellectual Scales, which is a relatively new test, but has both the advantage and disadvantage of not involving any psychomotor measures. *** The following indices are essentially I.Q. scores:
> Verbal Index = 68, 2nd percentile, 95th confidence interval 63-77 (i.e. range where true score lies)
> Non-Verbal Index = 67, 1st percentile, 95th confidence interval 62-75
> **Composite Index = 63**, 1st percentile rank, 95th confidence interval 59-70

Id., at page 7 (emphasis added).

Considering the scores that Petitioner has achieved on ALL the IQ tests he has been administered from when he was 14 years old to the present, the preponderance of the evidence is that Petitioner's IQ is below 70. Taken together with Petitioner's academic performance as well as his performance on achievement tests, the evidence establishes that Petitioner has consistently suffered from significantly subaverage intellectual functioning.

<u>Significant Limitations in Two or More Adaptive Behavior Skills</u>

The third part of the constitutional test of mental retardation, as stated by the Ohio Supreme Court in <u>Lott</u>, is "significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction."

The thrust of the State's questions and argument at the evidentiary hearing was, essentially, that Petitioner does not meet the definition of mental retardation because he was able

45

to go to school, drive a car, get married, have children, be a Marine, and hold various jobs (ignoring how poorly Petitioner generally fared in almost all of these areas).

The definition of mental retardation -- be it the definition of the American Association of Mental Retardation, the definition of the American Psychiatric Association, the constitutional definition set out by the United States Supreme Court in <u>Atkins</u>, or the definition adopted by the Court in <u>Lott</u> -- does <u>not</u> require that to qualify as "mentally retarded" an offender must be profoundly mentally retarded. The execution of a person who is mildly mentally retarded is unconstitutional under <u>Atkins</u>. Indeed, the AAMR definition of "mental retardation" expressly contemplates that:

**"Within an individual, limitations often coexist with strengths."**

American Association of Mental Retardation (AAMR), Definition of Mental Retardation, What is Intelligence?, http://www.aamr.org/Policies/faq_mental_retardation.shtml (emphasis added).

The State's questions and arguments during the evidentiary hearing seemed to suggest that to be "mentally retarded" as defined by <u>Atkins</u> an offender must be profoundly mentally retarded and have significant limitations in <u>ALL</u> adaptive behavior skills. That obviously is not the law. The law is the three-part test. The question is not whether Petitioner has some strengths -- he obviously does. The question is whether Petitioner meets the three-part test, the third part pertaining to significant limitations in two or more adaptive skills.

Dr. Chiappone testified that Petitioner had a "[l]ack of coping skills" which, along with other factors, "made it more difficult for him to effectively problem solve." Trial Tr. at 996.

Dr. Nelson, who did not visit, interview, or test Petitioner, or even testify at the evidentiary hearing in support of his report, nevertheless agrees that: "It is clear that Mr. O'Neal has difficulties in dealing with stressful situations in an effective manner and does not think

through the consequences of his behavior very well." Hearing Exhibit 1, March 21, 2005 Dr. Nelson Report, at page 5. While Dr. Nelson goes on to say that this same problem is experienced by "individuals who function at higher levels of intelligence," he does not deny that Petitioner's limitation in this area is evidence of a problem with his social skills or that this limitation is caused by mental retardation. Moreover, Dr. Nelson concedes that: "Mr. O'Neal does seem to exhibit significant deficits in <u>several</u> conceptual areas (i.e., reading, money concepts). <u>Id</u>. (emphasis added). Finally, Dr. Nelson says expressly that: "I would agree that Mr. O'Neal certainly has evidenced difficulties in his adaptive functioning in situations involving emotional intensity." <u>Id</u>. While Dr. Nelson attributes these difficulties to "psychiatric difficulties," he fails to provide any basis for concluding that these difficulties are not caused by Petitioner's mental retardation. Importantly, Dr. Nelson was not available to have his assertion cross-examined.

At the evidentiary hearing on May 17, 2005 Dr. Tureen testified specifically in terms of the constitutional standard of mental retardation and the requirement of the third prong of the test that requires significant limitations in two or more adaptive skills. In particular, Dr. Tureen testified that Petitioner has significant limitations in <u>conceptual</u> as well as <u>social</u> skills:

> Q. Based on your education, training, and experience and your interviewing and testing of Mr. O'Neal, as well as your review of his scholastic records, do you have an opinion, Dr. Tureen, to a reasonable certainty as a psychologist as to **whether or not Mr. O'Neal currently suffers from a disability characterized by significant limitations in two or more adaptive skills** as expressed in conceptual, social, and practical adaptive skills, which occurred before he was age 18?

> A.  Yes, I do.

> Q.  What is your opinion?

47

A.  That he still suffers from the same level of **conceptual inability**, if you will, and **social limitations** as he did prior -- in the past.

Q.  And what **particular adaptive skills** does Mr. O'Neal suffer from a significant limitation of?

A.  First of all, there is **a significant limitation in academic skills. I would say reading, math**, but more importantly is the limitation as a result of what I initially referred to as mild cerebral dysfunction, which I believe is the cause of the **low level of intellectual function.**

Now, that particular type of disturbance that he demonstrated on our earlier testing limits his ability to consider alternative modes of dealing with situations which are stressful or which he finds in some way threatening.

Q.  And I don't have *Atkins* in front of me, I'm going from memory. Feel free to review *Atkins* if you have it in your possession. The reference in *Atkins* to adaptive skills relates to the following: Communication, self care, home living, social, community use, self direction, health and safety, functional academics, leisure, work. What you have just described, does that fall into that category of functional academics?

A.  The functional academics and social adaptive.

Q.  How does that fall into the category of **social adaptive**?

A.  **This is an individual who is going to become rigid, perseverative, not able to think of alternative ways of dealing with situations which occur particularly under stress.**

Q.  Does it impact the issue of whether or not Mr. O'Neal is mentally retarded if he meets two of the ten types of limitations in adaptive behavior?

A.  My understanding is that it does.

Q.  You have provided us with your opinion concerning whether or not James O'Neal is mentally retarded. Are there **gradations of mental retardation**, Doctor?

48

A.  Yes, there are.

Q.  Based on your education, training and experience and your interviewing and your testing of Mr. O'Neal and your review of his scholastic records, do you have an opinion to a reasonable certainty as a psychologist as to the **level of gradation of Mr. O'Neal's retardation?**

A.  Yes, I do.

Q.  What is that opinion?

A.  **He is mildly mentally retarded**.

Hearing Transcript at pages 30-33 (emphasis added).

## III. PROCEDURAL DEFAULT ANALYSIS

Respondent's return of writ contains, at pages 36 to 39, a general statement of the principles of state court procedural default of federal habeas corpus review emanating from the "adequate and independent state ground" doctrine of Fox Film Corp. v. Muller, 296 U.S. 207 (1935), reviewed and approved in Michigan v. Long, 463 U.S. 1032 (1983).

The return of writ also contains, at pages 24 to 28, a restatement of Petitioner's habeas corpus grounds for relief, with each ground followed by a statement of Respondent's position on where and how the grounds were raised in the state courts.

Although Petitioner's analysis is largely in agreement with that of Respondent, Petitioner will nevertheless independently state the principles as he believes them to be and then state specifically where Petitioner raised his claims in the state courts.

A.  General Principles

In 1963, in Fay v. Noia, 372 U.S. 391 (1963), the Supreme Court held that a federal habeas corpus court has the power, i.e. jurisdiction, to consider a petitioner's federal

constitutional claim despite his failure to raise the claim properly in the state courts and the state courts' concomitant refusal to consider the claim on the merits. Fay v. Noia, however, recognized a federal habeas court's discretion to deny review to a claim if the petitioner had deliberately bypassed state procedures for review of that claim.

The Supreme Court began the demise of the "deliberate bypass" test in 1977 with the adoption of the "cause and prejudice" test of Wainwright v. Sykes, 433 U.S. 72 (1977). In Wainwright v. Sykes, which involved the habeas petitioner's failure to file a pretrial motion to suppress a confession under Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court followed the adequate and independent state ground doctrine -- which bars federal review of state court decisions resting on state substantive law -- to bar federal habeas corpus review of state court decisions relying on state procedural law absent a showing of cause and prejudice. 433 U.S. at 81-87.

The Supreme Court reaffirmed the principles adopted in Sykes in Engle v. Isaac, 456 U.S. 107 (1982). In Engle v. Isaac, where the habeas petitioners failed to make contemporaneous objection to jury instructions, the Supreme Court held that a habeas petitioner must show cause and prejudice to excuse a state procedural default.

The Supreme Court held in Murray v. Carrier, 477 U.S. 478 (1986), where appellate counsel failed to raise a substantive claim of error on appeal, that the cause and prejudice test of Sykes applies to defaults on appeal.  The Court stated in Murray that ineffective assistance of counsel is cause for a procedural default, but added that the exhaustion doctrine requires a claim of ineffective assistance of counsel to be presented to the state courts as an independent claim before it can be asserted as cause for a procedural default.  477 U.S. at 488-489.  In Murray the Supreme Court created an exception to the cause and prejudice test to correct a fundamental

miscarriage of justice. The Court held that "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." Id. at 495-496.

In Coleman v. Thompson, 501 U.S. 722 (1991), the Supreme Court affirmed the cause and prejudice test in holding that the deliberate bypass test of Fay v. Noia was expressly overruled in all cases in which a habeas petitioner has defaulted his federal claim in state court pursuant to an adequate and independent state procedural rule. In Coleman the Court applied the cause and prejudice test in a case where the habeas petitioner defaulted his entire postconviction appeal.

B. Procedural Default Analysis in the Sixth Circuit

The Sixth Circuit Court of Appeals in Maupin v. Smith, 785 F.2d 135 (6th Cir. 1986), adopted a step-by-step analysis to apply procedural default principles. First, the federal habeas court must determine that there is, in fact, a state procedural rule that was applicable to the petitioner's claim and that the petitioner did, in fact, fail to comply with the rule. 785 F.2d at 138. Second, the federal court must determine whether the state courts actually enforced the state procedural sanction. Id. Third, the court must decide whether the state procedural sanction is an adequate and independent state ground upon which the state can rely to foreclose federal review of a constitutional claim. Id. And, fourth, the federal habeas court must determine whether the habeas petitioner can demonstrate that there was cause for the procedural default and that he was actually prejudiced by the alleged constitutional error. Id.

Maupin further defined the prejudice prong of the cause and prejudice test. First, the prejudice must be a result of the alleged constitutional violation and not a result of the failure to

51

comply with the state procedural rule.  Second, the burden is on the habeas petitioner to show he was prejudiced by the alleged constitutional error.  And third, in analyzing a petitioner's contention of prejudice the habeas court should assume that the petitioner has stated a meritorious constitutional claim.  Id. at 139.  The Court in Maupin was careful to point out on the last point that a habeas court must not conflate the prejudice determination with a review of the merits of the petitioner's constitutional claim.  Rather, the question for a determination of prejudice is, assuming a meritorious constitutional claim, whether the petitioner has been prejudiced by such a constitutional violation.  Id. at 139-140.

The procedural default analysis outlined in Maupin does not include what should be the fifth step adopted by the Supreme Court in Murray v. Carrier, 477 U.S. 478 (1986), the fundamental miscarriage of justice/actual innocence exception in the absence of a showing of cause and prejudice.  Any complete analysis must include this step.  Rust v. Zent, 17 F.3d 155, 162 (6th Cir. 1994).

### i. compliance with applicable state procedural rule

The first step of the Maupin analysis requires the federal habeas court to determine whether there was a state procedural rule applicable to the petitioner's claim and whether the petitioner failed to comply with the rule.  This step of the analysis requires the court to determine as a preliminary matter whether there was, in fact, a state procedural rule in effect when the petitioner raised his claim. The state procedural rule must have been in effect and well established.   Ford v. Georgia, 498 U.S. 411, 424 (1991); Blair v. Kentucky, 449 U.S. 962, 964 (1980) (new rule not in effect at the time of trial is not a bar to federal review of the claim).

This step also requires the court to determine as a matter of fact whether the petitioner did or did not comply with the state procedural rule. This entails a determination of whether the

claim was raised, whether the claim was raised at the appropriate stage of state court proceedings, and whether the claim was fairly presented as a constitutional claim. A claim is "fairly presented" when state courts have been presented with the substance of the petitioner's federal habeas corpus claim and have been provided a fair opportunity to apply controlling legal principles to the facts. Anderson v. Harless, 459 U.S. 4, 6 (1982); Riggins v. McMackin, 935 F.2d 790, 793 (6th Cir. 1991); Franklin v. Rose, 811 F.2d 322, 325-326 (6th Cir. 1987).

### ii. enforcement of state procedural sanction

In the second step of the Maupin analysis the federal court must determine whether the state courts enforced a procedural bar to the review of petitioner's claim. When the state courts have been presented with the federal claim, the federal courts must determine whether the state courts enforced a procedural bar. In Harris v. Reed, 489 U.S. 255, 263 (1989), the Supreme Court adopted the "plain statement" rule of Michigan v. Long, 463 U.S. 1032 (1983), a decision involving the application of the adequate and independent state ground rule on direct appeal of a state court judgment. The rule was stated as follows:

> A procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case " 'clearly and expressly' " states that its judgment rests on the state procedural bar.

489 U.S. at 263. In Coleman v. Thompson, 501 U.S. 722 (1991), the Supreme Court stated that pursuant to the "plain statement" rule of Harris v. Reed federal habeas courts "will presume that there is no independent and adequate state ground for a state court decision when the decision 'fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion,' " quoting Michigan v. Long, 463 U.S. at 1040-1041. 501 U.S. at 734-735. The

Supreme Court in <u>Ylst v. Nunnemaker</u>, 501 U.S. 797 (1991), held that where there is "one reasoned state court opinion or judgment which explicitly imposes a procedural default it will be presumed that later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."  And see <u>Couch v. Jabe</u>, 951 F.2d 94, 96 (6th Cir. 1991); <u>McBee v. Abramajtys</u>, 929 F.2d 264, 267 (6th Cir. 1991).

iii. <u>adequate and independent state ground</u>

As previously discussed, the cause and prejudice test adopted in <u>Wainwright v. Sykes</u>, 433 U.S. 72 (1977), is based on the adequate and independent state ground doctrine. The contours of the adequate and independent state ground doctrine are well established.  In <u>Fox Film Corp. v. Muller</u>, 296 U.S. 207 (1935), the Supreme Court summarized the doctrine as follows:

> [W]here the judgment of a state court rests upon two grounds, one of which is federal and the other non-federal in character, our jurisdiction fails if the non-federal ground is independent of the federal ground and adequate to support the judgment.

296 U.S. at 210.  Whether a state ground is "independent" depends on whether it meets the "plain statement" rule originally adopted in <u>Michigan v. Long</u>, applied to habeas corpus petitions by <u>Harris v. Reed</u>, and as clarified by <u>Coleman v. Thompson</u>, above.  That is to say, a state ground is not independent of the federal ground if it " 'fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion.' " <u>Coleman v. Thompson</u>, 501 U.S. at 723.

Whether a state ground is adequate to foreclose federal review depends on whether the state rule is "firmly established and regularly followed state practice." <u>Ford v. Georgia</u>, 498 U.S. 411, 423-424 (1991), quoting <u>James v. Kentucky</u>, 466 U.S. 341 (1984); <u>Warner v. United States</u>,

54

975 F.2d 1207, 1213 (6th Cir. 1992). A state procedural rule "not strictly or regularly followed" is not adequate to bar federal review. <u>Barr v. City of Columbia</u>, 378 U.S. 146, 149 (1964). A rule not in effect and firmly established is not adequate, <u>Ford v. Georgia</u>, above, nor is a procedural rule never applied with the "pointless severity shown here." <u>NAACP v. Alabama ex rel. Flowers</u>, 377 U.S. 288, 297 (1964). Under some circumstances a state procedure which is confusing may be inadequate to bar consideration of a claim. <u>Sloan v. Delo</u>, 54 F.3d 1371 (8th Cir. 1995).

### iv.  <u>cause and prejudice</u>

The cause and prejudice test adopted in <u>Wainwright v. Sykes</u> has become defined in the Supreme Court's decisions applying the cause and prejudice test.  In <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986), the Court said "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."  This includes a showing that a constitutional claim is so novel that its legal basis was not reasonably available to counsel, <u>Reed v. Ross</u>, 468 U.S. 1, 16 (1984), or a showing of interference by state officials, <u>Brown v. Allen</u>, 344 U.S. 443, 486 (1953).

The most common cause for a procedural default is, of course, the constitutionally ineffective assistance of counsel. <u>Murray v. Carrier</u>, 477 U.S. at 488-489; <u>Rachel v. Bordenkircher</u>, 590 F.2d 200, 203-204 (6th Cir. 1978).  See <u>Carpenter v. Mohr</u>, 163 F.3d 938, 945 (6th Cir. 1998), <u>cert</u>. <u>granted</u> <u>sub</u> <u>nom</u>. <u>Edwards v. Carpenter</u>, 120 S.Ct. 444 (1999). ("There is no additional requirement beyond exhaustion in order for a petitioner to utilize ineffective assistance of appellate counsel as cause for the procedural default of an independent claim").

The petitioner has the burden of establishing actual prejudice. <u>United States v. Frady</u>, 456 U.S. 152, 170 (1982). <u>Maupin</u> states that in meeting this burden the petitioner has the presumption that he has stated a meritorious constitutional claim. 785 F.2d at 139. Thus, in showing that the constitutional violation worked to his actual and substantial disadvantage, the petitioner's constitutional claim is presumed valid.

v.  <u>miscarriage of justice</u>

In <u>Murray v. Carrier</u>, 477 U.S. 478, 495-496 (1986), the Supreme Court held that a federal habeas court may review a federal claim to correct "a fundamentally unjust incarceration" or "where a constitutional violation has probably resulted in the conviction of one who is actually innocent" even though the petitioner is not able to demonstrate cause and prejudice for a procedural default. In <u>Schlup v. Delo</u>, 513 U.S. 298 (1995), the Supreme Court held that where constitutional violations at trial have resulted in the conviction of one who is actually innocent, fundamental considerations of justice require the examination of evidence not available or not presented at trial which shows a fair probability that no reasonable juror would have convicted the petitioner. The <u>Murray</u> standard governs the miscarriage of justice inquiry when a petitioner who has been sentenced to death raises a claim of actual innocence to excuse a procedural default.

C.  <u>Claims raised in the state courts</u>

**<u>Ground One</u>:**

> **Petitioner's right to fair warning and due process under the Fourteenth Amendment was denied by the change in the rule of law with respect to a spouse's privilege to enter the marital residence by the Court of Appeals in its pretrial decision in <u>O'Neal I</u> and by the Ohio Supreme Court in the application of its decision in <u>State v. Lilly</u>.**

56

The elements of this claim were first raised in Petitioner's pretrial motion to dismiss the aggravated burglary charges that made Petitioner eligible for the death penalty. The elements of this claim were further raised on the prosecution's pretrial appeal to the Court of Appeals and Petitioner's attempted pretrial appeal to the Ohio Supreme Court. The claim was raised in the Court of Appeals on direct appeal in assignments of error 1 and 11 and on direct appeal to the Ohio Supreme Court in propositions of law 1 and 2. The claim was most specifically and directly raised in the direct appeal motion for reconsideration in the Ohio Supreme Court in arguments (i) and (ii). The claim was also raised in the United States Supreme Court by petition for writ of certiorari. At pages 46-48 of her return of writ Respondent expressly concedes that the claim was "properly preserved" for federal habeas corpus review.

**Ground Two:**

> **Petitioner's right to due process under the Fourteenth Amendment was denied by his convictions on counts, specifications, and charges of aggravated burglary on insufficient evidence.**

This claim was raised on direct appeal to the Court of Appeals in assignments of error 1 and 11 and on direct appeal to the Ohio Supreme Court in propositions of law 2 and 12. The claim was also raised in Petitioner's direct appeal motion for reconsideration in argument (iii). At pages 53-57 of her return of writ Respondent expressly concedes that the claim was "preserved" for federal habeas corpus review.

**Ground Three:**

> **The imposition of a sentence of death on Petitioner based on an aggravating circumstance identical to the element that makes the murder an aggravated offense--aggravated burglary resulting from the alleged trespass of the marital residence--violated Petitioner's Eighth Amendment right to be free from cruel and unusual punishment because it fails to draw a rational distinction between those eligible and those not eligible for the death penalty.**

This claim was presented to the Court of Appeals on direct appeal in assignments of error 12 and 13. It was presented to the Ohio Supreme Court on direct appeal in propositions of law 13 and 14. The claims was also raised in Petitioner's petition for writ of certiorari to the United States Supreme Court. Respondent expressly concedes at page 59 of her return of writ that Petitioner "preserved" this claim for review.

