1

2

3

4

5

6

7        IN THE UNITED STATES DISTRICT COURT

8        FOR THE SOUTHERN DISTRICT OF OHIO

9        WESTERN DIVISION AT DAYTON

10                    - - -

11   JAMES DERRICK O'NEAL,              :
                                        :
12             Petitioner,             :
                                        :
13        vs.                          :  CASE NO. 1:02-cv-357
                                        :  (Judge Barrett)
14   MARGARET BAGLEY, WARDEN,          :
                                        :
15             Respondent.             :

16                    - - -

17                  DEPOSITION

18   of KENNETH FRANCIS TAYLOR, taken before me, Carol A. Metz,

19   Registered Professional Reporter and Notary Public in and

20   for the State of Ohio at Large, pursuant to agreement of

21   counsel, as on Cross-Examination, at 3851 Germania Street,

22   in the City of Cincinnati, County of Hamilton, and State

23   of Ohio, on Monday, the 5th day of November, 2007,

24   beginning at 9:45 A.M.

25                    - - -

```
 1    APPEARANCES:

 2         On Behalf of the Petitioner(s):

 3              MICHAEL W. KRUMHOLTZ, ESQ.
                    and
 4              STEVEN DANKOF, JR., ESQ.
                BIESER, GREER & LANDIS
 5              400 National City Center
                6 North Main Street
 6              Dayton, Ohio  45402

 7
           On Behalf of the Respondent(s):
 8
                STEPHEN E. MAHER, ESQ.
 9              OFFICE OF THE OHIO ATTORNEY GENERAL
                23rd Floor, Capital Crimes
10              30 E. Broad Street
                Columbus, Ohio  43215
11                          - - -

12

13

14

15

16

17                    INDEX TO EXAMINATION

18    KENNETH FRANCIS TAYLOR                      PAGE

19         Cross-Examination by Mr. Krumholtz..........   4

20         Examination by Mr. Maher....................  19

21                          - - -

22

23

24

25
```

1

2                          EXAMINATION BY EXHIBITS

3    DEFENDANT'S EXHIBITS                                    INTRODUCED

4     A - Section 8 lease document..................     7

5                                  - -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. KRUMHOLTZ:  Why don't you swear Mr. Taylor.

2                    KENNETH FRANCIS TAYLOR

3    a witness of lawful age, being by me first duly

4    cautioned and sworn, testified on his oath as follows:

5                         - - -

6                    CROSS-EXAMINATION

7    BY MR. KRUMHOLTZ:

8          Q     Sir, would you give your full name.

9          A     Kenneth Francis Taylor.

10         Q     We are here at your home for this deposition,

11   and what is your current home address?

12         A     3851 Germania Street or Avenue -- they can't

13   figure out which -- 45227, Cincinnati, Ohio.

14         Q     How long have you lived at this address?

15         A     Oh, about 3 years, give or take a year.

16         Q     How are you currently employed, sir?

17         A     Self.  I flip houses, and I own rental property.

18         Q     Did you ever have any connection to a residence

19   at 4938 Plainville Road in Madisonville, Ohio?

20         A     Yes.

21         Q     Did you ever have an ownership interest in that

22   residence?

23         A     Yes, I did.

24         Q     In fact, were you the sole owner of that

25   particular residence?

1      A    Sole owner.  I am not sure if I had my trust

2  together then, let's see, or not.  So I was a sole owner,

3  but I might have had a trust set up by then.  I think the

4  trust was set up in '95.  So just to make it easy, we'll

5  just say yes.

6      Q    In terms of the trust, was that created for the

7  ownership of that particular location?

8      A    No, several, 14 properties at that time.

9      Q    Including the location at 4938 Plainville Road?

10     A    Yes.

11     Q    And that location at Plainville Road was in

12  Madisonville, Ohio?

13     A    Yes.

14     Q    Is that in the greater Cincinnati, Ohio, area?

15     A    Yes.

16     Q    How long did you have an ownership interest in

17  that property on Plainville Road?

18     A    How long?  From, okay, from about '81 till 2000.

19     Q    Do you know a man named James O'Neal, sometimes

20  referred to as Dirk O'Neal?

21     A    Yes.  D-I-R-K?

22     Q    D-I-R-K.

23     A    I think it was D-I-R-T.

24     Q    My understanding, it is D-I-R-K, but maybe your

25  understanding is better than mine.

1       A    Could be wrong, it doesn't matter.

2       Q    But James O'Neal is somebody that you know?

3       A    I have met him briefly, 2 or 3, 4, 5 times.

4       Q    When did you first meet James O'Neal?

5       A    On the front porch of that house there.  He and

6    his mother's boyfriend wanted to look at the house.  It

7    was a house for rent, and I would accept Section 8.  So

8    they were looking at it.

9       Q    Do you remember what year that would have been?

10      A    '81, I would say.

11      Q    Did you know Mr. O'Neal's wife, Carol O'Neal?

12      A    I have met her, yes.

13      Q    In what connection did you meet Carol O'Neal?

14      A    Same situation.

15      Q    Was it related to that property at 4938

16   Plainville Road?

17      A    Yes.

18      Q    Did you have any kind of business relationship

19   with the O'Neals relating to that property?

20      A    No -- I can't say -- yes, I guess.  They were

21   tenants.  So --

22      Q    That was my next question.  Were you the

23   landlord for James and Carol O'Neal when they lived in

24   that property at 4938 Plainville Road in Madisonville?

25      A    Yes.

1          MR. KRUMHOLTZ:  Carol, why don't you mark this

2    as Exhibit A.

3          (Marked Defendant's Exhibit A.)

4    BY MR. KRUMHOLTZ:

5      Q    Mr. Taylor, let me show you a document.  I will

6    give you a couple minutes to take a look at it.  I have

7    given a copy to Steve.

8      A    I may have never seen this.  They don't always

9    mail these to you, and it doesn't seem like they lived

10   there very long.

11     Q    Well, let me ask you this.  Go to, if you would,

12   the second to the last page of the document.

13     A    Okay.

14     Q    Does your name appear on that second to the last

15   page?

