```
 1
 2
 3
 4
 5
 6
 7              IN THE UNITED STATES DISTRICT COURT
 8            FOR THE SOUTHERN DISTRICT OF OHIO
 9               WESTERN DIVISION AT DAYTON
10                      -  -  -
11   JAMES DERRICK O'NEAL,            :
                                      :
12            Petitioner,             :
                                      :
13       vs.                          :   CASE NO. 1:02-cv-357
                                      :   (Judge Barrett)
14   MARGARET BAGLEY, WARDEN,         :
                                      :
15            Respondent.             :
16                      -  -  -
17                     DEPOSITION
18   of JOHN TADEUS KELLER, taken before me, Carol A. Metz,
19   Registered Professional Reporter and Notary Public in and
20   for the State of Ohio at Large, pursuant to agreement of
21   counsel, as on Cross-Examination, at 2345 Kemper Lane, in
22   the City of Cincinnati, County of Hamilton, and State of
23   Ohio, on Thursday, the 13th day of December, 2007,
24   beginning at 3:05 P.M.
25                      -  -  -
```

```
1    APPEARANCES:

2         On Behalf of the Petitioner(s):

3              MICHAEL W. KRUMHOLTZ, ESQ.
                    and
4              STEVEN DANKOF, JR., ESQ.
               BIESER, GREER & LANDIS
5              400 National City Center
               6 North Main Street
6              Dayton, Ohio  45402

7
          On Behalf of the Respondent(s):
8
               STEPHEN E. MAHER, ESQ.
9              OFFICE OF THE OHIO ATTORNEY GENERAL
               23rd Floor, Capital Crimes
10             30 E. Broad Street
               Columbus, Ohio  43215
11                           - - -

12

13

14

15

16

17                   INDEX TO EXAMINATION

18   JOHN TADEUS KELLER                          PAGE

19        Cross-Examination by Mr. Krumholtz...........   4

20        Examination by Mr. Maher....................  17

21                    - - -

22

23

24

25
```

EXAMINATION BY EXHIBITS

PETITIONER'S EXHIBITS                              INTRODUCED

  1 - lease documents re Carol O'Neal...........      6

                           - - -

Charlene Nicholas & Associates, LLC
5136 Phillipsburg-Union Road, Englewood, OH  45322
Phone:  (937) 836-7878    Fax:  (937) 836-1718

```
1                       JOHN TADEUS KELLER

2       a witness of lawful age, being by me first duly

3       cautioned and sworn, testified on his oath as follows:

4                              - - -

5                         CROSS-EXAMINATION

6       BY MR. KRUMHOLTZ:

7            Q    Sir, would you tell us your full name.

8            A    John -- I will spell the middle name,

9       T-A-D-E-U-S, last name Keller, K-E-L-L-E-R.

10           Q    How are you currently employed?

11           A    I am a lawyer licensed to practice in the state

12      of Ohio.

13           Q    How long have you been licensed in Ohio?

14           A    November, 1975.

15           Q    And what is your office address currently?

16           A    2345 Kemper Lane, Cincinnati, Ohio, 45244.

17           Q    Are you in the private practice of law?

18           A    Yes.

19           Q    How long have you been in private practice?

20           A    Since -- well, I was working part time from the

21      time I passed the bar exam in November of 1975, but at

22      that point my full-time employment was as a probation

23      officer with the Adult Probation Department for Hamilton

24      County, Ohio, and then I went into full-time private

25      practice in March of 1976.
```

```
1        Q    Where did you attain your law degree?

2        A    Simon P. Chase College of Law in northern

3    Kentucky.

4        Q    Are you also licensed in the state of Kentucky

5    to practice law?

6        A    No.

7        Q    Just Ohio?

8        A    Yes.

9        Q    Did you have any involvement, Mr. Keller, in the

10   defense of James Derrick O'Neal in the Hamilton County

11   Common Pleas Court pertaining to the death of his wife,

12   Carol O'Neal?

13       A    Yes.

14       Q    What was your involvement with Mr. O'Neal?

15       A    I was one of 2 attorneys appointed to represent

16   him in that matter.

17       Q    Who was the other defense counsel that was

18   appointed to represent Mr. O'Neal?

19       A    Dale Schmidt.

20       Q    As I understand it, Mr. Schmidt has passed away?

21       A    That's correct, in the past year.

22       Q    Was there a lead counsel designated and a second

23   chair counsel designated in your defense of Mr. O'Neal?

24       A    I honestly don't recall if Dale was senior to

25   me.  So he may have been lead counsel, but I don't know
```

1    that for sure.

2         Q    Do you have a general recollection of the case

3    involving James O'Neal?

4         A    I have a general sketchy recollection.

5         Q    Let me talk to you about Mr. O'Neal's trial.  Do

6    you have a general recollection of Mr. O'Neal's trial?

7         A    Yes.

8         Q    Let me show what you has been marked as

9    Petitioner's Exhibit Number 1.

10             MR. KRUMHOLTZ:  This is a document, Steve, I

11   think you already have.

12   BY MR. KRUMHOLTZ:

13        Q    And I'll give you a minute to look at that,

14   Mr. Keller.

15        A    Okay.

16        Q    Sir, do you have any recollection of ever seeing

17   that particular document today, before today?  I'm sorry.

18        A    To the best of my recollection, no.

19        Q    Do you have any recollection as to whether a

20   lease involving the premises where Carol O'Neal lived at

21   the time of her death was introduced into evidence at the

22   trial of James O'Neal?  Do you have any recollection as to

23   whether such a lease was introduced?

