# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT CINCINNATI

JAMES O'NEAL,

            :

               Petitioner,                           Case No. 1:02-cv-357

            :

                                     District Judge Michael R. Barrett
      -vs-                                 Magistrate Judge Michael R. Merz

MARGARET A. BAGLEY,

            :

               Respondent.

---

## REPORT AND RECOMMENDATIONS

---

This capital habeas corpus case is before the Court for decision on the merits.

Petitioner was indicted on December 15, 1993, by the Hamilton County Grand Jury on four counts, including purposely causing the death of Carol O'Neal during the commission of an aggravated burglary under Ohio Revised Code § 2903.01(A) and purposely causing the death of Carol O'Neal with prior calculation and design under Ohio Revised Code § 2903.01(B). Each count had two death penalty specifications, one alleging a course of conduct involving the purposeful attempt to kill two or more persons under Ohio Revised Code § 2929.04(A)(5), and the other alleging murder during an aggravated burglary under Ohio Revised Code § 2929.04(A)(7). He was also indicted on one count of attempted murder of Ricardo Lee and one count of aggravated burglary. Each of these counts carried a firearm specification.

O'Neal filed a pretrial motion pursuant to Crim. R. 12(B) to dismiss all charges and specifications relating to aggravated burglary as trespass is an essential element of the offense,

-1-

and there was no court-imposed restraining order preventing him from entering the home he had lived in with his wife.  He argued that one spouse cannot trespass upon the residence of the other spouse.  The trial court heard oral arguments and agreed, dismissing the burglary charges and all charges pertaining to aggravated burglary.  The State appealed and the court of appeals reversed the judgment and remanded, holding that "the issue of whether the state can prove that the defendant trespassed on the premises is to be determined at trial, not by a motion to dismiss." *State v. O'Neal*, 103 Ohio App. 3d 151, 155, 658 N.E.2d 1102 (1995).  Petitioner sought to appeal to the Ohio Supreme Court. This was denied. *State v. O'Neal*, 73 Ohio St. 3d 1411, 651 N.E.2d 1309 (1995).

A jury found O'Neal guilty on both counts of aggravated murder, on both aggravated burglary death penalty specifications, of the firearm specifications, and of the aggravated burglary charge.  They found him not guilty on the attempted murder charge and the course-of-conduct death penalty specifications.  After a sentencing hearing, the jury recommended death. The court accepted the jury's recommendation and sentenced O'Neal to death on counts one and two, to a term of 10-25 years with 10 years of actual incarceration on the fourth count, and a consecutive term of three years for each of the firearm specifications.

-2-

### Procedural History in State Courts

The Ohio Supreme Court on direct appeal summarized the facts as follows:[1]

> On November 14, 1992, appellant, James Derrick O'Neal, and Carol O'Neal were married. Initially, they lived together in Corryville, Ohio, with Carol's four children. In September 1993, Carol, individually, entered into a lease agreement for a home at 4938 Plainville Road in Madisonville. Subsequently, Carol, appellant, and Carol's four minor children moved into the home. Thereafter, two of appellant's minor children also moved into the home.
>
> By December 1993, the marital relationship between appellant and Carol had deteriorated due, in part, to discord among the children and problems between appellant and Carol's oldest son, Ricardo. During this time, Carol worked at Ampco Parking during the day and at a convenience store at night. Patricia Carr, a friend of Carol's and a coworker at Ampco, stated that Carol acted tired and stressed and that she wanted to end her marriage with appellant.
>
> On December 7, 1993, an altercation occurred between Carol and appellant. As a result, Officer Michael Mercer from the Cincinnati Police Department responded to a call for assistance at the Plainville Road residence. Mercer found Carol to be "very upset" and "very fearful" of appellant. Carol told Mercer that she had argued with appellant over food stamps and that she had asked him to leave. Carol also informed Mercer that appellant had struck her in the face numerous times, choked her, shoved her to the ground, and kicked her. Mercer noticed that Carol's face and neck were bruised. Carol also advised Mercer that appellant had recently moved out of the house.
>
> The same day, December 7, 1993, Carol filed, in the Hamilton County Municipal Court, a domestic violence complaint and a temporary protection order against appellant.[2] A warrant was then issued for appellant's arrest.
>
> Carr testified that she saw Carol at Ampco Parking on December 7 and noticed that her jaw was swollen and that Carol was "very upset." Carol told Carr that when appellant tried to take food stamps

---

[1] Underlining, as appears here and throughout this Report, is as it appears in the original Lexis document.

[2] The temporary protection order was issued on December 12, 1993, the day after Carol was killed.

out of her purse, they argued and appellant hit her in the jaw. According to Carr, Carol planned to change the locks on the house and was "scared [appellant] would kill her." Carr also stated that every day thereafter Carol was nervous, shaky, and drained, and explained that whenever the telephone rang at work, "[Carol] would be shaking, scared, thinking it was going to be [appellant] on the phone."

On December 11, 1993, appellant telephoned Carol at her place of employment. Jamie Wright, who worked with Carol and also knew appellant, answered the telephone and advised Carol that she suspected the caller was appellant. The telephone was then placed in speaker mode so that both Carol and Wright could hear the conversation. Wright testified that after Carol said hello, appellant stated, "Bitch, it ain't over yet." Appellant then started laughing and hung up. According to Wright, Carol stumbled backward, appeared to nearly faint, and was shaking and "nervous and jittery" the rest of the work day.

Later that evening, appellant broke the glass portion of the front door and entered the residence at 4938 Plainville Road. At the time, Carol was coming down the stairs. When the glass broke, Carol ran upstairs screaming, and she and her three youngest children retreated into a bedroom. Carol directed the children into a closet and she stood pushing on the bedroom door trying to keep appellant from entering. Two of Carol's children, who were looking out of the closet, testified that appellant fired a shot at the bedroom door and that Carol fell to the floor behind the bedroom door. Appellant then entered the bedroom and, while standing over Carol, fired two or three shots at her. One of the bullets struck Carol in the upper left chest.

Appellant left the bedroom and confronted Carol's oldest child, Ricardo, who was then fourteen years old. According to Ricardo, appellant pointed the gun at his neck and pulled the trigger at least twice. When the gun did not fire, appellant hit him in the face with the gun and left the house.

Timothy Schopmeyer, who was delivering a pizza at a neighbor's home on the day of the murder, testified that he saw appellant approach the front door at 4938 Plainville Road. Schopmeyer noticed that appellant was wearing a thick jacket with the collar pulled up and a hat that was pulled down over a large portion of his head. Moments later, Schopmeyer heard breaking glass and realized that appellant

-4-

had entered the neighboring house.  Schopmeyer testified that within seconds after appellant had entered the home, he (Schopmeyer) heard a woman screaming "No, no, no."  The cries of "no" were then followed by several gunshots.  Schopmeyer saw appellant leave the house and walk quickly up the street.  Schopmeyer stated that approximately thirty seconds passed from the time he heard the breaking glass until appellant left the house. After appellant left the home, Schopmeyer approached the house and he heard children shouting that their mother had been shot.  Schopmeyer entered the house, went upstairs, and saw Carol lying on a bed.  When he asked her who had done this, she answered faintly, "My husband." Schopmeyer then ran to get help.

Police officers responding to the 911 calls noticed that the glass to the front door had been shattered.  The police went upstairs and found Carol lying on a bed suffering from a chest wound.  They also noticed that Ricardo had a severe "gash" on his face.

Later that day, during surgery, Carol died.  The forensic pathologist concluded that a bullet had lacerated one of Carol's lungs and a major vein to her heart, and that she died as a result of blood loss.

Later that night, on December 11, 1993, a police canine unit discovered appellant hiding inside a house that he had broken into near the Plainville Road residence.  Appellant surrendered and, in the process, he slid a .25 caliber Raven semiautomatic pistol across the floor to the police.  Officer Kevin York took possession of the pistol and later testified that the gun appeared to be jammed.

After being advised of his Miranda rights, appellant told Detective Charles Beaver that he and Carol had argued about the children on December 7 and that he had hit her.  During the questioning, appellant acknowledged that he was aware that Carol had filed a complaint against him following the December 7 altercation. Appellant also indicated that, on December 11, he had not been living at the Plainville Road home.  Appellant stated that prior to that date he had "moved out" when Carol demanded that he and his sons leave the home and that since that time he had been living on the streets. Appellant also stated that he did not know where his sons were living. Appellant told police that he had entered the residence by kicking the front door glass and that he had chased Carol up the stairs.  Appellant further confessed that he forced his way into the bedroom and as Carol lay "huddled" on the floor behind the bedroom door "crying and screaming" he shot her "two or three times."

-5-

Appellant also stated that he "wanted to teach her a lesson," and that he did not care if she died.

During appellant's confession, Beaver did not tell appellant that Carol had died and appellant never asked about her condition. At the end of the police interview, Beaver told appellant that Carol had died during surgery. Beaver testified that appellant "showed exactly no emotion one way or the other as to whether he cared." When asked whether he would do anything differently considering that Carol died as a result of the shooting, appellant stated, "I have no regrets what I did. It hurt what she did to my kids."

William Schrand, a forensic firearms expert, testified that the bullet found in Carol's body came from the Raven semiautomatic pistol recovered from appellant. This same pistol was linked to a spent bullet and three cartridge shells that police recovered from the bedroom.

In December 1993, appellant was indicted by the Hamilton County Grand Jury for the aggravated murder of Carol. Count 1 of the indictment charged appellant with purposely causing the death of Carol during the commission of an aggravated burglary (R.C. 2903.01[A]). Count 1 also carried two death penalty specifications: one alleged a course of conduct involving the purposeful attempt to kill two or more persons (R.C. 2929.04 [A][5]); and a second alleged murder during an aggravated burglary (R.C. 2929.04[A][7]). Count 2 of the indictment charged appellant with purposely causing the death of Carol with prior calculation and design (R.C. 2903.01 [B]). Count 2 also carried the same two death penalty specifications as count 1. Appellant was also indicted on one count of attempted murder of Ricardo (count 3) and one count of aggravated burglary (count 4). Each count in the indictment also carried a firearm specification.

Appellant filed a pretrial motion pursuant to Crim. R. 12(B) to dismiss all charges and specifications relating to aggravated burglary. In his motion, appellant claimed that he could not be guilty of an aggravated burglary offense because trespass is an essential element of the offense and, in the absence of a court-imposed protection order, one spouse cannot technically trespass upon the residence of the other spouse. The trial court agreed and dismissed count 1 of the indictment (purposely causing the death of Carol during the commission of an aggravated burglary) and its specifications. The court also dismissed the aggravated burglary death penalty

specification with respect to count 2, and the court further dismissed count 4. Thus, the course-of-conduct death penalty specification regarding count 2 remained. Thereafter, the state, pursuant to R.C. 2945.67 appealed the holding of the trial court to the court of appeals.[3]

Upon appeal, the court of appeals reversed the judgment of the trial court and remanded the cause, holding that "the issue of whether the state can prove that the defendant trespassed on the premises is to be determined at trial, not by a motion to dismiss. If, at the end of the state's case, the evidence is insufficient to prove that the defendant committed a trespass, then the court must dismiss the aggravated burglary charges and specifications pursuant to a Crim. R. 29 motion for acquittal." State v. O'Neal (1995), 103 Ohio App. 3d 151, 154, 658 N.E.2d 1102, 1103. The court further noted that "in the absence of a restraining order or an order granting one party exclusive possession of the marital residence, the question of whether one spouse has the sole possessory interest in the house depends on whether the evidence shows that both parties had made the decision to live in separate places. Both parties must have understood that the possessory interest of one was being relinquished, even if it was relinquished begrudgingly or reluctantly. In the absence of such a showing, there can be no finding of trespass and, hence, no aggravated burglary." (Emphasis sic.) Id. at 155, 658 N.E.2d at 1104.

On remand to the trial court, the jury found appellant guilty of both counts of aggravated murder (counts 1 and 2), both aggravated burglary death penalty specifications, three of the firearm specifications, and the aggravated burglary charge (count 4). The jury found appellant not guilty of attempted murder (count 3) and the course-of-conduct death penalty specifications.

Following a penalty hearing, the jury recommended that appellant be sentenced to death on both aggravated murder counts. The trial court conducted an independent review of the evidence pursuant to R.C. 2929.03(F) and accepted the jury's recommendation and imposed the sentence of death. For the aggravated burglary charge (count 4) and firearm specifications, appellant was sentenced in accordance with the law. On appeal, the court of appeal affirmed.

State v. O'Neal, 87 Ohio St. 3d 402, 402-406,721 N.E.2d 73, 77-81 (2000).

---

[3] R.C. 2945.67(A) provides that "[a] prosecuting attorney * * * may appeal as a matter of right any decision of a trial court in a criminal case * * * which * * * grants a motion to dismiss all or any part of an indictment."

-7-

In his direct appeal to the First District Court of Appeals of Ohio, O'Neal raised the following assignments of error:

### First Assignment of Error

The trial court erred to the prejudice of defendant in denying the defendant's motions for judgment of acquittal or for a new trial, and in accepting and journalizing guilty verdicts on all counts and specifications charging an aggravated burglary.

### Second Assignment of Error

The trial court erred to defendant's prejudice when it permitted the use of peremptory challenges on three separate occasions to strike members of defendant's race from the jury panel, and overruled defense motions to strike the panel or for mistrial.

### Third Assignment of Error

Admission of multiple hearsay statements allegedly made by the victim denies defendant the right to confront the witnesses against him, and to due process of law, where the admitted statements do not fall into any recognized hearsay exception.

### Fourth Assignment of Error

The trial court erred to defendant's prejudice when it refused to grant his request for an instruction on the lesser included offense of murder.

### Fifth Assignment of Error

The trial court erred to defendant's prejudice in overruling his motion to suppress statements made after his arrest.

### Sixth Assignment of Error

The trial court erred to defendant's prejudice when it permitted the state to argue that the nature and circumstances of the offense were

aggravating rather than mitigating factors, and that the jury should base its decision on emotion rather than evidence.

**Seventh Assignment of Error**

The trial court erred to defendant's prejudice in presenting multiple counts and multiple specifications to the jury, and in entering verdicts and sentences on more than one count of aggravated murder.

**Eighth Assignment of Error**

Submission of irrelevant and duplicative specifications to the jury during the penalty phase of the trial violated defendant's right to be free from cruel and unusual punishment as guaranteed by the Eighth Amendment to the United States Constitution and by parallel state constitutional provisions.

**Ninth Assignment of Error**

Systematic exclusion of prospective jurors opposed to the death penalty violated defendant's right to a fair and impartial jury which reflects the community from which it is drawn, as guaranteed by the state and federal constitutions.

**Tenth Assignment of Error**

The trial court erred to defendant's prejudice by refusing to permit the jury to consider mercy when determining the proper sentence for these offenses.

**Eleventh Assignment of Error**

Imposition of the death penalty without proof beyond a reasonable doubt of all statutory aggravating circumstances violated defendant's rights under the Eighth Amendment and Due Process and Equal Protection Clauses of the Fourteenth Amendment, and corresponding provisions of the Ohio Constitution.

**Twelfth Assignment of Error**

Use of the same operative fact to first elevate ordinary murder to aggravated murder and then to capital, death eligible, aggravated murder violates defendant's protection against cruel and unusual punishment as secured to him by the Eighth Amendment, and the right to due process and equal protection of law under the Fourteenth Amendment and corresponding provisions of the Ohio Constitution.

**Thirteenth Assignment of Error**

Imposition of the sentence of death on defendant violates his rights under the Eighth Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the Federal Constitution, and his right to due course of law and punishment not cruel and unusual under the Ohio Constitution.

**Fourteenth Assignment of Error**

The trial court erred to defendant's prejudice in accepting the jury's recommendation and sentencing him to death.

**Fifteenth Assignment of Error**

Individual and collective errors mandate reversal of defendant's conviction and sentence.

(Return of Writ, Doc. No. 14, Apx. Vol. III at 288.)

After reviewing the merits of O'Neal's assignment of errors, re-weighing the aggravating circumstances against the mitigating factors, and independently assessing the appropriateness of the death sentence, the court of appeals affirmed. *State v. O'Neal*, 1997 Ohio App. LEXIS 5510 (1st Dist. Dec. 12, 1997).[4]

---

[4] Effective January 1, 1995, Ohio law was changed to eliminate direct review of capital cases by the intermediate courts of appeal. However, because the offenses in this case were committed before that date, even though the trial was later, Mr. O'Neal was entitled to be heard twice on direct appeal.

-10-

In his direct appeal to the Ohio Supreme Court, O'Neal advanced the following propositions of law:

### First Proposition of Law

A person does not lose all possessory interest in the marital residence, nor the right to legally enter that residence, because he has temporarily left the residence as a result of a marital argument.

### Second Proposition of Law

Trespass is an essential element of aggravated burglary, and where defendant enters the marital residence, prior to the issuance of any court order restricting him from doing so, he does not commit a trespass or a burglary.

### Third Proposition of Law

The state's use of peremptories to excuse three Afro-American jurors, without articulating inadequate [sic] non-discriminatory reason [sic] for their dismissal, combined with the acknowledged fact that defendant is a member of a cognizable racial group, violates defendant's right to equal protection under the United States and Ohio Constitutions.

### Fourth Proposition of Law

Admission of multiple hearsay statements allegedly made by the victim denies defendant the right to confront the witnesses against him, and to due process of law, where the admitted statements do not fall into any recognized hearsay exception.

### Fifth Proposition of Law

When the jury, on the basis of the evidence presented, could reasonably find for the state on all elements of aggravated murder except prior calculation and design, or commission of an underlying felony, the trial court must charge on the lesser included offense of murder if a timely request for such a charge is made.

**Sixth Proposition of Law**

Admission in evidence of statements elicited from defendant while in custody, which are obtained by deception, and are thus not the product of a knowing and intelligent waiver, violates the Fifth and Sixth Amendments to the United States Constitution and parallel constitutional and statutory provisions in the state of Ohio.

**Seventh Proposition of Law**

Ohio's death penalty statute mandates that the nature and circumstances of the offense can only be considered as mitigating factors; thus, their consideration as aggravating factors, as well as appeals to emotion, violates this statute and defendant's right to be free from arbitrary infliction of the death penalty as guaranteed by the Eighth Amendment to the United States Constitution, and parallel state provisions.

**Eighth Proposition of Law**

Although multiple charges of aggravated murder may be submitted to the jury during the guilt phase of trial, where there is only one death charge there can be only one conviction, and presentation to the jury of multiple counts, with multiple specifications, followed by imposition of multiple death sentences, violates defendant's right to be free from cruel and unusual punishment under the state and federal Constitutions.

**Ninth Proposition of Law**

The alternative provisions of O.R.C. § 2929.04(A)(7) are mutually exclusive and, where one is presented to the jury as an aggravating circumstance, inclusion of the other undermines the required reliability of the jury's determination, in violation of the Eighth Amendment to the United States Constitution and by parallel state constitutional provisions.

**Tenth Proposition of Law**

The Sixth Amendment to the United States Constitution, and the parallel provision in Ohio's Constitution, require that juries be a cross-section of the jurisdiction where a defendant is tried, and systematic exclusion of prospective jurors opposed to the death penalty violated defendant's right to a fair and impartial jury which reflects the community from which it is drawn, as guaranteed by the state and federal Constitutions.

**Eleventh Proposition of Law**

An instruction to the jury at the penalty phase of trial that it could not be governed by considerations of sympathy, improperly restricts consideration of legitimate mitigating factors, in violation of the prohibition against cruel and unusual punishment embodied in the state and federal Constitutions.

**Twelfth Proposition of Law**

Imposition of the death penalty without proof beyond a reasonable doubt of all statutory aggravating circumstances violated defendant's rights under the Eighth Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and corresponding provisions of the Ohio Constitution.

**Thirteenth Proposition of Law**

Use of the same operative fact to first elevate ordinary murder to aggravated murder and then to capital, death eligible, aggravated murder violates defendant's protection against cruel and unusual punishment as secured to him by the Eighth Amendment, and the right to due process and equal protection of law under the Fourteenth Amendment and corresponding provisions of the Ohio Constitution.

**Fourteenth Proposition of Law**

Imposition of the sentence of death on defendant violates his rights under the Eighth Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the federal

Constitution, and his right to due course of law and punishment not cruel and unusual under the Ohio Constitution.

### Fifteenth Proposition of Law

Defendant's sentence violates the Eighth and Fourteenth Amendments to the Constitution of the United States, and parallel state provisions, because it is disproportionately severe in relation to the crime committed, and to sentences visited upon others for the same crime in the same and other jurisdictions.

### Sixteenth Proposition of Law

Defendant's death sentence must be set aside because it is disproportionately severe when compared to other cases in Hamilton County and in the state of Ohio in which capital sentencing decisions were made.

### Seventeenth Proposition of Law

The combined effect of errors in the evidentiary rulings, and rulings on pretrial motions denied defendant a fair and impartial disposition of his case, and made imposition of the death penalty arbitrary, all in violation of defendant's rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitutions [sic], and parallel state provisions.

(Return of Writ, Doc. No. 14, Apx. Vol. V at 18.)

After reviewing the merits of O'Neal's proposition of law, re-weighing the aggravating circumstances against the mitigating factors, and independently assessing the appropriateness of the penalty of death, the Ohio Supreme Court affirmed the conviction and death sentence. *State v. O'Neal*, 87 Ohio St. 3d 402, 721 N.E.2d 73 (2000).

O'Neal then filed an application to reopen his direct appeal under Ohio R. App. P. Rule 26(B) and *State v. Murnahan*, 63 Ohio St.3d 60 (1992). (Return of Writ, Doc. No. 14, Apx. Vol. VII

-14-

at 2.)  The application was denied by the Hamilton County Court of Appeals and the Ohio Supreme

Court declined review. *Id*. at 34, 37.

O'Neal sought post-conviction relief under Ohio Revised Code § 2953.21, pleading the

following causes of action:

> **I.        Ineffective assistance of counsel on issue of trespass**
>
> Trial counsel rendered constitutionally ineffective assistance of counsel in failing to introduce into evidence at trial a complete copy of the lease of the premises at 4938 Plainville Road listing O'Neal as Carol O'Neal's husband and an occupant of the premises, which would have provided documentary support for O'Neal's claim of right to enter and to occupy the premises.
>
> **II.       Ineffective assistance of counsel on jury instructions.**
>
> Trial counsel also rendered constitutionally ineffective assistance of counsel in failing to file and preserve in the record a request for a jury instruction that "in absence of a restraining order or an order granting one party exclusive possession", O'Neal had a right to enter the premises and to file and preserve in the record an objection to the court's use of the phrase "Wife's residence" rather than "marital residence."   Defense counsel provided Petitioner constitutionally ineffective assistance of counsel by failing to object to the Court's inclusion of the term "estranged" when the jury requested a definition of the term during deliberation.

(Return of Writ, Doc. No. 14, Apx. Vol. VI at 13.)  The court denied O'Neal's Petition for Post-

Conviction Relief. (Return of Writ, Doc. No. 14, Apx. Vol. VI at 107 "Findings of Fact,

Conclusions of Law, and Entry Dismissing Petition to Vacate.")  O'Neal then appealed the

denial of his petition to the court of appeals, alleging:

> I.        The trial court erred in concluding that Appellant failed to raise a substantive ground for relief based on ineffective assistance of counsel when Appellant presented evidence outside the record that Appellant's trial counsel failed to introduce a complete copy of the lease of the marital

residence listing Appellant as an occupant and thereby
deprived the jury of key factual, documentary support for his
claim of right to enter the marital residence, and further erred
in concluding that Appellant was not prejudiced by factually
unsupported representations to the jury by the prosecution
and the defense that Appellant's name was not on the lease
and that he did not have a key to the marital residence.

II.     The trial court erred in concluding that Appellant's claim of
ineffective assistance of counsel with respect to jury
instructions was barred by res judicata.

(Return of Writ, Doc. No. 14, Apx. Vol. VI at 133.)  The court of appeals affirmed (Return of

Writ, Doc. No. 14, Apx. Vol. VI at 209) and the Ohio Supreme Court declined review. *Id*. at

313.

On June 20, 2002, the United States Supreme Court handed down *Atkins v. Virginia*, 536

U.S. 304 (2002), in which it held that execution of the mentally retarded constitutes cruel and

unusual punishment in violation of the Eighth Amendment of the United States Constitution.  The

*Atkins* decision prompted O'Neal's return to the state court to litigate the issue of his mental

retardation in a First Successive Petition to vacate or set aside judgment.  On November 15, 2002,

O'Neal filed his *Atkins* post-conviction petition. (First Successive Petition to Vacate or Set Aside

Judgment and/or Sentence Pursuant to Ohio Revised Code Sections 2953.21 and 2953.23, Doc. No.

40, Vol. VIII at 13.)  After a hearing on O'Neal's petition, the trial court concluded that O'Neal is

not mentally retarded under the criteria identified by the Ohio Supreme Court in *State v. Lott*, 97

Ohio St. 3d 303, 779 N.E.2d 1011 (2002). (Findings of Fact, Conclusions of Law, and Entry

Dismissing Successive Petition Filed Pursuant to *Atkins v. Virginia*, Doc. No. 40, Vol. VIII at 43,

Hamilton County Court of Common Pleas, April 7, 2004.)  O'Neal appealed and the state court of

appeals affirmed the trial court's decision.[5] *State v. O'Neal*, Case No. C-050840 (Dec. 1, 2006). He

further appealed to the Ohio Supreme Court, which declined to accept jurisdiction.[6] *State v. O'Neal*,

Case No. 2007-80 (May 2, 2007).

### Proceedings in this Court

O'Neal filed his Notice of Intention to seek habeas relief in this Court on March 29, 2002

(Doc. No. 3), and followed with the Petition on May 21, 2002. (Doc. No. 7.) He filed an

Amended Petition on May 31, 2007. (Doc. No. 38.) O'Neal pleads the following grounds for

relief:

#### Ground One

Petitioner's right to fair warning and due process under the
Fourteenth Amendment was denied by the change in the rule of law
with respect to a spouse's privilege to enter the marital residence by
the Court of Appeals in its pretrial decision in <u>O'Neal I</u> and by the
Ohio Supreme Court in the application of its decision in <u>State v.
Lilly</u>.

#### Ground Two

Petitioner's right to due process under the Fourteenth Amendment
was denied by his convictions on counts, specifications, and charges
of aggravated burglary on insufficient evidence.

#### Ground Three

The imposition of a sentence of death on Petitioner based on an
aggravating circumstance identical to the element that makes the

---

[5] See attached appendix for claims raised

[6] See attached appendix for claims raised

-17-

murder an aggravated offense - -aggravated burglary resulting from the alleged trespass of the marital residence - - violated Petitioner's Eighth Amendment right to be free from cruel and unusual punishment because it fails to draw a rational distinction between those eligible and those not eligible for the death penalty.

**Ground Four**

Petitioner's right to due process under the Fourteenth Amendment and his right to be free from cruel and unusual punishment under the Eighth Amendment was violated by the government's argument in penalty phase closing argument that the nature and circumstances of the offense - - a statutory mitigating factor under Ohio's death penalty scheme - -should be considered an aggravating circumstance.

**Ground Five**

Petitioner's right to due process under the Fourteenth Amendment and his right to be free from cruel and unusual punishment under the Eighth Amendment were violated by the submission to the jury in the penalty phase of the trial of multiple charges of aggravated murder and multiple and duplicative aggravating circumstances when only one victim was involved.