## Ground Four:

**Petitioner's right to due process under the Fourteenth Amendment and his right to be free from cruel and unusual punishment under the Eighth Amendment was violated by the government's argument in penalty phase closing argument that the nature and circumstances of the offense--a statutory mitigating factor under Ohio's death penalty scheme--should be considered an aggravating circumstance.**

This claim was raised on direct appeal to the Court of Appeals in assignment of error 6 and on direct appeal to the Ohio Supreme Court as proposition of law 7. Respondent acknowledges this at page 25 of her return of writ. But Respondent contends at pages 62-63 of her return of writ that the claim was procedurally defaulted based on the Ohio Supreme Court's application of the state contemporaneous objection rule and its "plain error" review.

## Ground Five:

**Petitioner's right to due process under the Fourteenth Amendment and his right to be free from cruel and unusual punishment under the Eighth Amendment were violated by the submission to the jury in the penalty phase of the trial of multiple charges of aggravated murder and multiple and duplicative aggravating circumstances when only one victim was involved.**

This claim was raised on direct appeal to the Court of Appeals in assignment of error 7 and on direct appeal to the Ohio Supreme Court as proposition of law 8. Respondent acknowledges this at page 25 of her return of writ. But Respondent contends at pages 67-68 of

58

her return of writ that the claim was procedurally defaulted based on the Ohio Supreme Court's application of the state contemporaneous objection rule and its "plain error" review.

**Ground Six:**

> **Petitioner's right to due process under the Fourteenth Amendment and his right to be free from cruel and unusual punishment under the Eighth Amendment were violated by the penalty phase jury instructions which told the jury that the aggravating circumstance which the jury was to weigh against mitigating evidence included two mutually exclusive alternatives-- that he was either the "principal offender" or that he acted with "prior calculation and design."**

This claim was raised on direct appeal to the Court of Appeals in assignment of error 8 and on direct appeal to the Ohio Supreme Court as proposition of law 9. Respondent acknowledges this at page 25 of her return of writ. But Respondent contends at pages 71-72 of her return of writ that the claim was procedurally defaulted based on the Ohio Supreme Court's application of the state contemporaneous objection rule and its "plain error" review.

**Ground Seven:**

> **Petitioner was denied his Sixth Amendment right to the effective assistance of counsel by the failure of trial counsel to introduce a complete copy of the lease listing Petitioner as husband and occupant of the home and by their failure to introduce evidence that the locks to the home had not been changed.**

This claim was presented to the Court of Common Pleas as the first ground in his first petition for postconviction relief. It was presented to the Court of Appeals on postconviction appeal in assignments of error 1. It was presented to the Ohio Supreme Court on postconviction appeal in propositions of law 1. Respondent expressly concedes at pages 78-80 of her return of writ that Petitioner "preserved" this claim for habeas corpus review.

**Ground Eight:**

> **Petitioner was denied his Sixth Amendment right to the effective assistance of counsel by the failure of trial counsel to object to the omission from the culpability phase jury instructions on trespass the phrase "in the absence of a restraining order or an order granting one party exclusive possession of the marital residence" and the failure to object to reference in the instructions to the marital residence as the "wife's residence" and the use of the word "estranged" without defining the term for the jury.**

Petitioner raised this claim in the Court of Common Pleas as the second ground in his first petition for postconviction relief. He raised the claim on postconviction appeal to the Court of Appeals as assignment of error 2. He raised the claim in the Ohio Supreme Court on postconviction appeal as proposition of law 2. Petitioner raised the claim in his application for reopening in the Court of Appeals as assignments of error 1, 2, 3, 4, 5 and 6. Petitioner then raised the same claims in his application for reopening appeal to the Ohio Supreme Court as propositions of law 1, 2, and 3. At pages 82-84 of her return of writ Respondent asserts that this claim is procedurally defaulted because it is a claim based on the record of state trial court proceedings. Petitioner disagrees that the claim could have been raised on direct appeal.

**Ground Nine**:

> **Petitioner's right to confrontation under the Sixth Amendment and to due process under the Fourteenth Amendment were violated by the admission of multiple hearsay statements allegedly made by the victim.**

This claim was presented to the Court of Appeals on direct appeal in assignment of error 3. It was presented to the Ohio Supreme Court on direct appeal in proposition of law 4. Respondent expressly concedes at pages 87-89 of her return of writ that Petitioner "preserved" this claim for review.

**Ground Ten**:

> **Petitioner's right to be free from cruel and unusual punishment under the Eighth Amendment was violated by the imposition of punishment disproportionate to the punishment normally inflicted on defendants for**

**domestic homicides and for similar offenses committed in the same jurisdiction.**

This claim was presented to the Court of Appeals on direct appeal in assignment of error 14. It was presented to the Ohio Supreme Court on direct appeal in propositions of law 15 and 16. Respondent expressly concedes at pages 90-93 of her return of writ that Petitioner "preserved" this claim for review.

## Ground Eleven:

**Petitioner's right to due process and to equal protection of the law under the Fourteenth Amendment was violated by the use of peremptory challenges to exclude members of his race from the jury contrary to the standards established in <u>Batson v. Kentucky.</u>**

This claim was presented to the Court of Appeals on direct appeal in assignment of error 2. It was presented to the Ohio Supreme Court on direct appeal in proposition of law 3. Respondent expressly concedes at pages 95-96 of her return of writ that Petitioner "preserved" this claim for review.

## Ground Twelve:

**Petitioner's right to due process under the Fourteenth Amendment was violated by the admission of statements obtained from Petitioner by the police by means of deceiving Petitioner into believing his wife was still alive, making his waiver of his right to remain silent not voluntary, knowing, and intelligent.**

This claim was presented to the Court of Appeals on direct appeal in assignment of error 5. It was presented to the Ohio Supreme Court on direct appeal in proposition of law 6. Respondent expressly concedes at pages 106-107 of her return of writ that Petitioner "preserved" this claim for review.

## Ground Thirteen:

**Petitioner's right to due process under the Fourteenth Amendment and his right to be free from cruel and unusual punishment under the Eighth Amendment were violated by the trial court's refusal to give an instruction in the culpability phase of the trial of the lesser included offense of murder.**

This claim was presented to the Court of Appeals on direct appeal in assignment of error 4. It was presented to the Ohio Supreme Court on direct appeal in proposition of law 5. Respondent expressly concedes at pages 109-110 of her return of writ that Petitioner "preserved" this claim for review.

**Ground Fourteen:**

**Petitioner's Sixth Amendment right to a fair and impartial jury and his Eighth Amendment right to be free from cruel and unusual punishment were violated by the selection of a jury predisposed to impose a sentence of death, contrary to the standards in <u>Witherspoon v. Illinois</u>.**

This claim was presented to the Court of Appeals on direct appeal in assignment of error 9. It was presented to the Ohio Supreme Court on direct appeal in proposition of law 10. Respondent expressly concedes at page 112 of her return of writ that Petitioner "preserved" this claim for review.

**Ground Fifteen:**

**Petitioner's right to be free from cruel and unusual punishment under the Eighth Amendment was violated by the imposition of sentences of death under the Ohio death penalty scheme which is devoid of penological justification, has a racially disproportionate impact, fails to rationally narrow the class of death eligible defendants, permits the imposition of death when aggravating circumstances only just outweigh mitigating factors, denies the consideration of mercy, allows the arbitrary selection of those to receive the death penalty, and fails to provide guidance on the weighing of aggravating circumstances and mitigating factors.**

This claim was presented to the Court of Appeals on direct appeal in assignment of error 13. It was presented to the Ohio Supreme Court on direct appeal in proposition of law 14. Respondent expressly concedes at page 117 of her return of writ that Petitioner's fifteenth ground

for relief was "partially properly preserved" with respect to every argument except for the argument that under Ohio's capital scheme the prosecutor has unfettered discretion, which Respondent contends is procedurally defaulted. Petitioner disagrees. Petitioner maintains that all of his grounds, including the ground of excessive prosecutorial discretion, were fairly presented and preserved at all levels of state review.

**Ground Sixteen:**

> **Petitioner's right to be free from cruel and unusual punishment under the Eighth Amendment was violated by the instruction to the jury in the penalty phase of the trial that it could not be governed by considerations of sympathy.**

This claim was presented to the Court of Appeals on direct appeal in assignment of error 10. It was presented to the Ohio Supreme Court on direct appeal in proposition of law 11. Respondent expressly concedes at page 125 of her return of writ that Petitioner "preserved" this claim for review.

**Ground Seventeen:**

> **Petitioner's right to due process under the Fourteenth Amendment and his right to be free from cruel and unusual punishment under the Eighth Amendment were violated by the cumulative effect of all the errors committed during the culpability and penalty phases of the trial and on appeal.**

This claim was presented to the Court of Appeals on direct appeal in assignment of error 15. It was presented to the Ohio Supreme Court on direct appeal in proposition of law 17. Respondent contends at page127 of her return of writ that Petitioner procedurally defaulted this claim for habeas review because Petitioner "lumps in" his cumulative error claim with other claims which Respondent asserts are defaulted. Because Respondent does not identify which grounds were not fairly presented to the state courts -- unless she means the claims which she

63

argues in her return of writ are procedurally defaulted -- Petitioner cannot directly respond. Petitioner submits, however, that because Respondent has conceded that even those grounds for relief which she claims to be defaulted were reviewed for "plain error" by the state's highest court those grounds for relief are properly part of a claim of cumulative error.

**Ground Eighteen:**

> **The imposition of a sentence of death on Petitioner violates his right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution because he is mentally retarded under the standards -- reasonably applied -- announced in <u>Atkins v. Virginia</u> and in light of the facts -- reasonably determined -- presented to the state courts that show that Petitioner suffers from significantly subaverage intellectual functioning which had its onset before he attained the age of 18 and which leaves Petitioner with significant limitations in two or more adaptive behavior skills.**

This claim was presented to the Court of Common Pleas in Petitioner's second petition for postconviction relief. Petitioner presented the claim to the Court of Appeals in his single postconviction assignment of error . It was presented to the Ohio Supreme Court on postconviction appeal as his sole proposition of law. Respondent does not contend that this claim is procedurally defaulted but implicitly concedes at page 2 of the amendment to her return of writ that Petitioner' eighteenth ground for relief was "properly preserved" by her acknowledgement that the state courts addressed this ground on the merits.


IV. <u>STANDARD OF REVIEW OF HABEAS CORPUS PETITION</u>

A. <u>Background</u>

The AEDPA (Antiterrorism and Effective Death Penalty Act of 1996) amended 28 U.S.C. §2254(d) to reformulate the standard of federal habeas review as follows:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The Sixth Circuit Court of Appeals addressed this revised standard of federal review in a series of decisions.

In Harpster v. Ohio, 128 F.3d 322 (6th Cir. 1997), the Sixth Circuit reviewed the different approaches of other circuits to the interpretation of the standard of review. Id. at 326. In the end, the Court decided in Harpster that it did not need to formulate a standard of review because in that case the Double Jeopardy Clause violation in the state trial court's granting of the prosecution's motion for a mistrial was so clearly unreasonable as to dispense with the need for an extensive interpretation of §2254(d).

The Sixth Circuit decided in Nevers v. Killinger, 169 F.3d 352 (6th Cir. 1999), in a review of the claims of Detroit Police Officer Larry Nevers concerning extrinsic influences on the jury and prejudicial pretrial publicity in his trial for the beating death of Malice Green, that it needed to adopt some approach to the interpretation and application of the standard of review under §2254(d). The Court again reviewed the approaches of the other circuits. The Court expressed its agreement with the Fifth Circuit's "reasonable jurist" approach in Drinkard v. Johnson, 97 F.3d 751, 767 (5th Cir. 1996), cert. denied, 520 U.S. 1107 (1997).  Id. at 361-362. But the Court also expressed its agreement with the First Circuit's "outside the universe of

65

plausible, credible outcomes" approach in <u>O'Brien v. Dubois</u>, 145 F.3d 16, 24 (1st Cir. 1998). <u>Id</u>. at 362.

The Sixth Circuit in <u>Tucker v. Prelesnik</u>, 181 F.3d 747 (6th Cir. 1999), expressly attempted to consolidate the two approaches by stating the standard of review as follows:

> In this circuit, therefore, the writ will issue if the unreasonableness of the state court's application of clearly established precedent is not debatable among reasonable jurists. The unreasonableness of the application will not be debatable if it is so offensive to the precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes.

181 F.3d at 753. This formulation did not survive.

In <u>Maurino v. Johnson</u>, 210 F.3d 638 (6th Cir. 2000), the Court re-reviewed the approaches of the other circuits in their interpretation of §2254(d). The Court in <u>Maurino</u> described the approach of the Fifth, Seventh, and Eleventh Circuits as being based on the classification of the issue as one of pure law, as a mixed question of law and fact, or a question of pure fact. <u>Id</u>. at 643. Under the classification approach, pure law questions involve the phrase "contrary to" in part (d)(1), mixed questions involve the phrase "unreasonable application" in part (d)(1), and purely factual questions involve part (d)(2) of §2254. <u>Id</u>. On the other hand, the Sixth Circuit characterized the First Circuit's approach as being a two-step process of determining whether the Supreme Court has prescribed a clear rule and then applying the "contrary to" phrase or, in the absence of a governing rule, applying the "unreasonable application" phrase. <u>Id</u>. at 643-644.

The struggle to define the standard of review came to a halt in <u>Harris v. Stovall</u>, 212 F.3d 940 (6th Cir. 2000), where the Sixth Circuit held that since the Supreme Court in <u>Terry Williams v. Taylor</u>, __ U.S. __, 120 S.Ct. 1495, 146 L.Ed.2d 389 (April 18, 2000), set forth the standard of

review under §2254(d) "we find that Nevers and Maurino no longer correctly state the law on the issue of the appropriate standard under 28 U.S.C. §2254(d)." Id. at 943.

B. Terry Williams v. Taylor

In Terry Williams v. Taylor[1] the Court interpreted the AEDPA amendments to §2254(d) in the context of claims of ineffective assistance of counsel in a death penalty case. Williams therefore involved the constitutional standards for ineffective assistance of counsel adopted in Strickland v. Washington, 466 U.S. 668 (1984).

In Terry Williams v. Taylor the judgment of the Court reversing the denial of a writ of habeas corpus and the opinion of the Court with respect to everything except the standard of review under §2254(d) as amended by the AEDPA were delivered by Justice Stevens. Justice O'Connor, who joined in the judgment and the opinion of Justice Stevens except with respect to the standard of review, wrote a concurring opinion stating her view and the view of four other Justices on the standard of review.  Thus, Justice O'Connor's concurring opinion speaks for the majority of the Court on the standard of review, whereas Justice Stevens' opinion on that issue speaks for a minority of the Court.

In order to fully understand the majority opinion it is necessary to understand the minority view as expressed by Justice Stevens.  The minority opinion on the standard of review, contained in Part II of Justice Stevens' opinion, 120 S.Ct. at 1503-1513, concluded that the AEDPA amendments to §2254(d) were essentially a codification of Supreme Court habeas corpus jurisprudence.  With respect to the requirement that state courts are charged with applying only "clearly established Federal law," Justice Stevens stated:

---

[1] Petitioner uses the first name of Terry Williams in the citation in order to avoid confusion with Michael Williams v. Taylor, __ U.S.__, 120 S.Ct.1479, 146 L.Ed.2d, decided on the same date as Terry Williams. In Michael Williams the Supreme Court interpreted the phrase "failed to develop" in 28 U.S.C. §2254(e)(2).

67

> It is perfectly clear that AEDPA codifies Teague to the extent that Teague requires federal habeas courts to deny relief that is contingent upon a rule of law not clearly established at the time the state conviction became final.

120 S.Ct. at 1506. In other words, under this view, the "clearly established law" requirement in amended §2254(d) incorporated into the statute the pre-existing nonretroactivity principles adopted in Teague v. Lane, 489 U.S. 288 (1989). Justice Stevens noted, however, that the AEDPA amendments went beyond Teague in adding the clause limiting the area of relevant law to that "determined by the Supreme Court of the United States."[2]

Likewise, the minority opinion concluded that the "contrary to, or unreasonable application of" requirement did not represent a fundamental change in the standard of review:

> AEDPA plainly sought to ensure a level of "deference to the determinations of state courts," provided those determinations did not conflict with federal law or apply federal law in an unreasonable way.

Id. at 1509. But Justice Stevens was quick to point out that the word "deference" does not appear in the text of the statute, and whatever level of deference Congress may have had in mind in inserting the phrases "contrary to, or an unreasonable application of,"

> [I]t surely is not a requirement that federal courts actually defer to a state-court application of the federal law that is, in the independent judgment of the federal court, in error.

Id. at 1510. Justice Stevens summed up the minority opinion of the standard of review in the following way:

---

[2] Justice Stevens observed that if the Supreme Court "has not broken sufficient legal ground to establish an asked-for constitutional principle" then the lower federal courts cannot establish such a rule for AEDPA purposes. But he went on to assert that the Teague line of cases shows that "rules of law may be sufficiently clear for habeas purposes even when they are expressed in terms of a generalized standard rather than as a bright-line rule" and he elaborated on that assertion by pointing out that "[I]n constitutional adjudication, as in the common law, rules of law develop incrementally....rules that depend upon such elaboration are hardly less lawlike than those that establish a bright-line test." Id. at 1507-1508. Justice Stevens is saying, implicitly, that the lower federal courts as well as the state courts have a role in developing constitutional principles by applying and extending the "generalized standards" established by the Supreme Court.

> In sum, the statute directs federal courts to attend to every state-court judgment with utmost care, but it does not require them to defer to the opinion of every reasonable state-court judge in the context of federal law.  If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody -- or, as in this case, his sentence of death -- violates the Constitution, that independent judgment should prevail.  Otherwise, the federal "law as determined by the Supreme Court of the United States" might be applied by the federal courts one way in Virginia and another way in California.

120 S.Ct. at 1511.

Justice O'Connor, speaking for the majority on the standard of review, rejected the minority view, as stated by Justice Stevens, that the AEDPA amendments to §2254(d) do not alter the previously settled scope of independent federal review.  Justice O'Connor asserted that Justice Stevens' view gave no effect to the AEDPA amendments, which she found "remarkable given his apparent acknowledgement that Congress wished to bring change to the field." 120 S.Ct. at 1518. Justice O'Connor concluded that Justice Stevens' "erroneous interpretation" derived from his failure to give independent meaning to the two clauses, "contrary to" and "unreasonable application of." Id. at 1519.  Justice O'Connor then proceeded to explain her, and the majority's view, as to the meaning of the two clauses.

### i.  "contrary to"

Justice O'Connor, in her opinion for the majority on the interpretation of the standard of review, approved of the Fourth Circuit's interpretation of the "contrary to" clause in its decision in Green v. French, 143 F.3d 865 (1998), cert. denied, 525 U.S. 1090 (1999). Justice O'Connor read Green to hold that a state court decision can be "contrary to" clearly established precedent in two circumstances:

> First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by

69

> this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours. (citation omitted.)

125 S.Ct. at 1519. Justice O'Connor provided an example of the first type of "contrary to" state court decision where a state court applies a rule that contradicts the rule set forth in Supreme Court cases. If a state court denied a state prisoner's ineffective assistance of counsel claim on the ground that the prisoner did not show prejudice by a preponderance of the evidence, in view of the <u>Strickland</u> standard which requires only that the prisoner show "a reasonable probability that...the result of the proceeding would have been different," then the state court decision would be "contrary to" clearly established precedent. An example of the second type of "contrary to" state court decision would be a decision in which a state court reaches a different result from that reached by the Supreme Court on "facts that are materially indistinguishable from a decision of this Court." <u>Id</u>. at 1519-1520.

## ii. "unreasonable application"

Justice O'Connor, again speaking for the majority, also approved of and adopted the Fourth Circuit's explanation in <u>Green</u> of the circumstances in which the "unreasonable application" clause applies. Justice O'Connor summarized the Fourth Circuit's interpretation as follows:

> First, a state court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it

70

> should not apply or unreasonably refuses to extend that principle to
> a new context where it should apply. (citation omitted.)[3]

120 S.Ct. at 1520.  Thus, a state court decision that correctly identifies the governing legal rule

but applies it unreasonably to the facts of a particular prisoner's case would be an "unreasonable

application of" clearly established Federal law.  Id. Justice O'Connor noted in passing that the

Fourth Circuit's formula may have "problems with precision," since it might be difficult to

distinguish a decision involving an "unreasonable extension of a legal principle" from a decision

involving an unreasonable application of law to the facts.  Id. at 1521.