16     A    Yes.

17     Q    Does your signature appear on that page?

18     A    I signed this.  Then okay, I have seen it.

19     Q    And below your signature is another signature,

20   and can you tell us who signed in that location?

21     A    Carol O'Neal.

22     Q    And in signing this, is that an indication that

23   you would have seen the entire document?

24     A    Oh, I would say so, because I am in the habit of

25   reading documents.  I see a mistake on the date, 8-27-93,

1   and I said -- I am not sure when I said they moved in.  I

2   have no idea what their tenancy was.  I see it says I

3   signed this 8-27-93, so I signed that.  That's my

4   signature.

5       Q    Just so we are clear for our record.  What is

6   that document, sir?

7       A    This is a -- this is a Section 8 lease.  Housing

8   assistance -- they have a name for this, but it's a

9   Section 8 lease.  It's their part of the rent that is paid

10  to me.

11      Q    And is this a particular lease that dealt with

12  that property at 4938 Plainville Road in Madisonville,

13  Ohio?

14      A    I would say yes.  This probably wasn't altered

15  very much from any others that was used at the time.

16      Q    Are you shown here as the landlord on this

17  lease?

18      A    Yes.

19      Q    And does this lease indicate who the tenant or

20  tenants are for that particular residential location?

21      A    Why would it miss -- why would it list her

22  stepsons and not him?

23      Q    Well, let me ask you about that.  Does this list

24  Carol O'Neal, first of all, as the person who rented that

25  property?

```
 1        A    Well, I remember meeting both of them, but
 2   usually the woman -- typically on Section 8 the woman has
 3   the rent, what is that, the lessee.
 4        Q    Lessee?
 5        A    Lessee, because a lot of times families break
 6   up, and they want the woman to still have the house.
 7        Q    Going to that second to the last page, where
 8   Carol O'Neal signed the lease, did she do so as the
 9   tenant?
10        A    Apparently.
11        Q    Now, is there any reference -- let me refer you
12   to page 3 of the lease.  Is there any reference in the
13   lease to James O'Neal?
14        A    Page 3, I would say, yes.
15        Q    Is Mr. O'Neal, James O'Neal listed as someone
16   who will be occupying those premises along with some other
17   people?
18        A    I would say so.
19        Q    And who are the other people that are listed
20   with Mr. O'Neal, James O'Neal, as being permitted
21   occupants of the premises?
22        A    Let's see, I was under the impression he had 2
23   sons and she had 2 children.  I don't know the -- I
24   thought they were both sons, but apparently one of them
25   was a daughter.  So 3 sons -- let's see, no.  Well, yeah,
```

1    3 sons and a daughter.

2        Q    Is the relationship of James O'Neal to Carol

3    O'Neal set out in that portion of the lease?  Does it

4    indicate what his relationship is to Carol O'Neal?

5        A    Husband, yes.

6        Q    Based on your personal knowledge, Mr. Taylor,

7    was James O'Neal living at that address with Carol O'Neal

8    at any point in time before her death?

9        A    One time for sure I was over there working on

10   the furnace, and she came down to the basement and was

11   kind of watching me light the furnace, and then he was

12   home, and he came down, was talking to me.  So one time

13   for sure I saw him in the house.

14       Q    Do you know if James O'Neal had a key to that

15   residence at any time before Carol O'Neal was killed?

16       A    I would imagine.  I can't remember specifically

17   giving him a key, but then, you know, in 14 years time or,

18   you know, you are bound to forget one.

19       Q    As the landlord to different residences, are you

20   the person that gives the key to the tenants?

21       A    Let me think about Section 8.  Sometimes Section

22   8 wants you to give them the key before, before this is

23   signed, and I will never do that, because I think that's

24   bad business, but yeah, that's usually my job.

25       Q    Let me speak in general, and then I'm going to

1    go to the specific of this residence, but generally in

2    your residences where you are the landlord, if the tenant

3    asks for the locks to be changed in a residence that you

4    own, who changes the locks?  Is it done by the tenant, is

5    it done by you as the landlord, or is it a combination of

6    both?

7         A    Usually me.

8         Q    Is there a reason for that?

9         A    Well, if I do it, it will probably work, but if

10   they are kind of mechanically inclined -- look at my own

11   house here.  No dead bolt lock on the front door.  But

12   anyway, you know, if the tenant is mechanically inclined

13   and I can con him to changing the lock, I probably will,

14   but people don't usually change locks.

15        Q    Do you know regarding the residence at 4938

16   Plainville Road in Madisonville where Carol O'Neal was

17   living before her death, do you know if the locks for that

18   residence were changed at any time during the period that

19   Carol O'Neal lived there?

20        A    I'd say no, as far as I know, you know, because

21   I can remember what happened.  Did I tell you the little

22   story the other day about the locks?

23        Q    No, but go ahead.

24        A    Okay.  Well, she called me, said she was having

25   a restraining order issued against him.  This must have

```
 1    been on a Monday or a Tuesday or a Wednesday.

 2              I said, "Oh, boy, really?"

 3              And she said, "Yeah, he hit me."

 4              So she says, "Can you change the lock?"

 5              I said, "Sure."

 6              I said, "Do you want me to come right now, or do

 7    you want me to come tomorrow or whatever?"

 8              So of course, I couldn't get ahold of her,

 9    because she worked 4 jobs.  In the meantime I was

10    thinking, man, he is a co-tenant of the house.  Wouldn't

11    you be mad if you got home and your locks were changed?

12    So I couldn't get ahold of her.  I just kind of let it

13    drop.

14              Saturday night there is helicopters flying over

15    the house, she is dead, shot through the bedroom door.  So

16    you know, I didn't change the lock, but it wasn't really

17    because of my negligence, and that's kind of a tricky

18    thing to change a lock on somebody anyway.

19        Q    The person that asked you, based on what you

20    just told us, the person that asked to you change the

21    locks, that was Carol O'Neal?

22        A    Yes.

23        Q    And that was before her death?

24        A    Right.

25        Q    And based on what you just told us, you had no
```

```
 1    involvement in changing locks at that location where Carol
 2    O'Neal was living in Madisonville at any point before she
 3    was killed?
 4         A    Correct.
 5         Q    Do you know if anyone else changed the locks to
 6    that residential location from the time that Carol O'Neal
 7    called you and asked you to do it to the point that she
 8    was killed?
 9         A    Not that I am aware of, and from what I
10    understand, the front door was not locked when Mr. O'Neal
11    got there on Saturday night.  I am not even positive it
12    was a Saturday night.  I think it was, but the door was
13    not locked.  Plus, he crashed through the -- it had
14    beveled glass, and he crashed through that to get in the
15    house.  So he didn't even need a lock.
16         Q    When did you first learn that Carol O'Neal had
17    been killed?
18         A    Well, I rode by the house there.  They had just
19    opened up the Kroger's there in Mariemont, and I had these
20    chickens that they, rotisserie-baked chickens, and oh, my
21    God.  So anyway, I was on a date with this new girlfriend,
22    and right then there was helicopters and police cars.  I
23    could hardly get up to the front of the house.
24              Then there was this cop there in the front yard
25    named Bachelor, and I said, "What happened?"
```