24        A    I don't.

25        Q    And whether or not this particular document,

1    which is I will represent to you a lease involving those

2    premises, whether that was introduced at Mr. O'Neal's

3    trial, do you know either way as we talk about it today?

4        A    No.

5        Q    At page, I think it's the third page of this

6    particular document that's marked as Petitioner's Exhibit

7    Number 1, there is a listing of people who are permitted

8    to occupy the residence where Carol O'Neal was living at

9    the time of her death, which includes James O'Neal as her

10   husband.  Do you see where I am referencing?

11       A    Yes.

12       Q    Do you have any recollection as we talk about

13   Mr. O'Neal's trial today, in 2007, whether any

14   documentation like this was introduced at trial which

15   shows that James O'Neal was permitted by the terms of the

16   lease to be a resident of the residence where his wife,

17   Carol, was living at the time of her death?

18       A    I remember, to the best of my recollection, he

19   and his 2 sons had been listed as parties permitted to

20   live at that residence.  Beyond that, I can't speak.

21       Q    Okay, just to make sure I understand what your

22   recollection is.  I understand we are talking today, some

23   years after the trial of Mr. O'Neal.  As we talk about it

24   today, do you remember any documentation that was

25   introduced into evidence at that trial which showed that

1    Mr. O'Neal, James O'Neal, was a permitted resident of the

2    location where Carol O'Neal lived at the time of her

3    death?

4         A    No, I can't even remember if that was a disputed

5    claim.

6         Q    Okay.  Do you remember from the standpoint of

7    being one of Mr. O'Neal's defense counsel whether there

8    was a tactical reason on the part of the defense not to

9    introduce this particular document, which is marked as

10   Petitioner's Exhibit 1, at the trial of Mr. O'Neal?  Do

11   you remember anything like that, where there was a

12   tactical reason on your part as defense counsel not to

13   introduce this particular document, assuming that it was

14   not introduced at trial?

15        A    No.

16        Q    Mr. Keller, do you know if any evidence, or do

17   you remember if any evidence was introduced at James

18   O'Neal's trial indicating that Carol O'Neal or anyone else

19   had changed the locks to that residence at 4938 Plainville

20   Road in Madisonville, Ohio, prior to Carol O'Neal's death?

21        A    I believe that she may have changed the locks

22   after she threw him out, but prior to her death, and that

23   was within a short period of time, 5 days, 4 days,

24   somewhere in there.

25        Q    And again, just to basically inquire about what

1   you remember.  Do you remember that that was evidence that

2   came forth through a particular witness, or was that

3   evidence that was revealed through documentation of some

4   kind?

5       A    That I can't remember.

6       Q    In defending Mr. O'Neal, did you ever talk to

7   the landlord or the owner of the residence at 4938

8   Plainville Road in Madisonville, Ohio, a man named Kenneth

9   Taylor?  Do you remember ever talking to him?

10      A    No.

11      Q    Did you have an investigator that was working

12  with you when you were defending Mr. O'Neal in this

13  capital case?

14      A    Not to the best of my recollection.

15      Q    Do you have any knowledge about Mr. Schmidt and

16  whether he ever spoke with Kenneth Taylor in his

17  representation, his co-representation of James O'Neal?

18      A    No.

19      Q    Is it fair to say based on your best

20  recollection, you have no memory of ever talking or

21  interviewing, ever talking with or ever interviewing

22  Mr. Taylor?

23      A    That would be a fair statement.

24      Q    Do you have any recollection as to whether the

25  defense on behalf of Mr. O'Neal ever subpoenaed Mr. Taylor

1    to appear at Mr. O'Neal's trial?

2        A    No recollection of that.

3        Q    Do you have any recollection, as you think upon

4    what happened at Mr. O'Neal's trial, whether Mr. Taylor

5    actually came to trial and gave testimony?

6        A    I don't remember that.

7        Q    Assuming that Mr. Taylor did not testify at

8    trial, was there any kind of a tactical determination on

9    the part of Mr. Schmidt and yourself as defense counsel

10   not to call Mr. Taylor, the landlord, the owner of the

11   premises, to trial?

12       A    You are asking me in the negative.

13       Q    Right.

14       A    I don't remember ever speaking with him, so I

15   wouldn't have ever come to that conclusion.

16       Q    Okay.  Was there any evidence, as you recall,

17   presented at Mr. O'Neal's trial by the defense indicating

18   that Mr. O'Neal had a key to the residence at 4938

19   Plainville Road in Madisonville, Ohio?  This is a

20   residence where Carol O'Neal was living at the time of her

21   death.  Was there any evidence that was presented by the

22   defense at Mr. O'Neal's trial indicating that Mr. O'Neal

23   had a key to that residence at any time leading up to

24   Mrs. O'Neal's death?

25       A    Well, at any time, meaning from the time he

1  moved in?

2      Q  Yes -- yes.

3      A  I don't recall any evidence.  My assumption was

4  that he did, because he and the boys came and went.

5      Q  Was there any evidence that, at any point before

6  Mrs. O'Neal's death that James O'Neal had a key to the

7  residence and had that key taken away from him by somebody

8  else?

9      A  Not that I recall.

10      Q  Was there any evidence at Mr. O'Neal's trial

11  presented either by the State or the defense indicating

12  what items were found in his possession at the time of his

13  arrest following the death of Carol O'Neal?