**Ground Six**

Petitioner's right to due process under the Fourteenth Amendment and his right to be free from cruel and unusual punishment under the Eighth Amendment were violated by the penalty phase jury instructions which told the jury that the aggravating circumstance which the jury was to weigh against mitigating evidence included two mutually exclusive alternatives - -that he was either the "principal offender" or that he acted with "prior calculation and design."

**Ground Seven**

Petitioner was denied his Sixth Amendment right to the effective assistance of counsel by the failure of trial counsel to introduce a complete copy of the lease listing Petitioner as husband and occupant of the home and by their failure to introduce evidence that the locks

-18-

to the home had not been changed.

**Ground Eight**

Petitioner was denied his Sixth Amendment right to the effective assistance of counsel by the failure of trial counsel to object to the omission from the culpability phase jury instructions on trespass the phrase "in the absence of a restraining order or an order granting one party exclusive possession of the marital residence" and the failure to object to reference in the instructions to the marital residence as the "wife's residence" and the use of the word "estranged" without defining the term for the jury.

**Ground Nine**

Petitioner's right to confrontation under the Sixth Amendment and to due process under the Fourteenth Amendment were violated by the admission of multiple hearsay statements allegedly made by the victim.

**Ground Ten**

Petitioner's right to be free from cruel and unusual punishment under the Eighth Amendment was violated by the imposition of punishment disproportionate to the punishment normally inflicted on defendants for domestic homicides and for similar offenses committed in the same jurisdiction.

**Ground Eleven**

Petitioner's right to due process and to equal protection of the law under the Fourteenth Amendment was violated by the use of peremptory challenges to exclude members of his race from the jury contrary to the standards established in Batson v. Kentucky.

**Ground Twelve**

Petitioner's right to due process under the Fourteenth Amendment was violated by the admission of statements obtained from Petitioner

by the police by means of deceiving Petitioner into believing his wife was still alive, making his waiver of his right to remain silent not voluntary, knowing, and intelligent.

## Ground Thirteen

Petitioner's right to due process under the Fourteenth Amendment and to be free from cruel and unusual punishment under the Eighth Amendment was violated by the trial court's refusal to give an instruction in the culpability phase of the trial of the lesser included offense of murder.

## Ground Fourteen

Petitioner's Sixth Amendment right to a fair and impartial jury and his Eighth Amendment right to be free from cruel and unusual punishment were violated by the selection of a jury predisposed to impose a sentence of death, contrary to the standards in Witherspoon v. Illinois.

## Ground Fifteen

Petitioner's right to be free from cruel and unusual punishment under the Eighth Amendment was violated by the imposition of sentences of death under the Ohio death penalty scheme which is devoid of penological justification, has a racially disproportionate impact, fails to rationally narrow the class of death eligible defendants, permits the imposition of death when aggravating circumstances only just outweigh mitigating factors, denies the consideration of mercy, allows the arbitrary selection of those to receive the death penalty, and fails to provide guidance on the weighing of aggravating circumstances and mitigating factors.

## Ground Sixteen

Petitioner's right to be free from cruel and unusual punishment under the Eighth Amendment was violated by the instruction to the jury in the penalty phase of the trial that it could not be governed by considerations of sympathy.

-20-

**Ground Seventeen**

Petitioner's right to due process under the Fourteenth Amendment and his right to be free from cruel and unusual punishment under the Eighth Amendment were violated by the cumulative effect of all the errors committed during the culpability and penalty phases of the trial and on appeal.

**Eighteenth Ground for Relief**

The imposition of a sentence of death on Petitioner violates his right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution because he is mentally retarded under the standards- - reasonably applied - -announced in Atkins v. Virginia and in light of the facts- - reasonably determined - -presented to the state courts that show that Petitioner suffers from significantly subaverage intellectual functioning which had its onset before he attained the age of 18 and which leaves Petitioner with significant limitations in two or more adaptive behavior skills.

(Petition, Doc. No. 7); (Motion to Amend Petition, Doc. No. 38.) Respondent, Bagley, (hereinafter "Respondent") filed a Return of Writ on September 9, 2002. (Return of Writ, Doc. No. 14.) Petitioner filed a Traverse on October 11, 2007 (Traverse, Doc. No. 47).

Discovery was granted and an evidentiary hearing held on the seventh ground for relief on July 18 and August 13, 2008. (Decision and Order Granting in Part and Denying in Part Petitioner's Motion for Discovery, Doc. No. 44); (Order Granting Petitioner's Motion for Evidentiary Hearing, Doc. No. 59); (Evid Hrg. Tr. 7/18/08, Doc. No. 71); (Evid Hrg. Tr. 7/18/08, Doc. No. 72); (Evid. Hrg. Tr. 8/13/08, Doc. No. 73.) The parties then briefed the merits of the issues on which evidence was taken. (Post-Evid. Brief by Petitioner, Doc. No. 76); (Post-Evid. Brief by Respondent, Doc. No. 77); (Petitioner's Reply Post-Evid. Brief, Doc. No. 78.) The case became ripe for decision on the merits on December 26, 2008.

## Standard of Review and Generally Applicable Law

The Antiterrorism and Effective Death Penalty Act ("AEDPA") was signed and took effect on April 24, 1996.  O'Neal filed his petition on May 21, 2002. (Doc. No. 7.)  As O'Neal's petition was submitted after the Act was signed, it is subject to its provisions.  *Benge v. Johnson*, 474 F.3d 236, 241 (6th Cir. 2007); *Bowling v. Parker*, 344 F.3d 487 (6th Cir. 2003); *Mason v. Mitchell*, 320 F.3d 604, 613 (6th Cir. 2003);*Herbert v. Billy*, 160 F.3d 1131 (6th Cir. 1998), citing *Lindh v. Murphy,* 521 U.S. 320, 117 S. Ct. 2059, 2068, 138 L. Ed. 2d 481 (1997) and *Harpster v. Ohio*, 128 F.3d 322, 326 (6th Cir. 1998).

28 U.S.C. § 2254(d), as amended by the AEDPA, provides:

> (d)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim-
>> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
>
> (e) (1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

Any factual finding made by the state courts is presumed to be correct and a petitioner must rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e).  A state court's decision is contrary to the Supreme Court's clearly-established precedent if (1) the state court

applies a rule that contradicts the governing law as set forth in the Supreme Court case law, or (2) the state court confronts a set of facts that is materially indistinguishable from those in a decision of the Supreme Court and nonetheless arrives at a result different from Supreme Court precedent. *Terry Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal rule [from the Supreme Court] but unreasonably applies it to the facts of the particular state prisoner's case," "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply[,] or [if the state court] unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407-08.

In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that the petitioner is "actually innocent." *Coleman v. Thompson*, 501 U.S. 722, 749 (1991); *see also Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000). To meet the "actual innocence" standard, the petitioner must demonstrate from new evidence that "it is more likely than not that no reasonable fact finder would have found petitioner guilty beyond a reasonable doubt" or "must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." *Schlup v. Delo*, 513 U.S. 298 (1995)(articulating the necessary standard to prove actual innocence of the crime in which the petitioner was convicted); *Sawyer v. Whitley*, 505 U.S. 333, 336, 350 (1992)(setting forth standard which applies the *Schlup* "actual innocence"

standard to the sentencing phase of the trial.)

The standard for evaluating a procedural default defense is as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an adequate and independent state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause of the default and actual prejudice as a result of the alleged violation of federal law; or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 749 (1991); *see also Simpson v. Jones,* 238 F.3d 399, 406 (6th Cir. 2000). That is, a petitioner may not raise on federal habeas a federal constitutional right he could not raise in state court because of procedural default. *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Engle v. Isaac*, 456 U.S. 107 (1982). Absent cause and prejudice, a federal habeas petitioner who fails to comply with a State's rules of procedure waives his right to federal habeas corpus review. *Boyle v. Million*, 201 F.3d 711, 716 (6th Cir. 2000); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107 (1982); *Wainright v. Sykes*, 433 U.S. 72, 87 (1977). *Wainright* replaced the "deliberate bypass" standard of *Fay v. Noia,* 372 U.S. 391 (1963).

Failure to raise a constitutional issue at all on direct appeal is subject to the cause and prejudice standard of *Wainwright v. Sykes*, 433 U.S. 72 (1977). *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Mapes v. Coyle,* 433 U.S. 72, 413 (6th Cir. 1999); *Rust v. Zent,* 17 F.3d 155 (6th Cir. 1994); *Leroy v. Marshall*, 757 F.2d 94 (6th Cir. 1985). Failure to present an issue to the state supreme court on discretionary review constitutes procedural default. *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999).

The Sixth Circuit Court of Appeals requires a four-part analysis when the State alleges a

habeas claim is precluded by procedural default. *Reynolds v. Berry*, 146 F.3d 345, 347-48 (6th

Cir. 1998), *citing Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *accord Lott v. Coyle*, 261

F.3d 594 (6th Cir. 2001).

> First the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.
>
> . . . .
>
> Second, the court must decide whether the state courts actually enforced the state procedural sanction, *citing County Court of Ulster County v. Allen*, 442 U.S. 140, 149, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).
>
> Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.
>
> Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate under *Sykes* that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Maupin,* 785 F.2d at 138.

The general governing standard for effective assistance of counsel is found in *Strickland*

*v. Washington*, 466 U.S. 668 (1984):

> defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

-25-

466 U.S. at 687.

With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

> Judicial scrutiny of counsel's performance must be highly deferential.
> . . . A fair assessment of attorney performance requires that every
> effort be made to eliminate the distorting effects of hindsight, to
> reconstruct the circumstances of counsel's challenged conduct, and
> to evaluate the conduct from counsel's perspective at the time.
> Because of the difficulties inherent in making the evaluation, a court
> must indulge a strong presumption that counsel's conduct falls within
> a wide range of reasonable professional assistance; that is, the
> defendant must overcome the presumption that, under the
> circumstances, the challenged action "might be considered sound trial
> strategy."

466 U.S. at 689.

As to the second prong, the Supreme Court held:

> The defendant must show that there is a reasonable probability that,
> but for counsel's unprofessional errors, the result of the proceeding
> would have been different. A reasonable probability is a probability
> sufficient to overcome confidence in the outcome.

466 U.S. at 694; *see also Darden v. Wainright*, 477 U.S. 168 (1986); *Wong v. Money,* 142 F.3d

313, 319 (6th Cir. 1998); *Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir. 1987); *see generally*

Annotation, 26 ALR Fed 218.

A criminal defendant is entitled to effective assistance of counsel on appeal as well as at trial,

counsel who acts as an advocate rather than merely as a friend of the court. *Evitts v. Lucey*, 469 U.S.

387 (1985); *Penson v. Ohio*, 488 U.S. 75 (1988). Counsel must be appointed on appeal of right for

indigent criminal defendants. *Douglas v. California*, 372 U.S. 353 (1963); *Anders v. California*, 386

U.S. 738 (1967); *United States v. Cronic,* 466 U.S. 648 (1984). The right to counsel is limited to

the first appeal as of right. *Ross v. Moffitt*, 417 U.S. 600 (1974); *Lopez v. Wilson*, 426 F.3d 339 (6th

-26-

Cir. 2005). The *Strickland* test applies to appellate counsel. *Burger v. Kemp,* 483 U.S. 776 (1987). The attorney need not advance every argument, regardless of merit, urged by the appellant. *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues.") Effective appellate advocacy is rarely characterized by presenting every non-frivolous argument which can be made. *See Smith v. Murray*, 477 U.S. 527 (1986). However, failure to raise an issue can amount to ineffective assistance. *McFarland v. Yukins*, 356 F.3d 688 (6th Cir. 2004), *citing Joshua v. Dewitt,* 341 F.3d 430, 441 (6th Cir. 2003); *Lucas v. O'Dea*, 179 F.3d 412, 419 (6th Cir. 1999); *Mapes v. Coyle,* 171 F.3d 408, 427-29 (6th Cir. 1999).

"In order to succeed on a claim of ineffective assistance of appellate counsel, a petitioner must show errors so serious that counsel was scarcely functioning as counsel at all and that those errors undermine the reliability of the defendant's convictions." *McMeans v. Brigano*, 228 F.3d 674 (6th Cir. 2000), *citing Strickland,* 466 U.S. 668; and *Rust v. Zent*, 17 F.3d 155, 161-62 (6th Cir. 1994). Counsel's failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal. *McFarland v. Yukins*, 356 F.3d 688 (6th Cir. 2004), *citing Greer v. Mitchell,* 264 F.3d 663, 676 (6th Cir. 2001), *cert. denied,* 535 U.S. 940 (2002). "Counsel's performance is strongly presumed to be effective." *McFarland,* 356 F.3d at 710, *quoting Scott v. Mitchell*, 209 F.3d 854, 880 (6th Cir. 2000)(*citing Strickland*).

> In *Mapes v. Coyle*, 171 F.3d 408 (6th Cir. 1999), the court wrote that ... the following considerations ought to be taken into account in determining whether an attorney on direct appeal performed reasonably competently.

(1) Were the omitted issues 'significant and obvious'?
(2) Was there arguably contrary authority on the omitted issues?
(3) Were the omitted issues clearly stronger than those presented?
(4) Were the omitted issues objected to at trial?
(5) Were the trial court's rulings subject to deference on appeal?
(6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
(7) What was appellate counsel's level of experience and expertise?
(8) Did the petitioner and appellate counsel meet and go over possible issues?
(9) Is there evidence that counsel reviewed all the facts?
(10) Were the omitted issues dealt with in other assignments of error?
(11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

Manifestly, this list is not exhaustive, and neither must it produce a correct "score"; we offer these inquiries merely as matters to be considered.

171 F.3d at 427-28 (6th Cir. 1999)(citations omitted).

## ANALYSIS

### Ground One

Petitioner's right to fair warning and due process under the Fourteenth Amendment was denied by the change in the rule of law with respect to a spouse's privilege to enter the marital residence by the Court of Appeals in its pretrial decision in O'Neal I and by the Ohio Supreme Court in the application of its decision in State v. Lilly.

In his first ground for relief, O'Neal argues that his Fourteenth Amendment rights were violated when the Ohio Supreme Court on direct appeal retroactively applied its *Lilly* decision and the interlocutory decision of the Hamilton County Court of Appeals in *State v. O'Neal*, 103 Ohio App. 3d 151, 154, 658 N.E. 2d 1102 (Ohio App. 1st Dist. 1995)("*O'Neal I*"), to uphold his conviction. (Petition, Doc. No. 7 at 33.)  Respondent concedes that this claim is properly

preserved for federal habeas review as it was raised in direct appeal. (Return of Writ, Doc. No. 14 at 46.)

On April 29, 1994, O'Neal moved to dismiss the aggravated burglary charge and the capital specifications relating to aggravated burglary, relying on Ohio Revised Code § 3103.04 as preventing one spouse from being held criminally liable for trespassing in the dwelling of the other. (Return of Writ, Doc. No. 14, Apx. Vol. III, "Motion to Dismiss"at 78-81.)  Petitioner relied on *State v. Middleton*, 85 Ohio App. 3d 403, 619 N.E. 2d 1113 (Ohio App. 4th Dist. 1993), and *State v. Herder*, 65 Ohio App. 2d 70, 415 N.E. 2d 1000 (Ohio App. 10th Dist. 1979), and argued *State v. Herrin*, 6 Ohio App. 3d 68, 453 N.E. 2d 1104 (Ohio App. 9th Dist. 1982) "can clearly be distinguished."  *Id.* at p. 80.  The State opposed the Motion, relying on *Herder* and *Herrin, supra,* and on *State v. Winbush*, 44 Ohio App. 2d 256, 337 N.E. 2d 639 (Ohio App. 10th Dist. 1975).  After hearing oral argument, Judge Winkler dismissed "anything pertaining to an agg[ravated] burglary in this case." (Return of Writ, Doc. No. 14, Apx. Vol. I at 21.)

The State filed an interlocutory appeal of this ruling.  The First District Court of Appeals first sustained the State's objection to having the question decided on a motion to dismiss, *i.e.*, in the absence of any evidence. *O'Neal I*.  Because a procedural decision alone would have been unhelpful to the trial court on remand, the court further considered the substantive issue.  It held that Ohio Revised Code § 3103.34, which has "its historical roots in Ohio's version of the Married Women's Act, ... has no application to the case at bar." *Id.* at 154-155.  While agreeing with the State that the "burglary statutes are designed to protect occupancy and possession, not title," the Court held that

> [I]n the absence of a restraining order or an order granting one party
> exclusive possession of the marital residence, the question of whether

> one spouse has the sole possessory interest in the house depends on whether the evidence shows that both parties had made a decision to live in separate places. Both parties must have understood that the possessory interest of one was being relinquished, even if it was relinquished begrudgingly or reluctantly. In the absence of such a showing, there can be no finding of trespass and hence, no aggravated burglary.

*Id.* at 155. The Ohio Supreme Court declined review and the case was returned to the trial court for trial. *State v. O'Neal*, 73 Ohio St. 3d 1411, 651 N.E. 2d 1309 (1995). After conviction and sentence, O'Neal appealed to the Hamilton County Court of Appeals. As to this Ground for Relief, the court held:

> To sustain a conviction for aggravated burglary under R.C. 2911.11, the state must show that an individual by force, stealth or deception trespassed in an occupied structure with purpose to commit a theft offense or felony therein. Appellant's argument focuses on the element of trespass. According to appellant, the element of trespass was not proven by the state because, he contends, in the absence of a court order restricting him from entering the martial residence on the date of the murder, the state failed to present evidence, as directed by this court upon remand in O'Neal I, of the parties intent to live separately.
>
> In *O'Neal I*, this court held that in order to find one spouse guilty of trespass at the former marital residence in the absence of some form of court intervention, it must be shown that the other spouse has the sole possessory interest in the marital residence. We then established a test to determine when one spouse is deemed to have the sole possessory interest in the property. Specifically, we stated:
>
>> We hold that in the absence of a restraining order or an order granting one party exclusive possession of the marital residence, the question of whether one spouse has the sole possessory interest in the house depends on whether the evidence shows that both parties had made the decision to live in separate places. Both parties must have understood that the possessory interest of one was being relinquished, even if it was relinquished begrudgingly or reluctantly. In the absence of such a showing, there

> can be no finding of trespass and, hence, no
> aggravated burglary. [Emphasis in original.]

Contrary to appellant's assertion, we did not remove from the trial court the right to dismiss all aggravated-burglary-related charges pursuant to a Crim.R. 29 motion in the instant action if the evidence was insufficient to meet the O'Neal test as a matter of law. Also, contrary to appellant's assertion, the record before us reflects that the state did present some evidence that the parties understood that they were living separately.

Cincinnati police officer Michael Mercer, who was dispatched to the house on December 7, 1993, with respect to the altercation which gave rise to the filing of the domestic-violence charge against appellant, testified that Mrs. O'Neal told him that appellant was no longer living at the house and had moved to another family member's house up the street. The officer testified that Mrs. O'Neal stated to him that appellant had gone to her house in an attempt to obtain her food stamps so that he could purchase beer, and that he had assaulted her when she refused his demand. On cross-examination, Officer Mercer indicated that Mrs. O'Neal had told him that appellant's moving out was a recent event and that appellant had moved out at Mrs. O'Neal's request. Officer Mercer further stated that Mrs. O'Neal had told him that appellant still had clothes and other possessions "stored" at the residence.

The record also contains testimony, primarily from Mrs. O'Neal's children, which indicated that appellant and his children were living at the house up until the date of the December 7, 1993, altercation, at which time Mrs. O'Neal "kicked" the three out. The record is devoid of evidence indicating that appellant made any attempt either to visit or to gain entry into the residence between December 7, 1993, and December 11, 1993, at which time he forced his way in and killed Mrs. O'Neal.

There was evidence in the record, then, that was sufficient to allow reasonable minds to conclude that appellant understood, although probably begrudgingly, that his possessory interest in the residence had been relinquished by December 7, 1993, since he had, according to Officer Mercer, moved out of the residence and was staying somewhere else. Accordingly, evidence was presented from which reasonable minds could have reached differing conclusions as to whether appellant committed aggravated burglary by trespassing in the marital residence when he committed the murder, and we

therefore conclude that the trial court did not err in overruling appellant's Crim.R. 29 motion for acquittal made with respect to the charge of aggravated burglary.

*State v. O'Neal,* 1997 Ohio App. LEXIS 5510, 10-12 (Hamilton County Dec. 12, 1997). Thus the court of appeals adhered to the test it had enunciated in *O'Neal I* and concluded the State had offered sufficient evidence of trespass to meet that test.

O'Neal appealed to the Ohio Supreme Court, arguing that *O'Neal I* was in conflict with Ohio Revised Code § 3103.04 which provided a spousal privilege, absent a court order, to enter the marital residence. (Traverse, Doc. No. 47 at 83.) The court rejected O'Neal's argument based on the following analysis:

> In his first proposition, appellant challenges the conclusions reached by the court of appeals in State v. O'Neal (1995), 103 Ohio App. 3d 151, 658 N.E.2d 1102 ("O'Neal I"), that he could be found to have trespassed on the premises in question and that therefore he could have committed an aggravated burglary. In support of this proposition, appellant contends that the holding in O'Neal I is in direct conflict with R.C. 3103.04,[7] which, according to appellant, provided him with a privilege, absent a court order, to enter the residence leased by his spouse at 4938 Plainville Road.
>
> We disagree. Recently, in State v. Lilly (1999), 87 Ohio St. 3d 97, 717 N.E. 2d 322, paragraph two of the syllabus, we held that R.C. 3103.04 is inapplicable in criminal cases. In Lilly, this court reviewed the historical implications of R.C. 3103.04 and concluded that the statute "was intended to address property ownership rights of married persons, matters of a civil nature. Privileges of a husband and wife with respect to the property of the other were not meant to be enforced criminally and do not affect criminal liabilities." Id. at 102, 717 N.E. 2d at 326. Thus, we find appellant's contention regarding the applicability of R.C. 3103.04 not well taken.

---

[7] R.C. 3103.04 provides: "Neither husband nor wife has any interest in the property of the other, except as mentioned in section 3103.03 of the Revised Code, the right to dower, and the right to remain in the mansion house after the death of either. Neither can be excluded from the other's dwelling, except upon a decree or order of injunction made by a court of competent jurisdiction."

Appellant also argues that the holding in O'Neal I is contrary to law and that it is an "unnecessary act of judicial legislation" redefining criminal trespass.  Again, we disagree.

In the case at bar, the jury convicted appellant of, among other charges, aggravated murder with aggravated burglary death penalty specifications, and the separate charge of aggravated burglary. R.C. 2911.11 sets forth the crime of aggravated burglary:

"(A) No person, by force, stealth, or deception, shall *trespass* in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with the purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:
"(1) The offender inflicts, or attempts or threatens to inflict physical harm on another;
(2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control." (Emphasis added.)

As can be gleaned, trespass is an essential element of aggravated burglary.  A criminal trespass occurs when a person "without privilege to do so," "knowingly enters or remains on the land or premises of another." R.C. 2911.21 (A)(1).  "Land or premises" includes "any land, building, structure, or place belonging to, controlled by, or in custody of another." R.C. 2911.21(E).

R.C. 2911.21(A)(1), when read in conjunction with 2911.21(E), establishes that *any* person can indeed commit a trespass against property that belongs to, is controlled by, or is in the custody of, someone else.  Therefore, a spouse can be convicted of trespass and aggravated burglary in the dwelling of the other spouse who owns, has custody of, or control over the property where the crime has occurred.  *Lilly*, paragraph one of the syllabus ("A spouse may be criminally liable for trespass and/or burglary in the dwelling of the other spouse who is exercising custody or control over that dwelling.")

*State v. O'Neal*, 87 Ohio St. 3d 402, 721 N.E.2d 73, 81-83 (2000).

O'Neal asked the state supreme court to reconsider its decision based on its application of

the *Lilly* rule, noting that the rule was not in existence at the time of this crime, but rather the controlling law was that the spouse had a privilege to enter the marital residence. (Traverse, Doc. No. 47 at 84.) Additionally, he notes that the *O'Neal I* standard as given to the jury in his case was not in existence prior to the crime either. Therefore, the application of either *O'Neal I* or *Lilly* would deny O'Neal his rights to fair warning and due process. *Id*. The court however, denied reconsideration. *State v. Neal*, 88 Ohio St. 3d 1428, 723 N.E. 2d 1115 (2000).

Plainly, the Ohio courts decided this constitutional claim on the merits. The question for this Court, then, is whether their final decision is contrary to or an objectively unreasonable application of clearly established federal law.

Petitioner principally relies on *Bouie v. City of Columbia*, 378 U.S. 347 (1964). In *Bouie*, the Supreme Court struck down as unconstitutional a new judicial construction of a trespass statute which applied it to persons (lunch counter sit-in protesters against racial segregation) who failed to leave a place of general public accommodation after notice, as opposed to the prior construction, in which had applied the statute only to those who received notice prior to entry. In *Bouie*, the South Carolina Supreme Court had, by a new interpretation of the trespass statute which it applied retrospectively, made criminal conduct which was innocent when it was done: remaining in a place of public accommodation after being asked to leave when one had had no notice before entering the store that one was unwanted. That is the most radically unfair sort of retrospective state action: criminalizing primary conduct when it is too late for the subject to conform his conduct to the prohibition. Petitioner also relies on *Marks v. United States*, 430 U.S. 188 (1977), in which the Supreme Court reversed an obscenity conviction based on the standard announced in *Miller v. California*, 413 U.S. 15 (1973), rather than the standard which

-34-

had prevailed at the time of the defendants' conduct, to wit, in *Memoirs v. Massachusetts*, 383 U.S. 413 (1966).

However, in *Rogers v. Tennessee*, 532 U.S. 451 (2001), the Court distinguished *Bouie* and held that the Due Process Clause does not incorporate as to state judicial decisionmaking all the restrictions imposed on state legislatures by the *Ex Post Facto* Clause.  In *Rogers* the Tennessee Supreme Court, had as an act of common-law lawmaking, (1) abolished the common-law rule that the death of an assault victim within a year and a day after the assault is a prerequisite to a homicide prosecution, and (2) applied the abolition to uphold the murder conviction in that case where death occurred fifteen months after the assault.  The United States Supreme Court upheld the conviction, holding that the retroactive abolition of the year-and-a-day rule did not violate Rogers' due process rights.  In *Rogers*, the Court described the situations to which it had applied *Bouie*:

> Those decisions instead have uniformly viewed *Bouie* as restricted to its traditional due process roots. In doing so, they have applied *Bouie's* check on retroactive judicial decisionmaking not by reference to the *ex post facto* categories set out in *Calder [v. Bull,* 3 Dall. 386, 1 L. Ed. 648 (1798)], but, rather, in accordance with the more basic and general principle of fair warning that *Bouie* so clearly articulated. See, e.g., *United States v. Lanier*, 520 U.S. 259, 266, 137 L. Ed. 2d 432, 117 S. Ct. 1219 (1997) ("Due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope"); *Marks v. United States*, 430 U.S. at 191-192 (Due process protects against judicial infringement of the "right to fair warning" that certain conduct might give rise to criminal penalties); *Rose v. Locke*, 423 U.S. 48, 53, 46 L. Ed. 2d 185, 96 S. Ct. 243 (1975) (per curiam) (upholding defendant's conviction under statute prohibiting "crimes against nature" because, unlike in *Bouie*, the defendant "[could] make no claim that [the statute] afforded no notice that his conduct might be within its scope"); *Douglas v. Buder*, 412 U.S. 430, 432, 37 L. Ed. 2d 52, 93 S. Ct. 2199 (1973) (per curiam) (trial court's construction of the term "arrest" as including a traffic citation, and

> application of that construction to defendant to revoke his probation, was unforeseeable and thus violated due process); *Rabe v. Washington*, 405 U.S. 313, 316, 31 L. Ed. 2d 258, 92 S. Ct. 993 (1972) (per curiam) (reversing conviction under state obscenity law because it did "not give fair notice" that the location of the allegedly obscene exhibition was a vital element of the offense).