Although Justice O'Connor agreed with the Fourth Circuit's description of the

circumstances in which the "unreasonable application" clause applies, she nevertheless disagreed

with the Fourth Circuit's definition of what constitutes an "unreasonable application."  Justice

O'Connor declared the Fourth Circuit's view--that a state court decision is unreasonable only if it

applied federal law "in a manner that reasonable jurists would all agree is unreasonable"--to be

erroneous:

> Stated simply, a federal habeas court making the "unreasonable
> application" inquiry should ask whether the state court's
> application of clearly established federal law was objectively
> unreasonable.  The federal habeas court should not transform the
> inquiry into a subjective one by resting its determination instead on
> the simple fact that at least one of the Nation's jurists has applied
> the relevant federal law in the same manner as the state court did in
> the habeas petitioner's case.  The "all reasonable jurists" standard
> would tend to mislead federal habeas courts by focusing their
> attention on a subjective inquiry rather than on an objective one.

120 S.Ct. at 1521-1522 (emphasis added). Justice O'Connor, taking note of her opinion in Wright

v. West, 502 U.S. 1021 (1991), in which she maintained that federal habeas corpus courts had an

---

[3] Justice O'Connor thus says explicitly what Justice Stevens said implicitly, see fn. 2 above, that the lower federal courts and the state courts have a role in extending, and therefore in defining, constitutional principles, even though the Supreme Court has final word on what constitutes "clearly established Federal law."

independent obligation to say what the law is even if the state court decision was reasonable, stated that the inclusion of the term "unreasonable" in the AEDPA amendments changed the standard of review:

> In §2254(d)(1), Congress specifically used the word "unreasonable," and not a term like "erroneous" or "incorrect." Under §2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, the application must also be unreasonable.

120 S.Ct. at 1522.

C. Summary of standard of review

Justice O'Connor summarized the majority view of the standard of review under §2254(d) as amended by the AEDPA:

> In sum, §2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state court prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under §2254(d)(1), the writ may issue only if one of the following two conditions is satisfied -- the state-court adjudication resulted in a decision that (1) "was contrary to...clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of...clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

120 S.Ct. at 1523.

Justice O'Connor**,** in her concurring opinion**,** then proceeded to state how the Virginia Supreme Court's decision was both "contrary to" and an "unreasonable application" of the clearly established standards in <u>Strickland</u>. <u>Id</u>. at 1523-1524.

D. <u>Application to this Case</u>

According to the AEDPA standard of review, as expressed in the majority opinion of Justice O'Connor, federal courts owe deference to state courts, at least in the state court application of clearly established federal law to the facts.

What Justice O'Connor's majority opinion did not address is the question of what--if any--deference is due a state court decision on a prisoner's claim where the state court did <u>not</u> identify a governing legal rule or the facts to which the governing legal rule was applied. What is the standard of review, for example, where a state court adjudicated the merits of a state prisoner's claim but did not provide any reasoning identifying the governing legal rule or the facts to which the rule was applied?

Petitioner submits that where a state court adjudicated the merits but failed to provide any reasoning identifying the governing legal rule or the facts to which the rule was applied, or where a state court invoked a procedural default that was not an adequate and independent state ground precluding federal review, the standard of review articulated in the majority opinion in <u>Terry Williams v. Taylor</u> does not apply.

i. <u>"adjudicated on the merits without reasoning"</u>

In the absence of discussion in the Ohio Supreme Court's decision identifying the governing legal rule applicable to a claim and the absence of discussion of the facts to which the governing legal rule is being applied, a federal court cannot determine whether the state court decision was "contrary to" or an "unreasonable application of" clearly established federal law but

must engage in independent review as it would have before the AEDPA amendments to §2254(d).

Pre-AEDPA independent review is appropriate for the following reasons.  First, there is a consensus among the circuit courts that a state court decision--even a state court decision without legal or factual analysis--reached on substantive rather than procedural grounds was "adjudicated on the merits" as contemplated in the first paragraph of §2254(d). <u>Aycox v. Lytle</u>, 196 F.3d 1174, 1177 (10th Cir. 1999) ("Other circuits have clearly held that a summary decision without even the cursory reasoning found in <u>Moore</u> [<u>v. Gibson</u>, 195 F.3d 1152 (10th Cir. 1999)] also can constitute an "adjudication on the merits" for purposes of §2254(d), provided that the decision was reached on substantive rather than procedural grounds." [citations omitted]); <u>Fisher v. Texas</u>, 169 F.3d  295, 299-300 (5th Cir. 1999) (finding that the Texas Court of Appeals' decision was <u>not</u> an "adjudication on the merits" because the state court "explicitly decided the religion issue on waiver grounds"); <u>Cardwell v. Greene</u>, 152 F.3d 331, 339 (4th Cir. 1998) (finding that the Virginia Supreme Court's "perfunctory decision" was an "adjudication on the merits" because the federal claim was "adjudicated" "on the merits" and "not disposed of on procedural grounds.").

In some instances--particularly where the state court decision is silent on the reason for the denial of relief--the question of whether a state court decision is based on substantive or procedural grounds may not be obvious and may need some level of interpretation by a federal habeas corpus court.  <u>See</u>, <u>e.g.</u>, <u>Mercadel v. Cain</u>, 179 F.3d 271, 274-275 (5th Cir. 1999) ("The obvious procedural defect in Mercadel's filing of his [postconviction] petition in the Louisiana Supreme Court instead of the district court, coupled with the Louisiana Supreme Court's consistent practice of denying such improperly-filed petitions without considering the merits of the underlying claim" dictated de novo review rather than application of the AEDPA standard;

74

however, the appeal was remanded to the district court to dismiss without prejudice for lack of exhaustion of state court remedies).  But the principle is accepted among the circuits that a decision on substantive rather than procedural grounds, even when devoid of analysis, is an "adjudication on the merits."

Second, there also appears to be a developing consensus among the circuits that without legal and factual analysis a state court decision is not entitled to the same level of deference provided in the AEDPA standard of review.  A less than fully deferential, independent, but not de novo, standard of review seems to be the intermediate standard adopted by the circuits under these circumstances. <u>Aycox v. Lytle</u>, 196 F.3d 1174, 1177-1178 (10th Cir. 1999); <u>Schaff v. Snyder</u>, 190 F.3d 513, 522-523 (7th Cir. 1999); <u>Delgado v. Lewis</u>, 181 F.3d 1087, 1091 (9th Cir. 1999). However, in <u>Cardwell v. Greene</u>, 152 F.3d 331 (4th Cir. 1998), the Fourth Circuit suggested that a perfunctory decision by the Virginia Supreme Court might make essentially de novo review appropriate:

> Of course, because the state court decision fails to articulate any rationale for its adverse determination of Cardwell's claim, we cannot review that court's "application of clearly established Federal law," but must independently ascertain whether the record reveals a violation of Cardwell's Sixth Amendment right to the effective assistance of counsel. With only one minor change we adopt the approach taken by the district court, which stated:
>
> Where, as here, there is no indication of how the state court applied federal law to the facts of a case, a federal court must necessarily perform its own review of the record....
>
> Thus, on the facts of this case, the distinction between de novo review and "reasonableness" review becomes insignificant.

152 F.3d at 339. Here the Fourth Circuit explicitly recognized the difficulty--if not impossibility--of making a "reasonableness" determination in the absence of any reasoning and implicitly

75

concluded that where there is no state court reasoning independent federal habeas corpus review is, in effect, de novo review.

But in a more recent decision, Barnabei v. Angelone, 214 F.3d 463, 469 (4th Cir. 2000), the Fourth Circuit appeared to tow more toward the consensus position that a less deferential, independent, but not fully de novo, review is appropriate in the absence of state court reasoned analysis. It is interesting to note, however, that in Barnabei the Fourth Circuit found that the district court "struck the proper balance" even though the district court described the difference between de novo review and "reasonableness" review under the AEDPA standard as being "less significant" (as opposed to the Cardwell term "insignificant") where there is no reasoned state court determination.  Id.

The Sixth Circuit seemed to follow this consensus in Harris v. Stovall, 212 F.3d 940 (6th Cir. 2000), where it observed:

> Other circuit courts have concluded that where the state court has not articulated its reasoning, federal courts are obligated to conduct independent review of the record and applicable law to determine whether the state court decision is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented. (citations omitted)  That independent review, however, is not a full, de novo review of the claims, but remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA.

212 F.3d at 943.  Thus, the Sixth Circuit seemed to conclude--without explicitly holding--that the appropriate level of review was an "independent" review but not "a full, de novo review."  The Harris court did not explain how a federal habeas court could determine whether a state court decision was "reasonable" without state court reasoning. However, the Harris court concluded, after identifying the governing legal standard and the applicable facts, that the "result of the

decision of the Michigan Court of Appeals to affirm petitioner's conviction was not an unreasonable application of clearly established federal law." Id. at 945.

Justice O'Connor stated in the majority opinion in Terry Williams v. Taylor that the key change made by the AEDPA amendments to the standard of review is that, in order to grant relief, a federal habeas corpus court must find that the state court determination must be not just erroneous or incorrect but also unreasonable. 120 S.Ct. at 1522. As a practical matter, a federal habeas corpus court cannot determine whether a state court decision is "unreasonable" without a reasoned state court decision. In the absence of state court reasoning, a federal habeas court must do what the state court failed to do--identify the governing legal rule applicable to a claim, identify the facts to which the governing legal rule applies, and apply the law to the facts. In short, the federal court must do the reasoned analysis that the state court failed to do.

When a state court fails to provide a reasoned determination a federal habeas court must do its own independent analysis to determine whether the state court reached the correct conclusion. If a federal court finds, after doing its independent analysis of a claim, that the state court reached the correct conclusion, then the federal court must, of course, conclude that the state court determination was correct. Harris v. Stovall, Aycox v. Lytle, and Delgado v. Lewis seem to say that if the state court's unreasoned conclusion agrees with the federal court's independent reasoned analysis then the state court decision is therefore necessarily "reasonable."[4] But is a correct conclusion necessarily a "reasonable" conclusion as contemplated by §2254(d) and by the majority opinion in Terry Williams v. Taylor? Did Congress intend that unreasoned state court determinations should be entitled to the heightened deference which the majority in

---

[4] One wonders whether it is even necessary to reach the question of whether a state court determination is "reasonable" if a federal court concludes, after conducting an independent analysis, that the state court determination is correct.

Terry Williams v. Taylor says is required by the AEDPA?  The majority opinion in Terry Williams v. Taylor holds that the inverse is not the case; not every incorrect or erroneous state court determination is "unreasonable."  It would seem that to be "reasonable" within the meaning of §2254(d) a state court decision would have to be reasoned--that is, it would have to identify the governing legal standard, identify the relevant facts, and contain reasoning applying the law to the facts.  Why would an unreasoned state court determination be entitled to the heightened deference provided, according to the majority in Terry Williams v. Taylor, in the AEDPA amendments?

The logical answer would seem to be that there can be no deference to a state court determination devoid of legal or factual analysis.  Under such a circumstance the AEDPA standard cannot practically be applied.  It is nothing more than a fiction to say that an unreasoned state court determination meets the AEDPA standard of reasonableness because, after independent review, one can conclude that the state court conclusion is correct.  It is apparent that the circuit courts hesitate to say as much, but the Fourth Circuit disclosed the reality of the situation in its decision in Cardwell.  Absent state court reasoning, a federal habeas corpus court is left to conduct the same level of review as before the AEDPA amendments.

In Harris v. Stovall the Sixth Circuit appeared to embrace the view that, in the absence of a reasoned state court determination, a federal habeas corpus court should conduct an independent, but not fully de novo, review.  Petitioner respectfully suggests that the view that an unreasoned state court determination is entitled to the AEDPA "reasonableness" review is itself unreasonable.

ii. "not adjudicated on the merits"

78

There is no disagreement among the circuits that where a state court did not decide a claim on the merits, or "adjudicate the merits" in AEDPA terms, but instead decided the claim on procedural grounds the deferential AEDPA standard does not apply and a federal habeas court must conduct de novo review.  Fisher v. Lee, 215 F.3d 438 (4th Cir. 2000); Aycox v. Lytle, 196 F.3d 1174, 1177 (10th Cir. 1999); Mercadel v. Cain, 179 F.3d 271, 275 (5th Cir. 1999).

In Petitioner's case the state courts failed to address claims based on the invocation of procedural bars which were not adequate and independent so as to preclude federal review.  For example, in his Traverse at pages 87-96 Petitioner contends that the failure of the Court of Appeals and the Ohio Supreme Court to address the claims raised in his timely filed application for reopening was not based on an adequate and independent ground.

Finally, without reiterating the argument in support of each ground for relief contained in Petitioner's Traverse, Petitioner submits that with respect to each of those grounds for relief for which the state courts may have identified a governing legal rule, or identified facts to which it applied the identified governing legal rule, or provided some reasoning for its decision, the decision of the state courts was "contrary to" and/or an "unreasonable application of" clearly established federal law.


## V.  ARGUMENT IN SUPPORT OF CONSTITUTIONAL GROUNDS FOR RELIEF

**Ground One:**

> **Petitioner's right to fair warning and due process under the Fourteenth Amendment was denied by the change in the rule of law with respect to a spouse's privilege to enter the marital residence by the Court of Appeals in its pretrial decision in O'Neal I and by the Ohio Supreme Court in the application of its decision in State v. Lilly.**

**A.  Procedural Default**

Respondent expressly concedes at pages 47-48 of her return of writ that Petitioner's first ground for relief was "properly preserved."

## B. Merits

Petitioner was charged with killing his wife, Carol O'Neal, on December 11, 1993. Petitioner was indicted for aggravated murder based on the felony of aggravated burglary. He was also indicted for aggravated murder based on prior calculation and design. Each of the counts of aggravated murder contained the death penalty specification in Ohio Revised Code §2929.04(A)(7) that the offense was committed while Petitioner was committing aggravated burglary. An essential element of aggravated burglary is a trespass.

Prior to trial Petitioner's counsel moved the trial court to dismiss all counts and specifications charging him with aggravated burglary on the ground that he could not be guilty of aggravated burglary because under Ohio Revised Code §3103.04, in the absence of a court order, he had a privilege to enter the marital residence and therefore could not be convicted of trespass in the marital residence. The trial court agreed and dismissed all of the aggravated burglary charges and specifications, including the entire first count charging felony aggravated murder, the aggravated burglary death penalty specification to the second count, and the fourth count charging aggravated burglary. The trial court stayed its order pending appeal by the prosecutor.

On appeal by the prosecutor the Court of Appeals for Hamilton County held:

> We hold that in the absence of a restraining order or an order granting one party exclusive possession of the marital residence, the question of whether one spouse has the sole possessory interest in the house depends on whether the evidence shows that <u>both parties had made a decision to live in separate places</u>. Both parties must have understood that the possessory interest of one was being relinquished, even if it was relinquished begrudgingly or

80

> reluctantly.  In the absence of such a showing, there can be no finding of trespass and, hence, no aggravated burglary.

State v. O'Neal ("O'Neal I"), 103 Ohio App. 3d 151, 155, 658 N.E. 2d 1102, 1104 (1995) (emphasis added). The Court of Appeals then said that at trial "the trial court must decide if there is sufficient evidence of a decision by both parties to establish separate residences." Id. (emphasis added). Thus, the Court of Appeals in O'Neal I established the rule that the test was one of possessory interest rather than of a privilege under Ohio Revised Code §3103.04.

At the time of Carol O'Neal's death on December 11, 1993 there was no decision by the Supreme Court of Ohio establishing a rule on this point, as the Greene County Court of Appeals observed in State v. Brown, Greene App. No. 96-CA-092, unreported (May 16, 1997).  In Brown the Court of Appeals stated that the only applicable Court of Appeals decision on point at the time of Brown's conviction in July, 1992 was State v. Herder, 65 Ohio App.2d 70, 415 N.E.2d 1000 (1979), a decision of the Franklin County Court of Appeals. The Greene County Court of Appeals noted, however, that the Herder decision, while persuasive, was not binding or controlling authority in Greene County.

In O'Neal I the Court of Appeals cited State v. Herrin, 6 Ohio App.3d 68, 453 N.E.2d 1104 (1982), a Summit County Court of Appeals decision, and State v. Winbush, 44 Ohio App. 2d 256, 337 N.E.2d 639 (1975), a Franklin County Court of Appeals decision, as belonging to a line of cases that "holds that the use of force or violence to enforce a possessory interest turns an authorized entrance into a trespass." The Court of Appeals for Hamilton County rejected this line of cases on the ground that "it is adding an element to the offense of burglary which is simply not in the statute." Presumably the additional element that the Court of Appeals was referring to was the element of enforcing a possessory interest, because trespass includes the element of

81

entering the land of another.  In both <u>Herrin</u> and <u>Winbush</u> the trespassing spouses supposedly still had a possessory interest in the marital residence.  However, the Court of Appeals could not have legitimately followed either <u>Herrin</u> or <u>Winbush</u>, because in <u>Herrin</u> the spouse was barred from the premises by court order and <u>Winbush</u> was arguably superseded by the more recent decision of the Franklin County Court of Appeals in <u>Herder</u>.

The Court of Appeals in <u>O'Neal I</u> recognized the line of cases in <u>State v. Middleton</u>, 85 Ohio App.3d 403, 619 N.E.2d 1113 (1993), a Vinton County Court of Appeals decision, and <u>State v. Herder</u>, *supra*, as holding that Ohio Revised Code §3103.04 creates a privilege for a spouse to enter the premises of the other spouse. The Court of Appeals rejected this line of cases on the ground that  §3103.04 is not applicable to criminal cases.

However, the Court of Appeals in <u>O'Neal I</u> failed to account for controlling precedent in Hamilton County, namely, <u>State v. Weitzel</u>, 112 Ohio App. 300, 168 N.E.2d 550 (1960).  In <u>Weitzel</u> the Court of Appeals reversed a conviction for burglary and remanded for a new trial because the trial court improperly took a decisive issue away from the jury, specifically, whether the defendant and the complaining witness were common-law husband and wife. In <u>Weitzel</u> the Court of Appeals approved of the trial court's instruction to the jury that if the defendant and complaining witness were husband and wife the jury should find the defendant not guilty.  The Court of Appeals said:  "This is a correct statement of the law.  A man cannot steal from his wife or burglarize his wife's home." <u>Id</u>. at 301. Thus, until <u>O'Neal I</u> was decided on April 26, 1995 <u>Weitzel</u> was the law in Hamilton County. When, on December 11, 1993, James O'Neal entered the marital residence and shot Carol O'Neal, <u>Weitzel </u>was the law. James O'Neal could not -- as a matter of law -- trespass in or burglarize the marital residence.

82

In sum, controlling precedent not only in Hamilton County but in most, if not all, of the other appellate districts in Ohio at the time James O'Neal was charged in the death of Carol O'Neal held that §3103.04 provided an absolute bar to a burglary conviction, in the absence of a court order. As the Supreme Court of Ohio observed in footnote 1 of its decision on direct appeal, a temporary protection order was entered on December 12, 1993, the day after Carol O'Neal was killed.

Petitioner unsuccessfully sought review of O'Neal I by the Supreme Court of Ohio. On post-trial appeal, Petitioner argued to the Court of Appeals that its holding in O'Neal I was contrary to the long-standing rule recognized in Weitzel.

Petitioner argued to the Supreme Court of Ohio that the rule established by the Court of Appeals of Hamilton County in O'Neal I was in direct conflict with §3103.04 which provides a privilege, absent a court order, to enter the marital residence and was an act of judicial legislation. The Supreme Court of Ohio, at 87 Ohio St. 3d at 407, rejected Petitioner's arguments, not on the basis of the rule established by the Court of Appeals in O'Neal I, but on the basis of its own recent decision in State v. Lilly, 87 Ohio St.3d 97, 717 N.E.2d 322 (1999), paragraph two of the syllabus, in which the Court held that §3103.04 is inapplicable in criminal cases.  The court held in Lilly:

> We hold that "custody and control," rather than legal title, is dispositive. See R.C. 2911.21(E) providing that "'land or premises' includes any land, building, structure, or place belonging to, controlled by, or in custody of another, and any separate enclosure or room, or portion thereof." (Emphasis added.) Thus, in Ohio, one can commit a trespass and burglary against property of which one is the legal owner if another has control or custody of that property.