1           He goes, "Oh, she got shot."

2           I said, "She going to be all right?"

3           He goes, "I hope so."

4           So I went home, called UC Medical Center, and

5    they said she was deceased.

6        Q    Did you have an occasion after Carol O'Neal's

7    death to examine the condition of that residential

8    location?

9        A    Yes.

10       Q    When was the first time that you did that after

11   Carol O'Neal's death?

12       A    Probably on Monday morning, because her family

13   was there.

14       Q    When you say Monday morning, would this have

15   been the Monday morning --

16       A    Following.

17       Q    -- following her death?

18       A    Yes.

19       Q    When you examined the location at 4938

20   Plainville Road on that occasion, did you notice that the

21   locks had been changed in any way?

22       A    That was the furthest thing from my mind.  I

23   can't say yes or no.  You know, you are standing around,

24   there is a bunch of children.  Then I saw her oldest son

25   was 17, and he had been pistol whipped by James.  He did a

1    good job.

2        Q    When you examined that residence that Monday

3    following Carol O'Neal's death, what was the condition of

4    the residence?  What did you notice?

5        A    Well, a lot of things.  They had 2 or 3 places

6    in the ceiling where the water had run over the bathtub,

7    and there was a hole in the back bedroom door, a bullet

8    hole, and place was just kind of a mess, you know,

9    roaches.

10       Q    What about the front door to the residence; did

11   you notice the condition of the front door at that point?

12       A    Well, the glass was gone.

13       Q    When you say the glass was gone, what kind of

14   door was that?

15       A    The door similar to my storm door, but you know.

16   an antique.  It was a beveled glass door.

17       Q    And when you say the glass was gone, was it

18   broken, or had it been removed?

19       A    Oh, it was shattered.

20       Q    Was the frame of the door damaged in any way, if

21   you can remember?

22       A    I don't think so, because I fixed that door with

23   plywood, if I remember right.

24       Q    Was there a second door beyond the door with the

25   beveled glass, or just that particular door?

```
 1        A    Just that door.

 2        Q    Sir, did you testify at the trial of James

 3   O'Neal which was held in Cincinnati?

 4        A    I don't believe so.  I will tell you why.  One

 5   reason I didn't answer whoever's letter was -- and I will

 6   tell you why.  They had a court hearing, and then I was

 7   all ready to go, nervous and everything, and then I called

 8   down there.

 9             And they said, "Oh, that was," not set aside,

10   "postponed.  Didn't they let you know?"

11             That happened several times.

12        Q    I was going to ask.  Were you ever subpoenaed to

13   testify in that particular case?

14        A    Probably.

15        Q    But in terms of actually being called in and

16   testifying at the trial, that did not occur.  Am I right?

17        A    I don't know.

18        Q    Do you remember testifying in --

19        A    No, I don't remember testifying.

20        Q    -- Mr. O'Neal's trial?

21        A    No, but that doesn't mean I wasn't subpoenaed

22   and then they postponed it.

23        Q    I understand, but in terms of actually coming to

24   court and testifying, that's something you did not do?

25        A    Not that I remember.
```

Charlene Nicholas & Associates, LLC
5136 Phillipsburg-Union Road, Englewood, OH  45322
Phone:  (937) 836-7878    Fax:  (937) 836-1718

1      Q    Before Carol O'Neal's death, had anyone told you

2   as the landlord that James O'Neal was not permitted in

3   that residence?

4      A    No.  One thing I did learn was it takes awhile

5   to issue a restraining order, and they were supposedly

6   trying to blame this on the police.

7      Q    Go ahead, we'll go off the record.  You need to

8   answer your phone.

9           (An off-the-record discussion was had.)

10     Q    We talked about giving keys to this residence to

11  the tenant, and you said you didn't know whether you did

12  that in this case or not.  In cases where you have a

13  situation like we have in this lease, where Carol O'Neal

14  has signed the lease as the tenant, but there is another

15  adult, her husband, in this case James O'Neal, who is

16  listed as an occupant of that residence, would you if you

17  were giving the keys out customarily give the tenant more

18  than one key?

19     A    Oh, yeah.

20     Q    How would that work?  What would you do?

21     A    I just give out how many they want, and

22  typically they will get copies made down at the hardware

23  store.

24     Q    So you would give them one, and then it would be

25  up to --

1    A    Or 2, so yeah, they usually get copies made.

2    Q    Did you ever receive a return of any keys to the

3  residence at 4938 Plainville Road in Madisonville after

4  Carol O'Neal's death?  Did you ever get any keys back?

5    A    I doubt it, and I don't remember.  You know, I

6  really -- the only person that probably returned the keys

7  would have been one of the families, and they, you know, I

8  don't think that thought ever occurred to them.

9    Q    Were you the person that repaired the door to

10 this residence after the death of Carol O'Neal?

11    A    Yes.

12    Q    Did you change locks to the residence at that

13 time, if you can remember?