14      A  I don't recall.  All I remember is he was hiding

15  at a house in close proximity to that residence.

16      Q  Was there any evidence at Mr. O'Neal's trial

17  that you can recall indicating that Carol O'Neal had taken

18  a key to the residence at 4938 Plainville Road from James

19  O'Neal, that she had actually taken a key from him before

20  her death?

21      A  Not that I recall.  All I remember is they had

22  an altercation.  She told him to take, that he and the 2

23  boys were to leave, and shortly thereafter he and the boys

24  exited, got on a bus and went downtown.

25      Q  Based on the answer that you gave me just a few

1   moments ago, I think I know the answer to my next

2   question, but let me ask it to make sure that I understand

3   your answer.

4           As you recall the trial of Mr. O'Neal, did the

5   defense present any evidence at the trial that the locks

6   at Mrs. O'Neal's residence, the place where she was

7   killed, had not been changed before the death of Carol

8   O'Neal, any evidence presented by the defense that in fact

9   the locks had not been changed prior to her death?

10      A    Not that I recall.

11      Q    Prior to your work defending Mr. O'Neal, what

12  was your experience in defending capital cases?

13      A    I had been doing capital cases, I believe,

14  since -- I started in 1984 or 1985.

15      Q    How many capital cases had you defended at trial

16  before your work on Mr. O'Neal's case, if you can

17  remember?

18      A    I honestly can't remember.

19      Q    Assume for me that at a series of pretrial

20  hearings in the James O'Neal case -- in fairness to you,

21  I'm not sitting here with the trial transcript or pretrial

22  hearing transcripts, but I want you to assume for me,

23  Mr. Keller, if you would, that at pretrial proceedings and

24  oral hearings before trial the State suggested to the

25  Court that the locks at Mrs. O'Neal's home, the residence

1    where she was killed, had been changed from the time that

2    James O'Neal was kicked out of the residence and before

3    Carol O'Neal was killed.  Assume that is true.  Was there

4    any tactical decision on the part of the defense team for

5    Mr. O'Neal not to challenge that suggestion by the

6    prosecution?

7        A    You know, I simply can't remember.  I think the

8    issue was, one of the issues was whether or not the

9    parties were lawfully married.

10       Q    And do you remember how that played out at the

11   trial, that issue?

12       A    I recall, I think I presented to the Court

13   actually the first time when the case was dismissed and

14   then was referred to the court of appeals, I got a

15   marriage license or marriage certificate evidencing that

16   he and the decedent had been lawfully married.

17       Q    Assume for me again -- and I don't have the

18   transcript that you are able to review as we talk today,

19   so please just assume for the sake of my question that

20   this is a correct statement of what occurred at trial.

21   Assume that in opening statement at trial the State

22   through the prosecutors argued that Carol, or stated that

23   Carol O'Neal took James O'Neal's key from him when she

24   kicked him out of the residence prior to her death.

25   Assume that is what the State stated in the course of

1    opening statement.  With that assumption, assume further

2    that no objection was made to that portion of the State's

3    opening statement.

4            Do you remember any tactical decision on the

5    part of the defense team not to object or challenge the

6    State's claim that Carol O'Neal had taken a key from James

7    to the residence before Carol was killed?

8        A    I have no recollection of that.

9        Q    Assume in closing argument at trial that the

10   State through the prosecution contended that the evidence

11   established that James O'Neal did not have a key.

12       A    I'm sorry, assume that --

13       Q    Assume that at the closing argument at the trial

14   of James O'Neal.

15       A    By whom, closing argument by?

16       Q    By the prosecution.  I'm sorry.

17       A    Okay.

18       Q    Let me restate it, because it was confusing.

19            Assume at closing argument by the State at

20   Mr. O'Neal's trial the prosecutor contended that that

21   evidence said or indicated that James O'Neal did not have

22   a key to the premises.  Assume that the trial evidence did

23   not speak to that issue, did not establish whether he had

24   a key or did not.  Assume that no objection was raised to

25   that part of the prosecution's closing argument.

1          Do you remember whether there was a tactical

2     decision on the part of the defense team not to object to

3     that portion of the prosecution's closing argument?

4          A     No, I have no recollection of any of closing

5     arguments.

6          Q     Do you have any recollection -- again, in

7     fairness to you, I'm not here with the instructions that

8     were given by the Court to the jury at the time of

9     Mr. O'Neal's trial.  But in terms of what you remember, do

10    you have any recollection of the Court referring to the

11    premises where Carol O'Neal was killed as the wife's

12    residence?  Do you have any recollection of that either

13    way?

14         A     No.

15         Q     If the Court indicated in the course of its

16    instructions to the jury that the residence where Carol

17    O'Neal was killed was the wife's residence, and if that

18    statement of the Court, if that instruction of the Court

19    was not objected to by defense counsel, assuming that, was

20    there some tactical decision made by the defense team that

21    you remember which led you to refrain from objecting to

22    that instruction or that statement by the Court?

23         A     Not that I remember.

24         Q     I said an hour, and I think I am down to my last

25    question.

1    A    Okay.

2    Q    Lastly, do you have any recollection of the use

3    of the word "estranged" by the Court in instructing the

4    jury in the case of James O'Neal as it related to Carol

5    O'Neal's relationship with James O'Neal?

6    A    No.

7    Q    If you assume that the Court used that term,

8    "estranged," to describe the relationship between Carol

9    O'Neal and James O'Neal, and if you assume that no

10   objection was made to the use of that term, do you

11   remember any tactical decision on the part of the defense

12   team not to object to the Court's use of the term

13   "estranged" relating to Carol O'Neal and James O'Neal and

14   their relationship?