532 U.S. at 460.

The crime of aggravated burglary is prohibited by Ohio Revised Code § 2911.11 which provides:

> (A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with the purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:
>
> (1) The offender inflicts, or attempts or threatens to inflict physical harm on another;
>
> (2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

On its face, the statute prohibits any person from trespassing on property in the custody or control of someone else, whether or not they are married. Petitioner points to no generally accepted interpretation of this statute, prior to December 11, 1993, under which he could not have been convicted of burglary.

In *State v. Herder*, 65 Ohio App. 2d 70, 415 N.E. 2d 1000 (Ohio App. 10th Dist. 1979), the court reversed a conviction of misdemeanor trespass. It relied on its prior decision in *State v. Winbush*, 44 Ohio App. 2d 256, 337 N.E. 2d 639 (Ohio App. 10th Dist. 1975), that a husband could not be found guilty of simple trespass on his spouse's property, although he could be found "guilty of offenses involving violence, such as ... aggravated burglary, where, by the use

-36-

of violence, he enters his spouse's dwelling armed with a shotgun for the express purpose of shooting her alleged paramour, which he accomplishes." *Id.* at 76.

In *State v. Middleton*, 85 Ohio App. 3d 403, 619 N.E. 2d 1113 (Ohio App. 4th Dist. 1993), defendant appealed convictions for domestic violence and burglary. The court of appeals relied on Ohio Revised Code § 3103.04 and held it created a privilege and should be read *in pari materia* with the burglary statute. However, the prosecutor had not opposed a motion to dismiss in the trial court on this basis and filed no brief on appeal. The Vinton County court read *Herder* as prohibiting a conviction for trespass, and therefore burglary, which is a nonviolent felony offense.

Thus prior to December 11, 1993, there was not a generally accepted interpretation of Ohio's aggravated burglary statute which prevented its application to a person in O'Neal's circumstances. Thus *O'Neal I* and *Lilly* involved less change of the law than even *Rogers v. Tennessee*. There is no valid basis to claim that either of those cases was a novel construction of the statute or that it extended the statute to conduct outside its scope by virtue of prior interpretation. It follows that the Ohio Supreme Court's final decision in this point is neither contrary to nor an unreasonable application of clearly established Supreme Court law. Ground One is without merit.

### Ground Two

Petitioner's right to due process under the Fourteenth Amendment
was denied by his convictions on counts, specifications, and charges
of aggravated burglary on insufficient evidence.

In his second ground for relief, Petitioner asserts a due process violation because there was insufficient evidence to show aggravated burglary. (Petition, Doc. No. 7 at 38); (Traverse,

Doc. No. 47 at 86.) Petitioner was charged with aggravated murder based on aggravated

burglary, the aggravating circumstance of aggravating burglary, and on a free-standing count of

aggravated burglary. (Traverse, Doc. No. 47 at 86.) He argues that there was no trespass as he

had a privilege to enter his marital residence, and as such he cannot be convicted of the charges

or specifications of aggravated burglary. *Id*.

      Respondent concedes that this claim is preserved for habeas review as it was raised in

direct appeal. (Return of Writ, Doc. No. 14 at 53.) However, Respondent argues that the ground

for relief is without merit. *Id*.

      Petitioner further argues that the Ohio Supreme Court applied the *Lilly* rule, not the

*O'Neal I* rule. (Traverse, Doc. No. 47 at 87.) The *Lilly* standard of "custody and control" did not

even exist at the time of O'Neal's trial or even at the time of oral argument. (Traverse, Doc. No.

47.) The standard set forth in *O'Neal I* is whether both parties had made a decision to establish

separate residences. *Id*. This was the test in effect at the time of trial, was used by the state court

of appeals, and was the standard argued in Petitioner's brief to the Supreme Court of Ohio. In

applying the *O'Neal* I standard, the court of appeals held:

> In his first assignment of error, appellant attacks the determination
> that an aggravated burglary had occurred. Appellant's arguments
> with respect to this assignment are centered on the trial court's failure
> to grant a <u>Crim. R. 29</u> motion for acquittal on the aggravated burglary
> charge and the aggravated-burglary death-penalty specifications.
> Appellant argues that the trial court incorrectly concluded that it was
> without authority to grant a judgment of acquittal on those charges
> due to this court's statement in *O'Neal I* that the trial court was to
> provide the state with an opportunity to present evidence of the
> parties' mutual decision to live apart. Appellant contends that the
> state presented no such evidence and that, therefore, at the end of the
> state's case, he was entitled to an acquittal on the aggravated burglary
> charge and the aggravated-burglary death-penalty specifications.
> <u>Crim. R. 29</u> provides that a court may order a judgment of acquittal

if the evidence is insufficient to sustain a conviction. However, if the evidence is such that reasonable minds can reach different conclusions on whether each element of the crime has been proven beyond a reasonable doubt, then a trial court shall not order judgment of acquittal pursuant to Crim. R. 29. State v. Bridgeman (1978), 55 Ohio St. 2d 261, 381 N.E.2d 184. When a court reviews evidence for sufficiency, the evidence must be construed in a light most favorable to the prosecution. State v. Grant (1993), 67 Ohio St. 3d 465, 620 N.E.2d 50.

To sustain a conviction for aggravated burglary under R.C. 2911.11, the state must show that an individual by force, stealth or deception trespassed in an occupied structure with purpose to commit a theft offense or felony therein. Appellant's argument focuses on the element of trespass. According to appellant, the element of trespass was not proven by the state because, he contends, in the absence of a court order restricting him from entering the marital residence on the date of the murder, the state failed to present evidence, as directed by this court upon remand in *O'Neal I*, of the parties intent to live separately.

In *O'Neal I*, this court held that in order to find one spouse guilty of trespass at the former marital residence in the absence of some form of court intervention, it must be shown that the other spouse has the sole possessory interest in the marital residence. We then established a test to determine when one spouse is deemed to have the sole possessory interest in the property. Specifically, we stated:

> We hold that in the absence of a restraining order or an order granting one party exclusive possession of the marital residence, the question of whether one spouse has the sole possessory interest in the house depends on whether the evidence shows that *both* parties had made the decision to live in separate places. Both parties must have understood that the possessory interest of one was being relinquished, even if it was relinquished begrudgingly or reluctantly. In the absence of such a showing, there can be no finding of trespass and, hence, no aggravated burglary. [Emphasis in original.]

Contrary to appellant's assertion, we did not remove from the trial court the right to dismiss all aggravated-burglary-related charges pursuant to a Crim. R. 29 motion in the instant action if the evidence

-39-

was insufficient to meet the O'Neal test as a matter of law. Also, contrary to appellant's assertion, the record before us reflects that the state did present some evidence that the parties understood that they were living separately.

Cincinnati police officer Michael Mercer, who was dispatched to the house on December 7, 1993, with respect to the altercation which gave rise to the filing of the domestic-violence charge against appellant, testified that Mrs. O'Neal told him that appellant was no longer living at the house and had moved to another family member's house up the street. The officer testified that Mrs. O'Neal stated to him that appellant had gone to her house in an attempt to obtain her food stamps so that he could purchase beer, and that he had assaulted her when she refused his demand. On cross-examination, Officer Mercer indicated that Mrs. O'Neal had told him that appellant's moving out was a recent event and that appellant had moved out at Mrs. O'Neal's request. Officer Mercer further stated that Mrs. O'Neal had told him that appellant still had clothes and other possessions "stored" at the residence.

The record also contains testimony, primarily from Mrs. O'Neal's children, which indicated that appellant and his children were living at the house up until the date of December 7, 1993, altercation, at which time Mrs. O'Neal "kicked" the three out. The record is devoid of evidence indicating that appellant made any attempt either to visit or to gain entry into the residence between December 7, 1993, and December 11, 1993, at which time he forced his way in and killed Mrs. O'Neal.

There was evidence in the record, then, that was sufficient to allow reasonable minds to conclude that appellant understood, although probably begrudgingly, that his possessory interest in the residence had been relinquished by December 7, 1993, since he had, according to Officer Mercer, moved out of the residence and was staying somewhere else. Accordingly, evidence was presented from which reasonable minds could have reached differing conclusions as to whether appellant committed aggravated burglary by trespassing in the marital residence when he committed the murder, and we therefore conclude that the trial court did not err in overruling appellant's Crim. R. 29 motion for acquittal made with respect to the charge of aggravated burglary.

We also believe it is important to address Judge Painter's concurrence. The O'Neal test should not be read to mean that every

marital spat is going to be turned into an aggravated burglary when one spouse leaves or is kicked out of the house, and then returns. But we are very mindful of the propensity of domestic-violence incidents to escalate into tragic situations exactly like this one. We thus reaffirm the O'Neal test and decline to disrurb the jury's factual finding under the test. See, generally, <u>State v. Williams (1997), 79 Ohio St. 3d 459, 683 N.E.2d 1126</u>.

\* \* \*

Appellant's eleventh assignment alleges that the death penalty imposed in this case must be reversed because it was imposed without proof beyond a reasonable doubt of all the statutory aggravating circumstances. Appellant does not present any new arguments in this assignment. Instead, he incorporates the arguments made in the first assignment of error with respect to his challenge to the aggravated-burglary-related convictions. For the reason given in our response to the first assignment, we likewise overrule the eleventh assignment of error.

*State v. O'Neal*, 1997 Ohio App. LEXIS 5510 at \*7-13, 28 (1997).

The Ohio Supreme Court also addressed this issue, holding that:

In his second and twelfth propositions, appellant contends that there was insufficient evidence to find that he trespassed on the property in question. Specifically, appellant claims that the record does not support a finding that the Plainville Road property was in the custody or control of Carol. However, construing the evidence in a light most favorable to the prosecution, which we are required to do, see <u>Jackson v. Virginia (1979), 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573</u>, and <u>State v. Fears (1999), 86 Ohio St. 3d 329, 341, 715 N.E.2d 136, 149</u>, we disagree with appellant's contentions.

There was sufficient evidence submitted at trial for the jury to find that, at the time appellant broke into the residence and murdered Carol, Carol was in sole custody of and control over the home. Carol was the lessee under the lease agreement for the home. Appellant's name was not on the lease. Further, on December 7, 1993, following an altercation with Carol, appellant moved out and began living somewhere else. Carol had also filed a motion for a temporary protection order against appellant. Moreover, appellant admitted to the police that, prior to the day of the murder, he had moved out and no longer lived in the home. On December 11, 1993, appellant shattered the glass in the front door, entered the residence, and killed

-41-

> Carol. Clearly, the evidence was sufficient for the jury to conclude that, at the time of the murder, appellant did not live at 4938 Plainville Road and that the residence was in Carol's sole custody and/or control.
>
> Accordingly, appellant's second and twelfth propositions of law are not well taken.

*State v. O'Neal*, 87 Ohio St. 3d 402, 408, 721 N.E.2d 73, 82 (2000).

An allegation that a verdict was entered upon insufficient evidence states a claim under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Jackson v. Virginia*, 443 U.S. 307 (1979); *In re Winship*, 397 U.S. 358 (1970); *Johnson v. Coyle*, 200 F.3d 987, 991 (6th Cir. 2000); *Bagby v. Sowders,* 894 F.2d 792, 794 (6th Cir. 1990)(en banc). In order for a conviction to be constitutionally sound, every element of the crime must be proved beyond a reasonable doubt. *In re Winship*, 397 U.S. at 364.

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt . . . . This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson v. Virginia*, 443 U.S. at 319; *United States v. Paige,* 470 F.3d 603, 608 (6th Cir. 2006). This rule was adopted as a matter of Ohio law at *State v. Jenks*, 61 Ohio St. 3d 259, 574 N.E. 2d 492 (1991). Of course, it is state law which determines the elements of offenses; but once the state has adopted the elements, it must then prove each of them beyond a reasonable doubt. *In re Winship, supra.*

In order to establish all the essential elements beyond a reasonable doubt, the State had to show that an individual, James O'Neal, by force, stealth, or deception trespassed in an occupied

-42-

structure with purpose to commit a theft offense or felony therein. Trespass is an essential element, and occurs when a person "without privilege to do so," "knowingly enters or remains on the land or premises of another." O.R.C. 2911.21 (A)(1). "Land or premises" includes "any land, building, structure, or place belonging to, controlled by, or in custody of another." O.R.C. 2911.21(E). Evidence was introduced: that Carol was listed as the tenant on the lease and that Petitioner and his children were living at the home up until a domestic altercation on December 7, 1993, at which point they left or were kicked out of the home, (Evid. Hrg. Tr. 7/18/08, Doc. No. 71 at 10-11); (Trial Tr. Vol. III at 342, 346-347); (Trial Tr. Vol. IV at 427, 459, 506, 509, 525); (Trial Tr. Vol. V at 720.) There was additional testimony given by the interviewing police officer who stated that when interviewed O'Neal responded that he no longer lived at the home and did not remember the last time he spoke with his wife. (Trial Tr. Vol. V at 720.) The record is devoid of any evidence indicating that Petitioner made any attempt either to visit, enter, or make a peaceful return to the residence between December 7, 1993, and December 11, 1993. These facts could support the elements that Carol was in custody of or had control of the home.

Additionally, there was testimony given that O'Neal used force to obtain entry into the home, specifically by breaking the front door. (Trial Tr. Vol. IV 418, 429, 459-460, 487-488, 498, 512, 549, 572-573, 575); (Trial Tr. Vol. V at 720.) There is also evidence of the use of a firearm to murder Carol O'Neal. (Trial Tr. Vol. IV at 419, 432-434, 454-455, 487-492, 498-499, 512, 515-516, 532-533, 575); (Trial Tr. Vol. V at 658, 660-662, 675, 721, 723-727.)

The Ohio courts decided this case based on their interpretation of Ohio law. In viewing the evidence most favorable to the prosecution, sufficient evidence for the jury to reasonably find guilt of trespass and the element of aggravated burglary beyond a reasonable doubt.

Decision by the state courts was not contrary to, nor an unreasonable application of established

federal law. *Jackson v. Virginia*, 443 U.S. 307 (1979); *In Re Winship*, 397 U.S. 358, 364 (1970).

### Ground Three

> The imposition of a sentence of death on Petitioner based on an
> aggravating circumstance identical to the element that makes the
> murder an aggravated offense - -aggravated burglary resulting from
> the alleged trespass of the marital residence - - violated Petitioner's
> Eighth Amendment right to be free from cruel and unusual
> punishment because it fails to draw a rational distinction between
> those eligible and those not eligible for the death penalty.

In his third ground for relief, Petitioner argues that his rights were violated because he

was charged with aggravated burglary, which repeats an element of the aggravated felony

murder charge. (Petition, Doc. No. 7 at 44);(Traverse, Doc. No. 47 at 91.)  In addition, he was

also charged under Ohio Revised Code § 2929.04(A)(7) with the death penalty specification of

committing the aggravated murder while committing the aggravated felony of aggravated

burglary. (Traverse, Doc. No. 47 at 92.)  He argues specifically that the use of an aggravating

circumstance which merely duplicates the element of the underlying offense which makes the

underlying offense an aggravated murder violates the Eighth Amendment to the United States

Constitution because it fails to narrow those who are eligible for the death penalty from those

who are not eligible for the death penalty. (Traverse, Doc. No. 47 at 92.)  Respondent does not

assert procedural default, but rather argues that this claim is without merit.(Return of Writ, Doc.

No. 14 at 59.)  As such, this Court may proceed to address this ground for relief on the merits.

In addressing this claim on direct appeal the state court held that:

> In his thirteenth proposition, appellant contends that Ohio's capital
> sentencing scheme is unconstitutional because the same operative
> fact used to elevate murder to aggravated murder (aggravated

-44-

> burglary in this case) can then be used as a death penalty
> specification. However, appellant's claim lacks merit. We have
> previously considered and rejected this argument. State v. Henderson
> (1988), 39 Ohio St. 3d 24, 528 N.E.2d 1237, paragraph one of the
> syllabus. See also Lowenfield v. Phelps (1988), 484 U.S. 231, 108 S.
> Ct. 546, 98 L. Ed. 2d 568.

*State v. O' Neal*, 87 Ohio St. 3d 402, 417, 721 N.E.2d 73, 88 (2000).

The Sixth Circuit has held this claim to be without merit in *Scott v. Mitchell*, 209 F.3d

854, 884 (2000). An aggravating circumstance may duplicate an element of the capital offense if

the class of death-eligible defendants is sufficiently narrowed by the definition of the offense

itself. *Williams v. Taylor*, 529 U.S. 362 (2000), *citing Lowenfield v. Phelps*, 484 U.S. 231 (1988).

This claim is without merit.


### Ground Four

> Petitioner's right to due process under the Fourteenth Amendment
> and his right to be free from cruel and unusual punishment under the
> Eighth Amendment was violated by the government's argument in
> penalty phase closing argument that the nature and circumstances of
> the offense - - a statutory mitigating factor under Ohio's death
> penalty scheme - -should be considered an aggravating circumstance.


Petitioner argues that the State's closing argument during the penalty phase of trial made

improper comments as to the nature and circumstances of the crime as "aggravating

circumstances." (Petition, Doc. No. 7 at 48); (Traverse, Doc. No. 47 at 96.) This argument

encouraged the jury to weigh an invalid aggravating circumstance against the mitigating

evidence and violated Petitioner's Eighth Amendment rights. (Traverse, Doc. No. 47 at 97.)

Respondent counters that this claim is procedurally defaulted, as under Ohio's contemporanious

objection rule, an objection should have been raised at trial and the failure to do so results in a

waiver of the claim of alleged error. (Return of Writ, Doc. No. 14 at 62), *citing State v. Williams*, 51 Ohio St. 2d 112, 364 N.E.2d 1364 (1977). The Ohio Supreme Court enforced the waiver when it reviewed the claim for plain error only. (Return of Writ, Doc. No. 14 at 62.) Petitioner concedes that the Ohio Supreme Court reviewed this ground for relief for plain error. (Traverse, Doc. No. 47 at 96.)

This Court agrees that the ground is procedurally defaulted. Ohio's contemporaneous objection rule states that parties must preserve errors for appeal by calling them to the attention of the trial court at a time when the error could have been avoided or corrected, set forth in *State v. Williams,* 51 Ohio St. 2d 112, 364 N.E. 2d 1364 (1977); *see also State v. Mason*, 82 Ohio St. 3d 144, 162, 694 N.E. 2d 932 (1998). This rule is an adequate and independent state ground, thus this claim is procedurally defaulted. *Mason v. Mitchell*, 320 F.3d 604 (6th Cir. 2003), *citing Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000), *citing Engle v. Isaac,* 456 U.S. 107, 124-29 (1982). *See also Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000). In the alternative, Respondent asserts that this claim is without merit as the jury was instructed that opening and closing arguments are not in evidence and that it was the duty of the trial judge to instruct the jurors on applicable law. (Return of Writ, Doc. No. 14 at 65.) Therefore, the proper instructions would have cured any confusion the jurors may have had. (Return of Writ, Doc. No. 14 at 66.)

Upon review for plain error, the Ohio Supreme Court held:

> In his seventh proposition, appellant asserts that the prosecutor's closing argument in the penalty phase of the trial appealed to the jury's emotions and improperly referred to the nature and circumstances of the offense as aggravating circumstances. Granted, "it is improper for prosecutors in the penalty phase of a capital trial to make any comment before a jury that the nature and circumstances

of the offense are 'aggravating circumstances.'" *State v. Wogenstahl* (1996), 75 Ohio St. 3d 344, 662 N.E.2d 311, paragraph two of the syllabus. However, appellant failed to object to these remarks and thus waived all but plain error. *State v. Slagle* (1992), 65 Ohio St. 3d 597, 604, 605 N.E.2d 916, 924-925; Crim.R.52(B).

During the penalty phase, the prosecutor questioned whether mitigation "outweighs the cruel manner in which he killed? How does the cruel manner in which he killed, the aggravating circumstances, weigh against the mitigation which you heard[?]" The prosecutor also referred to the "cruel manner in which he killed her" as giving additional weight to the aggravating circumstances.

However, we find that the prosecutor's comments did not amount to plain error. During the penalty phase, both the prosecutor and defense counsel correctly identified the aggravating circumstance. Moreover, the trial court correctly instructed the jury on the weighing process and the relevant aggravating circumstance. In this regard, proper instructions can cure misstatements of law by the parties. *See State v. Loza* (1994), 71 Ohio St. 3d 61, 79, 641 N.E.2d 1082, 1102-1104; *State v. Wogenstahl*, 75 Ohio St. 3d 360, 662 N.E.2d at 324-325; *State v. Greer* (1988), 39 Ohio St. 3d 236, 251, 530 N.E.2d 382, 400.

Also during his penalty argument, the prosecutor referred to the emotions felt by Carol's children witnessing her murder, and noted that the feelings "were brought from that room into this room. I felt them and so did you." However, in making these statements, it is obvious that the prosecutor was not asking the jury to render verdicts based upon emotion. In any event, "criminal trials cannot be squeezed dry of all feeling." *State v. Keenan* (1993), 66 Ohio St. 3d 402, 409, 613 N.E.2d 203, 209.

We find that the alleged errors did not affect the outcome of the trial. The prosecutor's sentencing argument did not contribute unfairly to the death verdict, and it did not create outcome-determinative plain error. Cf. *State v. Landrum* (1990), 53 Ohio St. 3d 107, 112, 559 N.E.2d 710, 718; and *State v. Hill* (1996), 75 Ohio St. 3d 195, 201-202, 661 N.E.2d 1068, 1077.

Accordingly, we reject appellant's seventh proposition of law.

*State v. O'Neal*, 87 Ohio St. 3d 402, 413-414, 721 N.E.2d 73, 86-87 (2000).

On habeas corpus review, the standard to be applied to claims of prosecutorial misconduct is whether the conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process," *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Darden v. Wainwright,* 477 U.S. 168 (1986); *Bates v. Bell*, 402 F.3d 635, 640-41 (6th Cir. 2005); *Kincade v. Sparkman*, 175 F.3d 444 (6th Cir. 1999) or whether it was "so egregious as to render the entire trial fundamentally unfair." *Cook v. Bordenkircher*, 602 F.2d 117 (6th Cir. 1979); *accord Summitt v. Bordenkircher*, 608 F.2d 247 (6th Cir. 1979), *aff'd sub nom, Watkins v. Sowders*, 449 U.S. 341 (1981); *Stumbo v. Seabold*, 704 F.2d 910 (6th Cir. 1983).  The court must first decide whether the complained-of conduct was in fact improper. *Frazier v. Huffman*, 343 F.3d 780 (6th Cir. 2003), *citing United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001).  A four-factor test is then applicable to any conduct the Court finds inappropriate: "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and whether the evidence against the defendant was strong." *Id.*  The court must decide whether the prosecutor's statement likely had a bearing on the outcome of the trial in light of the strength of the competent proof of guilt. *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982).  The court must examine the fairness of the trial, not the culpability of the prosecutor. *Serra v. Michigan Department of Corrections,* 4 F.3d 1348, 1355 (6th Cir. 1993), *quoting Smith v. Phillips*, 455 U.S. 209, 219 (1982).  The misconduct must be so gross as probably to prejudice the defendant. *Prichett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997), *cert. denied*, 118 S. Ct. 572 (1997); *United States v. Ashworth,* 836 F.2d 260, 267 (6th Cir. 1988).  Claims of prosecutorial misconduct are reviewed deferentially on habeas review.

*Thompkins v. Berghuis,* 547 F.3d 572 (6th Cir. 2008), *citing Millender v. Adams*, 376 F.3d 520,

528 (6th Cir. 2004).

      Petitioner bases this ground for relief on the following portion of the State's closing

argument during the penalty phase:

> Mr. Schmidt mentioned to you that the prosecutor has to justify
> requesting the death penalty to you. And that is something I've been
> waiting to do for almost two years. From the beginning of this case
> it has been crying out for a kind of justice reserved for the most cruel
> and horrific offenses. And the explanation is very simple as to why.
> Simple human emotions call for it.
>
> Death in itself is a very emotional thing. The death of a loved one is
> worse. Then, make it a violent death of a loved one and what
> happens to it? It multiplies. But to witness the violent death of your
> mother at a young age, how does that multiply the simple human
> emotions involved? The ultimate in horror and sadness that one can
> experience is to view the violent death of their mother.
>
> What emotions were present in that small bedroom on Plainville
> Road on December 11th, 1993? Crying and screaming, the defendant
> cursing, the children watching in the closet, terrified and horrified,
> then grief-stricken.
>
> Those emotions were brought from that room into this room. I felt
> them and so did you. LaShawnda, who they call "Precious" sitting
> there in that chair staring blankly and dealing with it, with her grief
> and her horror, in her own way, the best way she could. I'll never
> forget her testimony. One thing she did remember, "Don't die,
> mama, please don't die."
>
> Clarence, who's nickname is C.J. He's a brave little boy. He was
> obviously choking back his tears telling you how his mother was
> killed. He told you how it happened because he saw it.
>
> Ricardo told you what his last words to his mother were, that he
> loved her. Then she slipped off.
>
> Judge Winkler will tell you in the instructions that you will consider
> all the evidence, arguments, the statement of the defendant, and all
> the information which is relevant to the nature and circumstances of

the aggravating circumstances.

The fact that the killing occurred in that room in front of those children is directly related to the aggravating circumstances which you found him guilty of. He chose, ladies and gentlemen, to kill her in that house. He could have killed her at work at one of two jobs, on the street. But you found him guilty of planning her death and carrying it out in that house in front of those children. The cruelty of that offense and the emotional horror inflicted on those children as a result of that offense is directly related to that aggravating circumstance, the burglary. Without the burglary that doesn't happen.

That, ladies and gentlemen is what gives the immense weight to the aggravated burglary, that those children were present, that they saw their mother die. They saw her killed. This killing becomes much more cruel much more horrible because of that. That's the weight, ladies and gentlemen, that you use to compare with the mitigation you heard Monday.

What did you learn on Monday about that man that committed this offense, this cruel, horrible offense? I've got a list of five things that I learned. I think that will be consistent with yours. Low IQ, borderline, but can plan a murder, can carry it out, knows right from wrong, is not insane, is not mentally ill.

What does that mean, ladies and gentlemen? What is the important thing about that for you all? That means that the law applies to him. It is not an excuse. Law applies to him. He meets the standards. He knows what's going on. He knows it's wrong. The law applies to him.

Second thing, drug dealer, drug use. You didn't know about that until they brought it up, did you? You know, that's something that I always suspected was going on here because it explains the behavior. It explains what was going on in that house. Does the fact that the Brady Bunch didn't work out, does that explain to you this murder?
No, it doesn't. It doesn't make any sense. But–

* * *

Dr. Chiappone testified Monday that he diagnosed the defendant as a poly-substance abuser. I questioned him on cross-examination, I'm

-50-

sure you all were paying attention to it, and I asked him if there was any evidence of drug use in 1993, specifically December of 1993. He said, "The defendant told me that he was using cocaine the night he killed her."

Do you all remember that? I thought so. Does that explain a little bit about the children's explanation of what they were fighting about, that they were fighting over food stamps? Maybe you were wondering what would he want to do with food stamps. Now we know. You know, somebody with a borderline IQ can deal drugs, based on his brother's testimony, for five years, from 1983 to 1988, before he gets caught. Tell me he doesn't know what he's doing.