87 Ohio St. 3d at 102, 717 N.E. 2d at 327.

83

Of course, the rule on which Petitioner's jury was instructed, and the rule the jury presumably applied, was not the rule of Lilly but the rule of O'Neal I.  O'Neal I did not hold that custody and control is dispositive. Rather, O'Neal I held that the issue is, simply put, "a decision by both parties to establish separate residences."  103 Ohio App.3d at 155, 658 N.E.2d at 1104.

Petitioner asked the Supreme Court of Ohio to reconsider its application of Lilly to Petitioner's case, noting that under the rule of law existing at the time Carol O'Neal was killed a spouse had a privilege to enter the marital residence and that the application of either the rule adopted by the Court of Appeals in O'Neal I or the rule adopted by the Supreme Court of Ohio in Lilly denied Petitioner fair warning and due process. The Supreme Court of Ohio, over the dissent of two Justices, denied reconsideration.

In Bouie v. City of Columbia, 378 U.S. 347 (1964), the United States Supreme Court reversed the application of a South Carolina trespass statute to two black college students who refused to leave a whites-only drugstore restaurant. Although the statute literally covered only the entry of premises after notice not to enter, the state courts construed the statute to cover the act of remaining on the premises after notice to leave.  The Court held that this "unforeseeable judicial enlargement," applied retroactively, was a denial of due process under the Fourteenth Amendment because the defendants had not been given fair warning that the contemplated conduct constitutes a crime.

The rule of Bouie, that a deprivation of the right of fair warning can result not only from a statute vague on its face but also from "an unforeseeable and retroactive judicial expansion," has been applied in many subsequent cases to set aside convictions. For example, in Marks v. United States, 430 U.S. 188 (1977), the Court reversed a Sixth Circuit decision affirming obscenity convictions based on application of the new obscenity standards announced in Miller

84

v. California, 413 U.S. 15 (1973). Relying on Bouie, the Court held that the Due Process Clause precluded the application of standards that might impose criminal liability for conduct not punishable under the standard in effect when the conduct was committed.

The rule of O'Neal I or the rule of Lilly, applied to Petitioner's trial, constitutes "an unforseeable and retroactive judicial expansion" of the element of trespass as defined by Ohio law. The application of the rule of O'Neal I or of the rule of  Lilly to conduct committed when a different rule existed constitutes an act of judicial expansion of criminal liability in violation of Petitioner's right to fair notice and due process due under the Fourteenth Amendment.

All aggravated burglary charges should have been dismissed.

**Ground Two:**

**Petitioner's right to due process under the Fourteenth Amendment was denied by his convictions on counts, specifications, and charges of aggravated burglary on insufficient evidence.**

**A.  Procedural Default**

Respondent expressly concedes at pages 53-57 of her return of writ that Petitioner's second ground for relief was "properly preserved."

**B.  Merits**

The Fourteenth Amendment to the United States Constitution provides in Section 1:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process or law; ***

In Re Winship, 397 U.S. 358, 364 (1970), held that the Due Process Clause of the Fourteenth Amendment protects every accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.  Applying the

85

holding of <u>Winship</u>, the Court in <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979), held that to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt, the test is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. <u>Id</u>. at 319. A conviction based on evidence insufficient to persuade a rational factfinder of guilt beyond a reasonable doubt violates the Due Process Clause. <u>Tibbs v. Florida</u>, 457 U.S. 31, 45 (1982). In <u>State v. Jencks</u>, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, the Ohio Supreme Court adopted the <u>Jackson v. Virginia</u> test for the sufficiency of the evidence.

Petitioner was charged with aggravated murder based on aggravated burglary, the aggravating circumstance of aggravated burglary, and a free-standing count of aggravated burglary. Petitioner asserted before trial that based on the rule of spousal privilege to enter the marital residence he could not be charged with trespass and could not, therefore, be convicted of any of the charges or specifications of aggravated burglary. Petitioner has maintained his privilege to enter the marital residence throughout the state court proceedings.

The last state court to consider Petitioner's claim of privilege was the Ohio Supreme Court. That court concluded that there was sufficient evidence for the jury to find, in accordance with the syllabus rule of <u>State v. Lilly</u>, that Carol O'Neal was "in sole custody and control" of the marital residence at 4938 Plainville Road at the time Petitioner entered the home and shot Carol. 87 Ohio St.3d at 408.

The problem with this conclusion is that the syllabus rule of <u>State v. Lilly</u> is neither the rule on which the jury was instructed nor presumably the rule which the jury applied in convicting Petitioner. Rather, the trial court instructed the jury to determine whether a trespass

occurred using the O'Neal I test--whether both parties had made a decision to establish separate residences.

The Ohio Supreme Court's opinion suggested that Petitioner argued that there was insufficient evidence based on the rule of Lilly.  The court stated: "Specifically, appellant claims that the record does not support a finding that the Plainville Road property was in the custody or control of Carol." Id. at 408.  However, the Lilly rule did not exist at the time of trial or even at the time of oral argument.  It was the O'Neal I test that was applied at trial and employed by the Hamilton County Court of Appeals on direct appeal and argued by Petitioner in his brief in the Ohio Supreme Court. Nowhere in the O'Neal I test is there any discussion of  "custody or control."  Nowhere in its decision did the Ohio Supreme Court specifically discuss the effect of the differences between the O'Neal I test and the rule adopted in Lilly.

Petitioner argued in support of Proposition of Law II, beginning at page 9 of his brief in the Ohio Supreme Court, that the law afforded a spouse a privilege to enter the marital residence. Petitioner further argued, in support of Proposition of Law XII beginning at page 44 of his brief, that there was insufficient evidence to support his conviction on trespass.  In his statement of the facts beginning at page 5 of his brief, Petitioner stated that there was no evidence that he obtained or occupied a separate residence and no evidence that his property had been removed from the marital residence. In addition, Petitioner noted in his statement of facts that in his statement to the police Petitioner listed 4938 Plainville Road as his residence.

Thus, contrary to suggestions in the Ohio Supreme Court's opinion, the terms "custody and control" as used in the Lilly rule are nowhere contained in the O'Neal I test, in the instructions given to and used by the jury, in the test applied in O'Neal II, or in the arguments made by Petitioner in the Ohio Supreme Court.  What the rule of law was, or should have been,

at trial--or, more importantly, at the time of the shooting--is crucial to this case, as Petitioner contends in Ground One above. The Ohio Supreme Court did not address, in its discussion of Petitioner's first, second, and twelfth propositions of law, the rule of law which was actually applied in Petitioner's trial.  Instead, the court concluded that there was sufficient evidence that "Carol was in sole custody and control over the home."  87 Ohio St.3d at 408.  The Court found, in support of this conclusion, that Carol was the lessee under the lease agreement; that Petitioner's name was not on the lease; that on December 7, 1993, after an altercation with Carol Petitioner "moved out" and "began living somewhere else"; that Carol filed a motion for a protective order against Petitioner; and that on December 11, 1993 Petitioner admitted to police that prior to the shooting he had "moved out and no longer lived in the home."  Id.

The finding that Petitioner "moved out" of the marital residence and "began living somewhere else" is neither a reasonable nor a supportable interpretation of events, nor does it comport with the O'Neal I test that required the jury to find that both Carol and Petitioner had made a decision to establish separate residences.

It is true that Officer Mercer testified that Carol O'Neal advised him that Petitioner "moved out" of the house. Detective Beaver testified that Petitioner told him that he had "moved out" of the house. It is not clear, however, whether the phrase "moved out" were the words actually used by Carol and James or were the words chosen by the two police officers to describe--however inaccurately--what happened. Whatever the case, it is clear that James did not voluntarily "move out" of the home, and all the facts and circumstances indicate that neither James nor even Carol believed that James had decided to establish a separate residence.

Officer Mercer, while testifying that Carol told him that James "moved out," added that Carol was saying that James "fled" the day of the "assault" on December 7, 1993, and that James

88

was living "temporarily" at another family member's house, and that his clothes and belongings were still at 4938 Plainville Road. (Trial Tr. at 342, 345).

Patricia Carr, Carol's best friend, testified that Carol told her she planned to get the locks changed and to get a restraining order in order to get James out of the house and to keep him away from her. (Trial Tr. at 376). There is no evidence that Carol got the locks changed before the shooting.

Sanchez Lee, Carol's son, testified that Carol "put him out" on Tuesday and that Carol was bagging up James' and his sons' clothes and taking them downstairs when Petitioner broke in. (Trial Tr. at 426-427). Carol's daughter, LaShawnda Lee, testified that Carol "was kicking him out," referring to James, and that she was carrying bags of James' and his sons' clothes down the stairs the night of the shooting. (Trial Tr. at 458).

Detective Beaver testified that he made handwritten notes of his interrogation of Petitioner. He testified that Petitioner gave his address as 4938 Plainville Road. Although Detective Beaver testified that Petitioner said he "moved out" on Tuesday or Wednesday--again, raising the issue of whether the terminology was Petitioner's or Detective Beaver's--he testified in the same breath and in the same context that Petitioner said that Carol "threw him and his sons--threw James out and his sons out," that he had "no home address," that he "was living in the streets." (Trial Tr. at 719-731).

In terms of the O'Neal I test, the question is whether the evidence establishes that both parties had made a decision to establish separate residences.

The actions of Carol O'Neal do not support a finding that Petitioner decided to establish a separate residence. According to her friend Patricia Carr, Carol planned to change the locks and to get a temporary restraining order in order to get Petitioner out of the house and to keep

89

Petitioner away. There would have been no need to change the locks or to get a temporary restraining order if Carol believed that Petitioner had relinquished his possessory interest in the marital residence or that Petitioner had decided to establish a separate residence.

Officer Mercer's testimony about Carol's statements to him show that Petitioner had not "moved out" voluntarily but had in fact fled as a result of Carol's throwing him out and calling the police. Officer Mercer indicated that Carol said that Petitioner was living only "temporarily" at another family member's house. Officer Mercer confirmed that Petitioner's property was still at the Plainville Road residence, further showing that Appellant had not "moved out."

Carol O'Neal's son and daughter, Sanchez and LaShawnda, both confirmed that Carol had put Petitioner out or kicked him out on the Tuesday preceding the shooting and that Petitioner's belongings were still there, again showing that Petitioner had not "moved out."

Finally, Detective Beaver said that Petitioner told him that Carol threw him and his sons out and that he was living on the streets. It was Carol's throwing his sons out on the street that Detective Beaver testified Petitioner gave as the motivation for shooting Carol. This evidence not only shows that Petitioner did not establish a separate residence but also shows that he had not decided to establish a separate residence.

Thus, the evidence was not sufficient for a rational trier of fact to find that Petitioner "moved out" and "began living somewhere else." The evidence supports the finding that Petitioner was kicked out of the house and that he was living on the streets. There is no evidence to suggest that he had decided to establish a separate residence, or in terms of O'Neal I, that he had relinquished his possessory interest in the marital residence on Plainville Road.

Nor was the evidence sufficient to prove beyond a reasonable doubt that Carol was "in sole custody and control over the home" in accordance with the Lilly rule. Contrary to the

finding of the Ohio Supreme Court, Petitioner's name was on the lease as husband and occupant. Contrary to the finding of the court, Petitioner did not "move out" and he did not "begin living somewhere else." By all accounts, Petitioner's and his children's belongings were still at 4938 Plainville Road. Although Carol had applied for a temporary protective order, a protective order was not granted until December 12, 1993, the day after the incident. There was no evidence that the locks were changed. Petitioner gave the police his 4938 Plainville Road address as his residence. This evidence did not support a verdict beyond a reasonable doubt that Carol had sole custody and control of the home.

The verdicts on all of the charges involving aggravated burglary should be vacated. The trespass charges should all be dismissed. Petitioner is entitled to a new trial on the reduced charges and his sentence of death should be vacated.

**Ground Three:**

**The imposition of a sentence of death on Petitioner based on an aggravating circumstance identical to the element that makes the murder an aggravated offense--aggravated burglary resulting from the alleged trespass of the marital residence--violated Petitioner's Eighth Amendment right to be free from cruel and unusual punishment because it fails to draw a rational distinction between those eligible and those not eligible for the death penalty.**

**A. Procedural Default**

Respondent expressly concedes at page 59 of her return of writ that Petitioner's third ground for relief was "properly preserved."

**B. Merits**

Petitioner was charged under Ohio Revised Code §2903.01(B) with aggravated felony murder based on the felony of aggravated burglary. He was also charged under Ohio Revised Code §2929.04(A)(7) with the death penalty specification of committing the aggravated murder

while committing the aggravated felony of aggravated burglary.  Moreover, he was charged with a count of aggravated burglary.

At the conclusion of the culpability phase of his trial, the jury found Petitioner guilty of felony aggravated murder based on the felony of aggravated burglary and found Petitioner guilty of the death penalty specification/aggravating circumstance of committing the aggravated murder while committing aggravated burglary. The jury also found Petitioner guilty of the free-standing charge of aggravated burglary. Thus, the murder with which Petitioner was charged and convicted was made aggravated by the same circumstance by which he was made eligible for the death penalty: the felony of aggravated burglary based on the trespass of the marital residence.

The use of an aggravating circumstance which merely duplicates the element of the underlying offense which makes the underlying offense an aggravated murder violates the Eighth Amendment to the United States Constitution because the aggravating circumstance of aggravated burglary contained in Ohio Revised Code §2929.04(A)(7) fails to narrow those who are eligible for the death penalty from those who are not eligible from the death penalty.

Theoretically, a defendant could be charged under Ohio Revised Code 2903.01(B) with felony aggravated murder while committing aggravated burglary without being charged under Ohio Revised Code §2929.04(A)(7) with a death penalty specification of aggravated burglary. But as a practical matter, if a defendant is charged with felony aggravated murder while committing aggravated burglary, that defendant is almost necessarily chargeable under Ohio Revised Code §2929.04(A)(7) with the death penalty specification/aggravating circumstance of committing the felony aggravated murder while committing the aggravated burglary.

In <u>Gregg v. Georgia</u>, 428 U.S. 153 (1976), the United States Supreme Court held that the sentencing authority must be "provided with standards to guide its use of the information" it is

92

given. Id. at 195. In reviewing the Georgia death penalty scheme, the Court observed that the

Georgia scheme did narrow the class of death penalty murderers subject to the death penalty. Id.

at 196. In his concurring opinion in Gregg, Justice White explained his view, and that of two

other Justices, that an essential aspect of a constitutional death penalty system is that "the types

of murders for which the death penalty may be imposed [is] more narrowly defined and are

limited to those which are particularly serious or for which the death penalty is peculiarly

appropriate." Id. at 222.

The Court reaffirmed this principle in Zant v. Stepehens, 462 U.S. 862 (1983), where the

Court held that "an aggravating circumstance must genuinely narrow the class of persons eligible

for the death penalty and must reasonably justify the imposition of a more severe sentence on

the defendant compared to others found guilty of murder." Id. at 877.

In Lowenfield v. Phelps, 484 U.S. 231 (1984), the Court again reviewed the issue of the

narrowing function necessary to a constitutional death penalty scheme. The Court held that the

challenged Louisiana statute was constitutional even though an aggravating circumstance

repeated an element of the underlying offense. The Court reasoned:

> The use of "aggravating circumstances" is not an end in itself,
> but a means of genuinely narrowing the class of death-eligible
> persons and thereby channeling the jury's discretion.   We see no
> reason why this narrowing function may not be performed by jury
> findings at either the sentencing phase of the trial or the guilt
> phase.
>
> ***
>
> It seems clear to us from this discussion that the narrowing
> function required for a regime of capital punishment may be
> provided in either of these two ways: The legislature may itself
> narrow the definition of capital offenses, as Texas and Louisiana
> have done, so that the jury finding of guilt responds to this
> concern, or the legislature may more broadly define capital

93

offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase.

484 U.S. at 244-246.

In <u>Lowenfield</u> the class of death penalty eligible offenders provided by the Louisiana statutory scheme was narrowed by the definition of first degree murder. Every defendant convicted of first degree murder in Louisiana is death eligible. Thus, the aggravating circumstance in the Louisiana death penalty scheme is required to establish the appropriateness of the death penalty but is not part of the constitutionally required narrowing process. <u>Id</u>.

Unlike the Louisiana scheme, where a finding of first degree murder makes a defendant eligible for the death penalty, a finding under the Ohio death penalty scheme that a defendant is guilty of aggravated murder under Ohio Revised Code §2903.01(B) does not make the defendant death eligible. An Ohio jury must also find, in the culpability phase, that the defendant is guilty of an aggravating circumstance contained in Ohio Revised Code §2929.04(A). Thus, the Ohio death penalty scheme does not narrow the class of death eligible persons as does the death penalty scheme examined in <u>Lowenfield</u>.

The second method prescribed in <u>Lowenfield</u> for narrowing the class of death eligible persons is for the legislature to more broadly define capital offenses and for the jury to provide the narrowing by its findings of aggravating circumstances in the penalty phase. The Ohio scheme does not comply with this method, either. Rather, a capital sentencer in Ohio is required, at the culpability phase, to find both guilt or innocence of the underlying aggravated murder and guilt or innocence of the aggravating circumstance. The government is required to present, during the culpability phase of the trial, evidence supporting the aggravating circumstance charged in the indictment.

94

There is no meaningful difference between felony aggravated murder based on aggravated burglary as defined in Ohio Revised Code §2903.01(B) and the aggravating circumstance of committing the offense while committing aggravated burglary as defined in Ohio Revised Code §2929.04(A)(7).  Ohio's death penalty scheme does not meaningfully narrow the class of persons eligible for the death penalty.

The Supreme Court of Ohio addressed the duplication of felony aggravated murder and felony aggravating circumstances in State v. Henderson, 39 Ohio St. 3d 24, 528 N.E. 2d 1237 (1988). The Supreme Court concluded that Ohio's statutory scheme was identical to the Louisiana statutory scheme examined by this Court in Lowenfield.   It is apparent, however, that under the two methods prescribed in Lowenfield for narrowing the class of death eligible persons, the Ohio statutory scheme does not really narrow the class of death eligible persons at the culpability phase, and since under Ohio law aggravating circumstances are determined during the culpability phase, there can be no narrowing in the penalty phase.

Therefore, Ohio's death penalty scheme--at least in the circumstance where the same element is used to make murder aggravated murder and to constitute the aggravating circumstance making the defendant eligible for the death penalty--violates the Eighth Amendment because it fails to draw a rational distinction between those eligible for the death penalty and those not eligible for the death penalty.

All of the aggravating circumstances of aggravated burglary should be vacated.

**Ground Four:**

> **Petitioner's right to due process under the Fourteenth Amendment and his right to be free from cruel and unusual punishment under the Eighth Amendment was violated by the government's argument in penalty phase closing argument that the nature and circumstances of the offense--a**

**statutory mitigating factor under Ohio's death penalty scheme--should be considered an aggravating circumstance**.

## A. Procedural Default

Respondent contends at pages 62-63 of her return of writ that Petitioner's fourth ground for relief was procedurally defaulted because the state's highest court, the Ohio Supreme Court, enforced the contemporaneous objection rule and only reviewed the ground for plain error. Petitioner concedes that the Ohio Supreme Court reviewed the ground for plain error.

## B. Merits

"[I]t is improper for prosecutors in the penalty phase of a capital trial to make any comment before a jury that the nature and circumstances of the offense are 'aggravating circumstances.'" State v. Wogenstahl, 75 Ohio St. 3d 344, 662 N.E. 2d 311 (1996), second paragraph of the syllabus.

The prosecutor made the following argument to the jury during the penalty phase of the trial:

> Mr. Schmidt mentioned to you that the prosecutor has to justify requesting the death penalty to you. And that is something that I've been waiting to do for almost two years. From the beginning of this case it has been crying out for a kind of justice reserved for the most cruel and horrific offenses. And the explanation is very simple as to why. Simple human emotions call for it.

> Death in itself is a very emotional thing. The death of a loved one is worse. Then, make it a violent death of a loved one and what happens to it? It multiplies. But to witness the violent death of your mother at a young age, how does that multiply the simple human emotions involved? The ultimate in horror and sadness that one can experience is to view the violent death of their mother.

> ***

> Those emotions were brought from that room into this room. I felt them and so did you.