14    A    Probably not.  I didn't figure James would need

15 it anymore.

16    Q    Let me look at one other sheet, and I may be

17 done.

18    A    I think the door is totally gone.  I think the

19 guy that rehabbed it that I sold it to, I think he

20 changed, put in what they call, my memory is, let's see,

21 pre-hung, pre-hung door.  That means it's got, you know,

22 the frame with it.

23    Q    This was, this door -- let me finish with this

24 question.  This door that you have described for us was a

25 door with a wooden frame and beveled glass in the middle

1    of the wooden frame?

2        A    Right.

3        Q    How big was the section of glass?

4        A    Not -- it didn't take up quite as much area as

5    that piece of glass there, (indicating).

6            MR. MAHER:  Can you give us foot dimensions?

7    BY MR. KRUMHOLTZ:

8        Q    That's what I was going to ask for.

9        A    3 feet by 72.

10       Q    For the glass?

11       A    That would be the door.  So let's knock off 6

12   inches on each side.  Let's knock off 10 inches at the

13   bottom and 6 inches at the top.

14       Q    That would be the dimensions?

15       A    Of the glass -- I mean, the glass was huge and

16   heavy.  So was the door.  The door, it was a beautiful

17   door.  That's why I spent quite awhile trying to restore

18   it.

19       Q    I don't have any other questions.  Steve may

20   have some questions for you.

21                           EXAMINATION

22   BY MR. MAHER:

23       Q    Tell me about that phone call.  She calls you

24   up.  What do you recollect?

25       A    Oh, you mean James called me?

1      Q    No -- no, when she called you up, when Carol
2    called you up.
3      A    You mean when she -- oh, that phone call.  I
4    thought you meant the first phone call, the initial
5    contact.
6      Q    No -- no -- no.  When she calls up, gets ahold
7    of you, says --
8      A    Just real nice, real calm.
9           She said, "Ken, can you -- can you change the
10   locks?"
11          And I said, "How come?"
12          She goes, "Oh, he hit me," she said.
13          And she says, "How soon can you do it?"
14          I said, "Immediately," because I always have
15   extra locks around.
16          So I would have done it, like I said, I would
17   have done it that night or the next day.  So she was doing
18   something that night.  The next day I called, and she
19   wasn't there.  She was at work.  She worked, that job was
20   at UDF there at Red Bank Expressway in Madison.  And so I
21   just kind of let it drop, you know.  It was just a short
22   conversation from what I remember.  She didn't seem too,
23   too scared or anything.
24     Q    Now, when she called you, was it on a Tuesday in
25   reference to she got killed Saturday?

1    A    It was either a Monday or Tuesday or Wednesday.

2    I am not exactly sure.  Seemed like it was Monday or

3    Tuesday.

4    Q    But let's say from your recollection it wouldn't

5    have been the day before?

6    A    No.

7    Q    It would have been --

8    A    Wasn't the day before, because there was a few

9    days that I sort of forgot about it, but not really, you

10    know.  You got this big problem, and all of a sudden it

11    seems like it's going away on its own, and boom, you know,

12    it didn't go away, but --

13    Q    Now, this is just your recollection.  When she

14    called you up that Tuesday, Wednesday, that type of time

15    frame, how would she have known how to get ahold of you?

16    A    She had my phone number, of course.  If you want

17    to know what date it was for sure, find out what day she

18    had that restraining order.  It wasn't issued yet, but it

19    was --

20    Q    In the works?

21    A    In the works, yeah.  If you want to know exactly

22    what day, because I imagine that day that she got the

23    restraining order in gear, that's the day she called me.

24    Q    Now, any particular reason why you think that?

25    Was it something she said?

1       A    No -- no -- well, just common sense.  I would

2   think if she was going to go through the trouble of going

3   to the police station, that immediately after that she

4   called me and would want -- I don't know.  I was kind of

5   wondering where she got the idea that a landlord is going

6   to change the locks on a husband.

7       Q    But nevertheless, she called you not, I mean,

8   just to chit-chat or --

9       A    No -- no -- no, she wanted the locks changed.

10      Q    Now, what -- I am just, just curious.  You were

11  being responsive, and you said, "Okay.  Well, Carol, when

12  do you want this done?"

13           And was it she was the one that was saying like,

14  "Hey, right away," or --

15      A    Right.

16      Q    So she said, "I want the locks changed, and I

17  want, Ken, I want them changed right away"?

18      A    She might not have said that exactly.

19      Q    Well --

20      A    But she was the one -- she definitely wanted it

21  changed.  When she wasn't there the next night, I was kind

22  of relieved because, you know, do you want to get in

23  between a fight of a husband and wife?

24      Q    I understand that.

25      A    And there is legalities of it.  I still don't

1    know them.

2        Q    I understand that.  Now, did you go over to the

3    house to change the locks?

4        A    No.

5        Q    You were --

6        A    I called, called ahead.

7        Q    Okay.  You called her house?

8        A    Right.

9        Q    And what happened?

10       A    She wasn't there.

11       Q    Did you talk to one of the kids, do you think?

12       A    I must have.

13       Q    But anyway, whoever you talked to, it wasn't

14   her?

15       A    And it wasn't James.

16       Q    It wasn't James?

17       A    Because I would have remembered that.

18       Q    Now, this is just your recollection.  When you

19   called over there, would you have called the same day she

20   called you, or would it have been like maybe the next day?

21       A    Oh, it was the next day.

22       Q    Next day?

23       A    Because I offered to do it that night or

24   immediately, and she was busy, and she said -- I said,

25   "How about tomorrow night?"

1      And she says, "Okay."

2      So I called her, wasn't there.  She might have

3  been called in to work.  That could have been.

4      Q    She would -- for you to do -- for you to change

5  the locks, you would want her at the premises; is that

6  right?

7      A    I'd prefer.

8      Q    If she would have -- when she called you the day

9  she called you and, you know, whatever you guys were

10  talking about, if she was going to be home that evening,

11  would you have changed, or would you have gone over there

12  that night?