15   A    No, I would have to look at what the legal

16   definition of estranged is.

17   Q    Do you -- last question.  Do you remember

18   looking at that definition of the term "estranged" during

19   the course of Mr. O'Neal's trial or in preparing for that

20   trial?

21   A    All I remember is that the issue of a legal

22   marriage was raised, and it may have even been by the

23   judge.

24   Q    Mr. Keller, I don't have any other questions for

25   you.  Steve may have some questions.

```
 1        A     Okay.

 2                          EXAMINATION

 3   BY MR. MAHER:

 4        Q     Mr. Keller, my name is Steve Maher.  I am with

 5   the Attorney General's Office.

 6               How did Mr. O'Neal get in the house just before

 7   he killed the Mrs.?

 8        A     My recollection is that she was coming down the

 9   stairs with some of his belongings that were boxed up when

10   he kicked the door in.  That's my recollection, and she

11   ran up the stairs, put her 3 children in a closet, and

12   then ran behind the door of the room in which she had

13   entered and was hiding behind that door.

14        Q     What -- tell me about the kicking in the door.

15        A     I think that's all I remember.  That's my

16   recollection though.  I can't -- as I sit here today, 12

17   years or 13 years later, I don't know whether that's

18   accurate or not.  That's my recollection of what had

19   occurred.

20        Q     What about the kicking out part?  Kind of we got

21   a kicking in of the door, but then now what about the

22   kicking out?  What about the Mrs., or the woman kicking

23   James out?  What do you remember about that?

24        A     That they had, "they" being James O'Neal and the

25   decedent, had a verbal altercation which, as I recall,
```

1    turned physical, and I remember he was very upset, "he"

2    being James O'Neal, after the fact he was explaining that

3    she was disrespecting him, but she had told both he and

4    the 2 children to leave, to get out of the house.

5        Q    His 2 children?

6        A    His -- he had 2 biological children, whom my

7    recollection is that he had lawful custody.  I think he

8    had, as I recall, he may have had 10 children or fathered

9    10 children, but he had taken these children because there

10   were problems with the biological mother, and had

11   established this residence with the decedent, brought his

12   2 kids and her 3 kids.  So it was a blended family.

13       Q    Now, the kicking out part, the kicking out of

14   Mr. O'Neal in relation to the kicking in of the door,

15   what's the time frame?

16       A    I believe it was 4 or 5 days from the date he

17   left to the date he returned and the shooting occurred.

18       Q    Okay.  Now, with this context, now that it's

19   relatively fresh in your head, you have kind of brought

20   yourself back to it, tell me what you think as a defense

21   attorney about a burglary spec in this context, felony

22   murder by reason of burglary.  Give me your thoughts as a

23   defense attorney about a felony murder burglary spec,

24   death spec in this context.

25       A    I believe the first time that we argued this

1    case before Judge Winkler, we raised the issue that you

2    couldn't be convicted.  Could obviously be charged, but

3    you shouldn't be convicted of an aggravated burglary where

4    the parties -- and that's where the marriage.  They were

5    lawfully married, although he had left.  I may have even

6    given the example, if my wife -- and I may have -- when my

7    wife and I, I left in the morning, I was pissed, told her

8    to go pound salt, and she said, "Get out."  When I came

9    home that night, if she had changed the locks, I could

10   kick the door in, because I didn't believe that that was

11   an aggravated burglary.

12          I remember that she had, "she" being Carol, had

13   filed a domestic violence charge with a TPO attached to

14   it, but it had never been served upon him, and my

15   recollection is -- I don't know why I remember this, but

16   the night of the homicide, homicide detectives went to

17   Judge Mestamaker, and somehow they tried to right the fact

18   that they hadn't served the TPO personally upon Mr. O'Neal

19   until after the fact.  So we were arguing, and that

20   triggers my recollection that Judge Winkler -- and this is

21   Ralph Winkler, Sr., because now there is a Ralph Winkler,

22   Jr.

23          Ralph Winkler, Sr., had said, "Unless you can

24   prove that there is a lawful marriage, that this is not a

25   common law" -- and common law was struck down I think in

1    1991 in Ohio -- "that I am not going to buy that

2    argument."

3        I went early in the morning once and got one of

4    the people in probate court to go through the records,

5    which sometimes is not an easy thing to get them to do

6    that, but we had a certified copy of the marriage

7    certificate.  I recall that, I think.

8        Q    Okay.  Now, correct me if I am wrong.  It sounds

9    to me like you recognized an issue, a defense issue in

10    regards to the burglary spec, and you attacked the

11    burglary spec.  The validity of the burglary spec was

12    attacked by you guys pretrial.

13        A    Correct, which resulted in the judge throwing

14    out that specific spec, and as an afterthought, at the end

15    of trial the second spec was thrown out, attempting to

16    kill 2 or more, because it was the stepson.  And as I

17    recall, that spec was dismissed at the trial.  The irony

18    of that was had the aggravated burglary been dismissed the

19    second time around, so to speak, they would have knocked

20    out both of the specs.

21        Q    Beat both the specs?

22        A    Correct, and it was Judge -- I remember, because

23    I didn't like her opinion -- Bettman wrote the opinion

24    from a court of appeals just saying that, as I recall, you

25    had to take additional information, you had to get

1  additional information at trial, which I thought we had,

2  but obviously we wouldn't be here if we had done that.