What's the third thing you learned? The defendant has a tendency to beat up on women. You heard about his prior domestic violence conviction and you've heard about the domestic violence to this victim.

Well, you know, that's his antisocial personality. He has bad coping skills, and he really has a problem with his interpersonal relationships. He wouldn't have a problem with someone at work, it's just when you get close to him, when you marry him, when you live with him, when you develop a close relationship with him that he has bad coping skills. It's pretty scary that he's more dangerous to the people he's close to than he is to everybody else. Think about that. Is that mitigating?

The fourth thing: He's thriving in jail. He's comfortable there. I'm sure you all want him to be comfortable. You wouldn't want him sitting on death row waiting to find out whether he should die, whether he's going to die and when. Let's make him comfortable. He'll have a nice job in the penitentiary. Be sure he's happy.

The fifth thing: You heard him, he's remorseful now. He told you he didn't mean to do it. Well, I guess he missed your verdict where you told him he meant to do it; that he planned it; that he did it purposefully; that he intended to kill her. What is that? Is he being honest with you?

* * *

Did his son tell you how remorseful his dad was when he took the stand and said, "He did it for us"? Am I misdirecting those facts or did I not hear that? Did you hear that? Were you shocked by that?

-51-

"He did it for us."  After saying that he loved the woman and called her "mother" he sat there and told you that his dad killed her "for us".

How much weight do you give all that?  Does that outweigh the cruel manner in which he killed?  How does the cruel manner in which he killed, the aggravating circumstances, weigh against the mitigation which you heard on Monday?  It's no contest, ladies and gentlemen. How could it be?  How could it be?

* * *

(Trial Tr. Vol. VI at 1044-1051.)

Petitioner argues that the State improperly told the jury to consider the nature and circumstances of the offense as an aggravating circumstance. (Traverse, Doc. No. 47 at 97.) Respondent counters that the above comments were made in rebuttal to Petitioner's mitigation claim that the nature and circumstances of the murder were mitigating. (Return of Writ, Doc. No. 14 at 65-66); *citing* (Trial Tr. Vol. VI at 1044.)  Additionally, the comments were not likely to confuse the jury as the State, defense counsel, and the court had properly informed them of the single aggravating circumstance to be weighed. (Return of Writ, Doc. No. 47 at 65-66); (Trial Tr. Vol. VI at 914, 1020, 1044, 1057.)

Consideration of a non-statutory aggravating circumstance, even if contrary to state law, does not violate the Constitution. *Nields v. Bradshaw*, 482 F.3d 442, 451 (6th Cir. 2007), *quoting Smith v. Mitchell*, 348 F.3d 177, 210 (6th Cir. 2003).  Even if the comments had been improper they are not flagrant.  Rather than being extensive, the remarks were isolated to the closing argument of the penalty phase.  The remarks were deliberate however, and in direct rebuttal to the closing argument made by the defense.  The circumstances of a capital crime are admissible during the sentencing phase to dispel the existence of any mitigating circumstances. *Slagle v. Bagley*, 457 F. 3d 501 (6th Cir. 2006).  "A prosecutor can legitimately refer to the facts and the

nature and circumstances of the offense, to refute any suggestion they are mitigating or to demonstrate why aggravating circumstances outweigh mitigating factors." *Slagle v. Ohio*, 65 Ohio St. 3d 597, 605 N.E.2d 916 at 930 (1992).  In *Slagle*, the Sixth Circuit held that the Ohio Supreme Court had consistently taken this position, *citing State v. Stumpf*, 32 Ohio St. 3d 95, 512 N.E.2d 598 (1987), and *State v. Gumm,* 73 Ohio St. 3d 413, 653 N.E.2d 253, 262 (1995).

There is little likelihood given the strength of evidence against O'Neal, which included multiple eye witnesses to the shooting, that the jury was prejudiced by the remarks. Furthermore, the jury was not misled by the State's comments as the trial court not only instructed the jury that the closing statements were not in evidence, but gave the jury the proper instruction as to the single aggravating circumstance of aggravated burglary:

> The single aggravating circumstance which the defendant has been convicted of committing is that the offense was committed while the offender was committing, attempting to commit or fleeing immediately after committing or attempting to commit aggravated burglary and either the offender was the principal offender in the commission of the aggravated murder, or if not the principal offender, committed the aggravated murder with prior calculation and design.

(Trial Tr. Vol. VI at 1057.)  The proper jury instructions cured any unlikely confusion.  Federal courts generally assume that juries follow their instructions. *Washington v. Hofbauer*, 228 F.3d 689, 706 (6th Cir. 2000), *citing Richardson v. Marsh,* 481 U.S. 200, 211 (1987).  Furthermore, when reviewing the jury's recommendation the trial court considered only the proper aggravating circumstance:

> Based upon that review, the Court finds itself in complete agreement with the recommendation of the jury.  Specifically, the Court finds proof beyond a reasonable doubt that the aggravating circumstance the offender James Derrick O'Neal, was found guilty of committing

-53-

outweigh the mitigating factors as to each count of the indictment.

(Trial Tr. Vol. VI at 1075-76);(Return of Writ, Doc. No. 14, Apx III at 271-278.)[8]

The decision by the Ohio court was a reasonable application of federal law.  Even if the

statement was improper it was not flagrant and the instructions by the trial judge to the jurors

---

[8]

On December 11, 1995, pursuant to Section 2929.03, after consideration of the relevant evidence raised at trial, the testimony, the exhibits, the unsworn statement of the defendant, other evidence and arguments of counsel, this Court found by proof beyond a reasonable doubt that the aggravating circumstance the offender was found guilty of committing outweigh the mitigating factors.

* * * *

The defendant has been convicted of two counts of Aggravated Murder and an identical specification of an aggravating circumstance as to both counts.  The specification involved as to both counts is that the Aggravated Murder occurred during the Aggravated Burglary of the decedents' home in Cincinnati, Ohio on December 11, 1993.

* * * *

In reach [sic] its decision, the jury and the Court considered all the evidence, arguments, the unsworn statement of the defendant and all other information relevant to the nature and circumstances of the aggravating circumstance which was that the Aggravated Murder was committed while the defendant was committing Aggravated Burglary and any mitigating factors including but not limited to: the nature and circumstances of the offense, the history, character and background of the defendant.  The jury and the Court, at the specific request of the defendant, limited its consideration of the numbered statutory mitigating factors found in 2929.04(B) O.R.C. to the following:

    (1)    Any other factors that are relevant to the issue of whether the defendant should be sentenced to death.

The Court has previously discussed the aggravating circumstance the defendant was found guilty of committing and the nature and circumstances of the offense and will not repeat them here.

* * * *

Upon full, careful and complete scrutiny of everything presented, the Court concludes that the aggravating circumstance does outweigh any mitigating factors advanced by the defendant beyond a reasonable doubt as required by 2929.03(D)(3) O.R.C.

(Return of Writ, Doc. No. 14, Apx. Vol. III at 271-278.)

-54-

prevented any prejudice. This ground for relief is without merit.

### Ground Five

Petitioner's right to due process under the Fourteenth Amendment and his right to be free from cruel and unusual punishment under the Eighth Amendment were violated by the submission to the jury in the penalty phase of the trial of multiple charges of aggravated murder and multiple and duplicative aggravating circumstances when only one victim was involved.

Next Petitioner argues that the submission to the jury in the penalty phase of the trial of multiple charges of aggravated murder and multiple and duplicative aggravating circumstances when there was only one victim violated his constitutional rights. (Petition, Doc. No. 7 at 50); (Traverse, Doc. No. 47 at 98.) Respondent counters that this claim is procedurally defaulted, as under Ohio's contemporanious objection rule, an objection should have been raised at trial and the failure to do so results in a waiver of the claim of alleged error. (Return of Writ, Doc. No. 14 at 67-68), *citing State v. Williams*, 51 Ohio St. 2d 112, 364 N.E.2d 1364 (1977). The Ohio Supreme Court enforced the waiver when it reviewed the claim for plain error only. (Return of Writ, Doc. No. 14 at 68.) Petitioner concedes that the Ohio Supreme Court reviewed this ground for relief for plain error. (Traverse, Doc. No. 47 at 98.)

This Court agrees that the ground is procedurally defaulted. Ohio's contemporaneous objection rule states that parties must preserve errors for appeal by calling them to the attention of the trial court at a time when the error could have been avoided or corrected, set forth in *State v. Williams,* 51 Ohio St. 2d 112, 364 N.E. 2d 1364 (1977); *see also State v. Mason*, 82 Ohio St. 3d 144, 162, 694 N.E. 2d 932 (1998). This rule is an adequate and independent state ground, thus this claim is procedurally defaulted. *Mason v. Mitchell*, 320 F.3d 604 (6th Cir. 2003), *citing*

*Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Scott v. Mitchell*, 209 F.3d 854 (6th Cir.

2000), *citing Engle v. Isaac,* 456 U.S. 107, 124-29 (1982). *See also Seymour v. Walker*, 224 F.3d

542, 557 (6th Cir. 2000).         In the alternative, Respondent argues that this ground for relief is

without merit. (Return of Writ, Doc. No. 14 at 69.)  When reviewed on direct appeal for plain

error the state court held:

> In his eighth proposition, appellant contends that the trial judge erred in allowing the jury to recommend a sentence on each aggravated murder count because appellant killed only one person.  Because appellant did not object to the penalty phase jury instructions at trial, he waived all but plain error. *State v. Underwood* (1983), 3 Ohio St. 3d 12, 3 Ohio B. Rep. 360, 444 N.E.2d 1332, syllabus.
>
> Appellant is correct in that aggravating murder counts involving the same victim are to be merged for sentencing. *State v. Lawson* (1992), 64 Ohio St. 3d 336, 351, 595 N.E.2d 902, 913; R.C. 2941.25(A). n6[9] Here, during the trial court's review of the evidence, the trial court should have merged the two aggravated murder counts and imposed only a single death sentence. *See id.; State v. Huertas*, 51 Ohio St. 3d at 28, 553 N.E.2d at 1066.
>
> However, sentencing an accused on each of two murder counts, involving a single victim, represents a "procedural" error that is "harmless beyond a reasonable doubt." *State v. Moore*, 81 Ohio St. 3d at 39, 689 N.E.2d at 17; *State v. Brown* (1988), 38 Ohio St. 3d 305, 317-318, 528 N.E.2d 523, 538-539.  The fact that the jury considered two aggravated murder counts for a single victim did not unfairly affect the penalty hearing. *See State v. Woodard* (1993), 68 Ohio St. 3d 70, 78, 623 N.E.2d 74, 81.
>
> Therefore, appellant's eighth proposition of law is not well taken.

*State v. O'Neal*, 87 Ohio St. 3d 402, 414, 721 N.E.2d 73, 87 (2000).

Errors by the sentencing court in weighing aggravating and mitigating factors can be

---

[9] n6 R.C. 2941.26(A) provides: "Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one."

cured by reweighing in the state appellate court. *Richmond v. Lewis*, 506 U.S. 40, 48 (1992);

*Clemons v. Mississippi*, 494 U.S. 738 (1990). Reweighing by the Ohio Supreme Court satisfies

the requirements of *Clemons. Cooey v. Coyle,* 289 F.3d 882, 888-90 (6th Cir. 2002). *See also*

*Baston v. Bagley*, 420 F.3d 632 (6th Cir. 2005). Here both courts on appeal merged the

specifications and considered the single aggravating circumstance of aggravated burglary against

the mitigation. (Return of Writ, Doc. No. 14 at 69); *State v. O'Neal*, 1997 Ohio App. LEXIS

5510; *State v. O'Neal*, 87 Ohio St. 3d at 418, 421. In its opinion the court of appeals held that

"the aggravating circumstance of the murder of Carol O'Neal outweighs, overwhelmingly and

beyond any reasonable doubt, the factors offered in mitigation." *State v. O'Neal*, 1997 Ohio App.

LEXIS 5510 at *32 (1st Dist. 1997). In affirming the sentence, the Ohio Supreme Court held that

"the aggravating circumstance clearly outweighs the mitigating factors beyond a reasonable

doubt." *State v. O'Neal*, 87 Ohio St. 3d 402, 421, 721 N.E.2d 73, 91 (2000). It is apparent from

these decisions that upon reweighing, the state courts properly weighed the aggravating

circumstance against the mitigation. This ground for relief is also without merit. The decision

of the state courts was a reasonable application of federal law.

### Ground Six

Petitioner's right to due process under the Fourteenth Amendment and his right to be free from cruel and unusual punishment under the Eighth Amendment were violated by the penalty phase jury instructions which told the jury that the aggravating circumstance which the jury was to weigh against mitigating evidence included two mutually exclusive alternatives - -that he was either the "principal offender" or that he acted with "prior calculation and design."

Next O'Neal alleges a constitutional violation from jury instructions given at the penalty

phase of trial which had jurors weighing an aggravated circumstance, that included two mutually exclusive alternatives, against the mitigating evidence. (Petition, Doc. No. 7 at 51); (Traverse, Doc. No. 47 at 99.) Respondent counters that this ground is procedurally defaulted because an objection should have been raised at trial and counsels' failure to do so resulted in a waiver of the claim of alleged error. (Return of Writ, Doc. No. 14 at 71.) The Ohio Supreme Court enforced the waiver when it reviewed the claim for plain error only. Petitioner concedes that it was reviewed by the state courts for plain error. (Traverse, Doc. No. 47 at 99.)

This claim is procedurally defaulted because it was not raised at the proper time. Ohio's contemporaneous objection rule states that parties must preserve errors for appeal by calling them to the attention of the trial court at a time when the error could have been avoided or corrected, set forth in *State v. Williams,* 51 Ohio St. 2d 112, 364 N.E. 2d 1364 (1977); *see also State v. Mason*, 82 Ohio St. 3d 144, 162, 694 N.E. 2d 932 (1998). This rule is an adequate and independent state ground, thus this claim is procedurally defaulted. *Mason v. Mitchell*, 320 F.3d 604 (6th Cir. 2003), *citing Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000), *citing Engle v. Isaac,* 456 U.S. 107, 124-29 (1982). *See also Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000).

In the alternative, Respondent argues that this ground for relief is without merit. (Return of Writ, Doc. No. 14 at 71.) In addressing this ground for plain error, the Ohio Supreme Court held:

> The imposition of the death penalty for aggravated murder is precluded unless one of the criteria contained in R.C. 2929.04 is specified in the indictment or count in the indictment and established beyond a reasonable doubt. R.C. 2929.04(A). At issue in this proposition is R.C. 2929.04(A)(7), which provides that the offense must have been "committed while the offender was committing [or]

attempting to commit * * * aggravated burglary, and either the offender was the principal offender in the commission of the aggravated murder with prior calculation and design." We have held that the "principal offender" and the "prior calculation and design" language in R.C. 2929.04(A)(7) are not intended to be cumulative aggravating circumstances but are mutually exclusive alternatives that are not to be charged and proven together in the same cause. State v. Penix (1987), 32 Ohio St. 3d 369, 371, 513 N.E.2d 744, 746.

In his ninth proposition of law, appellant asserts that the trial court's instructions to the jury violated our holding in Penix. We disagree. Initially, we note that appellant failed to object to this instruction at trial and thus waived all but plain error. Underwood. Furthermore, the trial court's instruction to the jury was proper in all respects. At trial, the court instructed the jury that "the single aggravating circumstance which defendant has been convicted of committing is that the offense was committed while the offender was committing, attempting to commit or fleeing immediately after committing or attempting to commit aggravated burglary and either the offender was the principal offender in the commission of the aggravated murder, or if not the principal offender, committed the aggravated murder with prior calculation and design."

The trial court's instruction to the jury followed the language of R.C. 2929.04(A)(7). We have held that when the "prior calculation and design" and the "principal offender" language of R.C. 2929.04(A)(7) are charged disjunctively to the jury in a single specification, as was done in this case, no error is committed. State v. Cook, 65 Ohio St. 3d 516, 527, 605 N.E.2d 70, 82-83.

Accordingly, we reject appellant's ninth proposition of law.

State v. O'Neal, 87 Ohio St. 3d 402, 415, 721 N.E.2d 73, 87-88 (2000).

In order for habeas relief to be warranted on the basis of incorrect jury instructions, a petitioner must show more than that the instructions are undesirable, erroneous, or universally condemned; taken as a whole they must be so infirm that they rendered the entire trial fundamentally unfair. *Henderson v. Kibbe,* 431 U.S. 145, 154 (1977). The only question for a habeas court to consider is "whether the ailing instruction by itself so infected the entire trial that

-59-

the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62 (1991)*, quoting*

*Cupp v. Naughten*, 414 U.S. 141 (1973). The category of infractions that violate fundamental

fairness is very narrow. *Byrd v. Collins*, 209 F.3d 486 (6ᵗʰ Cir. 2000), *citing Dowling v. United*

*States*, 493 U.S. 342, 352 (1990).

The instruction as given by the trial court is as follows:[10]

> The single aggravating circumstance which the defendant has been
> convicted of committing is that the offense was committed while the
> offender was committing, attempting to commit or fleeing
> immediately after committing or attempting to commit aggravated
> burglary and either the offender was the principal offender in
> commission of the aggravated murder, or if not the principal
> offender, committed the aggravated murder with prior calculation and
> design.

(Trial Tr. Vol. VI at 1057.)

Petitioner argues that the instruction was improper because, as the Ohio Supreme Court

held in *State v. Penix*, the elements of "principal offender" and "committed the aggravated

murder with prior calculation and design" are mutually exclusive alternatives and are not to be

charged and proven together in the same case. (Traverse, Doc. No. 47 at 100); *State v. Penix*, 32

Ohio St. 3d 369, 371, 513 N.E. 2d 744, 746 (1987). Additionally, in the penalty phase of trial,

the court instructed the jury with the language that "either the offender was the principal

offender in the commission of the aggravated murder, or if not the principal offender, committed

the aggravated murder with prior calculation and design" though the jury had found earlier in the

culpability phase that O'Neal was the principal offender. (Traverse, Doc. No. 47 at 100); (Trial

---

[10] "In this case the indictment alleged the aggravating circumstances contained in the Ohio Revised Code §2929.04(A)(7), namely: The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit . . . aggravated burglary . . . and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design." (Traverse, Doc. No. 47 at 99.)

Tr. Vol. VI at 837, 846); (Trial Tr. Vol. VI at 1057.)  This instruction improperly suggested to the jurors that despite its verdict in the first phase, O'Neal was the principal offender *or* he committed the aggravated murder with prior calculation and design. (Traverse, Doc. No. 47 at 100.)  This denied the jury its right and obligation to determine this element and allowed them to sentence him without finding him guilty of all essential elements of the charges and capital specifications. *Id*.  Additionally, it required that the jury weigh an invalid aggravating circumstance. *Id*.

Respondent, however, argues that the jury did in fact determine that O'Neal was the principal offender and that he murdered with prior calculation and design. (Return of Writ, Doc. No. 14 at 74.) The trial court specifically instructed the jurors that to convict O'Neal of the capital specification in count one, they must find he was the principal offender and went on to define the term principal offender. (Trial Tr. Vol. VI at 832-837.)  The jury found beyond a reasonable doubt that O'Neal was the principal offender. (Trial Tr. Vol. VI at 897.)  Likewise, the trial court instructed the jurors that to convict on the second count of aggravated murder, they must find that O'Neal had purposely caused Carol's death "with prior calculation and design," and explained the meaning of "prior calculation and design." (Trial Tr. Vol. V at 839-841.)  Again, the jury found that O'Neal had purposely caused Carol's death with prior calculation and design. (Trial Tr. Vol VI at 897.)

Therefore, contrary to Petitioner's argument, the penalty phase instructions did not remove consideration of any element from the jurors, and the jury determined that O'Neal was the principal offender *and* that he murdered with prior calculation and design. (Return of Writ, Doc. No. 14 at 74.)

In *Penix* the jury was not given the option of finding either that the defendant was the principal offender or if not the principal offender, committed the murder with prior calculation or design. Rather, they were required to find both. In subsequent cases, the Ohio Supreme Court found no error where "the prior calculation and design and principal offender elements of R.C. 2929.04(A)(7) were charged disjunctively to the jury in a single specification; the jury could not have found both elements to have been proven, as it could have in *Penix*." *Ohio v. Cook*, 65 Ohio St. 3d 516, 527, 605 N.E.2d 70 (1992); *see also Ohio v. Nields*, 93 Ohio St. 3d 6, 30, 752 N.E.2d 859 (2001); *State v. Burke*, 73 Ohio St. 3d 399, 405, 653 N.E. 2d 242, 248 (1995). The rationale is, if the instruction is given disjunctively then the jurors will not consider both. Nonetheless, a court errs if it does not instruct the jury that they must be unanimous in agreeing on which of the alternatives the defendant is guilty. *See Ohio v. Burke*, 73 Ohio St. 3d 399, 405, 653 N.E.2d 242 (1995). That error is harmless if the jury elsewhere indicates its unanimous verdict on either the prior calculation and design aspect or on the principal offender aspect. *Id.*; *see also Ohio v. Moore*, 81 Ohio St. 3d 22, 40, 689 N.E.2d 1 (1998).

In this case the instruction was given in the disjunctive form and the jury was asked to consider the various portions in separate counts. The jury unanimously found O'Neal guilty of being the principal offender in the capital specification to count one and of acting with prior calculation and design in the second count of aggravated murder. (Trial Tr. Vol. V at 832-837, 839.) Therefore the jury indicated its unanimous verdict on both portions. This is in contrast to Petitioner's contention that "the instruction had the effect of telling the jury that despite its verdicts in the culpability phase of trial, Petitioner was the principal offender *or* that he committed the aggravated murder with prior calculation and design." The instruction as given

did not remove from the jury its right and obligation to determine the facts and deliberate on the elements. (Emphasis added);(Traverse, Doc. No. 47 at 100.) As for Petitioner's contention that the jury was improperly required to weigh an invalid aggravating circumstance, this Court finds the sub-claim to be without merit. (Traverse, Doc. No. 47 at 100.) The trial judge instructed the jury on a single aggravating circumstance. Likewise, when the trial court reviewed for sentencing it was on a single aggravating circumstance. Additionally, on direct review only one aggravating circumstance was weighed. There is nothing to suggest that the state courts double counted or considered something invalid.

### Ground Seven

> Petitioner was denied his Sixth Amendment right to the effective assistance of counsel by the failure of trial counsel to introduce a complete copy of the lease listing Petitioner as husband and occupant of the home and by their failure to introduce evidence that the locks to the home had not been changed.

In his seventh ground for relief Petitioner argues ineffective assistance of counsel. (Petition, Doc. No. 7 at 53);(Traverse, Doc. No. 47 at 101.) Specifically, he claims their failure to introduce a complete copy of the lease for the residence and in failing to show that the locks on the house had not yet been changed constituted ineffective assistance of trial counsel. (Traverse, Doc. No. 47 at 101-106.) This claim is properly preserved for habeas review. (Return of Writ, Doc. No. 14 at 78.) As the Ohio Supreme Court declined jurisdiction in post-conviction, the last reasoned decision was from the court of appeals, which held as follows:

> O'Neal presents two assignments of error for review. In his first assignment of error, he states that the trial court erred in concluding that he failed to raise a substantive ground for relief based upon ineffective assistance of counsel. He argues that he presented

evidence outside the record that his trial counsel failed to introduce a complete copy of the lease of the marital residence listing him as an occupant, and deprived the jury of key documentary support for his claim of right to enter the marital residence. He also claims that he was prejudiced by the prosecution's misrepresentations to the jury that his name was not on the lease and that he did not have a key to the residence, due to his counsel's failure to present evidence on those issues and to object at proper times. We find that his assignment of error is not well taken.

In a petition for postconviction relief that asserts ineffective assistance of counsel, the petitioner bears the initial burden to submit evidentiary documents containing sufficient operative facts to demonstrate not only that counsel substantially violated his or her duties to the client, but also that the defense was prejudiced by such a violation. State v. Cole (1982), 2 Ohio St. 3d 112, 114, 443 N.E.2d 169, 171; State v. Jackson (1980), 64 Ohio St. 2d 107, 413 N.E.2d 819, syllabus. O'Neal has not demonstrated how his defense was prejudiced by any of his counsel's alleged deficiencies.

O'Neal's assertion that his being listed as an "occupant" on the lease somehow gave him a legal right to be on the property and prevented a finding that he was trespassing is incorrect. The language of the lease is clear that the "tenant" named in the lease was Carol O'Neal and that her spouse was merely a member of her household permitted to be on the premises. R.C. 5321.01 (A) defines a "tenant" as "a person entitled under a rental agreement to the use and occupancy of residential premises to the exclusion of others." The rights conferred by the terms of the lease to the tenant to use and occupancy of residential premises are paramount and exclusive to all others. Cent. Mut. Ins. Co. v. Faller Pietrykowski v. Hamblin, 1985 Ohio App. LEXIS 6344 (Apr. 12, 1985), Wood App. No. WD-84-86, unreported; State v. Harding, 1983 Ohio App. LEXIS 11621 (Mar. 23, 1983), Hamilton App. No. C-820345, unreported. Consequently, the lease agreement did not give O'Neal the right to use the premises absent his wife's consent, and introduction of the missing page would not, therefore, have supported his defense at trial.

Further, the evidence showed that O'Neal lived in the marital residence until he assaulted his wife and she "kicked him out." A page in the lease listing him as an occupant was cumulative at best and potentially could have been prejudicial to his defense. Consequently, introduction of that page of the lease would not have changed the outcome of the proceeding, and O'Neal was not

prejudiced by his counsel's failure to introduce it into evidence. See Strickland v. Washington (1984), 466 U.S. 668, 693-694, 104 S. Ct. 2052, 2067-2068, 80 L. Ed. 2d 674; State v. Hamblin (1988), 37 Ohio St. 3d 153, 157, 524 N.E.2d 476, 479.

O'Neal's claim that he was prejudiced by his counsel's failure to introduce evidence that the locks on the marital residence had not been changed and that he possessed a key to the residence was not supported by any evidentiary documents. Since he failed to supply appropriate evidentiary documents, he was not entitled to relief on that basis. State v. Kapper (1983), 5 Ohio St. 3d 36, 38-39, 448 N.E.2d 823, 826. "General conclusory allegations to the effect that a defendant has been denied effective assistance of counsel are inadequate as a matter of law to impose an evidentiary hearing." Jackson, supra, at 111, 413 N.E. 2d at 822.

Additionally, the evidence presented at trial showed that the victim planned to get the locks changed, but that she had not yet done so at the time of her death. It also showed that O'Neal gained entrance to the premises, not by using a key, but by breaking a glass door. Further, as we held in O'Neal II, the state presented substantial evidence from which the jury could have reasonably concluded that O'Neal no longer had any possessory interest in the premises. Under the facts of this case, the issue of whether the locks were changed or whether O'Neal still had a key had little relevance, and evidence on those issues would not have changed the outcome of the proceedings. Consequently, O'Neal was not prejudiced by counsel's failure to introduce evidence on those matters or to object to the prosecutor's argument, which comported with the evidence. See Strickland, 466 U.S. at 693-694, 104 S. Ct. At 2067-2068; Hamblin, supra, at 156, 524 N.E.2d at 479. Therefore, he has failed to meet his burden to show ineffective assistance of counsel.

In reality, O'Neal is simply using the postconviction process to try to circumvent our holdings in O'Neal I and O'Neal II. His petition for postconviction relief does not support his claim of ineffective assistance of counsel. The trial court did not err in dismissing the petition pursuant to R.C. 2953.21 (C), and we therefore overrule his first assignment of error.