> ***

96

**The fact that the killing occurred in that room in front of those children is directly related to the aggravating circumstances** which you found him guilty of.  He chose, ladies and gentlemen, to kill her in that house.  He could have killed her at work at one of two jobs, on the street. But you found him guilty of planning her death and carrying it out in that house in front of those children.  **The cruelty of that offense and the emotional horror inflicted on those children as a result of that offense is directly related to that aggravating circumstance**, the burglary.  Without the burglary that doesn't happen.

That, ladies and gentlemen is what gives the immense weight to the aggravated burglary, that those children were present, that they saw their mother die. They saw her killed. This killing becomes much more cruel much more horrible because of that. **That's the weight, ladies and gentlemen, that you will use to compare with the mitigation you heard Monday**.

What did you learn on Monday about that man that committed this offense, this cruel, horrible offense?  I've got a list of five things that I learned.

\*\*\*

How much weight do you give all that?  Does that outweigh the cruel manner in which he killed**?  How does the cruel manner in which he killed, the aggravating circumstances, weigh against the mitigation which you heard on Monday?**  It's not contest, ladies and gentlemen. How could it be?  How could it be?

(Trial Tr. at 1044-1051) (emphasis added).

In a state where the sentencer weighs aggravating and mitigating circumstances, the weighing of an invalid aggravating circumstance violates the Eighth Amendment. See Sochor v. Florida, 504 U.S. 527, 532, (1992); Stringer v. Black, 503 U.S. 222, 232 (1992); Parker v. Dugger, 498 U.S. 308, 319-321 (1991); Clemons v. Mississippi, 494 U.S. 738, 752 (1990).

The prosecutor's argument to the jury that the nature and circumstances of the offense should be weighed against the mitigating evidence presented by Petitioner prejudiced the jury's verdict and the verdict should be set aside.

**Ground Five:**

**Petitioner's right to due process under the Fourteenth Amendment and his right to be free from cruel and unusual punishment under the Eighth Amendment were violated by the submission to the jury in the penalty phase**

97

**of the trial of multiple charges of aggravated murder and multiple and duplicative aggravating circumstances when only one victim was involved.**

## A. Procedural Default

Respondent contends at pages 67-68 of her return of writ that Petitioner's fifth ground for relief was procedurally defaulted because the state's highest court, the Ohio Supreme Court, enforced the contemporaneous objection rule and only reviewed the ground for plain error. Petitioner concedes that the Ohio Supreme Court reviewed the ground for plain error.

## B. Merits

Petitioner was found guilty during the culpability phase of the trial on two counts of aggravated murder and on one aggravating circumstance under each of those counts of murder. Under Ohio law aggravated murder counts involving the same victim should be merged for sentencing. Ohio Revised Code §2941.25(A); State v. Lawson, 64 Ohio St. 3d 336, 351, 595 N.E.2d 902, 913 (1992).

The trial court did not merge the counts and specifications for the penalty phase of the trial. Indeed, in the judgment entry of sentence filed on December 11, 1993 the trial court imposed two death sentences on Petitioner. Thus, in the penalty phase of the trial the jury was allowed to consider two charges of aggravated murder and two death penalty specifications.

The failure of the trial court to merge the two aggravated murder convictions and the two aggravating circumstances before the penalty phase allowed the jury to consider the same aggravating circumstance twice. The jury was permitted to weigh these two aggravating circumstances against the mitigating factors presented by Petitioner. Under a death penalty statute that provides for the weighing of aggravating circumstances against mitigating factors it is not permissible to allege aggravating circumstances in a duplicative fashion. See United States

v. McCullah, 76 F.3d 1087, 1111-1112 (10th Cir. 1996).  "Such double counting of aggravating factors, especially under a weighing scheme, has a tendency to skew the weighing process and creates the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally. Cf. Stringer v. Black, 503 U.S. 222 (1992)."

The death sentences should be vacated.

**Ground Six:**

**Petitioner's right to due process under the Fourteenth Amendment and his right to be free from cruel and unusual punishment under the Eighth Amendment were violated by the penalty phase jury instructions which told the jury that the aggravating circumstance which the jury was to weigh against mitigating evidence included two mutually exclusive alternatives-- that he was either the "principal offender" or that he acted with "prior calculation and design."**

**A. Procedural Default**

Respondent contends at pages 71-72 of her return of writ that Petitioner's sixth ground for relief was procedurally defaulted because the state's highest court, the Ohio Supreme Court, enforced the contemporaneous objection rule and only reviewed the ground for plain error. Petitioner concedes that the Ohio Supreme Court reviewed the ground for plain error.

**B. Merits**

In order to impose the death penalty on Petitioner the government had to prove beyond a reasonable doubt one of the death penalty aggravating circumstances contained in Ohio Revised Code §2929.04.  In this case the indictment alleged the aggravating circumstance contained in Ohio Revised Code §2929.04(A)(7), namely:

> The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit...aggravated burglary...and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design.

99

The Ohio Supreme Court held in State v. Penix, 32 Ohio St. 3d 369, 371, 513 N.E. 2d 744, 746 (1987), that the elements "principal offender" and "committed the aggravated murder with prior calculation and design" are mutually exclusive alternatives and are not to be charged and proven together in the same case.

In the culpability phase of the trial the trial court instructed the jury on the second specification to each of the two counts of aggravated murder. The trial court instructed the jury that the second specification charged that Petitioner was the principal offender. (Trial Tr. at 837, 846). The verdicts returned by the jury found that Petitioner was the principal offender. (Trial Tr. at 896, 897). However, during the penalty phase of the trial the trial court instructed the jury that the aggravating circumstance was as follows:

> The single aggravating circumstance which the defendant has been convicted of committing is that the offense was committed while the offender was committing, attempting to commit or fleeing immediately after committing or attempting to commit aggravated burglary and **either the offender was the principal offender in the commission of the aggravated murder, or if not the principal offender, committed the aggravated murder with prior calculation and design**.

(Trial Tr. at 1057)(emphasis added). This instruction had the effect of telling the jury that, despite its verdicts in the culpability phase of the trial, Petitioner was the principal offender or that he committed the aggravated murder with prior calculation and design. This instruction removed from the purview of the jury it's right and obligation to determine this element and deprived Petitioner of his right to have the jury determine the facts. United States v. Gaudin, 515 U.S. 506, 510 (1995); see also Apprendi v. New Jersey, 530 U.S. 466 (2000); Sandstrom v. Montana, 442 U.S. 510 (1979). And it improperly required the jury to weigh an invalid aggravating circumstance. See Sochor v. Florida, 504 U.S. 527, 532 (1992).

The verdicts to impose sentences of death should be vacated.

100

**Ground Seven**:

> **Petitioner was denied his Sixth Amendment right to the effective assistance of counsel by the failure of trial counsel to introduce a complete copy of the lease listing Petitioner as husband and occupant of the home and by their failure to introduce evidence that the locks to the home had not been changed.**

## A. Procedural Default

Respondent expressly concedes at pages 78-80 of her return of writ that Petitioner's seventh ground for relief was "properly preserved."

## B. Merits

On April 29, 1994 Petitioner's trial counsel filed a pretrial motion to dismiss all of the aggravated burglary charges contained in the indictment.

The motion argued, *inter alia*, that as Carol O'Neal's spouse and in the absence of a court order Petitioner had a right to enter the marital dwelling. The motion did not discuss Petitioner's right to enter the premises of 4938 Plainville Road under a lease agreement. Nor did the motion address the issue of the changing of locks at 4938 Plainville Road.

At the August 15, 1994 oral hearing on the motion to dismiss, Assistant Prosecuting Attorney Seth Tieger stated that on December 7, 1993 Carol O'Neal "was in the process of changing the locks." (8/15/94 Hrg. Tr. at 8-9). He went on to speculate that Petitioner "didn't have a key...[b]ecause if he did, he would have just opened up the door." Id. Defense counsel John Keller addressed the suggestion "that it's alleged that Carol Ann O'Neal had tried to change the locks." (Id. at 11). Mr. Keller proposed a hypothetical in which his own wife "has changed the locks." (Id. at 11-12). He argued that under that circumstance his kicking in his front door wouldn't be a trespass. He went on to conclude: "But simply to take a key or to change the lock doesn't suggest or vindicate a possessory interest in the property." (Id.).

In its decision reversing and remanding the judgment of the trial court dismissing all charges of aggravated burglary, the Court of Appeals found, based on information in the record "not presented in the form of evidentiary material," that Carol O'Neal had, in fact, changed the locks.  State v. O'Neal, 103 Ohio App. 3d 151, 153 and 155, 658 N.E.2d 1102 (1995). It is unclear what information in the record the Court of Appeals was relying on for this finding, or how the suggestion that Carol O'Neal was "in the process of changing the locks" was translated into an accomplished fact.

In his opening statement for the government, Mr. Kunkel stated that the evidence would show that Carol O'Neal "took his key....[she] put him out."  (Trial Tr. at 323).

Prior to the beginning of the government's case, the parties stipulated into evidence several joint exhibits. One of these joint exhibits was supposedly a copy of the lease agreement for 4938 Plainville Road. Joint Exhibit 3 consists of the first page of a Housing Assistance Payments Contract for 4938 Plainville Road, and a one-page October 19, 1993 Notification of Change to Lease and Housing Assistance Payments Contract which states that Petitioner's two sons, Jermaine and Cortez, were to be added to the lease.

In the direct examination of prosecution witness Patricia Carr, Carol O'Neal's long-time friend and co-worker, Prosecutor Kunkel asked her what was Carol O'Neal's plan for getting Appellant out of the house.  Ms. Carr testified: "She had packed up his things. **She was going to get the locks changed, but she wasn't able to in time before all this had happened**." (Trial Tr. at 375)(emphasis added).   Mr. Kunkel asked Ms. Carr again what was Carol O'Neal's plan. Ms. Carr again testified: "**She was going to get the locks changed** and hopefully she was going to try to get a restraining order to get him out of there to keep him away from her." (Trial Tr. at

376 )(emphasis added). Carol O'Neal was going to get the locks changed and was going to try to get a restraining order. She had not accomplished either goal as of December 11, 1993.

Mr. Leon argued, in closing argument for the government that Petitioner didn't have a key to 4938 Plainville Road. (Trial Tr. at 771). The prosecution did not introduce any evidence as to what Petitioner had in his possession when he was arrested on the night of December 11, 1993, including whether or not he had a key, or whether Petitioner still owned a key. Nor did the prosecution introduce evidence that Carol O'Neal took Petitioner's key.

Mr. Keller, in closing argument on behalf of Petitioner, argued that the lease agreement for 4938 Plainville Road included Petitioner's two children as residents, which established that Petitioner was residing there. (Trial Tr. at 775). Mr. Keller did not argue that Petitioner's name was on the lease agreement or rebut the prosecution argument that Petitioner did not own or possess a key to 4938 Plainville Road.

Mr. Schmidt argued on behalf of Petitioner that "he didn't have a key," although no evidence was adduced as to whether Petitioner owned or possessed a key. (Trial Tr.at 779).

Mr. Kunkel argued in his final culpability phase closing argument on behalf of the government: "There's **the lease**. You have the front page of the lease and addendum for the lease. When you get back there, you look at these. And **nowhere on either of these documents is his name**. **Nowhere**. His wife rented that house." (Trial Tr. at 802)(emphasis added). He went on to say: "he has **no key** to get in. He's moved." ( Id.) (emphasis added).

Kenneth Taylor, the owner and landlord of the premises at 4938 Plainville Road, was twice subpoenaed to testify. A subpoena was issued for Mr. Taylor on April 6, 1994 and was served on him on April 8, 1994. Another subpoena was issued for him on July 20, 1994 and

served on him on July 25, 1994. A subpoena was not issued for him on August 24, 1995 or on September 25, 1995 when the other subpoenas were issued.

Kenneth Taylor, if called to testify, could have provided a complete copy of the lease agreement and other documents for the premises at 4938 Plainville Road. Exhibit E to the petition for postconviction relief is the affidavit of Kenneth Taylor identifying and authenticating a complete copy of the six-page lease of 4938 Plainville Road. The lease, attached as an exhibit to the affidavit, does in fact contain the name of Petitioner James O'Neal as "husband," along with that of Carol O'Neal and her children, on page 3 of the lease under Part G, Occupancy, which lists those who "shall personally use and occupy the premises." Also attached to the affidavit is a complete copy of the Housing Assistance Payments Contract. Kenneth Taylor also identifies and authenticates the October 19, 1993 Notification of Change to Lease and Housing Assistance Payments Contract.

Kenneth Taylor, as the owner and landlord of the premises at 4938 Plainville Road, if necessary, could have provided testimony corroborating the testimony of Patricia Carr that the locks to 4938 Plainville Road had not been changed as of December 11, 1993.

All of these arguments -- and especially the arguments by the prosecution -- show how important the question of whether Petitioner's name was on the lease and the question of whether the locks had been changed were to this case. These questions were crucial to the determination of whether there was a trespass, and hence, whether there was an aggravated burglary and whether Petitioner was eligible for the death penalty.

Petitioner's defense was prejudiced not only by the positive misinformation given to the jury about the lease. It is apparent from the proceedings involving the motion to dismiss the trespass charges, including the first direct appeal to the Court of Appeals, that the notion had

104

somehow taken hold that Carol O'Neal had changed the locks and that Petitioner no longer had a key to the marital residence. Indeed, the prosecution asserted, without any factual support whatsoever, that Carol O'Neal had taken Petitioner's key away from him.

As it turned out, the prosecution's own witness, Patricia Carr, testified that Carol O'Neal had planned to change the locks but had not done so. The fact that the locks were not changed is significant because if the locks weren't changed and Petitioner still had a key, he could have entered the marital residence without breaking his way in, if he had his key with him. Breaking the door down wasn't a necessity.

The prosecution elicited from Patricia Carr the fact that Carol O'Neal was going to get the locks changed and was going to get a restraining order. However, the defense failed to recognize and to argue the logical point that the fact that Carol O'Neal was planning on getting the locks changed as supporting the obvious inference that she knew that Petitioner had a key. Why else would she need to change the locks unless Petitioner still had a key? If defense counsel had presented and argued the obvious facts, that Petitioner had a right to enter the marital residence because his name was on the lease and there was no restraining order, and that Petitioner could have used his key to enter the premises because the locks weren't changed, the jury would have been presented with a substantially different factual picture than the one it was presented with. Thus, the failure of defense counsel to introduce the complete lease containing Petitioner's name -- coupled with the failure to argue the obvious inference from the fact that the locks weren't changed that Petitioner was able to enter with his key -- resulted in an unreliable verdict.

Strickland v. Washington, 466 U.S. 668 (1984), established the Sixth Amendment standards for claims of ineffective assistance of counsel. To establish a claim of ineffective assistance a petitioner must show that counsel's performance was deficient and that the deficient

performance prejudiced the defense. 466 U.S. at 687. To establish deficient performance the petitioner "must show that counsel's representation fell below an objective standard of reasonableness." Id. at 688. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id.

The prejudice component of an ineffectiveness claim was explained by Glenn v. Tate, 71 F.3d 1204 (6th Cir. 1995):

> Under the *Strickland* test, the petitioner must show a "reasonable probability" that, but for his counsel's unprofessional errors, the result would have been different, *Strickland*, 466 U.S. at 694. **The petitioner does not have to show that his counsel's deficient conduct "more likely than not altered the outcome in the case."** *Id.* at 693. The "reasonable probability" of which Strickland speaks, rather, is "a probability sufficient to undermine confidence in the outcome." *Id.* at 694. The question, in other words, is whether counsel's errors were serious enough to deprive the petitioner of a proceeding the result of which was "reliable," *id.* at 687 - - "whether counsel's conduct so undermined the proper functioning of the adversarial system that the trial [a term that includes capital sentencing proceedings] cannot be relied on as having produced a just result." *Id.* at 686.

Id. at 1210 (emphasis added).

The failure of trial counsel to introduce a complete copy of the lease and to present evidence that the locks to the home had not been changed undermines confidence in the jury's verdict on the issue of trespass. The verdicts should be set aside and Petitioner granted a new trial.

**Ground Eight:**

> **Petitioner was denied his Sixth Amendment right to the effective assistance of counsel by the failure of trial counsel to object to the omission from the culpability phase jury instructions on trespass the phrase "in the absence of a restraining order or an order granting one party exclusive possession of the marital residence" and the failure to object to reference in the instructions to the marital residence as the "wife's residence" and the use of the word "estranged" without defining the term for the jury.**

## A. Procedural Default

Respondent contends at pages 82-84 of her return of writ that Petitioner's eighth ground for relief was procedurally defaulted because the ground is an "on the record claim." Petitioner disagrees for two reasons, as further explained below in the discussion of the merits. First, Petitioner's trial counsel did make a general objection. Second, jury instructions proposed by Petitioner's trial counsel were not filed and made a part of the record. Therefore, this claim was not waived.

## B. Merits

The Court of Appeals in <u>O'Neal I</u> rendered a pretrial decision remanding the case for trial to determine whether the prosecution could prove that Petitioner committed a trespass in entering the premises of 4938 Plainville Road on the evening of December 11, 1993. <u>State v. O'Neal</u> (1995), 103 Ohio App. 3d 151, 658 N.E.2d 1102 .

In its decision the Court of Appeals held as follows:

> We hold that **in the absence of a restraining order or an order granting one party exclusive possession of the marital residence**, the question of whether one spouse has the sole possessory interest in the house depends on whether the evidence shows that both parties had made the decision to live in separate places. Both parties must have understood that the possessory interest of one was being relinquished, even if it was relinquished begrudgingly or reluctantly. In the absence of such a showing, there can be no finding of trespass and, hence, no aggravated burglary. (emphasis added)

103 Ohio App. 3d at 155, 658 N.E. 2d at 1104 (emphasis added). The holding did not include the term "estranged" or any term synonymous with that term. The instructions on trespass delivered by the trial court were as follows:

> Now we had some talk during the trial in closing arguments about trespass, and I want to tell you what that is. Trespass means any

107

entrance, knowingly made, in a structure, residence, or dwelling of another is unlawful if it is without authority, consent or privilege to do so. [sic]

Evidence has been introduced to demonstrate that the defendant and the victim have been married to each other.   A husband can be convicted of an aggravated burglary of his **wife's residence** if you find that certain conditions exist, including those that demonstrate a criminal trespass.

Those conditions are that both parties understand that they are now living separate and apart.  In order to decide this issue, you must review all the facts and circumstances in evidence that relate to this question.

When a husband and wife are **estranged** and both parties understand they are living separate and apart, a husband may not use force to enter the **wife's residence**. If he does so, that is a trespass.  If he does so with the intent to commit a felony, he can be convicted of aggravated burglary.

The question whether one spouse has the sole possessory interest in the house depends on whether the evidence shows that both parties have made the decision to live in separate places.  Both parties must have understood that the possessory interest of the one was being relinquished, even if it was relinquished begrudgingly or reluctantly. In the absence of such a showing, there can be no finding of trespass, and, hence, no aggravated burglary.

(Trial Tr. at 826-827.) (emphasis added).

At the conclusion of the culpability phase of the trial the trial court and counsel conferred about the jury instructions after the prosecution's exhibits were admitted. (Trial Tr. at 748-751). The following colloquy ensued:

MR. KELLER:            At this point we're anticipating no other evidence.   And then I would like - - we've had some discussions, but I submitted on behalf of Mr. O'Neal a motion for some additional special instructions for the jury and I've given a copy to the Court. I just want those made a part of the record.

| | |
|---|---|
| THE COURT: | Well, you only gave me one on burglary. |
| MR. KELLER: | We'll give you the other one on murder. |
| THE COURT: | Well, I've already addressed the one on agg burglary, and what I've taken is in the instructions for count number four regarding the aggravated burglary, when I give them the standard definition of trespass, I then include the submitted instructions that the State gave, followed by yours.  Now, have you seen what I've done? |

(Trial Tr. at 748.)  The foregoing passage reflects that the trial court composed the instructions on aggravated burglary from the standard definition on trespass as well as instructions proposed by the prosecution and by the defense.

The court acknowledged receipt from defense counsel of a motion for instructions on burglary. (Id.) Mr. Schmidt stated that defense counsel submitted a charge on burglary and trespassing. (Id. at 750.) The docket does not show that the proposed instructions were also filed with the Clerk.

In its discussion of the proposed jury instructions, the trial court informed the parties that **"I've dropped out the wording 'in the absence of court order' and started right after that and put in exactly what you gave me."**  (Trial Tr.at 748-9)(emphasis added).