13     A    Sure.

14     Q    Now, the door, maybe using your door as an

15  example.  Now, I know you have given us the dimensions,

16  and I understand how that beveled glass, you have thick

17  wood surrounding beveled glass, kind of an antique type

18  door.

19     A    Uh-huh.

20     Q    Now, based upon how it was broken -- well,

21  first, was it just the glass that was broken, or was the

22  actual, the little --

23     A    The wood broken?

24     Q    Was the wood broken?

25     A    I doubt it, because it was that thick,

1    (indicating).

2        Q    The wood?

3        A    Of real wood.  It wasn't some play wood.  It was

4    real wood.  It was the original door to the house.  Matter

5    of fact, when I bought the house, I found the door down in

6    the basement and I, you know, reinstalled it, but you

7    know, it was just the glass, but that was some serious

8    glass too.

9        Q    Okay.  Now, when you say that, you are talking

10   in terms of thickness?

11       A    Exactly.  Well, James -- James O'Neal was a

12   serious guy.  I mean, he was --

13       Q    Physically big, you mean?

14       A    Exactly, very strong guy.  You'd have to crash

15   through that once very hard to break it, because beveled,

16   number one, it has to be thick enough to bevel, you know.

17   You just can't take some old, you know, thin.

18       Q    Regular window glass?

19       A    Right, and bevel it.  I mean, this was real

20   thick.  Matter of fact, it was so expensive I didn't

21   replace it.  I think I just put plywood in its place, if I

22   remember right.

23       Q    Did anybody -- did you talk to anybody about the

24   actual, how James O'Neal got in, or did you say --

25       A    I must have heard it.  Somebody told me that he

```
 1    crashed through the front door, and somebody told me it

 2    wasn't locked.

 3         Q    Basically it didn't need to be crashed through

 4    to begin with?

 5         A    Right, and I guess he didn't know it was

 6    unlocked.

 7         Q    And this is just based upon what maybe somebody

 8    might have told you; is that right?

 9         A    Right -- right.

10         Q    Is it he crashed through the door because your

11    recollection is somebody told you he must have thought it

12    was locked, because it wasn't locked?

13         A    Right, correct.

14         Q    Now, the window -- if you remember that beveled

15    glass, was that totally out, or were there pieces still

16    hanging in there?

17         A    The guy that just called might know the answer

18    to that question.

19         Q    Why is that?

20         A    Because he was there.

21         Q    Is that right?

22         A    He worked for me at the time.

23         Q    Well, good for you.  So you are staying in touch

24    with your friends.  Good for you.

25         A    I know all the guys that used to work for me.
```

```
 1    Matter of fact, first guy worked for me 30 years ago, he

 2    is working for me again.

 3         Q    Good for you, yes, good for you.

 4              Do you remember anything specific about somebody

 5    saying how James got in, or is it just general

 6    recollection?

 7         A    General recollection.  Somebody must have told

 8    me that stuff, because I didn't imagine it.

 9         Q    Okay.

10         A    I can't tell you who told me or, you know.

11         Q    All right.  Well, I appreciate it, Mr. Taylor.

12              MR. KRUMHOLTZ:  Mr. Taylor, I don't have any

13    other questions for you.  You have a right to review the

14    transcript to make sure it's an accurate recording of what

15    you said, or you can waive that right where you say, hey,

16    I don't care, I don't need to see it again.  But that's up

17    to you.  Nobody here represents you, whatever you want to

18    do.

19              THE WITNESS:  Have you ever had anybody do that?

20              MR. KRUMHOLTZ:  Take a look at it to make sure

21    it's accurate?  I have people do both; people that say I

22    want to see it, and then Carol has to send it to you.  You

23    have to review it, get it back to her.  I have had people

24    waive it, say I trust in her accuracy.

25              THE WITNESS:  Can I get a copy of it and keep
```

1    it?

2                MR. KRUMHOLTZ:  To get a copy, she charges for

3    that.  That's how she makes money.  Depends on the number

4    of pages when she has transcribed it.

5                THE WITNESS:  How much would it be?

6                (An off-the-record discussion was had.)

7                MR. KRUMHOLTZ:  So based on our off-the-record

8    discussion --

9                THE WITNESS:  I don't need it.

10               MR. KRUMHOLTZ:  -- do you want to waive your

11   right to review the deposition?

12               THE WITNESS:  Right.

13               MR. KRUMHOLTZ:  All set.  Thanks for your

14   hospitality.

15               (Deposition concluded 10:17 A.M.)

16                             -  -  -

17

18

19

20

21

22

23

24

25

```
1    STATE OF OHIO            :
                             : ss      C-E-R-T-I-F-I-C-A-T-E
2    COUNTY OF MONTGOMERY    :

3         I, Carol A. Metz, Registered Professional

4    Reporter and Notary Public in and for the State of Ohio at

5    Large, duly commissioned and qualified;

6         DO HEREBY CERTIFY that the above named KENNETH

7    FRANCIS TAYLOR, was by me first sworn to testify to the

8    truth, the whole truth, and nothing but the truth; that

9    his testimony was recorded by me in stenotype and

10   thereafter reduced to typewriting; that the signature of

11   the Witness was expressly waived; and was taken at the

12   time and place hereinabove set forth, by agreement of

13   counsel as stated.

14        I FURTHER CERTIFY that I am not a relative or

15   attorney of either party, nor in any manner interested in

16   the event of the action.

17        IN WITNESS WHEREOF I have hereunto set my hand

18   and affixed my seal of office on the 7th day of November,

19   2007.

20

21

22                         _____
                           CAROL A. METZ, RPR
23                         NOTARY PUBLIC, STATE OF OHIO
                           My Commission Expires 10-30-2012
24                                  - - -

25
```

Charlene Nicholas & Associates, LLC
5136 Phillipsburg-Union Road, Englewood, OH  45322
Phone:  (937) 836-7878    Fax:  (937) 836-1718

LEASE
HAMILTON COUNTY SECTION 8 PROGRAM

Whereas, ___Kenneth Taylor_____, the landlord, agrees
to rent to ___Carol O'Neal_____, the tenant, the
dwelling unit located at ___4938 Plainville Road, Madisonville, OH 45227__,
under the Section 8 Existing Housing Program administered by the
Hamilton County Department of Community Development, the
following provisions shall apply:

### TERMS OF LEASE

The term of the Lease shall begin on _____Sept. 1, 1993_____ and
shall continue until (1) a termination of the Lease by the
landlord in accordance with paragraph (K) of this section,
(2) a termination of the Lease by the Tenant in accordance
with the Lease or by mutual agreement during the term of the
Lease, or (3) termination of the Contract by the PHA.