3  So --

4       Q    Now, let me see if I have got this right.  Of

5  course, correct me if I am wrong.  You guys attacked the

6  burglary spec and beat it, and then although you beat it,

7  you wound up, it got reinstated?

8       A    Correct, with I think instructions from the

9  court of appeals to take additional evidence, my

10 recollection is, as it related to the burglary.

11      Q    Okay.  So at least sounds to me like you did not

12 fall asleep at the switch in terms of recognizing an issue

13 about the burglary spec and then attacking the burglary

14 spec?

15      A    I think that would be a fair statement.

16      Q    You were on the job --

17      A    Correct.

18      Q    -- for that?  Okay.  Now, same context.  Tell me

19 what your thoughts are as a defense attorney about whether

20 or not, whether or not the Mr. had a key.  Does it make a

21 difference to you?  Does it not make a difference in terms

22 of kicking in the door and the burglary spec?  The same

23 context.  Does it make a difference to you as a defense

24 attorney whether or not the Mr. would have had a key

25 hypothetically in his pocket?

1      A    Well, my sense was that now -- I can't remember

2   what I thought back then, but my sense today would be it

3   wouldn't make a difference.  It was a matter of whether or

4   not the parties had established separate residences.

5   Clearly if there had been a TPO in effect, it wouldn't

6   matter how he got into the house; in effect, having been

7   served upon him.  The fact that he kicked -- whether he

8   had a key when he left the residence and came back a

9   couple days later doesn't have as much importance to me as

10  apparently it does to counsel.

11     Q    To Mr. Krumholtz.

12          MR. KRUMHOLTZ:  Story of my life.

13          THE WITNESS:  With all due respect.

14          MR. KRUMHOLTZ:  I appreciate that.

15          MR. MAHER:  That's about all I have.

16          MR. KRUMHOLTZ:  I don't have anything else.

17  Mr. Keller, you are, I am sure, familiar with the process.

18  You have a right to review Carol's recording of your

19  testimony to make sure it's accurate, or you can waive

20  that right.  Completely up to you.

21          THE WITNESS:  I would want to review it.  I

22  wouldn't be doing my job if I said I'm going to waive it.

23          (Deposition concluded 3:40 P.M.)

24  _____

                     JOHN TADEUS KELLER

25
    CAM

```
 1   STATE OF OHIO            :
                              : ss     C-E-R-T-I-F-I-C-A-T-E
 2   COUNTY OF MONTGOMERY     :

 3              I, Carol A. Metz, Registered Professional

 4   Reporter and Notary Public in and for the State of Ohio at

 5   Large, duly commissioned and qualified;

 6              DO HEREBY CERTIFY that the above named JOHN

 7   TADEUS KELLER, was by me first sworn to testify to the

 8   truth, the whole truth, and nothing but the truth; that

 9   his testimony was recorded by me in stenotype and

10   thereafter reduced to typewriting; and was taken at the

11   time and place hereinabove set forth, by agreement of

12   counsel as stated.

13              I FURTHER CERTIFY that I am not a relative or

14   attorney of either party, nor in any manner interested in

15   the event of the action.

16              IN WITNESS WHEREOF I have hereunto set my hand

17   and affixed my seal of office on the 17th day of December,

18   2007.

19

20

21              _____
                CAROL A. METZ, RPR
22              NOTARY PUBLIC, STATE OF OHIO
                My Commission Expires 10-30-2012
23                      - - -

24

25
```

Whereas, _____Kenneth Taylor_____, the landlord, agrees
to rent to _____Carol O'Neal_____, the tenant, the
dwelling unit located at ___4938 Plainville Road, Madisonville, OH 45227___,
under the Section 8 Existing Housing Program administered by the
Hamilton County Department of Community Development, the
following provisions shall apply:

TERMS OF LEASE

The term of the Lease shall begin on _____Sept. 1, 1993_____ and
shall continue until (1) a termination of the Lease by the
landlord in accordance with paragraph (K) of this section,
(2) a termination of the Lease by the Tenant in accordance
with the Lease or by mutual agreement during the term of the
Lease, or (3) termination of the Contract by the PHA.

HOUSING ASSISTANCE PAYMENTS OR HOUSING VOUCHER CONTRACT

The landlord will enter into a Housing Assistance Payments
or Housing Voucher Contract ("Contract") with a Public
Housing Agency ("PHA") under the Section 8 Existing Housing
Program of the U.S. Department of Housing and Urban
Development. Under the Contract, the PHA will make housing
assistance payments to the Landlord to assist the Family, of
which the Tenant is the representative, to lease the
dwelling unit from the Landlord.

CONFLICT WITH OTHER PROVISIONS OF THE LEASE

In case of any conflict between the provisions of this
section of the Lease and any other provisions of the Lease,
the provisions of this section shall prevail.