*State v. O'Neal*, 1999 Ohio App. LEXIS 1207 (1st Dist. March 26, 1999).

The general governing standard for effective assistance of counsel is found in *Strickland*

-65-

*v. Washington*, 466 U.S. 668 (1984). . In evaluating whether or not the representation of counsel fell into the category of ineffectiveness it must be evaluated for "reasonableness under prevailing professional norms." *Id*. Next, Petitioner must be able to show that he was prejudiced by the ineffectiveness of counsel. *Strickland*, 466 U.S. at 680. Prejudice results when a defendant is deprived of a fair trial. *Id*. To demonstrate prejudice a petitioner must show that there is a reasonable probability that, but for the unprofessional errors, the result of the proceeding would have been different. *Id*. at 698. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.**;** *see also Darden v. Wainright*, 477 U.S. 168 (1986); *Wong v. Money,* 142 F.3d 313, 319 (6th Cir. 1998); *Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir. 1987); *see generally* Annotation, 26 ALR Fed 218.

The first portion of this ground focuses on counsels' alleged ineffectiveness because they failed to present the entire lease. (Traverse, Doc. No. 47 at 103.) Petitioner argues that had they done so they could have countered the State's position that "[t]here's the lease. You have the front page of the lease and addendum for the lease. When you get back there, you look at these. And nowhere on either of these documents is his name. Nowhere. His wife rented that house." *Id*.; *citing* (Trial Tr. Vol. V at 802.) O'Neal further notes that the landlord, Kenneth Taylor, was subpoenaed twice to testify, but was not called for the actual hearing. (Traverse, Doc. No. 47 at 103-104.) If he had testified Taylor could have provided the entire lease agreement, which did list Petitioner's name as an occupant to the residence. *Id*. at 104.

Petitioner cannot show prejudice arising from counsels' failure. There is no reasonable probability of a different outcome if the complete lease had been admitted as ample evidence was presented at trial corroborating the fact that Petitioner had been living at the residence until

-66-

the domestic violence altercation. (Trial Tr. Vol. III at 342, 346-347); (Trial Tr. Vol. IV at 427, 459, 506, 509, 525, 720). Trial counsel for O'Neal testified at the evidentiary hearing before this Court that he did not feel this was in dispute at the time of trial, "[t]here was no question that he was residing with his wife and blended family until the day of the alleged domestic violence where he left. That thereafter, he went to work but he did not return to, what I'm going to refer to as the marital residence until the date of the offense that brings us here today." (Evid. Hrg. Tr. 7/18/08, Doc. No. 72 at 26.) The complete lease would have been cumulative and would only have shown that Carol was listed as the tenant and that O'Neal was listed under occupants. (Evid. Hrg. Tr. 7/18/08, Doc. No. 71 at 10-11.) Specifically, the lease stated that "[t]he tenant Carol, 'shall personally use and occupy the premises solely as a private dwelling.'" Counsel was not ineffective in their failure to introduce the entire lease. There was sufficient evidence for the jury to find that Petitioner had been married to Carol, that he had been living in the home, and that he had relinquished his rights and was no longer living there. There is not a reasonable probability that if the lease had been introduced in its entirety, showing Carol as tenant and Petitioner as occupant, that the result would have been different.

In the next portion Petitioner argues ineffectiveness in counsels' failure to introduce evidence that the locks to the home had not been changed. (Traverse, Doc. No. 47 at 104.) O'Neal argues that this is significant because if the locks had not been changed and he still had a key, then he could have entered the residence without breaking in. *Id*. at 105. This, in conjunction with the full lease, would have been important information for the jury to consider in determining whether a trespass had occurred, and hence, whether there was an aggravated burglary. *Id*. However, Petitioner cannot establish prejudice. Testimony was given during trial

that Carol had intended to change the locks but had not done so before her murder. (Trial Tr.

Vol. III at 375-376.)  Any additional testimony on this matter, including testimony from the

landlord, would have been cumulative. (Evid. Hrg. Tr. 7/18/08, Doc. No. 71 at 11-12.)

Furthermore, the Court agrees with the Respondent's contention that it would have been

contradictory for the defense to argue that "O'Neal had a key and thus a right to enter, but he had

to break the door to get in."(Return of Writ, Doc. No. 14 at 81.)  There is no reasonable

probability that the outcome of the trial would have been different had counsel introduced

evidence that the locks had been changed.

### Ground Eight

> Petitioner was denied his Sixth Amendment right to the effective
> assistance of counsel by the failure of trial counsel to object to the
> omission from the culpability phase jury instructions on trespass the
> phrase "in the absence of a restraining order or an order granting one
> party exclusive possession of the marital residence" and the failure
> to object to reference in the instructions to the marital residence as
> the "wife's residence" and the use of the word "estranged" without
> defining the term for the jury.

Next, Petitioner alleges ineffective assistance of trial counsel in their failure to object to

the instructions to the jury that used the terms "wife's residence" and "estranged" and failed to

use the "in the absence of a restraining order" language. (Petition, Doc. No. 7 at 58); (Traverse,

Doc. No. 47 at 106.)  Respondent argues that this ground is procedurally defaulted because

counsel failed to object at trial. (Return of Writ, Doc. No. 14 at 82.)  During post-conviction

relief proceedings both the trial court and court of appeals held that because this ground for relief

was based on the record and should have been raised during direct appeal but was not, the claim

was barred by *res judicata*. *State v. O'Neal*, 1999 Ohio App. LEXIS 1207 at *10.  In the

alternative, Respondent asserts that this claim is without merit. (Return of Writ, Doc. No. 14 at 84.) Petitioner rebuts Respondent's argument by asserting that this claim was not based on the record and therefore, could not have been raised on direct appeal. (Traverse, Doc. No. 47 at 60.) Additionally, Petitioner notes that trial counsel did not make specific objections, but did make a general one based on prior requests and arguments. (Traverse, Doc. No. 47 at 107, 110); *see also* (Trial Tr. Vol. V at 859.) Petitioner argues that the jury instructions proposed by trial counsel were not filed and made part of the record.

In addressing the issue of procedural default, this Court finds that the jury instructions were part of the trial record and trial counsel should have lodged an objection at the proper time, on the record and again on direct appeal. Counsel did make a general objection to the jury instructions on the record, however, counsel failed to properly raise the issue again on direct appeal, and as a result failed to properly preserve the claim. Petitioner's argument that the proposed instructions were not filed and made part of the trial record and therefore should have been raised during post-conviction relief proceedings is without merit. The jury instructions themselves were part of the trial record. Any proposed jury instructions, if filed, would have been part of that record. Therefore, the actual instructions as well as the proposed instructions were available to counsel at the time of direct appeal.

On interlocutory appeal, the court of appeals issued a pretrial decision, "O'Neal I", which remanded O'Neal's case to the trial court to allow for evidence to be presented and for a jury to determine whether Petitioner had committed a trespass in entering the home:

> We hold that in the absence of a restraining order or an order granting one party exclusive possession of the marital residence, the question of whether one spouse has the sole possessory interest in the house depends on whether the evidence shows that both parties had made

> the decision to live in separate places. Both parties must have
> understood that the possessory interest of one was being relinquished,
> even if it was relinquished begrudgingly or reluctantly. In the
> absence of such a showing, there can be no finding of trespass and,
> hence, no aggravated burglary.

*State v. O'Neal*, 103 Ohio App. 3d 151, 155, 658 N.E.2d 1102, 1104 (1995). Petitioner notes

that the instructions from the court of appeals do not contain the word "estranged." (Traverse,

Doc. No. 47 at 107.) During the culpability phase of trial the following exchange occurred

between counsel and the judge as to the requested instructions on aggravated burglary and on

trespass:

> Mr. Keller: At this point we're anticipating no other evidence. And
> then I would like - - we've had some discussions, but I submitted on
> behalf of Mr. O'Neal a motion for some additional special
> instructions for the jury and I've given a copy to the Court. I just
> want those made part of the record.
>
> The Court: Well, you only gave me one on the burglary.
>
> Mr. Keller: We'll give you the other one on murder.
>
> The Court: Well, I've already addressed the one on the agg burglary,
> and what I've taken is in the instructions for count number four
> regarding the aggravated burglary, when I give them the standard
> definition of trespass, I then include the submitted instructions that
> the State gave, followed by yours. Now, have you seen what I've
> done?

(Trial Tr. Vol. V at 748.)

> The actual instructions as given by the trial court to the jury are as follows:

> Now we had some talk during the trial in closing arguments about
> trespass, and I want to tell you what that is. Trespass means any
> entrance, knowingly made, in a structure, residence, or dwelling of
> another is unlawful if it is without authority, consent or privilege to
> do so.
>
> Evidence has been introduced to demonstrate that the defendant and

the victim have been married to each other. A husband can be convicted of an aggravated burglary of his wife's residence if you find that certain conditions exist, including those that demonstrate a criminal trespass.

Those conditions are that both parties understand that they are now living separate and apart. In order to decide this issue, you must review all the facts and circumstances in evidence that relate to this question.

When a husband and wife are estranged and both parties understand that they are living separate and apart, a husband may not use force to enter the wife's residence. If he does so, that is a trespass. If he does so with the intent to commit a felony, he can be convicted of aggravated burglary.

The question of whether one spouse has the sole possessory interest in the house depends on whether the evidence shows that both parties have made the decision to live in separate places. Both parties must have understood that the possessory interest of the one was being relinquished, even if it was relinquished begrudgingly or reluctantly. In the absence of such a showing, there can be no finding of trespass, and, hence, no aggravated burglary.

(Trial Tr. Vol. V at 826-827.)

The governing standard for effective assistance of counsel is found in *Strickland v. Washington*, 466 U.S. 668 (1984). To show ineffective assistance of trial counsel, Petitioner must be able to show that counsels' performance was deficient. *Id*. In evaluating whether or not the representation of counsel fell into the category of ineffective it must be evaluated for "reasonableness under prevailing professional norms." *Id*. Next, Petitioner must be able to show that he was prejudiced by the ineffectiveness of counsel. *Id*. at 680. Prejudice results when a defendant is deprived of a fair trial. *Id*. To demonstrate prejudice a petitioner must show that there is a reasonable probability that, but for the unprofessional errors, the result of the proceeding would have been different. *Id*. at 698. "A reasonable probability is a probability

sufficient to undermine confidence in the outcome." *Id.*; *See also Darden v. Wainwright*, 477 U.S. 168 (1986); *Wong v. Money,* 142 F.3d 313, 319 (6th Cir. 1998); *Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir. 1987). *See generally* Annotation, 26 ALR Fed 218.

In the first sub-claim Petitioner alleges ineffectiveness due to counsels' failure to object to the absence of the phrase "in the absence of a restraining order or an order granting one party exclusive possession of the marital residence" in the jury instructions. (Traverse, Doc. No. 47 at 114.) Petitioner argues that the absence of this phrase resulted in a failure to inform the jury that there was no restraining order at the time of Carol O'Neal's death, and therefore their consideration of the restraining order would have undermined the confidence in the reliability of the verdict. *Id.*

This sub-claim is without merit.  There was evidence presented to establish that while Carol had requested a restraining order, it was not signed until the day after her murder.  Defense counsel made this point in their opening statement, informing the jurors "[t]hat yes, after the domestic violence incident on December 7th, Carol Lee O'Neal did file and sign an affidavit with the Hamilton County Municipal Court alleging the domestic violence.  That as part of that procedure she also requested a Temporary Protective Order excluding Mr. O'Neal from the residence.  But the evidence will further show that on December 11, 1993, there was no such Temporary Protective Order granted by the Hamilton County Municipal Court.  That the evidence will show that only after Carol's death on December 12, 1993, was a Temporary Protective Order granted by telephone, per Judge Mestemaker." (Trial Tr. Vol. III at 334.)  This protective order was admitted at trial as a joint exhibit. *Id.* at 336-337.  Furthermore, throughout trial, testimony was given that while the victim had intended to change the locks and get a

protective order, she had not done so prior to her death. (Trial Tr. Vol. III at 376); (Trial Tr. Vol. IV at 510, 530.) Defense counsel further reminded jurors during closing that there was not a protective order. (Trial Tr. Vol. V at 777.) There is no probability that the outcome would have been different if the language had appeared in the instruction. It is obvious from the evidence that there was no restraining order on December 11th. The jury would not have considered the restraining order and there is no need for the instructions on the lack of an order.

In his next sub-claim O'Neal alleges counsels' ineffectiveness because they did not object when the trial court used the word "estranged." "When a husband and wife are estranged and both parties understand that they are living separate and apart, a husband may not use force to enter the wife's residence. If he does so, that is a trespass." (Trial Tr. Vol. V at 826-827.) Petitioner argues that the term estranged was not defined in the jury instructions, nor was it defined upon the jury's request, so therefore the jury had to speculate as to the meaning of the word. (Traverse, Doc. No. 47 at 112.)

> The Court:　The record should reflect that we're here because the jury sent out a note, and you can show that to Gina.
>
> The note reads: We need the legal definition in Ohio of what "estranged" means. Signed Lee Baumgartner, Foreman.
>
> * * * *
>
> The Court has discussed the matter with counsel and concluded that we're unable to give any further instructions to the jury, at least in this area.
>
> And the Court, with approval of counsel, plans to send a note to the jurors worded something like this: Ladies and gentlemen of the jury, in response to your request for a legal definition the word "estranged," [sic] this is to notify that you [sic] the Court has

> previously given you all the applicable instructions regarding this case and is unable to give you any further instructions at this time. Please rely upon your collective memories and understanding in making your deliberations.

(Trial Tr. Vol. VI at 861-862.)

Petitioner asserts that because the court failed to instruct the jury on the term, the jury could conclude that if spouses had differences and were living apart, then one could not use force to enter the others residence. *Id.* In considering the totality of the jury instructions, the jury was instructed that in making their determination they must consider whether or not the evidence has shown "those conditions are that both parties understand that they are now living separate and apart. In order to decide this issue, you must review all the facts and circumstances in evidence that relate to this question." (Trial Tr. Vol. V at 826.) Given the instructions in their entirety, the use of the word "estranged" and counsels' failure to object to the term did not prejudice Petitioner.

In his final sub-claim, Petitioner alleges ineffectiveness of counsel in their failure to object when the trial court referred to the home as the "wife's residence" when instructing the jury. (Traverse, Doc. No. 47 at 114.) He specifies that this error deprived him of his due process right under the 14th amendment that the prosecution prove every element of the offense. *Id.* at 115. Petitioner asserts that referring to the home as the "wife's residence," in combination with the court's use of the word "estranged" and the omission of the "in the absence of a restraining order" language, created an impression on the jurors that the wife had sole possessory interest in the home. (Traverse, Doc. No. 47 at 115.)

O'Neal cannot show prejudice as there is no reasonable probability that the outcome would have been different. The jury instructions explicitly told the jury that they would need to determine

whether or not "both parties understand that they are now living separate and apart." (Return of Writ, Doc. No. 14 at 85), *quoting* (Trial Tr. Vol. V at 826.) Evidence had been presented to the jury that both Petitioner and the victim had been residing in the home, but after an altercation O'Neal moved out while Carol and her children remained in the home. (Return of Writ, Doc. No. 14 at 85); *see also* (Trial Tr. Vol. III at 342, 346-347); (Trial Tr. Vol. IV at 427, 459, 506, 509, 525, 720.) The instructions immediately prior to the use of the phrase "wife's residence" reminded the jurors that they needed to determine if one spouse had sole possessory interest because **both** parties had decided to live in separate places. *Id.*; *see also* (Trial Tr. Vol. V at 827.) Therefore, when considering the instructions as a whole, counsels' failure to object to the isolated use of the phrase "wife's residence" likely had no impact or prejudice. The decisions by the state courts were neither contrary to, nor an unreasonable application of U.S. Supreme Court law. This ground for relief is without merit in its entirety.

### Ground Nine

Petitioner's right to confrontation under the Sixth Amendment and to due process under the Fourteenth Amendment were violated by the admission of multiple hearsay statements allegedly made by the victim.

In his ninth ground for relief, O'Neal alleges constitutional violations arising out of the admission of hearsay testimony. (Petition, Doc. No. 7 at 67); (Traverse, Doc. No. 47 at 115.) Respondent concedes that this claim is preserved for habeas review, but argues that it is without merit. (Return of Writ, Doc. No. 14 at 87.) In reviewing this ground the Ohio Supreme Court held:

In his fourth proposition, appellant argues that the admission of multiple hearsay statements attributed to Carol denied him due

process of law and the right to confront his accuser. In support, appellant points to testimony of Officer Mercer, Carol's friend Patricia Carr, and Carol's son Ricardo regarding statements that Carol made concerning the December 7 altercation between Carol and appellant, her fears of appellant, and her plans to end the marriage. In allowing the testimony into evidence, the trial court relied on the "excited utterance" exception to the hearsay rule, Evid. R. 803(2),[11] and the "then existing mental, emotional, or physical condition" exception set forth in Evid. R. 803(3).[12]

At trial, Officer Mercer testified that after he responded to a call for assistance on December 7, Carol told him that she had just had an altercation with appellant during which he struck her in the face numerous times, choked her, shoved her to the ground, and kicked her because she refused to give him food stamps. Mercer also testified that Carol told him that appellant had moved out and no longer lived at the residence.

We conclude that Carol's statements to Mercer were relevant to the issues tried and admissible under Evid. R. 803(2) as an excited utterance. All of the above statements related to a startling event or condition, the assault by appellant, which had reportedly just occurred. Mercer testified that Carol was "very excited," "very upset," crying, and "very fearful." In this regard, Carol was still "under the stress and excitement caused by the event or condition." Evid. R. 803(2). See State v. Huertas (1990), 51 Ohio St. 3d 22, 31, 553 N.E.2d 1058, 1068. See also, State v. Duncan (1978), 53 Ohio St. 2d 215, 7 Ohio Op. 3d 380, 373 N.E.2d 1234, paragraph one of the syllabus.

Patricia Carr, Carol's friend and coworker, testified about statements Carol made to her, including details about the December 7 altercation and Carol's relationship with appellant. Carr testified that Carol was "really stressed" in December and wanted to get out of the marriage.

---

[11] The "excited utterance" exception, Evid. R. 803(2), excludes from the hearsay rule "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

[12] The "then existing mental, emotional, or physical condition" exception to the hearsay rule is found at Evid. R. 803 (3). It provides that "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)" is not excluded by the hearsay rule.

Carr testified that after the December 7 altercation, whenever the phone rang, Carol was "shaking, scared," thinking it was going to be appellant on the phone. Carr also testified that appellant no longer stayed at the marital home, and that Carol planned to get the locks changed.

We agree with appellant that the trial court erred by admitting Carr's recitation of Carol's conversations as an excited utterance. The trial court also erred by allowing Carol's son Ricardo to testify about his mother's description of the December 7 altercation to him. For an excited utterance to be admissible, "the central requirements are that the statement must be made while the declarant is still under the stress of the event and the statement may *not* be a result of reflective thought." (Emphasis added.) State v. Taylor (1993), 66 Ohio St. 3d 295, 303, 612 N.E.2d 316, 322. Because Carol's conversations with Ricardo and Carr occurred hours after the altercation, she had considerable time to reflect, thereby negating the "excited utterance" status of the statement. Id. at 300-305, 612 N.E.2d at 320-323; State v. Johnson (1994), 71 Ohio St. 3d 332, 338, 643 N.E.2d 1098, 1104.

However, we find beyond a reasonable doubt that any improperly admitted hearsay testimony did not contribute to the verdict and therefore was harmless error. Id. Ricardo's and Carr's description of the December 7 altercation, as told to them by Carol, duplicated Mercer's admissible testimony. Also, other admissible evidence established that Carol had filed a motion for a protective order and that appellant no longer lived in the home. Moreover, appellant confessed that he had shot Carol.

Carol's statements that she was feeling stressed and was afraid of appellant were relevant to prove her intent to end the marriage. These statements were properly admitted as evidence under Evid. R. 803(3), which permits hearsay evidence of a declarant's "then existing state of mind, emotion, sensation * * * (such as intent, plan, motive, design, mental feeling [or] pain)." To be sure, "testimony of state-of-mind witnesses, that the victim was fearful and apprehensive [is] not inadmissible hearsay and [is] properly admitted." State v. Apanovitch (1987), 33 Ohio St. 3d 19, 22, 514 N.E.2d 394, 398. Accord State v. Frazier (1995), 73 Ohio St. 3d 323, 338, 652 N.e.2d 1000, 1013; State v. Simko (1994), 71 Ohio St. 3d 483, 491, 644 N.E.2d 345, 353. In addition, statements about Carol's plans to separate and end the marriage were also admissible under Evid. R. 803(3). State v. Sage (1987), 31 Ohio St. 3d 173, 182-183, 31 Ohio B. Rep. 375, 383, 510 N.E.2d 343, 350 (victim's statements regarding

                    intent to break up with defendant admissible.)

                    Accordingly, appellant's fourth proposition of law is not
persuasive.

*State v. O'Neal*, 87 Ohio St. 3d 402, 411-412, 721 N.E.2d 73, 83-85 (2000).

      "Errors in application of state law, especially with regard to admissibility of evidence, are usually not cognizable in federal habeas corpus." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003); *citing Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983); *see also Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001).  However, in an instance where an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and warrant habeas relief. *Coleman*, 244 F.3d at 542; *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000).  "Courts 'have defined the category of infractions that violate 'fundamental fairness' very narrowly.'" *Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993), *quoting Dowling v. United States*, 493 U.S. 342, 352 (1990).  "Generally, state court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour*, 224 F.3d at 552, *quoting Montana v. Egelhoff*, 518 U.S. 37, 43 (1996).

      Although the Confrontation Clause reflects the Constitution's strong preference for face-to-face confrontation at trial, the Clause has not been interpreted to bar all hearsay. *Maryland v. Craig*, 497 U.S. 836, 847-48 (1990); *Ohio v. Roberts*, 448 U.S. 56 (1980).  *Roberts* has been overruled by *Crawford v. Washington*. 541 U.S. 36 (2004)(holding that "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine"); *see also Melendez-Diaz v. Massachusetts*,  129 S. Ct. 2527, 2009 U.S. LEXIS 4734 (2009).  The Confrontation

Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant has a prior opportunity for cross-examination." *Crawford,* 541 U.S. at 53-54. On the other hand, the mere fact that an out-of-court statement satisfies a recognized hearsay exception does not automatically satisfy the Confrontation Clause. *Idaho v. Wright,* 497 U.S. 805, 814 (1990). Under *Roberts,* even if an out-of-court statement falls within a recognized hearsay exception, it still must have "adequate indicia of reliability." Those indicia are presumed to exist if the hearsay falls within a "firmly rooted exception." *Roberts*, 448 U.S. at 66. If a statement does not come within a firmly rooted exception, it is admissible only if it has particularized guarantees of trustworthiness, the other prong of the *Roberts* test. *Roberts*, 448 U.S. at 66.

In determining whether a particular hearsay statement bears such guarantees of trustworthiness, courts may look only to the circumstances in which the statement was made and that render the declarant particularly worthy of belief. *Idaho v. Wright,* 497 U.S. 805, 820-21 (1990). Conversely, they may not look to any external facts that might corroborate the substance of the hearsay statement. "To be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial." *Id.* at 822.

Under the hearsay exception for excited utterance, a statement is permissible if it was, "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Ohio Evid. R. 803(2); *U.S. v. Arnold*, 2007 U.S. App. LEXIS 11616 (6th Cir. 2007), *quoting Haggins v. Warden, Fort Pillow State Farm*, 715 F.2d 1050, 1057 (6th Cir. 1983). Courts have not prescribed a precise showing of

lapse in time between the startling event and the out-of-court statement. Statements are considered to be nontestimonial when they are made under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. Comments are considered to be testimonial, however, when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution. *Davis v. Washington*, 547 U.S. 813 (2006).

Much of the testimony offered in this case were statements given to the police officer when he responded to a domestic violence call and the victim was crying and was obviously upset. (Trial Tr. Vol. III at 342-344.) The testimony given pertaining to that time frame was properly admitted under the excited utterance exception to hearsay. Once the situation changed and Carol became calm, however, then any statements made were no longer covered by this exception. The testimony given by the victim's friend, as well as the comments given by the victim's son in regards to the incident of domestic violence were improper. (Trial Tr. Vol. III at 368-372, 379); (Trial Tr. Vol. IV at 510-511.) Portions of this testimony were in fact objected to and sustained by the court. (Trial Tr. Vol. III at 370, 371, 373, 379.) The court further properly instructed the jury that they were to disregard such testimony. (Trial Tr. Vol. III at 371, 379); (Trial Tr. Vol. V at 817.) A jury is presumed to follow curative instructions. *Richardson v. Marsh,* 481 U.S. 200, 211 (1987); *United States v. Waldon,* 296 F.3d 597 (6th Cir. 2000); *Washington v. Hofbauer*, 228 F.3d 689, 706 (6th Cir. 2000).

Likewise, statements that fall under the state of mind exception for hearsay allow for "a statement of the declarant's then existing state of mind, emotion, sensation, or physical condition

(such as intent, plan, motive, design, mental feeling, pain, and bodily health)." Ohio Evid. R. 803

(3). The testimony that Carol was feeling stressed and afraid, as well as the testimony of her

desire to end the marriage fall under this exception as they show her existing state of mind,

mental feelings, and intent and plan to end her marriage.

As most of the portions admitted came under an exception or the objection was sustained,

there is no error. The portions that were erroneously admitted did not unduly prejudice the

Petitioner. It was cumulative to testimony that had properly been admitted. The decision of the

state court was not contrary to, nor an unreasonable application of, clearly established federal

law.

### Ground Ten

> Petitioner's right to be free from cruel and unusual punishment under
> the Eighth Amendment was violated by the imposition of punishment
> disproportionate to the punishment normally inflicted on defendants
> for domestic homicides and for similar offenses committed in the
> same jurisdiction.

Next Petitioner asserts that Ohio law provides inadequate appellate review of the

proportionality of death sentences. (Petition, Doc. No. 7 at 70); (Traverse, Doc. No. 47 at 119.)

Respondent does not assert procedural default, but rather states that this claim was raised on

direct appeal and was found to be without merit. (Return of Writ, Doc. No. 14 at 90.) This

ground is properly preserved for review on the merits. On direct appeal, the state court held:

> Having considered appellant's propositions of law, we must now
> independently review the death sentence for appropriateness and
> proportionality (also raised in appellant's sixteenth proposition of
> law). R.C. 2929.05(A). For purposes of independent review, the two
> counts of aggravated murder of a single victim must be merged. State
> v. Lawson, 64 Ohio St. 3d at 351, 595 N.E.2d at 913.

We find that the aggravating circumstance appellant was found guilty of committing, murder during an aggravated burglary in which appellant was the principal offender (R.C. 2929.04[A][7]), was proven beyond a reasonable doubt. The nature and circumstances of the offense reveal nothing of any mitigating value.

Testifying on behalf of appellant at the mitigation hearing were Dr. David Chiappone, a clinical psychologist; Dr. Robert Tureen, a clinical psychologist with a specialty in neuropsychology; Dorothy O'Neal, appellant's mother; Steve Dumas, appellant's long-time friend; Cortez O'Neal, appellant's son; and Jamie Powers, appellant's former workplace supervisor. Also, appellant read a statement to the jury.

Dr. Chiappone conducted lengthy interviews with appellant and administered several psychological tests. He also obtained information from appellant's family members and friends. The history he received indicated that appellant had two older and two younger sisters, that he had been the family favorite, that his mother had "doted" over him, and that his parents separated when he was nine years old.