In its instructions to the jury the court defined "trespass" as:

> Trespass means any entrance, knowingly made, in a structure, residence, or dwelling of another is unlawful if it is without authority, consent or privilege to do so. [sic]

109

(Trial Tr. at 826.)  The court went on to instruct the jury that a husband can be convicted of an aggravated burglary of his wife's residence under certain conditions.  The court specified those conditions:

> Those conditions are that both parties understand that they are now living separate and apart.  In order to decide this issue, you must review all the facts and circumstances in evidence that relate to this question.

> When a husband and wife are **estranged** and both parties understand that they are living separate and apart, a husband may not use force to enter the **wife's residence**.  If he does so, that is a trespass.

(Trial Tr. at 826-7.) (emphasis added).

The proposed defense instruction on trespass not filed and made a part of the record contained the language "...in the absence of...[a] restraining order or an order granting one party exclusive possession of the marital residence." The instructions given by the trial court omitted the language referring to the absence of a restraining order or an order granting one party exclusive possession, and referred twice to the "wife's residence" rather than to the "marital residence."  (Trial Tr. at 826-7.) The trial court, in fact, interrupted Mr. Keller's closing argument when he suggested that the court would instruct on the absence of a restraining order. (Trial Tr. at 777.)

Joint Exhibit 2 included a copy of a restraining order, although granted on December 12, 1993, the day after the death of Carol O'Neal.

At the conclusion of the court's culpability phase instructions, the court excused the jury for deliberations and invited objections to the instructions from counsel. (Trial Tr. at 858.)

Petitioner's trial counsel made no specific objections, but made a general objection based on prior requests and arguments. (Id. at 859.) Petitioner's counsel did not object to the court's

110

omission of reference to the absence of a restraining order or an order granting one party exclusive possession nor to the court's reference to the "wife's residence" rather than to the "marital residence," nor to the use of the term "estranged." (Id.)

     After the jury began its deliberations it sent out a note:

THE COURT:     The record should reflect that we're here because the jury sent out a note, and you can show that to Gina.

                    The note reads:  **We need the legal definition in Ohio of what "estranged" means.** Signed Lee Baumgartner, Foreman.

                                   \*\*\*

                    The Court has discussed the matter with counsel and concluded that we're unable to give any further instructions to the jury, at least in this area.

                    And the Court, with approval of counsel, plans to send a note to the jurors worded something like this: Ladies and gentlemen of the jury, in response to your request for a legal definition the word "estranged," [sic] this is to notify you the Court has previously given you all the applicable instructions regarding this case and is unable to give you any further instructions at this time. Please rely on you collective memories and understanding in making your deliberations.

(Trial Tr. at 861-862.) (emphasis added). The prosecution and the defense approved this response to the jury question.  (Id.)

Strickland v. Washington, 466 U.S. 668 (1984), established the Sixth Amendment standards for claims of ineffective assistance of counsel. To establish a claim of ineffective assistance a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. 466 U.S. at 687. To establish deficient performance the petitioner "must show that counsel's representation fell below an objective standard of reasonableness." Id. at 688. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id.

The prejudice component of an ineffectiveness claim was explained by Glenn v. Tate, 71 F.3d 1204 (6th Cir. 1995):

> Under the *Strickland* test, the petitioner must show a "reasonable probability" that, but for his counsel's unprofessional errors, the result would have been different, *Strickland*, 466 U.S. at 694. **The petitioner does not have to show that his counsel's deficient conduct "more likely than not altered the outcome in the case**." *Id*. at 693. The "reasonable probability" of which Strickland speaks, rather, is "a probability sufficient to undermine confidence in the outcome." *Id*. at 694. The question, in other words, is whether counsel's errors were serious enough to deprive the petitioner of a proceeding the result of which was "reliable," *id*. at 687 - - "whether counsel's conduct so undermined the proper functioning of the adversarial system that the trial [a term that includes capital sentencing proceedings] cannot be relied on as having produced a just result." *Id*. at 686.

Id. at 1210 (emphasis added).

The Court of Appeals, in its decision remanding the case for trial on the issue of trespass, did not hold that whether spouses were "estranged" was an element of whether the one spouse has sole possessory interest or whether the other spouse commits a trespass.

The term "estranged" was not defined in the jury instructions nor was it defined for the jury upon the jury's request for instructions and as a result the jury was required to speculate on the definition of the term.

112

The inclusion of the term "estranged" in the instruction on trespass informed the jury that if the spouses merely had differences and were living apart, then the husband could not use force to enter the wife's residence (presupposing that it was the "wife's residence" as opposed to the marital residence).

Coupled with the trial court's omission of the language in the Court of Appeal's holding "in the absence of a restraining order or an order granting one party exclusive possession of the marital residence," the instruction on trespass, and especially the instruction using the term "estranged," created an impermissible suggestion that Carol O'Neal's application for a temporary restraining order barred Petitioner from entering the marital residence.

The failure of defense counsel to object to the inclusion of the term "estranged" in the definition of trespass, and the further failure to request clarification of the instruction upon notification of the jury's request, was constitutionally deficient performance which undermines confidence that the jury's finding of trespass was reliable.

Following opening statements and preceding the government's case, the parties stipulated three joint exhibits.  Joint Exhibit 2 consisted of a copy of a motion for a temporary protective order filed in Case No. 93CRB40795 in the Hamilton County Municipal Court, a citizen referral form on domestic violence completed by Cincinnati Police Officer Michael Mercer, and an entry granting the motion for temporary protective order dated December 12, 1993, the day after Carol O'Neal's death.

In reversing the trial court's dismissal of the trespass charges and in remanding for trial, the Court of Appeals held:

> We hold that **in the absence of a restraining order or an order granting one party exclusive possession of the marital residence**, the question of whether one spouse has the sole possessory interest in the house depends on whether the

evidence shows that both parties had made the decision to live in separate places. Both parties must have understood that the possessory interest of one was being relinquished, even if it was relinquished begrudgingly or reluctantly.  In the absence of such a showing, there can be no finding of trespass and, hence, no aggravated burglary.

103 Ohio App. 3d at 155, 658 N.E. 2d at 1104 (emphasis added). Defense counsel proposed a jury instruction on trespass including the phrase "in the absence of a restraining order or an order granting one party exclusive possession of the marital residence." The trial court deliberately omitted the phrase. (Trial Tr. at 748-9).

In view of the admission into evidence of the restraining order entered the day after the death of Carol O'Neal, a restraining order of no relevance and highly prejudicial under the circumstances, it was imperative that the jury be instructed not to consider the after-the-fact restraining order in determining whether there was a trespass. The standard established on appeal by the Court of Appeals expressly included " absence of a restraining order" as a factor in the determination of whether there is a trespass when spouses are living separately. The record contains no explanation for the trial court's omission of the phrase, a phrase of crucial importance in light of the admission of the restraining order.  Absent an instruction including the phrase "in the absence of a restraining order" the jury must be deemed to have considered the restraining order. The trial court's jury instructions failed to tell the jury that there was no restraining order at the time of the Carol O'Neal's death.  Jury consideration of the restraining order undermines confidence in the reliability of the jury's verdict.

The issue on remand from the Court of Appeals was "whether one spouse has the sole possessory interest in the house," referred to by the Court of Appeals as the "marital residence."

In its instruction on trespass the trial court did not refer to the house as the "marital residence" but as the  "wife's residence." The trial court essentially took the issue away from the

114

jury, requiring the jury to follow the trial court's instruction that the house on Plainville Road was the "wife's residence." This deprived Petitioner of his due process right under the Fourteenth Amendment that the prosecution be required to prove every element of the offense.  Sandstrom v. Montana,  442 U.S. 510 (1979); Francis v. Franklin, 471 U.S. 307 (1985).

The trial court's instruction, when coupled with the court's omission of the  "in the absence of a restraining order" phrase and the inclusion of the undefined term "estranged," amounted to a presumption that the wife had sole possessory interest in the residence.

Defense counsel made no objection to the trial court's error in referring to the marital residence as the "wife's residence." This undermines confidence in the verdict, that the jury felt compelled to follow the trial court's instruction that the house was the "wife's residence." Defense counsels' performance fell below an objective standard of reasonableness.

Defense counsels' deficient performance on the jury instructions on the crucial element of trespass undermines confidence in the outcome of the jury's deliberations. The verdicts should be vacated and Petitioner given a new trial.

**Ground Nine:**

> **Petitioner's right to confrontation under the Sixth Amendment and to due process under the Fourteenth Amendment were violated by the admission of multiple hearsay statements allegedly made by the victim.**

**A.  Procedural Default**

Respondent expressly concedes at page 87 of her return of writ that Petitioner's ninth ground for relief was "properly preserved."

**B.  Merits**

The trial court allowed prosecution witnesses to testify--over the strenuous and repeated objections of defense counsel--about hearsay statements made to them by Carol O'Neal.

115

The trial court allowed Carol's friend, Patricia Carr, to testify that Carol told her that she wasn't happy about Petitioner's coming to visit her on the job, that Carol told her she couldn't sleep at night as the result of arguments with Petitioner, that she wanted to get out of her marriage and went to Legal Aid to see about getting a dissolution. (Trial Tr. at 365-366). The prosecutor's questions about what Carol told Ms. Carr, and her answers, didn't end there.

Ms. Carr testified that Carol told her that she was trying to find out what she could do about her marriage.  Carol called her from a car dealership where she had been and told Ms. Carr that Petitioner "had just jumped her."  (Trial Tr. at 368). On December 7th, after the incident and after Carol went to her job, she told Ms. Carr that she was afraid and that she wanted stay with Ms. Carr but she also wanted to stay with her children. (Trial Tr. at 369). Carol told Ms. Carr she didn't want to intrude and that she wanted to stay at her house with her children. (Id.).

Carol told Ms. Carr that Petitioner told Carol he didn't want her to go on a trip to New Orleans and that Petitioner said he would kill Carol and throw her back in the creek before he would let her go. (Trial Tr. at 371). Ms. Carr testified that Carol told her that on December 7th Petitioner tried to get her purse from her because the food stamps were in the purse. (Trial Tr. at 372). Carol also told Ms. Carr that she would not let the purse go and that is when Petitioner hit her. (Id.). Carol told Ms. Carr that she ran out of the house to a car dealership where they called the police.

Ms. Carr also testified that Carol talked to her about how she planned to get Petitioner out of the house. (Trial Tr. at 374). Carol packed up Petitioner's belongings, which were still at the house. (Trial Tr. at 375-376). Carol told her that she was going to get the locks changed. (Id.). Ms. Carr added that Carol wasn't able to change the locks "before this all happened." (Id.).

116

Carol told Ms. Carr that she was going to get the locks changed and she was going to try to get a restraining order to keep him away. (Trial Tr. at 376). The prosecutor asked Ms. Carr if Carol ever told her that Petitioner used the word "power." Ms. Carr said that Carol told her that Petitioner told Carol he wanted to get his power back. (Trial Tr. at 376-377). Ms. Carr said that Carol told her that the power was a gun. (Trial Tr. at 377).

The prosecutor asked Ms. Carr if she knew if Petitioner had a gun. She testified that Carol made it be known that the gun had to be gotten out of the house. (Trial Tr. at 378).

Ms. Carr testified that on December 7th, after the incident, Carol went to work and told Ms. Carr that Petitioner said he would kill her. (Trial Tr. at 379). Ms. Carr said that Carol told her that Petitioner was going to shoot her. (Id.).

Police Officer Michael Mercer testified that he was called to 4938 Plainville Road on December 7th. He said that Carol O'Neal, who was with several juveniles, told him that her ex-husband or common-law husband had attempted to get food stamps for beer and assaulted her when she wouldn't give him the food stamps. (Trial Tr. at 342). Officer Mercer testified that Carol told him at that time that Petitioner no longer lived there and moved to the home of another family member. (Id.). Officer Mercer said that Carol told him that Petitioner struck her in the face numerous times, that he shoved her to the ground, kicked her, and choked her. (Trial Tr. at 344).

Prosecutor Kunkel asked Carol's son Ricardo whether Carol had ever confided to him about her plans regarding her marriage. Ricardo testified that Carol told him that she was looking forward to getting a divorce but that she was going to take it slow. (Trial Tr. at 510). After December 7th Carol told Ricardo that she wanted to leave Petitioner right away. (Id.). The

117

prosecutor asked Ricardo if Carol filed charges against Petitioner. Ricardo said she did and that she had a piece of paper that was supposed to keep Petitioner out. (Trial Tr. at 511).

The Confrontation Clause of the Sixth Amendment, applicable to the States through the Fourteenth Amendment, guarantees the right of the accused to confront the witnesses against him. The Confrontation Clause limits the admission of hearsay to circumstances in which the declarant is unavailable and the statement bears adequate indicia of reliability. Idaho v. Wright, 497 U.S. 805, 813-815 (1990). Reliability is inferred where the hearsay falls within a "firmly rooted hearsay exception." Id. at 815. Otherwise, the hearsay must be excluded absent a showing of particularized guarantees of trustworthiness. Id.

Most of the hearsay-riddled testimony of Ms. Carr cannot qualify as an "excited utterance" or as "then existing mental, emotional, or physical condition." Even statements made to Ms. Carr later in the day of December 7th when she went to work would not qualify under those or any other hearsay exception. The same is true with respect to the hearsay testimony of Ricardo. As to the testimony of Officer Mercer, it stretches credibility to suggest that all of Carol's statements to him, particularly about what the altercation was about, constitute an "excited utterance." Moreover, in light of the fact that it was obviously untrue--especially immediately after the altercation--that Petitioner had "moved" to a relative's home, it is apparent that Carol had the motive to exaggerate what happened to get Petitioner in trouble with the police to keep him away. Thus, Carol's statements to Officer Mercer were not totally trustworthy and should not have been admitted.

The massive amount of hearsay admitted over objection by the trial court violated Petitioner's right of confrontation. This violation can only be cured by a new trial.

**Ground Ten:**

118

**Petitioner's right to be free from cruel and unusual punishment under the Eighth Amendment was violated by the imposition of punishment disproportionate to the punishment normally inflicted on defendants for domestic homicides and for similar offenses committed in the same jurisdiction.**

## A. Procedural Default

Respondent expressly concedes at pages 90-93 of her return of writ that Petitioner's tenth ground for relief was "properly preserved."

## B. Merits

Petitioner recognizes that the United States Supreme Court has held that proportionality review is not constitutionally required.  Pulley v. Harris, 465 U.S. 37, 44-51 (1984).  In Coleman v. Mitchell, 268 F.3d 417 (6th Cir. 2001), the Sixth Circuit stated the rule:

> The Eighth Amendment bars punishments which are grossly disproportionate to their corresponding crime. See  Coker v. Georgia, 433 U.S. 584, 592, 53 L. Ed. 2d 982, 97 S. Ct. 2861 (1977). "When a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution--and, in particular, in accord with the Due Process Clause."  Evitts v. Lucey, 469 U.S. 387, 401, 83 L. Ed. 2d 821, 105 S. Ct. 830 (1985).

Id. at 453. Where, as here, state law requires proportionality review, that review must accord with due process.

On appeal in the Ohio Supreme Court Petitioner contended that there were no known cases similar to Petitioner's--a spouse shooting the other spouse in a domestic dispute--where the death penalty had been imposed. The Ohio Supreme Court rejected the principle that proportionality review entails comparison of sentences imposed in similar circumstances. 87 Ohio St. 3d 402, 421. This is contrary to the principle approved by the Sixth Circuit in Coleman, supra, where it noted that the United States Supreme Court had approved proportionality review

119

that ensures that a decision to impose the death penalty is consistent with sentences imposed in similar circumstances. Id.

Petitioner's sentences of death should be vacated as being disproportionate to sentences imposed in similar cases.

**Ground Eleven:**

> **Petitioner's right to due process and to equal protection of the law under the Fourteenth Amendment was violated by the use of peremptory challenges to exclude members of his race from the jury contrary to the standards established in Batson v. Kentucky.**

**A. Procedural Default**

Respondent expressly concedes at pages 95-96 of her return of writ that Petitioner's eleventh ground for relief was "properly preserved."

**B. Merits**

During voir dire the government used peremptory challenges to dismiss three prospective black jurors. Each time defense counsel objected to the dismissal on the ground that the prospective juror was black and the dismissal of the juror violated Batson v. Kentucky, 476 U.S. 79 (1986). Each time defense counsel asked for a non-racial neutral explanation. Each time the government gave a pretextual explanation which the trial court accepted.

The government excluded Prospective Juror No. 7, Ms. Anderson, to which the defense objected on Batson grounds. (Trial Tr.at 143-144). When the trial court requested an explanation by the government, the prosecutor claimed that Ms. Anderson was "the lowest rated juror on applying the death penalty on scale of one to ten." The trial judge accepted that explanation without further inquiry.

The government exercised another peremptory challenge to dismiss Juror No. 6, Mr. Breckenridge. (Trial Tr. at 230). Again the defense objected to the dismissal of the prospective juror on <u>Batson</u> grounds. The prosecutor claimed that this black juror was being excused because he had "mixed feelings" about the death penalty, that he was single and lived at home with his mother, and that he didn't have a stake in the community. (Trial Tr. at 231). The trial court accepted this explanation at face value. (Trial Tr. at 231-232).

Finally, the government exercised another peremptory challenge to dismiss prospective Juror No. 7, Ms. Cowins. (Trial Tr. at 274). Once again the defense objected on <u>Batson</u> grounds. The prosecutor gave as reasons for the dismissal that the prospective juror was a social worker, an occupation that was not conducive to a pro-conviction juror, that she agreed with the verdict in the O.J. Simpson case, and said she would not openly deliberate with the other jurors. (Trial Tr. at 275-276). The defense challenged the final reason, noting that the prospective juror had explained or clarified what she meant when rehabilitated by defense counsel. (Trial Tr. at 276). The trial court responded that under <u>Batson</u> the prosecutor merely needed to provide "apparently plausible" reasons. The prosecutor added that there were still two prospective black jurors who could get on the petit jury. (<u>Id</u>.). Defense counsel asked for a mistrial, which the trial court denied.  (Trial Tr. at 277).

At the conclusion of the voir dire defense counsel renewed the objection to the dismissal of black jurors based on <u>Batson</u>. (Trial Tr. at 319). The prosecutor responded that there were two blacks on the jury.  (<u>Id</u>.). The trial court overruled the motion. (<u>Id</u>.)

Here, the trial court accepted the prosecutor's explanations without making a determination whether the explanations were genuine or were pretextual. Under the

circumstances of this case Petitioner maintains that the explanations were pretextual and that he should be granted a new trial.

**Ground Twelve:**

> **Petitioner's right to due process under the Fourteenth Amendment was violated by the admission of statements obtained from Petitioner by the police by means of deceiving Petitioner into believing his wife was still alive, making his waiver of his right to remain silent not voluntary, knowing, and intelligent.**

**A. Procedural Default**

Respondent expressly concedes at pages 106-107 of her return of writ that Petitioner's twelfth ground for relief was "properly preserved."

**B. Merits**

Police Officer Charles Beaver interviewed Petitioner at the police station on December 11, 1993. He testified in a motion to suppress hearing that he gave Petitioner Miranda warnings and that Petitioner waived his rights and agreed to talk to him. (6/16/94 Hrg. Tr. at 4-8). Officer Beaver testified about a number of statements Petitioner made to him, including an admission that he shot his wife and that he didn't regret it. (Id. at 13).

Officer Beaver admitted that he deliberately did not tell Petitioner that Carol O'Neal had died because he felt that Petitioner would not have agreed to talk if he found out Carol had died. (Id. at 19).

The United States Supreme Court has held that police deception to induce a waiver of the right to remain silent does not always result in an involuntary, unknowing, an unintelligent waiver, see Colorado v. Spring, 479 U.S. 564, 574 (1987), citing Moran v. Burbine, 475 U.S. 412, 421-423 (1986). But here the fact that at the time of the interview Carol O'Neal had died was central to the question of whether Petitioner's willingness to talk to the police about shooting

his wife Carol was knowing. It is apparent from Officer Beaver's testimony that Petitioner talked to the police and gave answers to the police under the assumption that he had not killed his wife. Petitioner's statements about what he had done and how he felt about it were offered in a context of which he was unaware. As Officer Beaver admitted, Petitioner might not have been willing to talk if he had known his wife had died. But more than that, Petitioner's statements about what he had done and how he felt might well have been different too if he had been aware of Carol's death. Under these circumstances Carol's death was relevant to a knowing waiver of his right to remain silent.