### HOUSING ASSISTANCE PAYMENTS OR HOUSING VOUCHER CONTRACT

The landlord will enter into a Housing Assistance Payments
or Housing Voucher Contract ("Contract") with a Public
Housing Agency ("PHA") under the Section 8 Existing Housing
Program of the U.S. Department of Housing and Urban
Development.  Under the Contract, the PHA will make housing
assistance payments to the Landlord to assist the Family, of
which the Tenant is the representative, to lease the
dwelling unit from the Landlord.

### CONFLICT WITH OTHER PROVISIONS OF THE LEASE

In case of any conflict between the provisions of this
section of the Lease and any other provisions of the Lease,
the provisions of this section shall prevail.

### RENT

1.  The amount of the total monthly
    Landlord during the term of the
    "Contract Rent") shall be determined in accordance with
    the Contract between the Landlord and the PHA.
2.  The portion of the Contract Rent payable by the Tenant
    ("Tenant Rent") shall be an amount determined by the PHA
    in accordance with HUD regulations and requirements.
    The amount of the tenant rent is subject to change as
    determined by the PHA during the term of the Lease.  Any
    change in the amount of the tenant rent will be stated
    in a written notice by the PHA to the Tenant and the
    Landlord, stating the new amount and the effective date
    of the change.  Initially and until such change the
    Tenant agrees to pay $__73.00___ per month to the
    Landlord as the tenant rent.
    The tenant rent as determined by the PHA is the maximum
    amount the Landlord can require the Tenant to pay as
    rent for the dwelling unit, including all services,
    maintenance and utilities to be provided by the Landlord
    in accordance with the Lease.
    Each month, the PHA will pay a housing assistance
    payment to the Landlord on behalf of the Tenant Family
    in accordance with the Contract.  The monthly housing
           payment is the difference between the
    Contract Rent and Tenant Rent.
    Therefore, the total rent shall be $_542.00____ per
    month.  The tenant shall pay $__73.00___ per month and
    the Hamilton County Section 8 Program shall pay
    $__469.00___ per month.
    Rent installments are due and payable on the first of
    each month in advance.  Payment shall be made to the
    Landlord or the Landlord's agent by cash, check or money
    order.
    MAKE CHECKS PAYABLE TO: (Please Print Clearly)

X _KENNETH TAYLOR_  _6226 ORCHARD LE._  _CINTI, O 45213_
    NAME                ADDRESS              ZIP CODE

DEFENDANT'S
EXHIBIT

7    If the Landlord fails to receive the Tenant's monthly
     installment on or before the fifth (5th) day of the
     month in which it is due, the Tenant shall pay to the
     Landlord a late charge of $25, unless prior written
     arrangements have been made. If the Tenant is more than
     5 days late in rent payments, the Landlord is to notify
     the Hamilton County Section 8 Program.   BE PAID ON 9-5-93

SECURITY DEPOSIT                    $82 TO

1.  The tenant has deposited $133.78 with the Landlord
    as security deposit. The Landlord will comply with
    HUD regulations regarding security deposits from a
    Tenant, and shall not collect a security deposit which
    is more than the maximum amount permitted under the
    regulations.
2.  The Landlord will hold the security deposit during the
    period the Tenant Family occupies the dwelling unit
    under the Lease. The Landlord shall comply with State
    and local laws regarding interest payments on security
    deposits.
3.  After the Tenant Family has moved from the dwelling
    unit, the Landlord may (subject to State and local laws)
    use the security deposit, including any interest on the
    deposit, as reimbursement for any rent payable by the
    Tenant or other amounts which the Tenant owes under the
    Lease. The Landlord will give the Tenant a written list
    of all items charged against the security deposit and
    the amount of each item. After deducting the amount
    used as reimbursement to the Landlord, the Landlord
    shall promptly refund the full amount of the balance to
    the Tenant.
4.  The Tenant agrees to pay rent so long as he inhabits the
    premises, to keep the apartment clean and to leave the
    apartment in a clean and rentable condition. In the
    event the Tenant pays the rent due and complies with
    such covenant and conditions, and surrenders the
    premises in good condition at the expiration of the term
    of the Lease or any such renewals or extensions, said
    sum without interest thereon, unless required by law,
    shall be returned to the Tenant, less any deductions
    made for the cost of repairing damages to the premises
    caused by the Tenant, his family, dependents, guests
    and/or visitors, reasonable wear and tear expected, or
    rent or other charges owed by the Tenant.
5.  Tenant shall, in compliance with Ohio Rev. Code 5321.16,
    provide the Landlord in writing with forwarding address
    or new address to which the Landlord shall send the list
    described in paragraph 3 above and the refund due the
    tenant (if any).
6.  The security deposit may not be used as rent payment
    while the Tenant resides on the premises.

UTILITIES AND APPLIANCES

1.  The Landlord shall pay for the following utilities
    without any additional charge to the Tenant:
        Garbage Collection

2.  The Tenant shall pay for the following utilities:
        Heat, Electric, Water/Sewer, Water Heating, Cooking Fuel

3.  The Landlord shall provide the following appliances
    without any additional charge to the Tenant:
        Range/Refrigerator

4.  The Tenant shall provide    following appliances:
        None

G.  OCCUPANCY

1.  The Tenant shall personally use and occupy the premises
    solely as a private dwelling for the people listed ___
    below:

| NAME | RELATIONSHIP |
|------|--------------|
| 1.  Carol O'Neal | Self |
| 2.  James O'Neal | Husband |
| 3.  Richardos Lee | Son |
| 4.  Sanchel Lee | Son |
| 5.  Lashawnda Lee | Daughter |
| 6.  Clarence Cody | Son |
| 7. | |
| 8. | |

2.  The Tenant may have temporary visitors.  The same
    visitor may not stay over night more than four (4) times
    within any month without written permission from the
    Landlord.