RENT

1. The amount of the total monthly
   Landlord during the term of the
   "Contract Rent") shall be determined in accordance with
   the Contract between the Landlord and the PHA.
2. The portion of the Contract Rent payable by the Tenant
   ("Tenant Rent") shall be an amount determined by the PHA
   in accordance with HUD regulations and requirements.
   The amount of the tenant rent is subject to change as
   determined by the PHA during the term of the Lease. Any
   change in the amount of the tenant rent will be stated
   in a written notice by the PHA to the Tenant and the
   Landlord, stating the new amount and the effective date
   of the change. Initially and until such change the
   Tenant agrees to pay $__73.00____ per month to the
   Landlord as the tenant rent.
   The tenant rent as determined by the PHA is the maximum
   amount the Landlord can require the Tenant to pay as
   rent for the dwelling unit, including all services,
   maintenance and utilities to be provided by the Landlord
   in accordance with the Lease.
   Each month, the PHA will pay a housing assistance
   payment to the Landlord on behalf of the Tenant Family
   in accordance with the Contract. The monthly housing
              payment is the difference between the
   Contract Rent and Tenant Rent.
   Therefore, the total rent shall be $ 542.00_____ per
   month. The tenant shall pay $__73.00____ per month and
   the Hamilton County Section 8 Program shall pay
   $ 469.00_____ per month.
   Rent installments are due and payable on the first of
   each month in advance. Payment shall be made to the
   Landlord or the Landlord's agent by cash, check or money
   order.
   MAKE CHECKS PAYABLE TO: (Please Print Clearly)

X KENNETH TAYLOR  6226 ORCHARD LE.  CINTI, O 45213
  NAME              ADDRESS                    ZIP CODE

EXHIBIT
Petitiona
# 1

1 of 6

7   If the Landlord fails to receive the Tenant's monthly installment on or before the fifth (5th) day of the month in which it is due, the Tenant shall pay to the Landlord a late charge of $25 , unless prior written arrangements have been made. If the Tenant is more than 5 days late in rent payments, the Landlord is to notify the Hamilton County Section 8 Program. *TO BE PAID ON 9-5-93*

SECURITY DEPOSIT

1.  The tenant has deposited $133 $82 *TO BE PAID ON 9-5-93* with the Landlord as    security deposit.  The Landlord will comply with HUD regulations regarding security deposits from a Tenant, and shall not collect a security deposit which is more than the maximum amount permitted under the regulations.

2.  The Landlord will hold the security deposit during the period the Tenant Family occupies the dwelling unit under the Lease.  The Landlord shall comply with State and local laws regarding interest payments on security deposits.

3.  After the Tenant Family has moved from the dwelling unit, the Landlord may (subject to State and local laws) use the security deposit, including any interest on the deposit, as reimbursement for any rent payable by the Tenant or other amounts which the Tenant owes under the Lease.  The Landlord will give the Tenant a written list of all items charged against the security deposit and the amount of each item.  After deducting the amount used as reimbursement to the Landlord, the Landlord shall promptly refund the full amount of the balance to the Tenant.

4.  The Tenant agrees to pay rent so long as he inhabits the premises, to keep the apartment clean and to leave the apartment in a clean and rentable condition.  In the event the Tenant pays the rent due and complies with such covenant and conditions, and surrenders the premises in good condition at the expiration of the term of the Lease or any such renewals or extensions, said sum without interest thereon, unless required by law, shall be returned to the Tenant, less any deductions made for the cost of repairing damages to the premises caused by the Tenant, his family, dependents, guests and/or visitors, reasonable wear and tear expected, or rent or other charges owed by the Tenant.

5.  Tenant shall, in compliance with Ohio Rev. Code 5321.16, provide the Landlord in writing with forwarding address or new address to which the Landlord shall send the list described in paragraph 3 above and the refund due the tenant (if any).

6.  The security deposit may not be used as rent payment while the Tenant resides on the premises.

UTILITIES AND APPLIANCES

1.  The Landlord shall pay for the following utilities without any additional charge to the Tenant:
    Garbage Collection

2.  The Tenant shall pay for the following utilities:
    Heat, Electric, Water/Sewer, Water Heating, Cooking Fuel

3.  The Landlord shall provide the following appliances without any additional charge to the Tenant:
    Range/Refrigerator

4.  The Tenant shall provide     following appliances:
    None

of 6

G.   OCCUPANCY

1.   The Tenant shall personally use and occupy the premises
     solely as a private dwelling for the people listed
     below:

|      | NAME | RELATIONSHIP |
|------|------|--------------|
| 1.   | Carol O'Neal | Self |
| 2.   | James O'Neal | Husband |
| 3.   | Richardos Lee | Son |
| 4.   | Sanchel Lee | Son |
| 5.   | Lashawnda Lee | Daughter |
| 6.   | Clarence Cody | Son |
| 7.   |      |      |
| 8.   |      |      |

2.   The Tenant may have temporary visitors. The same
     visitor may not stay over night more than four (4) times
     within any month without written permission from the
     Landlord.
3.   The Tenant must receive written approval from the
     Landlord and the Section 8 Office for additional
     occupants prior to their occupancy.

H.   MAINTENANCE AND SERVICES

1.   The Landlord shall maintain the dwelling unit, equipment
     and appliances, and common areas and facilities, to
     provide decent, safe, and sanitary housing in accordance
     with the Housing Quality Standards (24 CFR Section
     882.109 and 887.251) for the Section 8 Existing Housing
     Program, including the provision of all the services,
     maintenance and utilities set forth in the Lease.
2.   The Landlord shall respond with reasonable promptness to
     calls for service consistent with this section, and
     normally begin repairs within 5 days, depending on the
     nature of the repair.