Chiappone noted that appellant completed twelve years of education but was passed academically only because he was a very good basketball player. Appellant had been suspended from school several times for fighting. From 1972 to 1975, appellant served in the United States Marine Corps but was discharged for being absent without leave. From 1976 through approximately 1989, appellant supported himself by selling drugs. During this time, appellant was convicted of selling marijuana. He also served approximately one year in prison for selling cocaine.

After his release from prison, appellant apparently stopped selling drugs and held a number of jobs. Appellant and Carol were married in 1992. Appellant has nine children from different relationships. Appellant attributed his marital problems with Carol to their inability to raise their children together. According to Chiappone, appellant strongly resented Carol because he felt that she had thrown his children out on the street.

Chiappone concluded that appellant had a mixed personality disorder, with narcissistic self-centeredness and antisocial elements, and that he was borderline mentally retarded. Chiappone noted, however, that appellant was not mentally ill and that he understood the difference

between right and wrong. Appellant abused alcohol and used cocaine sporadically, and he told Chiappone that he had ingested cocaine on the day that he killed Carol. Chiappone stated that he believed that appellant could adapt to a life in prison.

Chiappone believed that appellant may have suffered brain damage in his childhood and requested that Dr. Tureen, a clinical psychologist with a specialty in clinical neuropsychology, evaluate appellant. Tureen described appellant as suffering from both low intelligence and "minimal cerebral dysfunction," or a basic problem in the "hard wiring" of his brain. His poor academic performance showed evidence of "organicity" or brain damage. Because of this "mild to moderate degree of impairment," his ability to learn is impaired and his thinking tends to be very "concrete." Tureen further stated that he believed that appellant would have more difficulty thinking clearly under the stress of a failed relationship than would the average person. Tureen concluded that appellant killed Carol because appellant felt that it was the only way he could express his anger when Carol made appellant and his sons leave her home.

Other defense witnesses supported these descriptions of appellant's history and background. Appellant's mother, Dorothy O'Neal, stated that appellant was a normal boy when growing up and that he loved basketball. Appellant's father died when appellant was young and this event significantly affected him because appellant and his father had been very close.

Dumas stated that he was a long-time friend of appellant, that appellant was like an older brother to him, and that appellant was not a violent person. Dumas described appellant as a peacemaker. Dumas noted that when appellant got out of prison in 1989, he stopped selling drugs. According to Dumas, appellant did not want his children to grow up in the streets, stressed education, and urged his children to stay in school.

Cortez, one of appellant's sons, testified that he loves his father. He also stated that he liked Carol and that she treated him well and was like mother to him. Cortez stated that on December 7, 1993, he saw his father beat Carol.

Powers, one of appellant's former employers, stated that appellant had a positive attitude and did a good job even while working in an undesirable, low-paying job. Powers also stated that he had seen appellant act as a peacemaker on different occasions when fights

-83-

would break out in the kitchen.  Powers described appellant as having a really strong work ethic even though he had been fired several times for absenteeism and for being late to work.  Powers rehired appellant each time after he had been fired and testified that he would rehire him now if he could.

In an unsworn statement that he read to the jury, appellant stated that he did not plan or mean to kill Carol, but that his feelings "got the best" of him.  He stated that he was sorry for what he had done and for the pain he had caused Carol's family and his own family.

Upon review of the evidence admitted in mitigation, we find that the evidence concerning appellant's history, character, and background is entitled to very little weight in mitigation.  Specifically, we find that appellant's attempt to turn his life around and become a responsible citizen after years of selling drugs and his attempt to be a father to two of his children by taking custody of them and encouraging them to get an education is entitled to some weight in mitigation.  Also, his attempt at legitimate, steady employment after his prison term is entitled to some, but very minimal, mitigating weight.  See State v. Mitts (1998), 81 Ohio St. 3d 223, 236, 690 N.E.2d 522, 533; State v. Fox (1994), 69 Ohio St. 3d 183, 194, 631 N.E.2d 124, 133.

During the penalty phase, appellant presented no evidence regarding the mitigating factors set forth in R.C. 2929.04(B)(1) through (B)(6), and our review of the record reveals that these factors are inapplicable here.  However, there are some "other factors" in the record that appear relevant and are entitled to weight in mitigation. R.C. 2929.04(B)(7).

Testimony from both psychologists established that appellant has organic brain problems and although appellant is not mentally retarded, he functions in the lower two to three percent of the general population.  His judgment, thinking process, and ability to learn from mistakes are all impaired, and he suffers from a mixed personality disorder.  These conditions are entitled to some weight in mitigation. See, e.g., State v. Bies (1996), 74 Ohio St. 3d 320, 327, 658 N.E.2d 754, 761; State v. Green (1993), 66 Ohio St. 3d 141, 153, 609 N.E.2d 1253, 1263; State v. Davis (1992), 63 Ohio St. 3d 44, 51, 584 N.E.2d 1192, 1198.

At the time of the murder, appellant was angry with Carol over what he perceived to be mistreatment of his sons.  Appellant expressed

-84-

regret and remorse, which are entitled to some mitigating weight. See State v. Mitts, 81 Ohio St. 3d at 236-237, 690 N.E.2d at 533; State v. Moore, 81 Ohio St. 3d at 44, 689 N.E.2d at 20. Further, appellant's cooperation with police is entitled to some weight in mitigation, State v. Dunlap, 73 Ohio St. 3d at 319, 652 N.E.2d at 998, as is appellant's ability to adapt to prison, State v. Smith (1997), 80 Ohio St. 3d 89, 121, 684 N.E.2d 668, 696.

Pursuant to our statutory duty we have weighed the evidence presented in mitigation against the R.C. 2929.04(A)(7) aggravating circumstance appellant was found guilty of committing. We find that the aggravating circumstance clearly outweighs the mitigating factors beyond a reasonable doubt.

As a final matter, we have undertaken a comparison of the sentence imposed in this case to those in which we have previously imposed the death penalty. Appellant's death sentence is neither excessive nor disproportionate in comparison to the penalty imposed in similar cases. See, e.g., State v. Benge (1996), 75 Ohio St. 3d 136, 661 N.E.2d 1019; State v. Simko (1994), 71 Ohio St. 3d 483, 644 N.E.2d 345; State v. Huertas, 51 Ohio St. 3d 22, 553 N.E.2d 1058. In this regard, we also reject appellant's fifteenth proposition of law, *supra*. Appellant attempts to distinguish his crime from the crimes of others on the basis that this was a domestic dispute and the victim was his wife. Such a notion is repugnant to us. We vigorously reject this argument.

Accordingly, for the foregoing reasons, we affirm the judgment of the court of appeals and uphold the sentence of death.

*State v. O'Neal*, 87 Ohio St. 3d 402, 418-421, 721 N.E.2d 73, 89 (2000).

Petitioner's contention fails, however, as no proportionality review is constitutionally "required in every case in which the death penalty is imposed and the defendant requests it." *Pulley v. Harris*, 465 U.S. 37, 50-51 (1984); *Buell v. Mitchell*, 274 F.3d 337 (6th Cir. 2001). As this is not a constitutional right states are afforded great latitude in the review it does provide as it is an additional safeguard against arbitrarily imposed death sentences . . . ." *Pulley*, 465 U.S. at 50. This ground for relief is without merit.

**Ground Eleven**

Petitioner's right to due process and to equal protection of the law under the Fourteenth Amendment was violated by the use of peremptory challenges to exclude members of his race from the jury contrary to the standards established in Batson v. Kentucky.

In his eleventh ground for relief, Petitioner alleges constitutional violations due to *Batson* errors. (Petition, Doc. No. 7 at 71); (Traverse, Doc. No. 47 at 120.) Respondent does not allege procedural default but rather argues that this claim is without merit. (Return of Writ, Doc. No. 14 at 95.) The state supreme court addressed this claim on direct appeal and held that:

In his third proposition, appellant contends that the prosecution peremptorily excused jurors based on their race. In Batson v. Kentucky (1986), 476 U.S. 79, 89, 106 S. Ct. 1712, 1719, 90 L. Ed. 2d 69, 82-83, the Supreme Court of the United States held that the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution precludes purposeful discrimination by the state in the exercise of its peremptory challenges so as to exclude members of minority groups from petit juries. See, also, State v. Hernandez (1992), 63 Ohio St. 3d 577, 581, 589 N.E.2d 1310, 1313. If a defendant makes a prima facie case of discrimination, the state must provide a race-neutral explanation. However, the explanation need not rise to the level justifying exercise of a challenge for cause. Id. at 582, 589 N.E.2d at 1313, citing Batson, 476 U.S. at 96-98, 106 S. Ct. at 1723-1724, 90 L.Ed. 2d at 87-89.

Appellant claims that the State's peremptory challenges against prospective jurors Anderson, Breckenridge, and Cowins were racially motivated. However, appellant has failed to show any facts or relevant circumstances that raise an inference that the prosecutor used the challenges for racial reasons. State v. Hernandez, 63 Ohio St. 3d at 582, 589 N.E.2d at 1313. In fact, in at least one case an African-American replaced a juror challenged by the State, and two African-Americans sat on the jury.

Nonetheless, the trial court requested that the state explain, for the record, the reasons for its challenges. The prosecutor noted that Anderson was dismissed because she was "the lowest rated juror as far as applying the death penalty." The state excused Breckenridge

-86-

because of his "mixed feelings regarding the death penalty" and because he was single and lived at home with his mother and thereby lacked "a stake in the community."

The state challenged Cowins because she was a social worker, which the state felt was not a "pro-conviction" occupation, and because she agreed with the verdict finding O.J. Simpson not guilty despite her admission that she had not followed the case. Cowins also stated that she would not openly deliberate with her fellow jurors.

These explanations are clearly race-neutral and are supported by the record. '"Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'" Purkett v. Elem (1995), 514 U.S. 765, 768, 115 S. Ct. 1769, 1771, 131 L.Ed. 2d 834, 839, quoting Hernandez v. New York (1991), 500 U.S. 352, 360, 111 S. Ct. 1859, 1866, 114 L.Ed. 2d 395, 406 (plurality opinion). We have held that a trial court's finding of no discriminatory intent will not be reversed on appeal unless clearly erroneous. State v. Hernandez, 63 Ohio St. at 583, 589 N.E.2d at 1313, following Hernandez v. New York, 500 U.S. at 369, 111 S. Ct. At 1871, 114 L. Ed. 2d at 412. To that end, we conclude that the trial court's acceptance of the State's race-neutral explanations was not clearly erroneous. Cf. State v. Sheppard (1998), 84 Ohio St. 3d 230, 234-235, 703 N.E.2d 286, 291-292; State v. Moore (1998), 81 Ohio St. 3d 22, 28, 689 N.E.2d 1, 9; State v. Dennis (1997), 79 Ohio St. 3d 421, 428, 683 N.E.2d 1096, 1104; State v. Wilson (1996), 74 Ohio St. 3d 381, 388, 659 N.E.2d 292, 302.

Therefore, we reject appellant's third proposition of law.

State v. O'Neal, 87 Ohio St.3d 402, 409-410, 721 N.E.2d 73, 82-83 (2000).

It is clearly established United States Supreme Court law that the State may not exercise its [peremptory] challenges in violation of the Equal Protection Clause. It is impermissible to use the challenges to exclude from the jury minorities "for reasons wholly unrelated to the outcome of the particular case on trial" or to deny "the same right and opportunity to participate in the administration of justice enjoyed by the white population." Batson v. Kentucky, 476 U.S. 79, 91 (1986), quoting Swain v. Alabama, 380 U.S. 202, 224 (1965). As with any equal

protection claim, the defendant who alleges the discrimination has the burden of establishing

"the existence of purposeful discrimination." *Id.;Whitus v. Georgia*, 385 U.S. 545, 550 (1967),

*citing Tarrance v. Florida*, 188 U.S. 519 (1903).

To make a *prima facie* showing, a defendant must show that he is a member of a

cognizable racial group, that a challenge has been exercised to remove a venireperson of the

same race, and any additional facts and circumstances from which an inference could be drawn

that the prosecutor had used the peremptory challenge in a race-based manner. *Batson,* 476 U.S.

at 79. The defendant is entitled to rely on the fact that the peremptory challenge process is one

in which those who are of a mind to discriminate on the basis of race are able to do so. *Id.* A

trial court must use a three-step process to evaluate a *Batson* claim. The burden then shifts to the

proponent to articulate a race-neutral reason for the challenge. Finally, the trial court must

determine if the opponent has carried his burden of proving purposeful discrimination. *Purkett v.*

*Elem,* 514 U.S. 765, 768 (1995); *Hernandez v. New York*, 500 U.S. 352 (1991). A trial judge's

conclusion that the challenge was race-neutral must be upheld unless it is clearly erroneous.

*Hernandez*; *supra*; *United States v. Tucker*, 90 F.3d 1135, 1142 (6th Cir. 1996); *United States v.*

*Peete*, 919 F.2d 1168, 1179 (6th Cir. 1990). The fact that the evidence would have supported a

challenge for cause is sufficient to demonstrate that it is race-neutral. *Batson*, 479 U.S. at 97.

In the present case the State exercised peremptory challenges against Prospective Jurors

Anderson, Breckenridge, and Cowins, all African-Americans. (Trial Tr. Vol. II at 143-144);

(Trial Tr. Vol. III at 231, 274.) After each challenge Petitioner objected immediately based on

*Batson v. Kentucky*. The judge then asked the State to justify each of their challenges. In regard

to Anderson, the State offered that she was the lowest rated juror on the death penalty scale.

(Trial Tr. Vol. II at 70, 143-144.) As for Breckenridge, their reasoning was that he had mixed feelings as to the death penalty and did not have a stake in the community as he was still in school and living with his mother. (Trial Tr. Vol. II at 65-66, 96-97);(Trial Tr. Vol. III at 230-231.) Additionally the State noted that the potential juror that would take Mr. Breckenridge's spot was also African-American. *Id.* The State offered the explanation as to potential juror Cowin that her occupation as a social worker did not make her pro-conviction, that she stated that she agreed with the Simpson verdict after admitting she did not follow the case, and that she may have had trouble deliberating with the other jurors. (Trial Tr. Vol. II at 147-148); (Trial. Tr. Vol. III at 274-277.)

Additionally, the State pointed to its pattern of challenges in this particular case. Their peremptory challenges were used against both whites and African-Americans. (Trial Tr. Vol. II at 188); (Trial Tr. Vol. III at 274-277.) The State offered the following summary explaining their use of the peremptory challenge against the prospective jurors:

> Mr. Kunkel: Judge, I want to put a number of things on the record and then I'll give reasons.
>
> I'd like the record to reflect that this is the final State's peremptory.
>
> The challenge was Juror Anderson, a black female. The reason was given was that at the time she scored the lowest on the panel as being in favor of the death penalty.
>
> The second peremptory exercised was on Mr. Tebbs, a male white.
>
> The third was James Gulick, a male white.
>
> The fourth was Christopher Breckenridge, a male black. Reasons were given at the time.

The fifth exercise was a male white, Mr. Bowdre.

Three whites and three blacks have been excluded by the State.

The reasons given in this case are, number one, juror's occupation is social worker. The State feels that that is not an occupation which could lead to be a pro-conviction juror.

Number two, the prospective juror, when asked about the verdict in the California verses Simpson case said that she agreed with the verdict, after having told us on her questioning that she did not follow the case at all.

And finally, she said in questioning that she would not openly deliberate with her fellow jurors. While she was rehabilitated by the defense and somewhat by the Court, it still stands as an inconsistent statement, Your Honor.

The Court:     All right.

Mr. Keller:    Your Honor, I would just, in argument, say that I believe both the Court and I did rehabilitate her and clarified what she was saying. And I think that's the whole purpose of rehabilitation. And you can't say-if they're inconsistent, then you would never rehabilitate anyone.

The Court:     I think under Batson the prosecutor is simply required to give his reasons.

He's given reasons that to me are apparently plausible, and I can't fault him for the way he wants to try his case.

I don't see it as a systematic exclusion.

Mr. Leon:      For the record, there are also two female black jurors remaining on the panel.

The Court:     Yes, and they could get into the box. It's conceivable

-90-

that they could get into the box. Okay.

Mr. Schmidt:   Your Honor, at this point, for the record we'll ask for a mistrial.

The Court:   It's overruled.

Mr. Leon:   Judge, again, for the record there are two female blacks in the box now.

The Court:   Yes.

(Trial Tr. Vol. III at 274-277.)

The State offered evidence sufficient to show that the challenges were facially race-neutral and, as evidenced by the record, the State used peremptory challenges against white jurors that cited similar facts or reasons, such as being "middle of the road" on the death penalty or because their careers did not lend them to be pro-conviction. (Trial Tr. Vol. II at 77-81, 175, 186-187); (Trial Tr. Vol. III at 202-203, 205-208, 243.)  The use of peremptory challenges to excuse those who have doubts about the death penalty does not violate *Witherspoon v. Illinois*, 391 U.S. 510 (1968); *see Wainwright v. Witt* (modifying that the critical question is not whether excusing or refusing to excuse a particular juror was error, but whether the jury that actually sits is impartial.)  Judge Winkler concluded that the challenges were race-neutral and a trial judge's conclusion that the challenge was race-neutral must be upheld unless it is clearly erroneous. *Hernandez v. New York*, 500 U.S. 352 (1991); *United States v. Tucker*, 90 F.3d 1135, 1142 (6th Cir. 1996); *United States v. Peete*, 919 F.2d 1168, 1179 (6th Cir. 1990).  This Court does not find the decision to have been clearly erroneous.  It was not an unreasonable application of, nor contrary to, U.S. Supreme Court law.  This claim is without merit.

**Ground Twelve**

Petitioner's right to due process under the Fourteenth Amendment was violated by the admission of statements obtained from Petitioner by the police by means of deceiving Petitioner into believing his wife was still alive, making his waiver of his right to remain silent not voluntary, knowing, and intelligent.

In his twelfth ground for relief Petitioner alleges a due process violation because police deception was used to induce a waiver of Miranda rights. (Petition, Doc. No. 7 at 79); (Traverse, Doc. No. 47 at 122.) Respondent does not allege procedural default but rather argues that the ground is without merit. (Return of Writ, Doc. No. 14 at 106.) In addressing this claim on direct appeal, the state court held:

In his sixth proposition, appellant contends that his postarrest statement to police should not have been admitted at trial because it was obtained through deception by police officers. Specifically, appellant asserts that the failure of police officers to inform him about Carol's death prevented a knowing and intelligent waiver of his Fifth Amendment rights. We disagree. "A suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." Colorado v. Spring (1987), 479 U.S. 564, 577, 107 S. Ct. 851, 859, 93 L.Ed. 2d 954, 968.

Further, the police did not lie to appellant about Carol's condition and appellant never asked about her condition while being questioned. The United States Supreme Court "has never held that mere silence by law enforcement officials as to the subject matter of an interrogation is 'trickery' sufficient to invalidate a suspect's waiver of *Miranda* rights." Id. at 576, 107 S. Ct. At 858, 93 L. Ed.2d at 967.

Accordingly, appellant's sixth proposition of law is not persuasive.

*State v. O'Neal*, 87 Ohio St. 3d 402, 413, 721 N.E.2d 73, 86 (2000).

The Court turns to the merits of whether the statement was unknowing or unintelligent

-92-

and applies a totality of the circumstances test. *Colorado v. Spring*, 479 U.S. 564, 574 (1987). In considering the "totality of the circumstances" the Court must evaluate both the characteristics of the accused and the details surrounding the interrogation. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). Under the guidelines of *Spring*, to waive constitutional privilege within the meaning of the Fifth Amendment:

> First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Spring*, 479 U.S. at 573, *quoting Fare v. Michael C.*, 442 U.S. 707, 725 (1979); *see also Faretta v. California*, 422 U.S. 806, 835 (1975); *North Carolina v. Butler*, 441 U.S. 369, 374-375 (1979); *Brewer v. Williams*, 430 U.S. 387, 404 (1977).

Petitioner has not shown that his confession was the result of intimidation, coercion, or deception. O'Neal does not allege "physical violence or deliberate means calculated to break his will," but rather argues that the police officers failed to provide him with all relevant information. *Colorado v. Spring*, 479 U.S. 564, 573-574 (1987), *citing Oregon v. Elstad*, 470 U.S. 298, 312 (1985). Coercive police activity is a necessary predicate to the finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment. *Colorado v. Connelly*, 479 U.S. 157, 163. As held in *Colorado v. Spring*, "once *Miranda* warnings are given, it is difficult to see how official silence could cause a suspect to misunderstand the nature of his constitutional right-'his right to refuse to answer any question

-93-

that might incriminate him.'" *Id.* at 576, *citing United States v. Washington*, 431 U.S. 181, 188

(1977). Using the Supreme Court's analysis in *Moran v. Burbine,* the *Spring* court further stated

that a valid waiver does not require that an individual be informed of all information 'useful' in

making his decision or all information that 'might . . . .[affect] his decision to confess'" and that

the failure of the law enforcement officers to inform Spring of the subject matter of the

interrogation could not have affected his decision to waive his Fifth Amendment rights.

*Colorado v. Spring*, 479 U.S. at 576-577, *citing Moran v. Burbine*, 475 U.S. 412, 422 (1986).

The Supreme Court declined to find that mere silence by law enforcement officials as to the

subject matter of an interrogation is "trickery" sufficient to invalidate a waiver of Miranda rights.

*Colorado v. Spring*, 479 U,S, at 576.

      In this case Petitioner argues that law enforcement failed to disclose to him that his wife

had died as a result of the shooting. (Traverse, Doc. No. 47 at 122.) Petitioner was aware,

however, of the incident for which he was being interrogated and at no time did he inquire as to

the extent of Carol's injuries.[13] Absent a showing that his will was overbourne because of

---

[13] * * *

    Prior to that point, I had knowledge that his wife had died during surgery at the hospital. During the course of his interview I did not advise Mr. O'Neal of the fact that his wife had died as a result of the gunshot wound.

    Upon termination of the interview, I advised him of his wife's demise. He showed exactly no emotion one way or the other as to whether he cared. I asked him if he had any questions. He appeared to me like he just didn't care at all. He showed no signs of emotion one way or the other as far as his wife's death.

Q:     He didn't ask you any questions about the wife's conditions the whole time?
A:     The only thing- - I asked him, "Since your wife died as a result of you shooting her, would you do anything different?" He said "I have no regrets what I did. It hurt what she did to my kids."

(Trial Tr. Vol. V at 726-727.)

Q:     And the reason that you didn't tell Mr. O'Neal was that that may very well have changed his position as far as being cooperative with you?
A:     Well, not so much of the cooperation, just the emotional stress that that might have held against Mr. O'Neal.

coercive police conduct, the waiver of his Miranda rights was voluntary. *Colorado v. Spring*, 479

U.S. 564 at 574; *Colorado v. Connelly*, 479 U.S. 157, 163-164 (1986). The decision of the state

court was neither contrary to, nor an unreasonable application of, U.S. Supreme Court law. This

claim is without merit.

> **Ground Thirteen**
> Petitioner's right to due process under the Fourteenth Amendment
> and to be free from cruel and unusual punishment under the Eighth
> Amendment was violated by the trial court's refusal to give an
> instruction in the culpability phase of the trial of the lesser included
> offense of murder.

In his thirteenth ground for relief, O'Neal alleges a constitutional violation because the

trial court refused to give a lesser included offense jury instruction. (Petition, Doc. No. 7 at 74);

(Traverse, Doc. No. 47 at 123.) Respondent argues that while this ground for relief was raised

on direct appeal and is properly preserved, it is without merit. (Return of Writ, Doc. No. 14 at

109.) In its holding, the state supreme court held:

> In his fifth proposition, appellant argues that the trial court erred in
> rejecting his request for an instruction on murder as a lesser included
> offense to the aggravated murder charged in counts 1 and 2. Murder,
> which does not require proof of prior calculation and design, R.C.
> 2903.02, is a lesser included offense of aggravated murder, R.C.
> 2903.01(A). State v. Goodwin (1999), 84 Ohio St. 3d 331, 345, 703
> N.E.2d 1251, 1264. However, "even though an offense may be
> statutorily defined as a lesser included offense of another, a charge on
> such lesser included offense is required only where the evidence
> presented at trial would reasonably support both an acquittal on the

Q:    So you thought it was more productive that you not share that with him?
A:    I preferred to see his side of the story prior to telling him of his wife's demise.

(Trial Tr. Vol. V at 732.)

crime charged and a conviction upon the lesser included offense." State v. Thomas (1988), 40 Ohio St. 3d 213, 533 N.E.2d 286, paragraph two of the syllabus. Accord State v. Shane (1992), 63 Ohio St. 3d 630, 632, 590 N.E.2d 272, 274.

We conclude that the trial court did not err by refusing to instruct on murder as a lesser included offense to count 2.  The state presented strong evidence of prior calculation and design, and a jury could not reasonably find appellant guilty of murder and not guilty of aggravated murder.  Appellant attacked Carol four days before the murder.  On the day of the murder, he made a threatening telephone call to Carol at her place of work, then several hours later broke into her home armed with a gun.  He was wearing a jacket with the collar pulled up and a cap over a large portion of his head in an apparent attempt to conceal his identity.  He chased Carol up the stairs and while standing over her, shot and killed her.  The entire incident, breaking into the home, killing Carol, and leaving the home took place in approximately thirty seconds.  These facts indicate a calculated plan of attack swiftly carried into execution. Cf. State v. Goodwin (1999), 84 Ohio St. 3d 331, 344-345, 703 N.E. 2d 1251, 1263; State v. Wilson, 74 Ohio St. 3d at 394-395, 659 N.E. 2d at 306. Appellant's claim to police that he did not intend to kill Carol is irrelevant to an instruction on murder as a lesser offense, since murder involves a purposeful killing. See R.C. 2903.02.

With respect to count 1, we also find that the trial court did not err by refusing to instruct the jury that murder is a lesser included offense to the felony murder charge.  The state also presented strong evidence that Carol was in custody and/or control of the home.  Prior to killing Carol, appellant was not living at the residence.  He broke into the home and mercilessly killed her.  The findings of the jury that appellant committed an aggravated burglary were clearly in accord with the evidence produced by the state.

Therefore, appellant's fifth proposition of law is not well taken.

State v. O'Neal, 87 Ohio St. 3d 402, 412-413, 721 N.E. 73, 85-86 (2000).

The decision of the state courts was not contrary to, nor an unreasonable application of federal law.  This ground for relief is without merit.  Paragraph one of the syllabus in State v. Kidder, 32 Ohio St. 3d 279, 513 N.E.2d 311 (1987), states the Ohio law on lesser included

offenses.

> 1. An offense may be a lesser included offense of another only if (I) the offense is a crime of lesser degree than the other, (ii) the offense of the greater degree cannot, **as** statutorily defined, ever be committed without the offense of the lesser degree, as statutorily defined, also being committed, and (iii) some element of the greater offense is not required to prove the commission of the lesser offense. (R.C. 2945.74, construed; *State v. Wilkins* [1980], 64 Ohio St.2d 382, 18 O.O.3d 528, 415 N.E.2d 303, approved and followed; *State v. Rohdes* [1986], 23 Ohio St.3d 225, 23 OBR 382, 492 N.E.2d 430, modified.)