Petitioner's statements should have been suppressed. Petitioner should be granted a new trial.

**Ground Thirteen:**

> **Petitioner's right to due process under the Fourteenth Amendment and to be free from cruel and unusual punishment under the Eighth Amendment was violated by the trial court's refusal to give an instruction in the culpability phase of the trial of the lesser included offense of murder.**

**A. Procedural Default**

Respondent expressly concedes at pages 109-110 of her return of writ that Petitioner's thirteenth ground for relief was "properly preserved."

**B. Merits**

At the conclusion of the culpability phase evidence, defense counsel requested a jury instruction on the lesser included offense of murder. (Trial Tr. at 748-752). The trial court refused to give the instruction. After the trial court instructed the jury defense counsel objected and moved for a mistrial. (Trial Tr. at 859).

123

In <u>Beck v. Alabama</u>, 447 U.S. 625 (1980), the Court held that under the due process clause of the Fourteenth Amendment the death penalty could not be imposed after a jury verdict of guilt on the capital offense when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense and when the evidence would have supported such a verdict. <u>Id</u>. at 637.  Here, the evidence would have supported a verdict of murder. The jury could have-- and should have--found that there was no aggravated burglary. Even the Judge concurring in the Court of Appeals decision on direct appeal conceded that the evidence of trespass was "sparse."

The verdicts of conviction for aggravated murder should be vacated and Petitioner should be granted a new trial.

**Ground Fourteen:**

**Petitioner's Sixth Amendment right to a fair and impartial jury and his Eighth Amendment right to be free from cruel and unusual punishment were violated by the selection of a jury predisposed to impose a sentence of death, contrary to the standards in <u>Witherspoon v. Illinois</u>.**

**A.  Procedural Default**

Respondent expressly concedes at page 112 of her return of writ that Petitioner's fourteenth ground for relief was "properly preserved."

**B.  Merits**

<u>Witherspoon v. Illinois</u>, 391 U.S. 510 (1968), established the principle that a sentence of death is unconstitutional if the jury that imposed the sentence was chosen by excluding prospective jurors based on general objections to the death penalty or based on conscientious or religious scruples against its infliction. <u>Id</u>. at 522. In <u>Lockhart v. McCree</u>, 476 U.S. 162 (1986), the Court held that a capital defendant's right under the Sixth Amendment to be tried by a fair cross section of the community was not violated by the "death qualification" of a jury--creating a

124

jury predisposed to imposing the death penalty by excluding prospective jurors not strongly disposed to impose the death penalty. Id. at 176-177. While addressing the fair-cross-section requirement, the Court in Lockhart did not address the dictates of the Eighth Amendment.

It is apparent from an examination of the transcript of the voir dire (and see the prosecutor's explanation in response to challenges on Batson grounds that peremptorily excused jurors were not strongly supportive of imposing a death sentence) that the prosecution used the voir dire to exclude not only those prospective jurors who could not conscientiously consider or impose a death sentence but even those who were not predisposed in favor of imposing a sentence of death.

Petitioner submits that if trying a death penalty case before a jury predisposed to imposing a death sentence does not violate the right to a fair and impartial jury, then it violates the fundamental principle of Eighth Amendment jurisprudence that the sentence imposed be proportionate to the offense. See Gregg v. Georgia, 428 U.S. 153, 175 (1976) ("We may not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved."). A jury predisposed to impose the death sentence is not fit to determine whether a sentence of death is proportionate to the crime.

Petitioner's sentences of death should be vacated.

**Ground Fifteen:**

**Petitioner's right to be free from cruel and unusual punishment under the Eighth Amendment was violated by the imposition of sentences of death under the Ohio death penalty scheme which is devoid of penological justification, has a racially disproportionate impact, fails to rationally narrow the class of death eligible defendants, permits the imposition of death when aggravating circumstances only just outweigh mitigating factors, denies the consideration of mercy, allows the arbitrary selection of those to**

125

**receive the death penalty, and fails to provide guidance on the weighing of aggravating circumstances and mitigating factors**.

## A. Procedural Default

Respondent expressly concedes at page 117 of her return of writ that Petitioner's fifteenth ground for relief was "partially properly preserved" with respect to every argument except for the argument that under Ohio's capital scheme the prosecutor has unfettered discretion, which Respondent contends is procedurally defaulted. Petitioner disagrees. Petitioner maintains that all of his grounds, including the ground of excessive prosecutorial discretion, were fairly presented and preserved at all levels of state review.

## B. Merits

Petitioner contends, as he has in the state courts, that the death penalty scheme by which the sentences of death were imposed on him is unconstitutional and that his death sentences should therefore be set aside.

Petitioner raises seven challenges to the state death penalty scheme. Two of the seven challenges -- that the death penalty statute fails to narrow the class of death eligible defendants because of the duplication of the element which makes the murder an aggravated murder and the aggravating circumstance (Ground Three) and that the statute, at least in its application, fails to allow a consideration of mercy (Ground Sixteen) -- are addressed under other grounds and will not be addressed again here.

The hallmark of Eighth Amendment jurisprudence is that "the penalty selected is not cruelly inhumane or disproportionate to the crime involved." Gregg v. Georgia, 428 U.S. 153, 175 (1976). Proportionality bars not only barbaric punishment but punishment that is excessive in relation to the crime and if it is nothing more than the needless infliction of pain and suffering.

<u>Coker v. Georgia</u>, 433 U.S. 584, 591-592 (1977). The death penalty is excessive and needless, when the stated purposes of deterrence, incapacitation, and retribution can be accomplished by life imprisonment.

While <u>McCleskey v. Kemp</u>, 481 U.S. 279 (1987), held that studies that show that the death penalty is disproportionately imposed on black defendants and defendants killing white victims than on white defendants and defendants killing black victims were insufficient to show that juries on death penalty cases were acting with discriminatory purpose, that case did not dispute the conclusion of the studies. <u>Gregg v. Georgia</u>, *supra*, held that the death penalty is "not a form of punishment that may never be imposed, regardless of the circumstances of the offense, regardless of the character of the offender, and regardless of the procedure followed in reaching the decision to impose it." <u>Id</u>. at 187. The premise underlying this holding is that the death penalty would not be imposed in a capricious or arbitrary manner. <u>Id</u>. at 194-195. What could be more capricious and arbitrary than the disparate impact of the death penalty based on the race of the victim and the race of the defendant?

Under Ohio law a death sentence may be imposed if the trier finds that aggravating circumstances outweigh mitigating evidence. Ohio Revised Code §2929.03(D). The statute does not indicate whether aggravating circumstances must outweigh mitigating evidence by a little or a lot. In <u>Gregg v. Georgia</u>, *supra*, the Court said that the concerns expressed in <u>Furman</u> that the death penalty not be imposed in an arbitrary and capricious manner can best be met when the sentencing authority is given adequate information and guidance and is provided with standards to guide its use of the information. <u>Id</u>. at 195. A statute which permits the sentencer to impose a sentence of death when an aggravating circumstance outweighs mitigating evidence by the barest degree is not adequate to assure that the sentence is not arbitrarily applied. To satisfy the Eighth

Amendment a weighing statute should provide that, to impose a death sentence, the aggravating circumstances must outweigh mitigating evidence clearly and substantially.

Arbitrariness is evident in the death penalty process when prosecutors have unfettered discretion in selecting which cases to prosecute for a capital offense. Across the state different prosecutors are known for widely different policies in which cases they will decide to seek the death penalty. Whether one is apt to be prosecuted under the death penalty statute for a particular offense depends on where one commits the offense. This arbitrariness is further exacerbated by the readiness or not of a prosecutor to plea bargain death penalty charges away.  It defies reason and common sense to suggest that the death penalty is not "imposed on a capriciously selected group of offenders," see Gregg v. Georgia at 1999, simply because the sentencer in a particular death penalty case has standards requiring the sentencer to focus on the particularized circumstances of the crime and the defendant.

Finally, without an express standard as to the degree by which aggravating circumstances must outweigh mitigating evidence, the sentencing authority does not have sufficient guidance to avoid being arbitrary and capricious. Judges, juries, and appellate courts are informed by the statute that they are required to impose a sentence of death if aggravating circumstances outweigh mitigating evidence. But juries are not obliged to state in their verdicts what weight they gave to which aggravating circumstances and what weight they gave to which mitigating evidence. Judges are not required to state that they found that aggravating circumstances outweigh mitigating evidence beyond a reasonable doubt or by what degree of proof. And appellate judges are not required to state by what measure they determined that aggravating circumstances outweighed mitigating evidence. These standards are necessary to save the statute from being arbitrary and capricious and, hence, unconstitutional.

128

These defects in the statute should lead to the vacating of Petitioner's sentences of death.

**Ground Sixteen:**

> **Petitioner's right to be free from cruel and unusual punishment under the Eighth Amendment was violated by the instruction to the jury in the penalty phase of the trial that it could not be governed by considerations of sympathy.**

**A.  Procedural Default**

Respondent expressly concedes at page 125 of her return of writ that Petitioner' sixteenth ground for relief was "properly preserved."

**B.  Merits**

The trial court instructed the jury during the penalty phase of the trial to:

> Consider all the evidence and make your findings with intelligence, impartiality, without bias, sympathy or prejudice, so that the State of Ohio and this defendant will feel that this proceeding was fairly and impartially tried.

(Trial Tr. at 1060-1061).

Petitioner recognizes that the United Supreme Court has held that the death penalty must not be administered in an arbitrary, capricious, or unpredictable manner, see California v. Brown, 479 U.S. 538, 541 (1987), and that consideration of mercy violates that principle.

However, the Ohio Supreme Court, while holding that a capital defendant is not entitled to an instruction that mercy is a mitigating factor, State v. Lorrraine, 66 Ohio St. 3d, 414, 417-418, 613 N.E. 2d 212 (1993), nevertheless approved an instruction that the jury might consider mitigating factors "in fairness and mercy." State v. Grant, 67 Ohio St. 3d  465, 481, 620 N.E. 2d 67 (1993), citing State v. Jenkins, 15 Ohio St. 3d 164, 191, 473 N.E. 2d 264, 290 (1984)("Mitigating factors are factors that, while they do not justify or excuse the crime,

129

nevertheless, in fairness and mercy, may be considered by you as extenuating or reducing the degree of the defendant's blame or punishment.").

In <u>Graham v. Collins</u>, 506 U.S. 461 (1993), Justice Thomas wrote a concurring opinion in which he said: "We have consistently recognized that the discretion to accord mercy--even if "largely motivated by the desire to mitigate"--is indistinguishable from the discretion to impose the death penalty. <u>Furman v. Georgia</u>, 408 U.S. 238, 313-314 (1972)(White, J., concurring).

An instruction to the jury in the penalty phase of a capital trial, directing the jury to consider mercy--in the sense of fairly considering mitigating evidence as extenuating or reducing the degree of the defendant's blame--comports with due process and the Eighth Amendment.

**Ground Seventeen:**

**Petitioner's right to due process under the Fourteenth Amendment and his right to be free from cruel and unusual punishment under the Eighth Amendment were violated by the cumulative effect of all the errors committed during the culpability and penalty phases of the trial and on appeal.**

**A. Procedural Default**

Respondent contends at page 127 of her return of writ that Petitioner's seventeenth ground for relief was procedurally defaulted because Petitioner "lumps in claims not fairly presented" to the state courts. Because Respondent does not identify which grounds were not fairly presented to the state courts -- unless she means the claims which she argues in her return of writ are procedurally defaulted -- Petitioner cannot directly respond. Petitioner submits, however, that because Respondent has conceded that even those grounds for relief which she claims to be defaulted were reviewed for "plain error" by the state's highest court those grounds for relief are properly part of a claim of cumulative error.

**B. Merits**

Petitioner maintains that if none of the allegations of error contained in his other grounds for relief, by itself, merits the granting of relief, then the cumulative effect of the errors establishes that Petitioner was deprived of his right to due process and his right to be free from cruel and unusual punishment by the cumulative effect of all of these errors. "[E]rrors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair." U.S. v. Hernandez, 227 F.3d 686, 697 (6th Cir. 2000), quoting Walker v. Engle, 703 F.2d 959, 963 (6th Cir. 1983), cert. denied, 464 U.S. 951 (1983).

The cumulative effect of all the errors during the culpability phase of Petitioner's trial require a new trial, and the cumulative effect of all the errors in the penalty phase of Petitioner's trial require the setting aside of his death penalty sentences.

**Ground Eighteen:**

> **The imposition of a sentence of death on Petitioner violates his right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution because he is mentally retarded under the standards -- reasonably applied -- announced in Atkins v. Virginia and in light of the facts -- reasonably determined -- presented to the state courts that show that Petitioner suffers from significantly subaverage intellectual functioning which had its onset before he attained the age of 18 and which leaves Petitioner with significant limitations in two or more adaptive behavior skills.**

**A. Procedural Default**

Respondent does not contend that this claim is procedurally defaulted but implicitly concedes at page 2 of the amendment to her return of writ that Petitioner's eighteenth ground for relief was "properly preserved" by her acknowledgement that the state courts addressed this ground on the merits.

131

**B. Merits**

The three-part constitutional standard for evaluating a claim of mental retardation, as recognized and enunciated by Atkins v. Virginia and as applied by State v. Lott (December 11, 2002), 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, is: (1) significantly subaverage intellectual functioning, (2) significant limitations in two or more adaptive skills, and (3) onset before age 18. The facts as to each part of this standard are as follows.

Onset Before Age 18

The third part of the constitutional test of mental retardation, as restated by the Ohio Supreme Court in Lott, is "onset before the age of 18."

Petitioner did not begin to claim that he was mentally retarded only after the decision in Atkins was issued. Nor was the preparation for the penalty phase of his trial the first time that Petitioner was diagnosed as mentally retarded.

The report of Cincinnati Public Schools' Psychologist, Ruth Kaufman, from February, 1968 when Petitioner was 14 years old and in the 6th grade (Hearing Exhibit A) shows that Petitioner obtained a full scale IQ of 64 on the Wechsler Intelligence Scale for Children (WISC). Ms. Kaufman, in her assessment of Petitioner's performance on the WISC and other tests, noted Petitioner's strengths and weaknesses, and observed that Petitioner's performance tests showed that he was "moderately retarded." Ms. Kaufman  concluded that Petitioner should be in the "Junior High Slow Learning Program." She further stated that "Below normal intellectual functioning due to organic dysfunction seemed to be the primary problem."

Dr. Michael Nelson, who submitted a written report to the Court of Common Pleas (Hearing Exhibit 1) but did not interview or test Petitioner and who did not testify at the hearing, wrote in his report at page 3 that the full scale IQ test results placed Petitioner overall in the

132

"Mild range of Mental Retardation." And Dr. Nelson added that "He manifested a significant deficit in his performance capabilities where he functioned in the moderate to mild range of mental retardation."

Dr. Robert Tureen, who interviewed and tested Petitioner in June, 1994 before his trial and who interviewed and tested Petitioner again in December, 2004 after being appointed by the trial court, and who testified at the evidentiary hearing on May 17, 2005, provided a more thorough analysis of the significance of the school psychological evaluation. Dr. Tureen said this (at page 4 of his report):

> On the Wechsler Intelligence Scale for Children, he obtained a **Fullscale I.Q. of 64** (Verbal I.Q. 79, Performance I.Q. 55). **That large a discrepancy on the Wechsler scales between Verbal and Performance Scores does raise at least the possibility of some level of brain disturbance or dysfunction, that might be interfering with intellectual ability.** The school psychologist summary evaluation recommended that James be placed in the junior high school slow learner program. She further was of the opinion that "Below normal intellectual functioning, due to organic dysfunction seemed to be the primary problem." She also indicated that emotional problems might be interfering with his school achievement. The importance of this is **the early establishment of not only measured I.Q. levels, but also the presumption of impaired brain function (cerebral dysfunction). \*\*\* It is my opinion that the above data establishes the existence of low intellectual ability, at least in terms of his academic performance, as well as assessed intellectual measures before the age of eighteen, with suggested evidence of cerebral brain dysfunction, resulting in poor academic achievement and low intellectual status.** (emphasis added)

Noting Petitioner's low achievement test scores, Dr. Nelson agreed that "Mr. O'Neal had long-standing achievement/academic skill deficits."

While the school psychological testing and evaluation was focused on Petitioner's intellectual and academic skills and abilities and does not contain a discrete analysis of

133

Petitioner's adaptive behavioral skills, the performance scores on the Wechsler test and other tests led Ms. Kaufman to conclude more broadly that "When tasks required that he work toward an unknown goal or concentrate on visual cues, he gave an extremely defective performance. Spatial reasoning was also very poor for his age. Moreover, his knowledge of vocabulary and recall of information indicated defective functioning."

<u>Significantly Subaverage Intellectual Functioning</u>

The second part of the constitutional test of mental retardation, as restated in <u>Lott</u>, is "significantly subaverage intellectual functioning."

Before the death penalty trial began in October, 1995 Petitioner was examined and evaluated by two psychologists, Dr. David Chiappone and Dr. Robert Tureen. Dr. Tureen, in his January 18, 2005 report to the trial court, summarizes the assessment by Dr. Chiappone which led to Dr. Chiappone's requesting that Dr. Tureen, a neuropsychologist, examine Petitioner:

> In 1994, during his incarceration at the Hamilton County Justice Center, **David Chiappone, Ph.D. administered the Wechsler Adult Intelligence Scale-R.** This is a scale that is related in characteristics to the Wechsler Intelligence Scale for Children, but is normed on the adult population and is in fact the fourth revision of the adult Wechsler Scales. On March 31, 1994, the following I.Q. scores were obtained: Verbal I.Q. 72, Performance I.Q. 71 and **Full Scale I.Q. 71**, all representing **a ranking in the 3rd percentile**, compared to the general population, meaning that 97% of the population does as well or better than James performed on the test. **The 95% confidence interval for the Full Scale I.Q. is 67 to 77, which are reasonable limits of the range within which James's "true" Full Scale I.Q. lies. Thus, there is a reasonable probability that James' true score lies below the established score of 70, representing mental retardation,** but also a reasonable probability that his true score lies above that particular level. What was more important at the time, was the **continued presence of evidence of brain dysfunction.** This was essentially why Dr. Chiappone requested my involvement in the case, since on his initial testing, he was finding signs suggesting brain disorder and this is my specialty area. Additional testing, using specific

134

measures that are sensitive to the presence of brain dysfunction I administered in 1994 substantiated **a consistent picture of a brain dysfunction, present on several measures, indicating impairment in abstraction and problem solving and difficulty on measures of spatial analysis and synthesis**, which was suggested by the poor performance I.Q. reported in 1968. On the other hand, his general language, his auditory comprehension and general verbal expression and his ability to follow instructions were all intact, within **his level of intellectual functioning, that is, of an individual with an I.Q. in the borderline to mildly retarded range**, as measured on the Wechsler Adult Intelligence Scale-R (WAIS-R). (emphasis added)

Hearing Exhibit C, January 18, 2005 Dr. Tureen Report at pages 5-6.

The state courts fixated on the isolated fact that Petitioner obtained a full scale score of 71 on the WAIS-R administered by Dr. Chiappone in 1994 and virtually ignored the fact that Petitioner got a full scale score of 64 on the WISC administered in 1968, and a score of 63 on the Cognitive Status Exam administered by Dr. Tureen in 1994, and a full scale score of 67 on the WAIS-III administered by Dr. Tureen in 2004, and a composite index score of 63 on the Reynolds Intellectual Scales test administered by Dr. Tureen in 2004.

As Dr. Tureen carefully and thoughtfully explained in his hearing testimony at Hrg. Tr. 36-37, these tests have errors of measurement. As explained cogently by the AAMR:

Although not perfect, intelligence is represented by Intelligence Quotient (IQ) scores obtained from standardized tests given by a trained professional. In regard to the intellectual criterion for the diagnosis of mental retardation, **mental retardation is generally thought to be present if an individual has an IQ test score of <u>approximately</u> 70 or below**. An obtained IQ score must always be considered in light of its **standard error of measurement**, appropriateness, and **consistency** with administration guidelines. <u>**Since the standard error of measurement for most IQ tests is approximately 5, the ceiling may go up to 75**</u>. This represents a score approximately 2 standard deviations below the mean, considering the standard error of measurement.