3.  The Tenant must receive written approval from the
    Landlord and the Section 8 Office for additional
    occupants prior to their occupancy.

H.  MAINTENANCE AND SERVICES

1.  The Landlord shall maintain the dwelling unit, equipment
    and appliances, and common areas and facilities, to
    provide decent, safe, and sanitary housing in accordance
    with the Housing Quality Standards (24 CFR Section
    882.109 and 887.251) for the Section 8 Existing Housing
    Program, including the provision of all the services,
    maintenance and utilities set forth in the Lease.

2.  The Landlord shall respond with reasonable promptness to
    calls for service consistent with this section, and
    normally begin repairs within 5 days, depending on the
    nature of the repair.                          ___

I.  USE OF PROPERTY

1.  The Tenant shall use the premises in such a manner as to
    comply with all local, state and federal laws.  The
    Tenant shall not use the premises or permit it to be
    used for any disorderly or unlawful purpose in any
    manner offensive to other occupants of the building.

2.  The Tenant shall not remodel or make any structural
    changes to the premises, nor shall the Tenant attach or
    remove any fixtures or locks, without the Landlord's
    prior written permission.

3.  The Landlord shall supply the Tenant's apartment with
    electric light bulbs, fuses and fluorescent starters at
    the time the Tenant moves in.  The Tenant is to furnish
    replacements thereafter and leave said replacements when
    the Tenant moves out.

4.  Pets are permitted only with written consent of the
    Landlord.

5.  No trash, trash cans or garbage receptacles shall be
    placed in patios, stoops, or public halls at any time.
    No signs, laundry or personal property shall be hung or
    placed in the public hall or on the exterior of any
    building or yard area.

6.  The Tenant shall not commit any act which will
    unreasonably interfere with the rights, comforts, or

conveniences of other tenants or occupants. The Tenant shall keep the volume of any radio, television or musical instruments sufficiently reduced at all times, so as not to disturb other occupants in the building.

7   The Landlord reserves the right to enter the unit for maintenance, to determine the condition of the unit, and to show the unit to building inspectors, appraisers, prospective buyers, etc., on reasonable notice and at reasonable times. The unit may also be shown to prospective renters after the tenant has given the Landlord notice to move.

8.  If the tenant moves out and fails to remove any of his/her personal property within 5 days, then the personal property shall be deemed abandoned.

9.  Failure of the Post Office to deliver a certified letter to the Tenant shall be considered bonafide evidence that the Tenant has vacated the unit.

J.  INVENTORY

The following equipment is now on the premises. The Leasee agrees to maintain it in its present condition, reasonable wear and tear expected:

| ITEMS | BRAND | NUMBER | COLOR | CONDITION |
|-------|-------|--------|-------|-----------|
| Refrigerator | _TENANT TO SUPPLY - OWNER FURNISHING TEMPORARY_ | | | E G F P |
| Stove | _TENANT TO SUPPLY_ " " " | | | E G F P |
| Carpet/Floor | _CARPET IN FRONT HALL & KITCHEN_ | | | NEW G F P |
| Drapes/Shades | _____ | | | E G F P |
| Cabinets | _KITCHEN_ | | | E G F P |
| Storm Windows | _IN BASEMENT (STORED)_ | | | E G F P |
| Screens | _SCREEN DOOR FRONT & REAR_ | | | E (G) F P |
| Other Items | _____ | | | E G F P |

ADDITIONAL COMMENTS: _____

_____

K.  TERMINATION OF TENANCY BY LANDLORD

1.  The Landlord shall not terminate the tenancy except for:

   i.   Serious or repeated violation of the terms and conditions of the Lease:

   ii.  Violation of Federal, State, or local law which imposes obligations on a tenant in connection with the occupancy or use of the dwelling unit and surrounding premises;

   iii. Other good cause. However, during the first year of the term of the Lease, the owner may not terminate the tenancy for "other good cause" unless the termination is based on malfeasance or nonfeasance of the Tenant Family.

   The following are some examples of "other good cause" for termination of tenancy by the Landlord. (i) failure by the Tenant Family to accept the offer of a new Lease in accordance with paragraph L of this section; (ii) Tenant Family history of disturbance of neighbors or destruction of property; or of living or housekeeping habits resulting in damage to the unit or property; (iii) criminal activity by Tenant Family members involving crimes of physical violence to persons or property or use, or distribution of controlled

substances; (iv) the Landlord's desire to utilize the unit for personal or family use or for a purpose other than use as a residential rent unit; (v) a business or economic reason for termination of tenancy (such as sale of the property, renovation of the unit, desire to rent the unit at a higher rental). This list of examples is intended as a non-exclusive statement of some situations included in "other good cause", but shall in no way be construed as a limitation on the application of "other good cause" to situations not included in the list.  The Owner may not terminate the tenancy during the first year of the term of the Lease, pursuant to paragraph K (1)(iii), for the grounds stated in paragraph K (2)(i), K (2)(iv) or K (2)(v) of this section.

3.  The Landlord may evict the Tenant from the unit only by instituting a court action.  The Landlord must notify the PHA in writing of the commencement of procedures for termination of tenancy, at the same time that the Landlord gives notice to the Tenant under State or local law.  The notice to the PHA may be given by furnishing the PHA a copy of the notice to the Tenant.

L.  RENEWAL OF LEASE/OFFER OF NEW LEASE

Prior to the anniversary date of this Lease, the Landlord shall be mailed either a Request for New Contract Rent or a Request for Lease Approval.  If a Request for New Contract Rent is sent to the Landlord, the Landlord shall request a new rent for the following year.  The requested rent must be approved by the Section 8 Office.  If a Request for Lease Approval is sent to the Landlord, the Landlord and Tenant shall utilize this form to request changes in the Lease for the following year. After approval of a proposed new Lease by the PHA in accordance with HUD regulations, the Landlord may offer the Tenant Family the proposed new Lease for execution on behalf of the Tenant Family, for a term beginning at any time after the first year of the term of this Lease.  The Landlord shall give the Tenant written notice of the offer, with copy to the PHA, at least sixty days before the proposed commencement date of the new Lease term.  The offer may specify a reasonable time limit for acceptance by the Tenant Family.