I.   USE OF PROPERTY

1.   The Tenant shall use the premises in such a manner as to
     comply with all local, state and federal laws. The
     Tenant shall not use the premises or permit it to be
     used for any disorderly or unlawful purpose in any
     manner offensive to other occupants of the building.
2.   The Tenant shall not remodel or make any structural
     changes to the premises, nor shall the Tenant attach or
     remove any fixtures or locks, without the Landlord's
     prior written permission.
3.   The Landlord shall supply the Tenant's apartment with
     electric light bulbs, fuses and fluorescent starters at
     the time the Tenant moves in. The Tenant is to furnish
     replacements thereafter and leave said replacements when
     the Tenant moves out.
4.   Pets are permitted only with written consent of the
     Landlord.
5.   No trash, trash cans or garbage receptacles shall be
     placed in patios, stoops, or public halls at any time.
     No signs, laundry or personal property shall be hung or
     placed in the public hall or on the exterior of any
     building or yard area.
6.   The Tenant shall not commit any act which will
     unreasonably interfere with the rights, comforts, or

conveniences of other tenants or occupants. The Tenant shall keep the volume of any radio, television or musical instruments sufficiently reduced at all times, so as not to disturb other occupants in the building.

7   The Landlord reserves the right to enter the unit for maintenance, to determine the condition of the unit, and to show the unit to building inspectors, appraisers, prospective buyers, etc., on reasonable notice and at reasonable times. The unit may also be shown to prospective renters after the tenant has given the Landlord notice to move.

8.  If the tenant moves out and fails to remove any of his/her personal property within 5 days, then the personal property shall be deemed abandoned.

9.  Failure of the Post Office to deliver a certified letter to the Tenant shall be considered bonafide evidence that the Tenant has vacated the unit.

J.  INVENTORY

The following equipment is now on the premises. The Leasee agrees to maintain it in its present condition, reasonable wear and tear expected:

| ITEMS | BRAND | NUMBER | COLOR | CONDITION |
|---|---|---|---|---|
| Refrigerator | *Tenant To Supply - Owner Furnishing Temporarily* | | | E G F P |
| Stove | *Tenant To Supply* " " " | | | E G F P |
| Carpet/Floor | *Carpet in Front Hall & Kitchen* | | | NEW G F P |
| Drapes/Shades | — | | | E G F P |
| Cabinets | *Kitchen* | | | E G F P |
| Storm Windows | *in Basement (Stored)* | | | E G F P |
| Screens | *Screen Door Front & Rear* | | | E (G) F P |
| Other Items | | | | E G F P |

ADDITIONAL COMMENTS: _____

_____

K.  TERMINATION OF TENANCY BY LANDLORD

1.  The Landlord shall not terminate the tenancy except for:

   i.   Serious or repeated violation of the terms and conditions of the Lease:

   ii.  Violation of Federal, State, or local law which imposes obligations on a tenant in connection with the occupancy or use of the dwelling unit and surrounding premises;

   iii. Other good cause. However, during the first year of the term of the Lease, the owner may not terminate the tenancy for "other good cause" unless the termination is based on malfeasance or nonfeasance of the Tenant Family.

   The following are some examples of "other good cause" for termination of tenancy by the Landlord. (i) failure by the Tenant Family to accept the offer of a new Lease in accordance with paragraph L of this section; (ii) Tenant Family history of disturbance of neighbors or destruction of property; or of living or housekeeping habits resulting in damage to the unit or property; (iii) criminal activity by Tenant Family members involving crimes of physical violence to persons or property or use, or distribution of controlled

4 of 6.

substances; (iv) the Landlord's desire to utilize the unit for personal or family use or for a purpose other than use as a residential rent unit; (v) a business or economic reason for termination of tenancy (such as sale of the property, renovation of the unit, desire to rent the unit at a higher rental). This list of examples is intended as a non-exclusive statement of some situations included in "other good cause", but shall in no way be construed as a limitation on the application of "other good cause" to situations not included in the list. The Owner may not terminate the tenancy during the first year of the term of the Lease, pursuant to paragraph K (1)(iii), for the grounds stated in paragraph K (2)(i), K (2)(iv) or K (2)(v) of this section.

3. The Landlord may evict the Tenant from the unit only by instituting a court action. The Landlord must notify the PHA in writing of the commencement of procedures for termination of tenancy, at the same time that the Landlord gives notice to the Tenant under State or local law. The notice to the PHA may be given by furnishing the PHA a copy of the notice to the Tenant.

L.   RENEWAL OF LEASE/OFFER OF NEW LEASE

Prior to the anniversary date of this Lease, the Landlord shall be mailed either a Request for New Contract Rent or a Request for Lease Approval. If a Request for New Contract Rent is sent to the Landlord, the Landlord shall request a new rent for the following year. The requested rent must be approved by the Section 8 Office. If a Request for Lease Approval is sent to the Landlord, the Landlord and Tenant shall utilize this form to request changes in the Lease for the following year. After approval of a proposed new Lease by the PHA in accordance with HUD regulations, the Landlord may offer the Tenant Family the proposed new Lease for execution on behalf of the Tenant Family, for a term beginning at any time after the first year of the term of this Lease. The Landlord shall give the Tenant written notice of the offer, with copy to the PHA, at least sixty days before the proposed commencement date of the new Lease term. The offer may specify a reasonable time limit for acceptance by the Tenant Family.

M.   TERMINATION OF LEASE BY TENANT

The Tenant may terminate the Lease without cause at any time after the first year of the term of the Lease, on not more than sixty days nor less than 30 days written notice by the Tenant to the Landlord (with copy to the PHA). (The provisions of this subsection (M) are not intended to limit any right of the Tenant to terminate the Lease where so provided elsewhere in the Lease).