"Due process requires that a lesser included offense instruction be given only when the evidence warrants such an instruction." *Palmer v. Bagley*, 2009 U.S. App. LEXIS 11695 *9 (6th Cir. May 29, 2009), *quoting Hopper v. Evans*, 456 U.S. 605, 611 (1982). The *Hopper* Court determined that no lesser included offense instruction was required where the evidence not only supported the claim that the defendant intended to kill the victim, but affirmatively negated any claim that he did not intend to do so. *Hopper v. Evans*, 456 U.S. 605, 611 (1982). In this case, the evidence shows that O'Neal did in fact intend to shoot Carol. There was testimony as to threats made over the telephone, that Petitioner attempted to disguise his identity before entering the house, that he kicked in the front door, that he stood within close range and shot Carol multiple times, and then he fled the scene. (Trial Tr. Vol. IV at 405-407, 416-419, 429, 432-434, 454-455, 459-460, 487-492, 498-499, 512, 515-516, 532-533, 549, 572-573, 575); (Trial Tr. Vol. V at 603, 658, 661-662, 675.) Additionally there was testimony from an officer to the effect that when O'Neal was interviewed he admitted to police that he broke in and shot Carol because of what "she did to his kids." (Trial Tr. Vol. V at 720-721, 723-727.) This is all evidence as to prior calculation and design, and as such, the case did not warrant an instruction on the lesser included offense of murder. This claim is without merit. The state court decision was not contrary to, nor

an unreasonable application of federal law.

### Ground Fourteen

Petitioner's Sixth Amendment right to a fair and impartial jury and his Eighth Amendment right to be free from cruel and unusual punishment were violated by the selection of a jury predisposed to impose a sentence of death, contrary to the standards in <u>Witherspoon v. Illinois</u>.

Petitioner argues that the State used peremptory challenges to exclude jurors who were not predisposed to impose a death sentence. (Petition, Doc. No. 7 at 75); (Traverse, Doc. No. 47 at 125.) Respondent does not allege procedural default, but rather counters that the claim is without merit. (Return of Writ, Doc. No. 14 at 112.)

The state court addressed this claim on direct appeal and held that:

In his tenth proposition, appellant asserts that the "systematic exclusion of prospective jurors opposed to the death penalty violated [appellant's] right to a fair and impartial jury which reflects the community from which it is drawn." We summarily reject this argument on the authority of <u>Lockhart v. McCree (1986), 476 U.S. 162, 106 S. Ct. 1758, 90 L. Ed. 2d 137</u>; <u>State v. Moore, 81 Ohio St. 3d at 26, 689 N.E. 2d at 8</u>; <u>State v. Grant (1993, 67 Ohio St. 3d 465, 476, 620 N.E.2d 50, 64</u>; <u>State v. Jenkins (1984), 15 Ohio St. 3d 164, 15 Ohio B. Rep. 311, 473 N.E. 2d 264</u>, paragraph two of the syllabus.

*State v. O'Neal*, 87 Ohio St. 3d 402, 416, 721 N.E. 2d 73, 88 (2000).

As the United States Supreme Court held in *Witherspoon v. Illinois*, the proper inquiry on voir dire is not whether the prospective juror is opposed to the death penalty, but rather whether their religious, moral, or conscientious objections would preclude them from following the instructions of the court. 391 U.S. 510, 521-522 (1968). Thus, it is proper to exclude for cause a prospective juror who indicates that either they could not vote for capital punishment under any circumstances or that they would be hesitant to do so. *Morgan v. Illinois*, 504 U.S. 719, 728

(1992); *Lockhart v. McCree*, 504 U.S. 719, 728, (1986) (holding that juror can be removed for cause for a hesitancy to impose a death sentence); *see also Luckett v. Kemna*, 203 F.3d 1052, 1054-5 (8th Cir. 2000); *see further Gosier v. Welborn*, 175 F.3d 504, 509-10 (7th Cir. 1999); *Keel v. French*, 162 F.3d 263, 271 (4th Cir. 1998). When a trial judge excuses a juror as to whom the judge has a definite impression that the prospective juror will be unable to faithfully apply the law, that decision is entitled to deference. *State v. Beuke*, 38 Ohio St. 3d 29, 38, 526 N.E. 2d 274, 284-85, *citing Wainwright v. Witt*, 469 U.S. 412 (1985).

This Court has reviewed the voir dire in connection with the peremptory challenges. Here the prosecution asked, on a scale of one to ten, how the individual prospective juror would rate their beliefs about the death penalty. (Trial Tr. Vol. II at 46-47, 52, 57, 63-64, 66, 72, 75, 79, 84-86, 148, 168, 172, 177, 186); (Trial Tr. Vol. III at 210-211, 217, 233, 247, 255, 264, 280.) Juror Woodhouse rated herself a nine under the right circumstances, Juror Owens rated herself a ten, Juror Baumgartner rated himself a nine, Juror Franke rated himself a nine or ten, Juror Wehby rated himself a ten, Juror Hallo rated herself a six or seven, Juror Bailey rated herself a five, Juror Lloyd rated herself a six, Juror Henderson rated herself a seven, Juror Geselbracht rated herself a seven or eight, and Juror O'Gorman rated himself a three. (Trial Tr. Vol. II at 52, 64, 75, 85, 86, 122, 177-178); (Trial Tr. Vol. III at 217, 233, 247-248, 255, 264, 280.) Each of the potential jurors were questioned by both the judge and counsel as to whether they could follow the law and apply it as given, to which they all answered affirmatively. (Trial Tr. Vol. II at 48, 50, 76, 88-89, 96-98, 116-117, 151-152, 161-162); (Trial Tr. Vol. III at 200-201, 220-223, 238, 250, 255, 258, 266-267, 269-270.) The potential jurors that were excused, were not excused because of their "low ranking" on the scale rating views on the death penalty, but

because they held views in opposition to a sentence of death. While the reasons for opposition to

the death penalty varied – from moral opposition to personal relationships with the family of an

executed inmate, the potential jurors and potential alternate jurors each had an opposition which

would seriously impair his or her ability to recommend a death sentence even under appropriate

circumstances. (Trial Tr. Vol. III at 291, 293-299, 308-309.) The Court concludes that the

potential jurors were properly excused. As held by the United States Supreme Court, it is proper

to exclude for cause a prospective juror who indicates that either they could not vote for capital

punishment under any circumstances or that they would be hesitant to do so. *Morgan v. Illinois*,

504 U.S. 719, 728 (1992). The state court decision affirming their removal for cause was not an

unreasonable applications of clearly established federal law. *See State v. O'Neal*, 87 Ohio St. 3d

402, 416, 721 N.E. 2d 73, 88 (2000). This claim is therefore without merit.

### Ground Fifteen

> Petitioner's right to be free from cruel and unusual punishment under
> the Eighth Amendment was violated by the imposition of sentences
> of death under the Ohio death penalty scheme which is devoid of
> penological justification, has a racially disproportionate impact, fails
> to rationally narrow the class of death eligible defendants, permits the
> imposition of death when aggravating circumstances only just
> outweigh mitigating factors, denies the consideration of mercy,
> allows the arbitrary selection of those to receive the death penalty,
> and fails to provide guidance on the weighing of aggravating
> circumstances and mitigating factors.

Petitioner next raises multiple sub-claims as to Ohio's death penalty scheme. (Petition,

Doc. No. 7 at 76.) With regard to the following sub-claims, Respondent states that they are

properly preserved as they were raised on direct appeal: fails to narrow class of death eligible

defendants; no instruction on mercy; excessive punishment; disparate impact based on race; no

standard to balance aggravation and mitigation; and no sufficient guidance for sentencing authority. (Return of Writ, Doc. No. 14 at 117.)  Respondent asserts, however, that Petitioner failed to raise the sub-claim alleging that the prosecutor had unfettered discretion in capital cases, and as such, that portion of this claim is now procedurally defaulted. *Id*.  In the alternative, Respondent argues that this claim lacks merit in its entirety.  *Id*.

In his first sub-claim, O'Neal makes the argument that the death penalty is unconstitutional because it constitutes cruel and unusual punishment. (Petition, Doc. No. 7 at 76); (Traverse, Doc. No. 47 at 126.)  He argues that a punishment is excessive and needless "when the stated purposes of deterrence, incapacitation, and retribution can be accomplished by life imprisonment." (Traverse, Doc. No. 47 at 127.)  That claim has been rejected by the Sixth Circuit Court of Appeals in a previous case, *Buell v. Mitchell*, 274 F.3d 337, 367 (6th Cir. 2001). Furthermore, as the *Gregg* Court stated, legislative measures, such as the system for electing representatives, is a way in which to gauge contemporary standards on punishment. *Gregg v. Georgia*, 428 U.S. 153, 174 (1976).  Thus, courts will presume the validity of such methods. *Id*. at 175.  The Ohio Revised Code specifically lists which crimes are death eligible to avoid random imposition of the death penalty. O.R.C. § 2929.04.  O'Neal was found guilty of such eligible crime and a jury of his peers gave death as the recommended sentence.  The decision was affirmed by the state courts on appeal.  The punishment is not excessive in this case.

Next Petitioner makes the argument that the death penalty is applied in an arbitrary and capricious manner. (Petition, Doc. No. 7 at 77);(Traverse, Doc. No. 47 at 127.)  Specifically, O'Neal argues that the death penalty is disproportionately imposed on black defendants and defendants killing white victims as compared with white defendants and defendants killing black

victims. (Traverse, Doc. No. 127.)  The argument that the system as a whole has racially

discriminatory impact was rejected in *Zuern* on basis of *McCleskey v. Kemp*, 481 U.S. 279

(1987). 101 F. Supp. 2d 948, 1003 (S.D. Ohio 2000) *rev'd on other grounds*, 336 F.3d 478 (6th

Cir. 2003)

Next O'Neal argues that Ohio's capital sentencing scheme results in unreliable

sentencing procedures. (Petition, Doc. No. 7 at 77); (Traverse, Doc. No. 47 at 127.)  Specifically

he argues that Ohio's death penalty statute fails to provide sufficient guidance on how to

establish a standard by which to balance the mitigating factors against the aggravating

circumstances. (Traverse, Doc. No. 47 at 127.)  The United States Supreme Court has never held

that "the state must affirmatively structure in a particular way the manner in which juries must

consider mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998).  The Court

notes as well that the Ohio statutes clearly place the burden of proving the existence of any

mitigating factors on the defendant in a capital case, Ohio Rev. Code § 2929.03(D)(1), and a

requirement that the defendant do so by a preponderance of the evidence does not offend the

federal constitution. *See Walton v. Arizona*, 497 U.S. 639, 649-51 (1990) *overruled in part by

Ring v. Arizona*, 536 U.S. 584 (2002).

Next O'Neal argues that death sentences are arbitrary as prosecutors have unfettered

discretion in selecting which cases to prosecute for a capital offense. (Petition, Doc. No. 7 at 78);

(Traverse, Doc. No. 47 at 128.)  Respondent asserts that this sub-claim is procedurally defaulted.

(Return of Writ, Doc. No. 14 at 117.)  Petitioner however maintains that this sub- claim was in

fact presented in the state courts. (Traverse, Doc. No. 47 at 126.)  After a review of the record

the Court find this sub-claim is procedurally defaulted as Petitioner failed to raise it at the proper

time.  Alternatively, it is without merit.  The Supreme Court held in *McClesky v. Kemp* that statistical studies suggesting racially-motivated disparities in the selection and prosecution of death penalty cases is insufficient to support a claim that such discriminatory practices occurred in the petitioner's case. 481 U.S. 279 (1987).  O'Neal has produced no evidence that the decision-makers in this particular case acted in a discriminatory manner.  The same claim has been rejected by this Court in *Zuern v. Tate*, 101 F. Supp. 2d 948, 1002 (S.D. Ohio 2000) *rev'd on other grounds*, 336 F.3d 478 (6th Cir. 2003), on the authority of *Gregg v. Georgia*, 428 U.S. 153 (1976).

O'Neal next takes issue with the fact that judges, juries, and courts are not obligated to state in their verdict what weight they gave to which aggravating circumstance and mitigating factor. (Petition, Doc. No. 7 at 78);(Traverse, Doc. No. 47 at 128.)  He argues that without an express standard as to the degree by which aggravating circumstances must outweigh mitigation evidence, the sentencing authority does not have enough guidance to avoid being arbitrary and capricious. (Traverse, Doc. No. 47 at 128.)  Ohio's weighing scheme has been upheld as consonant with Supreme Court decision in *Proffitt v. Florida,* 428 U.S. 242, 258 (1976); *Furman v. Georgia*, 408 U.S. 238 (1972); *Proffit v. Florida*, 428 U.S. 242 (1976). *Buell v. Mitchell*, 274 F. 3d 337 (6th Cir. 2001).

Petitioner's remaining two sub-claims allege that Ohio's death penalty statute is unconstitutional because it fails to narrow the class of death eligible defendants because of the duplication of the element which makes the murder an aggravated murder and that the application of the statute is arbitrary because the jury cannot consider mercy.  These sub-claims are addressed in the third and sixteenth grounds for relief. (Petition, Doc. No. 7 at 76);(Traverse,

Doc. No. 47 at 126); *see supra* Third Ground for Relief at 45-46; *see infra* Sixteenth Ground for

Relief at 105-107.  This ground for relief is without merit.

### Ground Sixteen

> Petitioner's right to be free from cruel and unusual punishment under
> the Eighth Amendment was violated by the instruction to the jury in
> the penalty phase of the trial that it could not be governed by
> considerations of sympathy.

Next Petitioner argues a violation of his rights because the jurors were instructed that

sympathy could not be considered when rendering their decision. (Petition, Doc. No. 7 at 79.)

Respondent does not allege procedural default but argues that the claim is without merit. (Return

of Writ, Doc. No. 14 at 125.)  On direct appeal the state court held:

> In his eleventh proposition, appellant contends that the trial court's
> instruction to the jury during the penalty phase that the jury was to
> arrive at its findings without sympathy was improper because it
> effectively restricted the jurors from considering mercy as a
> mitigating factor.  However, the instruction to exclude sympathy "is
> intended to insure that the sentencing decision is based upon * * *
> guidelines fixed by statute." State v. Jenkins, paragraph three of the
> syllabus.  See, also, State v. Taylor (1997), 78 Ohio St. 3d 15, 30, 676
> N.E.2d 414, 417, 613 N.E.2d 212, 216.

> Accordingly, we find appellant's eleventh proposition of law not
> persuasive.

*State v. O'Neal*, 87 Ohio St. 3d 402, 416, 721 N.E.2d 73, 88 (2000).

The trial judge instructed the jury to "consider all the evidence and make your findings

with intelligence, impartiality, without bias, sympathy or prejudice, so that the State of Ohio and

this defendant will feel that this proceeding was fairly and impartially tried." (Trial Tr. Vol. VI at

1060-1061.)  The Supreme Court has held that "the sentencer must **rationally** distinguish

between those individuals for whom death is an appropriate sanction and those for whom it is

-104-

not." *Spaziano v. Florida*, 468 U.S. 447, 460 (1984); *Zuern v. Tate*, 101 F. Supp. 2d 948 (2000).

The jury must of course listen sympathetically to the mitigating evidence. That is, they are

required to accept as mitigating those factors which the Supreme Court has held are proper to be

considered in mitigation. But they may not exercise general sympathy. This is to ensure that the

death penalty is not administered in an arbitrary and unpredictable manner. *Gregg v. Georgia,*

428 U.S. 153 (1976); *Furman v. Georgia*, 408 U.S. 238 (1972). The decision by the state courts

was neither an unreasonable application of, nor contrary to established United States Supreme

Court law. This ground for relief is without merit.


### Ground Seventeen

> Petitioner's right to due process under the Fourteenth Amendment
> and his right to be free from cruel and unusual punishment under the
> Eighth Amendment were violated by the cumulative effect of all the
> errors committed during the culpability and penalty phases of the trial
> and on appeal.

Next, Petitioner argues that his rights were violated as a result of the cumulative effect of

all the errors committed during both phases of his trial and that if "none of the allegations of

error contained in his other grounds for relief, by itself, merits the granting of relief, then the

cumulative effect of the errors establishes that Petitioner was deprived of his right to due process

and his right to be free from cruel and unusual punishment by the cumulative effects of all of

these errors." (Petition, Doc. No. 7 at 80); (Traverse, Doc. No. 47 at 130-131.) Respondent

argues that Petitioner "lumps in claims" that have not been fairly presented to the state courts,

and as such, this ground for relief is procedurally defaulted. (Return of Writ, Doc. No. 14 at

127.) Alternatively, Respondent asserts that because the claims in O'Neal's Petition lack merit,

-105-

they cannot combine to have merit, thus rendering his conviction or sentence unfair. *Id.* The Court finds that many of the individual claims presented in O'Neal's Petition were found to be procedurally defaulted, as such they would remain so when considered cumulatively.

Alternatively, this ground for relief is without merit. In *Lorraine v. Coyle*, 291 F.3d 416 (6th Cir. 2002), the court held:

> The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief. Thus, it cannot be said that the judgment of the Ohio courts is contrary to *Berger*, or to any other Supreme Court decision so as to warrant relief under the AEDPA. *Cf. Walker v. Engle*, 703 F.2d 959, 963 (6th Cir. 1983) (pre-AEDPA case; holding that "errors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair").

*Id.* at 447. "We have held that, post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief." *Moore v. Parker*, 425 F.3d 250, (6th Cir. 2005), *citing Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002); *Lorraine v. Coyle*, 291 F.3d 416 (6th Cir. 2002). Cumulative error claims are not cognizable because the Supreme Court has not spoken on the issue. *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006), *citing Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005).

### Eighteenth Ground for Relief

The imposition of a sentence of death on Petitioner violates his right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution because he is mentally retarded under the standards- - reasonably applied - -announced in Atkins v. Virginia and in light of the facts- - reasonably determined - -presented to the state courts that show that Petitioner suffers from significantly subaverage intellectual functioning which had its onset before he attained the age of 18 and which leaves Petitioner with significant limitations in two or more adaptive behavior skills.

On June 20, 2002, the United States Supreme Court issued its decision in *Atkins v. Virginia*, 536 U.S. 304 (2002).  After considering evolving standards of decency and reviewing several states' legislative prohibitions against executing the mentally retarded, the Court held that executions of mentally retarded criminals are "cruel and unusual punishments" prohibited by the Eighth Amendment.  However, the Supreme Court left it to the States to make their own determination as to what defines or constitutes mental retardation.  Ohio replied with *State v. Lott,* 97 Ohio St. 3d 303, 779 N.E. 2d 1011 (2002).  *Lott* determined that the decision as to whether a person is mentally retarded is to be made by the trial court considering the evidence *de novo*.  The burden is on the defendant to establish mental retardation by a preponderance of the evidence.  The criteria set forth by the court mirrored the definition given by American Association of Mental Retardation and the American Psychiatric Association, under which it must be shown there is: (1) significant subaverage intellectual functioning, (2) significant limitations in two or more adaptive skills, such as communications, self-care, and self-direction, and (3) onset before the age of 18.  Moreover, the Ohio Supreme Court clarified that IQ tests alone are "not sufficient to make a final determination on this issue . . . there is a rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70." *State v. Lott,* 97 Ohio St. 3d 303, 779 N.E. 2d 1011 (2002).

O'Neal filed his petition for writ of habeas corpus on June 21, 2002. (Doc. No. 7.) On November 12, 2002 O'Neal filed a motion requesting leave pursuant to the decision in *Atkins v. Virginia*, 536 U.S. 304, to allow him to amend his petition and add this ground for relief. (Doc. 22.)  A stay and hold in abeyance was granted on the habeas petition on November 13, 2002, to allow Petitioner to exhaust his state court remedies on this matter.  On November 15, 2002,

Petitioner filed his First Successive Petition to Vacate or Set Aside his Sentence based on *Atkins*, in the Hamilton County Court of Common Pleas. (Supp. Appendix to Return of Writ, Doc. No. 40, Vol. VIII at 13.) The court denied the petition on April 7, 2004, concluding that Petitioner's work and social history were incompatible with mental retardation. *Id*. at 43-48. Petitioner filed an appeal based on the fact his case was decided without an evidentiary hearing. By way of agreed entry O'Neal withdrew his appeal and was granted an evidentiary hearing before the Court of Common Pleas. Experts were appointed on behalf of both Petitioner and Respondent. (Supp. Appendix to Return of Writ, Doc. No. 40, Vol. IX at 32.) After an evidentiary hearing, the trial court again denied O'Neal's *Atkins* claim, holding that O'Neal failed to show insufficient functioning on any of the three prongs as articulated by *Lott*. (Supp. Appendix to Return of Writ, Doc. No. 40, Vol. X at 51-61.) The state court of appeals affirmed this decision. (Supp. Appendix to Return of Writ, Doc. No. 40, Vol. XI at 209-218.) On May 2, 2007, the Ohio Supreme Court declined jurisdiction. (Supp. Appendix to Return of Writ, Doc. No. 40, Vol. XII at 86.) On May 31, 2007, O'Neal filed his "Second Motion to Amend/Correct Petition for Writ of Habeas Corpus to include his *Atkins* claim to his Petition" before this Court. (Doc. No. 38.) Respondent answered with an Amended Return of Writ Regarding Petitioner's Atkins Claim on June 29, 2007. (Doc. No. 42.) The claim is now properly before this Court.

Respondent argues that as it was *Lott*, and not the Supreme Court case *Atkins,* that set the standards for mental retardation in Ohio, in order for this Court to grant a writ of habeas corpus on Petitioner's claim it must find that the state appellate court based its decision on an "unreasonable determination of the facts" under the AEDPA standards. (Amended Return of Writ Regarding Petitioner's Atkins Claim "Amended Return of Writ," Doc. No. 42.) On a case

-108-

of first impression the U.S. District Court, Northern District of Ohio, determined that the

AEDPA standard was applicable based on the following analysis:

> Before proceeding to a review of Murphy's mental retardation claim, the Court must decide what standard of review to apply. Pursuant to 28 U.S.C. § 2254(d), a habeas court shall not grant a writ of habeas corpus unless the claim - -
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
>
> 28 U.S.C. § 2254 (d)(1)-(2). Thus, the Court must first decide whether the standard set forth in § 2254 (d)(1) or (d)(2) applies to Murphy's *Atkins* claim. This decision necessarily turns on whether the Court determines the State court's finding that Murphy was not mentally retarded to be a mixed question of law and fact, or a purely factual issue.
>
> It appears this issue is one of first impression in this Circuit. Based on the findings of another circuit court, and the application of prior Sixth Circuit holdings to this context, the Court finds that § 2254(d)(2) governs the disposition of Murphy's claim. While the Sixth Circuit has yet to adjudicate whether a State court finding regarding a habeas petitioner's mental retardation is a question of pure fact under § 2254 (d)(2), that Court has held that the issue of whether a petitioner is competent to stand trial is a factual question. In *Mackey v. Dutton*, 217 F.3d 399, 413 (6th Cir. 2000), the Sixth Circuit, contrary to its prior findings, held "§ 2254 (d)'s presumption of correctness applies to a trial court's competency determination." *Id*. Although the *Mackey* court noted it previously had held in *Cremeans v. Chapleau*, 62 F.3d 167 (6th Cir. 1995), competency determination are mixed questions of law and fact, the subsequent United States Supreme Court holding in *Thompson v. Keohane*, 516 U.S. 99, 111, 116 S. Ct. 457, 133 L.Ed. 2d 383 (1995), superceded the *Cremeans* holding. *Id*.
>
> The *Mackey* court adopted the *Thompson* Court's reasoning in

finding that a competency claim was purely a factual issue.  It quoted the Supreme Court's reasoning, as follows:

> In several cases, the Court has classified "factual issues" within § 2254(d)'s compass questions extending beyond the determination of "what happened."  This category notably includes: competency to stand trial; and juror impartiality. While these issues encompass more than "basic, primary, or historical facts," their resolution depends heavily on the trial court's appraisal of witness credibility and demeanor.  This Court has reasoned that a trial court is better positioned to make decisions of this genre, and has therefore accorded the judgment of the jurist-observer "presumptive weight."

*Mackey*, 217 F.3d at 413 (quoting *Thompson*, 516 U.S. at 111.)

Although *Mackey* was admittedly a pre-Anti Terrorism and Effective Death Penalty Act case, the Court finds the *Mackey* and *Thompson* court's reasoning persuasive and applicable to State court findings of mental retardation.  Similar to a competency determination, a State trial court enjoys an incomparable vantage point in assessing the witnesses' and the petitioner's demeanor.  Thus, the Court finds that the *Mackey* and *Thompson* holdings, which afford a State court finding regarding a petitioner's competency to stand trial a presumption of correctness, also applies to a State court's finding regarding a petitioner's mental retardation.

In so finding, this Court follows the Fifth Circuit.  In *Clark v. Quaterman*, 457 F.3d 441, 444 (5th Cir. 2006), the Fifth Circuit, presented with the identical issues this Court now encounters, held that "the question of whether [a habeas petitioner] suffers from significantly subaverage intellectual functioning is a question of fact, and not a mixed question of law and fact . . ." *Id*.  Thus, to prevail on his *Atkins* claim, Murphy must demonstrate that the State court determination that he is not mentally retarded "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." [14]

---

[14]     A plain reading of § 2254(d) also suggests that the review of Murphy's *Atkins* claims should fall under the purview of Section (d)(2).  If the Court were to utilize Section (d)(1), it would not grant Murphy's application unless the State court

*Murphy v. Ohio*, 2006 U.S. Dist. LEXIS 81332 at *6-*9 (N.D. Ohio 2006) *aff'd Murphy v. Ohio*, 551 F.3d 485 (6th Cir. 2009).

Based on the foregoing analysis, this Court determines the AEDPA to be applicable to this case. Thus, to prevail on an *Atkins* claim, O'Neal must demonstrate that the State court determination that he is not mentally retarded "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 2254 (d)(2).

In this particular case, the state courts reviewed "evidence that was related to Defendant's mental health status that was produced at trial, trial, at the mitigation hearing [sic], submitted with his petition herein, the testimony of witnesses at the evidentiary hearing on this petition and the reports of experts submitted in evidence by both parties . . . also considered the memoranda and the arguments of counsel." (Supp. Appendix to Return of Writ, Doc. No. 40, Vol. X at 51.) The court considered such evidence in terms of the mental retardation guidelines as established by the Ohio Supreme Court in *State v. Lott*, in that to make a showing of mental retardation, the defendant must show by a preponderance of the evidence: (1) significant subaverage intellectual functioning, (2) significant limitations in two or more adaptive skills, such as communications, self-care, and self-direction, and (3) onset before the age of 18. 91 Ohio

---

decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254 (d)(1).

In deciding Murphy's claim, however, the State court did not apply any United States Supreme Court precedent because *Atkins* itself directs the States to create their own standards by which to determine if a petitioner is mentally retarded. Thus, complying with the dictates of Section (d)(1) would be impracticable. *Murphy v. Ohio*, 2006 U.S. Dist. LEXIS 81332 at *6-*9 (N.D. Ohio 2006) *aff'd Murphy v. Ohio*, 551 F.3d 485 (6th Cir. 2009).

St.3d 303, 779 N.E.2d 1011 (2002); (Supp. Appendix to Return of Writ, Doc. No. 40, Vol. X at 52-54.)

Dr. Chiappone, a clinical pscyhologist, testified in the mitigation phase of trial that he had administered psychological tests to O'Neal, and that the results"[s]cored in the what are called the border range of mental retardation. [sic]  He's not retarded, but he functions at the second or third percentile of the general population." (Trial Tr. Vol. VI at 981.)  He further testified that O'Neal suffered from "borderline mental retardation based on the IQ test and substantiated by his educational data" and that his "[l]ack of coping skills" which, along with other factors, "made it more difficult for him to effectively problem solve." *Id*. at 987, 996.  However, he also testified to the fact that O'Neal's "fundamental skills are a bit higher than his attained intellect" and that O'Neal can work effectively, understands the proceedings, knows the difference between right and wrong, and is capable of forming and carrying out a plan of killing someone. *Id*. at 981, 992-993.