135

See, American Association of Mental Retardation (AAMR), Definition of Mental Retardation, What is Intelligence?, http://www.aamr.org/Policies/faq_mental_retardation.shtml (emphasis added). At the time of Petitioner's trial in October, 1995 the prevailing rule on the imposition of the death penalty on mentally retarded persons was that contained in Penry v. Lynaugh (1989), 492 U.S. 302. Penry held that it was not a violation of the Eighth Amendment's ban on cruel and unusual punishment to execute a mentally retarded person. Thus, the penalty phase mitigation testimony regarding Petitioner's mental retardation was presented, not as a bar to the imposition of the death penalty, but merely as evidence in mitigation. The constitutional standards for determining if an offender is mentally retarded -- as set out in Atkins -- did not exist and were not referred to during the questioning of either Dr. Chiappone or Dr. Tureen. The examinations of Dr. Chiappone and Dr. Tureen, which are part of the trial record, are noticeably devoid of any reference to the definitions of mental retardation of the American Association of Mental Retardation or the American Psychiatric Association. Even more noticeable is the absence of any questioning, and consequently the absence of any testimony, about the actual scores that Petitioner achieved on the various I.Q. and other tests administered in 1994 or to Petitioner's abilities with respect to specific adaptive behavior skills.

Thus, when during his testimony Dr. Chiappone said that "He's not retarded," -- referring of course to Petitioner -- this statement was not made with explicit reference to the AAMR or APA definitions of mental retardation. Nor, obviously, could this statement have referred to the constitutional standard of mental retardation later set out in Atkins.

But virtually all of the rest of Dr. Chiappone's 1995 penalty phase mitigation testimony supports the conclusion that Petitioner meets the constitutional definition of mental retardation.

136

Dr. Chiappone testified that he administered a number of tests to Petitioner and that Petitioner "scored in the what are called the border range of mental retardation. [sic] He's not retarded, but he functions at the second or third percentile of the general population." Trial Tr. at 981. He testified that Petitioner had difficulty performing some simple tests that the Doctor administered. "And so at that point I thought there was what we call organicity above and beyond limited intellect. And at that point I recommended we have a neuropsychologist who specializes in dysfunctions of the brain to do further testing to make sure we didn't miss anything." Trial Tr. at 982. Dr. Chiappone testified that Petitioner suffered from "borderline mental retardation based on the IQ test and substantiated by his educational data." Trial Tr. at 987. Finally, Dr. Chiappone stated that Petitioner had a "[l]ack of coping skills" which, along with other factors, "made it more difficult for him to effectively problem solve." Trial Tr. at 996.

As noted above, after he evaluated and tested Petitioner, Dr. Chiappone referred Petitioner to Dr. Robert Tureen, a clinical neuropsychologist at the Mayfield Neurological Institute in Cincinnati. Dr Tureen also testified in the mitigation phase of the trial. Trial Tr. at 997.

Dr. Tureen did further testing of Petitioner which showed a "longstanding type of disturbance" which he called "minimal cerebral dysfunction." Trial Tr. at 1001. Dr. Tureen testified that Petitioner had a very poor academic performance throughout his limited academic career and that "early psychological testing that was done in '68 stated there was evidence of organicity or brain damage." Trial Tr. at 1002.

As to Petitioner's level of intellectual functioning, Dr. Tureen described it as being "in the borderline to mildly retarded range." Trial Tr. at 1002. Dr. Tureen concluded that Petitioner is "an individual who's going to have some limitations on how well they're [sic] going to be able to

137

function. *** By cognitive thinking general problems involving memory, spatial and statistical skills, language usage, as well as motor skills. [sic] And on that particular exam he performed well into the impaired range. You take that performance and put it together with the IQ level and you see an individual who is going to have some sort of difficulties in adjusting in the world." Trial Tr. at 1003. He added that persons like Petitioner would have "some real limitations of what they're going to be able to do in life and what they're going to be able to accomplish." Trial Tr. at 1005. Finally, Dr. Tureen testified on cross-examination that Petitioner "was functioning in the mildly mentally retarded to borderline range." Trial Tr. at 1009.

Dr. Nelson, on page 3 of his report (Hearing Exhibit 1, March 21, 2005 Dr. Nelson Report) summarizes Dr. Chiappone's and Dr. Tureen's penalty phase mitigation testimony as follows: "It appears that Mr. O'Neal is functioning in the Mild MR to Borderline range of intelligence." Thus, Respondent's expert, Dr. Nelson, does not disagree with the diagnosis of mental retardation.

It is important to emphasize here that the WAIS-R was not the only test administered to Petitioner in 1994. Other tests were administered and Petitioner's performance on all of these tests demonstrates, as Dr. Tureen testified at the evidentiary hearing before the state trial court, a consistent pattern of significantly subaverage intellectual functioning. If Atkins had been the rule at the time of Petitioner's trial, his attorneys would have questioned Dr. Tureen with respect to the specific results of all of these tests.

Hearing Exhibit B, Dr. Tureen's July 27, 1994 report, contains this most important summary of all of the 1994 test results:

> TEST RESULTS AND INTERPRETATION: James was administered the **Wechsler Adult Intelligence Scale - R (WAIS-R) by Dr. Chippone [sic] yielding Verbal Performance and Full**

138

**scale I.Q.'s in the borderline range to mildly mentally retarded range (3rd percentile in comparison with others of his age).** The only subscale score which was significantly out of line and significantly higher than his overall average subscale scores was on the Digit Symbol subtest which reflects relatively good psychomotor speed and visual motor coordination. The general intellectual level is compatible with the academic levels reported and described above.

**On the Cognitive Status Exam (Barrett), a screening exam for cognitive, sensory, and motor functions, James obtained a score of 63 out of a possible 104 points, scores below 75 are in the impaired range.** <u>**Generally speaking, individuals who have WAIS-R I.Q. levels in the borderline to retarded range coupled with cognitive status exam scores significant [sic] below 65, as is the case here, are generally seen as having difficulties functioning in the environment in even relatively routine ways on a day to day basis as he result of impairment in brain function**</u>. If this impairment is longstanding, that is congenital as opposed to something more recently acquired, then the functioning is likely to be marginal at best. Because of difficulty adapting and adjusting, such individuals are likely to find themselves struggling in the general adaptation.

James's performance on the Wisconsin Card Sort and Porteus Mazes reflects evidence of difficulty in abstraction and problem solving. On the **Wisconsin Card Sort** in particular, there is very **high perseverative response rate**. What this reflects is an inability to learn effectively from feedback information regarding one's performance and a tendency to continually repeat the same types of behavior pattern even though there may be information provided that the behavior pattern is incorrect. In otherwords [sic], **he does not learn well from information being provided by the environment, particularly in novel situations**. On the **Porteus Mazes**, James again demonstrates **considerable difficulty in planning ahead and attempting to anticipate a course of action**. His performance level actually reaches around year 7, but even here he is struggling to perform within the acceptable limits.

Further evidence of impaired functioning is reflected on any spatial analytic task. On copying simple configurations such as a Greek cross, there is marked constructional dyspraxia, that is an inability to accurately reproduce the appropriate juxtaposition of the various spatial features of the figure. His attempt to copy the complex Rey figure resulted in even more evidence of the difficulty he has with

139

spatial analytical skills resulting in a markedly distorted copy of the figure. When he was asked to recall the figure immediately after the copy phase, he was only able to produce one or two lines of this rather intricate figure and even those were drawn incorrectly.

Finally, on the **Hooper Visual Organization Test (VOT),** a task which does not involve a motor component, but strictly involves the conceptual organization of spatial elements into recognizable wholes, **performance is in the severely impaired range.**

Brief measures of language assessment indicate that object, number, letter, and word recognition are unimpaired within the level of the patient's intellect. His auditory comprehension and expression are unimpaired. He is able to follow instructions without difficulty. His reading level is functional for routine day to day activities.

GENERAL CONCLUSIONS: This is a 39 year old male with **borderline to mildly retarded level of intellectual functioning** as reflected in previously administered psychometric measures. Current testing reflects evidence of impaired higher cortical functions such as novel reasoning, abstracting, and planning, and spatial analytical skills, while motor functions remain relatively intact.

Given the early academic records, these findings most likely reflect **a longstanding condition**.

Hearing Exhibit B, July 27, 1994 Dr. Tureen Report, at pages 2-3.

In December of 2004 Dr. Tureen again interviewed Petitioner and again administered tests. The details of the results of these tests are contained in his January 18, 2005 report:

On the **WAIS-III**, James obtained a Verbal I.Q. of 71, Performance I.Q. of 69, and **Full Scale I.Q. of 67.** The descriptions currently used rate the Performance and Full Scale I.Q. as "extremely low" and Verbal I.Q. as "borderline."

Hearing Exhibit C, January 18, 2005 Dr. Tureen Report at page 6 (emphasis added).

Dr. Tureen also had Petitioner take the **Reynolds Intellectual Scales** test:

140

> I also chose to administer the Reynolds Intellectual Scales, which is a relatively new test, but has both the advantage and disadvantage of not involving any psychomotor measures. *** The following indices are essentially I.Q. scores:
> Verbal Index = 68, 2nd percentile, 95th confidence interval 63-77 (i.e. range where true score lies)
> Non-Verbal Index = 67, 1st percentile, 95th confidence interval 62-75
> **Composite Index = 63**, 1st percentile rank, 95th confidence interval 59-70

Id., at page 7 (emphasis added).

Considering the scores that Petitioner achieved on ALL the IQ tests that have been administered from when he was 14 years old to the present, the weight of the evidence -- reasonably determined -- is that Petitioner's IQ is below 70. Taken together with Petitioner's academic performance as well as his performance on achievement tests, the evidence establishes that Petitioner has consistently suffered from significantly subaverage intellectual functioning.

<u>Significant Limitations in Two or More Adaptive Behavior Skills</u>

The third part of the constitutional test of mental retardation, as stated by the Ohio Supreme Court in <u>Lott</u>, is "significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction."

The thrust of the government's questions and argument at the evidentiary hearing was, essentially, that Petitioner does not meet the definition of mental retardation because he was able to go to school, drive a car, get married, have children, be a Marine, and hold various jobs (ignoring how poorly Petitioner generally fared in almost all of these areas).

The definition of mental retardation -- be it the definition of the American Association of Mental Retardation, the definition of the American Psychiatric Association, the constitutional definition set out by the United States Supreme Court in <u>Atkins</u>, or the definition adopted in <u>Lott</u>

141

-- does <u>not</u> require that to qualify as "mentally retarded" an offender must be profoundly mentally retarded. The execution of a person who is mildly mentally retarded is unconstitutional under <u>Atkins</u>. Indeed, the AAMR definition of "mental retardation" expressly contemplates that:

**"Within an individual, limitations often coexist with strengths."**

American Association of Mental Retardation (AAMR), Definition of Mental Retardation, What is Intelligence?, http://www.aamr.org/Policies/faq_mental_retardation.shtml (emphasis added).

The government's questions and arguments during the evidentiary hearing seemed to suggest that to be "mentally retarded" as defined by <u>Atkins</u> an offender must be profoundly mentally retarded and have significant limitations in <u>ALL</u> adaptive behavior skills. That obviously is not the law. The law is the three-part test. The question is not whether Petitioner has some strengths -- he obviously does. The question is whether Petitioner meets the three-part test, the third part pertaining to significant limitations in two or more adaptive skills.

Dr. Chiappone testified that Petitioner had a "[l]ack of coping skills" which, along with other factors, "made it more difficult for him to effectively problem solve." Trial Tr. at 996.

Dr. Nelson, who did not visit, interview, or test Petitioner, or even testify at the evidentiary hearing in support of his report, nevertheless agrees that: "It is clear that Mr. O'Neal has difficulties in dealing with stressful situations in an effective manner and does not think through the consequences of his behavior very well." Hearing Exhibit 1, March 21, 2005 Dr. Nelson Report, at page 5. While Dr. Nelson goes on to say that this same problem is experienced by "individuals who function at higher levels of intelligence," he does not deny that Petitioner's limitation in this area is evidence of a problem with his social skills or that this limitation is caused by mental retardation. Moreover, Dr. Nelson concedes that: "Mr. O'Neal does seem to exhibit significant deficits in <u>several</u> conceptual areas (i.e., reading, money concepts)." <u>Id</u>.

142

(emphasis added). Finally, Dr. Nelson says expressly that: "I would agree that Mr. O'Neal certainly has evidenced difficulties in his adaptive functioning in situations involving emotional intensity." Id. While Dr. Nelson attributes these difficulties to "psychiatric difficulties," he fails to provide any basis for concluding that these difficulties are not caused by Petitioner's mental retardation. Importantly, Dr. Nelson was not available to have his assertions cross-examined.

Dr. Tureen testified at Petitioner's October, 1995 trial (in the mitigation phase, before Atkins) that Petitioner is "an individual who's going to have some limitations on how well they're [sic] going to be able to function. *** By cognitive thinking general problems involving memory, spatial and statistical skills, language usage, as well as motor skills. [sic] And on that particular exam he performed well into the impaired range. You take that performance and put it together with the IQ level and you see an individual who is going to have some sort of difficulties in adjusting in the world." Trial Tr. at 1003.  He added that persons like Petitioner would have "some real limitations of what they're going to be able to do in life and what they're going to be able to accomplish." Trial Tr. at 1005. Finally, Dr. Tureen testified on cross-examination that Petitioner "was functioning in the mildly mentally retarded to borderline range." Trial Tr. at 1009.

At the evidentiary hearing on May 17, 2005 Dr. Tureen testified specifically in terms of the constitutional standard of mental retardation and the requirement of the third prong of the test that requires significant limitations in two or more adaptive skills. In particular, Dr. Tureen testified that Petitioner has significant limitations in conceptual as well as social skills:

> Q.  Based on your education, training, and experience and your
>     interviewing and testing of Mr. O'Neal, as well as your review
>     of his scholastic records, do you have an opinion, Dr. Tureen,
>     to a reasonable certainty as a psychologist as to **whether or
>     not Mr. O'Neal currently suffers from a disability**

143

**characterized by significant limitations in two or more adaptive skills** as expressed in conceptual, social, and practical adaptive skills, which occurred before he was age 18?

A.  Yes, I do.

Q.  What is your opinion?

A.  That he still suffers from the same level of **conceptual inability**, if you will, and **social limitations** as he did prior -- in the past.

Q.  And what **particular adaptive skills** does Mr. O'Neal suffer from a significant limitation of?

A.  First of all, there is **a significant limitation in academic skills. I would say reading, math**, but more importantly is the limitation as a result of what I initially referred to as mild cerebral dysfunction, which I believe is the cause of the **low level of intellectual function.**

Now, that particular type of disturbance that he demonstrated on our earlier testing limits his ability to consider alternative modes of dealing with situations which are stressful or which he finds in some way threatening.

Q.  And I don't have *Atkins* in front of me, I'm going from memory. Feel free to review *Atkins* if you have it in your possession. The reference in *Atkins* to adaptive skills relates to the following: Communication, self care, home living, social, community use, self direction, health and safety, functional academics, leisure, work. What you have just described, does that fall into that category of functional academics?

A.  The functional academics and social adaptive.

Q.  How does that fall into the category of **social adaptive**?

A.  **This is an individual who is going to become rigid, perseverative, not able to think of alternative ways of dealing with situations which occur particularly under stress.**

144

Q.  Does it impact the issue of whether or not Mr. O'Neal is mentally retarded if he meets two of the ten types of limitations in adaptive behavior?

A.  My understanding is that it does.

Q.  You have provided us with your opinion concerning whether or not James O'Neal is mentally retarded. Are there **gradations of mental retardation**, Doctor?

A.  Yes, there are.

Q.  Based on your education, training and experience and your interviewing and your testing of Mr. O'Neal and your review of his scholastic records, do you have an opinion to a reasonable certainty as a psychologist as to the **level of gradation of Mr. O'Neal's retardation?**

A.  Yes, I do.

Q.  What is that opinion?

A.  **He is mildly mentally retarded**.

Hearing Transcript at pages 30-33 (emphasis added).

Both the state trial court and the Court of Appeals went fundamentally awry in their attempts to apply the new constitutional rule adopted in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), where the United States Supreme Court held that a mentally retarded defendant is not subject to the death penalty, and in their efforts to apply that new constitutional rule under the procedures and standards adopted by the Ohio Supreme Court in State v. Lott (December 11, 2002), 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, to implement Atkins.

The trial court -- rather than simply observing the Atkins constitutional rule and applying the procedures and standards prescribed in Lott -- construed both the law and the facts most strongly against Petitioner.

145

It is not an exaggeration to say that the trial court reformulated the "over-70" IQ standard to require a defendant to prove IQ test scores of 64 or below to meet the standard of "significantly subaverage intellectual functioning." Nor is it hyperbole to state that the trial court reformulated the "onset-by-age-18" standard to require a defendant to prove that he had significant limitations in two or more adaptive behavior skills. Nor is it a stretch to say that the trial court recast the test of "significant limitations in two or more adaptive behavior skills" to require a defendant to prove that he is profoundly mentally retarded and without any skills and strengths whatsoever.

Not only did the trial court misunderstand and misapply the applicable legal standards, but the trial court also strained to conclude that Petitioner met none of these inventive standards by its rejecting the findings and conclusions and opinions of an expert (Dr. Robert Tureen) who actually met with Petitioner, interviewed him, evaluated him, gave him written tests, and testified under oath and was subject to cross-examination at the evidentiary hearing before the trial court in favor of an expert (Dr. Michael Nelson) who never met Petitioner, never interviewed him, never evaluated him, never gave him written tests and never testified under oath or was subjected to cross-examination at the evidentiary hearing.

The Court of Appeals, except for its rejection of the trial court's reformulation of the "over-70" IQ standard to require an IQ test score of 64, failed to correct the pervasive and fundamental errors in the trial court's decision.

Despite the fact that Petitioner raised the issue of "onset before the age of 18" on appeal to the Court of Appeals, the decision and judgment entry of the Court of Appeals is absolutely silent about the trial court's ruling on this prong of the constitutional standard for mental

retardation. <u>State of Ohio v. James Derrick O'Neal</u>, Hamilton County Court of Appeals Case No. C050840, Decision and Judgment Entry (December 1, 2006), at Appendix A-8 to A-9, ¶¶21-25.

The Court of Appeals' failure to address and to correct the trial court's erroneous reformulation of another prong of the constitutional test for mental retardation and it's failure to affirm the trial court's conclusion that Petitioner did not prove onset before age 18 was erroneous. The state court judgment is both contrary to and an unreasonable application of the standard established in <u>Atkins v. Virginia</u>.

The sentence of death imposed on Petitioner James O'Neal should be vacated under the Eighth Amendment to the United States Constitution and under the constitutional standards established by <u>Atkins v. Virginia</u>.


VI. <u>CONCLUSION</u>

For all the reasons expressed in this traverse this Court should grant Petitioner James O'Neal a writ of habeas corpus.

Petitioner is mentally retarded and should not be subject to a penalty of death. The sentence of death should be vacated.

Petitioner did not commit a trespass into the marital residence under the law of the state as it existed at the time of the offense. He was unfairly and without fair warning and due process tried under a new rule of law created by the Court of Appeals and his trial was reviewed under a yet newer rule of law created by the Ohio Supreme Court. The sentences should be vacated and the state should be required to give Petitioner a new trial.

Petitioner's grounds for relief will be augmented and elucidated by discovery and an evidentiary hearing.

147

Respectfully submitted,

_____s/John J. Gideon_____
JOHN J. GIDEON (0008151)
(Trial Counsel)
250 East Stanton Avenue
Columbus, Ohio 43214-1268
Phone: (614) 844-3954
Email: johngideon@sbcglobal.net


_____s/Michael W. Krumholtz_____
MICHAEL W. KRUMHOLTZ (0009099)
(Co-Counsel)
Bieser, Greer & Landis LLP
6 North Main Street, Suite 400
Dayton, Ohio 45402-1908
Phone: (937) 223-3277
Facsimile: (937) 223-6339
Email: mwk@bgllaw.com

COUNSEL FOR PETITIONER


VII. <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 11, 2007 I electronically filed the foregoing Traverse of

Petitioner James Derrick O'Neal with the Clerk of the Court using the CM/ECF system which

will send notification of such filing to the following: Stephen E. Maher, Assistant Attorney

General, Capital Crimes Section, 30 East Broad Street-23rd Floor, Columbus, Ohio 43215-3428.


_____s/ John J. Gideon_____
JOHN J. GIDEON (0008151)
(Trial Counsel)
250 East Stanton Avenue
Columbus, Ohio 43214-1268
Phone: (614) 844-3954
Email: johngideon@sbcglobal.net

COUNSEL FOR PETITIONER