M.  TERMINATION OF LEASE BY TENANT

The Tenant may terminate the Lease without cause at any time after the first year of the term of the Lease, on not more than sixty days nor less than 30 days written notice by the Tenant to the Landlord (with copy to the PHA).  (The provisions of this subsection (M) are not intended to limit any right of the Tenant to terminate the Lease where so provided elsewhere in the Lease).

N.  DISCRIMINATION

The Landlord shall not discriminate against the Tenant Family in the provision of services, or in any other manner, on the grounds of age, race, color, creed, religion, sex, handicap, national origin, or familial status.

O.  COMBINING NOTICES

Any notice under paragraph (K), (L), or (M) of this section may be combined with and run concurrently with any notice required under State or local law.

P.  ASSISTANCE CONTRACT

This Lease has been signed by the parties on the condition that the PHA will promptly execute a Housing Assistance Payments Contract or a Housing Voucher Contract with the Landlord.  This Lease shall not become effective unless th·

PHA has executed a Housing Assistance Payments Contract or Housing Voucher Contract with the Landlord effective the first day of the term of the Lease.

Q.    PROHIBITED LEASE PROVISIONS

Not withstanding anything to the contrary contained in the Lease, any provision of the Lease which falls within the classifications below shall be inapplicable.

1.   Confession of Judgement.  Consent by the Tenant to be sued, to admit guilt, or to a judgement in favor of the Landlord in a lawsuit brought in connection with the Lease.

2.   Treatment of Property.  Agreement by the Tenant that the Landlord may take or hold the Tenant Family's property, or may sell such property without notice to the Tenant and a court decision on the rights of the parties.

3.   Excusing Landlord from Responsibility.  Agreement by the Tenant not to hold the Landlord or Landlord's agent legally responsible for any action or failure to act, whether intentional or negligent.

4.   Waiver of Legal Notice.  Agreement by the Tenant that the Landlord may institute a lawsuit without notice to tenant.

5.   Waiver of Court Proceeding for Eviction.  Agreement by the Tenant that the Landlord may evict the Tenant Family (i) without instituting a civil court proceeding in which the Family has the opportunity to present a defense, or (ii) before a decision by the court on the rights of the parties.

6.   Waiver of Jury Trial.  Authorization to the Landlord to Waive the Tenant's right to a trial by jury.

7.   Waiver of Right to Appeal Court Decision.  Authorization to the Landlord to waive the Tenant's right to appeal a court decision or to waive the Tenant's right to sue to prevent a judgement from being put into effect.

8.   Tenant Chargeable with Cost of Legal Actions Regardless of Outcome of Lawsuit.  Agreement by the Tenant to pay lawyer's fees or other legal costs whenever the Landlord decides to sue, whether or not the Tenant wins.

SIGNATURES:

LANDLORD: KENNETH TAYLOR

BY: _Kenneth Taylor_
          Signature

DATE: 8-27-93

ADDRESS: 6226 ORCHARD LE

C INTI, O                                    ZIP CODE 45213

TELEPHONE (HOME): 271-8878
          BUSINESS: 271-8878

TENANT: CAROL O'NEAL

BY: Carol O'Neal
          Signature

DATE: 8-27-93

ADDRESS: 215 E. Rochelle

                                              ZIP CODE 45219

TELEPHONE (HOME): 281-5144

          BUSINESS: 421-0378

4/92
(forms1)

6 of 6



49

# County of Hamilton

**BOARD OF COMMISSIONERS**
STEVEN J. CHABOT
JOHN S. DOWLIN
GUY C. GUCKENBERGER
COUNTY ADMINISTRATOR
DAVID J. KRINGS

DEPARTMENT OF COMMUNITY DEVELOPMENT
ROOM 607 COUNTY ADMINISTRATION BUILDING
138 EAST COURT STREET
CINCINNATI, OHIO 45202

October 19, 1993

JAMES R. LOWRY
DIRECTOR

DAN DOMIS
DEPUTY DIRECTOR

PHONES:

COMMUNITY DEVELOPMENT
(513) 632-8754

HOUSING
(513) 632-8771

NOTIFICATION OF CHANGE TO LEASE AND HOUSING ASSISTANCE PAYMENTS CONTRACT

EFFECTIVE DATE OF CHANGE: 11-1-93

OWNER'S NAME: Ken Taylor                    TENANT'S NAME: Carol O'Neal

ADDRESS: 6226 Orchard Lane                  ADDRESS: 4938 Plainville Rd.

CITY: Cincinnati  STATE: OH  ZIP: 45213     CITY: Madisonville STATE: OH  ZIP: 45227

This form serves as an amendment to the Lease and the Housing Assistance Payments
Contracts.  As a result of the information the tenant has provided to Section 8, the
following is a summary of the changes:

HOUSING ASSISTANCE PAYMENTS CONTRACT

1.  Family portion of rent.......................$ 151.00    per month
2.  Hamilton County (PHA) Assistance Payment.......$ 391.00    per month

LEASE

Amount of rent: The total rent shall be $ 542.00    per month.  The tenant
shall pay $ 151.00    per month and the Hamilton County Section 8 Program
shall pay $ 391.00    per month.

Other Changes to the Lease: Please add tenant's step sons ( Jermaine Hudson and
Cortez Hudson) to lease, they are now residing in the unit.

If the Tenant's share of rent has increased, the Tenant is eligible for an informal
hearing if the Tenant believes a mistake has been made.  To arrange an informal hearing,
the Tenant must call Susan Walsh at 632-8772 no later than November 2, 1993

Sincerely,

*Lana Mottesi*
Housing Specialist II

cc: tenant

Ex.