N.   DISCRIMINATION

The Landlord shall not discriminate against the Tenant Family in the provision of services, or in any other manner, on the grounds of age, race, color, creed, religion, sex, handicap, national origin, or familial status.

O.   COMBINING NOTICES

Any notice under paragraph (K), (L), or (M) of this section may be combined with and run concurrently with any notice required under State or local law.

P.   ASSISTANCE CONTRACT

This Lease has been signed by the parties on the condition that the PHA will promptly execute a Housing Assistance Payments Contract or a Housing Voucher Contract with the Landlord. This Lease shall not become effective unless the

PHA has executed a Housing Assistance Payments Contract or Housing Voucher Contract with the Landlord effective the first day of the term of the Lease.

Q.    PROHIBITED LEASE PROVISIONS

Not withstanding anything to the contrary contained in the Lease, any provision of the Lease which falls within the classifications below shall be inapplicable.

1.  Confession of Judgement.  Consent by the Tenant to be sued, to admit guilt, or to a judgement in favor of the Landlord in a lawsuit brought in connection with the Lease.

2.  Treatment of Property.  Agreement by the Tenant that the Landlord may take or hold the Tenant Family's property, or may sell such property without notice to the Tenant and a court decision on the rights of the parties.

3.  Excusing Landlord from Responsibility.  Agreement by the Tenant not to hold the Landlord or Landlord's agent legally responsible for any action or failure to act, whether intentional or negligent.

4.  Waiver of Legal Notice.  Agreement by the Tenant that the Landlord may institute a lawsuit without notice to tenant.

5.  Waiver of Court Proceeding for Eviction.  Agreement by the Tenant that the Landlord may evict the Tenant Family (i) without instituting a civil court proceeding in which the Family has the opportunity to present a defense, or (ii) before a decision by the court on the rights of the parties.

6.  Waiver of Jury Trial.  Authorization to the Landlord to Waive the Tenant's right to a trial by jury.

7.  Waiver of Right to Appeal Court Decision.  Authorization to the Landlord to waive the Tenant's right to appeal a court decision or to waive the Tenant's right to sue to prevent a judgement from being put into effect.

8.  Tenant Chargeable with Cost of Legal Actions Regardless of Outcome of Lawsuit.  Agreement by the Tenant to pay lawyer's fees or other legal costs whenever the Landlord decides to sue, whether or not the Tenant wins.

SIGNATURES:

LANDLORD: *KENNETH TAYLOR*

BY: *Kenneth Taylor*
          Signature

DATE: *8-27-93*

ADDRESS: *6226 ORCHARD LE*

*CINTI, O*                    ZIP CODE *45213*

TELEPHONE (HOME): *271-8878*
          BUSINESS: *271-8878*

TENANT: *CAROL O'NEAL*

BY: *Carol O'Neal*
          Signature

DATE: *8-27-93*

ADDRESS: *215 E. Rochelle*

                    ZIP CODE *45219*

TELEPHONE (HOME): *281-5144*

          BUSINESS: *421-0378*

                              4/92
                              (forms1)

6 of 6



49

# County of Hamilton

**BOARD OF COMMISSIONERS**
STEVEN J. CHABOT
JOHN S. DOWLIN
GUY C. GUCKENBERGER
COUNTY ADMINISTRATOR
DAVID J. KRINGS

DEPARTMENT OF COMMUNITY DEVELOPMENT
ROOM 907 COUNTY ADMINISTRATION BUILDING
138 EAST COURT STREET
CINCINNATI, OHIO 45202

October 19, 1993

JAMES R. LOWRY
DIRECTOR

DAN DOMIS
DEPUTY DIRECTOR

**PHONES:**

COMMUNITY DEVELOPMENT
(513) 632-8754

HOUSING
(513) 632-8771

NOTIFICATION OF CHANGE TO LEASE AND HOUSING ASSISTANCE PAYMENTS CONTRACT

EFFECTIVE DATE OF CHANGE: 11-1-93

OWNER'S NAME: Ken Taylor                TENANT'S NAME: Carol O'Neal

ADDRESS: 6226 Orchard Lane              ADDRESS: 4938 Plainville Rd.

CITY: Cincinnati STATE: OH ZIP: 45213   CITY: Madisonville STATE: OH ZIP: 45227

This form serves as an amendment to the Lease and the Housing Assistance Payments
Contracts.  As a result of the information the tenant has provided to Section 8, the
following is a summary of the changes:

### HOUSING ASSISTANCE PAYMENTS CONTRACT

1.  Family portion of rent.........................$ 151.00 __ per month
2.  Hamilton County (PHA) Assistance Payment.......$ 391.00 __ per month

### LEASE

Amount of rent:  The total rent shall be $ 542.00 __ per month.  The tenant
shall pay $ 151.00 __ per month and the Hamilton County Section 8 Program
shall pay $ 391.00 __ per month.

Other Changes to the Lease: Please add tenant's step sons ( Jermaine Hudson and
Cortez Hudson) to lease, they are now residing in the unit.

If the Tenant's share of rent has increased, the Tenant is eligible for an informal
hearing if the Tenant believes a mistake has been made.  To arrange an informal hearing,
the Tenant must call Susan Walsh at 632-8772 no later than November 2, 1993

Sincerely,

*Lana Mottesi*

Housing Specialist II

cc: tenant

Ex.