Proceeding the mitigation hearing, Dr. Chiappone referred counsel to Dr. Robert Tureen for additional testing of the defendant in an attempt to determine the possible existence of minimal cerebral dysfunction. *Id*. at 1001.  Dr. Tureen testified at trial that he found O'Neal to be an individual who is going to have some limitations on how well he is able to function in life. *Id*. at 1003-1005.  Specifically, "[b]y cognitive thinking general problems involving memory, spatial and statistical skills, language usage, as well as motor skills. [sic]  And on that particular exam he performed well into the impaired range.  You take that performance and put it together with the IQ level and you see an individual who is going to have some sort of difficulties in adjusting in the world." *Id*. at 1003.  Dr. Tureen concluded that O'Neal was functioning in the

-112-

mildly mentally retarded to borderline range. *Id*. at 1009.

At his state court *Atkins* evidentiary hearing, O'Neal again presented testimony from Dr. Tureen. (Evid. Hrg. Tr. 5/17/05, Doc. No. 39 at 6.)  Dr. Tureen testified as to his various examinations and evaluations of O'Neal beginning in 1994 in preparation for the mitigation phase of the trial. *Id*. at 11-15.  Dr. Tureen concluded that O'Neal was in the borderline to mildly retarded level of retarded function and had impaired higher cortical functions that affected his ability to reason abstractly, problem solve, and plan, while other brain areas remained well intact. *Id*. at 15.  In addition to conducting examinations, Dr. Tureen also reviewed O'Neal's past IQ tests.  One such test was dated from 1968, when Petitioner was 14, in which he had a full IQ score of 64 and showed a major split between verbal and non-verbal skills. *Id*. at 18.  Dr. Tureen indicted that this split can be indicative of severe learning disabilities or problems in brain function. *Id*.  Likewise, the psychologist that administered the 1968 test, noted at the time that this test indicated "below intellectual functioning [is] due to organic dysfunction, organic impaired brain function." *Id*.  In preparing for the evidentiary hearing of May 17, 2005, Dr. Tureen again administered an IQ test. *Id*. at 25.  On this occasion O'Neal recorded a full score on the Weschler Adult Intelligence Scale of 67, an extremely low score with a disparity between the verbal and performance scores. *Id*. at 25-27.  Dr. Tureen opined that this result is consistent with O'Neal's IQ performance over time, showing no real variation from the test he took when he was 14. *Id*. at 28.

Dr. Tureen also gave testimony at the state court evidentiary hearing as to perceived deficiencies in adaptive behavior.  He explained adaptive behavior as one's "ability to adjust to the real world in which we live basically; does one have the skills that are necessary to function

academically, to function in the work-related world, to function in the legal world, to function in

the social world, to function interpersonally in a manner that is successful and not detrimental to

them or to society." *Id*. at 23.  In the following exchange he noted difficulties in O'Neal's

behavior:

> Q:    And what particular adaptive skills does Mr. O'Neal suffer
>       from a significant limitation of?
>
> A:    First of all, there is a significant limitation in academic skills.
>       I would say reading, math, but more importantly is the
>       limitation as a result of what I initially referred to as mild
>       cerebral dysfunction, which I believe is the cause of the low
>       level of intellectual function.
>
>       Now, that particular type of disturbance that he demonstrated
>       on our earlier testing limits his ability to consider alternative
>       modes of dealing with situations which are stressful or which
>       he finds in some way threatening.
>
> * * * *
> Q:    How does that fall into the category of social adaptive?
>
> A:    This is an individual who is going to become rigid,
>       perseverative, not able to think of alternative ways of dealing
>       with situations which occur particularly under stress.

(Evid. Hrg. Tr. 5/17/05, Doc. No. 39 at 31-32.)  He further testified that learning can take place

to a certain extent, the O'Neal, with this level of functioning, would be able to work and function

well under structured supervised situations. *Id*. at 33.

Based on the information gathered for the original trial, as well as for the state *Atkins*

evidentiary hearing, Dr. Tureen opined that O'Neal met the criteria for mental retardation. (Evid.

Hrg. Tr. 5/17/05, Doc. No. 39 at 29-31.)  This opinion was based on: low IQ scores in the

mentally retarded ranges, onset before age 18 as documented by school records, and evidence of

impaired brain function that has impacted O'Neal's ability to function continually and efficiently

-114-

in social situations, particularly social situations which are stressful. *Id*. at 29-31.

The State cross-examined Dr. Tureen as to his understanding of the "Flynn Effect" or standard error measurement on intelligence tests. (Evid. Hrg. Tr. 5/17/05, Doc. No. 39 at 36-39.) They argued that because the tests are based on a range, it is impossible to know the exact score as the margin of error allows for five points in either direction. *Id*. at 37-38. Because of this, it is impossible to determine if a score of 71 is actually 71 or rather falls somewhere in the margin of error, resulting in a score anywhere from 66 to 76. *Id*. at 37. Therefore, it is impossible to know O'Neal's exact score and whether or not it falls below 70. *Id*. at 38. Additionally the State noted that even if a score were in the 70 or below range, there must also be a showing of significant impairment in adaptive functioning. *Id*. at 39. The State then questioned Dr. Tureen as to evidence of O'Neal's adaptive functioning, specifically in the fact that he: went to high school and was not in any special classes; owned and drove an automobile; was a lance corporal in the military; was married and tried to raise a family; fought for and obtained custody of some of his children; was able to hold a job and was a valued employee; was a normal child; and had adjusted well to prison. *Id*. at 40-43. They further noted that in the original trial reports both Dr. Nelson and Dr. Chiappone were of the opinions that O'Neal was not mentally retarded, but rather was exhibiting signs of a borderline personality and antisocial disorder. *Id*. at 44.

The trial court noted that to qualify under *Lott*, Petitioner must demonstrate more than a low IQ, there must also be a showing of an impairment in adaptive behavior; such as sub-par functioning, self-direction, and self sufficiency. (Supp. Appendix to Return of Writ, Doc. No. 40, Vol. X at 51-61.) Two of the three experts concluded that Defendant was not mentally retarded, and in fact testified to a higher functioning than indicated by the test scores. (Trial Tr. Vol. VI at

-115-

981, 992-993); One low test result also indicated "'superior" performance on tasks requiring judgment in social situations, and "effective functioning" in his knowledge of vocabulary and recall information." (Supp. Appendix to Return of Writ, Doc. No. 40, Vol. X at 51-61.) Additional examples relied upon by the trial court as to O'Neal's ability to adapt and function were given by during mitigation and enunciated in the state court's finding of facts in his *Atkins* claim:[15]

> Additionally, as the State enumerates, Defendant's history lends further support to the position that he has sufficient adaptive skills, and therefore is not mentally retarded. Defendant's mother described him as a "normal kid" (Tp 918). Defendant fought for and obtained custody of his children (Tp 921-925). He served in the Marines from 1972 to 1975, rising to the rank of Lance Corporal. (See Dr. Nelson III Report, p.5, 3/21/05). Defendant worked at Aerotek for four consecutive years. (Tp 923). He began working at Kenwood Country Club on 4/1/93 as a dishwasher/floor cleaner. (Tp 959). Defendant's supervisor noted that Defendant "had a very strong work ethic and when he was there he did a fabulous job for us" (Tp. 959). Defendant's supervision also testified that he "observed [Defendant] at least on three occasions that are clear, that he kind of stepped in the middle as a peace maker and separated a couple guys that were going at it" (Tp 961).
>
> After returning home from prison after some drug problems, Defendant dedicated himself to turning his life around. His childhood friend testified that Defendant made a 360 degree turn after he was released from prison. (Tp 934). He further testified he no longer was "hustling and selling drugs and running the streets." *Id*.

(Supp. Appendix to Return of Writ, Doc. No. 40, Vol. X at 51-61.) Based on those findings of fact, the state court denied O'Neal's mental retardation claim, holding that:

> As stated above, in *State v. Lott* the Ohio Supreme Court prescribed a three part test for determining whether convicted petitioners facing

---

[15] See Index for the state courts finding of facts.

the death penalty are mentally retarded. *Lott*, 97 Ohio St.3d 303 (2002). The test includes: "(1) significantly subaverage intellectual functioning, (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self direction, and (3) onset before the age of 18." *Id*.

(1) Defendant Does Not Suffer From Significantly Subaverage Intellectual Functioning.

According to all three experts who provided opinions for the court, a sub-70 IQ points to significantly subaverage intellectual functioning. Pursuant to the Ohio Supreme Court's decision in *Lott*, Defendant's IQ score of 71 in 1994 triggered a rebuttable presumption that he is not mentally retarded. *Id*. Defendant contends that the presumption that he is not mentally retarded is rebutted by his two tests that point to a sub-70 IQ. This court agrees. However, Defendant also bears the burden of proving by a preponderance of the evidence that he suffers from significantly subaverage intellectual functioning. *Id*. at 307.

The Ohio Supreme Court determined that a score of 70 or above raised a rebuttable presumption that a defendant is not mentally retarded, but it did not ignore the aforementioned five point standard of error completely. *Id*. at 304. As such, to meet his burden, Defendant must present the court with IQ test scores of 64 or below. Based on the standard margin of error, Defendant's IQ score of 67 means his true score could place him anywhere between the 62 and 72 range. Furthermore, his February 9, 1968 IQ score of 64 is not a recent one, and at best provides the court with equal evidence as to whether Defendant suffers from significantly sub-average intellectual functioning. Therefore, Defendant has failed to prove the first prong of the test enumerated in *Lott* by a preponderance of the evidence. *Id*. at 307. This conclusion could end the court's analysis as the test enumerated in *Lott* is conjunctive. However, for purposes of clarity an analysis of the other two prongs will follow.

(2) Defendant Does Not Suffer From Significant Limitations in Two or More Adaptive Skills

Defendant argues that he suffers from significant limitations in two or more adaptive skills. Dr. Tureen was the only psychiatric expert to offer any support to Defendant's position. Conversely, the respective opinions of two of the three experts available to the court clearly indicate that Defendant does not have significant limitations

in two or more adaptive skills.  As such, Defendant has not proven by a preponderance of the evidence that he suffers from limitations in two or more adaptive skills and he has failed to meet his burden of proving the second prong of the three prong test by a preponderance of the evidence.  *Id*.  Moreover, Defendant's history lends further support to this court's conclusion.

Defendant was capable of positive communication, self-care and self-direction.  Defendant provided for his family, and fought for custody of his children.   He consistently held jobs, and earned high endorsements from his superiors.  These are not the actions of a man who is incapable of adapting to society's standards.  As such, and pursuant to the expert testimony provided to the court, Defendant has not proven by a preponderance of the evidence that he suffers from significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction. *Id*.

<u>(3) Defendant Has Failed To Prove Beyond A Preponderance Of The Evidence That He Was Mentally Retarded Prior To Age 18.</u>

Defendant's February 9, 1968 IQ of 64 demonstrates that he was functioning at a subaverage intellectual level at age 14.  However, Dr. Ruth Kaufman's 1968 Wechsler Intelligence Test for Children also indicated "superior" performance on tasks requiring judgment in social situations, and "effective functioning" in his knowledge of vocabulary and recall of information. *Id*.  (See Dr. Nelson III Report, p.3, 3/21/05). Subaverage intellectual functioning is only one prong of the three prong conjunctive test enumerated in *Lott*. *Lott*, 97 Ohio St.3d 305 (2002).  Dr. Kaufman's statement indicates that despite Defendant's sub-70 IQ, he was not suffering from significant limitations in two or more adaptive skills.  This demonstrates that all three prongs of the three prong test were not met in 1968.  Thus, Defendant has not met his burden of proving by a preponderance of the evidence that he was mentally retarded before age 18. *Id*. at 307.

<u>Conclusion</u>
Defendant has failed to prove each prong of the conjunctive three prong test prescribed by the *Lott* Court by a preponderance of the evidence. *Id*.  Therefore, Defendant is not mentally retarded, and his Petition to Vacate or Set Aside his death sentence is denied.

(Supp. Appendix to Return of Writ, Doc. No. 40, Vol. X at 51-61.)

As the district court and court of appeals in *Murphy* held, the Court is not free to

disregard the state's factual findings merely because some of the hearing testimony at times supported the claim for mental retardation. *Murphy v. Ohio*, 2006 U.S. Dist. LEXIS 81332 at *6-*9 (N.D. Ohio 2006) *aff'd Murphy v. Ohio*, 551 F.3d 485 (6th Cir. 2009).  The state's decision on the claim of mental retardation was not an unreasonable conclusion based on the evidence presented.

## CONCLUSION

In accordance with the foregoing analysis, it is respectfully recommended that the Second Amended Petition for Writ of Habeas Corpus be dismissed with prejudice.

October 14, 2010.

s/ **Michael R. Merz**
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F. 2d 947 (6th Cir., 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).

# INDEX

O'Neal raised the following *Atkins* claims in the state court of appeals:

Assignment of Error

The decision of the trial court concluding that Appellant is not mentally retarded as defined in Atkins v. Virginia is not based on competent, credible, reliable evidence and violates Appellant's right to be free from cruel and unusual punishment under the Eighth Amendment and his right to due process of law under the Fourteenth Amendments to the United States Constitution.

First Issue Presented for Review

Whether the trial court's conclusion - -that the "standard error of measurement" in IQ testing requires Appellant to "present the court with IQ scores of 64 or below" to raise the presumption that his IQ is 70 or below and to meet his burden of establishing that he suffers from significant subaverage intellectual functioning- - is contrary to law.

Second Issue Presented for Review

Whether the trial court's conclusion- - that Appellant is able to adequately perform some adaptive behavioral skills - -is sufficient to outweigh the preponderance of the evidence that Appellant has significant limitations in at least two adaptive behavior kills, namely academic skills and social skills.

Third Issue Presented for Review

Whether the trial court's reliance on the February, 1968 assessment of Appellant by Cincinnati Public School psychologist Ruth Kauffman when Appellant was 14 years old - - in which Appellant obtained a full scale IQ test score of 64 and in which the psychologist recommended Appellant for the Junior High Slow Learning Program due to "below normal intellectual functioning" - - for the conclusion that Appellant's mental retardation did not become manifest before age 18 is against the weight of the evidence and contrary to law.

(Supp. Appendix to Return of Writ, Doc. No. 40, Vol. XI at 103.)

O'Neal raised the following Atkins claims in the Ohio Supreme Court:

Proposition of Law I

A defendant who scores an average of 65.6 on five IQ tests administered beginning when he is 14-years-old in 1968 and ending in 2004 when he is 50 years old - -and whose IQ scores are re-normed to average 62.432 to adjust for rising IQ levels called the "Flynn Effect" - -proves by a preponderance of the evidence that his IQ is 70 or below and that he has significantly subaverage intellectual functioning pursuant to Atkins v. Virginia and State v. Lott.

Proposition of Law II

A defendant who is determined by his school psychologist when he is 14 years old to have a full scale IQ of 64 and whom the school psychologist recommends for the Junior High School Slow Learning Program due to "below normal intellectual functioning" has shown by a preponderance of the evidence that his mental retardation had its onset before age 18 pursuant to Atkins v. Virginia and State v. Lott.

Proposition of Law III

A trial court deciding whether a defendant is mentally retarded under the standards of Atkins v. Virginia and State v. Lott - - and in particular whether a defendant has significant limitations in two or more adaptive behavior skills - -may not choose to rely on evidence from an expert appointed by the court who has not met, interviewed, evaluated, or administered IQ tests to the defendant and who does not testify at the evidentiary hearing over evidence from an expert appointed by the court who has met, interviewed, evaluated, and administered IQ tests to the defendant and who does testify and is subject to cross-examination at the evidentiary hearing.

(Supp. Appendix to Return of Writ, Doc. No. 40, Vol. XII at 15.)

Excerpts of the Trial Court's Findings on the *Atkins* claim:

Findings of Fact

Three expert psychologists, including Dr. Michael Nelson III, Dr. Chiappone, and Dr. Robert Tureen provided this court with their respective expert opinions. To determine Defendant's level of intellectual functioning, all three psychologists evaluated his IQ scores. Additionally, the three experts used information obtained from interviews with Defendant and Defendant's history to determine whether he has significant limitations in adaptive skills. Two of the three experts concluded that Defendant is not mentally retarded. Dr. Tureen was the only expert to lend any support to Defendant's position.

On February 9, 1968 Defendant took a Wechsler Intelligence Test for Children administered by Dr. Ruth Kaufman, school psychologist for Cincinnati Public Schools. Defendant's score indicated a full scale IQ of 64. (See Dr. Nelson III Report, p.3, 3/21/05). However, the same test indicated "superior" performance on tasks requiring judgment in social situations, and "effective functioning" in his knowledge of vocabulary and recall information. *Id*. This court finds Dr. Kaufman's assessment of Defendant's IQ and social functioning credible.

This court further finds that Dr. Chiappone's assessment of Defendant's IQ and his level of social adaptability are also credible. Defendant's score on a 1994 Wechsler Adult Intelligence Scale-R indicated an IQ of 71. *Id*. Dr. Chiappone concluded that Defendant was not mentally retarded. *Id*. At trial on November 6, 1995 Dr. Chiappone testified that, "Defendant's fundamental skills were a bit higher than his attained intellect." (Tp 981-982). He also testified that Defendant understood the proceedings, knew "the difference between what's right and what's wrong" and was "capable of formulating a plan," such as "killing someone." *Id*. at 993.

In 2004, Defendant obtained a score indicating an IQ of 67 on the Wechsler Adult Intelligence Scale administered by Dr. Tureen. (See Dr. Nelson III Report, p.4, 3/21/05). He also received a score indicating an IQ of 63 on the Reynold's Intellectual Scales Test. *Id*. However, Dr. Tureen concluded that "[Defendant's] general language, his auditory comprehension and general verbal expression and his ability to follow instructions were all intact, within his level of intellectual functioning, that is, of an individual with an IQ in the *"borderline to mildly retarded range."* (See Dr. Tureen's Report, pp.5-6, 1/18/05) (Emphasis added). Conversely, Dr. Tureen testified

-122-

on 5/17/05 to his belief that Defendant meets the requirements necessary to be labeled mentally retarded because he has "low IQ scores in the mentally retarded range." (Tp 29).

There is an apparent unexplained deviation between Dr. Tureen's testimony that Defendant's IQ scores were conclusively "in the mentally retarded range" at the hearing of 5/17/05 and his conclusion that Defendant was functioning at the "borderline to mildly retarded range" articulated in his 1/18/05 report to the court.

It is apparent to this court that the psychiatric community has adopted the Wechsler Intelligence Scale as the standard for determining intelligence. Even Dr. Tureen (the only Dr. in this case who chose to administer the Reynold's Test) conceded that the Wechsler Test is the "Gold Standard" of intelligence assessment. (See Dr. Tureen's Report, 1/18/05). While the Wechsler Test is the standard, it is not flawless.

According to Dr. Nelson, there is a measurement error of approximately 5 points in assessing IQ, although this may vary from instrument to instrument. (See Dr. Nelson III Report, p. 1, 3/21/05). In Dr. Tureen's report of 1/18/05 he acknowledged the standard margin of error: "Thus there is a reasonable probability that [Defendant's] true score lies below the established score of 70, representing mental retardation, but also a reasonable probability that his true score lies above that particular level." (See Dr. Tureen's Report, p. 5, 1/18/05). The standard margin of error for IQ tests seems to be an accepted principal in the scientific community. As such, this court finds that there is a standard margin of error of at least five points for IQ tests. For example, a Wechsler IQ of 70 is considered to represent an IQ between 65 and 75. Defendant's IQ score of 71 in 1994 could place him anywhere between 66 and 76 on the scale of intelligence. His score of 67 in 2004 could place him anywhere from 62 to 72 on the IQ scale. The five point standard of error makes it difficult to determine whether Defendant is functioning at or above the 70 level. In *Lott* the Ohio Supreme Court faced the same difficulty. *Lott*, 97 Ohio st. 3d 303 (2002).

The *Lott* Court found that Lott had an IQ of 72. It also acknowledged the existence of a standard margin of error of five points for IQ test scores. *Id*. at 304. Even if this court decided to interpret Defendant's

-123-

IQ scores to indicate that he has sub-average intellectual functioning (which it does not), Defendant would still have to prove by a preponderance of the evidence that he has significant limitations in two or more adaptive skills such as communication, self-care, and self direction. *Lott*, 97 Ohio St. 3d 303, 305 (2002).

This court finds credible Dr. Nelson's, conclusion that Defendant does not meet the definition of mental retardation that involves significantly subaverage intellectual functioning, concurrent deficits or **impairments in present adaptive functioning**, and the onset before age 18 years. (See Dr. Nelson III Report, p. 6, 3/21/05) (Emphasis added). He determined that "[Defendant's] social skills abilities can become compromised at times, although this is more related to his drug usage and characterological/personality deficits than to any intellectual/cognitive deficits." *Id*.

Dr. Chiappone testified that Defendant's level of adaptive functioning was "much higher" than his obtained level of intelligence would suggest. (Tp. 981, 992). "He actually functions on a much higher level than his attained IQ." (Tp 99, 1004). Additionally, Dr. Chiappone testified that Defendant "is not retarded" . . .[because] "I think his fundamental skills are a bit higher than his attained intellect." (Tp 981-982.) This court finds that Defendant's level of adaptive functioning is considerably higher than his attained intellect.

In his January 18, 2005 report Dr. Tureen stated that "[Defendant's] limited intellectual ability affects his adaptability." (See Dr. Tureen Report, p.9, 1/18/05). He stated, "[e]vidence has been provided to indicate that there is impairment in the area of social adaptability." *Id*. However, he also concluded that Defendant was functioning in the "mild to borderline mental retardation" range. *Id*. at 6. Thus, Dr. Tureen's report indicates that despite Defendant's impairment in social adaptability, he was unable to determine with certainty whether Defendant was mentally retarded. Even though Dr. Tureen did not take a clear position on whether Defendant was mentally retarded, he did conclude that he suffered from impairment in social adaptability. This court finds his conclusion that Defendant suffered from impairment in social adaptability credible. However, this court finds the respective opinions of Dr. Chiappone, and Dr. Nelson credible as well.

-124-

Additionally, as the State enumerates, Defendant's history lends further support to the position that he has sufficient adaptive skills, and therefore is not mentally retarded. Defendant's mother described him as a "normal kid" (Tp 918). Defendant fought for and obtained custody of his children (Tp 921-925). He served in the Marines from 1972 to 1975, rising to the rank of Lance Corporal. (See Dr. Nelson III Report, p.5, 3/21/05). Defendant worked at Aerotek for four consecutive years. (Tp 923). He began working at Kenwood Country Club on 4/1/93 as a dishwasher/floor cleaner. (Tp 959). Defendant's supervisor noted that Defendant "had a very strong work ethic and when he was there he did a fabulous job for us" (Tp. 959). Defendant's supervision also testified that he "observed [Defendant] at least on three occasions that are clear, that he kind of stepped in the middle as a peace maker and separated a couple guys that were going at it" (Tp 961).

After returning home from prison after some drug problems, Defendant dedicated himself to turning his life around. His childhood friend testified that Defendant made a 360 degree turn after he was released from prison. (Tp 934). He further testified he no longer was "hustling and selling drugs and running the streets." *Id*.

Conclusions of Law

As stated above, in *State v. Lott* the Ohio Supreme Court prescribed a three part test for determining whether convicted petitioners facing the death penalty are mentally retarded. *Lott*, 97 Ohio St.3d 303 (2002). The test includes: "(1) significantly subaverage intellectual functioning, (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self direction, and (3) onset before the age of 18." *Id*.

(1) Defendant Does Not Suffer From Significantly Subaverage Intellectual Functioning.

According to all three experts who provided opinions for the court, a sub-70 IQ points to significantly subaverage intellectual functioning. Pursuant to the Ohio Supreme Court's decision in *Lott*, Defendant's IQ score of 71 in 1994 triggered a rebuttable presumption that he is not mentally retarded. *Id*. Defendant contends that the presumption that he is not mentally retarded is rebutted by his two tests that point to a sub-70 IQ. This court agrees. However,

-125-

Defendant also bears the burden of proving by a preponderance of the evidence that he suffers from significantly subaverage intellectual functioning. *Id*. at 307.

The Ohio Supreme Court determined that a score of 70 or above raised a rebuttable presumption that a defendant is not mentally retarded, but it did not ignore the aforementioned five point standard of error completely. *Id*. at 304.  As such, to meet his burden, Defendant must present the court with IQ test scores of 64 or below. Based on the standard margin of error, Defendant's IQ score of 67 means his true score could place him anywhere between the 62 and 72 range.  Furthermore, his February 9, 1968 IQ score of 64 is not a recent one, and at best provides the court with equal evidence as to whether Defendant suffers from significantly sub-average intellectual functioning.  Therefore, Defendant has failed to prove the first prong of the test enumerated in *Lott* by a preponderance of the evidence. *Id*. at 307.  This conclusion could end the court's analysis as the test enumerated in *Lott* is conjunctive.  However, for purposes of clarity an analysis of the other two prongs will follow.

## (2) Defendant Does Not Suffer From Significant Limitations in Two or More Adaptive Skills

Defendant argues that he suffers from significant limitations in two or more adaptive skills.  Dr. Tureen was the only psychiatric expert to offer any support to Defendant's position.  Conversely, the respective opinions of two of the three experts available to the court clearly indicate that Defendant does not have significant limitations in two or more adaptive skills.  As such, Defendant has not proven by a preponderance of the evidence that he suffers from limitations in two or more adaptive skills and he has failed to meet his burden of proving the second prong of the three prong test by a preponderance of the evidence.  *Id*.  Moreover, Defendant's history lends further support to this court's conclusion.

Defendant was capable of positive communication, self-case and self-direction.  Defendant provided for his family, and fought for custody of his children.   He consistently held jobs, and earned high endorsements from his superiors.  These are not the actions of a man who is incapable of adapting to society's standards.  As such, and pursuant to the expert testimony provided to the court, Defendant has

-126-

not proven by a preponderance of the evidence that he suffers from significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction. *Id.*

### (3) Defendant Has Failed To Prove Beyond A Preponderance Of The Evidence That He Was Mentally Retarded Prior To Age 18.

Defendant's February 9, 1968 IQ of 64 demonstrates that he was functioning at a subaverage intellectual level at age 14. However, Dr. Ruth Kaufman's 1968 Wechsler Intelligence Test for Children also indicated "superior" performance on tasks requiring judgment in social situations, and "effective functioning" in his knowledge of vocabulary and recall of information. *Id.* (See Dr. Nelson III Report, p.3, 3/21/05). Subaverage intellectual functioning is only one prong of the three prong conjunctive test enumerated in *Lott. Lott*, 97 Ohio St.3d 305 (2002). Dr. Kaufman's statement indicates that despite Defendant's sub-70 IQ, he was not suffering from significant limitations in two or more adaptive skills. This demonstrates that all three prongs of the three prong test were not met in 1968. Thus, Defendant has not met his burden of proving by a preponderance of the evidence that he was mentally retarded before age 18. *Id.* at 307.

### Conclusion

Defendant has failed to prove each prong of the conjunctive three prong test prescribed by the *Lott* Court by a preponderance of the evidence. *Id.* Therefore, Defendant is not mentally retarded, and his Petition to Vacate or Set Aside his death sentence is denied.

(Supp. Appendix to Return of Writ, Doc. No. 40, Vol. X at 51-61.)